# Exhibit 3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------------X

GUZEL GANIEVA,

                           Plaintiff,

                      v.

LEON BLACK,

                         Defendant.

-----------------------------------------------------------------------X

|  |  |
|---|---|
| : | Civil Action |
| : | No.:155262/2021 |
| : | **AMENDED COMPLAINT** |
| : | **Jury Trial Demanded** |

Plaintiff Guzel Ganieva ("Plaintiff") brings this Amended Complaint against Defendant

Leon Black ("Black" or "Defendant"), and hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      On April 8, 2021, Bloomberg published an article that contained the following

statements by Defendant Leon Black about Plaintiff Guzel Ganieva:

> "I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago," Black said in the statement Thursday. "Any allegation of harassment or any other inappropriate behavior towards her is completely fabricated. **The truth is that I have been extorted by Ms. Ganieva for many years and I made substantial monetary payments to her, based on her threats to go public concerning our relationship**, in an attempt to spare my family from public embarrassment."
>
> Black had previously planned to step down by the end of July as CEO of the firm he co-founded. He said that, on advice from his counsel, he asked criminal authorities several weeks ago to investigate Ganieva.[1]

2.      Everything that Black said in the above statement about Ms. Ganieva is false. First,

---

[1]     Gillian Tan, *Black Says He Paid to Hide Affair, Denies It Led to Apollo Exit*, Bloomberg, (April 8, 2021, 10:04 PM), https://www.bloomberg.com/news/articles/2021-04-09/black-says-he-paid-to-hide-affair-denies-it-led-to-apollo-exit, (emphasis added).

1

Black did not have "a consensual affair" with Ms. Ganieva. Second, any telling of "harassment" or "inappropriate behavior" by Black towards Ms. Ganieva is not fabricated. As described below, such words do not come close to the appalling forced sexual misconduct that Black inflicted on her. Third, Black has never been "extorted by Ms. Ganieva," much less for "many years." Disgustingly, he used his extreme power and wealth to coerce her into signing a non-disclosure agreement ("NDA") in October 2015 precisely because he knew what he had done to her was shocking, evil and exposed him to potential criminal charges.

3.      The only repeated threats for many years came from Black to Ms. Ganieva that if she did not sign the NDA, take his hush money and retreat into silence forever, she would feel the brunt of his true wrath. He said many times to her:

**"If you do not take the money, I will put you in prison."**

**"If you do not take the money, I will destroy your life."**

4.      Fourth, Ms. Ganieva never "threatened to go public" about Black regarding anything. As the people within Black's inner circle know, the suggestion that Black attempted to spare his family public embarrassment about their involvement is ridiculous.

5.      For years, Black ate countless meals with Ms. Ganieva in 5-star restaurants, took her to Broadway shows, numerous art shows, museum exhibitions, private parties, the movies, including the premier of The King's Speech and even sat beside her while he cheered for the New York Knicks at MSG. In the midst of all these very public outings, Black never once worried about sparing his family from public embarrassment.[2] In fact, he never worried about people associating

---

[2]      Nor did he care about being seen out with other young women, often of Russian descent, in addition to Ms. Ganieva.

him with Ms. Ganieva because he enjoyed being seen with her in public. What Black has worried about, however, is being exposed for the sadist that he is.

6.      On October 29, 2020 during an earnings call, in connection with his announcements about his future role at Apollo Global Management ("Apollo"), Black publicly stated:

> "**There has never been an allegation by anyone that I engaged in any wrongdoing, because I did not.**"

7.      This and similar subsequent false claims by Black, including his January 25, 2021 statement in connection with his "retirement" as CEO of Apollo in which he stated, "I did not engage in any wrongdoing or inappropriate conduct" in relation to Jeffrey Epstein, served as the tipping point for Ms. Ganieva. Having recently educated herself in law school and knowing that many of Black's sexual acts were against her will and without her consent, she no longer was willing to stand by and allow him to escape accountability.

8.      Knowing that her public outing of his disgusting conduct would surely end any further monetary payments from Black, *i.e.*, his "hush money," she did so regardless.

9.      On March 17, 2021, Ms. Ganieva bravely posted on Twitter that Black was a "predator" that had "sexually harassed and abused" her for years. The next morning, Black texted Ms. Ganieva to call him immediately. She refused.

10.     Knowing that he could no longer control her into silence, Black resorted to a tact that has been used by wealthy and powerful men like him who had committed sexual misconduct – he made a preemptive claim of extortion.[3]

---

[3]     Too many examples exist to include here of wealthy male sexual harassers re-victimizing their victims by accusing these women of extortion after they came forward. A number of high profile examples, some of whom also have close ties to Black as described below, are detailed *infra* at ¶ 232. Threats of extortion are potentially far more damaging and frightening to a female accuser

3

11.     By making a baseless or manufactured "extortion" claim, the female accuser is victimized one more time in a public way, often including threats of criminal charges.  As demonstrated by Black, this is accomplished by his going to the "criminal authorities" to accuse Ms. Ganieva of extortion and placing her on the legal defensive before she can take any legal action against him – just in case she planned on or considered doing so.

12.     Although heinous and disgusting, Ms. Ganieva had been threatened by Black for years that if she disobeyed him, he would **"put her in prison,"** and to speak out would be **"suicide."**

13.     For too long, wealthy and powerful men like Black have enjoyed an unequal and grossly imbalanced access to justice unavailable to the average man or woman and non-millionaires.  Knowing the right lawyers and politicians provided Black with the ability to do exactly as he said:

**"Ask criminal authorities to investigate Ganieva."**

14.     Threatening that a criminal charge will be brought against Ms. Ganieva first will not save Black from the truth about what he has done.  Nor will she be deterred by any baseless, retaliatory and unlawful counterclaims that have been asserted against her in this action, despite the immense potential liability and risks these claims could mean.  As chronicled below, the truth will reveal a violent, abusive, predatory, vindictive and brutal side to Black that he has shielded from public view for decades.

15.     Black defamed Ms. Ganieva by making the above statements.

**<u>JURISDICTION AND VENUE</u>**

---

than threats of a civil lawsuit for defamation, an option that numerous men accused of sexual misconduct use for similar reasons.

4

16.     The Court has personal jurisdiction pursuant to Civil Practice Law and Rules ("CPLR") § 301, *inter alia*, because Plaintiff and Defendant reside in New York.

17.     Venue is proper in this County pursuant to CPLR § 503 because a substantial part of the events giving rise to Plaintiff's claims took place in New York County.

**PARTIES**

18.     Plaintiff Guzel Ganieva resides in the state of New York, New York County.

19.     Defendant Leon Black resides in the state of New York, New York County.

**FACTUAL ALLEGATIONS**

I.     **Leon Black's Orchestrated Secrecy of His Sexual Violence and Deviance**

20.     Like a master chess player, Black was many moves ahead of Ms. Ganieva from the moment he met her. Black picked Ms. Ganieva out of a crowd on March 8, 2008, while attending an International Women's Day event held at Donald Engel's UES home.[4] Ms. Ganieva was invited by a woman who she knew through modeling. This woman also knew Black. The event included Russian musicians and a number of other Russian-speaking guests, including other models.

21.     A single mother in her early twenties (she was 25), having moved from Russia to the United States by herself, it was easy work for Black to convince Ms. Ganieva to dine with him at La Grenouille where he planned to tell her how he could help her with her "future."

22.     This is exactly what Black did.

23.     It was a choreographed plan that allowed him to quickly gain Ms. Ganieva's trust.

---

[4]     Donald Engel knew Black from Drexel Burnham. It has been alleged that it was Donald Engel who arranged for the beautiful "girls" to be present at the infamous annual Drexel Burnham conferences that came to be known as "the predators' ball." Linette Lopez, *Here's What Happened When I Went To Vegas With 1,800 Hedge Fund Managers*, (May 22, 2014), https://www.businessinsider.com/what-hedge-fund-managers-do-in-vegas-2014-5.

5

Common sense suggests that he had used this tactic before, and in fact, Ms. Ganieva later met at least two other women that were similarly involved with Black. Over the course of several dinners, Black repeatedly praised Ms. Ganieva on her innate talent and intellect, "arranged" a few appointments for her, for example, one with the Creative Artists Agency, LLC ("CAA") in Los Angeles. These efforts helped him quickly gain her gratitude and admiration.

24.     Ms. Ganieva was pleased that a successful businessman that she admired found her conversation and company enjoyable. As the person in charge of thousands of employees, Ms. Ganieva believed Black understood the value and importance of reliable, secure employment, and intended to help her move beyond simply modeling. Naïvely, Ms. Ganieva believed that Black was not interested in her sexually, particularly because she told him that their relationship would not be sexual.

25.     It was her intention and hope that Black would serve as a mentor to her professionally.

26.     Black, however, is a ruthless planner and a man that gets what he wants. It was not long before he managed to secure his ability to get Ms. Ganieva alone with him, out of sight from the public or his own employees.

27.     Once he did, Black forced sadistic sexual acts on her, some of which are described below, without her consent and despite her saying "no."

28.     The first time it happened, in 2008, Black took Ms. Ganieva to a studio apartment with a mattress on the floor and no other furniture. Black said that a young woman lived there. Humiliated and in shock, Ms. Ganieva never uttered a word about what he had done to her.

29.     In a sad but predictable pattern, for the next several years Ms. Ganieva endured a cycle of intimidation, abuse and humiliation by Black that on numerous occasions included forced

sexual conduct against her will.  As described below, many of these instances were perpetrated by Black in order for him to indulge in sadistic sexual acts that were physically painful to Ms. Ganieva and to which she never consented.  In addition to causing intentional physical pain, Black engaged in these acts because he derived pleasure from humiliating and debasing Ms. Ganieva.

30.     After these acts of violence, Ms. Ganieva would tell Black to never speak to her or contact her again.  Inevitably, after waiting weeks and sometimes several months, being a master manipulator, Black would engage in remorseful and conciliatory behavior, relentlessly – until he could induce her to meet him again.

31.     Black's persuasion tactics included endless promises in line with the mentor that she wanted him to be for her, such as: to help with Ms. Ganieva's child's educational opportunities; to finance a movie for her that she could produce or direct, after convincing her that acting was too difficult a business; to purchase a townhouse and turn it into an art museum that Ms. Ganieva could manage or be a director of; and to help her with an application to Harvard Business School because of his strong relationships there.  She believed his promises, and in fact, she was aware that Black had purchased an art gallery and hired another woman that he had been sexually involved with to run the gallery.

