# Exhibit 4

Case 1:21-cv-08824 Document 1-4 Filed 10/28/21 Page 2 of 73

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

GUZEL GANIEVA,

               *Plaintiff,*

      v.

LEON BLACK,

             *Defendant.*

Index No. 155262/2021

**AMENDED ANSWER AND**
**AFFIRMATIVE DEFENSES**

### PRELIMINARY STATEMENT

Drawing on Plaintiff Guzel Ganieva's own words in contemporaneous writings and recordings, Defendant Leon Black's prior Answer in this case exposed Ganieva as a fabulist and her initial Complaint as a work of fiction. Having been caught red-handed, Plaintiff and her counsel have chosen to double down in their Amended Complaint, adding reams of brand-new, tabloid-style allegations brimming with purple prose and breathless rhetorical flair. Rather than retract the spurious allegations in her first Complaint, Plaintiff and her counsel have spun a whole new yarn that is even less believable and even more disprovable than their initial story. These new allegations, wholly irrelevant to Ganieva's claims, have been crafted without even the slightest connection to reality or regard for the truth.

Perhaps most remarkably, the centerpiece of Plaintiff's new filing is the gratuitous inclusion of page after page of allegations involving Jeffrey Epstein, rendered in shocking detail —none of which are even mentioned in the original Complaint. It speaks volumes that these outlandish allegations are only now appearing for the very first time, and only after Plaintiff's original pleading was shown to be a cynical, irresponsible, and sanctionable pack of lies. Rather than respond to the evidence in Mr. Black's Answer, Ganieva simply invented an entirely new set

of allegations that she now deems central to her case, but that she did not bother to include in her initial pleading in June.

To be perfectly clear: the new allegations are just as demonstrably false as the allegations in the first Complaint, from start to finish. While a lurid potboiler starring Jeffrey Epstein may be good for grabbing tabloid headlines, the overwhelming and irrefutable evidence in this case betrays the utter falsity of these allegations.

- At the heart of the Amended Complaint is the new allegation that Mr. Black forcibly kidnapped Ganieva on his private plane to visit Jeffrey Epstein in Florida in October 2008, when Epstein was permitted to leave prison on "work release." ***But the aircraft records and flight manifests refute this fabricated story.***

- Also central to the Amended Complaint is a seamy story involving Epstein's "associate," Sarah Kellen, who allegedly conveyed a series of veiled threats to Ganieva of the "consequences" that would befall Ganieva should she refuse the sexual demands that Mr. Black and Epstein supposedly conveyed with their eyes (but not with their words). As noted, the alleged meeting involving Ms. Kellen, Mr. Black, Ganieva, and Epstein *never* happened. And in the face of these unsworn allegations by Ganieva, Mr. Black has every reason to expect that Ms. Kellen (a third party who has no relationship with Mr. Black) will confirm that these events never happened. Assuming Ms. Kellen's truthful testimony, ***the alleged eyewitness to Ganieva's fantastical tale will repudiate the story from beginning to end.***

- And once again, Ganieva's own contemporaneous recorded words put the lie to her sham pleading. As she was extorting Mr. Black, and inventing paranoid fantasies that numerous famous and powerful people were targeting her in bizarre ways around the globe, Mr. Black asked Ganieva—on tape—if she had ever even met Epstein. Common sense dictates that Mr. Black would never have asked such a question were the events described in the Amended Complaint true. It also dictates that, had Ganieva in fact experienced the harrowing kidnapping she now recounts, she immediately would have raised that unforgettable episode in response to Mr. Black's question. Instead, in that recording, Ganieva responded that she had never met Epstein, and then suggested in a muddled way that he had once called her. ***The recorded conversation further exposes Ganieva's story for the lie that it is.***

The Amended Complaint hardly stops there. In the latest edition of her pleadings, Ganieva now makes claim after claim against Mr. Black about events that should have been memorable, but that nevertheless had eluded Ganieva in her first telling just two months earlier. Newly imbued

with the powers of magical thinking, mind-reading, and photographic recall—down to remarkably precise quotations, facial expressions, and vocal intonations—Ganieva suddenly remembers shocking acts of sexual torture and threats to traffic her, plant heroin on her, manufacture evidence against her, and even kill her that somehow did not find their way into the original Complaint. The allegations in the Amended Complaint are so facially and farcically false that they collapse under their own weight.

The premise of the unsworn Amended Complaint remains wholly illogical: in her telling, Ganieva supposedly was forced into a years-long relationship with Black, who purportedly belittled, humiliated, and abused her before finally "coercing" her to sign an NDA and take his money—as if someone could be forced to take money. Mr. Black demonstrated in his initial Answer that the irrefutable documentary evidence—including numerous recorded conversations and written communications (spoken and written by Ganieva herself)—tells a stunningly different story. Remarkably, Ganieva in her Amended Complaint does not even address the evidence cited in Mr. Black's Answer that flatly contradicts her pleadings, other than to make vague and conspiratorial suggestions that Mr. Black and his "posse" of lawyers somehow coerced Ganieva into writing those texts and speaking those words.

At bottom, there is no disputing this central fact: for some six years, the parties in this lawsuit were involved in a casual, episodic, and completely consensual relationship, initiated and actively pursued by Ganieva herself. During that time, Ganieva consistently professed her love and appreciation for Mr. Black, while regularly extracting millions of dollars from him in money, gifts, rent, furniture, tuition, vacations—the list goes on and on.

In 2015, however, Ganieva decided that she wanted more, and embarked on an illicit campaign of extortion to get it. Flatly declaring that "I don't want to have to worry about money

ever again," she threatened to go public about their relationship—explicitly stating that she would harm Mr. Black's personal and professional life—unless he paid her a sum of *one hundred million dollars*.

Aware that he had become the victim of a criminal extortion scheme, Mr. Black began to record his conversations with Ganieva. Those recordings speak for themselves and are devastating to both Ganieva's original and new allegations. Mr. Black repeatedly asked Ganieva why she was claiming an entitlement to *any* money, let alone to such an eye-popping sum. Ganieva had no legitimate answer and no legitimate claim. Notably, she never—*not once*, in a series of recorded in-person meetings during her extortion campaign, nor at any other time—*claimed, or even alluded to, sexual or physical abuse of any kind; never once raised that she had been kidnapped and taken to Florida; and never once invoked any of the litany of misdeeds she now alleges*.

To the contrary, Ganieva repeatedly warned that if Mr. Black did not pay her this outrageous sum of money, she would report their affair to Mr. Black's wife, the board of his public company, and the press. *This is, of course, the very definition of extortion.* A married man, and the founder and head of a major asset management business, Mr. Black was legitimately and understandably concerned that Ganieva would do exactly as she threatened, and that the publicity could have personal and business consequences. Under this threat, Mr. Black entered into a release and confidentiality agreement with Ganieva in October 2015. As part of their agreement, Mr. Black agreed to give Ganieva what she was demanding: substantial amounts of additional cash beyond the millions Mr. Black already had voluntarily gifted her.

In that agreement, Ganieva explicitly admitted that allegations she had made against Mr. Black "are not true"; released any possible claims against Mr. Black; and agreed to keep their relationship and the agreement strictly confidential. Over the next five and a half years, Mr. Black

4

Case 1:21-cv-08824  Document 1-4  Filed 10/28/21  Page 6 of 73

fully upheld his end of the deal, paying Ganieva millions of dollars pursuant to a regular monthly schedule. She did not complain or raise any issues, or otherwise suggest that Mr. Black had at any point engaged in any wrongdoing whatsoever.

Suddenly, in March 2021—after having accepted millions of dollars, month in and month out—Ganieva posted a series of tweets proclaiming, among other things, that Mr. Black had "sexually harassed and abused" her "for years." Those statements were vicious, devastating—and false. Predictably, the consequences have been ruinous: branded a "predator[]", Mr. Black has suffered public and private humiliation, and has been the subject of endless press reports rehashing the manufactured allegations in Ganieva's pleadings—which no doubt was the desired outcome.

When Ganieva's tweets were first reported, Mr. Black quite reasonably issued a public statement in his own defense that was measured, proportionate—and true. Despite having herself violated the release and confidentiality agreement, and pocketed many millions of dollars, Ganieva then brought this spurious lawsuit. Even more perversely, after Mr. Black did what defendants so often do in responding to a complaint—he filed his own meritorious counterclaims rightly calling out Ganieva's contractual breaches and defamatory statements—Ganieva's Amended Complaint now goes so far as to add a legally frivolous claim for "retaliation." Her position is that she may unilaterally breach an agreement that Mr. Black honored for years by paying her millions of dollars; besmirch Mr. Black's name with impunity while keeping those millions; sue for defamation when he defends his name; allege retaliation with yet another claim when he countersues in response to her suit; and gin up a set of even more fantastical allegations in response to the undeniable evidence proffered by Mr. Black. Thankfully, that is not how our justice system works. To the contrary, that sort of conduct is impermissible, and appropriately subject to sanction and legal action.

5

Case 1:21-cv-08824  Document 1-4  Filed 10/28/21  Page 7 of 73

The mendacity of Ganieva's claims is breathtaking. Perhaps the most outrageous is Ganieva's allegation that Mr. Black sexually assaulted her on July 6, 2014, a claim of the utmost seriousness that only can be understood as an attempt to destroy Mr. Black's reputation. While the Amended Complaint alleges that Mr. Black "suddenly" "barged" into her apartment when she was supposedly too sick to walk or move, Ganieva's own text messages offer the definitive truth: that Ganieva was perfectly well when she herself initiated contact with Mr. Black that day—texting him "[t]his is love. I need you…"—and affirmatively requested that he bring a bottle of wine to her home that evening to "tuck" her into bed. The messages further make clear that Ganieva was perfectly unsurprised—and in fact, delighted—when he showed up at precisely the appointed time with the wine, as requested.

Ganieva's texts to Mr. Black following the alleged assault make the falsity of the allegations all the clearer. Indeed, the very morning after she alleges that Mr. Black brutally attacked her, Ganieva reached out to Mr. Black on her own initiative to say that "*[i]t was very nice to see you last night" . . . "I love you and thank you!!!! Xoxoxoxoxo and more love*." And just two days later, Ganieva, again unprompted, asked her supposed brutal rapist if he wanted to get together soon, signing the message: "*Lots of love, g.*" In the following days and weeks, she reached out to him on numerous occasions to meet in person, with such messages as, "*you are the kindest*", and signing off with, "*[a]lways yours….*".

In her Amended Complaint, which followed Mr. Black's initial Answer (which, in turn, revealed the texts and the recordings), Ganieva does not even attempt to dispute the veracity of this evidence. In fact, at no point in the Amended Complaint does Ganieva even acknowledge the incompatibility of her fabricated allegations in the initial Complaint with the contemporaneous text messages and recorded conversations between her and Mr. Black. Instead, she retrofits her

Case 1:21-cv-08824   Document 1-4   Filed 10/28/21   Page 8 of 73

pleadings and jury-rigs them with preposterous new conspiracy theories in an attempt to explain away the texts and recordings. Now she claims that soon after the "rape," Mr. Black and his team of white-shoe lawyers "'huddled up'" to "come up with a scheme to insulate Black from criminal liability." That "plan was to manufacture evidence that would counter the narrative that Black forced himself onto Ganieva," and consisted of Mr. Black "command[ing] her to send him messages that she loved him." Clearly, there is no possible basis for this allegation: neither Ganieva nor her lawyers can have the slightest idea what Mr. Black or his lawyers did or said or thought. It reads like (bad) fiction.

In any event, putting aside the audacity and inanity of the allegation that Mr. Black and his lawyers engaged in this type of criminal conspiracy, it is a logical impossibility. To take just one facet of the story, neither Mr. Black nor any of his lawyers could have caused Ganieva to tell Mr. Black *before* the alleged rape that she loved and needed him, and then forced her to invite Mr. Black over to share a glass of wine before tucking her into bed.

Likewise, Ganieva's desperate new attempts to defend against her incriminating recorded statements are so nonsensical that they are difficult even to parse. Ganieva's new allegation appears to be that, by "scream[ing]" at her to "'[s]ay that you are blackmailing me,'" Mr. Black somehow forced Ganieva to demand the sum of one hundred million dollars, and was "giddy" when she "took the bait." This allegation likewise can scarcely be dignified with a response. Faced with the black-and-white proof of her falsehoods, she contrives explanations for her own recorded words that would be laughable were the claims not so serious.

In short, Mr. Black is guilty only of extremely poor judgment in entering into an affair with Ganieva in the first instance, in making an easy target of himself by lavishing her with gifts and money throughout their relationship, and in allowing himself to be extorted rather than

Case 1:21-cv-08824  Document 1-4  Filed 10/28/21  Page 9 of 73

immediately reporting Ganieva to law enforcement. Ganieva must be held to account for her wrongdoing and, with her counsel, for their sanctionable litigation misconduct. In her defamatory Twitter posts, Ganieva purports to invoke "#MeToo," and claims to have come forward to protect "other women." In reality, her demonstrable lies and extortion are cynical attempts to weaponize a critically important and long-overdue movement. In so doing, Ganieva has done a tragic disservice to the brave truth-tellers—the vast majority of accusers—who have survived sexual abuse.

This lawsuit will reveal who Ganieva really is; what truly motivated this hit job; and whether she is working in concert with, or at the behest of, a third party or third parties who might wish Mr. Black ill and who are willing to promote and facilitate Ganieva's tactics to suit their own wrongful ends.

