**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LEON D. BLACK,

                              Plaintiff,

              v.

GUZEL GANIEVA, WIGDOR LLP,
JOSH HARRIS, and STEVEN RUBENSTEIN

                              Defendants.

Index No. 21-cv-8824 (PAE)

**AMENDED COMPLAINT**

Jury Trial Demanded

Plaintiff Leon D. Black, by his undersigned attorney, Susan Estrich, upon personal knowledge except where otherwise stated, alleges as follows:

**INTRODUCTION**

1.     This case arises out of two relationships that both led to an extortionate plot.  The first is Mr. Black's relationship with Defendant Guzel Ganieva, a consensual sexual association between two adults.  The second is Mr. Black's relationship with his former business partner Defendant Joshua Harris—who orchestrated a conspiracy and enterprise with Ms. Ganieva and Defendant Steven Rubenstein (the "Enterprise") to take down Mr. Black, first as an attempted coup to become the CEO of the firm Mr. Black founded, Apollo Global Management Inc., and then, after Mr. Black denied him that role, to retaliate and destroy him by, among other things, weaponizing Ms. Ganieva to assassinate his character and extort even more from him.

2.     The sexual relationship between Ms. Ganieva and Mr. Black began in 2008; was sporadic; and ended when she left the country in 2014, although she continued to profess her love for Mr. Black through numerous text messages and other communications.  Ms. Ganieva returned to the United States in 2015 to extort him.  In secretly taped conversations, she admitted her extortion by demanding $100 million of Mr. Black, expressly threatening to disclose and distort

their relationship to his wife and Apollo's board, as well as the press, if he did not pay her.  Mr. Black allowed himself to be extorted, forgiving close to $1 million in loans to Ms. Ganieva; pledging £2 million to help secure immigration rights in the United Kingdom for her and her son; and agreeing to pay $100,000 every month for fifteen years, provided she maintained the privacy of their relationship.  For six years thereafter, she did.  And then she did something so economically irrational and inexplicable that it would make no sense other than when understood in the context of defendants' scheme:  she walked away from the certainty of receiving $1.2 million a year for nine more years (having already received $9.2 million) and publicly attacked Mr. Black first on Twitter and then in lawsuits – lawsuits filed without even making a settlement demand first.

3.    Mr. Harris and Mr. Black first became acquainted in the mid-to-late 1980s, when Mr. Black ran the mergers and acquisitions department and then the 500-member corporate finance group at Drexel Burnham Lambert, and Mr. Harris joined fresh out of college.  After business school, Mr. Harris joined Apollo in 1991, a year after the firm's founding, as a junior employee. He was not until 2007, some 16 years later, designated as a "co-founder" of Apollo by Mr. Black even though he was not there when it started.  Mr. Harris made no bones about wanting the top job for years.  He asked for it and was rebuffed by Mr. Black in 2015.  When news more recently came to light that Jeffrey Epstein had served as Mr. Black's financial adviser, Mr. Harris began a renewed effort to depose him and take over as CEO.  In response to the Epstein news, Mr. Black did what most CEOs in his position would avoid:  he requested that the independent directors of Apollo formally commission an independent outside law firm to scrutinize the situation.  Senior former federal prosecutors from the Dechert law firm then investigated Mr. Black's relationship with Epstein for three months, ultimately concluding that neither Apollo nor Mr. Black had done anything wrong.  That report was issued in January 2021; and its conclusions cleared the way for

the Board to promote Mr. Black's chosen successor Marc Rowan and move forward with a substantial business merger he and Mr. Black supported, while Mr. Black would remain Chairman. For Mr. Black, as Apollo's founder, CEO, and Chairman for 30 years—as well as its largest shareholder, who had never sold a single share—this was an easy decision, since Mr. Rowan was strategic and growth-oriented.

4.      Seeing his long-held dream of becoming CEO or Co-CEO crushed with Mr. Rowan's ascension, and enraged that Mr. Black would remain as Chairman, Mr. Harris kicked into high gear his campaign to destroy Mr. Black.  Like Shakespeare's Iago, enraged by being passed over for promotion, he turned his wrath on his mentor and leader.  He sought to undermine Dechert's conclusions with the Board, engaged in a whisper campaign about Mr. Black with investors, and undertook a press and legal strategy to try and salvage one last chance at the promotion he had always wanted but never received.  Unbeknownst to Mr. Black, Apollo senior management, and the Board of Apollo, "co-founder" Mr. Harris convened a veritable war cabinet of advisers to take on the founder, the report, and Apollo itself—his very own company.  This war cabinet, more aptly called a war council, was an ever-expanding group.  It included *three* prominent political consulting/crisis management/public relations firms—Rubenstein (directed by its President, Defendant Steven Rubenstein), BerlinRosen (a firm that specifically promotes itself for its ability to "blunt the opposition's efforts" and "leverage the media" in litigation, with the "speed and intensity of a political campaign"), and Finsbury Glover Hering.  It also included *three* prominent law firms engaged by Mr. Harris by January 2021 to try to undermine the decisions of his own Board and, if that did not work, to destroy Mr. Black in retaliation and retribution.  Some of these firms, including one of the most prominent law firms in the world, were even representing

Apollo at the same time they secretly worked under Mr. Harris's direction to attack it and thus obviously were duty-bound not to act adversely to Apollo's interests.

5.      This war council met intensively over days and weeks, sometimes multiple times a day, including nights and weekends; they in turn set about to further their goals by contacting investors and the media, and by recruiting additional participants in their project.  They kept their internal meetings and communications closely guarded secrets and deliberately avoided creating much of a record:  as one email from Mr. Harris's Chief of Staff (and Apollo employee) Evan Zemsky, directed just days after Dechert's report was publicly announced, "ONLY USE SLACK WHEN COMMUNICATING WITH JOSH . . .  Even if JH pings you on whatsapp -- it should go to slack."  Slack is a communications platform that allows users to send what it describes as "self-destructing messages."

6.      Mr. Harris and his associates kept careful, indeed obsessive, track of media and metrics measuring the mentions, the popularity, the ratings and rankings of Josh Harris, Marc Rowan, and Leon Black.  They received lengthy decks analyzing search results, social media mentions, and the like for each of the protagonists.  They reviewed press and talking points and the like.  They interviewed litigators with the intention of launching or fomenting litigation against Mr. Black, and employed an ever-expanding group of media advisors.  They conscripted Apollo employees and advisors into Mr. Harris's effort to attack his own company and advance his career objectives.  They even went so far as secretly recruiting a director for Apollo's board who would be sympathetic to Mr. Harris's views, and actively working to undermine the existing board, including by planting fake news stories directly attacking individual board members.  But they still lacked the needed leverage over Mr. Black and were in search of a means – or more precisely, a

person – who could launch a public assassination of Mr. Black without leaving their own fingerprints.

7.       On the eve of the presentation of the Dechert report to the Board, Mr. Harris—who had more openly been trying to undermine the integrity of the report with Apollo's own directors— was called on precisely this point by one of the three independent directors who had commissioned it.  This was not his "first rodeo," the director told him, and unless Mr. Harris had evidence that Dechert did not (and Dechert examined some 60,000 documents, and conducted some two-dozen interviews), he should stop trying to undermine the report.  Mr. Harris and his associates had no new evidence, but they were intent on undermining the report—and with it, Mr. Black and even Apollo—anyway.  They reached out to third parties to determine, as one email documented, whether they could find anyone else who had "knowledge of additional allegations" about "LB"— Leon Black.  Indeed, one of Mr. Harris's future director appointments, apparently cognizant of Mr. Harris's attempts to undermine Mr. Black, desire to oust Mr. Black as Chairman of Apollo, and willingness to weaponize women who might level accusations, warned Mr. Harris in January 2021—some two months before Ms. Ganieva sued Mr. Black in New York state court—to be ready to spring into action: "If things break, they break fast.  Everything correlates.  *Consider what happened to Harvey Weinstein's firm*."  Mr. Black's relationship with Ms. Ganieva, of course, has absolutely nothing to do with, and is not remotely akin to, the circumstances of Mr. Weinstein's misconduct.  But the implication and purpose here was clear:  exploiting Mr. Black's relationship with Ms. Ganieva to fabricate a Weinstein-like situation where none actually existed.

8.       They thus made common cause with Ms. Ganieva, an unholy alliance in which litigation was the tinder in a larger campaign of destruction.  Ms. Ganieva had managed to extort Mr. Black after their relationship ended; she had already been paid nearly ten million dollars in

exchange for not disclosing their affair.  She wanted more.  An ex-lover who wanted more money had the potential to do harm, given both the times and technology.  She was the leverage.

9.      Beginning as early as January 2021, Mr. Harris and his confederates made it their business to frame and spread Ms. Ganieva's lies, potentially extorting more money for her while destroying Mr. Black.  Mr. Harris already had his personal lawyers engaged in the war council, and was searching for litigators on his own behalf.  But inflamed by Mr. Black's refusal to name him as co-CEO of Apollo, he began searching for yet more lawyers to represent Ms. Ganieva to bring down Mr. Black.  Within days of the Dechert report's completion, Mr. Harris's confederates, acting on his direction, began to contact law firms, not on their own behalves but apparently for an unidentified shadowy internal faction at Apollo that was involved in "cagey business" there. Among them, Alex Spiro at the Quinn Emanuel law firm.  They were seeking a firm which could be "adverse to Leon Black."  The name of the potential client was not disclosed, but a woman was mentioned.  Eventually, the woman was identified as Guzel Ganieva.

10.     Some weeks later, in March 2021, Ms. Ganieva, seemingly out of the blue, took to Twitter to accuse Mr. Black of being a sexual predator.  She posted just three carefully crafted tweets to a brand-new Twitter account, complete with the right hashtags, featuring three curated followers: all prominent members of the media who had covered the #metoo movement or Apollo. This was not the work of a single woman unsophisticated in media campaigns; she was plainly well advised in a deliberate plan, in league with others.  Tellingly, those three reporters, after learning more, all declined to write about her purported story.  Those reporters were not the only followers of Ms. Ganieva's newly created Twitter account.  In fact, Wigdor LLP ("Wigdor") partner Jeanne Christensen, who signed the complaint against Mr. Black soon to be filed on Ms. Ganieva's behalf in New York state court, was also an early follower.

11.     Not coincidentally, later that month, two investigators came to Ms. Ganieva's home, showing badges, and were admitted by the doorman.  The investigators supposedly told her that she should pursue claims against Mr. Black and gave her the name of a prominent litigator to contact—Spiro of Quinn Emanuel—the very same lawyer who had been contacted by an emissary of Mr. Harris at the behest of an Apollo faction previously to be adverse to Leon Black.  Mr. Spiro has denied sending the investigators, and his firm declined the representation.  However, Wigdor, which upon information and belief was working closely with one of the members of Mr. Harris's war council on another high profile case, ultimately agreed to take the case.  Incidentally, Wigdor was not the first law firm that Ms. Ganieva retained to pursue her fictitious claims against Mr. Black.  In 2019, another law firm sent Mr. Black a letter on Ms. Ganieva's behalf raising similarly trumped-up charges.  Ms. Ganieva's law firm change only came about, surely not coincidentally, in the wake of the outreach by Mr. Harris's emissary.

12.     In June 2021, represented by Defendant Wigdor, Ms. Ganieva sued Mr. Black in New York Supreme Court, bringing one outlandish complaint after another which Wigdor knew (or affirmatively chose not to know) were utterly fabricated.  The twin pillars of the complaints are an alleged rape, and supposed defamation.  Each of these pillars is nothing more than a tower of lies.