32.     Even during these periods of overt remorseful and conciliatory behavior, Black nevertheless engaged in textbook harasser conduct.  Specific details about each instance of Black's derogatory and controlling conduct towards Ms. Ganieva are too much to include in this Amended Complaint, but by way of example only, included such things as:

- Ubiquitous, constant belittling;

- Falsely accusing her of being jealous to deflect from his own hideous conduct;

7

- Pretending not to listen to or understand Ms. Ganieva when she said something he did not like, especially when it involved her attempts at cutting off communication;

- Forcing her to walk behind him;

- Forcing her to wait for his permission to speak;

- Punishing her by yelling and screaming if she did not speak to him "nicely";

- Insisting that she speak to him in a pleasing, pleasant or otherwise "happy" and "nice" manner and yelling at her if she failed to do so;

- Insisting that her text messages also be sufficiently pleasant;

- Criticizing her appearance by saying she needed to lose weight or improve certain parts of her body;

- Criticizing her clothing and make-up;

- Berating her for refusing to agree to threesomes with other women and Black;

- Intentionally making her feel stupid and inferior to him; and

- Physically intimidating her by such acts as clenching his fists, pounding nearby pieces of furniture, repetitive cracking of his knuckles and otherwise using his formidable 6'5" and 300+ pound body to intimidate her.

## II.    **Black's Violent Sexual Acts Against Ms. Ganieva**

33.    Black, the powerful and ruthless Wall Street titan, was also ruthless and overpowering in his sexual conquests.

34.    Unfortunately for Ms. Ganieva, during many, but not all, of her sexual experiences with Black, he [REDACTED] on Ms. Ganieva in order to achieve sexual arousal and gratification.

8

35.     Ms. Ganieva made it known to Black that she did not consent to his abnormal and atypical behaviors.  Black knew she did not consent.

36.     REDACTED

37.     REDACTED

38.     REDACTED

39.     The first time Black did this, Ms. Ganieva had no idea what was happening – REDACTED

40.     On some occasions, the pain was so extreme that Ms. Ganieva believes she lost consciousness or fainted.

41.     This practice of physically hurting her, REDACTED was something from which Black derived pleasure and arousal, and knew caused Ms. Ganieva pain and distress.

9

42. REDACTED

43. REDACTED

44. REDACTED

45.     Black, because of his abnormal and atypical sexual needs, was extremely concerned about keeping this information secret.  At the same time, Black's violent sexual behavior was a powerful way for him to exert complete physical, mental and emotional control over Ms. Ganieva and her body.

46.     At all times, Ms. Ganieva constantly feared Black.  When they were alone, she feared him physically and was unable to reject his sexual advances, too afraid to anger him or cause his temper to flare.  There were times when Ms. Ganieva physically submitted to his physical force without saying anything, afraid he would seriously hurt her.

47.     She experienced fear mentally and emotionally even when not in his physical presence.  She was always worried that she was not doing things exactly the way Black wanted her to do them.  By way of example only, Black had strong opinions about everything she did – from the way she spoke to him, to her tone of voice and what she said, to where she went on vacation, and what jobs she applied for.  In her experience, upsetting him was dangerous and she did her best to avoid it.

48. REDACTED

10

REDACTED

49.     The fear was exhausting but Ms. Ganieva felt she could not disobey Black for fear of her physical safety.

**III.     Leon Black's Public Statements About His Relationship with Jeffrey Epstein**

50.     There has been, and remains, much mystery surrounding the infamous Jeffrey Epstein ("Epstein"), and just how he became an ultra-wealthy and powerfully connected person.

51.     Indeed, Epstein had a modest upbringing in Coney Island, New York, did not complete college, and first worked as a high school math teacher in Manhattan.  Nonetheless, he somehow rose to become an extremely wealthy person, with properties all over the world, including a seven-story townhouse in the Upper East Side, a private island in the United States Virgin Islands, a massive home in ritzy Palm Beach, Florida, and his own compound in New Mexico that he was allegedly building into its own city.

52.     Not only was he wealthy, but Epstein is believed to have had close personal ties to some of the world's most powerful politicians, businessmen, and celebrity figures, including, but not limited to, former Presidents Bill Clinton and Donald Trump, Prince Andrew, Duke of York, billionaire businessman Les Wexner, and countless others.

53.     Mystery has also surrounded how Epstein received only a mild "slap on the wrist" despite operating an alleged sophisticated sex trafficking ring in Palm Beach, Florida.  Numerous young women had come forward and accused him of engaging in sex acts with them while they were minors.  Epstein ultimately pled guilty in 2008 to just one count of soliciting an underage

11

Case 1:21-cv-08824 Document 1-3 Filed 10/28/21 Page 13 of 59

prostitute, and ultimately spent 13 months out of an 18-month sentence in the Palm Beach County Stockade.

54.     After renewed public outcry concerning Epstein's heinous conduct and the sweetheart prosecution deal he received in 2008, Epstein was arrested again on July 6, 2019, when his private jet landed in New Jersey's Teterboro airport.  Manhattan federal prosecutors charged Epstein with sex trafficking and conspiracy to commit sex trafficking.

55.     Following Epstein's arrest, Leon Black told Apollo investors (Apollo is the publicly traded hedge fund with over $400 billion in assets under management founded by Black where he served as then-Chairman and Chief Executive Officer ("CEO")), during a July 31, 2019 earnings call that he **"was completely unaware of and [was] deeply troubled by the conduct** that is now the subject of the federal criminal charges brought against [Epstein]." (emphasis added).

56.     On August 10, 2019, after he was denied bail, Epstein was found dead in his jail cell in the Manhattan Correctional Center.  New York's Chief Medical Examiner determined that Epstein committed suicide by hanging.

57.     Then, on October 12, 2020, the *New York Times* published an article[5] revealing that Black, one of the world's wealthiest persons with a net worth estimated at close to $10 billion, had paid Epstein tens of millions of dollars *after* Epstein's 2008 conviction.

58.     In response, Black, in an October 12, 2020, letter to Apollo's Limited Partners, stated again that:

---

[5]     Matthew Goldstein, Steve Eder and David Enrich, *The Billionaire Who Stood by Jeffrey Epstein,* (Oct. 12, 2020), https://www.nytimes.com/2020/10/12/business/leon-black-jeffrey-epstein.html.

12

"I was completely unaware of, and continue to be appalled by, the reprehensible conduct that surfaced at the end of 2018 and led to the federal criminal charges brought against Epstein."

"There has never been an allegation by anyone, including the *New York Times,* that I engaged in any wrongdoing or inappropriate conduct."

59.    Later that month, during an October 29, 2020, earnings call ("October 2020 earnings call"), Black reiterated that:

"there has never been an allegation by anyone that I engaged in any wrongdoing, because I did not.  And any suggestion of blackmail or any other connection to Epstein's reprehensible conduct is categorically untrue."[6]

60.    Black also said:

**"Had I known any of the facts about Epstein's sickening and repulsive conduct, <u>which I learned in late 2018, more than a year after I stopped working with them</u>, I never would have had anything to do with him."**  (emphasis added)

61.    Following the October 12, 2020 *New York Times* article, Apollo hired the law firm of Dechert LLP ("Dechert") to "investigate" Epstein's ties to Black and to Apollo.

62.    Dechert was also tasked with creating a report to submit to the Securities and Exchange Commission ("SEC") (the "Report").

63.    On or around January 22, 2021, Dechert released its Report[7] which recounted Black's claim that, while he was aware of Epstein's 2008 guilty plea, he "understood from Epstein that these offenses arose from *a single instance* in which Epstein had received a *massage* from a

---

[6]    A full transcript of the call and Black's prepared remarks is available here: https://www.fool.com/earnings/call-transcripts/2020/10/30/apollo-global-management-llc-apo-q3-2020-earnings/.

[7]    https://www.sec.gov/Archives/edgar/data/1411494/000119312521016405/d118102dex99 1.htm ("Exhibit 99.1").

13

17-year-old *prostitute*." (Report at 6, emphasis added). Of course, it was widely reported that Epstein had had sex with *countless* underaged girls, and not merely a massage on one occasion from a *prostitute*.

64. Black claimed to Dechert that, as a result of what Epstein supposedly told him about the nature of his conviction, he thought it would "not be inappropriate to maintain a personal and professional relationship with Epstein" because: (i) Black believed Epstein had made a single "mistak[e]"; (ii) "numerous prominent figures" "continued to maintain social and business relationships with Epstein"; and (iii) because Black "believes in rehabilitation, and in giving people second chances," while "name-dropping" his relationships with Michael Milken and Martha Stewart. *Id.*

65. Black admitted to Dechert that, up until the fall of 2018, he maintained a relationship with Epstein, whom he viewed "as a friend worthy of trust" that he confided on personal matters, attended social events with, and introduced to his family. *Id.* at 7.

66. While Black admitted that he knew Epstein had "eclectic tastes" and "often *employed* attractive women," he claimed he did not believe that any of the women in Epstein's *employ* were underage," and was "repulsed" by the details of Epstein's crimes. *Id.* at 8 (emphasis added).

67. Throughout Dechert's *Alice in Wonderland* narrative, the Report repeatedly (and conveniently) emphasizes that between the years 2008-2010, "**Black had no client relationship with Epstein at the time.**" *Id.* at 6.

68. The Report further revealed that Black paid Epstein, between 2012 and 2017, a total of **$158 million** (*id.* at 4), which Black claimed were payments made to compensate Epstein — who possessed neither a college degree, nor any advanced degrees related to tax advisement or

14

estate planning — "for the overall value he believed Epstein was providing to him through Epstein's advice on trust and estate planning, tax issues, philanthropic issues, and the operation of [Black's] Family [wealth management] Office." *Id.* at 17.

69.    Despite taking on the appearance of a legitimate independent investigation, as Dechert must admit, any "conclusions" contained in the Report were based on nothing more than voluntary statements provided by willing participants, who likely prepared heavily with counsel about what they said and produced to Dechert, and may have even had counsel present when they spoke to Dechert.  Nobody testified under oath or provided sworn statements under the penalty of perjury, and it is unclear what access, if any, Dechert had to all relevant documents and evidence.

70.    Further, these "Good Samaritans" who volunteered to speak to Dechert were none other than Black's *posse*, consisting of Paul Weiss lawyers (supposedly the best and brightest legal minds in the world, but who were consistently outshined by Epstein, who could only come up with a $2 billion tax solution for Black), Apollo Global Management partners and associates, and other people with personal, professional and/or financial interests aligned with Black's.