## **FACTUAL BACKGROUND**

### **The Parties' Consensual Relationship**

1. Ganieva's allegations are false from the very start—even with respect to small-bore, gratuitous details that are squarely belied by objective fact and the irrefutable, contemporaneous documentary evidence that Ganieva does not even meaningfully attempt to impugn. To begin, the initial Complaint alleged that Mr. Black picked her "out of a crowd in March 2008, while attending an International Women's Day event in NYC" when she was in her "early twenties" (Amended Complaint ("AC") ¶¶ 20, 21). After Mr. Black alleged in his initial Answer that, in fact, the two had met at a private party thrown annually by a former colleague of Mr. Black's when she was 25, she now admits this much. (*Id.*). Though she still tries in her Amended Complaint to create the false impression that she was in attendance at some sort of feminist rally, she was there for one purpose: to meet a rich man like Mr. Black.

2.      On information and belief, Mr. Black was hardly the first nor the last of Ms. Ganieva's deep-pocketed targets.

3.      Ganieva, who claimed to have been working as a model at the time, immediately began pursuing Mr. Black, who had been the founder and head of Apollo Global Management, a publicly traded major alternative asset manager. The two met several times for meals before entering into a years-long consensual sexual relationship.

4.      At no time prior to the initiation of their sexual relationship did Mr. Black "'arrange[]' a few appointments" for Ganieva. (AC ¶ 23) (Internal quotations in original).[1] For example, contrary to the allegations, Mr. Black's facilitation of a meeting with a talent agency (*id.*) did not occur, on information and belief, until years after the parties met, and was done at Ganieva's request.

5.      And, contrary to her allegations, Ganieva most certainly did not tell Mr. Black "that their relationship would not be sexual." (*Id.* ¶ 24). True to form, Ganieva has no proof whatsoever that this *ever* happened. And it never did. Rather, as the objective evidence confirms, Ganieva was an eager and willing participant in the parties' relationship from the start.

6.      On information and belief, Ganieva had been struggling financially before she met Mr. Black. On information and belief, Ganieva reportedly had left her husband in Russia before

---

[1] The Amended Complaint liberally and seemingly randomly places quotations marks around certain words, turns of phrase, and full sentences. For example, the allegation that Mr. Black "'arranged' a few appointments" for Ganieva (AC ¶ 23) (internal quotations in original) is both untrue and puzzling. Does this purport to be a direct quote? If so, who is being quoted and in what context? Or are these scare quotes? Are they meant to be ironic? Rhetorical? Here, as in scores of other occasions within the Amended Complaint, the meaning of the quoted language is inscrutable at best and sanctionable at worst: quotations in a court filing should not be haphazardly tossed about as though verbatim. Words—*and allegations in court filings*—should be verified and they should matter. They should not casually and cavalierly be tossed about as though without meaning or consequence.

coming to the United States, had been sued on more than one occasion for nonpayment of rent, was living in a small one-bedroom apartment with her son, and was struggling in her modeling career.

7.    Ganieva apparently saw a golden ticket in Mr. Black, and persistently sought him out following their initial meeting. She quickly began pressing him for substantial payments of money and gifts. Contrary to Ganieva's bizarre framing of Mr. Black's generosity as something that he imposed upon Ganieva—as if Mr. Black could somehow force Ganieva to request, accept, and keep his money and presents—she frequently asked for such things as an expensive rental apartment on the Upper East Side (which she settled on only after rejecting as too small an initial apartment Mr. Black had proposed); a luxury car; lavish vacations (including at the beach and to the Alps); school tuition (for acting and at Columbia University); jewelry and clothing; a Steinway piano; a $40,000 commissioned portrait of herself (which she kept hung in her apartment); and many, many gifts of cash—all totaling in the millions of dollars.

8.    In 2011 and again in 2013, Ganieva requested two loans from Mr. Black of $480,000 apiece. Mr. Black acquiesced and provided the funds pursuant to two written agreements. (AC ¶¶ 165, 167). Mr. Black never requested repayment of either of the loans he agreed to make to Ganieva. As was made explicitly clear in recorded conversations between the parties, the request unequivocally came from Ganieva herself; there was every reason for her to have made this request, and no reason for Mr. Black to have somehow forced the money on her. (It is also hard to fathom how anyone could force someone else to take a loan in this way; that incoherence, like so many others, is left unexplained in Ganieva's Amended Complaint).

9.    Also unexplained in the Amended Complaint is how Mr. Black could possibly have forced Ganieva into a non-consensual affair over some six years. During their relationship,

Ganieva was a grown woman in her late twenties and early thirties, and a trained mathematician and international model. At no time did Ganieva work for Mr. Black or live with him, or even see him very often.

10.    Beginning in 2011, Ganieva decided to resume her undergraduate studies after a long hiatus and attended Columbia University (encouraged and financed by Mr. Black), earning a degree in mathematics.

11.    While Mr. Black agreed to Ganieva's request that he prepay for her apartment, he did not have a key or access to it in any way. In fact, Ganieva specifically made clear at the outset of their relationship that she preferred not to provide Mr. Black with access to her apartment, wishing for privacy and independence. Mr. Black had never asked for any other arrangement, and he of course respected Ganieva's request. The two did not spend nights together, vacation together, or attend events together, other than on rare, isolated occasion. They saw each other episodically—sometimes weekly, sometimes monthly, sometimes not for long periods at a time.

12.    Ganieva worked, attended school, traveled the world, had an active social life that did not include Mr. Black, and did exactly as she pleased, when she pleased. On more than one occasion, Ganieva would leave town or drop contact with Mr. Black for some time, only to reach out again to tell him how much she loved and missed him and re-initiate the relationship.

13.    In short, while the Amended Complaint twists itself in a knot in an effort to portray a dynamic in which Mr. Black somehow overpowered, controlled, and intimidated Ganieva to do such patently absurd things as walk behind him and accept nearly one million dollars in loans, he simply had no means by which to do such things—and he did not. At any time, Ganieva could have just stopped seeing him—as she occasionally did for long stretches of time and as she ultimately did when the relationship came to a definitive end in 2014. Instead, as the documentary

Case 1:21-cv-08824 Document 1-4 Filed 10/28/21 Page 13 of 73

record conclusively reflects, Ganieva actively pursued Mr. Black throughout, and he lavished her with gifts, support, and praise.

14.     For example, during the course of their relationship, Ganieva repeatedly requested (including in writing) that Mr. Black help her with job interviews. As the documents make clear, Mr. Black made bona fide attempts to help her secure interviews and get a job. Yet, despite being underqualified and "unprepared" (as one interviewer put it), Ganieva believed that she was entitled to a highly competitive job at a highly competitive company, telling Mr. Black that she would settle for nothing less: "After studying a lot about Goldman Sachs I came to conclusion that a position of an analyst in Investment Banking will suit me best. I positively don't want to be in any other department." Yet Ganieva had no relevant experience, and only mediocre grades and standardized test scores, and it is unsurprising that she was unable to land the precise (and highly coveted) job at Goldman Sachs that she demanded. It is false as a matter of fact, and puzzling as a matter of logic, for Ganieva to allege that it was somehow part of some "sick plan" for Mr. Black to arrange "sham interviews" for Ganieva in an effort to "belittle and humiliate her." (AC ¶¶ 170, 171). As the documents show, all that Mr. Black did was try to help her. Indeed, Ganieva herself admitted as much in an interview with the *New York Post* on April 8, 2021: "He tried for some time to help her get a job, she said, but claimed he wanted favors in return."

15.     Ultimately, the parties' relationship concluded when Ganieva left New York at the end of July 2014. Far from trying to "control" Ganieva or keep her in New York, Mr. Black wrote to her that "maybe its for the best," and indeed, at her request, helped her with her visa and hefty resettlement costs. Clearly, *she could have left at any time* and Mr. Black had no ability, or desire, to keep her close or to control her. There is no truth whatsoever to Ganieva's contention that she left New York "to physically distance herself from Black." (AC ¶ 191). Rather, Ganieva repeatedly

12

told Mr. Black that she was leaving for immigration-related reasons, because, on information and belief, her student visa had expired upon her graduation from Columbia and she had no legal status in the United States.

16.     Ganieva's claim that Mr. Black somehow tried to exert "power over her" after she moved abroad (AC ¶ 193) is yet another fabrication. The documents show that Mr. Black rarely reached out to Ganieva unprompted and often did not even respond when she reached out. For example, between November 2, 2014 and December 24, 2014—while Ganieva was thousands of miles away from Mr. Black and not engaged in any physical relationship with him—Ganieva on her own initiative texted Mr. Black on no fewer than eight occasions, without response from Mr. Black. In these notes and in others, she wrote such things as: "*You have no idea how much I miss you and love you. It's nice to know that someone like you exist in the world even tho a bit far,*" *and "I love you! I do!*" (Emphasis added).

17.     In her Amended Complaint, Ganieva attempts to explain away her many loving text messages that Mr. Black quoted in his Answer: to this end, she actually alleges that, from across the globe, Mr. Black had somehow "commanded her to send text messages saying that she loved him," and *that* is why she sent him so many adoring messages for so long. (AC ¶ 187). She also alleges—this time, truthfully, as Mr. Black had pleaded in his Answer—that Mr. Black had provided her with generous resettlement costs. (*Id.* ¶ 189). Of course, the fact that Mr. Black was so supportive of her long-distance move is wholly inconsistent with Ganieva's false allegation that Mr. Black wanted to maintain "control" over her. Nor could he possibly have maintained such control from halfway around the world.

18.     As noted, Ganieva's Amended Complaint is rife with such false allegations of control, despite that Mr. Black had no means of control. Ganieva adds a new lie in her Amended

Complaint that is silly, but telling. Seemingly prompted by a detail contained in Mr. Black's Answer about how the parties had shared a soufflé during the final shake-down meeting—but somehow forgetting that there is a *recording* of this conversation (despite that Mr. Black's initial Answer made clear that one exists)—Ganieva adds to her new pleading the gratuitous claim that, while she "desperately wanted to get out of there, Black *forced* her to wait while a dessert that took over 20 minutes to prepare came out." (AC ¶ 215) (Emphasis added). Yet, in the recording, Mr. Black can be heard politely asking Ganieva if she wanted dessert (literally saying: "So… dessert?"), to which she responded—of her own free will—that they "could share a soufflé." Then, when Mr. Black asked her "what flavor?", she chose Grand Marnier. Ganieva also ordered peppermint tea—again, of her own free will and without Mr. Black "forc[ing]" her to do so. This head-scratching allegation by Ganieva shows the casual ease with which she lies and claims use of force—and the similar nonchalance with which her lawyers are prepared to facilitate and sign their name to those lies—about even the simplest and smallest of details. In the same way that Mr. Black did not "*force*" a grown woman with free agency to order a particular dessert, he did not "*force*" Ganieva to do *any* of the things she claims in her pleadings. The documents and recordings (and common sense) make *all* of this clear.

### Ganieva's Extortion Campaign

19.     From the time Ganieva left New York in July 2014, up until she returned in June 2015, she continued to send text messages to Mr. Black proclaiming her love from afar, such as this three-part note on May 14, 2015: "*I need your love… And I need you love… Xoxo*". (Emphasis added). On June 4, 2015, she sent Mr. Black this in a text: "*[m]any kisses and lots of love xoxo*". (Emphasis added).

14

20.     Suddenly, on June 8, 2015, Ganieva sent a much more formal note, insisting that she needed to meet with him in person about a matter that she characterized, without detail, as "both urgent and important." Based on statements made by Ganieva to Mr. Black, this sudden shift in tone appears to have coincided with her failure to gain legal status in the United Kingdom; whatever the reason, Ganieva became intensely focused on getting even more money and trying to procure an expensive visa.

21.     Ultimately, at Ganieva's request, the parties met in New York on June 24, 2015, for what can only be described as a brazen shakedown by Ganieva. Ganieva warned Mr. Black that if he did not pay her a vast sum of money, she would tell the world about their affair. Shocked to his core, Mr. Black informed Ganieva that he believed that her conduct was extortionate and that he needed time to process what she was saying and to formulate a response.

22.     A number of additional in-person meetings followed, in the summer and fall of 2015: on June 26, July 21, July 24, August 12, August 14, August 19, September 17, October 15, and October 19. Understanding that he was the victim of a blatant criminal extortion scheme, Mr. Black consulted counsel with criminal law expertise. The parties' conversations thereafter were monitored and recorded.

23.     Ganieva's demand was nothing less than *one hundred million dollars*. She boldly declared that if she did not get this amount from Mr. Black, she would go public and ruin his family, his business, and his life. As Ganieva put it in her own words, in a recorded conversation: "*The more, the longer I wait, the more sure I become that I actually, I prefer to go public*," and "*I'm dying to talk to press about it.*"

15

24.     Mr. Black repeatedly asked Ganieva to explain why she was claiming a right to any money at all. Not surprisingly, Ganieva failed to identify any good faith basis for her demand. Instead, she offered two facially illegitimate rationales.

25.     First, Ganieva claimed that she was owed money on some form of palimony theory, claiming that she had been "like a wife" to him and that "for me, it was like a marriage." Based on this false premise and faulty reasoning, she claimed entitlement to half of his earnings: "When men and women in relationship for a very long time and woman doesn't work and man works, and she gets all the stress from his work, and he makes a lot of money—usually by law—she's entitled to half, ok?" She claimed that "in the marriage, I would get half of what you earned," such that she was entitled to "a couple of billions," but "I'm not asking for that, even though I think I totally deserve it."

26.     When Mr. Black repeatedly pointed out that "having an on-and-off affair" for "five years" was not "akin to a marriage," Ganieva landed on a second putative theory. While vague and multi-pronged, the argument effectively was that she had suffered "emotionally" as a result of their relationship and the fact that "our relationship didn't work." The reason for this, she said, was that "people are attacking me and humiliating me" and "all my chances for the future are limited because of the gossip that somebody is spreading," and "I'm pretty sure it's coming from you."