13.     First, the alleged rape: Ms. Ganieva's first complaint (the "Original Complaint") centered on her allegation that Mr. Black burst into her apartment and raped her seven years earlier on July 6, 2014 (conveniently, just before the statute of limitations would expire).  But she was seemingly unaware that Mr. Black retained text messages dating that far back, because her own words in the text messages showed her allegation was a complete lie.  In her own words, she had *invited* Mr. Black to her apartment that evening, instructed him to bring wine and asked that he

tuck her in.  In additional texts written and sent the next morning, she openly professed her love for him and, in the following weeks, repeatedly asked that he come see her.  Ms. Ganieva knew that her story was false and would be shown to be false.  Wigdor must have known it, could have known it, should have known it.  Did they not even ask her if she had any texts – texts which professed love for the man the morning after he supposedly raped her?

14.     The claim for supposed defamation is even more uncontrovertibly the product of Ms. Ganieva and Wigdor's fraud.  Although he had allowed himself to be extorted in 2015, knowing the crime that was occurring, he engaged professional investigators to lawfully record his conversations with Ms. Ganieva.  Not only was Ms. Ganieva caught red-handed on tape committing that extortion by demanding that $100 million, but in lengthy discussions that were recorded, she ***did not even mention*** any of the claims of rape that formed the basis of her newly-contrived suit.

15.     Mr. Black and his lawyers repeatedly offered Defendant Wigdor the opportunity to review those text messages, tapes and transcripts, and for many months they declined to do so, agreeing only after the complaint in this action was filed.  Such actions – like their failure *ever* to make a settlement demand before filing the complaint – would be inexplicable if these were legitimate complaints for legal relief rather than weapons being deployed to destroy Mr. Black.

16.     The truth did not matter to Ms. Ganieva, Wigdor, or the Enterprise—spreading bald-faced lies and scurrilous allegations to destroy Mr. Black and extort even more money from him did.  They used the courts as a vehicle, and social and mass media as an amplifier, to spread those lies and manipulate the public narrative.  They responded to the incontrovertible proof that their allegations were lies with yet more lies.  Pleadings showed up in the pages of *Vanity Fair* and the *New York Post* as they hit the docket.  And most of those lies did not even have anything to do

with the claims in the case, and were thrown in solely for the public shock and humiliation value. The second complaint (the "Amended Complaint"), filed after Mr. Black had disclosed the exculpatory text messages and tapes, doubled down by taking the scheme many steps further. Not only did Ganieva and Wigdor repeat their lies from the first complaint, they added 170-plus gratuitous mentions of Jeffrey Epstein. Those included an alleged incident in which Mr. Black allegedly **kidnapped** Ms. Ganieva **thirteen years earlier** and took her to Jeffrey Epstein's Florida home for a threesome—an incident which was contradicted by both the tape recordings (she wasn't sure she had ever met Epstein) and by flight logs showing Mr. Black's plane never even touched down in the State of Florida at that time. These lies were included solely to taint Mr. Black and for the purposes of yet more destructive publicity—Mr. Epstein is utterly irrelevant to the causes of action. Notwithstanding the liberal seasoning of the successive complaints with lies about Epstein, the claims against Mr. Black (rape and defamation) remain exactly the same. The Epstein allegations are entirely gratuitous, designed only to inflict maximum harm and character assassination, with the intention of forcing Black to pay even more.

17.     In fact, Ms. Ganieva has litigated her case in state court not like a plaintiff seeking to obtain justice as soon as possible, but like a defendant seeking to stall, obstruct and delay. Seeking to expose her illegitimate motives for bringing the lawsuit, Mr. Black has sought basic facts from Ganieva, such as her phone records in the weeks and months leading up to the filing of the case. Those records, upon information and belief, will reveal her claims to be false and will also reveal her connections to Mr. Harris and his advisors—motivated and coordinated with the Enterprise—which Ms. Ganieva to date has concealed from discovery. While Ms. Ganieva carefully crafts denials of coordination, she has obstructed basic discovery at every turn. The same is true as to other members of the Enterprise, such as public relations firm Rubenstein, which does

not deny speaking about her case to the press, but refuses to permit their denials to be tested by discovery—even just to search for phone records for calls with Ms. Ganieva.  If they have nothing to hide in this respect, one must wonder, why the stonewalling?

18.     The lawsuits provided the content for the campaign and the courts a public forum, and from there the campaign took off.  In modern terms, we call it a cancellation campaign; in figurative terms, it is an orchestrated assassination attempt, using scurrilous garbage wrapped in pleading paper as the Enterprise's vehicle to spread deceit and lies, and with it the hope of an eventual huge payout.  And never mind the truth:  did Wigdor even ask how Ms. Ganieva could have forgotten about being kidnapped and taken to Jeffrey Epstein's house – only to remember after her first complaint was literally shredded to bits by her own love notes cited in Mr. Black's answer.  Facing incontrovertible documentary evidence and the offers of more, did Wigdor stop and consider before they repeated the lies from the first version of the complaint in the second, and the second in the third?  Willful blindness and conscious avoidance amount to intent in the criminal law, and surely no more is required in the civil law.

19.     The Defendants have used and abused the resources of the New York courts not to redress legitimate grievances, much less to advance the "Me Too" movement.  Wigdor has represented many women who have been abused, but not here.  The Enterprise, in invoking the movement as they have, is taking advantage of – and perverting – the efforts of reformers to protect women who, unlike Ms. Ganieva, are victims (and, hopefully, someday survivors), not criminals themselves.  Were it not for the suffering of so many women whose pain has too often been ignored, Defendants would never have been able to get the attention – and inflict the harm  –  that they have.  That they have bootstrapped their fraudulent, extortionate, and defamatory claims onto the legitimate movement to protect women against true harassment and abuse is especially

reprehensible.  Destruction by accusation, using the justice system as a vehicle, does nothing to help the millions of women who continue to deal with real harassment, and will find nothing in common with Ms. Ganieva or her co-conspirators.

20.    This is not just the work of one woman.  Ms. Ganieva needed support.  The participants needed each other, and benefited from each other's participation, when not working directly together.  She needed her lawyers to file the phony complaints, packaging the lies as pleadings in an attempt to protect them from defamation claims, and abusing the attorney-client privilege to hide the work they did together to invent these stories and conceal her earlier extortion of Mr. Black.  She needed the attention of the media.  Mr. Harris worked hand in glove with experienced public relations agents he had both from Apollo and as owner of the 76ers, and he integrated them into his war council as he sought to destroy Mr. Black and win the top job at Apollo.  In contrast, Ms. Ganieva was a PR naif, having tried and failed repeatedly to attract press attention.  One after another, the leading reporters of the "MeToo" movement passed on her efforts to peddle lies about Leon Black—recognizing them for what they were after subjecting them to appropriate journalistic scrutiny.  Selling her story turned out to be harder than she anticipated, and she needed help.  She got it, thanks to Mr. Harris's PR team, who were working inside of Apollo at the same time they were working to undermine the report commissioned and accepted by the Board and the Chairman personally.  Upon information and belief, all of them were paid (or promised to be paid) by Mr. Harris.

21.    Mr. Black operated on the (sadly naïve) assumption that having been generous to Ms. Ganieva, having obeyed the law, having kept his family office, which made the payments to Epstein, entirely separate from Apollo, having literally invited the sort of independent investigation of himself that causes most CEOs to resign rather than face, he had nothing to fear.

He was wrong.  Mr. Black will ultimately be vindicated in the courts.  In the meantime, however, he is being publicly attacked with the imprimatur of a well-known law firm and the New York Supreme Court in a way that goes directly to his humanity.  Of course he must fight back.

## PARTIES

22.     Plaintiff Leon Black resides in New York County, in the State of New York.

23.     Mr. Black has spent the last three decades deeply involved not only in the business community but also in the arts, education, cancer research and other philanthropy.  He spent ten years on the Board of Trustees of Dartmouth College, 20 years on the board of Mt. Sinai Hospital, and 15 years on the Board of the Metropolitan Museum of Art.  A year ago, he was the Chairman of the Board of the Museum of Modern Art ("MoMA") and one of its most generous supporters. At the outset of the pandemic, Mr. Black and his family funded $20 million for the Healthcare Heroes campaign, providing meals for front-line workers at the hundreds of hospitals around the five boroughs of New York City.  Some fourteen years ago, Mr. Black and his wife also co-founded the Melanoma Research Alliance, the largest private funder of melanoma research worldwide. Melanoma is the most deadly form of skin cancer, the fastest-growing cancer in the world, and a cancer that had been, for too many, a hopeless diagnosis.  The Melanoma Research Alliance has directly invested more than $131 million to advance cutting edge research into immunotherapy for melanoma.  Through that funding, the Melanoma Research Alliance has supported clinical trials and patent applications, leading to some thirteen new FDA-approved therapies for melanoma and important progress in using immunotherapy to treat more than 30 other cancers.

24.     As a result of this hard work and generosity, Mr. Black and his family have long enjoyed the respect of peers in the business world and the arts community, among medical researchers and Jewish leaders, and at his alma mater.  That changed in the last year as he faced a never-ending and never-consistent barrage of unsupported and unsupportable charges orchestrated

by the Defendants, and was hamstrung in his ability to defend himself.  He had no wish to become engaged in a public battle, and no interest in attacking the reputation of a woman he tried to be kind to.  That is why, notwithstanding all his reservations about caving to unlawful threats, he fell victim to extortion in the first instance.  But he did not agree to have his reputation, his life's work, his philanthropy and his family tossed on the trash heap.  Those things that matter more than money are what is now at stake.

25.    Upon information and belief, Defendant Guzel Ganieva is a Russian national.  She currently resides in New York County, in the State of New York.

26.    Upon information and belief, Defendant Wigdor LLP maintains its principal place of business in New York County, in the State of New York.

27.    Upon information and belief, Defendant Joshua Harris currently resides in Miami-Dade County, in the State of Florida.  Mr. Harris, the loser in the competition to succeed Mr. Black at Apollo, arranged for lawyers, consultants, crisis managers, and public relations professionals to be recruited to take down Mr. Black and covered some or all of the costs of doing so; has contacted investors, board members and others to raise questions about Mr. Black's judgment and leadership; and has encouraged and assisted the Enterprise in its efforts to extort Mr. Black, among other actions aimed at undermining the personal and professional reputation of Mr. Black.

28.    Upon information and belief, Defendant Steven Rubenstein lives in New York County, in the State of New York.  Mr. Rubenstein is the President of Rubenstein, a public relations firm founded by his father, Howard Rubenstein.  Mr. Rubenstein's firm was for many years, including during relevant events at issue in this Complaint, engaged by Apollo to provide public relations services.  As Mr. Black has learned, he was also actively advancing the campaign to cancel Mr. Black, by promoting Ms. Ganieva's story to the press, and seeking to secure coverage

favorable to Mr. Harris and negative to Mr. Black—all in an effort to create a media narrative that would help force Mr. Black out as Chairman of Apollo.

29.     Collectively, Ms. Ganieva, Mr. Harris, Mr. Rubenstein and his firm, certain other public relations professional identified below, along with such others as shall be disclosed or discovered, shall be referred to as the Enterprise.  In its work, the Enterprise was aided by vendors whose participation may, upon further discovery, qualify them for inclusion as Defendants.  Each participant was a necessary part of, and critical to the success of, the Enterprise's fraudulent scheme.  They committed extortion and fraud.  They aided and abetted Ms. Ganieva and Mr. Harris on multiple fronts: to get more money through extortion and/or a fraudulently induced litigation award; to cost Mr. Black millions of dollars in a legal defense against Ms. Ganieva's fraudulent claims; to destroy the reputation of Mr. Black and his business; to undermine his career; to interfere with his business relationships; and to raise concerns about his having any role at the company he created and nurtured for thirty years in an attempt to open the door for Mr. Harris to succeed him.

## JURISDICTION AND VENUE

30.     Venue is proper in the District under 28 U.S.C. § 1391(b)(2) as a substantial number of the events giving rise to this action occurred in this District.

31.     This Court has subject matter jurisdiction over Mr. Black's claims under 28 U.S.C. § 1331 and under 18 U.S.C. § 1964. This suit is seeking monetary damages in excess of $75,000.