71.    Following the Report, in a January 25, 2021, statement, Black maintained that, "**I was completely unaware of Mr. Epstein's abhorrent misconduct that came to light in late 2018,**" and repeated, "**I did not engage in any wrongdoing or inappropriate conduct.**"

72.    In what can only be described as the epitome of irony, disingenuousness and "trolling" based on how Black horrifically abused Ms. Ganieva and, upon information and belief, other women with whom he has had been involved, Black also stated that:

> "Having reflected at great length on my *professional* relationship with Mr. Epstein, … I have also decided that one way I can begin to address the grievous error of having maintained a *professional* relationship with Mr. Epstein is to pledge $200 million towards initiatives that seek to achieve *gender equality and protect and*

15

*empower women*, including … helping *survivors of domestic violence, sexual assault and human trafficking*." (emphasis added)

73.     Though Black has, conveniently, tried to distance himself from Epstein in the wake of Epstein's death and the revelation of more sordid details about Epstein's criminal affairs, and though Black has tried his best, with the help of a well-crafted public relations and legal team, to make it appear that his and Epstein's relationship was only "professional," in reality, the two had an extremely close personal friendship, and Epstein was Black's **"best friend."**

74.     As detailed below, this relationship regularly delved into nefarious waters, and directly contradicts Black's statements to the public, to investors on the October 2020 earnings call, and to lawyers at Dechert.[8]

## IV.     Black Flies Ms. Ganieva From New York City to Jeffrey Epstein's Home in Palm Beach, Florida While Epstein Was Serving His Prison Sentence in the Palm Beach County Stockade

75.     One morning, in or about mid-to-late October 2008,[9] Black picked up Ms. Ganieva purportedly to take her to lunch. After she got in the car, however, Black told her that they were not going to lunch in Manhattan. Rather, he was taking her on a "trip" to Florida to see a "friend" of Black's.

76.     He refused to tell her where they were going, who they were visiting, or the reason for the visit.

---

[8]     A subpoena has been served on Dechert to obtain statements made by Black and by the voluntary witnesses specific to certain allegations set forth *infra*.

[9]     To identify the precise date, which Ms. Ganieva cannot specifically recall, subpoenas have been served on Teterboro Airport (TEB) for records of Black's flights to Palm Beach International Airport ("PBI") in this period, as well as on PBI for any records about Black's air travel. Additional subpoenas have been served on Fixed Base Operators ("FBO") at PBI for aircraft hangar storage, maintenance, or refueling of the aircraft used for Black's turnaround flight.

16

Case 1:21-cv-08824  Document 1-3  Filed 10/28/21  Page 18 of 59

77.     Black and Ms. Ganieva were driven to Teterboro Airport ("TEB"), located in New Jersey, where he and Ms. Ganieva boarded a small private jet.

78.     Once on the plane, Black finally told Ms. Ganieva where they were going and who they were going to see.  Black told her that they were flying down to Palm Beach to visit his "friend" Jeffrey Epstein.

79.     As referenced to above, earlier that year, on or about June 30, 2008, Epstein pleaded guilty to a felony charge of solicitation of prostitution involving a minor.  After being jailed full-time at Palm Beach County Stockade, at some point approximately three months in, Epstein was permitted to leave the jail on "work release" for up to 12 hours a day, six days a week.

80.     In addition to allegedly going to a work office, Epstein was permitted to spend hours away at "doctor's visits," as well as his Palm Beach home.

81.     Although Epstein pled guilty to one count of soliciting an underage prostitute, by the time he began his jail sentence, news about his sex trafficking ring had been widely reported on for several years.  Additionally, several civil lawsuits had been filed against him.

82.     Evidence strongly suggested that Epstein operated a sophisticated sex trafficking ring which involved minors, including girls as young as 12 and 14, in which he and his associates would recruit and groom underaged and/or economically disadvantaged girls and young women from the West Palm Beach, Florida and other surrounding areas to come over to Epstein's Palm Beach mansion in order to engage in sex acts with him.

83.     Repeatedly during their relationship, Black would confide in Ms. Ganieva, unsolicited, that Epstein was his **"best friend,"** as if it was a badge of honor for him.

17

84.     Notably, based on the timing of Black's trip to Palm Beach, Epstein would have only recently been allowed to leave the jail house on "work release."[10] Of course, whereas Epstein was known to have multiple sexual partners a day, during the three months he could not leave jail, Epstein, conceivably, had less ability to engage in sexual conduct with women.

85.     During the flight to Palm Beach, after Black disclosed where he was taking her, Black sternly warned Ms. Ganieva not to tell anyone that he was flying her down to meet with Epstein.

86.     Disgustingly, Black threatened that he would plant drugs on Ms. Ganieva and frame her for a crime if she did talk about it.

87.     When Ms. Ganieva said that such threats would not work on her, Black doubled down on his threats, acknowledged that planting "minor" drugs on her would probably not be problematic, but said he would frame her with possessing "very serious" drugs that would make her family and son ashamed of her.  Black specifically used heroin as an example of an illicit drug that would be problematic for her if he planted it on her.  Afraid to make him angrier, Ms. Ganieva did not talk back.

88.     It is deeply concerning that Black's scheme to bring Ms. Ganieva to Epstein's home was something he planned, and did do, without her knowledge.  It was wholly without her consent and even worse, by the time he told her, Ms. Ganieva was powerless to do anything about it.  Black's threats to frame her for a "crime," *i.e.*, by planting drugs, such as heroin, on her, is behavior

---

[10]     Epstein's work release began on October 10, 2008.  See DOJ, Office of Professional Responsibility (OPR) Report, November 2020, at 114-115 (investigation into whether prosecutors in the U.S. Attorney's Office for the Southern District of Florida improperly resolved a federal investigation into the criminal conduct of Jeffrey Epstein) ("DOJ Report").  The Palm Beach County Sheriff's office permitted this arrangement, allowing Epstein to work out of an office for a newly formed nonprofit called The Florida Science Foundation.  Id. at 116-117.

18

that falls squarely within the definition of New York Penal Law Section §230.34 "Sex Trafficking" ("a person is guilty of sex trafficking if he or she […] engag[es] in a scheme … by means of instilling fear in the person [of one of eight consequences, including] "accus[ing] some person of a crime or cause criminal charges to be instituted against some person.") N.Y. Pen. L. §230.4(3)(d).

89. After arriving at PBI, a driver affiliated with a car service picked up Ms. Ganieva and Black in a dark car, possibly a Mercedes-Benz manufactured vehicle, and drove them to Epstein's Palm Beach mansion.

90. When Black and Ms. Ganieva arrived at Epstein's home, Ms. Ganieva saw that there was a sheriff's deputy standing outside the door. Under the terms of the "work release" program, a prisoner like Epstein was required to pay for the services of a sheriff's deputy or similar law enforcement officer who would escort and monitor the prisoner while they were on "work release." Black even confirmed to Ms. Ganieva that the man was "a prison guard" hired to escort Epstein to and from his "work release." The deputy smiled sheepishly at Black and Ms. Ganieva as they entered Epstein's home.[11]

91. Black and Ms. Ganieva were greeted by Sarah Kellen ("Kellen"). Ms. Ganieva had never met Kellen before and had no idea who she was.

92. Media reports have described Kellen as a close associate and "lieutenant" of Epstein's. Some reports have described her as one of Epstein's victims, who also happened to

---

[11] It was later disclosed that Epstein paid the Sheriff's office more than $128,000 for off-duty deputies wearing business suits to "guard" Epstein while he was on work release. Additionally, the "office" for the nonprofit at which Epstein allegedly worked turned out to be the office of Jack Goldberger, one of Epstein's defense lawyers. The "supervisor" responsible for monitoring Epstein's work previously had submitted sworn filings with the IRS that Epstein worked one hour per week for no pay. That same supervisor, as part of Epstein's application for work release, represented that Epstein would work six days a week, twelve hours per day. DOJ Report, at 116-117.

Case 1:21-cv-08824 Document 1-3 Filed 10/28/21 Page 21 of 59

work for him.  Kellen is thought to be one of the unindicted co-conspirators in Epstein's sex trafficking ring, shielded from prosecution under Epstein's 2007 "Non-Prosecution Agreement" with the government.

93.     Kellen has also been described as Epstein's "personal assistant," who scheduled and managed the teenage girls and young women who came in and out of Epstein's houses, including collecting contact information, taking messages, arranging travel, and escorting the girls and women to Epstein's room.  Prison records also show that Kellen repeatedly visited Epstein while he was in prison.  Kellen has not been criminally prosecuted for her role in Epstein's sex trafficking ring.[12]

94.     Ms. Ganieva soon found herself alone with Black and Epstein in a room that appeared to be an office.  Black and Epstein were situated close to one another, each facing Ms. Ganieva while in almost supine positions, as if they were waiting for her to get on top of them. Indeed, Black indicated with his eyes that he wanted Ms. Ganieva to come and lay in between him and Epstein.  Alarmed and shocked, Ms. Ganieva remembers standing in front of them unable to

---

[12]     Kellen, however, has been identified, and her alleged conduct described in detail, in numerous civil lawsuits filed against Epstein.  For example, one civil complaint states that, "Epstein's plan and scheme reflected a particular pattern and method.  The underage victim would be brought to Epstein's (Palm Beach) mansion, where she would be introduced to Sarah Kellen, Epstein's assistant.  Ms. Kellen would then bring the girl up a flight of stairs to a bedroom that contained a massage table… [t]he girl would then find herself alone in the room with Epstein, who would be wearing only a towel…Epstein would then perform one or more lewd, lascivious and sexual acts…" *Jane Doe 7 v. Jeffrey Epstein*, Index No. 08-cv-80993 (S. Dist. FL 2008), Dkt. No. 1 (Complaint) at p. 3; *see also Jane Doe No. 1 v. Jeffrey Epstein, et. al*, Index No. 9:08-cv-80804-KAM (S. Dist. FL 2008), Dkt. No. 26 (Opinion and Order Remanding Case to State Court), at p. 3 ("Plaintiff was introduced to Kellen, who led her up the stairs to the room with the massage table…Kellen set up the massage table, laid out the massage oils, told Plaintiff that Epstein would be in shortly, and then left the room.")

say anything while they just stared up at her, saying nothing, but clearly expecting her to *do something*.

95.     As she continued to stand there in silence, Black became visibly annoyed.  He eventually told her to leave the room.