27.     The claims were nothing short of "paranoid," as Ganieva had to repeatedly admit even as she made them, and included the following (among many others):

- "People tried to drug" her, and she had been "poisoned."

- She was being stalked, bullied, and harassed by waiters and hairdressers and teachers and perfect strangers, who made her "feel bad." She also was being stalked by "the children of the rich. It's the high society. It's everybody from high society." Likewise, she claimed that "basically everybody in the society kind of was making fun of me."

16

- Several billionaires, whom she named, were threatening her, defaming her, treating her "a very disrespectful way," and might be involved in a "conspiracy" against her. Ganieva also claimed that one of those billionaires, who had given her a job as a writer for his publication, was "making fun" of her and also had threatened to fire her unless she slept with him. She said that this individual's employees were trying to "diminish" her and make her "look in a certain way," and had twisted and re-written articles that she had authored.

- Her son was bullied at camp and at school and had choked on a piece of meat, all of which she claimed was attributable to Mr. Black and to the parties' relationship. She stated that she had withdrawn her son from a series of schools as a result of the bullying attributable to Mr. Black.

- People were saying strange things to her and her son, which she likewise blamed on Mr. Black. For example, she said that "someone put a German newspaper in front of my door, then the woman came knocking at my door, saying "'sorry for your loss, can you please give me money?'" In another example, she said: "Then there was this guy [who] started pursuing us…. Just some random guy, like black guy, started like harassing us." She stated that this "random guy" had told her that her son had to play basketball professionally and this guy "was all dressed up and he was very sexual to me and to my son and when I refused to join the team, he said 'but you have to pay for my clothes,'" and "it was just, it was just terrible."

- She had been invited to one of her son's games and "I would see all the parents kind of acting very strange and when he [her son] started shooting, they would say '[son's name], we love you, we love you' but in a very acted out manner, which made me very uncomfortable."

- She had gone to "parents' week" for a school and "everywhere I went, there were kind of jokes and assumptions were made towards me and my son that they know that I'm with you and that I am a terrible person and I have to change."

- She "had to deal with a lot of public harassment, humiliation. And—I don't know what. I think it has to be investigated. My son was harassed in every school, I am getting harassed in every corner of the world."

- She described being targeted and bullied due to her relationship with Mr. Black, including by a teacher during an art class at Columbia. Ganieva reported an exchange in which the teacher had said "'now look at the lilies and tell me what you think about it?'" Ganieva stated that she had responded: "'well, it's so, it's done in a way where I feel like I could do it.'" According to Ganieva, "the teacher says, 'no, you can't' and everybody started laughing."

- She dropped out of graduate school in Russia because she had been "tortured" when "they" said that Ganieva had not known the definition of a particular word, "and then there were other inappropriate remarks and jokes towards me." The only

example she could provide is that in class a teacher had referenced a well-known financier with whom Mr. Black had worked decades ago, and that "I think they were referring to you, but I don't know." When Mr. Black asked her, "why in Russia would they bring that up?", she responded "I don't know."

- She "stopped going out because I didn't want to be treated like that. And like even when I went just for job interviews or I went to pick up my son, these things were happening, you know, and people were kind of making fun of me."

- She said: "I went through a lot of public humiliation. My reputation is really damaged. My son's future opportunity… Permanently…" When Mr. Black responded that this was not because of him, Ganieva replies: "No, but it's because of our relationship. It's a consequence… it's a consequence of our relationship. And, as a man, as a decent man. As a fair man, you can understand that. And you can help. It's not difficult for you to help me… All those years I lived very badly. And you could have taken care of me…better care. You could have given me a job. You could have given me a visa…This time... I want to tell you and I want to do what's right for me. I totally deserve it. I deserve more."

28.     Numerous additional examples abound. In short, Ganieva repeatedly claimed that her reputation had been damaged, while seemingly also agreeing with Mr. Black that he had not said anything to anyone about her. Ganieva said to Mr. Black that she was "pretty sure that you are connected to all of this harassment and blame," but when asked why he would possibly do that, she simply said "I don't know." Mr. Black further asked: "why would I do that, why would you think it was me who did that and at the same time as I am supporting you? It makes no sense." To this, Ganieva responded: "No, I don't have any proof that you've done it, right, but it all comes from our relationship. If we didn't have a relationship, this wouldn't happen to me or my son." As noted, she admitted on several occasions that she might be "paranoid."

29.     Ganieva also admitted that she had not previously told Mr. Black about this alleged harassment. For example, Mr. Black said: "And all this harassment. I never heard a word of it. I never heard a word of any of these issues. And it's only a year later after we haven't seen each for a year, it's coming out." She responded simply: "I'm telling you now."

Case 1:21-cv-08824   Document 1-4   Filed 10/28/21   Page 20 of 73

30.     A small facet of these claims was a vague assertion that Mr. Black had been somehow "abusive." Ganieva clarified, however, that that her definition of "abuse" was that, according to her, Mr. Black "liked to make me feel worthless" and "to put me down and make me feel like I'm nothing." She also claimed that she believed he was "abusive" because, according to her, Mr. Black and his "friends and other people" had been "extremely unfair" to her and her son at his schools, "all over the world."

31.     Most notable is what Ganieva did not claim: she *never*—not once—claimed physical or sexual assault of any kind. When Mr. Black stated that "we were two consenting adults that had an affair," she responded only that "it just lasted a little bit too long and you got a little bit too involved." Again and again, Mr. Black explicitly asked her: "How did I abuse you?" She *never* responded that he had been abusive in any physical or sexual way. Indeed, Mr. Black said, "you know I've never abused you," to which she appeared to accede by stating "okay."

32.     Thus, to the limited extent that Ganieva expressed a claim of "abuse," she made clear that she was referring to "emotional" abuse, connected in some way to her feelings for Mr. Black. Indeed, even while actively extorting him, she made clear that "I will never find anybody like you." After Ganieva had successfully extorted Mr. Black, her parting words to him on the last day the parties ever met in person included these: "*You know I still love you very much*."

**The Release and Confidentiality Agreement**

33.     Over the course of ten in-person meetings in the summer and fall of 2015, the parties eventually came to agreement. At a lunch meeting at the Four Seasons restaurant on October 19, 2015, they finalized the terms they had discussed, to include payments by Mr. Black to Ganieva of $100,000, forgiveness of approximately $1,000,000 in loans, and "other consideration to which has been agreed." That other consideration included an agreement that the

19

$100,000 monthly payments would continue for 15 years, and that Mr. Black would provide payment of £2,000,000 for Ganieva to use toward obtaining legal status in the United Kingdom. In exchange, they agreed that Ganieva would sign a one-page release and confidentiality agreement (the "Agreement" or the "Release and Confidentiality Agreement").[2]

34.    This one-page Agreement contains only two, very simple understandings, as is clear in the very title of the document: "**RELEASE AND CONFIDENTIALITY AGREEMENT**". (Emphasis in original). In it, Ganieva admitted that the claims she had made about Mr. Black to Mr. Black—including that he had been "abusive" to her—were fabricated: "GG [Ganieva] has made certain allegations and asserted certain claims against LBD [Mr. Black], which she made under extreme stress and *which she now concedes are not true*, and which allegations and claims, if made public, would damage LDB's career, reputation and relationships with others." (Emphasis added).

35.    The first clause provides a broad and clear release:

> GG hereby releases, remises and forever discharges LDB from all matters, causes of action, claims, suits and any and all further liability or accountability, in law or equity, by reason of any matter, cause or thing whatsoever arising prior to the signing of this Agreement, contemporaneous with the signing of this Agreement or any time in the future after the signing of this Agreement.

36.    The second clause provides a broad and clear confidentiality agreement:

> GG hereby agrees, except as otherwise required by applicable law, never to disclose, directly or indirectly, to any individual, entity or other potential recipient,    any    information    relating    to    (i)    the

---

[2] In her Amended Complaint, Ganieva alleges that "[i]ncredulously [sic], despite requested requests by counsel for Ms. Ganieva, Black has continued to fail to produce the NDA to this very day." (AC ¶ 241). This is nonsense. Counsel for Mr. Black has offered to provide a copy of the Agreement to counsel for Ganieva, subject only to the terms of a garden-variety, standard court-ordered protective agreement or an interim agreement between the parties not to publicize documents produced in litigation, and provided a draft of such an agreement to counsel for Ganieva. "Incredulously," counsel for Ganieva has refused even to discuss such an agreement.

20

Case 1:21-cv-08824   Document 1-4   Filed 10/28/21   Page 22 of 73

> allegations and claims that she has asserted against LDB, (ii) the
> signing, content or other attributes of this Agreement, including any
> consideration furnished by LDB in connection with the signing of
> this Agreement and (iii) any other matters that could damage LDB's
> career, reputation and relationships with others.

37.     Again, the October 19, 2015 conversation was monitored and recorded. Ganieva's allegations that strain to plead duress are complete fabrications. (AC ¶¶ 210-214). At no time, either before or during the meeting, did Mr. Black utter the phrases (which purport to be direct quotations), **"'If you do not take the money, I will put you in prison'"** and **"'If you do not take the money, I will destroy your life'"** (*Id.* ¶ 3, internal quotations and emphasis in original; *see also id.* ¶ 202)—or anything of the sort.

38.     Even if Mr. Black did not have indisputable recorded evidence that such things simply were never said, they would defy credulity and common sense in any event: if a private citizen even had the power to do such things, it is unclear why that person would force millions of dollars upon someone instead of just doing those things. Just as with the loans, Ganieva was desperate for the money and—far from being forced to take it—she extorted it.

39.     At no time did Mr. Black threaten or intimidate Ganieva. In Ganieva's initial Complaint, she falsely claimed that Mr. Black had "shoved a piece of paper across the table and told her she had to sign it." In one of the very few rollbacks in the Amended Complaint, Ganieva now claims that "he presented Ganieva with a one-page document" (AC ¶ 207). Contrary to the allegations in the Amended Complaint and consistent with the recorded conversations, Ganieva in no way appeared "nervous," she had no "difficulty understanding" the Agreement, and she did not "only read it once, quickly". (*Id.* ¶¶ 208, 210). Mr. Black did not "order[] her to sign" anything. (*Id.* ¶ 212). The allegation in bold that purports to be yet another verbatim quote— **"'[I will be**

Case 1:21-cv-08824 Document 1-4 Filed 10/28/21 Page 23 of 73

**paying you] as long as you keep your mouth shut'"**—simply was not said. (*Id.* ¶ 213, internal

quotations and emphasis in original). There is a record; each of these allegations is patently false.

40. *What actually happened at that meeting is very much the opposite of what Ganieva*

*alleges happened.* Over the extended conversations between the parties, Ganieva well understood

the terms of the Release and Confidentiality Agreement, and in fact it was Ganieva who had first

suggested they should have a written instrument.

41. At the October 19, 2015 meeting, Mr. Black presented Ganieva with the Agreement

and encouraged her to "take your time" and "read it carefully"—and she did. Indeed, Ganieva took

approximately 12 minutes to review the one-page document, including reading parts of it aloud

and engaging in extensive discussion about it. Not only did Mr. Black explain it to her, but Ganieva

made clear her understanding that "basically I cannot sue you" and that "I can't mention your

name, ever, basically." As to this, Mr. Black clarified that she could "say that you know me," but

that, under the terms of the Agreement, she had to refrain from discussing their relationship or her

putative claims or the parties' financial arrangement.

42. The second Agreement was an exact duplicate of the first, and Ganieva willingly

signed this duplicate as well.

43. Ganieva was elated. After the papers were signed, she spent approximately 45

minutes finishing her lunch, sharing a Grand Marnier soufflé with Mr. Black, discussing her

investment and travel plans, and laughing about the fact that she was "a woman of means now."

44. Shortly after their meeting, she texted him: "Thank you for everything. Talk soon

xoxo."

45. As per their Agreement, Mr. Black forgave a series of loans to Ganieva totaling

approximately $1,000,000, made a simultaneous payment to Ganieva of $100,000, and provided

Case 1:21-cv-08824   Document 1-4   Filed 10/28/21   Page 24 of 73

"other consideration to which has been agreed"—continuing monthly payments and payment of £2,000,000 for Ganieva to use in an effort to obtain legal status in the United Kingdom. From approximately October 2015 until approximately March 2021 (when Ganieva posted her defamatory tweets), Ganieva accepted millions in monthly payments from Mr. Black pursuant to the Agreement.

46.     After the parties entered into the Agreement, Mr. Black set up a new account from which to make the monthly payments to Ganieva, which he called "E Trust." In her Amended Complaint, Ganieva states that she "has no knowledge as to why payments began from the 'E Trust' or what it is." (AC ¶ 218). To be very clear: *the "E" in "E Trust" stands for "Extortion."*

## Ganieva's Newly Minted Allegations of Sexual Abuse

47.     As noted, even when Ganieva was extorting Mr. Black in the summer and fall of 2015, she never once claimed to have been physically or sexually abused, let alone raped.

48.     These claims are viciously and demonstrably false—as the documents and recordings make one hundred percent clear. Not only does Ganieva never make such an allegation in all of the recorded conversations, but the text message exchanges surrounding the time of the alleged rape are dispositive.