## FACTUAL ALLEGATIONS

### Ms. Ganieva Successfully Extorts Mr. Black: "I'm Dying to Talk to Press About It..."

32.     The relationship between Ms. Ganieva and Mr. Black began at a party both attended in 2008, continued sporadically, and ended when Ms. Ganieva left the country in 2014.  While Mr. Black paid for a luxurious apartment for Ms. Ganieva on the Upper East Side of Manhattan, he

never had the keys to that apartment, and came only when invited.  In July 2014, Ms. Ganieva told Mr. Black that she was leaving the country for immigration-related reasons.

33.    From the time she left New York in July 2014 until she returned in June 2015, Ms. Ganieva continued to send text messages to Mr. Black telling him that she missed him and loved him.  On June 8, 2015, however, the tone changed, and Ms. Ganieva sent a much more formal note insisting that she needed to meet with him in person about a matter that she characterized, without detail, as "both urgent and important." Based on statements later made by Ms. Ganieva to Mr. Black, this sudden shift appears to have coincided with her failure to gain legal status in the United Kingdom.

34.    The two met in person on June 24, 2015.  Ms. Ganieva warned Mr. Black that if he did not pay her $100 million, she would go public with their affair.  As Ms. Ganieva put it during a later meeting, "*the more, the longer I wait, the more sure I become that I actually, I prefer to go public*," and "*I'm dying to talk to press about it*."  Ms. Ganieva made her demands clear: "*I will not agree to anything less than $100 million*."

35.    Understanding that he was being extorted, either by Ms. Ganieva acting alone or in concert with others, Mr. Black consulted attorneys, including criminal defense counsel, and thereafter recorded their conversations.  Asked (secretly on tape) to explain her sudden demands, Ms. Ganieva claimed that the $100 million was justified based on a news report she saw about a woman who had been fired after sleeping with her boss four times and had received $18 million, and based on community property principles.  Of course, Mr. Black was neither her boss nor her husband.

36.    Ms. Ganieva also claimed that various prominent people—from international philanthropist Len Blavatnik to former New York Mayor Michael Bloomberg to ailing publisher

and developer Mort Zuckerman—were following or harassing her at Mr. Black's direction, musings that she herself called "paranoid."  She claimed that Mr. Black was responsible for her son choking on a piece of meat at a restaurant.  But *never once* in these conversations, laced as they were with extravagant fantasies of victimhood, did Ms. Ganieva so much as suggest that Mr. Black had physically or sexually assaulted her.

37.     At a lunch meeting at the Four Seasons restaurant in New York on October 19, 2015, Mr. Black and Ms. Ganieva finalized the terms they had discussed, including payments by Mr. Black to Ms. Ganieva of $100,000 monthly for 15 years, and forgiveness of approximately $1,000,000 in loans.  Mr. Black also agreed that he would provide £2,000,000 for Ms. Ganieva to use toward obtaining legal status in the United Kingdom.  In exchange, Ms. Ganieva agreed not to publicly disclose their affair.

38.     For the next five and a half years, Mr. Black paid the ransom, and deposited $100,000 each month in Ms. Ganieva's account.  She accepted every single payment, while attending law school and afterward, effectively ratifying the agreement she would later claim was forced upon her.  Never once did she take steps to void it.  All told, she received $9.2 million before deciding to go public not with the truth (which she had promised not to do) but with flat out lies.

**Ms. Ganieva Attempts To Extort More Money from Mr. Black**

39.     In October 2019, Ms. Ganieva complained to Mr. Black about their arrangement, claiming that he had forced her to sign the agreement under duress (although she had never made that claim during the preceding four years, during which she had accepted the payments).  Five months later, attorneys (not Wigdor) purporting to represent her sent a letter to Mr. Black stating they had been retained "to investigate certain matters related to [Mr. Black's] prior interactions with [Ms. Ganieva]" and requested copies of their agreement.  On information and belief, both the

messages from Ms. Ganieva and this letter were sent in an effort to extort additional money from Mr. Black.  He did not respond.  Nothing further happened.  He continued to pay her $100,000 each month.  She continued to accept the money.  She took no steps to void the contract.  Those lawyers were not heard from again.

40.     In October 2020, the *New York Times* reported that Mr. Black had paid Jeffrey Epstein some $50 million for tax advice.  Upon information and belief, members of the Enterprise and Mr. Harris's team took steps to spread the news in the media – to the tune of hundreds of negative articles about a man who, while well-known in the business community, is hardly a household name.  Then there were all the "concerned" investor calls to Apollo, also triggered by the Enterprise, and even a round of calls and stories carefully planted on the subject of who would replace Mr. Black, all of this even before Ms. Ganieva's artfully crafted tweets.

41.     And these articles not coincidentally trumpeted Mr. Harris as Apollo's future leader.  On October 31, 2020, just days after the *New York Times* published the story of Mr. Black and Epstein's professional relationship, the *Wall Street Journal* featured a profile of Mr. Harris.  The headline?  Not subtle:  "A $433 Billion Wall Street Giant Has a Reputation Problem.  It's Josh Harris's Job to Fix It."  The article was promoted and placed by some of the very PR advisers who shaped the cancellation campaign of Mr. Black.  The Enterprise had laid a canny trap—it had shaped and framed the problem, and positioned the fix.

**Mr. Harris Is Spurned, And Spurred into Action**

42.     The setup was in place.  But the Enterprise did not achieve its goals so readily.  Mr. Black turned to Apollo's Board of Directors and offered radical transparency.  He invited them to investigate his relationship with Epstein and they hired distinguished independent counsel, Andrew Levander, a former Assistant U.S. Attorney for the Southern District of New York and a senior partner in the Dechert law firm, to do so.  Mr. Black produced reams of texts, emails, and

other documents in his possession requested by Dechert to show the board—and the world—that he had nothing to hide when it came to Epstein.  Mr. Black also directed the employees of his family office to meet with Dechert.  There was no information asked for by Dechert that Mr. Black withheld, and they asked for a lot, all told some 60,000 documents.

43.     Even before the Dechert firm completed its work, Mr. Harris and team were on a war footing.  As early as January 7, two weeks before Dechert released its report, the war council had been fully assembled and presented Mr. Harris with options for litigators to take on Mr. Black and perhaps even Apollo.  In a presentation for Mr. Harris apparently prepared by one of the three public relations/crisis management/political consulting firms, the group proposed four of the most aggressive litigators that might bring claims against Leon Black and Apollo.  These litigators were, not surprisingly, among the most prominent in the nation.  They came expressly recommended by Mr. Harris's own top outside lawyers, who also included commentary of their own on how to deploy the litigators' talents to greatest effect.  And Mr. Harris indeed engaged one of them, from a prominent litigation boutique, who became yet another member of the war council, and undertook to form litigation strategy about how Mr. Harris might exercise purported rights in the context of Apollo's impending governance changes, in an apparent and highly improper effort to evict Mr. Black from the firm that he had founded decades earlier.

44.     Mr. Harris's war council added yet more crisis managers and public relations experts too.  In the week the Dechert report was released alone, Mr. Harris supplemented his longtime media advisor, Rubenstein—who happened also to represent Apollo—with two new advisors:  Jonathan Rosen from BerlinRosen, and Paul Holmes from Finsbury Glover Hering (together, the "Flacks").  According to BerlinRosen's website, it was founded on a "simple idea – build a communications firm that operates with the speed and intensity of a political campaign."

BerlinRosen touts itself as a firm that can "help attorneys and their clients leverage the media to support their best case narratives, blunt the opposition's efforts and elevate firm's public profiles." Its website features numerous news articles in which it has managed to secure critical coverage of its client's adversaries.

45.     Under Mr. Harris's and the Enterprise's direction, three of the most distinguished law firms in the City (including the newly retained litigation firm)—some of which were actually representing Apollo at the time and thus had duties to Apollo, including a duty not to act adversely to Apollo's interests—joined forces with three of the best-known public relations firms—Rubenstein, BerlinRosen, and Finsbury Glover Hering.  The war council even included Apollo staff, including Mr. Zemsky, many of whom doubled as Mr. Harris's family office employees. They met by Zoom (at a minimum) daily, including nights and weekends, to try to rally support for Mr. Harris and against the incumbent Chair of the company.  They met literally round the clock—in a dozen or more Zoom calls—in the days surrounding the release of the Dechert report. At least twice on Sunday, January 24.  Twice the next day, and again the following.

46.     The war council obsessively tracked public discussion of Mr. Harris and, critically, Mr. Black.  The day after the announcement of the Dechert report, they produced comprehensive reporting—in astonishing detail—of Mr. Harris, Mr. Rowan, and Mr. Black's media profiles.  The public relations advisors tracked top keyword searches associated with them; the geographic source of searches; the number of hits on Wikipedia pages; even the time of day of news hits mentioning the three men.

47.     The war council knew its activities were wrongful and conducted its internal activities in secret, making concerted efforts to avoid any detection of them by Apollo or others. For example, one email sent by Mr. Zemsky on January 27, just days after the release of the

Dechert report, warned that they should take their communications off the Apollo system: "GOING FORWARD, ONLY USE SLACK WHEN COMMUNICATING WITH JOSH.  Chris -- set up necessary groups.  Even if JH pings you on whatsapp -- it should go to slack."  Slack is a messaging system that promotes itself as "let[ting] you send self-destructing messages" and "transmit sensitive information, while keeping it out of your Slack account logs."

48.   And even when the war council members did create a record of their communications, they deliberately spoke in code.  For example, a subsequent email from Mr. Zemsky read, in its entirety:  "hi -- any new thinking on the matter earlier discussed?"  Another simply noted:  "No knowledge of additional allegations but as previously reported didn't think LB [Leon Black] should be at the co anymore."  The clear inference of this email is that the war council was actively trying to dig up as much dirt – and find people with dirt – to throw at Mr. Black.

49.   The Dechert report, presented to Apollo's Board on January 24, 2021, concluded that Mr. Black had engaged in no misconduct with Epstein.  The central findings of the report were:  first, all fees paid to Epstein were for legitimate business purposes; second, Epstein's fees were consistently vetted by major law firms; third, all fees paid were for value received from Epstein's legitimate advice on trust and estate planning, tax issues, the operation of the Family Office, and more; fourth, there was no evidence of any wrongdoing; and, fifth, there was no connection between Epstein and Apollo.

50.   Upon information and belief, Mr. Harris sought to undermine the conclusions of the Dechert report both before and after it was provided to the Board.  On January 23, 2021, aware of the report's conclusions, Mr. Harris sought out and conferred with at least two independent directors of Apollo to tell them that the report that they were about to receive was a whitewash, not thorough enough, inadequate to support its conclusions.  Mr. Harris did so not because he

possessed evidence that Mr. Levander had failed to consider, or because he possessed evidence that Mr. Levander had in any way been derelict in his duties, but because of his bitterness that he was about to be passed over as CEO by Mr. Black and his fellow Board members.

51.     Indeed, independent director A.B. Krongard called Mr. Harris on precisely this point the day before the report was formally presented to the Board.  A former Executive Director of the CIA, and one of the three independent directors who had hired Mr. Levander, Mr. Krongard told Mr. Harris that this was "not his first rodeo."  Mr. Krongard warned Mr. Harris that if he did not have additional information that was unavailable to the Dechert firm, he should not be attacking the conclusions that the Board was poised to accept.  Clearly, that would not have been in Apollo's interest—not that Mr. Harris cared.  The source of Mr. Harris's displeasure was not Jeffrey Epstein at all, but the Board's decision to appoint Mr. Rowan as Black's sole successor as CEO and retain Mr. Black as Chairman.

52.     In furtherance of the same scheme to stack the Apollo Board in his favor, Mr. Harris connived with one of his future designees to the Board.  More specifically, on January 27, 2021, this future Board member sent Mr. Harris an email in which the future Board member wrote that he "was thinking of two directors for" Mr. Harris, and proceeded to identify two candidates while noting that he had "other names in mind as well."  Forecasting that Mr. Harris might have to act fast in an effort to take down Mr. Black in the event there was more additional negative press on Mr. Black, the future Board member ominously advised Mr. Harris in the same email:  "If things break, they break fast.  Everything correlates.  Consider what happened to Harvey Weinstein's firm.  There will be lots more digging into these stories."