96.     After Black said this, Kellen suddenly appeared and took Ms. Ganieva into what appeared to be a living room.  Kellen first tried to make small talk, and asked Ms. Ganieva for her email address because she wanted to send Ms. Ganieva a good website to shop for clothes.

97.     Kellen then sat Ms. Ganieva down and said, in a serious but soft, feminine tone:

> **"You have to understand that [Jeffrey and Leon] are sex addicts."**
>
> **"You have to let them do whatever they want with you, and you have to let them be with multiple sexual partners if that's what they want."**
>
> **"They are very powerful, and if you don't do what they want you to do, there will be consequences that I do not want for you."**

98.     Kellen again said to her, "***you know***….[pausing] …. something may happen to you," as her voice trailed off.

99.     Although Epstein was on work release, the heightened scrutiny of his behavior and whereabouts made his earlier pattern of cycling in underaged girls from economically disadvantaged homes in West Palm Beach on a daily basis — sometimes three or four girls a day — no longer an option.  Since he was being monitored by law enforcement, he needed to be more discreet, and could not merely enlist his associates to procure for and bring him the same young, often underaged, women that he was accustomed to having sex with.

100.     Although Black knew better than to ever actually say aloud why he brought Ms. Ganieva down there, all the way from New York City to Epstein (without her consent), at the time,

Case 1:21-cv-08824   Document 1-3   Filed 10/28/21   Page 23 of 59

Ms. Ganieva was caught off-guard and too bewildered to appreciate exactly what was happening to her.

101.    Ms. Ganieva was disgusted, and she let Kellen know this.  Ms. Ganieva knew that by not submitting to Epstein, she would cause Epstein and Black to be very upset, and that there would be consequences for her refusal.

102.    Soon thereafter, Black and Epstein came into the room where Ms. Ganieva sat with Kellen.  The four of them sat around a table, with Black on Ms. Ganieva's left, Kellen on her right, and Epstein across from her where he could look directly at her and size her up.  An attempt at awkward conversation was made.  Ms. Ganieva recalls saying something about the financial crisis and remarking about the federal government's bailout of large financial institutions and the impact on jobs.  Black made a comment about a couch he had bought for Ms. Ganieva's apartment.  Epstein asked her a question and creepily referred to her as "love."

103.    Kellen then, in front of the men this time, brought up again her earlier comment about how Black and Epstein are addicted to sex.  This time, in response to the comment, Ms. Ganieva said that sex addiction was like any addiction in that you want to have it more often and with more frequency, but at some point, it will catch up and affect your life.

104.    Ms. Ganieva noticed that her voice was getting louder and she became very self-aware that she was in a precarious situation.  It is no wonder that Black refused to tell her about this planned trip until they were on his aircraft.  Black was bringing her down to Florida without her consent, to satisfy the sex needs of Epstein, his "best friend."

105.    When it became clear that Ms. Ganieva would not be engaging in sex with Epstein, Epstein and Black became angry and upset with Ms. Ganieva.  Not long after, Black and Ms.

22

Ganieva left Epstein's home and went back to PBI. Black was so furious he refused to speak to her.

106. The total visit lasted no more than two hours.

107. Back on the private plane, Ms. Ganieva was silent, still shaken from her encounter with Epstein. Black, visibly angry with Ms. Ganieva and her refusal to submit to Epstein, did not speak to her, but forcibly shoved food into Ms. Ganieva's mouth.

108. While this was the first time Black brought Ms. Ganieva to meet with Epstein, it was not the only time Epstein crept into their relationship.

## V.    **Black's Relationship with Epstein was Used as a Tool to Control Ms. Ganieva**

109. Despite Black's public statements to the contrary, Black would regularly boast about how "great" a friend Epstein was. He would regularly regale Ms. Ganieva with stories about Epstein's New Mexico compound with wonderment and reveal how Epstein flew around "pretty and very young girls" in his private jet, which Black described as "just jaw dropping."

110. In particular, Black appeared most impressed by how Epstein was allegedly creating his own town in New Mexico, which he said meant that Epstein would have "his own schools," be in "control of his own hospitals," and have "his own police force." Black seemed enthralled by the power and authority Epstein was amassing in this town that Epstein envisioned and captivated by how Epstein would effectively be "above the law" there.

111. On one occasion, when Ms. Ganieva asked Black how Epstein makes his money, Black bizarrely told her: "he takes care of the little girls." When Ms. Ganieva gave Black a puzzled look, Black stared into her eyes and repeated that Epstein does take care of "little girls" (using a condescending and suggestive tone), and said he was "doing a great job with it."

23

112.     Ms. Ganieva understood this to mean that Epstein, widely regarded as a master manipulator and "fixer," or someone who makes arrangements for other people, especially of an illicit or devious kind, was providing Black with advice and resources to help manage the women Black was involved in outside of his marriage.  Of course, this included Ms. Ganieva.

113.     Included in the idea of "managing" such affairs, was the implied reference to ensuring that Black's secrets remained secret.

114.     Indeed, on many other occasions, often while Black was texting with Epstein, he would reiterate to Ms. Ganieva how his "**best friends**" were Epstein and Harvey Weinstein, the disgraced Hollywood film producer and convicted sex offender.

115.     Worse, Black would mention that these men were helping him to **"do"** Ms. Ganieva.

116.     When asked what he meant by this, Black said that Epstein and Weinstein gave "very good advice," and knew how to "take care" of problems.

117.     Black also would tell Ms. Ganieva that Epstein and Weinstein were "recording her" and even making a movie about her.  In an effort to veil his threats, Black would chide her and say, "what kind of director do you prefer?"  As always, Ms. Ganieva took his threats seriously.  She believed that if she obeyed Black, he would not make good on his threats.  If she did not, however, there would be consequences.

118.     Such comments were yet another reference to how Epstein, and apparently also Weinstein, provided Black with advice about how to manipulate and control Ms. Ganieva and he other women with whom Black was involved, some of whom are discussed below.

119.     Black also made multiple comments to Ms. Ganieva about Epstein's sexual proclivities, dispelling any notion that Black did not know the true extent of Epstein's depravity.

24

120.    By way of example only, in early 2014, while at a café in New York, Ms. Ganieva criticized Black's friendship with Epstein.  Black rebuked Ms. Ganieva.  Superfluously, he said, "you are too old for [Epstein], he likes them young."  He then added, "he wouldn't be interested in you."

121.    Black once similarly made a comment about a woman with whom he allegedly had been having a sexual relationship.  This woman, Jane Doe 1, was an attractive, Russian-speaking woman, and only a few years older than Ms. Ganieva.  Black referred to Ms. Doe 1 as now being "too old" for him.

122.    Black also told Ms. Ganieva that Epstein had an attraction to ballerinas.  Disgustingly, Black boasted to her that he introduced Epstein to dancers at a ballet company that Black had connections to, and to which Epstein had apparently donated money.  Appalled, Ms. Ganieva never asked for more information.[13]

123.    Black constantly made it a point to remind Ms. Ganieva about how close he was with Epstein, and how well-connected Epstein was to rich and powerful people.  Black wanted her to believe that he was behind her introductions to other powerful men who had ties to Epstein, including Prince Andrew, and the aforementioned Weinstein.

124.    Based on Black's best friend status with Epstein, it is certain that he knew Ghislaine Maxwell ("Maxwell").  Maxwell has been dubbed as Epstein's "madam," and has been charged by the federal government with the crimes of enticement of minors and sex trafficking of underage girls, stemming from her connection to Epstein's sex trafficking ring.  Among other criminal acts,

---

[13]    Years later, it was reported that Epstein preyed on young dancers using the promise of advancing their careers.  Claire Lampen, *Report: Jeffrey Epstein Used NYC Dance Studios As Recruiting Grounds*, (Sept. 3, 2019), https://gothamist.com/news/report-jeffrey-epstein-used-nyc-dance-studios-recruiting-grounds

25

Case 1:21-cv-08824  Document 1-3  Filed 10/28/21  Page 27 of 59

Maxwell has been accused of personally recruiting and grooming underaged girls and young vulnerable women to have sex with Epstein and Epstein's friends.

125.    In the fall of 2013, Ms. Ganieva was approached by Maxwell at a restaurant/lounge. On the day in question, Maxwell aggressively tried to speak with Ms. Ganieva, and told her that she wanted to "**make [Ms. Ganieva] a global citizen**."

126.    Maxwell told Ms. Ganieva that she wanted to "help [her] get a passport" and that she "must call her."  Maxwell then handed Ms. Ganieva her business card.  Ms. Ganieva had no idea who Maxwell was, or that she was connected to Epstein, and thought her behavior was intrusive and bizarre.  Ms. Ganieva never contacted Maxwell.

127.    Upon information and belief, Black had pushed Maxwell on Ms. Ganieva, likely through Epstein, after Ms. Ganieva repeatedly rebuked Black's attempts to "help" Ms. Ganieva with her immigration status, which would have only pulled Ms. Ganieva further within Black's grip and control.

128.    Notably, on multiple occasions, including during the 2015 discussions in which Black pressured Ms. Ganieva into agreeing to a non-disclosure agreement described below, Black threatened Ms. Ganieva against talking about Epstein and Epstein's relationship with Black.

129.    Black would warn that Ms. Ganieva would **"die"** if she ever spoke about Epstein and Epstein's relationship with Black, and that he would pay people to destroy Ms. Ganieva's life if she ever did so.

## VI.    Black's "Conveyor Belt of Women" and the Absurdity of His Extortion Defense

130.    For many reasons, Black's claim that Ms. Ganieva attempted to extort him by threatening to make their relationship publicly known, which allegedly induced him to pay her money, is provably false.

131. Perhaps the biggest flaw in Black's manufactured narrative is that, like Ms. Ganieva, Black made no attempt to keep secret the many women with whom he was involved throughout the years. As he often bragged to Ms. Ganieva, Black had a "**conveyor belt of women**" available to him.

132. Black did not attempt to keep these women hidden from anyone, much less his family. Black openly traveled in social circles, including with Epstein, where men with excessive wealth like him had access to an endless supply of available, single young attractive women. It was no secret among those that know Black that he had a preference for Russian-speaking women, including many like Ms. Ganieva, who were young, had modeling experience, and may have newly arrived in the U.S. and thus did not have an extensive family or support system here.

133. Quite simply, if Black was trying to hide the fact that he was involved with women other than his wife, including young, Russian-speaking models, he did an extremely poor job, particularly for someone who founded and ruthlessly ran a publicly traded global hedge fund with $400 billion in assets under management.