49.     To begin, the allegation that, in 2008, Mr. Black took Ganieva to "a studio apartment with a mattress on the floor and no other furniture" (AC ¶ 28) does not read true, and it is not true. Even more preposterous is the notion that Mr. Black "forced sadistic sexual acts on her without her consent and despite her saying 'no.'" (*Id.* ¶ 27). In her initial Complaint, Ganieva states only (albeit repeatedly) that Mr. Black was "disgusting" and "sadistic." After Mr. Black filed both his Answer and a motion to strike such gratuitous and improper language, Ganieva has doubled down again—this time concocting horrific acts of sadistic torture.

23

50.    In her Amended Complaint, Ganieva claims that "[i]n the days leading up to the July 4, 2014 weekend, Ms. Ganieva became sick and was home for a number of days unable to go to the store or cook for herself." (AC ¶ 177). She claims that on July 6, she was "debilitated" and "in a weakened state, having been sick for almost a week"—so weak that she "could barely walk." (*Id.* ¶¶ 178, 179). She claims that she was "limp and unable to move." (*Id.* ¶ 181). She also claims that Mr. Black came to her home as though by surprise, "suddenly" knocking at her door and then "barg[ing] in." (*Id.* ¶ 177). These are lies.

51.    Rather, Ganieva had told Mr. Black that she felt sick on July 1, but on the very next day (July 2), she wrote to him that she was already feeling "much better," that "I think I will be all done by tonight," and that "I was just thinking about you."

52.    On June 28, Ganieva had written to Mr. Black: "*Baby… I'm all alone. Let's get together soon. I miss you. Xoxo*". (Emphasis added). She said she felt unwell for a day, as noted, but had recuperated by the very next day, July 2. Then, on July 6, Ganieva wrote to Mr. Black, unsolicited: "This is love. *I need you*…". (Emphasis added). In response to these entreaties, Mr. Black said that he would be driving back to the city in the evening of July 6, and inquired if he could "come over and tuck you in at 10:30?" She agreed, later adding: "Aaah. Can you please bring a bottle of wine if you can?" Mr. Black later said that he was back and asked if he could come earlier (at 9:45pm), with the requested wine. Ganieva again agreed, immediately.

53.    Thus, it was Ganieva who had initially reached out to "get together" because she was "all alone," then reached out again to tell him that she loved and needed him, and invited him to bring a bottle of wine when he was to come over on the night of July 6 to tuck her into bed. Though she had not felt well for a single day, on July 1, she reported that she was "much better"

by July 2 and that she thought she would be "done" with what ailed her by the night of July 2—

four nights before the parties met on July 6.

54. Clearly, Ganieva was not unwell by July 6—let alone debilitated and weak. Clearly,

she was looking forward to a pre-planned romantic evening with the wine she requested, and,

clearly, it was anything but "sudden[]"when Mr. Black showed up at precisely the appointed time.

55. There simply was no forced sex. A consensual rendezvous plainly had been

contemplated by both parties, and Ganieva reached out first thing the very next morning after the

alleged "rape" with a message of thanks and love: "*Good morning. It was very nice to see you last

night. I already feel better.... I love you and thank you!!! Xoxoxoxoxo and more love*". (Emphasis

added).

56. On July 9, she reached out to Mr. Black *again*, asked if he wanted to get together,

and sent "lots of love." When Mr. Black did not respond, Ganieva reached out *yet again* the

following day, July 10, to get together.

57. The Amended Complaint's false allegations continue. Ganieva claims that "[a]fter

this rape, Ms. Ganieva took her son and left New York to physically distance herself from Black."

(AC ¶ 191). This, too, is untrue. In the days and weeks that followed, Ganieva repeatedly and

insistently reached out to Mr. Black on numerous occasions, asking him, and indeed "begging"

him, to get together—which they did on no fewer than three occasions over the next few weeks.

58. Ganieva explained that she was having visa issues (apparently because, on

information and belief, her student visa had expired upon her graduation that spring), and that she

had to leave New York and return to Russia as a result.

25

Case 1:21-cv-08824   Document 1-4   Filed 10/28/21   Page 27 of 73

59.     While Mr. Black told Ganieva that he was "saddened" that she had to leave, he texted that "maybe its for the best." At her request, Mr. Black helped her set up interviews abroad and provided financial assistance for her relocation.

60.     As noted, in the few weeks between July 6 and her departure from New York on July 31, 2014, Ganieva and Mr. Black saw each other several times, at her request. Likewise, she frequently sent him loving messages, telling him the week after the alleged "rape" that he is "the kindest", and signing her text with, "Always yours….".

61.     Ganieva sent Mr. Black what he characterized as "beautiful flowers" on his birthday, the day she left New York. Mr. Black sent Ganieva a note to say that he was "very touched by your thoughtfulness and love." Ganieva texted this from the plane, as she was departing: "I love you and miss you already."

62.     From the time Ganieva left New York in July 2014, until the day she returned to extort him in June 2015, she continued to send him adoring messages, to try to see him, and to request financial, career, and other assistance.

63.     The lies in the Amended Complaint go on. Ganieva alleges that, while she was abroad, Mr. Black "managed to always be aware of where she was and what she was doing" and that she "continued to feel threatened by Black and his power over her." (AC ¶¶ 191, 193). This is nonsense.

64.     After Ganieva left New York, the record is clear that Mr. Black made minimal effort to maintain contact with her, let alone try to exert any "power over her." For example, between October 23, 2014 and February 19, 2015, Ganieva continually texted Mr. Black without response. She sent such messages to him as: "*You have no idea how much I miss you and love you.*

*It's nice to know that someone like you exist in the world even tho a bit far,*" and "*I love you! I do!*" (Emphasis added).

65. Ganieva and Mr. Black did not have friends or a social group in common. As is explicitly clear from the recorded conversations—and as Ganieva seemed to acknowledge—Mr. Black never told anyone about their relationship. It is delusional—and, as Ganieva herself has put it, "paranoid"—for her to allege that "it seemed that no matter where she traveled, inevitably, she happened to meet someone that [sic] knew Black, including people that worked with Black at Apollo, and Black managed to always know where she was and what she was doing." (AC ¶ 191). To the extent Mr. Black had any idea where Ms. Ganieva was, it was only because she so often reached out to let him know about her travels (and, at times, to request money for them). In her texts, she volunteered information to him about her exotic comings and goings, including her travels to Moscow, Rome, London, a beach vacation, and a ski junket in the French Alps at Courchevel.

66. As noted, in her 2015 campaign of extortion, Ganieva had tried on a theory of palimony, and apparently recognized that this was not an actionable claim. She also tried on a "paranoid" theory of harassment and belittlement, but must have been counseled that, this too, is not actionable in a non-employment context. And, so, finally she has landed on a brand-new theory—alleging now, so many years later, that she had been raped.

67. Seemingly mindful of the relevant 7-year statute of limitations—and clearly unaware when she filed her initial Complaint that Mr. Black has retained their earlier text communications and recorded their later conversations—Ganieva has alighted upon July 6, 2014 as the date on which she was allegedly raped.

68.     Unfortunately for Ganieva, the documentary record reveals her for the fabulist and extortionist that she is. Mr. Black has only ever been kind, supportive, and exceedingly generous to Ganieva. Clearly, he exercised bad judgment in entering into the relationship in the first instance and in paying an exorbitant ransom to exit it; just as clearly, there is no truth to Ganieva's mercenary slander that has devastated his family, his business, and his life.

**Ganieva's Defamatory Tweets and This Frivolous Lawsuit**

69.     On March 17, 2021, Ganieva posted a series of false and defamatory tweets on Twitter about Mr. Black. Ganieva's Twitter account appears to have been set up for the sole purpose of publishing the defamatory tweets. She only set up the account in March 2021, and the thread of three defamatory tweets on March 17, 2021 appear to be the only tweets she has posted either before or since that date. She presently follows only 21 Twitter users, including several investigative reporters who have reported on sexual abuse matters, two women who have made sexual harassment allegations in high-profile matters, and the law firm and lawyer she retained in this case. In the defamatory tweets, Ganieva pointedly refers to Mr. Black as "Apollo Global Management's CEO and Chairman, Leon Black", in an obvious effort to maximize the professional and reputational harm to Mr. Black. At the end of the thread, Ganieva included the hashtags #MeToo and #LeonBlack, similarly attempting to maximize the reach of her defamatory tweets.

70.     Ganieva's defamatory comments included: (i) that she had been "sexually harassed and abused" by Mr. Black "for years"; (ii) that Mr. Black "could not understand me when I refused his sexual advances"; (iii) that she had been "bullied, manipulated, threatened, and coerced" by Mr. Black; (iv) that, "under duress, I was forced to sign an NDA in 2015"; and (v) that she did "not want this type of predatory behavior to continue happening to other women." (AC ¶ 226).

28

71.     In response, and quite understandably given the circumstances, Mr. Black publicly

defended himself, including stating principally that: "I foolishly had a consensual affair with Ms.

Ganieva that ended more than seven years ago"; her allegations were "completely fabricated"; and

"I have been extorted by Ms. Ganieva for many years and I made substantial monetary payments

to her. . .". (AC ¶ 227).

72.     Ganieva made additional false and defamatory statements of fact concerning Mr.

Black in an interview with the *New York Post* on April 8, 2021, including that "Black's abuse 'was

over a long period of time and it was tragic.'" Josh Kosman, *Leon Black's Surprise Apollo Global

Exit Came Amid Sexual Harassment Allegation*, N.Y. Post (Apr. 8, 2021),

https://nypost.com/2021/04/08/leon-black-accused-of-sexual-harassment/.

73.     Ganieva followed this with her frivolous initial Complaint. Mr. Black responded in

a detailed Answer, pointing, in particular, to specific documentary and recorded evidence that lays

waste to each of Ganieva's claims. Now Ganieva has filed her Amended Complaint, in which she

manages not only to further lie in allegation after allegation, but to lie in ways and about matters

that have exactly nothing to do with the claims and everything to do with sensationalism and

spectacle.

### Ganieva's Fictitious Amended Complaint

74.     In her Amended Complaint, Ganieva for the first time adds a preposterous number

of allegations that she apparently has only just recalled since the filing of her initial Complaint.

The wholesale amendment of a complaint in response to an answer is quite unusual, and here—

most unusually—the Amended Complaint has mushroomed to add some 154 new paragraphs of

freshly-hatched "factual" allegations as compared to the 90 paragraphs in the initial Complaint,

for a grand total of 244 paragraphs. And, now that Ganieva has had a miraculous sudden recall of

29

Case 1:21-cv-08824 Document 1-4 Filed 10/28/21 Page 31 of 73

now-critical events, her recollections are recounted with detailed precision. As noted, one major category of new recall is the sexual sadism of which she falsely accuses Mr. Black, something she would have been expected to include in her initial Complaint given the nature of her claims.

75. Another major category of new allegations in the Amended Complaint relates to Mr. Black's purported "'**conveyor belt of women**'"—an expression that Ganieva ridiculously claims that Mr. Black "often" used. (AC ¶ 131) (Internal quotations and emphasis in original). These brand-new allegations are irrelevant and clearly designed only to further publicly harass and shame Mr. Black and his family. And Ganieva's premise for larding the pleadings with this new set of allegations is spurious. In the recorded conversations, Ganieva repeatedly makes clear her belief that her power over Mr. Black lay in his desire to avoid publicizing their affair to the press, his business, and his wife and family. Ganieva's threats to Mr. Black's family, repeatedly and on tape, are explicit in those recordings—as is his intense desire to defuse this threat.

76. But by far the most notable, and most truly bizarre, category of newly minted allegations is found in Ganieva's pages-long frolic-and-detour about Jeffrey Epstein. In what is a caricature of a frivolous pleading, this section of the Amended Complaint actually begins with a discursive biography of Epstein and his "modest upbringing," winds through a history of Epstein's criminal conduct, and struggles to implicate Black and his "*posse*" (AC ¶ 70) (emphasis in original) in all manner of sexual corruption, trafficking, conspiracy, and cover-up—despite one lick of proof. The tabloid-ready allegations are punctuated with randomly placed quotation marks, curiously highlighted text, and lurid mixed metaphors that do not even attempt to tether themselves to reality or to the claims.

77. Ganieva's motivation for attempting to retrofit Epstein into her Amended Complaint is as clear as her motivation for gratuitously salting into her pleadings a litany of other

30

controversial and notorious figures who also have nothing to do with her claims: it is classic distraction, obfuscation, and attempted guilt by association, and it has no place in a court pleading.

78.     Moreover, and more fundamentally, Ganieva's desperate ploy not only is irrelevant to the point of frivolity; it is a lie. Borrowing details from published reports (for just one example, there are numerous accounts of Epstein bringing in women for sex while sheriff's deputies stood guard outside) and concocting others (down to the "sheepish[]" grin of a deputy and to the "serious but soft, feminine tone" of alleged co-conspirator Sarah Kellen), Ganieva imagines an entire fever dream that *never happened*. This will be proven at trial; in the meantime, it suffices to say that the lies virtually fly off the page.