53.     At the same time, the PR professionals who had joined the Enterprise went into high gear.  They reached out to numerous media outlets, including Bloomberg, the Wall Street

Journal, the New York Post, and likely others, to attempt to undermine the Dechert report, and to undermine Mr. Black.

54.     Having been cleared of wrongdoing by the Dechert report, Mr. Black announced that he was following through on his plan to retire as CEO when he turned 70 in several months and remain as chairman of Apollo.  Twice before, Mr. Black had offered the position of CEO to Marc Rowan, the other co-founder who, unlike Mr. Harris, was actually part of Apollo when it was founded.  And twice before, Mr. Rowan had turned it down, because he was too busy building Athene.  Presumably, Mr. Harris thought he would do so again, as Mr. Rowan had taken a 6-month "semi-sabbatical" in the spring and summer of 2020.  But this time, though, with Apollo planning to merge with the insurance firm, Athene, that was Mr. Rowan's brilliant brain child, Mr. Rowan accepted the offer.  Mr. Harris was totally spurned.  Upon learning that he would be neither CEO nor co-CEO, Mr. Harris spurred his now fully constituted war council on to undermine the Apollo Board, which had refused to succumb to the Enterprise's pressure, and destroy Mr. Black.

**"[Y]ou are the right person to be CEO" . . . and "I wish there was something I could do to help you."**

55.     The attitude of Mr. Harris and his war council to Apollo's Board of Directors was simple:  if the Board would not support Mr. Harris, then Mr. Harris would change, or at least punish, the Board.  Mr. Harris's efforts to subvert the Board and Apollo's corporate governance began even before the Dechert report was released, and only intensified after the Board accepted it.

56.     Mr. Harris and the Enterprise had no time to waste.  The very same day that Apollo released the Dechert report, Mr. Harris began to correspond in secret with the future Board Member, who told Mr. Harris exactly what he wanted to hear.  He claimed to be "outraged that the board kept Leon Black," reassured Mr. Harris that "you are the right person to be CEO," and

wrote "I wish there was something I could do to help you."  And he had a specific idea for helping: he suggested that "looking at the bios of your board members," they were not the right people to advance Mr. Harris, and suggested that Mr. Harris needed "independent . . . minded directors." (Not "independent minded" from Mr. Harris, of course.)  The two spoke in secret just two days later.  After the call, the future Board Member told Mr. Harris that he needed to ensure that any new directors would have "safety in numbers," and "strong peers," and suggested how Apollo's Board could be restructured in a way that would allow Mr. Harris to exert maximum leverage.  He, not so subtly, asked "if there are any interesting boards you want someone like me on."  Soon thereafter, Mr. Harris appointed him to the Apollo Board.

57.     Meanwhile, the Enterprise also set to work trying to destroy others on the Apollo Board.  As part of a series of corporate governance enhancements announced around the time of the Dechert report's release, Mr. Black appointed two independent directors to the Board.  The first was a world renowned physician and scientist (and Pulitzer Prize winner), Siddhartha Mukherjee.  Fearful that Mr. Mukherjee might not support Mr. Harris, given his appointment by Mr. Black, the Enterprise worked to take him down.  Upon information and belief, Mr. Rubenstein and his team planted a hit job story with the *New York Post* attacking Mr. Mukherjee and questioning his independence.  That story, published in late April and authored by *Post* journalist Josh Kosman, cited "sources close to the situation" for its (inaccurate) discussion of confidential Apollo board processes.  Apollo fought back with the facts, emphasizing that all its directors had "impeccable credentials and offer significant value to the Apollo Board"; that "[n]o member of the board has raised any concerns regarding the qualifications or commitment of the independent directors"; that new directors were "unanimously approved after extensive due diligence"; and that "[i]t is disappointing that the integrity and independence of such highly accomplished individuals

is being questioned by anonymous, unsubstantiated accusations." But the damage was done. Two months later, Mr. Mukherjee announced he would step down.

58.     The *Post*'s Mr. Kosman penned a scurrilous and defamatory article about the other of Mr. Black's director nominees, Pamela Joyner, in the wake of Ms. Joyner's appointment to the Apollo Board in January 2021, baselessly impugning her independence and the propriety of her serving as a Board member.  Ms. Joyner, in fact, has unimpeachable integrity and extensive professional experience.  In addition to founding Avid Partners, LLC, Ms. Joyner has held positions at Bowman Capital Management, Capital Guardian Trust Company, Fidelity Management Trust Company, Kidder Peabody and Merrill Lynch.  Ms. Joyner is a former director of The Sharper Image, is a Trustee of Dartmouth College, and serves on the board of the Hopkins Center and the Hood Museum.  She also serves as Co-Chair of the San Francisco Ballet, a trustee of the California HealthCare Foundation, and a board member of the Harvard Business School Association of Northern California.  Mr. Kosman's—and the *Post*'s—assault on her credentials— at the behest of the Enterprise—was utterly misguided and of a piece with its attack on Mr. Mukherjee.  It is no coincidence that these two hit jobs appeared against the two independent directors nominated by Mr. Black.

**The Search for a Lawyer for Guzel Ganieva**

59.     Meanwhile, at the same time they worked to take down anyone associated with Mr. Black, the Enterprise continued their efforts to destroy Mr. Black himself.  Although Mr. Harris consulted with top litigators in the country to identify the most aggressive one to bring as of yet unidentified claims he could assert against Mr. Black, he lacked weapons which would detract from the conclusions of the Dechert report.   He had no claims to assert.  But Guzel Ganieva did, even if they were total fabrications.

60.     Upon information and belief, Mr. Harris deployed his associates to contact one or more of these firms in a search that ultimately ended when Ms. Ganieva retained the Wigdor firm. But before Wigdor was retained, the outlines of the Enterprise were revealed in a series of conversations with lawyers who ultimately turned down the representation.

61.     Dechert's report was presented to the Board over the weekend of January 23-24. As it was happening, Mr. Harris's confederates were making the first of multiple calls to secure the most aggressive attorney they could find in New York City who was willing to be adverse to Mr. Black.  They called Mr. Spiro of Quinn Emanuel, one of the four firms on their list, to find out if they would be free to take a case "adverse to Leon Black."  They were reaching out on behalf of a faction at Apollo engaged in "cagey business."  But Mr. Harris' confederates were not seeking counsel to represent themselves, or Mr. Harris.  The potential client, as it turned out, was someone else entirely: a woman who would be "adverse" to Mr. Black, a woman later identified as Ms. Ganieva.

62.     According to Ms. Ganieva's counsel, the incident with the investigators happened two months later, around the time Ms. Ganieva had taken to Twitter.  Two individuals showed some form of law enforcement identification to the doorman at her building and were allowed up to her apartment door.  The individuals supposedly identified themselves as investigators, but not for whom.  Upon information and belief, the investigators advised her that if she wanted to sue Leon Black, she should hire Spiro—the same litigator the "cagey" faction had already contacted.

**Ms. Ganieva Takes to Twitter**

63.     The timing of the investigators' approach to Ms. Ganieva was hardly a coincidence. A week earlier, on March 17, 2021, pointedly referring to Mr. Black as "Apollo Global Management's CEO and Chairman, Leon Black," and including the hashtags #MeToo and

#LeonBlack, Ms. Ganieva had tweeted (i) that she had been "sexually harassed and abused" by Mr. Black "for years"; (ii) that Mr. Black "could not understand me when I refused his sexual advances"; (iii) that she had been "bullied, manipulated, threatened, and coerced" by Mr. Black; (iv) that, "under duress, I was forced to sign an NDA in 2015"; and (v) that she did "not want this type of predatory behavior to continue happening to other women."

64.    Ms. Ganieva's new account had attracted only three followers, but they were no random trio:  Ronan Farrow of the New Yorker, Matt Goldstein of the New York Times, and Richard McHugh, then of NBC.  The three were all journalists who covered the #MeToo movement and Apollo.  Upon information and belief, they didn't just happen upon Ms. Ganieva's never-used Twitter account by accident—which would be a remarkable coincidence; they were recruited for that very reason, in advance of her explosive tweets.

65.    The Enterprise might have expected that at least one of the three followers would follow up with a story repeating the false charges—even if they were totally unsupported and inconsistent with Ms. Ganieva's own conduct.  But all three reporters passed on the story, as did other prominent journalists including Julie Brown, who broke the Epstein story, and Jodi Kantor, who broke the Weinstein story.  All of these reporters presumably saw this for what this was: *not* a true story, but an effort to use them as a tool to extort more money.

66.    The Enterprise had seemingly hit a wall.  Lacking other options—having failed to garner coverage from the leading reporters covering the #metoo movement or Apollo, notwithstanding the potentially explosive story, that any legitimate journalist would want to break—they went to an old friend.  An interview was arranged with Josh Kosman, the one reporter who they all knew, based on his past reporting, highly critical of Mr. Black, would not pass, and who was particularly close to Rubenstein.  He delivered.  The interview with Ms. Ganieva was

published in the *New York Post* on April 8, 2021, including her claim that "Black's abuse 'was over a long period of time and it was tragic.'"  Josh Kosman, *Leon Black's surprise Apollo Global exit came amid sexual harassment allegation*, N.Y. POST (Apr. 8, 2021), https://nypost.com/2021/04/08/leon-black-accused-of-sexual-harassment/.

67.     In response, Mr. Black, concerned that the story would not only damage him and his family, but also the company he spent thirty years building, stepped down as Chairman of Apollo.  Mr. Black responded to a reporter for the business publication, Bloomberg: "I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago" adding that her allegations were "completely fabricated"; and "I have been extorted by Ms. Ganieva for many years and I made substantial monetary payments to her . . . ."  Gillian Tan, *Leon Black says he paid to hide affair, denies it led to Apollo exit*, BLOOMBERG NEWS NETWORK (Apr. 8, 2021), https://www.bnnbloomberg.ca/leon-black-says-he-paid-to-hide-affair-denies-it-led-to-apollo-exit-1.1588031.  All of which was, and is, indisputably true.

68.     In the wake of Ms. Ganieva's tweet, Mr. Harris and his minions kicked their monitoring of press regarding Mr. Black into high gear.  On March 23, 2021, just days after the publication of the tweet, a technology and digital consulting firm evidently working on Mr. Harris's behalf sent an email to his Apollo employees doing his bidding, writing, "Attached is today's sentiment tracking report . . .  Would you like a similar report tomorrow?"  Accompanying the email was an attachment titled, "APO Leon Black Sentiment Tracking," a 21-page PowerPoint presentation detailing, among other things, press reports about Mr. Black and his association with none other than Jeffrey Epstein.

**The Original Complaint: An Alleged Sexual Assault.**

69.     The next step was litigation in New York State Court, with the accompanying presumptions of privilege from disclosure and defamation, privileges that should not withstand the rules governing crime-fraud and sham litigation.

70.     Notably, Ms. Ganieva's counsel in that litigation, Wigdor, deployed an entirely new playbook to handle this case, one that is flatly at odds with its handling of its other cases. Seemingly without fail, Wigdor takes cases on contingency, makes demands, signs protective orders where appropriate to obtain information from its accused targets, and resolves most of its cases without so much as filing an initial complaint.  As its website proudly proclaims, "Because we have a reputation for obtaining multi-million verdicts, we are able to settle the majority of our cases without the need for even filing complaints."  That is because Wigdor's clients have their greatest leverage—and Wigdor its biggest profit margins—when the firm can quietly trade away claims whose embarrassment potential is usually far greater than the potential liability or damages.

71.     This time, Wigdor took on a client who had already extorted her target and was walking away from far more money than she could ordinarily hope to collect once she went public. Wigdor chose to file its complaints without making a single demand for settlement – sacrificing all its leverage by going public with lies that went far beyond the "tweets" in scope and detail.