134. Worse, there were occasions where Ms. Ganieva found herself attending the same social functions as Black and his wife. Black made absolutely no effort to keep his wife and Ms. Ganieva away from one another. Black openly pursued Ms. Ganieva at these events in front of his wife. By way of example only, this included an event in the Hamptons that took place in the summer of 2011.

135. In that same summer, Black brought Ms. Ganieva over to his home in the Hamptons and tried to convince her to sleep with him in the house. When Ms. Ganieva asked Black where his wife was, he told her that she was in the "main house." In other words, Black had brought Ms.

Ganieva to his home in order to sleep with her in what was apparently a guest house, all while his wife was next door in the main house.

136. On another occasion, as Black and Ms. Ganieva were either entering or exiting Black's studio apartment located in a building on the southwest corner of 72nd and Park Avenue where they would usually meet, they encountered Black's wife on the street as she was walking towards her car. Black did not act surprised or worried in any way. In fact, there would have been no reason to be surprised given that the apartment in which Black lived with his family was located in a building on the *northwest* corner of 72nd and Park Avenue, *i.e.*, directly across from his studio. Black even brought Ms. Ganieva to the apartment where Black and his family lived.

137. Surely if Black was worried about his wife or family knowing about his relationship with Ms. Ganieva, he would have chosen an apartment slightly farther away from where they all lived to meet Ms. Ganieva.

138. Black even brought Ms. Ganieva to his family's home in Bedford, New York, demonstrating that his relationship with Ms. Ganieva was anything but secretive.

139. Black also openly told Ms. Ganieva about the other women with whom he was involved. Ms. Ganieva even met several of the other women in Black's life.

140. For instance, a Russian woman that Ms. Ganieva knew, Jane Doe 2, had confided in her about problems with a man with whom she was involved. At the time, Ms. Ganieva had yet to meet Black. Ms. Doe 2 confided in Ms. Ganieva that she was "exhausted" by a man with whom she was in a relationship with and could not wait to move on her with life because she could no longer endure him any longer. Ms. Doe 2 kept repeating the words, "**I just cannot**." Ms. Ganieva had no idea that Ms. Doe 2 was referring to Black. Ms. Ganieva thought that Ms. Doe 2 looked fragile, frightened and very jumpy, as if she had suffered from post-traumatic stress disorder.

28

FILED: NEW YORK COUNTY CLERK 08/09/2021 12:42 PM
NYSCEF DOC. NO. 26    Case 1:21-cv-08824   Document 1-3   Filed 10/28/21   Page 30 of 59

INDEX NO. 155262/2021
RECEIVED NYSCEF: 08/09/2021

141.    It was only a few months later that Black told Ms. Ganieva that he had been sexually involved with Ms. Doe 2 "for years."

142.    Ms. Doe 2 told Ms. Ganieva that she was introduced to Black by Epstein.  Ms. Doe 2 further told her that Epstein gave her advice about how to handle her relationship with Black.

143.     Upon information, Ms. Doe 2 was another victim of abuse and misconduct at the hands of Black.

144.    It defies credibility for Black to message to the public that he merely had a "professional" relationship with Epstein when Epstein was introducing Black to single young women with whom Black then became involved in relationships.

145.    Moreover, at the previously mentioned summer 2011 social event at the Hamptons in which Ms. Ganieva encountered Black and his wife, Black was also seen hugging and being affectionate with a Russian woman named Jane Doe 3.  It was obvious that Black was involved with Ms. Doe 3.

146.    Another Russian woman that knew Ms. Ganieva and Ms. Doe 3, told Ms. Ganieva that she should behave more like Ms. Doe 3 when it came to Black, implying that Ms. Doe 3 knew how to "do all the right things" with Black.

147.    Black was clearly not afraid to show affection for another woman in his wife's presence, nor to boast to Ms. Ganieva about his other relationships to make it clear to her that he regarded her as expendable and easily replaceable.

148.    Further, in or about late 2011, early 2012, while Black continued to pursue Ms. Ganieva no matter how many times she tried to end the intimacy and abuse cycle, Black also became sexually involved with another Russian-speaking model, Jane Doe 4, who was even younger than Ms. Ganieva.

Case 1:21-cv-08824   Document 1-3   Filed 10/28/21   Page 31 of 59

149.    Black in no way attempted to hide his sexual relationship with Ms. Doe 4 from Ms. Ganieva, or anyone else.  In fact, one day in the fall of 2012, while Ms. Ganieva was walking on a Manhattan street, she encountered Black walking along with Ms. Doe 4.  No effort to avoid her was made.

150.    Perhaps not shockingly, like Ms. Ganieva, Black paid for Ms. Doe 4 to attend Columbia University.[14]

151.    Ms. Doe 4 would come up to Ms. Ganieva at Columbia and at social events and try to speak with her.  Ms. Ganieva thought it was strange and inappropriate that Ms. Doe 4 did this and tried to avoid her.

152.    Bizarrely, Black moved Ms. Doe 4 into an apartment near where Ms. Ganieva lived, and even bought her a Steinway piano, just as he had for Ms. Ganieva.

153.    Again, Black made no effort to hide his relationship with Ms. Doe 4, but rather openly flaunted it.

---

[14]    Significantly, Black also financed the college tuition for Ms. Doe 2 – at the same time he was doing so for Ms. Doe 4 and Ms. Ganieva.  Black's claim that it was Ms. Ganieva who asked him for money to help with school is false.  Presumably, Black will claim that Ms. Doe 2 and Ms. Doe 4 also were the ones to ask Black for thousands of dollars to fund their education in the U.S. – which provided them the ability to remain in the U.S., despite their lack of citizenship.  Epstein similarly offered to and did in fact foot education costs for numerous young women that he sexually assaulted.  Tara Palmieri, *The Women Who Enabled Jeffrey Epstein*, POLITICO, (May 14, 2021), https://www.politico.com/news/magazine/2021/05/14/jeffrey-epstein-investigation-women-487157, ("In an email to POLITICO, Oh characterized Epstein's offers of tuition and the SoHo studio as tools of his 'prolonged and repeated' sexual abuse."); *New Jeffrey Epstein Accuser Calls on Prince Andrew to Talk*, BBC, (Nov. 19, 2019), https://www.bbc.com/news/world-us-canada-50469409, ("Many of the women's accounts allege they were recruited to give massages to Epstein, with the massages leading to sexual abuse.  Many also include promises made by Epstein to help them with things like college tuition, medical expenses or advancing their careers.")

30

154.    Disgustingly, he would chastise and try to guilt Ms. Ganieva for not having threesomes with him.  Black would compare Ms. Ganieva to Ms. Doe 4, who according to Black, had threesomes with Black.

155.    The above is simply a sampling of Black's "conveyor belt of women."

156.    Like his relationship with Ms. Ganieva, Black took these women to high end restaurants, and attended social events and art exhibits together.  He took them shopping and spent thousands of dollars on them.  There is simply no way that Black was afraid of people seeing him in public with these women.

157.    Importantly, Black financially supported some of these women.  Black would do this in order to hold financial control over these women.  He would offer them a small glimpse at a better life, but only under his terms, and for so long as he could continue to manipulate and control them.  Black purposely made it so that these women became indebted to him, which enabled him to do whatever he wanted to do with or asked of them without fear of them speaking out about his conduct.

158.    In short, Black had no legitimate concern if a woman said publicly that she and Black were involved or otherwise had sexual relations – because he did not try to keep this a secret.

159.    This of course begs the question of what Black was actually concerned about becoming revealed to prompt him to want to silence Ms. Ganieva.

VII.    **Ms. Ganieva Returns to College**

160.    In 2011, Ms. Ganieva enrolled in school to finish her undergraduate degree in math. She hoped that a degree would allow her to find a job outside of modeling.

161.    Ms. Ganieva believed that going to school would occupy more of her time and make her less available to Black.  Other efforts to distance from him included cutting off most of her hair,

believing that Black would find her unattractive. Unfortunately, these efforts had thus far been mostly futile.

162.    As it turned out, Black said that he was in favor of her returning to college, and used the situation to convince Ms. Ganieva to sign a "loan" with Black.

A.    The First $480,000 Loan

163.    One day in 2011, Black told Ms. Ganieva that he had arranged a loan for her. Despite being a financial titan with teams of lawyers at his disposal, Black presented a one-page document to her, set forth below.

164.    As stated, the "loan" included a 5% interest rate and was payable on June 1, 2016.

165.    Of course, such an amount of money was unfathomable to Ms. Ganieva and she protested that she would never be able to pay it back. Financial control – a tried-and true tactic to achieve dominance over another, was a method Black knew intimately and understood would place Ms. Ganieva in his debt forever.



**LOAN AGREEMENT BETWEEN LEON BLACK and GUZEL GANIEVA**

On this day, June 2, 2011, Leon Black ("the Lender") agrees to make a loan of $480,000 ("the principal") to Guzel Ganieva ("the Borrower") on the following terms. The principal amount will be lent over a period of two (2) years, extending over eight (8) intervals of three (3) months each, to be disbursed by bank wire transfer at the beginning of each interval:

| $60,000 | on | June 6, 2011 |
| $60,000 | on | September 1, 2011 |
| $60,000 | on | December 1, 2011 |
| $60,000 | on | March 1, 2012 |
| $60,000 | on | June 1, 2012 |
| $60,000 | on | September 1, 2012 |
| $60,000 | on | December 1, 2012 |
| $60,000 | on | March 1, 2013 |

The principal loan will be repaid in full on June 1, 2016 and will carry a simple interest rate of 5% per annum, also to be repaid on June 1, 2016.

The Lender and Borrower have read and fully understand the terms of this Agreement and hereby consent to such terms in full.

Leon Black                                    Guzel Ganieva

Dated: June 2, 2011

166.    Critically, it would ensure that his criminal and deviant behavior would remain silenced.

B.  The Second $480,000 Loan

167.   Unsurprisingly, Black followed this initial loan with another one just like it in 2013:



LOAN AGREEMENT BETWEEN LEON BLACK and GUZEL GANIEVA

On this day, May 24, 2013 Leon Black ("the Lender") agrees to make a loan of $480,000 ("the principal") to Guzel Ganieva ("the Borrower") on the following terms. The principal amount will be lent over a period of two (2) years, extending over eight (8) intervals of three (3) months each, to be disbursed by bank wire transfer at the beginning of each interval:

| $60,000 | on | June 1, 2013 |
| $60,000 | on | September 1, 2013 |
| $60,000 | on | December 1, 2013 |
| $60,000 | on | March 1, 2014 |
| $60,000 | on | June 1, 2014 |
| $60,000 | on | September 1, 2014 |
| $60,000 | on | December 1, 2014 |
| $60,000 | on | March 1, 2015 |

The principal loan will be repaid in full on June 1, 2018 and will carry a simple interest rate of 5% per annum, also to be repaid on June 1, 2018.