79.     Mr. Black simply did not kidnap Ganieva or threaten to plant "'very serious'" drugs on Ganieva. (AC ¶ 87) (Internal quotations in original). He did not fly her down for a two-hour encounter in Florida for the purpose of lying "almost supine" in an office next to Jeffrey Epstein, "indicat[ing] to Ganev "with his eyes" that he and Epstein wanted her to "*do something.*" (AC ¶ 94) (Emphasis in original). He did not tell her that his "'**best friends**'" (internal quotations and emphasis in original) Jeffrey Epstein and Harvey Weinstein "were helping him to '**do**' Ms. Ganieva" (internal quotations and emphasis in original), "'recording her'" (internal quotations in original), or "making a movie about her," whatever any of these things might possibly mean. (AC ¶¶ 114-17). The prose is laughably lurid,[3] unrealistically detailed,[4] and internally nonsensical.[5]

---

[3] To take just one of many possible examples, there is this: "Alarmed and shocked, Ms. Ganieva remembers"—now—"standing in front of them unable to say anything while they just stared up at her, saying nothing, but clearly expecting her to *do something.*" (AC ¶ 94) (Emphasis in original).
[4] Just one example: In her "serious but soft, feminine tone," Kellen said: "'*you know*…[pausing]… something may happen to you,' as her voice trailed off." (AC ¶¶ 97-99) (Internal quotations and emphasis in original).
[5] An example: Black became "visibly annoyed" when she just stood before him and Epstein without responding to the sexual overture he was making "with his eyes," and told her to leave the room. (AC ¶¶ 94-95). According to the story, they then adjourned to another room and engaged in

And, yet, Ganieva and her lawyers—notwithstanding their ethical obligations—think nothing of presenting them to this Court as truth.

80.     And, like many of the other lies in her pleadings, this one is exposed by the evidence in this case, including Ganieva's own words. In one of the recorded conversations, Ganieva spoke about how a number of billionaires supposedly had "defamed" and "threaten[ed] her by "treat[ing] her] in a very disrespectful way." She spouted off four names, including Epstein's, to which Mr. Black expressed incredulity and noted that he was unaware that she even knew two of them—one of whom was Epstein. Specifically, he stated: "I didn't even know you knew [billionaire #1]… I knew you knew [billionaire #2]. *Did you ever meet Epstein?*" To this, she immediately responded, "No, but he called me." The rest of her response is garbled, though she appears to then state that she had been to his "place" and spoken with a "girl." It goes without saying that both parties would have quite well remembered that Ganieva and Epstein had met if Mr. Black had forcibly taken Ganieva to join in a threesome with Epstein in Miami. It would have made no sense for Mr. Black to have asked the question, and equally no sense for Ganieva to have failed to raise the alleged trip in response.

81.     Likewise, both the flight records and, on information and belief, truthful testimony from Sarah Kellen will confirm that *the trip described in Ganieva's Amended Complaint simply did not happen*.

---

a conversation around a table about the financial and jobs markets, until "Epstein and Black became angry and upset with Ms. Ganieva" when it became clear to them—once again, apparently—that she would not be having sex with them. (AC ¶¶ 102-105). And according to the story, Mr. Black and Ganieva then turned right around and flew back home, as Mr. Black wordlessly but "forcibly shoved food into Ms. Ganieva's mouth." (AC ¶¶ 105-107). Not only is none of this true, it does not even have the patina of truth.

Case 1:21-cv-08824  Document 1-4  Filed 10/28/21  Page 34 of 73

82.     Another notable new addition to the Amended Complaint is Ganieva's revisionist attempt to explain away the devastating documentary and recorded evidence set forth in Mr. Black's Answer.

83.     In his Answer, Mr. Black laid bare both the small lies and the big ones surrounding Ganieva's allegation of rape. As noted, the text communications make clear that he did not barge in to Ganieva's apartment while she was sick and too weak to move and overbear her will; rather, she invited him over for a drink to tuck her in, and sent him her love and thanks first thing the following morning. In her Amended Complaint, Ganieva has an incredible response to these facts: she alleges that "[p]erhaps" Mr. Black had come to the "realization that he had 'gone too far' this time, and so he "'huddled up' again with his legal team … to come up with a scheme to insulate Black from criminal liability". (AC ¶ 185) (Internal quotations in original).

84.     This criminal conspiracy, according to Ganieva, was to "manufacture evidence" by having Mr. Black somehow "command[] her to send him text messages saying that she loved him." (AC ¶¶ 186-87). This is absurdist for so many reasons that it almost does not bear response. Ganieva does not even try to allege any possible basis for how she got wind of this wild conspiracy theory. And Ganieva had been sending Mr. Black such messages for years before the alleged rape and the alleged criminal cover-up. And Ganieva does not even attempt to explain away her lies about having been sick and debilitated and surprised by Mr. Black barging in on her; indeed, she repeats these lies in her Amended Complaint. Nor does she explain why Mr. Black, who she alleges had been brutalizing and raping her for years, would suddenly fear that he had "'gone too far' this time"—which, indeed, allegedly was one of the few times when "he spared Ms. Ganieva the pain of his usual sadistic rituals." (AC ¶ 182) (Internal quotations in original). These are not only lies, they are poorly crafted ones.

85.     Equally fanciful are Ganieva's attempts to explain away the recorded conversations. Although it is difficult to parse, Ganieva's claim seems to be that she traveled back to New York in June 2015 for the sole purpose of finding out "what she could do to be able to live her life without his continued involvement" (AC ¶ 194)—but definitely not to demand money from him. The claim does not bother to account for the fact that, at this time, Mr. Black had not been involved with or even seen Ganieva for nearly one year, and barely even responded to her many messages during this period. After Ganieva asked to meet with Mr. Black for the purpose of getting out of her life someone who already was solidly out of it—but definitely not to demand money from him—she claims that Mr. Black seized upon this opportunity to force money upon her.

86.     Thus, Ganieva alleges that: "Feeling pressured to respond" to Mr. Black's demands that she request money that she very much did not want, she effectively was forced to "blurt[ed] out a number" (AC ¶ 198)—of *one hundred million dollars,* no less. "Clearly," she reasons (as though logic applied here), "the 'fix' was in, and Black was giddy about Ms. Ganieva having 'taken the bait.'" (*Id.*) (Internal quotations in original). According to Ganieva's story, apparently over her repeated protests that she definitely did not want his money, Mr. Black "would scream" at her that "'I want to give you money… *Say that you are blackmailing me*.'" (*Id.* at ¶ 199) (Internal quotations in original; emphasis added). According to Ganieva's theory of the case, she told Mr. Black that she was blackmailing him—which she indeed did do, explicitly, repeatedly, aggressively, and on tape—only because he forced her to do this. This is simply gibberish, and wholly belied by the recorded conversations.

87.     Just as nonsensical is Ganieva's similar explanation for the hours of dialogue in which she recounts having been bullied around the globe by waiters, billionaires, hairdressers, teachers, strangers, and so on. The recordings are clear that Ganieva needed no "goad[ing]" (AC

34

¶ 203) to launch into this parade of horribles (and certainly at no time during the hours of conversation recording the extortion campaign did Mr. Black appeared "elated" and "giggl[y]"). (*Id.*).

88.     As will be shown in this case, Ganieva has a history of inventing tales of bullying, harassment, disrespect—and worse—in the hopes of winning a payday for herself. To take just one relatively benign example for present purposes: Ganieva recently filed an affidavit in an action she brought against a college preparatory agency that she believed had ineffectively tutored her son, in which she used language identical to some of the language she uses against Mr. Black. In that affidavit, she swore repeatedly under oath that numerous employees of the agency had "yelled" at her, "attempt[ed] to bully" her, "disregarded" her, treated her "rudely," were "shockingly disrespectful" to her, and "blamed" her and her son for the employees' own shortcomings. She claimed that her "son is still traumatized by the ineffectiveness" of the agency's tutoring. She lost that case.

## **ANSWERS TO SPECIFIC ALLEGATIONS**

Defendant Leon Black denies all allegations in the Amended Complaint, including those in any headings, subheadings, and footnotes, except as expressly admitted herein. All allegations in the Amended Complaint involving unnamed and unidentified individuals also are denied until such time as such individuals are identified. Further, to the extent that Mr. Black has no memory as to an allegation, he herein denies knowledge or information sufficient to form a belief about the truth of such allegation.

1.     Denies each and every allegation in Paragraph 1 of the Amended Complaint, including those contained in footnote 1, except admits that the April 8, 2021 *Bloomberg* article contains the quoted text, and respectfully refers the Court to the April 8, 2021 *Bloomberg* article

and Mr. Black's statement to *Bloomberg* for the full text and context of Mr. Black's statement to Bloomberg, and avers that Mr. Black provided the following statement to *Bloomberg* in connection with the article:

> I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago. Any allegation of harassment or any other inappropriate behavior towards her is completely fabricated. The truth is that I have been extorted by Ms. Ganieva for many years and I made substantial monetary payments to her, based on her threats to go public concerning our relationship, in an attempt to spare my family from public embarrassment. At my direction, my counsel referred Ms. Ganieva's conduct to the criminal authorities several weeks ago and I welcome a thorough investigation of this matter. I also want to emphasize that this is entirely a personal matter; this matter has nothing to do with Apollo or my decision to step away from the firm.

2.    Denies each and every allegation in Paragraph 2 of the Amended Complaint.

3.    Denies each and every allegation in Paragraph 3 of the Amended Complaint.

4.    Denies each and every allegation in Paragraph 4 of the Amended Complaint, and avers that Ganieva made such threats on numerous occasions, including in recorded conversations.

5.    Denies each and every allegation in Paragraph 5 of the Amended Complaint, including those contained in footnote 2, except admits that Mr. Black dined on occasion with Ganieva at restaurants and on rare occasions appeared with her at events.

6.    Denies each and every allegation in Paragraph 6 of the Amended Complaint, except admits that Mr. Black made the quoted statement during the October 29, 2020 earnings call, and respectfully refers the Court to the October 29, 2020 earnings call transcript for the full text and context of Mr. Black's statements on that call.

7.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 7 of the Amended Complaint regarding Ganieva's legal education and her state of mind. Denies each and every allegation in Paragraph 7 of the Amended Complaint, except

Case 1:21-cv-08824   Document 1-4   Filed 10/28/21   Page 38 of 73

admits that Mr. Black made the quoted statement on or about January 25, 2021, and respectfully refers the Court to a transcript of the statement for the full text and context of Mr. Black's statement.

8.       Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 8 of the Amended Complaint regarding Ganieva's state of mind. Denies each and every allegation in Paragraph 8 of the Amended Complaint.

9.       Denies each and every allegation in Paragraph 9 of the Amended Complaint, including each and every allegation contained in the excerpted tweets, except admits that Ganieva, or someone purporting to act on Ganieva's behalf, posted the excerpted tweets on March 17, 2021, respectfully refers the Court to the tweets for their full text and context, and admits that Mr. Black texted Ganieva the following day and asked her to call him.

10.      Denies each and every allegation in Paragraph 10 of the Amended Complaint, including those contained in footnote 3, except admits that Mr. Black described Ganieva's conduct as extortion, and avers that such description is accurate.

11.      Denies each and every allegation in Paragraph 11 of the Amended Complaint, except admits that Mr. Black referred Ganieva's extortion to the appropriate criminal authorities.

12.      Denies each and every allegation in Paragraph 12 of the Amended Complaint.

13.      Denies each and every allegation in Paragraph 13 of the Amended Complaint.

14.      Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 14 of the Amended Complaint regarding Ganieva's state of mind. Denies each and every allegation in Paragraph 14 of the Amended Complaint.

15.    To the extent the allegations in Paragraph 15 of the Amended Complaint call for legal conclusions, no response is required. To the extent any response is required, denies each and every allegation in Paragraph 15 of the Amended Complaint.

16.    To the extent the allegations in Paragraph 16 of the Amended Complaint call for legal conclusions, no response is required. To the extent any response is required, denies that Mr. Black engaged in any act or omission giving rise to the claims alleged in the Amended Complaint, and admits that Mr. Black resides in New York State and that Ganieva purports to invoke the Court's jurisdiction.

17.    To the extent the allegations in Paragraph 17 of the Amended Complaint call for legal conclusions, no response is required. To the extent any response is required, denies that Mr. Black engaged in any act or omission giving rise to the claims alleged in the Amended Complaint, and admits that Ganieva purports to invoke venue in New York County.

18.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 18 of the Amended Complaint.

19.    Admits the allegation in paragraph 19 of the Amended Complaint.

20.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 20 of the Amended Complaint as to who invited Ganieva to the party at Donald Engel's home. Denies each and every allegation in Paragraph 20 of the Amended Complaint and in Footnote 4, except admits that Mr. Black and Ganieva met in or around March 2008 at a party at Donald Engel's home and that Mr. Black knew Donald Engel from Drexel Burnham, and avers that Ganieva sought out Mr. Black.

21.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 21 of the Amended Complaint as to Ganieva's marital status and under

what circumstances Ganieva moved from Russia to the United States. Denies each and every allegation in Paragraph 21 of the Amended Complaint, except admits that Ganieva has a son and that she told him that she was 25 years old in March 2008.

22.     Denies each and every allegation in Paragraph 22 of the Amended Complaint.

23.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 23 of the Amended Complaint as to who Ganieva "later met." Denies each and every allegation in Paragraph 23 of the Amended Complaint.

24.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 24 of the Amended Complaint as to Ganieva's state of mind. Denies each and every allegation in Paragraph 24 of the Amended Complaint.

25.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 25 of the Amended Complaint as to Ganieva's state of mind. Denies each and every allegation in Paragraph 25 of the Amended Complaint.

26.     Denies each and every allegation in Paragraph 26 of the Amended Complaint.

27.     Denies each and every allegation in Paragraph 27 of the Amended Complaint.

28.     Denies each and every allegation in Paragraph 28 of the Amended Complaint.

29.     Denies each and every allegation in Paragraph 29 of the Amended Complaint.

30.     Denies each and every allegation in Paragraph 30 of the Amended Complaint.

31.     Denies each and every allegation in Paragraph 31 of the Amended Complaint, and avers that Mr. Black often tried to help and support Ganieva, including by financing an apartment rental for her in a school district that she wanted for her son, and that, while Mr. Black initially told Ganieva he would try to help her with a recommendation for Harvard Business School, ultimately, as a result of her extortion of him, he told her he would not do so.