72.     On June 1, 2021, Ms. Ganieva and Wigdor filed the first of three increasingly salacious (and wildly different) complaints in New York Supreme Court, New York County.  (Ex. 1, June 1, 2021 Complaint.)  The Original Complaint asserted four claims: two for defamation based on Mr. Black's public statement rebutting her defamatory tweets; a claim for intentional infliction of emotional distress based on abuse Mr. Black supposedly heaped on her during the duration of their affair; and a claim under the New York City Gender Motivated Violence Act based on a purported sexual assault, the centerpiece of the Original Complaint.  (*Id.* ¶¶ 91-130.)

73.     The assault supposedly took place seven years earlier, on July 6, 2014, when the Original Complaint alleges that Mr. Black "barged" into Ms. Ganieva's apartment "suddenly" and without warning.  (*Id.* ¶ 47.)  In her Original Complaint, Ms. Ganieva claimed that after sending Mr. Black a text inviting him ("Baby... I'm all alone. Let's get together soon. I miss you. Xoxo.") (Ex. 2, Answer ¶ 49), she then became unwell and was "limp and unable to move" when Black came "barg[ing] in."  (*Id.* ¶¶ 47, 51.)  Not too unwell, as it turned out, to invite Mr. Black to "tuck her in," to ask that he bring wine, and to profess her love the next day.

74.     A false accusation of criminal wrongdoing generally amounts to defamation, and may also give rise to claims for mental and emotional distress.  False accusations *may* be subject to the litigation privilege if made in the course of litigation brought and prosecuted in good faith, or in statements made about judicial proceedings.  *But there is nothing magical about packaging lies in a court filing.*  A "sham pleading"—a sham complaint, or answer, or other statement about litigation—does not protect the lies it contains from being actionable.  Under the sham pleading doctrine, a defamation claim may lie based on claims made in litigation "where the underlying lawsuit was a sham action brought solely to defame the defendant."  *Flomenhaft v. Finkelstein*, 127 A.D.3d 634, 638 (1st Dep't 2015); *see Williams v. Williams*, 23 N.Y.2d 592, 596 (1969).  A defamation claim based on the sham pleading doctrine is actionable against both the plaintiff in the underlying lawsuit and their attorneys.  *See, e.g.*, *Flomenhaft*, 127 A.D.3d at 634, 639; *Halperin v. Salvan*, 117 A.D.2d 546 (1st Dep't 1986).

**The Answer: "This is Love."**

75.     Mr. Black responded to the Original Complaint with an Answer filed on July 19, 2021.  The Answer contradicted the Original Complaint's claims with Ms. Ganieva's own words.  A week before the supposed assault, on June 28, Ms. Ganieva sent the text suggesting she and Mr. Black should get together "soon."  Then, on July 6, *the very day of the supposed assault*, it was

Ms. Ganieva who wrote to Mr. Black, unsolicited: "*This is love. I need you.*"  (Ex. 2, Answer ¶ 49 (emphasis added).)

76.     In response, Mr. Black said that he would be driving back to New York City the evening of July 6, and inquired if he could "come over and tuck you in at 10:30?"  (*Id.*)  She not only agreed.  She asked for wine.  "Aaah. Can you please bring a bottle of wine if you can?"  (*Id.*)  He agreed, as she knew he would.  And he arrived earlier, at her invitation.

77.     Ms. Ganieva reached out to Mr. Black first thing the following morning with a message of thanks and love:  "Good morning. It was very nice to see you last night. I already feel better..... I love you and thank you!!! Xoxoxoxoxo and more love." (*Id.*)  This, to her supposed brutal rapist.  And on July 9, she thanked Mr. Black again, asked if he wanted to get together, and sent "lots of love."  (*Id.* ¶ 53.)  When Mr. Black did not respond, Ms. Ganieva reached out yet again the next day to try again to get together.  (*Id.*)  When Ms. Ganieva peddled her lies in her June 2021 lawsuit, she obviously did not expect that Mr. Black still kept the text messages she had sent him some seven years earlier.

78.     Contrary to the claim in the Original Complaint that "[a]fter this rape, Ms. Ganieva took her son and left New York to physically distance herself from Black" (Ex. 1, Compl. ¶ 55), Ms. Ganieva and Mr. Black saw each other several times, at *her* request, between July 6, when Mr. Black supposedly raped her, and July 30, when she texted him from the plane as she was departing:  "I love you and miss you already."  (Ex. 2, Answer ¶ 58.)  Mr. Black's Answer— entirely corroborated by contemporaneous text messages—showed the fraudulent allegation of sexual assault to be a sham.

79.     Ms. Ganieva's defamation claims are no less of a sham.  Truth is an absolute defense to defamation.  The extortion was captured on tape.  Ms. Ganieva repeatedly warned that

if Mr. Black did not pay her the money she demanded, she would report their affair to Mr. Black's wife, the board of his company, and the press.  This is, of course, the very definition of extortion.

80.     Ms. Ganieva has alleged that she was threatened by Mr. Black, that he forced her to agree to the extortion against him.  Her Original Complaint offers supposed direct quotations from Mr. Black in this regard:  "**If you do not take the money, I will put you in prison**" and "**If you do not take the money, I will destroy your life**."  (Ex. 1, Compl.¶ 3 (emphasis in original); *see also id.* ¶ 63.)  Mr. Black never said anything of the sort.  Here and elsewhere, Defendants' pleadings in the state case liberally and seemingly randomly place quotation marks around certain words, turns of phrase, and full sentences, as though they were verbatim quotes but without any citation or even reference to where they come from.  There are recordings.  They were never said.  Once again, Ms. Ganieva miscalculated – this time she was unaware of the secret recordings Mr. Black had made six years earlier when he captured her extortionate threats.

81.     Ms. Ganieva was openly pleased with the agreement.  It was not simply in later years, while attending law school and afterwards, that she ratified the basic agreement by accepting her monthly checks.  After agreeing to accept millions of dollars in exchange for not speaking publicly about their affair, she spent approximately 45 minutes sharing a Grand Marnier soufflé with Mr. Black, discussing her investment and travel plans, and laughing about the fact that she was "a woman of means now."  (Ex. 2, Answer ¶ 40.)  Shortly after their meeting, she texted him: "[t]hank you for everything. Talk soon xoxo."  (*Id.* ¶ 41.)  Not a word about rape.

**The Amended Complaint: "Finding Jeffrey Epstein."**

82.     The Original Complaint clocked in at 90 paragraphs.  But after it was thoroughly debunked by the texts and tape recordings, Defendants intensified their efforts to destroy Mr. Black and extort him for even more.  On August 9, 2021, Ganieva and Wigdor filed an Amended Complaint.  This one ballooned to some 244 paragraphs—with a new slate of scandalous, headline-

grabbing and wholly fabricated material focused largely on Jeffrey Epstein.  None of these new allegations arose from anything that happened after the filing of the Original Complaint that might explain their noticeable absence from the Original Complaint.  Quite the contrary, they dealt with events even longer before:  in this case, *thirteen years earlier*.  Had there been even the slightest kernel of truth to any of them—which there is not—they logically would have appeared in the Original Complaint.  And there is no reason, legally speaking, for their inclusion at any point.  The newfound allegations regarding Epstein appear nowhere in any of the actual Causes of Action asserted in any iteration of the complaint.  They are part of the extortion campaign, not any litigation effort.  *See Oakley v. Madison Square Garden Networks*, 1:17-cv-06903-RJS (S.D.N.Y. 2021) Dkt. 68 ("From its inception, this case has had the feel of a public relations campaign"); Dkt. 124 (seeking sanctions against lead counsel Wigdor for pursuing "baseless allegations [in successive complaints] that they knew from the outset were false, but which furthered their smear campaign.").

83.    For the Amended Complaint, Ms. Ganieva suddenly remembered being kidnapped by Mr. Black in *2008*, flown against her will to Palm Beach, Florida on Mr. Black's private plane, taken to Epstein's home there, and coerced into a meeting with Epstein, Mr. Black, and one of Epstein's associates, Sarah Kellen, for the purpose of gratifying Mr. Epstein's sexual desire.  (Ex. 3, Am. Compl. ¶¶ 75-108.)  During that meeting, Ms. Kellen supposedly told Ms. Ganieva that Epstein and Mr. Black were "sex addicts."  (*Id.* ¶ 97.)  All wholly fabricated.

84.    Although the Amended Complaint contains boldfaced, block-text quotations supposedly from Ms. Kellen, it identifies no documentation, recordings, or other memorialization of the alleged conversation between Ms. Ganieva and Ms. Kellen some 13 years ago.  (*Id.*)  And

like so much of the various complaints Ms. Ganieva filed, they are fabrications.  Ms. Kellen will testify at the appropriate time that she took part in no such meeting, and had no such conversation.

**The Answer: "Jeffrey Who?"**

85.     In his Answer to the Amended Complaint (Ex. 4), Mr. Black used flight manifests to establish that Mr. Black and Ms. Ganieva never took the same-day round trip to Florida in October 2008 that is described in the Amended Complaint.  In fact, they never flew to Florida together at any point that entire year.  Another lie.

86.     Moreover, the contemporaneous recordings of Mr. Black and Ms. Ganieva from the summer of 2015, shortly after she began extorting him, call into question the Amended Complaint's allegation that Ganieva *ever even met* Epstein, let alone that their meeting was the result of a kidnapping by Mr. Black—which explains his late appearance as the centerpiece of this case.

87.     At one point during a recorded conversation, Ms. Ganieva brought up Epstein's name in the context of one of the convoluted conspiracy theories she accused Mr. Black of orchestrating against her.  Mr. Black questioned whether Ms. Ganieva had ever even met Epstein. In response to that question, Ms. Ganieva initially told Mr. Black that she had *never met* Epstein and mentioned *nothing* about Mr. Black's supposed kidnapping of Ms. Ganieva to take her to Epstein's house for a threesome, as she later alleged in her Amended Complaint.  (Ex. 4, Answer to Amended Complaint, at 2).

88.     The Amended Complaint also made accusations that Mr. Black subjected Ms. Ganieva to yet additional sexual assaults and abuse, that he threatened to plant heroin on her, and that he threatened to manufacture evidence against her and even kill her if she did not do his bidding.  *None of* these terrible accusations – all of them total lies -- were even alluded to in the Original Complaint, much less stated outright.  And none of the alleged "facts" underlying these

purported grievances were unknown or unknowable to Defendants when the Original Complaint was filed. The obvious explanation for their debut in the Amended Complaint is that Defendants, after realizing that the central rape and coercion allegations in the Original Complaint had been completely debunked by unrebuttable evidence, felt they had no choice but to double down and come up with yet a new slate of lies in order to keep their extortion scheme alive.

**The Proposed Second Amended Complaint:  Twenty Years After**

89.     After being confronted yet again with Ms. Ganieva's own words, this time in Mr. Black's second Answer, Defendants moved to amend the complaint once again on September 20, 2021.[1] Defendants' proposed Second Amended Complaint (Ex. 5) offers a new round of unfounded allegations including an impossible-to-defend against tale of an anonymous massage at Jeffrey Epstein's house some two decades ago for which the woman was supposedly paid $5,000.  In 2001.  Again, all lies.

90.     The definition of a sham complaint is one that is brought solely to defame.  These Jane Doe allegations have nothing whatsoever to do with Ganieva's claims, even such as they are: an alleged single encounter between strangers versus a multi-year affair; a supposed payoff of $5,000 twenty years ago versus monthly payments totaling millions of dollars; an unknown Jane Doe versus a woman sending her love.  No pattern can be found even in the fabrications.

91.     Defendants also added a completely gratuitous new section to their proposed Second Amended Complaint called "Other Evidence of Black's Close Ties to Epstein's Private Conduct."  These allegations have *nothing whatsoever* to do with anything else in the complaint, except in terms of its extra-judicial impacts, that is, attempting to use them as weapons of mass destruction.