The Lender and Borrower have read and fully understand the terms of this Agreement and hereby consent to such terms in full.

Leon Black                                Guzel Ganieva

Dated: May 24, 2013

168.   The two "loans," and his ability to force repayment of such an amount, allowed Black

34

Case 1:21-cv-08824   Document 1-3   Filed 10/28/21   Page 36 of 59

to exert even greater control over Ms. Ganieva. Black knew the magnitude of the harm that he had inflicted on Ms. Ganieva over the years. This money, at least in his twisted mind, was a way of excusing himself.

169.    After Ms. Ganieva finished her math degree, Black reignited his charade of promises to help her find a job. He convinced her that with all of his powerful Wall Street connections, he would find her a job.

170.    Pathetically, Ms. Ganieva believed all of his promises and pursued leads for jobs arranged by Black for over a year. In hindsight Ms. Ganieva knows that none of these arranged interviews were meant to be legitimate. Rather, it was all part of Black's sick plan to make her feel grateful to him on the one hand, but also allow him to belittle and humiliate her after each job rejection.

171.    Too many examples exist of these sham interviews to detail herein, but Black used his connections at Goldman Sachs and other financial powerhouses to arrange appointments for her. On the surface, such interviews appeared well-meaning, such as this example:

> **From:** Havis, Jenna L. [HCM]
> **Sent:** Wednesday, May 07, 2014 11:33 AM
> **To:** 'Guzel Ganieva'
> **Subject:** RE: Goldman Sachs Interview Opportunity
>
> Hello Guzel,
> Just following up to the voicemail I recently left. Curious if you are available to come onsite this
> **Friday May 9th from 11am to 1:30pm**?
> Please let me know. Thank you, Jenna
>
> On Wednesday, May 7, 2014, Havis, Jenna L.
> <Jenna.Havis@gs.com> wrote:
> Hello Guzel,
> Please see your interview details below:
> **Friday, May 9th, 2014**
> Interviewer Time Details:

35

Dana Bunting 11:00am EST 32/201
*HCM TBD 11:30am EST 32/201*
Pete Lyon & Alison Mass 12:00pm EST 32/201
Julie Silverman 1:00pm EST 32/301
Please keep in mind that all schedules are subject to change. When you arrive to our building at **200 West Street in New York**, our security team will direct you.

172.    As Black knew would happen, Ms. Ganieva never received an offer from any financial company in New York. Desperate for work and falling for Black's claims that he was the only person that could help her, Ms. Ganieva even interviewed for jobs in London and Moscow that Black arranged, including at Goldman Sachs in London and Moscow.

173.    Predictably, Ms. Ganieva was rejected. By way of example only, one such rejection email is as follows:

> On Saturday, November 29, 2014, Lyon, Pete <Pete.Lyon@gs.com> wrote:
> Thanks Guzel…in short, I think we just have to be patient for now…we have explored many options internally and, given the macro environment, there are no open jobs at Goldman Sachs right now that work for/are a fit for you…I also saw Paolo a few weeks ago in NYC and he told me he would keep his eyes open for you in Moscow with clients of his if they have roles/openings that make sense but that there were no immediate openings he was aware of…I wish we had better news but I think we just need to hang tight for now and if something opens that makes sense then Paolo and/or I will be in touch…thanks a lot."

174.    After yet another failed job interview, in desperation, Ms. Ganieva even asked Black

36

if she could work as a receptionist at one of these companies. This idea was rejected by Black. Clearly, Black preferred her instability and dependence. In fact, after yet another failed Goldman Sachs interview, Black said, in a perversely happy manner, that he knew her "world is shitty." Black then used the opportunity to remind her that he is the "only one" who can help her escape her "miserable life."

## VIII. Black Rapes Ms. Ganieva, and Concocts a Scheme to Insulate Himself from Liability and Frame Ms. Ganieva as an Extortionist

175.    Ms. Ganieva always made her objection to sex with Black known. This did not deter Black. He continued to force sex upon Ms. Ganieva even though he knew that it was against her will. As detailed above, that was part of how Black became sexually aroused and derived pleasure.

176.    Black, understandably, was concerned about this specific information becoming public, especially since it had gone on for several years.

177.    In the days leading up to the July 4, 2014 weekend, Ms. Ganieva became sick and was home for a number of days, unable to go to the store or cook for herself. At the time, her child was away at summer camp. On Sunday, July 6, 2014, Black came from the Hamptons to her apartment on East 77th Street. Although Ms. Ganieva did not buzz him through the building entrance, one of her neighbors must have done so, because suddenly he was knocking at her apartment door. When Ms. Ganieva opened the door, Black barged in, pushing her off to the side.

178.    Ms. Ganieva was weak and could barely walk. Disturbingly, when Black realized what a debilitated state she was in, he became happy.

179.    Aware that Black wanted to have sex with her, Ms. Ganieva quickly began protesting that she could not and would not have sex with him. She tried to tell him that she was

in a weakened state, having been sick for almost a week.

180.    Never a match for his physical size and strength, on this day in particular Ms. Ganieva knew what fate was in store.

181.    At over 6'5" and more than 300 pounds, Black had no difficulty dragging Ms. Ganieva into the bedroom and throwing her on her back on the bed.  She was limp and unable to move.

182.    Despite her begging him to leave, he took off her clothes and his own. Inexplicably, he spared Ms. Ganieva the pain of his usual sadistic rituals described in detail above, quickly got on top of her and forced his penis into her vagina against her will.  Disgustingly, when Black was done, as he stood up and put his clothes back on, he angrily said:

**"Now I have fucked you."**

183.    Black then walked out – leaving Ms. Ganieva naked and unable to move on her bed.

184.    Ms. Ganieva was no match for the cunning and masterful manipulation of Black or his repeated and unwanted sexual conduct.

185.    Perhaps after coming to the realization that he had "gone too far" this time when he raped Ms. Ganieva on July 6, 2014, Black "huddled up" again with his legal team – some of whom, upon information and belief, also served as Epstein's lawyers – to come up with a scheme to insulate Black from criminal liability for his actions towards Ms. Ganieva.

186.    The plan was to manufacture evidence that would counter the narrative that Black forced himself onto Ms. Ganieva, and to paint Ms. Ganieva as an extortionist if she ever gained the courage to report his vile behavior.

187.    Soon after the rape, knowing that Ms. Ganieva wanted to leave New York City, Black told her he was going to give her extra money to make this happen, suggesting it would be a

38

substantial amount. As anyone would be, and as Black knew she would be, Ms. Ganieva was extremely grateful and appreciative, as she had been wanting to leave with her son. As part of this substantial gift of money, he commanded her to send him text messages saying that she loved him. When Ms. Ganieva spoke to a close family member about Black's promise of money, she mentioned his order that she had to send texts like this. At the time, not knowing his nefarious plans, it seemed odd but not worrisome, as Black had always insisted that Ms. Ganieva be affectionate when she messaged him.

188.    Of course, beneath this facade was the reality that Black had, in fact, been physically, sexually and emotionally abusive towards Ms. Ganieva for years.

189.    Bank records confirm that Black deposited a payment of $500,000 into Ms. Ganieva's bank account on July 30, 2014. Not long after, another deposit in excess of $150,000 was made by Black.

190.    Then, in 2015, after Ms. Ganieva returned to the U.S. from Russia, the second leg of Black's plan – to frame Ms. Ganieva as an extortionist – went into motion.

191.    Following the July 2014 rape, Ms. Ganieva took her son and left New York to physically distance herself from Black. Unfortunately, she was unable to fully escape his influence as it seemed that no matter where she traveled, inevitably, she happened to meet someone that knew Black, including people that worked with Black at Apollo, and Black managed to always know where she was and what she was doing.

192.    In this regard, Black often called Ms. Ganieva to tell her than he knew that she had been at a certain event the night before, knew with whom she had been, even what she wore.

193.    No matter the physical distance between them, Ms. Ganieva never stopped feeling threatened by Black and his power and control over her. Of course, this was precisely what he

wanted.

194.    It was no surprise to Black that when Ms. Ganieva was back in New York City in 2015, she asked to meet him.  Ms. Ganieva wanted to know what she could do to be able to live her life without his continued involvement.  Having planned for years about how to silence Ms. Ganieva from revealing what he had done, Black was prepared to speak with her, especially knowing that her two "loans" were coming due, and that she of course did not have one million dollars to repay him.

195.    Black claims that he surreptitiously recorded select conversations with Ms. Ganieva. It remains to be seen which specific conversations (and which parts thereof) were and were not recorded.

196.    Black knew that he had violently and viciously raped Ms. Ganieva in July 2014, and that he had physically, mentally and emotionally abused her for years.

197.    During their conversations, Black would speak about how she, Ms. Ganieva, could "harm him" if she "spoke about our relationship."  Black would also say, "I want to provide for you for the rest of your life.  What is your number?  How much do you need to be taken care of?"

198.    Feeling pressured to respond, Ms. Ganieva blurted out a number.  This made Black happy.  Clearly, the "fix" was in, and Black was giddy about Ms. Ganieva having "taken the bait."

199.    Black and Ms. Ganieva met a few additional times in 2015.  During some meetings, Black would scream, "I want to give you money… Say that you are blackmailing me."  Black offered to make regular payments to Ms. Ganieva over a period of years so long as she agreed to meet with his lawyers and sign a document.

200.    Ms. Ganieva told Black that she did not want to receive regular payments from him and would not meet with his lawyers or sign any documents.  Ms. Ganieva did not want to be bound

40

to Black, and simply wanted to move on with her life and try to forget what Black had done to her. Ms. Ganieva made it clear that all she wanted was for Black's harassment of and control over her to stop, and for her remaining loan obligations to be forgiven since, as Black was well aware, she was in no financial position to repay them.

201.    Black was relentless. Black urged Ms. Ganieva to take money he was offering her in exchange for nothing "horrible" to happen to her or her child.