39

32.     Denies each and every allegation in Paragraph 32 of the Amended Complaint.

33.     Denies each and every allegation in Paragraph 33 of the Amended Complaint.

34.     Denies each and every allegation in Paragraph 34 of the Amended Complaint.

35.     Denies each and every allegation in Paragraph 35 of the Amended Complaint.

36.     Denies each and every allegation in Paragraph 36 of the Amended Complaint.

37.     Denies each and every allegation in Paragraph 37 of the Amended Complaint.

38.     Denies each and every allegation in Paragraph 38 of the Amended Complaint.

39.     Denies each and every allegation in Paragraph 39 of the Amended Complaint.

40.     Denies each and every allegation in Paragraph 40 of the Amended Complaint.

41.     Denies each and every allegation in Paragraph 41 of the Amended Complaint.

42.     Denies each and every allegation in Paragraph 42 of the Amended Complaint.

43.     Denies each and every allegation in Paragraph 43 of the Amended Complaint.

44.     Denies each and every allegation in Paragraph 44 of the Amended Complaint.

45.     Denies each and every allegation in Paragraph 45 of the Amended Complaint.

46.     Denies each and every allegation in Paragraph 46 of the Amended Complaint.

47.     Denies each and every allegation in Paragraph 47 of the Amended Complaint.

48.     Denies knowledge or information sufficient to form a belief about the truth of the
allegations in Paragraph 48 of the Amended Complaint as to the information contained in
published studies or the DSM-V. To the extent the allegations in Paragraph 48 of the Amended
Complaint call for legal conclusions, no response is required. Denies each and every allegation in
Paragraph 48 of the Amended Complaint.

49.     Denies each and every allegation in Paragraph 49 of the Amended Complaint.

50.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 50 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 50 of the Amended Complaint.

51.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 51 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 51 of the Amended Complaint, except admits that Epstein had or used several residences, including in New York, the U.S. Virgin Islands, Florida, and New Mexico.

52.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 52 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 52 of the Amended Complaint.

53.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 53 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 53 of the Amended Complaint, excepts admits that Epstein pled guilty in 2008 and that numerous women have publicly come forward to accuse Epstein of unlawful sex acts.

54.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 54 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 54 of the Amended Complaint, except admits that it has been widely reported that Epstein was arrested and charged in 2019.

55.     Denies each and every allegation in Paragraph 55 of the Amended Complaint, except admits that Mr. Black made the quoted statement during the July 31, 2019 earnings call, and respectfully refers the Court to the July 31, 2019 earnings call transcript for the full text and context of Mr. Black's statements on that call.

56.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 56 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 56 of the Amended Complaint, except admits that Epstein died in prison.

57.     Denies each and every allegation in Paragraph 57 of the Amended Complaint, except admits that the *New York Times* published the article cited in footnote 5 on October 12, 2020, and respectfully refers the Court to the article for its full text and context.

58.     Denies each and every allegation in Paragraph 58 of the Amended Complaint, except admits that Mr. Black made the quoted statement in an October 12, 2020 letter to Apollo's Limited partners, and respectfully refers the Court to the October 12, 2020 letter for the full text and context of Mr. Black's statements.

59.     Denies each and every allegation in Paragraph 59 of the Amended Complaint, including those contained in footnote 6, except admits that Mr. Black made the quoted statement during the October 29, 2020 earnings call, and respectfully refers the Court to the October 29, 2020 earnings call transcript for the full text and context of Mr. Black's statements on that call.

60.     Denies each and every allegation in Paragraph 60 of the Amended Complaint, except admits that Mr. Black made the quoted statement during the October 29, 2020 earnings call, and respectfully refers the Court to the October 29, 2020 earnings call transcript for the full text and context of Mr. Black's statements on that call.

61.     Denies each and every allegation in Paragraph 61 of the Amended Complaint, except admits that Apollo hired Dechert LLP to conduct an independent investigation.

62.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 62 of the Amended Complaint as to what Dechert LLP was "tasked with," but admits that a memorandum from Dechert LLP was filed with the SEC on January 22, 2021.

63.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 63 of the Amended Complaint as to what was "widely reported," and when it was reported. Denies each and every allegation in Paragraph 63 of the Amended Complaint, including those contained in footnote 7, except admits that a memorandum from Dechert LLP was filed with the SEC on January 22, 2021, and respectfully refers the Court to the January 22, 2021 memorandum for the full text and context of the memorandum.

64.    Denies each and every allegation in Paragraph 64 of the Amended Complaint, except admits that a memorandum from Dechert LLP was filed with the SEC on January 22, 2021, avers that the quoted term "name-dropping" does not appear in the memorandum, and respectfully refers the Court to the January 22, 2021 memorandum for the full text and context of the memorandum.

65.    Denies each and every allegation in Paragraph 65 of the Amended Complaint, except admits that a memorandum from Dechert LLP was filed with the SEC on January 22, 2021, and respectfully refers the Court to the January 22, 2021 memorandum for the full text and context of the memorandum.

66.    Denies each and every allegation in Paragraph 66 of the Amended Complaint, except admits that a memorandum from Dechert LLP was filed with the SEC on January 22, 2021, and respectfully refers the Court to the January 22, 2021 memorandum for the full text and context of the memorandum.

67.     Denies each and every allegation in Paragraph 67 of the Amended Complaint, except admits that a memorandum from Dechert LLP was filed with the SEC on January 22, 2021, and respectfully refers the Court to the January 22, 2021 memorandum for the full text and context of the memorandum.

68.     Denies each and every allegation in Paragraph 68 of the Amended Complaint, except admits that a memorandum from Dechert LLP was filed with the SEC on January 22, 2021, and respectfully refers the Court to the January 22, 2021 memorandum for the full text and context of the memorandum.

69.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 69 of the Amended Complaint as to the basis for Dechert LLP's conclusions. Denies each and every allegation in Paragraph 69 of the Complaint, except admits that a memorandum from Dechert LLP was filed with the SEC on January 22, 2021, and respectfully refers the Court to the January 22, 2021 memorandum for the full text and context of the memorandum.

70.     Denies each and every allegation in Paragraph 70 of the Amended Complaint, except admits that a memorandum from Dechert LLP was filed with the SEC on January 22, 2021, and respectfully refers the Court to the January 22, 2021 memorandum for the full text and context of the memorandum.

71.     Denies each and every allegation in Paragraph 71 of the Amended Complaint, except admits that Mr. Black made the quoted statement on January 25, 2021, and respectfully refers the Court to the January 25, 2021 statement for the full text and context of Mr. Black's statement.

72.    Denies each and every allegation in Paragraph 72 of the Amended Complaint, except admits that Mr. Black made the quoted statement on January 25, 2021, and respectfully refers the Court to the January 25, 2021 statement for the full text and context of Mr. Black's statement.

73.    Denies each and every allegation in Paragraph 73 of the Amended Complaint, except admits that Mr. Black had a professional and personal relationship with Epstein.

74.    Denies each and every allegation in Paragraph 74 of the Amended Complaint, including those contained in footnote 8, except admits that Plaintiff has purported to issue a subpoena to Dechert LLP, which she also has purported to have since withdrawn.

75.    Denies each and every allegation in Paragraph 75 of the Amended Complaint including those contained in footnote 9, except admits that Plaintiff has purported to issue subpoenas to the third parties identified in footnote 9, which she also has purported to have since withdrawn.

76.    Denies each and every allegation in Paragraph 76 of the Amended Complaint.

77.    Denies each and every allegation in Paragraph 77 of the Amended Complaint.

78.    Denies each and every allegation in Paragraph 78 of the Amended Complaint.

79.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 79 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 79 of the Amended Complaint, except admits that Epstein had pleaded guilty and had been sentenced to a term in prison.

80.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 80 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 80 of the Amended Complaint.

81.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 81 of the Amended Complaint as to Jeffrey Epstein and what had been "widely reported." Denies each and every allegation in Paragraph 81 of the Amended Complaint.

82.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 82 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 82 of the Amended Complaint.

83.     Denies each and every allegation in Paragraph 83 of the Amended Complaint.

84.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 84 of the Amended Complaint, including those contained in footnote 10, as to Jeffrey Epstein. Denies each and every allegation in Paragraph 84 of the Amended Complaint.

85.     Denies each and every allegation in Paragraph 85 of the Amended Complaint.

86.     Denies each and every allegation in Paragraph 86 of the Amended Complaint.

87.     Denies each and every allegation in Paragraph 87 of the Amended Complaint.

88.     Denies each and every allegation in Paragraph 88 of the Amended Complaint.

89.     Denies each and every allegation in Paragraph 89 of the Amended Complaint.

90.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 90 of the Amended Complaint, including those contained in footnote 11, as to Jeffery Epstein. Denies each and every allegation in Paragraph 90 of the Amended Complaint.

91.     Denies each and every allegation in Paragraph 91 of the Amended Complaint.

92.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 92 of the Amended Complaint as to the contents of media reports and as to Ms. Kellen. Denies each and every allegation in Paragraph 92 of the Amended Complaint.

Case 1:21-cv-08824 Document 1-4 Filed 10/28/21 Page 48 of 73

93.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 93 of the Amended Complaint, including those contained in footnote 12, as to Ms. Kellen. Denies each and every allegation in Paragraph 93 of the Amended Complaint, including those contained in footnote 12.

94.     Denies each and every allegation in Paragraph 94 of the Amended Complaint.

95.     Denies each and every allegation in Paragraph 95 of the Amended Complaint.

96.     Denies each and every allegation in Paragraph 96 of the Amended Complaint.

97.     Denies each and every allegation in Paragraph 97 of the Amended Complaint.

98.     Denies each and every allegation in Paragraph 98 of the Amended Complaint.

99.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 99 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 99 of the Amended Complaint.

100.     Denies each and every allegation in Paragraph 100 of the Amended Complaint.

101.     Denies each and every allegation in Paragraph 101 of the Amended Complaint.

102.     Denies each and every allegation in Paragraph 102 of the Amended Complaint.

103.     Denies each and every allegation in Paragraph 103 of the Amended Complaint.

104.     Denies each and every allegation in Paragraph 104 of the Amended Complaint.

105.     Denies each and every allegation in Paragraph 105 of the Amended Complaint.

106.     Denies each and every allegation in Paragraph 106 of the Amended Complaint.

107.     Denies each and every allegation in Paragraph 107 of the Amended Complaint.

108.     Denies each and every allegation in Paragraph 108 of the Amended Complaint.

109.     Denies each and every allegation in Paragraph 109 of the Amended Complaint.

110.     Denies each and every allegation in Paragraph 110 of the Amended Complaint.

111.    Denies each and every allegation in Paragraph 111 of the Amended Complaint.

112.    Denies each and every allegation in Paragraph 112 of the Amended Complaint.

113.    Denies each and every allegation in Paragraph 113 of the Amended Complaint.

114.    Denies each and every allegation in Paragraph 114 of the Amended Complaint.

115.    Denies each and every allegation in Paragraph 115 of the Amended Complaint.

116.    Denies each and every allegation in Paragraph 116 of the Amended Complaint.

117.    Denies each and every allegation in Paragraph 117 of the Amended Complaint.

118.    Denies each and every allegation in Paragraph 118 of the Amended Complaint.

119.    Denies each and every allegation in Paragraph 119 of the Amended Complaint.

120.    Denies each and every allegation in Paragraph 120 of the Amended Complaint.

121.    Denies each and every allegation in Paragraph 121 of the Amended Complaint.

122.    Denies each and every allegation in Paragraph 122 of the Amended Complaint.

123.    Denies each and every allegation in Paragraph 123 of the Amended Complaint.

124.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 124 of the Amended Complaint as to the accusations against Ghislaine Maxwell. Denies each and every allegation in Paragraph 124 of the Amended Complaint, except admits that Mr. Black knew Ghislaine Maxwell.

125.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 125 of the Amended Complaint.

126.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 126 of the Amended Complaint.

127.     Denies each and every allegation in Paragraph 127 of the Amended Complaint, and avers that Ganieva repeatedly sought Mr. Black's financial and other help in connection with her immigration status.

128.     Denies each and every allegation in Paragraph 128 of the Amended Complaint.

129.     Denies each and every allegation in Paragraph 129 of the Amended Complaint.

130.     Denies each and every allegation in Paragraph 130 of the Amended Complaint.

131.     Denies each and every allegation in Paragraph 131 of the Amended Complaint.

132.     Denies each and every allegation in Paragraph 132 of the Amended Complaint.

133.     Denies each and every allegation in Paragraph 133 of the Amended Complaint, except admits that Mr. Black was CEO of Apollo Global Management during the relevant time frame.

134.     Denies knowledge or information sufficient to form a belief about the truth of the allegation in Paragraph 134 that "there were occasions where Ms. Ganieva found herself attending the same social functions as Black and his wife." Denies each and every allegation in Paragraph 134 of the Amended Complaint.

135.     Denies knowledge or information sufficient to form a belief about the truth of the allegation in Paragraph 135 that Ganieva was ever at Mr. Black's home in the Hamptons. Denies each and every allegation in Paragraph 135 of the Amended Complaint.

136.     Denies knowledge or information sufficient to form a belief about the truth of the allegation in Paragraph 136 that Ganieva was ever at Mr. Black's apartment in New York City. Denies each and every allegation in Paragraph 136 of the Amended Complaint.

137.     Denies each and every allegation in Paragraph 137 of the Amended Complaint.

49

138.    Denies knowledge or information sufficient to form a belief about the truth of the allegation in Paragraph 138 that Ganieva was ever at Mr. Black's home in Bedford. Denies each and every allegation in Paragraph 136 of the Amended Complaint.