---

[1]     Mr. Black has reserved all rights with respect to the proposed Second Amended Complaint.

92.     Defendants included an image of a document that purports to show that someone requested someone named "Leon's" telephone number from Epstein.  Not Leon who?  Not Leon why?  Inclusion in the Epstein rolodex hardly appears, in retrospect, a mark of exclusivity.  Mr. Black invited Apollo's independent directors to investigate his relationship with Epstein because he knew they would find no wrongdoing.  It should have mattered.  It was the work of the Enterprise to assure that it did not.

**The Defendants Deliberately Stall**

93.     Nothing material has happened in the state case.  On September 27, 2021, an in-person conference was called because Mr. Black's lawyers were simply being ignored.  They wrote letters.  No one answered.  They asked for phone calls.  No luck.  Discovery deadlines came and went.  Nothing.  Fights about nothing—the signing of a boilerplate protective order—have become excuses used by Wigdor to block discovery.  Meanwhile, more and more stories, full of unverified, untrue, and scurrilous character assassination, are being spread in the mainstream and social media by the Enterprise.

94.     Once this case was filed, Defendants found a new excuse to block legitimate discovery in the case they themselves brought.  They claimed that Mr. Black was simply using discovery in the state case to uncover facts that support this claim.  Were that its purpose, and it is not, it would count as a dismal failure.  Ms. Ganieva and her confederates have blocked the most basic items that a party seeks in discovery – items such as phone records of the existence (not the substance) of conversations among parties.  Ms. Ganieva's attorneys at Wigdor have even blocked discovery of her own telephone records in the weeks and months leading up to the complaint, which, upon information and belief, will reveal coordination with the Enterprise.  Indeed, at the last court appearance in the state court action, on January 7, 2022, her lawyers at Wigdor made no mention of seeking to contest Mr. Black's subpoena for her phone records, and then made a motion

late that very evening that blocked the planned release of Ms. Ganieva's phone records, due four days later.

95.     Ms. Ganieva's determination to avoid confronting the weaknesses in her own case is understandable; they are no surprise to her.  But it is hardly typical conduct for a plaintiffs' firm (especially one acting on contingency), confronted with its own clients' texts and recordings directly and explicitly contradicting the claims included by counsel in a complaint, to decline the opportunity to review the transcripts, to listen to the tapes, to find out if their client's claims are bogus until after they had filed three complaints.

96.     There are myriad examples of Wigdor litigating Ms. Ganieva's state court case in a manner designed to maximize its extortionate impact while stalling the actual litigation of her claims.  One stark illustration is how they refused to enter into a standard protective order, using this as a pretext for not reviewing the evidence proving to the firm what it must have known, and what Mr. Black's answers in the state court case clearly demonstrated -- that Ms. Ganieva's allegations in the complaints were squarely contradicted by tape recordings, texts, and other evidence that she engaged in unlawful extortion.  Wigdor attempted to justify its willful blindness by claiming that the firm *never* signs protective orders to govern the disclosure of sensitive materials, stating that this is something "*which Wigdor LLP does not do*."  Except that it does. *See, e.g.*, Stipulation and Order, *Kafenbaum v. Soulcycle Inc.*, 20-cv-06315 (AT) (OTW) (S.D.N.Y. Apr. 21, 2021); Stipulation and Order, *Chase v. Reed Smith LLP*, 20-CV-06121 (JPO) (S.D.N.Y. Jan. 28, 2021); Stipulation and Order for the Production and Exchange of Confidential Information, *Mann v. MLB Advanced Media, L.P.*¸ 651503/2018 (Sup. Ct. N.Y. County Aug. 23, 2018); Stipulation and Order for the Production and Exchange of Confidential Information, *Town Total Holdings v. Conte*, 656194/2016 (Sup. Ct. N.Y. County Apr. 10, 2017).

**"Billionaire Investigated for Rape"**

97.     Ms. Ganieva has committed a crime.  She extorted Mr. Black.  Mr. Black reported this crime to the New York County District Attorney's Office without fanfare.

98.     The Enterprise has taken a different approach.  Seven years after texting her love to the man who she would later claim had raped her, the Enterprise arranged not only for the filing of a false police report by Ms. Ganieva, but for a new and enhanced round of publicity claiming that Mr. Black was being criminally "investigated" for rape.

99.     The Enterprise did this solely for its media impact.  They understood that the Manhattan District Attorney as a matter of policy is obligated to examine every complaint of sex abuse.  That hardly means there is an active investigation.

100.    In short, while still resisting legitimate discovery in the underlying action, while refusing to confront the evidence that establishes that their client's claims are lies, Defendants are pressing forward with their false claims, not because they have any realistic expectation of prosecution but because of the certainty of yet another public repetition of the false accusations that, in the wrong hands, have become a weapon of mass media destruction.

*        *        *

101.    It is not a sham to bring a lawsuit in good faith, even if it ultimately is not possible to prove liability by a preponderance of the evidence.  That has been true in the context of sexual assault, and women have been blamed, and victimized, by a system that visited upon the women victims of sexual assault a level of distrust and skepticism that made it all but impossible to find appropriate men—powerful men, husbands, bosses—responsible for wrongdoing.

102.    #MeToo was, in the view of many long overdue, and jury verdicts are beginning to reflect that.  A correction was needed, and the statistics suggest it still is.  But recognizing that women should be believed does not mean that every woman is telling the truth.  Understanding

that we have too long overlooked sexual assault and harassment can also lead to a tendency to be quick to credit accounts that are not well founded.  What makes Defendants' conduct so offensive is that they have attempted to capitalize and profit from the sympathies we rightly feel to extort Mr. Black and convict him in the court of public opinion long before a court of law will exonerate him.  They have subverted the movement they purport to represent.

103.    This is not a case at the edge, a borderline fact pattern, a "he said-she said," a maybe yes or maybe no.  The consensual sexual relationship ended years ago.  This has been a financial arrangement, a criminal one celebrated over Grand Marnier soufflé at the Four Seasons by a woman who toasted her newly and unlawfully acquired wealth, and then publicly renounced it on Twitter, then in the *New York Post*, and then in a series of fraudulent court filings and related public statements designed to show Mr. Black that $100,000 per month was no longer enough to prevent her from making good on her extortionate threats.

104.    Had there been physical abuse, harassment, or neglect, that would be the law's business.  Instead, here, what is the law's business was blackmail, extortion, and fraud. Ms. Ganieva was caught red handed.  And there is no way her co-Defendants did not know this before adopting and continuing her extortionate and fraudulent scheme.  Ms. Ganieva has already profited from her extortion, and she hopes to increase these ill-gotten gains by pursuing Mr. Black through her escalating campaign of fraudulent litigation and publicity.  As for Mr. Harris and his cohort, their goal has been clear from the outset, but it was their decision to join forces with Guzel Ganieva, to make common cause with an extortionist, to use social media and modern technology to further their attempt to retaliate against Mr. Black.

105.    Congress passed the Racketeer Influenced and Corrupt Organizations Act ("RICO") in 1970 because, as Attorney General Robert Kennedy had warned before his death, of

the special danger posed when formal and informal groups agree to work together to do wrong.
Groups are more likely to succeed, and to escalate, and to do more harm than an individual can
acting alone.  A group such as this one, which uses the courts as the unwitting vehicle for fraud,
extortion, and personal assassination, lawyers as its architects, and the media as the mouthpieces,
obstructs the working of the very system we depend upon to do justice.  It does so without the need
for any formal ties or organizational structure, as RICO recognizes.  It is an enterprise-in-fact, not
by law or contract, bound together by its wrongful purpose, operating in a technological time that
the law's drafters could not have imagined, but which makes possible a form of almost-instant
annihilation of everything and everyone in its path.  One of the earliest decisions interpreting RICO
rejected the argument that it should apply only to what is traditionally thought of as "organized
crime."  RICO is not limited by formal structure, and not restricted to groups that are themselves
unlawful (else it be a defense to a RICO charge that "all" the group did together was crime).  While
adopting a broad definition of RICO in this respect, courts have been equally careful to restrict the
civil RICO prohibitions so as not to turn every wrong into a federal case. But the courts in this
Circuit have specifically rejected the argument, which the Defendants are sure to make here as
well, that the Court "adopt a bright-line rule that mail and wire fraud committed in the course of
litigation . . . cannot, as a matter of law, constitute predicate acts for RICO purposes. . . . [T]he
Second Circuit and courts in this district have allowed RICO claims to proceed where the alleged
predicate acts involved litigation activities." *Mayfield v. Asta Funding Inc.*, 95 F. Supp. 3d 685,
698 (S.D.N.Y. 2015) (Preska, J.); *see also U.S. v. Eisen*, 974 F.2d 246, 253–54 (2d Cir. 1992);
*Sykes v. Mel S. Harris & Assocs. LLC*, 757 F. Supp. 2d 413, 425 (S.D.N.Y. 2010).

106.    In *Kim v. Kimm*, 884 F. 3d 98, 105 (2d Cir. 2018), the Second Circuit specifically
"declined[d] to reach the issue" of whether litigation activity without more could ever be the basis

of a RICO claim, concluding only that where "a plaintiff alleges that a defendant engaged in a single frivolous, fraudulent or baseless lawsuit, such litigation activity alone cannot constitute a viable RICO predicate act."  Here, far more has been alleged.

107.    Had Ms. Ganieva done no more than file a single complaint, had she not joined forces with business rivals like Mr. Harris, who had no legitimate business here, had the goal been to redress grievances in the court of law rather than to cancel an individual and everything associated with him, she would have failed.  The lawsuit qua lawsuit was a sham, beside the point. The legal claims would fall flat in court.  No jury is going to ignore that many love notes.  Or the tapes.  Or the flight logs.  She had no legal claim to financial support.  Defendants did not have a leg to stand on, which is why they were forced to resort to bald-faced lies contradicted by Ms. Ganieva's own texts and talk.  But this Enterprise operated not to increase the chance of success *in* court, but to increase the pressure to pay the blackmailer *out* of court, to brand the target, to extort him for money by convicting him in the court of public opinion long before any proceedings at all on the merits.

108.    "RICO is to be read broadly" and should "be liberally construed to effectuate its remedial purposes."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98 (1985) (quotation marks and citation omitted).  While the extortion and fraudulent pursuit of Mr. Black may not look like a traditional RICO case, machines like this Enterprise, which operate in secret, across state lines, invisibly wreaking havoc unique to our cultural and technological times, represent a threat with even greater potential to disrupt our economy and our social mores than the racketeers of old.

## FIRST CAUSE OF ACTION

## Civil RICO, 18 U.S.C. § 1962(c)

### (Against Ms. Ganieva, Mr. Rubenstein, and Mr. Harris)

109.    Mr. Black incorporates all of the above allegations as if they were fully stated here.

110.    Ms. Ganieva, Mr. Rubenstein, and Mr. Harris violated RICO, 18 U.S.C. § 1962 ("Section 1962").

111.    Ms. Ganieva, Mr. Rubenstein and his firm, the Flacks, and Mr. Harris, together, comprise an associated-in-fact Enterprise.

112.    Ms. Ganieva, Mr. Rubenstein and his firm, the Flacks, and Mr. Harris are also each a person within the meaning of 18 U.S.C. § 1961(3) and separate from the Enterprise.