202.    Simply put, it was never an actual offer because refusing Black was not an option. He reminded Ms. Ganieva that if she did not take the "deal," *i.e.*, his hush money, he would make sure she ended up **"in prison"** or he would **"destroy her life."**

203.    Black also attempted to goad Ms. Ganieva into speaking about who and when people connected with Black had harassed her. Ms. Ganieva repeated stories about people she had encountered who claimed to or appeared to know Black, and how some of them had mistreated her. Black sought to extract more and more details about some of these incidents. This was all of course a ploy on Black's part to make Ms. Ganieva seem paranoid (and he would become elated and giggle when Ms. Ganieva said something that he thought made her seem so), in support of his quest to frame Ms. Ganieva for extortion, all coming to light now.

204.    Black eventually told Ms. Ganieva that he would pay her $100,000 every month and a certain sum of money to help with her immigration status, but only if she agreed to make it seem like it was *her* idea that Black pay her substantial sums of money in exchange for her silence.

205.    Black told Ms. Ganieva that she would receive continuing payments for as long as she kept her mouth shut about all the things Black had done and said to her, as well as what she knew about Black's relationship to Epstein. Black threatened Ms. Ganieva's safety if she did not agree to this arrangement.

41

206.     Eventually, after friends of Ms. Ganieva pressured her into agreeing to Black's proposal for fear of what he would do to her if she refused, Ms. Ganieva reached out to Black, told him she did not want to fight with him any further, and would accept his money.

207.     Black then set up one last meeting at the Four Seasons restaurant on October 18, 2015, where he presented Ms. Ganieva with a one-page document.

208.     Ms. Ganieva was nervous and had difficulty understanding what it said.   She understood that it involved confidentiality -- what she later learned is referred to as a nondisclosure agreement ("NDA").

209.     Black "agreed" to allegedly forgive her loans.

210.     As to the other terms, she only read them once, quickly, and is unsure what other language is included in the document.

211.     There was no space on the document for Black to sign; only Ms. Ganieva.

212.     After she signed, he handed her another piece of paper which looked to be a copy of what she just signed.   He ordered her to sign this also.

213.     He then said to her:

**"[I will be paying you] as long as you keep your mouth shut."**

214.     Black refused to give her a copy.   He left with the documents.[15]

215.     While Ms. Ganieva desperately wanted to get out of there, Black forced her to wait while a dessert that took over 20 minutes to prepare came out.

---

[15]     There is no way for Ms. Ganieva to be sure that the language in the second piece of paper matches the language in the first document.   Although it appeared to be the same, to this day she cannot be sure what either document contains.

42

216.    While Black apparently made recordings of their conversations that he claims support his version of what happened, in reality, it was Black who was heavy-handedly trying to force Ms. Ganieva to keep silent about his years-long sexual, mental and emotional abuse in exchange for hush money.

217.    From that time until April 2021, Ms. Ganieva received regular payments from Black, via wire from an account called "E Trust."

218.    Prior to November 2015, whenever Black transferred money into her account, her bank statement recorded the funds as from "Leon D. Black," or "J. Black Trust Account."  Ms. Ganieva has no knowledge as to why payments began from the "E Trust," where the money from it originated, and why it was called "E Trust."

219.    Over the years, Ms. Ganieva asked Black numerous times to obtain a copy of what she signed that day.  He refused to respond.  By way of example only, in 2019 she wrote to him:

Mon, Oct 15, 10:06 AM

Hi. I would like to have a copy of the NDA I signed. Can you please email it to me to ▓▓▓▓▓▓▓▓▓? Thank you.

Tue, Oct 16, 12:59 PM

Leon. You sexually harassed me, sex trafficked me, raped me, and eventually blacklisted me. I don't know for how much longer it will take me, on my own, to process the pain your caused to me and my family. The least thing you can do is to give me that document that I was forced to sign under duress and wasn't able to read before signing. Unfortunately I am still tied to you...

220. Ms. Ganieva even retained legal counsel to demand that she receive a copy of the document. Her lawyer's February 18, 2020 and March 6, 2020 letters to Black remain unanswered.

221. To this day, only Black has the NDA documents.

## IX. Black Says Publicly that He Has Never Committed Any Act of Misconduct

222. On October 29, 2020, during an earnings call, in connection with his announcements about his future role at Apollo Management, Black publicly stated that:

> "There has never been an allegation by anyone that I engaged in any wrongdoing, because I did not."

223. This false proclamation, and similar ones shortly thereafter, including in his above-

44

Case 1:21-cv-08824 Document 1-3 Filed 10/28/21 Page 46 of 59

mentioned January 25, 2021 "retirement" announcement, of Black's character and representation of his clean hands deeply upset Ms. Ganieva. Black knew what he had done to her, and that Ms. Ganieva considered many of his sexual acts to have been against her will and consent.

224. Having enrolled in law school, Ms. Ganieva had a greater understanding of what Black had done to her physically and what he had coerced her into signing in connection with the non-produced confidentiality agreement.

225. Knowing that Black was the one who had committed unlawful acts on her and likely other vulnerable women, and despite the threats he made to her to coerce her into signing, or knowing that whatever money she received from the mysterious E Trust may cease, Ms. Ganieva finally had the courage to say what her experience with Black had been.

45

226.    On March 17, 2021, Ms. Ganieva posted on Twitter the following:



227.    Thereafter, on April 8, 2021, Bloomberg published an article containing the

following statement by Black:

> "I foolishly had a consensual affair with Ms. Ganieva that ended
> more than seven years ago," Black said in the statement Thursday.
> "Any allegation of harassment or any other inappropriate behavior
> towards her is completely fabricated. The truth is that I have been
> extorted by Ms. Ganieva for many years and I made substantial
> monetary payments to her, based on her threats to go public
> concerning our relationship, in an attempt to spare my family from
> public embarrassment."

> Black had previously planned to step down by the end of July as
> CEO of the firm he co-founded. He said that, on advice from his

46

counsel, he asked criminal authorities several weeks ago to investigate Ganieva.[16]

228.    This statement was reprinted in countless publications.[17]

229.    For all of the reasons detailed above, everything Black said in the above statement

about Ms. Ganieva is false.[18]

230.    Black's statement published on April 8, 2021 was made with malice.

231.    Black knew that he issued a false statement of facts to Bloomberg or made the

---

[16]    Gillian Tan, *Black Says He Paid to Hide Affair, Denies It Led to Apollo Exit*, Bloomberg, (April 8, 2021, 10:04 PM), https://www.bloomberg.com/news/articles/2021-04-09/black-says-he-paid-to-hide-affair-denies-it-led-to-apollo-exit.

[17]    Josh Kosman, *Robert Kraft resigns from Apollo board amid Epstein controversy*, the New York Post, (April 12, 2021, 2:09 PM), https://nypost.com/2021/04/12/robert-kraft-resigns-from-apollo-board-amid-epstein-controversy/.

> In a statement to The Post, Black acknowledged that he knew Ganieva, but denied that he acted inappropriately toward her. "I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago," Black said in his statement. "Any allegation of harassment or any other inappropriate behavior towards her is completely fabricated." He also denied that her allegations influenced his decision to step away from the company faster than planned. In January, Black had signaled he would stay on as chairman after stepping down as CEO on July 31."This is entirely a personal matter; this matter has nothing to do with Apollo or my decision to step away from the firm." Black added that he believes he was being "extorted" by Ganieva because he had allegedly "made substantial monetary payments to her, based on her threats to go public concerning our relationship, in an attempt to spare my family from public embarrassment." The billionaire said he has referred the matter to "the criminal authorities" at the recommendation of his counsel and welcomes "a thorough investigation."

[18]    On April 12, 2021, the New York Post published yet another article, stating that, "[a]s exclusively reported by The Post last week, Black's unexpected exit on March 22 came just days after several directors on the private-equity giant's board learned of accusations of sexual harassment against him by a woman **he claimed was trying to shake him down over a 'consensual affair.'**" (emphasis added).

47

statement intending it be published with reckless disregard for the truth.

232.    Black's decision to falsely state that Ms. Ganieva extorted him "for years" is right

from the playbook of scores of wealthy and powerful men, a number of whom have ties to Black,

who have faced similar accusations.  Just a fraction of such examples are below:

- Harvey Weinstein alleged that Ambra Gutierrez fabricated claims of sexual assault in an attempt to blackmail him into a movie role.[19]

- Bill O'Reilly and Fox News preemptively sued producer Andrea Mackris for extortion after she came forward with sexual harassment allegations.[20]

- Paul Haggis accused Christine Lepera of extortion following her allegations that he raped her.[21]

- Alan Dershowitz sued Virginia Giuffre for defamation following her claims of sexual assault, claiming that she made the claims in part to **"extort private settlements from other, wealthier individuals associated with [Jeffrey] Epstein."**[22]

---

[19]    Kyle Munzenrieder, *How Tabloids Dragged Ambra Gutierrez Through the Mud After She Accused Harvey Weinstein of Groping Her*, W Magazine, (October 10, 2017), https://www.wmagazine.com/story/harvey-weinstein-ambra-gutierrez-page-six-daily-mail-smear-campaign.

[20]    Anna North, *Men like Bill O'Reilly get to make a comeback. Women who speak up about harassment lose their jobs*, Vox, (May 16, 2018, 12:30 PM), https://www.vox.com/identities/2018/5/16/17360334/bill-oreilly-returning-sexual-harassment-fox-news-back-accusers-metoo-me-too-movement.

[21]    *Post-Weinstein, These Are the Powerful Men Facing Sexual Harassment Allegations*, Glamour, (May 18, 2019), https://www.glamour.com/gallery/post-weinstein-these-are-the-powerful-men-facing-sexual-harassment-allegations.

[22]    Tom Jackman and Deanna Paul, Alan Dershowitz countersues accuser in Jeffrey Epstein case, then is sued by David Boies, The Washington Post, (November 8, 2019, 3:39 PM), https://www.washingtonpost.com/crime-law/2019/11/08/alan-dershowitz-countersues-accuser-jeffrey-epstein-case-then-is-sued-by-david-boies/.

48

- Russell Simmons claimed that a Jane Doe suing him over an alleged rape in 1988 made up the event to extort him.[23]

233.    The false and defamatory statements exposed Ms. Ganieva to hostility, contempt, ridicule and professional disgrace.

234.    In order to be admitted to the New York State bar, Ms. Ganieva must pass an ethics and moral character test.  Such accusations against her will negatively impact this process and cause her severe damage.

235.     The false and defamatory statements imputed sexual immorality and involved criminal activity in connection with Ms. Ganieva. Such statements will inevitably cause her harm and damage in her ability to secure employment going forward, and in all of her relationships, personal and professional.