139.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 139 as to who Ganieva met. Denies each and every allegation in Paragraph 139 of the Amended Complaint.

140.    Denies each and every allegation in Paragraph 140 of the Amended Complaint.

141.    Denies each and every allegation in Paragraph 141 of the Amended Complaint.

142.    Denies each and every allegation in Paragraph 142 of the Amended Complaint.

143.    Denies each and every allegation in Paragraph 143 of the Amended Complaint.

144.    Denies each and every allegation in Paragraph 144 of the Amended Complaint.

145.    Denies each and every allegation in Paragraph 145 of the Amended Complaint.

146.    Denies each and every allegation in Paragraph 146 of the Amended Complaint.

147.    Denies each and every allegation in Paragraph 147 of the Amended Complaint.

148.    Denies each and every allegation in Paragraph 148 of the Amended Complaint.

149.    Denies each and every allegation in Paragraph 149 of the Amended Complaint.

150.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in footnote 14 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 150 of the Amended Complaint, including those contained in footnote 14.

151.    Denies each and every allegation in Paragraph 151 of the Amended Complaint.

152.    Denies each and every allegation in Paragraph 152 of the Amended Complaint.

153.    Denies each and every allegation in Paragraph 153 of the Amended Complaint.

154.    Denies each and every allegation in Paragraph 154 of the Amended Complaint.

Case 1:21-cv-08824  Document 1-4  Filed 10/28/21  Page 52 of 73

155.    Denies each and every allegation in Paragraph 155 of the Amended Complaint.

156.    Denies each and every allegation in Paragraph 156 of the Amended Complaint.

157.    Denies each and every allegation in Paragraph 157 of the Complaint.

158.    Denies each and every allegation in Paragraph 158 of the Amended Complaint.

159.    Denies each and every allegation in Paragraph 159 of the Amended Complaint.

160.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 160 of the Amended Complaint, including about Ganieva's state of mind. Denies each and every allegation in Paragraph 160 of the Amended Complaint, except admits that Ganieva enrolled in an undergraduate program at around the time indicated.

161.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 161 of the Amended Complaint as to Ganieva's state of mind. Denies each and every allegation in Paragraph 161 of the Amended Complaint.

162.    Denies each and every allegation in Paragraph 162 of the Amended Complaint, except admits that Mr. Black made a loan to Ganieva, pursuant to her request, in 2011.

163.    Denies each and every allegation in Paragraph 163 of the Amended Complaint, except admits that Mr. Black made a loan to Ganieva in 2011 pursuant to Ganieva's request and that certain terms of the loan were memorialized in a one-page, signed document, and respectfully refers the Court to the document referenced in Paragraph 165 of the Amended Complaint for the document's full text and context.

164.    Denies each and every allegation in Paragraph 164 of the Amended Complaint, and respectfully refers the Court to the document contained in Paragraph 165 of the Amended Complaint for its full text and context.

Case 1:21-cv-08824 Document 1-4 Filed 10/28/21 Page 53 of 73

165. Denies each and every allegation in Paragraph 165 of the Amended Complaint, and respectfully refers the Court to the document contained in Paragraph 165 of the Amended Complaint for its full text and context.

166. Denies each and every allegation in Paragraph 166 of the Amended Complaint.

167. Denies each and every allegation in Paragraph 167 of the Amended Complaint, except admits that Mr. Black made a loan to Ganieva in 2013 pursuant to Ganieva's request, and respectfully refers the Court to the document contained in Paragraph 167 of the Amended Complaint for its full text and context.

168. Denies each and every allegation in Paragraph 168 of the Amended Complaint.

169. Denies each and every allegation in Paragraph 169 of the Amended Complaint, except admits that Mr. Black helped Ganieva with her job search.

170. Denies each and every allegation in Paragraph 170 of the Amended Complaint.

171. Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 171 of the Amended Complaint regarding Ganieva's purported communications with Goldman Sachs, and respectfully refers the Court to those communications for their full text and context. Denies each and every allegation in Paragraph 171 of the Amended Complaint, except admits that Mr. Black helped Ganieva with her job search.

172. Denies knowledge or information sufficient to form a belief about the truth of the allegation in Paragraph 172 of the Amended Complaint that Ganieva "never received an offer from any financial company in New York." Denies each and every allegation in Paragraph 172 of the Amended Complaint, except admits that Mr. Black helped Ganieva with her job search.

173. Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 173 of the Amended Complaint regarding Ganieva's purported

52

communications with Goldman Sachs, and respectfully refers the Court to those communications for their full text and context. Denies each and every allegation in Paragraph 173 of the Amended Complaint.

174.    Denies each and every allegation in Paragraph 174 of the Amended Complaint.

175.    Denies each and every allegation in Paragraph 175 of the Amended Complaint.

176.    Denies each and every allegation in Paragraph 176 of the Amended Complaint.

177.    Denies each and every allegation in Paragraph 177 of the Amended Complaint, except admits that on July 6, 2014, Mr. Black returned from the Hamptons, and avers that he had previously arranged with Ganieva to visit her at her apartment on East 77th Street at an appointed time.

178.    Denies each and every allegation in Paragraph 178 of the Amended Complaint.

179.    Denies each and every allegation in Paragraph 179 of the Amended Complaint.

180.    Denies each and every allegation in Paragraph 180 of the Amended Complaint.

181.    Denies each and every allegation in Paragraph 181 of the Amended Complaint.

182.    Denies each and every allegation in Paragraph 182 of the Amended Complaint.

183.    Denies each and every allegation in Paragraph 182 of the Amended Complaint.

184.    Denies each and every allegation in Paragraph 184 of the Amended Complaint.

185.    Denies each and every allegation in Paragraph 185 of the Amended Complaint.

186.    Denies each and every allegation in Paragraph 186 of the Amended Complaint.

187.    Denies each and every allegation in Paragraph 187 of the Amended Complaint.

188.    Denies each and every allegation in Paragraph 188 of the Amended Complaint.

Case 1:21-cv-08824   Document 1-4   Filed 10/28/21   Page 55 of 73

189.    Denies each and every allegation in Paragraph 189 of the Amended Complaint, excepts admits that, at Ganieva's request, Mr. Black provided approximately those sums at approximately those times to Ganieva.

190.    Denies each and every allegation in Paragraph 190 of the Amended Complaint.

191.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 191 of the Amended Complaint regarding whether Ganieva "happened to meet someone that knew Black." Denies each and every allegation in Paragraph 191 of the Amended Complaint, and avers that Ganieva informed Mr. Black that her departure from New York was due to immigration issues.

192.    Denies each and every allegation in Paragraph 192 of the Amended Complaint.

193.    Denies each and every allegation in Paragraph 193 of the Amended Complaint.

194.    Denies each and every allegation in Paragraph 194 of the Amended Complaint, and avers that, prior to returning to New York, Ganieva had requested to meet with Mr. Black and that Mr. Black never requested repayment of either loan he made to Ganieva.

195.    Denies each and every allegation in Paragraph 196 of the Amended Complaint, except admits that Mr. Black recorded his conversations with Ganieva after he became aware of her plans to extort money from him, and avers that Ganieva threatened to go public about their relationship unless he paid her a sum of one hundred million dollars.

196.    Denies each and every allegation in Paragraph 196 of the Amended Complaint.

197.    Denies each and every allegation in Paragraph 197 of the Amended Complaint, and avers that Ganieva threatened to go public about their relationship unless Mr. Black paid her a sum of one hundred million dollars.

198.    Denies each and every allegation in Paragraph 198 of the Amended Complaint, and avers that Ganieva threatened to go public about their relationship unless Mr. Black paid her a sum of one hundred million dollars.

199.    Denies each and every allegation in Paragraph 199 of the Amended Complaint, except admits that Mr. Black met with Ganieva on several occasions in 2015 in person, and avers that those dates were: June 26, July 21, July 24, August 12, August 14, August 19, September 17, October 15, and October 19, and avers that Ganieva threatened to go public about their relationship unless Mr. Black paid her a sum of one hundred million dollars.

200.    Denies each and every allegation in Paragraph 200 of the Amended Complaint, and avers that Ganieva threatened to go public about their relationship unless Mr. Black paid her a sum of one hundred million dollars.

201.    Denies each and every allegation in Paragraph 201 of the Amended Complaint.

202.    Denies each and every allegation in Paragraph 202 of the Amended Complaint.

203.    Denies each and every allegation in Paragraph 203 of the Amended Complaint, except admits that Ganieva told many "stories about people she had encountered who claimed to or appeared to know Black, and how some of them had mistreated her."

204.    Denies each and every allegation in Paragraph 204 of the Amended Complaint, except admits that Mr. Black agreed "that he would pay her $100,000 every month and a certain sum of money to help with her immigration status" pursuant to a written agreement between the parties.

205.    Denies each and every allegation in Paragraph 205 of the Amended Complaint.

206.    Denies each and every allegation in Paragraph 206 of the Amended Complaint.

207.    Denies each and every allegation in Paragraph 207 of the Amended Complaint, and avers that the parties met at the Four Seasons Restaurant on October 19, 2015, that Mr. Black provided Ganieva with an Agreement containing the terms that the two previously had discussed, and that he encouraged Ganieva to take her time and to read it carefully.

208.    Denies each and every allegation in Paragraph 208 of the Amended Complaint, and avers that Ganieva made clear that she well understood each and every term of the Agreement.

209.    Denies each and every allegation in Paragraph 209 of the Amended Complaint.

210.    Denies each and every allegation in Paragraph 210 of the Amended Complaint.

211.    Denies each and every allegation in Paragraph 211 of the Amended Complaint, and avers that only Ganieva signed the Agreement.

212.    Denies each and every allegation in Paragraph 212 of the Amended Complaint, except admits that Ganieva signed two identical copies of the Agreement.

213.    Denies each and every allegation in Paragraph 213 of the Amended Complaint.

214.    Denies each and every allegation in Paragraph 214 of the Amended Complaint, including those in footnote 15, except admits that Mr. Black retained both copies of the Agreement.

215.    Denies each and every allegation in Paragraph 215 of the Amended Complaint, and avers that Ganieva proposed sharing a soufflé of her choosing.

216.    Denies each and every allegation in Paragraph 216 of the Amended Complaint, except admits that conversations between Mr. Black and Ganieva were consensually monitored and recorded, and avers that Ganieva threatened to go public about their relationship unless he paid her a sum of one hundred million dollars.

217.    Admits the allegations in Paragraph 217 of the Amended Complaint.

218.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 218 of the Amended Complaint regarding how Ganieva's bank statement recorded funds, or as to what Ganieva did or did not know. Denies each and every allegation in Paragraph 218 of the Amended Complaint, except admits that Mr. Black had previously sent funds to Ganieva; that due to Ganieva's extortion of him, Mr. Black set up the "E Trust" account; and that funds began to be transferred from the E Trust account beginning on or about October 22, 2015. Avers that the "E" in "E Trust" stands for "Extortion."

219.    Denies each and every allegation in Paragraph 219 of the Amended Complaint, including each and every allegation contained in the excerpted text messages, except admits that Ganieva sent Mr. Black the October 15 and October 16, 2019 text messages quoted therein, and that Mr. Black did not respond to the text messages, and respectfully refers the Court to those text messages for their full text and context.

220.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 220 of the Amended Complaint regarding Ganieva's retention of legal counsel and about the alleged letter dated March 6, 2020. Denies each and every allegation in Paragraph 220 of the Amended Complaint, except admits that counsel purporting to represent Ganieva sent a letter to Mr. Black on February 18, 2020, and that Mr. Black did not respond to that letter.

221.    Denies each and every allegation in Paragraph 221 of the Amended Complaint, except admits that both signed copies of the Agreement are in Mr. Black's custody or control. Avers that counsel for Mr. Black has offered to provide a copy of the Agreement to counsel for Ganieva, subject to the terms of a standard court-ordered protective agreement or an interim agreement between the parties not to publicize documents produced in litigation, and provided a

draft of such an agreement to counsel for Ganieva. Avers that counsel for Ganieva refused to discuss such an agreement.

222.     Admits the allegation in Paragraph 222 of the Amended Complaint that Mr. Black made the quoted statement during the October 29, 2020 earnings call, and respectfully refers the Court to the October 29, 2020 earnings call transcript for the full text and context of Mr. Black's statements on that call.

223.     Denies each and every allegation in Paragraph 223 of the Amended Complaint.

224.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 224 of the Amended Complaint regarding Ganieva's legal education and her state of mind. Denies each and every allegation in Paragraph 224 of the Amended Complaint.

225.     Denies each and every allegation in Paragraph 225 of the Amended Complaint.

226.     Denies each and every allegation in Paragraph 226 of the Amended Complaint, including each and every allegation contained in the excerpted tweets, except admits that Ganieva, or someone purporting to act on Ganieva's behalf, posted the excerpted tweets on March 17, 2021, and respectfully refers the Court to the tweets for their full text and context.

227.     Denies each and every allegation in Paragraph 227 of the Amended Complaint, including those contained in footnote 16, except admits that *Bloomberg* published the quoted material on April 8, 2021, and respectfully refers the Court to the April 8, 2021 *Bloomberg* article and Mr. Black's statement to *Bloomberg* for the full text and context of Mr. Black's statement to *Bloomberg*, and avers that Mr. Black provided the following statement to *Bloomberg* in connection with the article:

> I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago. Any allegation of harassment or any other inappropriate behavior towards her is completely fabricated. The truth is that I have been extorted by Ms. Ganieva for many years and

> I made substantial monetary payments to her, based on her threats
> to go public concerning our relationship, in an attempt to spare my
> family from public embarrassment. At my direction, my counsel
> referred Ms. Ganieva's conduct to the criminal authorities several
> weeks ago and I welcome a thorough investigation of this matter. I
> also want to emphasize that this is entirely a personal matter; this
> matter has nothing to do with Apollo or my decision to step away
> from the firm.