113.    Ms. Ganieva was a willing and critical participant in the racketeering scheme.  Ms. Ganieva encouraged and enabled the Enterprise by, among other things:

   a.   threatening to reveal her affair with Mr. Black to his family and the public if Mr. Black did not pay her money;

   b.   threatening to make false allegations to the public that Mr. Black abused and harassed her if Mr. Black did not pay her money;

   c.   accepting from Mr. Black (i) a £2 million pound payment, (ii) forgiveness of two loans of $480,000 that had been accruing interest at 5% per annum for two and four years, respectively, and (iii) monthly payments of $100,000 from October 2015 through March 2021, in exchange for not revealing her affair with Mr. Black to his family and the public and not making false allegations of abuse or harassment to the public;

d. attempting to extort and fraudulently induce Mr. Black into providing additional consideration by sending Mr. Black a threatening text message on October 16, 2019, in which she falsely accused him of "sexually harrass[ing]" her, "sex traffick[ing]" her, "rap[ing]" her, "blacklist[ing]" her, and "forc[ing] [her] to sign" the Release and Confidentiality Agreement "under duress" without permitting her to read it;

e. causing lawyers other than Wigdor LLP to send letters to Mr. Black on February 18, 2020, and March 6, 2020 regarding the Release and Confidentiality Agreement, on information and belief, in order to demand additional consideration from Mr. Black in exchange for not publicizing her affair with Mr. Black and making false allegations against Mr. Black;

f. making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by falsely posting on Twitter on March 17, 2021 that she was "sexually harassed and abused by [Mr. Black] for years," that "[i]t started in 2008 when [she] met with [Mr. Black] to discuss work," that she "refused [Mr. Black's] sexual advances," that Mr. Black "bullied, manipulated, threatened, and coerced" her, that Mr. Black "forced [her] to sign an NDA in 2015," and that Mr. Black engaged in "predatory behavior";

g. making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by falsely stating in an interview with the New York Post that Mr. Black had "abuse[d]" her "over a long period of time and it was tragic," which statements

were published in an April 8, 2021 news article, Josh Kosman, Leon Black's Surprise Apollo Global Exit Came Amid Sexual Harassment Allegation, N.Y. Post (Apr. 8, 2021), https://nypost.com/2021/04/08/leon-black-accused-of-sexual-harassment/;

h.  making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by working with Wigdor LLP to file a Complaint seeking damages on her behalf on June 1, 2021 in which she publicized her affair with Mr. Black and falsely accused Mr. Black of abuse, harassment, and sexual assault, among other outrageous and false accusations;

i.  making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by causing Wigdor LLP to file an Amended Complaint seeking damages on her behalf on August 9, 2021 in which she publicized her affair with Mr. Black and falsely accused Mr. Black of abuse, harassment, and sexual assault, among other outrageous and false accusations;

j.  making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by causing Wigdor LLP to file a Proposed Second Amended Complaint seeking damages on her behalf on September 20, 2021 in which she publicized her affair with Mr. Black and falsely accused Mr. Black of abuse, harassment, and sexual assault, among other outrageous and false accusations; and

     k. making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by, on information and belief, making a false report to the Manhattan District Attorney's Office that Mr. Black sexually assaulted her.

114. Mr. Rubenstein and the Flacks were willing and critical participants in the racketeering scheme. They encouraged and enabled the Enterprise by, among other things:

     a. on information and belief, assisting Ms. Ganieva in making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by disseminating the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media in an effort to publicize those allegations;

     b. on information and belief, assisting Ms. Ganieva in making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by telling the press that the Manhattan District Attorney's Office had opened a criminal investigation into Mr. Black; and

     c. on information and belief, accepting payments and/or promises to pay from Mr. Harris as consideration for Mr. Rubenstein and the Flacks' dissemination of the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media and encouragement of press coverage regarding Ms. Ganieva's false allegations.

115. Mr. Harris was a willing and critical participant in the racketeering scheme. Mr. Harris encouraged and enabled the Enterprise by, among other things:

a.  on information and belief, causing an emissary to inquire with one or more law firms to see if they could represent Ms. Ganieva in her fraudulent lawsuit against Mr. Black, with the search resulting in the eventual retention of Wigdor;

b.  on information and belief, providing payments and/or promises to pay to Mr. Rubenstein and the Flacks as consideration for their dissemination of the Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media and encouragement of press coverage regarding Ms. Ganieva's false allegations; and

c.  on information and belief, providing payments and/or promises to pay to Mr. Rubenstein and the Flacks as consideration for their assisting Ms. Ganieva in making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by telling the press that the Manhattan District Attorney's Office had opened a criminal investigation into Mr. Black.

116.  Defendants' scienter is established by the pattern of intentional and knowing material misrepresentations described above.

117.  Defendants committed extortion, in violation of both federal and state law, including, without limitation, violations of the Hobbs Act, 18 U.S.C. § 1951.

a.  **Ms. Ganieva**.  Ms. Ganieva threatened to publicize her affair with Mr. Black and make false allegations to the public that he harassed or abused her.  Ms. Ganieva engaged in this unlawful conduct with the intent to extort money from Mr. Black; if Mr. Black did not pay money to Ms. Ganieva, she would carry out

her threat to cause substantial financial, reputational, and emotional damage to Mr. Black.  Ms. Ganieva exploited Mr. Black's fear of economic, reputational, and emotional harm, by causing Mr. Black to make payments to Ms. Ganieva or risk exposing himself to such harm.

b.  As a result of her extortionate threats, Ms. Ganieva accepted from Mr. Black (i) a £2 million payment; (ii) forgiveness of two loans of $480,000 that had been accruing interest at 5% per annum for two and four years, respectively; and (iii) monthly payments of $100,000 from October 2015 through March 2021. Some of the monthly payments were made and accepted through interstate and international wires. Each acceptance of such payments by Ms. Ganieva constituted a predicate act within the meaning of RICO.

c.  Ms. Ganieva then made good on her extortionate threats and attempted to extort Mr. Black into providing additional consideration by: (i) making the false posts on Twitter, described above; (ii) making false statements to the New York Post, described above; (iii) causing the filing and dissemination of the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint seeking damages, and the false allegations contained therein; and (iv) on information and belief, making a false report to the Manhattan District Attorney's Office that Mr. Black sexually assaulted her.

d.  **Mr. Rubenstein and the Flacks.** Mr. Rubenstein and the Flacks assisted Ms. Ganieva in making good on her extortionate threats and attempting to extort Mr. Black into providing additional consideration by: (i) on information and belief, disseminating the Original Complaint, the Amended Complaint, and the

Proposed Second Amended Complaint and the false allegations therein to members of the media in an effort to publicize those allegations; and (ii) on information and belief, telling the press that the Manhattan District Attorney's Office had opened a criminal investigation into Mr. Black.

e.   **Mr. Harris**.   Mr. Harris assisted Ms. Ganieva in making good on her extortionate threats and attempting to extort Mr. Black into providing additional consideration by:  (i) on information and belief, causing an emissary to inquire with one or more law firms to see if they could represent Ms. Ganieva in her extortionate lawsuit against Mr. Black, with the search resulting in the eventual retention of Wigdor; and (ii) on information and belief, providing payments and/or promises to pay to Mr. Rubenstein and the Flacks as consideration for their dissemination of the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media, and telling the press that the Manhattan District Attorney's Office had opened a criminal investigation into Mr. Black, and encouraging press coverage regarding Ms. Ganieva's false allegations.

118.   Defendants committed mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343.

a.   **Ms. Ganieva.** Ms. Ganieva used interstate and international mails and wires to obtain money from Mr. Black under fraudulent pretenses. Ms. Ganieva threatened to publicize her affair with Mr. Black and make false allegations to the public that he harassed or abused her. Ms. Ganieva engaged in this unlawful conduct with the intent to obtain money from Mr. Black under fraudulent pretenses; if Mr. Black did not pay money to Ms. Ganieva, she would carry out

her threat to unlawfully cause substantial financial, reputational, and emotional damage to Mr. Black

b.  As a result of her threats, Ms. Ganieva accepted from Mr. Black under fraudulent pretenses (i) a £2 million payment; (ii) forgiveness of two loans of $480,000 that had been accruing interest at 5% per annum for two and four years, respectively; and (iii) monthly payments of $100,000 from October 2015 through March 2021. Some of the monthly payments were made and accepted through interstate and international wires. Each acceptance of such payments by Ms. Ganieva constituted a predicate act within the meaning of RICO.

c.  Ms. Ganieva then made good on her threats and attempted to induce Mr. Black into providing additional payments under fraudulent pretenses through interstate mails and/or wires by: (i) making the false posts on Twitter, described above; (ii) making false statements to the New York Post, described above; (iii) causing the filing and dissemination of the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint seeking damages, and the false allegations contained therein; and (iv) on information and belief, making a false report to the Manhattan District Attorney's Office that Mr. Black sexually assaulted her.

d.  **Mr. Rubenstein and the Flacks.** Mr. Rubenstein and the Flacks assisted Ms. Ganieva in making good on her threats and attempting to induce Mr. Black into providing additional payments under fraudulent pretenses through interstate mails and/or wires by: (i) on information and belief, disseminating the Original Complaint, the Amended Complaint, and the Proposed Second Amended

Complaint and the false allegations therein to members of the media in an effort to publicize those allegations; and (ii) on information and belief, telling the press that the Manhattan District Attorney's Office had opened a criminal investigation into Mr. Black.

    e.  **Mr. Harris**.  Mr. Harris assisted Ms. Ganieva in making good on her threats and attempting to induce Mr. Black into providing additional payments under fraudulent pretenses through interstate mails and/or wires by:  (i) on information and belief, causing an emissary to inquire with one or more law firms to see if they could represent Ms. Ganieva in her extortionate lawsuit against Mr. Black, with the search resulting in the eventual retention of Wigdor; and (ii) on information and belief, providing payments and/or promises to pay to Mr. Rubenstein and the Flacks as consideration for their dissemination of the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media, and telling the press that the Manhattan District Attorney's Office had opened a criminal investigation into Mr. Black, and encouraging press coverage regarding Ms. Ganieva's false allegations.

119.    Accordingly, Ms. Ganieva, Mr. Rubenstein, and Mr. Harris have each committed at least two predicate acts, as required by Section 1962.

120.    The racketeering acts identified above were related to one another and formed a pattern of racketeering activity in that they (a) were in furtherance of common goals, including to extort and fraudulently induce Mr. Black into providing payments to prevent or stop the spread of false and outrageous allegations against him; (b) used similar methods to perpetrate the frauds,

including making and making good on threats to spread false and outrageous allegations against Mr. Black; (c) had similar participants; and (d) had the same victim.

121.    Defendants' racketeering acts were a regular way of conducting their ongoing business regarding Mr. Black and of conducting or participating in the ongoing RICO Enterprise. The racketeering acts were sufficiently continuous to form a pattern of racketeering activity.

122.    Defendants' racketeering acts pose a threat of continuing criminal activity.  On information and belief, Ms. Ganieva, in *Ganieva v. Black*, No. 155262/2021 (N.Y. Sup. Ct., N.Y. Cty. 2021), will continue to make and disseminate filings containing false and outrageous accusations regarding Mr. Black.  The media likewise continues to publish articles regarding Ms. Ganieva's litigation and the false accusations she has made against Mr. Black.  *See, e.g.,* Gabriel Sherman, *Billionaire Leon Black is Being Investigated by the Manhattan D.A*., Sources Say, Vanity Fair, Oct. 25, 2021, https://www.vanityfair.com/news/2021/10/billionaire-leon-black-is-being-investigated-by-the-manhattan-da.

123.    Mr. Black has been injured in business or property as a result of Defendants' racketeering scheme.  For example, Defendants' fraudulent and extortionate conduct caused Mr. Black to suffer damages insofar as he provided Ms. Ganieva (i) a £2 million payment; (ii) forgiveness of two loans of $480,000 that had been accruing interest at 5% per annum for two and four years, respectively; and (iii) monthly payments of $100,000 from October 2015 through March 2021.  Mr. Black likewise has incurred substantial costs defending against Defendants' sham lawsuits and media campaign.  Mr. Black has also suffered loss of business opportunities as a result of Defendants' wrongdoing.

124.    Mr. Black is not the only victim of the Enterprise.   Apollo—which manages $480 billion in assets, on behalf of major institutional investors, and employs thousands of people

around the world—was victimized as well.  Mr. Harris was an officer of the Company, promoted for years as a "co-founder" of the firm, and remains a member of its Board.  The Enterprise's conduct caused Apollo significant reputational harm.  Investors in Apollo-managed funds were deeply troubled by the allegations raised by Ms. Ganieva and the wave of negative publicity directly fomented by the Enterprise.  Apollo suffered vis-à-vis its peers who were not the targets of such misconduct.   And it was wrongfully deprived of the services of its founder and Chairman.