## X.    **Black Asserts Retaliatory Counterclaims**

236.    On June 1, 2021, Ms. Ganieva filed the instant lawsuit alleging defamation and gender-motivated violence.

237.    On July 19, 2021, Black, in a blatant act of retaliation, filed baseless counterclaims against Ms. Ganieva for defamation, defamation *per se*, and breach of contract (the "Counterclaims") because she protested the years of abuse she suffered at Black's hands and his attempts to besmirch her name.

238.    Black commenced the Counterclaims only after Ms. Ganieva brought this action against him.  At the time the tweets were made, on March 17, 2021, this case had not been filed

---

[23]    Ashley Cullins, *Russell Simmons Says Jane Doe's Rape Lawsuit is a "Vile" Extortion Attempt*, The Hollywood Reporter, (April 18, 2018, 6:31 PM). https://www.hollywoodreporter.com/business/business-news/russell-simmons-says-jane-does-rape-lawsuit-is-a-vile-extortion-attempt-1103734/.

49

and nowhere were the allegations about Black's conduct involving violations of the GMVA discussed or alleged by Ganieva publicly.

239.    Black's intentions are clear, he is attempting to make good on his promise, that if Ms. Ganieva did not comply with his whims, he would "destroy [her] life."

240.    Black has chosen to bully, threaten and intimidate by causing Ms. Ganieva to fear that she may owe him substantial life-altering money as a result of the Counterclaims.

241.    To make matters worse, Black audaciously seeks to hold Ms. Ganieva legally liable for breach of contract under an alleged contract that Ms. Ganieva is not even in possession of and has been requesting a copy of for years.  Incredulously, despite repeated requests by counsel for Ms. Ganieva, Black has continued to fail to produce the NDA to Ms. Ganieva to this very day.

242.    The GMVA protects victims of violence that are specifically "motivated by gender," which occurs when the act is "committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender."

243.    While the GMVA does not expressly contain an anti-retaliation provision, the lack of express "anti-retaliation" language has not prevented courts from reading robust anti-retaliation protections into statutes to further their remedial purpose.[24]

244.    Clearly, based on the purpose of the GMVA and how courts have interpreted similar statutes, the GMVA prohibits retaliation.

### FIRST CAUSE OF ACTION
**(Defamation)**

---

[24]    For example, 20 USC § 1681 ("Title IX"), the federal law prohibiting sex discrimination in education, contains no anti-retaliation language. Nevertheless, in *Jackson v. Birmingham Board of Education*, the United States Supreme Court held that the law prohibited retaliation against a third-party teacher because, "if retaliation were not prohibited, Title IX's enforcement scheme would unravel." (544 US 167, 180 (2004)).

50

245.    Ms. Ganieva hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

246.    As described above, Defendant Black has stated false information regarding, *inter alia*, the circumstances surrounding his relationship with Ms. Ganieva and payments made to Ms. Ganieva.

247.    These statements were untrue and defamatory in that they falsely reported, *inter alia*, that Ms. Ganieva and Defendant Black engaged in a wholly consensual relationship and that Ms. Ganieva extorted Defendant Black.

248.    Defendant Black knew or should have known that such defamatory statements were false.

249.    Defendant Black made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

250.    Defendant Black's statements constitute defamation because they impugn Ms. Ganieva's honesty, trustworthiness, dependability, and professional fitness and abilities by falsely claiming, *inter alia*, that Ms. Ganieva engaged in a wholly consensual affair with Defendant Black and that Ms. Ganieva committed a crime by extorting Defendant Black.

251.    Defendant Black's statements constitute defamation because they accuse Ms. Ganieva of committing a crime, namely, extortion.

252.    Defendant Black's defamatory statements have harmed Ms. Ganieva's professional reputation and standing in her industry, have caused her economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost income, benefits, job security

51

and opportunities for career advancement and have caused her embarrassment, humiliation and emotional injury.

253.    As a direct and proximate result of Defendant Black's defamation, Ms. Ganieva has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and emotional distress.

254.    As a direct and proximate result of Defendant Black's conduct, Ms. Ganieva has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

255.    Defendant Black's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Ms. Ganieva's rights.  As such, Ms. Ganieva is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Defamation *Per Se*)

256.    Ms. Ganieva hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

257.    As described above, Defendant Black has stated false information regarding, *inter alia*, the circumstances surrounding his relationship with Ms. Ganieva and payments made to Ms. Ganieva.

258.    These statements were untrue and defamatory in that they falsely reported, *inter alia*, that Ms. Ganieva and Defendant Black engaged in a wholly consensual relationship and that Ms. Ganieva extorted Defendant Black.

259.    Defendant Black knew or should have known that such defamatory statements were false.

260.    Defendant Black made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

261.    Defendant Black's statements constitute defamation per se because they impugn Ms. Ganieva's honesty, trustworthiness, dependability, and professional fitness and abilities by falsely claiming, *inter alia*, that Ms. Ganieva engaged in a wholly consensual affair with Defendant Black and that Ms. Ganieva committed a crime by extorting Defendant Black.

262.    Defendant Black's statements constitute defamation because they accuse Ms. Ganieva of committing a crime, namely, extortion.

263.    Defendant Black's defamatory statements have harmed Ms. Ganieva's professional reputation and standing in her industry, have caused her economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost income, benefits, job security and opportunities for career advancement and have caused her embarrassment, humiliation and emotional injury.

264.    As a direct and proximate result of Defendant Black's defamation, Ms. Ganieva has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and emotional distress.

265.    As a direct and proximate result of Defendant Black's conduct, Ms. Ganieva has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

266.    Defendant Black's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Ms. Ganieva's rights.  As such, Ms. Ganieva is entitled to an award of punitive damages.

267.    Ms. Ganieva hereby repeats and re-alleges each and every allegation in all of the

preceding paragraphs, as though fully set forth herein.

268.    Defendant Black made defamatory statements with malice and with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

269.    Defendant Black's statements constitute defamation *per se* because they impugn Ms. Ganieva's honesty, trustworthiness, dependability and accuse her of a crime.

270.    Defendant Black's defamatory statements have harmed Ms. Ganieva's professional reputation and standing in her industry, have harmed her personal reputation, have caused her economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost income, benefits, job security and/or opportunities for career advancement, and have caused her embarrassment, humiliation and physical and emotional injury.

271.    As a direct and proximate result of Defendant Black's defamation, Ms. Ganieva has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and physical and emotional distress.

272.    As a direct and proximate result of Defendant Black's conduct, Ms. Ganieva has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

273.    Defendant Black's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Ms. Ganieva's rights.  Therefore, Ms. Ganieva is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Intentional Infliction of Emotional Distress)**

274.    Ms. Ganieva hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

275. Defendant Black engaged in conduct toward Ms. Ganieva that is extreme and outrageous so as to exceed the bounds of decency in a civilized society; namely by, *inter alia*, subjecting her to defamatory statements and publicly accusing her of the crime of extortion.

276. These actions were taken with intent to cause, or disregard for, the substantial probability of causing severe emotional distress.

277. As a direct and proximate result of Defendant Black's extreme and outrageous conduct, Ms. Ganieva has suffered severe emotional distress.

278. Defendant Black's conduct was wanton, malicious, willful and/or cruel, entitling Ms. Ganieva to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Gender-Motivated Violence Pursuant to GMVA)

279. Ms. Ganieva hereby repeats, reiterates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

280. The above-described conduct of Defendant Black, including, but not limited to, Defendant Black's sexual assaults and rapes of Ms. Ganieva constitutes a "crime of violence" and a "crime of violence motivated by gender" against Ms. Ganieva as defined by the New York City Gender Motivated Violence Act, N.Y.C. Admin. Code § 8-901 *et seq.* (2017).

281. The above-described conduct of Defendant Black, including, but not limited to, Defendant Black's sexual assaults and rapes of Ms. Ganieva, constitutes a "crime of violence" against Ms. Ganieva motivated: (i) by her gender; (ii) on the basis of her gender; and/or (iii) due, at least in part, to an animus based on her gender.

282. Defendant Black committed a "crime of violence" against Ms. Ganieva because she is a woman and, at least in part, because he has an unlawful animus towards women. Defendant

Case 1:21-cv-08824  Document 1-3  Filed 10/28/21  Page 57 of 59

Black's gender-motivated animus towards women is demonstrated by, among other things, his sexually violent and abusive treatment of women.

283.    As a direct and proximate result of the aforementioned gender-motivated violence, Ms. Ganieva has sustained in the past and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory damages.

284.    Defendant Black's gender-motivated violence against Ms. Ganieva entitles her to punitive damages, as well as an award of attorneys' fees and costs.

### FIFTH CAUSE OF ACTION
### (Retaliation Pursuant to GMVA)

285.    Ms. Ganieva hereby repeats, reiterates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

286.    The above-described conduct of Defendant Black, including, but not limited to, Defendant Black's filing of counterclaims against Ms. Ganieva, constitutes retaliation under the GMVA.

287.    Defendant Black committed retaliation in violation of the GMVA by filing counterclaims against Ms. Ganieva as a result of her protected action of filing GMVA claims against Black .

288.    A cause of action for retaliation furthers the remedial purpose of the GMVA.

289.    As a direct and proximate result of the aforementioned retaliation in violation of the GMVA, Ms. Ganieva has sustained in the past and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory damages.

Case 1:21-cv-08824  Document 1-3  Filed 10/28/21  Page 58 of 59

290.    Defendant Black's retaliation against Ms. Ganieva entitles her to punitive damages, as well as an award of attorneys' fees and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the State of New York and the City of New York;

B.    An injunction and order permanently restraining Defendant and his partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.    An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.    An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

E.    An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, reputational harm and harm to professional reputation, in an amount to be determined at trial, plus prejudgment interest;

F.    An award of punitive damages, and any applicable penalties and/or liquidated damages in an amount to be determined at trial;

57

G.      Prejudgment interest on all amounts due;

H.      Dismissal of the Defendant's retaliatory counterclaims, and costs and fees incurred in defense thereof;

I.      An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

J.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: August 9, 2021
       New York, New York                  Respectfully submitted,

                                           **WIGDOR LLP**

                                           By: _____
                                               Jeanne M. Christensen
                                               Tanvir H. Rahman
                                               Lindsay M. Goldbrum

                                           85 Fifth Avenue
                                           New York, NY 10003
                                           Telephone: (212) 257-6800
                                           Facsimile: (212) 257-6845
                                           jchristensen@wigdorlaw.com
                                           trahman@wigdorlaw.com
                                           lgoldbrum@wigdorlaw.com

                                           *Counsel for Plaintiff*

58