228.   Denies each and every allegation in Paragraph 228 of the Amended Complaint, including those contained in footnote 17, except admits that additional publications also reported on the matter, including the publication cited at footnote 17, and respectfully refers the Court to those publications for their full text and context.

229.   Denies each and every allegation in Paragraph 229 of the Amended Complaint, including those contained in footnote 18, except admits that the *New York Post* published the article and the quoted material in footnote 18, and respectfully refers the Court to the article for its full text and context.

230.   To the extent the allegations in Paragraph 230 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 230 of the Amended Complaint.

231.   To the extent the allegations in Paragraph 231 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 231 of the Amended Complaint.

232.   Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 232 of the Amended Complaint as to the "examples" listed and the "playbook" cited in Paragraph 232 of the Amended Complaint, and respectfully refers the Court to the publications cited in footnotes 19-23 therein for their full text and context. Denies each and every allegation in Paragraph 232 of the Amended Complaint.

Case 1:21-cv-08824  Document 1-4  Filed 10/28/21  Page 61 of 73

233.   Denies each and every allegation in Paragraph 233 of the Amended Complaint.

234.   Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 234 of the Amended Complaint about the requirements for admission to the New York State bar. Denies each and every allegation in Paragraph 234 of the Amended Complaint.

235.   To the extent the allegations in Paragraph 235 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 235 of the Amended Complaint.

236.   Denies each and every allegation in Paragraph 236 of the Amended Complaint, except admits that Ganieva filed the initial Complaint in this action on June 1, 2021, and respectfully refers the Court to that Complaint for its full text and context. Avers that the original Complaint was nullified by the filing of the Amended Complaint by Ganieva and is no longer operative.

237.   Denies each and every allegation in Paragraph 237 of the Amended Complaint, except admits that on July 19, 2021, Mr. Black filed Counterclaims with his Answer to the original Complaint and respectfully refers the Court to that Answer and Counterclaims for their full text and context. Avers that those Counterclaims were nullified by the filing of the Amended Complaint by Ganieva and are no longer operative.

238.   Denies each and every allegation in Paragraph 238 of the Amended Complaint, except admits that on July 19, 2021, Mr. Black filed Counterclaims with his Answer to the original Complaint and respectfully refers the Court to that Answer and Counterclaims for their full text and context. Avers that those Counterclaims were nullified by the filing of the Amended Complaint by Ganieva and are no longer operative.

239.    Denies each and every allegation in Paragraph 239 of the Amended Complaint.

240.    Denies each and every allegation in Paragraph 240 of the Amended Complaint.

241.    Denies each and every allegation in Paragraph 241 of the Amended Complaint. Avers that counsel for Mr. Black has offered to provide a copy of the Agreement to counsel for Ganieva, subject to the terms of a standard court-ordered protective agreement or an interim agreement between the parties not to publicize documents produced in litigation, and provided a draft of such an agreement to counsel for Ganieva. Avers that counsel for Ganieva refused to discuss such an agreement.

242.    To the extent the allegations in Paragraph 242 of the Amended Complaint call for legal conclusions, no response is required. To the extent any response is required, denies each and every allegation in Paragraph 242 of the Amended Complaint, except admits that NYC Admin. Code §§ 10-1103 & 10-1104 contains the quoted language.

243.    To the extent the allegations in Paragraph 243 of the Amended Complaint call for legal conclusions, no response is required. To the extent any response is required, denies each and every allegation in Paragraph 243 of the Amended Complaint, including those contained in footnote 24, except admits that the GMVA does not contain an anti-retaliation provision.

244.    To the extent the allegations in Paragraph 244 of the Amended Complaint call for legal conclusions, no response is required. To the extent any response is required, denies each and every allegation in Paragraph 244 of the Amended Complaint, except admits that the GMVA does not contain an anti-retaliation provision.

245.    Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Amended Complaint, and otherwise denies each and every allegation in Paragraph 245 of the Amended Complaint.

61

246.     Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Amended Complaint, and otherwise denies each and every allegation in Paragraph 246 of the Amended Complaint.

247.     To the extent the allegations in Paragraph 247 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 247 of the Amended Complaint.

248.     To the extent the allegations in Paragraph 248 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 248 of the Amended Complaint.

249.     To the extent the allegations in Paragraph 249 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 249 of the Amended Complaint.

250.     To the extent the allegations in Paragraph 250 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 250 of the Amended Complaint.

251.     To the extent the allegations in Paragraph 251 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 251 of the Amended Complaint.

252.     To the extent the allegations in Paragraph 252 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 252 of the Amended Complaint.

253.    To the extent the allegations in Paragraph 253 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 253 of the Amended Complaint.

254.    To the extent the allegations in Paragraph 254 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 254 of the Amended Complaint.

255.    To the extent the allegations in Paragraph 255 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 255 of the Amended Complaint.

256.    Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Amended Complaint, and otherwise denies each and every allegation in Paragraph 256 of the Amended Complaint.

257.    Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Amended Complaint, and otherwise denies each and every allegation in Paragraph 257 of the Amended Complaint.

258.    To the extent the allegations in Paragraph 258 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 258 of the Amended Complaint.

259.    To the extent the allegations in Paragraph 259 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 259 of the Amended Complaint.

260.    To the extent the allegations in Paragraph 260 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 260 of the Amended Complaint.

261.    To the extent the allegations in Paragraph 261 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 261 of the Amended Complaint.

262.    To the extent the allegations in Paragraph 262 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 262 of the Amended Complaint.

263.    To the extent the allegations in Paragraph 263 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 263 of the Amended Complaint.

264.    To the extent the allegations in Paragraph 264 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 264 of the Amended Complaint.

265.    To the extent the allegations in Paragraph 265 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 265 of the Amended Complaint.

266.    To the extent the allegations in Paragraph 266 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 266 of the Amended Complaint.

267.     Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Amended Complaint, and otherwise denies each and every allegation in Paragraph 267 of the Amended Complaint.

268.     To the extent the allegations in Paragraph 268 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 268 of the Amended Complaint.

269.     To the extent the allegations in Paragraph 269 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 269 of the Amended Complaint.

270.     To the extent the allegations in Paragraph 270 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 270 of the Amended Complaint.

271.     To the extent the allegations in Paragraph 271 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 271 of the Amended Complaint.

272.     To the extent the allegations in Paragraph 272 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 272 of the Amended Complaint.

273.     To the extent the allegations in Paragraph 273 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 273 of the Amended Complaint.

274.     Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Amended Complaint, and otherwise denies each and every allegation in Paragraph 274 of the Amended Complaint.

275.     To the extent the allegations in Paragraph 275 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 275 of the Amended Complaint.

276.     Denies each and every allegation in Paragraph 276 of the Amended Complaint.

277.     To the extent the allegations in Paragraph 277 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 277 of the Amended Complaint.

278.     To the extent the allegations in Paragraph 278 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 278 of the Amended Complaint.

279.     Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Amended Complaint, and otherwise denies each and every allegation in Paragraph 279 of the Amended Complaint.

280.     To the extent the allegations in Paragraph 280 of the Amended Complaint call for legal conclusions, no response is required. Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Amended Complaint, and otherwise denies each and every allegation in Paragraph 280 of the Amended Complaint.

281.     To the extent the allegations in Paragraph 281of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 281 of the Amended Complaint.

282.     To the extent the allegations in Paragraph 282 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 282 of the Amended Complaint.

283.     To the extent the allegations in Paragraph 283 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 283 of the Amended Complaint.

284.     To the extent the allegations in Paragraph 284 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 284 of the Amended Complaint.

285.     Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Amended Complaint, and otherwise denies each and every allegation in Paragraph 285 of the Amended Complaint.

286.     To the extent the allegations in Paragraph 286 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 286 of the Amended Complaint.

287.     To the extent the allegations in Paragraph 287 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 287 of the Amended Complaint.

288.     To the extent the allegations in Paragraph 288 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 288 of the Amended Complaint.

289.    To the extent the allegations in Paragraph 289 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 289 of the Amended Complaint.

290.    To the extent the allegations in Paragraph 290 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 290 of the Amended Complaint.

### PRAYER FOR RELIEF

Denies that Ganieva has suffered any cognizable injury or damages entitling her to any legal recourse, and denies that Ganieva is entitled to any such relief, whether monetary, compensatory, punitive, declarative, equitable, costs, and/or fees relating to this matter, or in any other form sought by Ganieva.

### AFFIRMATIVE AND OTHER DEFENSES

#### First Defense

The Amended Complaint fails to state a claim upon which relief may be granted.

#### Second Defense

Ganieva's claims are barred by the existence of a signed, valid release.

#### Third Defense

Ganieva's claims are barred by waiver and/or estoppel.

#### Fourth Defense

Ganieva's claims are barred, in whole or in part, based on the doctrine of unclean hands as a result of her misconduct.

#### Fifth Defense

Ganieva's claims are barred by reason of her unlawful conduct.

68

### Sixth Defense

All of the statements Mr. Black is alleged to have made about Ganieva were either true or substantially true.

### Seventh Defense

All of the statements Mr. Black allegedly made about Ganieva were protected by his qualified privileges to make them, including the self-defense privilege and the *Chapadeau* privilege for statements involving matters of public concern, and Mr. Black's statements about Ganieva were not made with actual malice or gross irresponsibility.

### Eighth Defense

Ganieva is a limited purpose public figure, and the alleged defamatory statements were not published with an intent rising to constitutional malice and cannot be demonstrated by clear and convincing evidence.

### Ninth Defense

Any statements that Mr. Black has allegedly made about Ganieva were made in good faith.

### Tenth Defense

Ganieva's defamation claim fails because the alleged harm and damages sustained by Ganieva, if any, are the result of the acts and/or omissions of Ganieva or other entities, not of Mr. Black.

### Eleventh Defense

Ganieva's claims are barred because Mr. Black's alleged statements were not the proximate cause of Ganieva's alleged injuries.

69

### Twelfth Defense

The alleged defamatory statements were not published negligently, in reckless disregard of their truth, with gross irresponsibility, wantonly, or maliciously.

### Thirteenth Defense

All sexual encounters alleged to have taken place between Ganieva and Mr. Black were consensual.

### Fourteenth Defense

Ganieva's claims are barred, in whole or in part, because they implicate New York's anti-SLAPP statute, N.Y. Civil Rights Law § 76-a, and Ganieva has failed to allege actual malice.

### Fifteenth Defense

To the extent Ganieva bases her Gender-Motivated Violence Act claim on any conduct that occurred prior to June 1, 2014, those claims are barred by the applicable statute of limitations set forth in Admin. Code § 10-1105.

### Sixteenth Defense

Ganieva's claims are frivolous and are merely an attempt to preempt Mr. Black's lawful claims against her.

### Seventeenth Defense

The alleged harm and damages sustained by Ganieva, if any, are speculative.

### Eighteenth Defense

Ganieva has sustained no cognizable injury by reason of any wrongful conduct by Mr. Black. Ganieva makes only conclusory allegations of damages.

70

### Nineteenth Defense

Mr. Black's alleged conduct did not cause any loss of revenue or income to Ganieva. Ganieva makes only conclusory allegations of economic harm and has not alleged any facts demonstrating actual pecuniary loss or special damages.

### Twentieth Defense

Without conceding that Ganieva has suffered any damages as a result of any alleged wrongdoing by Mr. Black, Ganieva has failed to mitigate or minimize her alleged damages.

### Twenty-First Defense

Without conceding that Ganieva has suffered any damages as a result of any alleged wrongdoing by Mr. Black, any "damage" incurred by Ganieva as a result of any alleged wrongful conduct should be offset by the value of the substantial sums of money that Ganieva unlawfully obtained from Mr. Black.

### Twenty-Second Defense

Ganieva fails to state a claim for punitive damages.

### Twenty-Third Defense

Ganieva has not adequately pleaded extreme and outrageous conduct, intent, or severe emotional distress for her intentional infliction of emotional distress claim.

### Twenty-Fourth Defense

Ganieva's intentional infliction of emotional distress claim is duplicative of her defamation claims.

### **Twenty-Fifth Defense**

Ganieva fails to state a claim for retaliation under the GMVA, including because there is no anti-retaliation provision in the GMVA, because Mr. Black's filing of counterclaims was not retaliatory, and because the original filing of such counterclaims has been nullified.

Mr. Black is not knowingly waiving any affirmative defense and hereby expressly reserves the right to amend his Answer and include all such defenses as may become available or apparent during pretrial proceedings of this action.

**WHEREFORE,** Mr. Black respectfully requests that this Court:

(a)    Dismiss the Amended Complaint in its entirety with prejudice;

(b)    Award Mr. Black the costs of defending against the suit, including reasonable attorneys' fees and expenses;

(c)    Impose sanctions on Ganieva and her attorneys pursuant to NYCRR 130-1.1 for engaging in frivolous conduct, making material factually false statements, engaging in conduct undertaken primarily to harass and maliciously injure Mr. Black, and failing to conduct reasonable inquiry and diligence; and

(d)    Grant such other and further relief as the Court deems just and proper.

Dated: September 8, 2021
     New York, New York

Respectfully submitted,

E. Danya Perry
Peter A. Gwynne
PERRY GUHA LLP
35 East 62nd Street
New York, New York 10065
Email: dperry@perryguha.com
Telephone: (212) 399-8330
Facsimile: (212) 399-8331

*Attorneys for Defendant Leon Black*

72