125.    As a result of Defendants' violations of 18 U.S.C. § 1962(c), Mr. Black is entitled to treble damages, plus interest, costs, and attorneys' fees

**SECOND CAUSE OF ACTION**

**Civil RICO Conspiracy, 18 U.S.C. § 1962(d)**

**(Against Ms. Ganieva, Mr. Rubenstein, and Mr. Harris)**

126.    Mr. Black incorporates all of the above allegations as if they were fully stated here.

127.    In violation of 18 U.S.C. § 1962(d), Ms. Ganieva, Mr. Rubenstein, and Mr. Harris conspired to violate 18 U.S.C. § 1962(c) in that, on information and belief, they knowingly agreed and conspired together and with others to conduct or participate, directly or indirectly, in the affairs of an enterprise through the pattern of racketeering activity described above.

128.    In violation of 18 U.S.C. § 1962(d), the frauds that were perpetrated, and the continuance of this scheme, could not have occurred without the consent and knowing connivance of Ms. Ganieva, Mr. Rubenstein, and Mr. Harris together.

129.    In violation of 18 U.S.C. § 1962(d), as part of and in furtherance of their conspiracy, Ms. Ganieva, Mr. Rubenstein, and Mr. Harris conspired in the commission of the many predicate acts described above, with the knowledge that they furthered that pattern of racketeering activity. As part of and in furtherance of their conspiracy, in violation of 18 U.S.C. § 1962(d), Ms. Ganieva,

Mr. Rubenstein, and Mr. Harris agreed to and did commit at least two predicate acts of racketeering. Further in violation of 18 U.S.C. § 1962(d), each of Ms. Ganieva, Mr. Rubenstein, and Mr. Harris's actions are attributable to the other.

130.    No Defendant has withdrawn, or otherwise disassociated itself, from the conspiracy at issue or the other conspirators.

131.    Mr. Black has been injured in business or property as a result of Defendants' violations of 18 U.S.C. § 1962(d). For example, Defendants' fraudulent and extortionate conduct caused Mr. Black to suffer damages insofar as he provided Ms. Ganieva (i) a £2 million payment; (ii) forgiveness of two loans of $480,000 that had been accruing interest at 5% per annum for two and four years, respectively; and (iii) monthly payments of $100,000 from October 2015 through March 2021. Mr. Black likewise has incurred substantial costs defending against Defendants' sham lawsuits and media campaign. Mr. Black has also suffered loss of business opportunities as a result of Defendants' wrongdoing.

132.    As a result of Defendants' violations of 18 U.S.C. § 1962(d), Mr. Black is entitled to treble damages, plus interest, costs, and attorneys' fees.

### THIRD CAUSE OF ACTION

### Defamation *Per Se*

### (Against All Defendants)

133.    Mr. Black incorporates all of the above allegations as if they were fully stated here.

134.    Ms. Ganieva publicly accused Mr. Black of sexual harassing and abusing her for years on Twitter, knowing that those accusations were false, with the intent to cause Mr. Black severe reputational, professional, and economic harm.

135.    Aware of Ms. Ganieva's lies, Mr. Rubenstein and the Flacks pushed stories and articles to promote her lies, including setting up an interview with the New York Post.  In that interview, Ms. Ganieva claimed that Mr. Black's abuse of her "was over a long period of time and it was tragic."  These continued lies that Mr. Black sexually abused Ms. Ganieva were made to cause Mr. Black reputational, professional and economic harm.

136.    Wigdor LLP's pleadings (actual and proposed) filed on behalf of Ms. Ganieva were shams.  Wigdor LLP and Ms. Ganieva knew that the pleadings had no basis in fact and included in them defamatory and libelous statements about Mr. Black that were made (i) without any good faith basis, (ii) without conducting anything akin to a remotely adequate investigation (if any investigation was done at all), (iii) in direct defiance and conscious disregard of contemporaneous documentary evidence, (iv) in bad faith and with malice, and (v) with the sole purpose of causing Mr. Black severe reputational, professional, and economic harm.

137.    Wigdor LLP filed those complaints on behalf of Ms. Ganieva and in coordination with Mr. Harris, Mr. Rubinstein, and the Flacks not because they had a good faith basis to reasonably believe that their client had any passably legitimate claim for redress, but because they wanted to publicize and disseminate lurid, scandalous and calumnious accusations about Mr. Black.

138.    With each pleading, Wigdor LLP, Mr. Rubenstein, and the Flacks communicated the filing and substance of that filing to the press.  On information and belief, Mr. Harris funded and actively encouraged these actions.

139.    Defendants are in no way entitled to any protections, immunities or privileges with respect to the allegations in their complaints because those filings were made exclusively for the

purpose of attempting to cloak the allegations in them with the appearance of such protections, immunities or privileges.

140.    In addition, the allegations in the complaints were not in any way made in furtherance of any bona fide litigation objective.

141.    The allegations in all three iterations of the complaint are written defamatory and libelous statements of purported fact concerning Mr. Black, and were and are utterly false, as conclusively shown by contemporaneous documentary evidence that Wigdor LLP has deliberately refused to view and has never rebutted.

142.    The allegations in the complaints amount to defamation and libel per se under the law as they allege that Mr. Black committed serious crimes, including sexual assault, and thus damages are presumed.

143.    The defamatory statements in Defendants' pleadings include, but are not limited to: that Mr. Black raped Ms. Ganieva; that Mr. Black "sexually harassed and abused" Ms. Ganieva "for years"; that Mr. Black "bullied, manipulated, threatened, and coerced" Ms. Ganieva; that Mr. Black kidnapped her and flew her to Epstein's home for purported sex trafficking; that Mr. Black previously raped an unidentified woman that he met through Epstein; that Mr. Black is a "sadist" and a "sex addict"; and that Mr. Black threatened Ms. Ganieva to sign the NDA, saying "If you do not take the money, I will put you in prison" and "If you do not take the money, I will destroy your life."

144.    Defendants' statements to the public and the press also amount to defamation and libel per se under the law as they allege that Mr. Black committed serious crimes, including sexual assault, and thus damages are presumed.  These allegations include, but are not limited to, Ms. Ganieva's tweets accusing Mr. Black of "sexually harass[ing] and abus[ing]" her; Ms. Ganieva's

statements to the New York Post that Mr. Black abused her "over a long period of time and it was tragic"; Ms. Christensen's statement branding Mr. Black as a "sexual predator[]" and inviting prosecutors to "go after" him, invoking the "#MeToo" movement; Ms. Christensen's participation in telephone interviews with news organizations, including a statement to Forbes accusing Mr. Black of "heinous conduct" towards Ganieva and of "intimidating" her; and allegations that Mr. Black raped a Jane Doe twenty years ago.

145.    The allegations in the pleadings were published without privilege or authorization to a third party.

146.    In publishing those defamatory and libelous allegations, and repeating those lies to the press and the public, the Defendants wrongfully and willfully intended by such publication to injure Mr. Black's personal and business reputation.

147.    At the time Defendants uttered and caused to be published the defamatory and libelous matter set out above, Defendants acted with actual malice because they knew the allegations in the pleadings were false or, in the alternative, they failed to take any reasonable steps to ascertain the accuracy of the allegations and instead published them with reckless or grossly negligent disregard for whether they were true or not.

148.    As a direct result of the foregoing defamatory and libelous statements, in Defendants' sham pleadings and to the press, Mr. Black has suffered injury to his personal and business reputation.

149.    In addition, because of the wanton, willful and malicious nature of the foregoing wrongful conduct, Mr. Black is also entitled to recover punitive damages.

## FOURTH CAUSE OF ACTION

### Breach of Contract

### (Against Ms. Ganieva)

150.    Mr. Black incorporates all of the above allegations as if they were fully stated here.

151.    Mr. Black and Ms. Ganieva entered into a contract on October 19, 2015.

152.    The contract consists of a one page document entitled "Release and Confidentiality Agreement" that was signed by Ms. Ganieva.

153.    Under the agreement, Mr. Black agreed to forgive two loans of $480,000 that he had made to Ms. Ganieva that had been accruing interest at 5% per annum for two and four years, respectively; make a simultaneous payment to Ms. Ganieva of $100,000; and to provide Ms. Ganieva with "other consideration," which Mr. Black and Ms. Ganieva agreed that day would consist of £2 million to secure Ms. Ganieva a United Kingdom visa, as well as payments of $100,000 a month for fifteen years.

154.    In exchange, Ms. Ganieva agreed to release Mr. Black from "all matters, causes of action, claims, suits and any and all further liability or accountability, in law or equity, by reason of any matter, cause or thing whatsoever arising prior to the signing of this Agreement, contemporaneous with the signing of this Agreement or any time in the future after the signing of this Agreement."

155.    Ms. Ganieva further agreed "never to disclose, directly or indirectly, to any individual, entity or other potential recipient, any information relating to (i) the allegations and claims that she has asserted against [Mr. Black], (ii) the signing, content or other attributes of this Agreement, including any consideration furnished by [Mr. Black] in connection with the signing

of this Agreement and (iii) any other matters that could damage [Mr. Black's] career, reputation and relationship with others."

156.     Before signing the contract, Ms. Ganieva read the document for as long as she wanted.  She asked questions about its terms, which Mr. Black answered.  And she negotiated the amount of money she would receive from Mr. Black.

157.     Mr. Black faithfully performed under the agreement for more than five years, from October 2015 through March 2021.

158.     On March 17, 2021, Ms. Ganieva failed to perform under the contract by publicly tweeting that Mr. Black had "sexually harassed and abused" her for years and that she "was forced to sign an NDA in 2015."

159.     Ms. Ganieva has thereafter breached the agreement on numerous occasions, including by making or authorizing the statements and legal claims in the court filings and press statements pleaded herein.

160.     By breaching their agreement, Ms. Ganieva caused Mr. Black damages.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment

### (Against Ms. Ganieva)

161.     Mr. Black incorporates all of the above allegations as if they were fully stated here.

162.     Pursuant to the agreement, Mr. Black paid Ms. Ganieva $9,251,084.00 from October 2015 through March 2021.

163.     Ms. Ganieva was enriched by these payments, at Mr. Black's expense.

164.     Ms. Ganieva willfully broke the terms of the agreement, depriving Mr. Black of what he had bargained for—that is, Ms. Ganieva's silence as to their affair and the resolution of their agreement.

165.     It is against equity and good conscience for Ms. Ganieva to be allowed to keep the money she extorted from Mr. Black after breaking the terms of their agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Leon D. Black hereby requests judgment against Defendants Guzel Ganieva, Wigdor, LLP, Steven Rubenstein, and Josh Harris as follows:

a)  Enter judgment on the claims in Mr. Black's favor;

b)  Award Mr. Black damages, in an amount to be determined at trial, plus prejudgment interest, to compensate Mr. Black for all monetary and/or economic damages;

c)  Award Mr. Black damages for any and all other monetary and/or non-monetary losses suffered by him, including, but not limited to, loss of income, reputational harm and harm to professional reputation, in an amount to be determined at trial, plus prejudgment interest;

d)  Award punitive damages for the Defendants' gross wanton, malicious, and outrageous misconduct in an amount to be determined at trial;

e)  Award Mr. Black treble damages;

f)  Award attorneys' fees, costs, and disbursements incurred as a result of this action; and

g)  Award such other, further, and different relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Mr. Black demands a jury trial for all claims and issues in this action that are triable as a matter of right to a jury.


By:  /s/ Susan Estrich
      Susan Estrich

ESTRICH GOLDIN LLP
947 Berkeley Street
Santa Monica, CA 90403
(212) 399-2132
susan@estrichgoldin.com
(*pro hac vice*)


*Attorney for Plaintiff Leon Black*