# EXHIBIT 1

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-------------------------------------------------------------------- x

GUZEL GANIEVA,

                                        Plaintiff,

                    v.

LEON BLACK;

                                        Defendant.

-------------------------------------------------------------------- x

**SUMMONS**

Plaintiff designates
NEW YORK COUNTY
as the place of trial

The basis of the venue is: Residence of
Plaintiff and a substantial part of the
events giving rise to Plaintiff's claims took
place in New York County

To the above-named Defendant:

      **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiff's attorney within twenty (20) days after service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: June 1, 2021
      New York, New York

      Respectfully submitted,

      **WIGDOR LLP**

      By: _____
            Jeanne M. Christensen
            Lindsay M. Goldbrum

      85 Fifth Avenue
      New York, NY 10003
      Telephone:  (212) 257-6800
      Facsimile:  (212) 257-6845
      jchristensen@wigdorlaw.com
      lgoldbrum@wigdorlaw.com

      *Counsel for Plaintiff*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------------X

GUZEL GANIEVA,                                           :
                                                         :
                                   Plaintiff,            :        Civil Action No.:
                                                         :
              v.                                         :
                                                         :        **COMPLAINT**
LEON BLACK,                                              :
                                                         :
                                   Defendant.            :        **Jury Trial Demanded**

------------------------------------------------------------------------X

Plaintiff Guzel Ganieva ("Plaintiff") brings this Complaint against Leon Black ("Black"

or "Defendant"), and hereby alleges as follows:

## PRELIMINARY STATEMENT

1.       On April 8, 2021, Bloomberg published an article that contained the following

statements by Defendant Leon Black about Plaintiff Guzel Ganieva:

> "I foolishly had a consensual affair with Ms. Ganieva that ended
> more than seven years ago," Black said in the statement Thursday.
> "Any allegation of harassment or any other inappropriate behavior
> towards her is completely fabricated. **The truth is that I have
> been extorted by Ms. Ganieva for many years and I made
> substantial monetary payments to her, based on her threats to
> go public concerning our relationship**, in an attempt to spare my
> family from public embarrassment."
>
> Black had previously planned to step down by the end of July as
> CEO of the firm he co-founded. He said that, on advice from his
> counsel, he asked criminal authorities several weeks ago to
> investigate Ganieva.[1]

---

[1]      Gillian Tan, *Black Says He Paid to Hide Affair, Denies It Led to Apollo Exit*, Bloomberg,
(April 8, 2021, 10:04 PM), https://www.bloomberg.com/news/articles/2021-04-09/black-says-he-paid-to-hide-affair-denies-it-led-to-apollo-exit, (emphasis added).

1

2.      Everything that Black said in the above statement about Ms. Ganieva is false. First, Black did not have "a consensual affair" with Ms. Ganieva. Second, any telling of "harassment" or "inappropriate behavior" by Black towards Ms. Ganieva is not fabricated. As described below, such words do not come close to the appalling forced sexual misconduct that Black inflicted on her. Third, Black has never been "extorted by Ms. Ganieva," much less for "many years." Disgustingly, he used his extreme power and wealth to coerce her into signing a non-disclosure agreement ("NDA") in October 2015 precisely because he knew what he had done to her was shocking, evil and exposed him to potential criminal charges.

3.      The only repeated threats for many years came from Black to Ms. Ganieva that if she did not sign the NDA, take his hush money and retreat into silence forever, she would feel the brunt of his true wrath. He said many times to her:

**"If you do not take the money, I will put you in prison."**

**"If you do not take the money, I will destroy your life."**

4.      Fourth, Ms. Ganieva never "threatened to go public" about Black regarding anything. As the people within Black's inner circle know, the suggestion that Black attempted to spare his family public embarrassment about a purported extramarital relationship is ridiculous.

5.      For years, Black ate countless meals with Ms. Ganieva in 5-star restaurants, took her to Broadway shows, numerous art shows, museum exhibitions, private parties, the movies, including the premier of The King's Speech and even sat beside her while he cheered for the New York Knicks at MSG. In the midst of all these very public outings, Black never once worried about sparing his family from public embarrassment.[2] In fact, he never worried about people

---

[2] Nor did he care about being seen out with other young women, often of Russian descent, in addition to Ms. Ganieva.

2

associating him with Ms. Ganieva because he enjoyed being seen with her in public. What Black has worried about, however, is being exposed for the sadist that he is.

6.     On October 29, 2020 during an earnings call, in connection with his announcements about his future role at Apollo Management, Black publically stated:

> **"There has never been an allegation by anyone that I engaged in any wrongdoing, because I did not."**

7.     This false claim of Black's was the tipping point for Ms. Ganieva.  Having recently educated herself in law school and knowing that many of his sexual acts were against her will and without her consent, she no longer was willing to stand by and allow him to escape accountability.

8.     Knowing that her public outing of his disgusting conduct would end any further monetary payments from Black, she did so regardless.

9.     On March 17, 2021, Ms. Ganieva bravely posted on Twitter that Black was a "predator" that had "sexually harassed and abused" her for years. The next morning, Black texted Ms. Ganieva to call him immediately.  She refused.

10.     Knowing that he could no longer control her into silence, Black resorted to the age-old playbook used by wealthy and powerful men – he made a preemptive claim of extortion. [3]

11.     This textbook strategy involves overpowering the female accuser by victimizing her one more time in a public way with threats of criminal charges.  As demonstrated by Black, this is accomplished by going to the "criminal authorities" to accuse Ms. Ganieva of extortion

---

[3]    Too many examples exist to include here of wealthy male sexual harassers re-victimizing their victims by accusing these women of extortion after they came forward.  A number of high profile examples are detailed *infra* at ¶ 87.  Threats of extortion are potentially far more damaging and frightening to a female accuser than threats of a civil lawsuit for defamation, an option that numerous men accused of sexual misconduct use for similar reasons.

and placing her on the legal defensive before she can take any legal action against him – just in case she planned on doing so.

12. Although heinous and disgusting, Ms. Ganieva had been threatened by Black for years that if she disobeyed him, he would **"put her in prison"** and to speak out would be **"suicide."**

13. For too long, wealthy men like Black have enjoyed an unequal access to justice unavailable to the average citizen and non-millionaires. Knowing the right lawyers and politicians provided Black with the ability to do exactly as he said:

**"Ask criminal authorities to investigate Ganieva."**

14. Threatening that a criminal charge will be brought against Ms. Ganieva first will not save Black from the truth about what he has done. The truth will reveal a violent, sadistic side to Black that he has shielded from public view for decades.

15. Black defamed Ms. Ganieva by making the above statements.

## JURISDICTION AND VENUE

16. The Court has personal jurisdiction pursuant to Civil Practice Law and Rules ("CPLR") § 301, *inter alia*, because Plaintiff and Defendant reside in New York.

17. Venue is proper in this County pursuant to CPLR § 503 because a substantial part of the events giving rise to Plaintiff's claims took place in New York County.

## PARTIES

18. Plaintiff Guzel Ganieva resides in the state of New York, New York County.

19. Defendant Leon Black resides in the state of New York, Westchester County.

4

## FACTUAL ALLEGATIONS

**I.**     **Leon Black's Orchestrated Secrecy of His Sexual Violence and Deviance**

20.     Like a master chess player, Black was many moves ahead of Ms. Ganieva from the moment he met her.  Black picked Ms. Ganieva out of a crowd in March 2008, while attending an International Women's Day event in NYC.

21.     A single mother in her early twenties, having moved from Russia to the United States by herself, it was easy work for Black to convince Ms. Ganieva to dine with him at La Grenouille where he planned to tell her how he could help her with her future.

22.     This is exactly what Black did.

23.     It was a choreographed plan that allowed him to quickly gain Ms. Ganieva's trust. Common sense suggests that he had used this tactic before, and in fact, Ms. Ganieva later met at least two other women that were similarly involved with Black.  Over the course of several dinners, Black repeated proclamations about her innate talent and intellect, and combined with a few "arranged" appointments, for example with the Creative Artists Agency, LLC in Los Angeles, he quickly gained her gratitude and admiration.

24.     Ms. Ganieva was flattered that a successful businessman would find her conversation and company enjoyable. As the person in charge of thousands of employees, Ms. Ganieva believed Black understood the value and importance of reliable, secure employment and intended to help her move beyond modeling.  Naïvely, Ms. Ganieva believed that Black was not interested in her sexually, simply because she told him that their relationship would not be sexual.

25.     Black, however, is a ruthless planner and a man that gets what he wants. It was not long before he managed to secure his ability to get Ms. Ganieva alone with him, out of sight from the public or his own employees.

5

26.     Once he did, Black forced sadistic sexual acts on her without her consent and despite her saying no.

27.     The first time it happened, in 2008, Black took Ms. Ganieva to a studio apartment with a mattress on the floor and no other furniture.  Humiliated and in shock, Ms. Ganieva never uttered a word about he had done to her.

28.     In a sad but predictable pattern, for the next several years Ms. Ganieva endured a cycle of intimidation, abuse and humiliation by Black that on numerous occasions included forced sexual conduct against her will.  Many of these instances were perpetrated by Black in order for him to indulge in sadistic sexual acts that were physically painful to Ms. Ganieva and to which she never consented.  In addition to causing intentional physical pain, Black engaged in these acts because he derived pleasure from humiliating and debasing Ms. Ganieva.

29.     After these acts of violence, Ms. Ganieva would tell Black to never speak to her or contact her again. Inevitably, after waiting weeks and sometimes several months, being a master manipulator, Black would engage in remorseful and conciliatory behavior, relentlessly – until he could induce her to meet him again.

30.     Black's persuasion tactics included endless promises such as: to help with Ms. Ganieva's child's educational opportunities; to finance a movie for her that she could produce or direct, after convincing her that acting was too difficult a business; to purchase a townhouse and turn it into an art museum that Ms. Ganieva could manage or be a director of; and to help her with an application to Harvard Business School because of his strong relationships there.  She believed his promises, and in fact, she was aware that Black had purchased an art gallery and hired another woman that he had been involved with to run the gallery.

6

31. Despite Black's periods of remorseful and conciliatory behavior, he nevertheless also engaged in textbook harasser conduct. Specific details about each instance of Black's derogatory and controlling conduct towards Ms. Ganieva are too much to include in this Complaint. By way of example only, it included such things as:

- Ubiquitous belittling;

- Falsely accusing her of being jealous to deflect from his own hideous conduct;

- Pretending not to listen to or understand Ms. Ganieva when she said something he did not like, especially when it involved her attempts at cutting off communication;

- Forcing her to walk behind him;

- Forcing her to wait for his permission to speak;

- Punishing her by yelling and screaming if she did not speak to him "nicely";

- Insisting that she speak to him in a pleasing, pleasant or otherwise "happy" and "nice" manner and yelling at her if she failed to do so;

- Insisting that her text messages also be sufficiently pleasant;

- Criticizing her appearance by saying she needed to lose weight or improve certain parts of her body;

- Criticizing her clothing and make-up;

- Berating her for refusing to agree to threesomes with other women and Black;

- Intentionally making her feel stupid and inferior to him; and

- Physically intimidating her by such acts as clenching his fists, pounding nearby pieces of furniture, repetitive

7

cracking of his knuckles and otherwise using his formidable 6'5" and 300+ pound body to intimidate her.

## II.    Ms. Ganieva Returns to College

32.    In 2011, Ms. Ganieva enrolled in school to finish her undergraduate degree in math.  She hoped that a degree would allow her to find a job outside of modeling.

33.    Ms. Ganieva believed that going to school would occupy more of her time and make her less available to Black.  Other efforts to distance from him included cutting off most of her hair, believing that Black would find her unattractive.  Unfortunately, these efforts had thus far been mostly futile.

34.    As it turned out, Black said that he was in favor of her returning to college, and used the situation to convince Ms. Ganieva to sign a "loan" with Black.

### A.    The First $480,000 Loan

35.    One day in 2011, Black told Ms. Ganieva that he had arranged a loan for her. Despite being a financial titan with teams of lawyers at his disposal, Black presented to her a one-page document, set forth below.

36.    As stated, the "loan" included a 5% interest rate and was payable on June 1, 2016.

37.    Of course, such an amount of money was unfathomable to Ms. Ganieva and she protested that she would never be able to pay it back. Financial control – a tried-and true tactic to achieve dominance over another, was a method Black knew intimately and understood would place Ms. Ganieva in his debt forever.

8



38.     Critically, it would ensure that his criminal behavior would remain silenced.

9

B.    The Second $480,000 Loan

39.    Unsurprisingly, Black followed this initial loan with another one just like it in

2013:



**LOAN AGREEMENT BETWEEN LEON BLACK and GUZEL GANIEVA**

On this day, May 24, 2013 Leon Black ("the Lender") agrees to make a loan of

$480,000 ("the principal") to Guzel Ganieva ("the Borrower") on the following terms.

The principal amount will be lent over a period of two (2) years, extending over eight (8)

intervals of three (3) months each, to be disbursed by bank wire transfer at the beginning

of each interval:

| | | |
|---|---|---|
| $60,000 | on | June 1, 2013 |
| $60,000 | on | September 1, 2013 |
| $60,000 | on | December 1, 2013 |
| $60,000 | on | March 1, 2014 |
| $60,000 | on | June 1, 2014 |
| $60,000 | on | September 1, 2014 |
| $60,000 | on | December 1, 2014 |
| $60,000 | on | March 1, 2015 |

The principal loan will be repaid in full on June 1, 2018 and will carry a simple

interest rate of 5% per annum, also to be repaid on June 1, 2018.

The Lender and Borrower have read and fully understand the terms of this

Agreement and hereby consent to such terms in full.

Leon Black                              Guzel Ganieva

Dated: May 24, 2013

10

40. The two "loans" and his ability to force repayment of such an amount allowed Black to exert even greater control over Ms. Ganieva. Black knew the magnitude of the harm that he had inflicted on Ms. Ganieva over the years. This money, at least in his twisted mind, was a way of excusing himself.

41. After Ms. Ganieva finished her math degree, Black reignited his charade of promises to help her find a "real job" outside of modeling. He convinced her that with all of his powerful Wall Street connections, he would find her a job.

42. Pathetically, Ms. Ganieva believed all of his promises and pursued leads for jobs arranged by Black for over a year. In hindsight Ms. Ganieva knows that none of these arranged interviews were meant to be legitimate. Rather, it was all part of Black's sick plan to make her feel grateful to him on the one hand, but also allow him to belittle and humiliate her after each job rejection.

43. Too many examples exist of these sham interviews to detail herein, but Black used his connections at Goldman Sachs and other financial powerhouses to arrange appointments for her. On the surface, such interviews appeared well-meaning, such as this example:

> **From:** REDACTED, Jenna L. [HCM]
> **Sent:** Wednesday, May 07, 2014 11:33 AM
> **To:** 'Guzel Ganieva'
> **Subject:** RE: Goldman Sachs Interview Opportunity
>
> Hello Guzel,
> Just following up to the voicemail I recently left. Curious if you are available to come onsite this
> **Friday May 9th from 11am to 1:30pm**?
> Please let me know. Thank you, Jenna

> On Wednesday, May 7, 2014, ▮REDACTED▮, Jenna L. <Jenna.▮REDA▮@gs.com> wrote:
> Hello Guzel,
> Please see your interview details below:
> **Friday, May 9th, 2014**
> Interviewer Time Details:
> Dana Bunting 11:00am EST 32/201
> *HCM TBD 11:30am EST 32/201*
> Pete Lyon & Alison Mass 12:00pm EST 32/201
> Julie Silverman 1:00pm EST 32/301
> Please keep in mind that all schedules are subject to change. When you arrive to our building at **200 West Street in New York**, our security team will direct you.

44.     As Black knew would happen, Ms. Ganieva never received an offer from any financial company in New York.  Desperate for work and falling for Black's claims that he was the only person that could help her, Ms. Ganieva even interviewed for jobs in London and Moscow that Black arranged, including at Goldman Sachs in London and Moscow.

45.     Predictably, Ms. Ganieva was rejected. By way of example only, one such rejection email is as follows:

> On Saturday, November 29, 2014, ▮REDACT▮, Pete <Pete.▮REDACT▮@gs.com> wrote:
> Thanks Guzel…in short, I think we just have to be patient for now…we have explored many options internally and, given the macro environment, there are no open jobs at Goldman Sachs right now that work for/are a fit for you…I also saw Paolo a few weeks ago in NYC and he told me he would keep his eyes open for you in Moscow with clients of his if they have roles/openings that make sense but that there were no immediate openings he was aware of…I wish we had better news but I think we just need to hang tight for now and if something opens that makes sense then Paolo and/or I will be in touch…thanks a lot."

46.     After yet another failed job interview, in desperation Ms. Ganieva even asked Black if she could work as a receptionist at one of these companies.  This idea was rejected by Black.  Clearly, Black preferred her instability and dependence.  In fact, after yet another failed

Goldman Sachs interview, Black said in a perversely happy manner that he knew her "world is shitty." Black then used the opportunity to remind her that he is the "only one" who can help her escape her "miserable life."

### III.   The Rape in July 2014

47.   In the days leading up to the July 4, 2014 weekend, Ms. Ganieva became sick and was home for a number of days unable to go to the store or cook for herself. At the time, her child was away at summer camp. On Sunday, July 6, 2014, Black came from the Hamptons to her apartment on East 77th Street. Although Ms. Ganieva did not buzz him through the building entrance, one of her neighbors must have done so, because suddenly he was knocking at her apartment door. When Ms. Ganieva opened the door, Black barged in, pushing her off to the side.

48.   Ms. Ganieva was weak and could barely walk. Disturbingly, when Black realized what a debilitated state she was in, he became happy.

49.   Aware that Black wanted to have sex with her, Ms. Ganieva quickly began protesting that she could not and would not have sex with him. She tried to tell him that she was in a weakened state, having been sick for almost a week.

50.   Never a match for his physical size and strength, on this day in particular Ms. Ganieva knew what fate was in store.

51.   At over 6'5" and 300+ pounds, Black had no difficulty dragging Ms. Ganieva into the bedroom and throwing her on her back on the bed. She was limp and unable to move.

52.   Despite her begging him to leave, he took off her clothes and his own. Inexplicably, he spared Ms. Ganieva the pain of his usual sadistic rituals and quickly got on top

13

of her and forced his penis into her vagina against her will. Disgustingly, when Black was done, as he stood up and put his clothes back on, he angrily said:

> **"Now I have fucked you."**

53.     Black then walked out – leaving Ms. Ganieva naked and unable to move on her bed.

54.     Ms. Ganieva was no match for the cunning and masterful manipulation of Black or his repeated and unwanted sexual conduct.

55.     After this rape, Ms. Ganieva took her son and left New York to physically distance herself from Black. Unfortunately, she was unable to fully escape his influence as it seemed that no matter where she traveled, inevitably she happened to meet someone that knew Black and he managed to always be aware of where she was and what she was doing.

56.     In this regard, Black often called Ms. Ganieva to let her know that he knew she had been at a certain event the night before, who she had been with and what she had been wearing.

57.     No matter the physical distance between them, Ms. Ganieva continued to feel threatened by Black and his power over her. Of course, this was precisely what he wanted.

58.     It was no surprise to Black that when Ms. Ganieva was back in New York City in 2015, she asked to meet him. Ms. Ganieva wanted to know what she could do to be able to live her life without his continued involvement. Having planned for years about his ability to silence her for what he had done, Black was prepared to talk to her, especially knowing that her two "loans" were coming due.

59.     Of course, Ms. Ganieva did not have one million dollars to repay Black.

60.     Of course, she was no match for his power, connections, control and money.

14

61.     Although intimidated by him, Ms. Ganieva repeated her prior messages that she did not want Black's money – she wanted him to leave her and her child alone, for good.

62.     Black was relentless.  Black urged Ms. Ganieva to take money he was offering her in exchange for nothing "horrible" to happen to her or her child.

63.     It was not an offer because refusing Black was not an option.  He reminded Ms. Ganieva that if she did not take the "deal," i.e., his hush money, he would make sure she ended up **"in prison"** or he would **"destroy her life."**

64.     At the Four Seasons hotel on October 18, 2015, he shoved a piece of paper across the table and told her she had to sign it.

65.     Ms. Ganieva was nervous and had difficulty understanding what it said.  She understood that it involved confidentiality -- what she later learned was a nondisclosure agreement ("NDA").

66.     Black "agreed" to allegedly forgive her loans.

67.     As to the other terms, she only read it once, quickly, and is unsure what other language is included in the document.

68.     There was no space on the document for Black to sign, only Ms. Ganieva.

69.     After she signed, he handed her another piece of paper which looked to be a copy of what she just signed.  He ordered her to sign this also.

70.     He then said to her:

   **"[I will be paying you] as long as you keep your mouth shut."**

15

71.     Black refused to give her a copy.  He left with the documents.[4]

72.     From that time until April 2021, Ms. Ganieva received regular payments from Black, via wire from an account called "E Trust."

73.     Prior to November 2015, whenever Black transferred money into her account, her bank statement recorded the funds as from "Leon D. Black," or "J. Black Trust Account."  Ms. Ganieva has no knowledge as to why payments began from the "E Trust" or what it is.

74.     Over the years, the only contact Ms. Ganieva had with Black was to ask numerous times to obtain a copy of what she signed that day. He refused to respond.  By way of example only, in 2019 she wrote to him:



Mon, Oct 15, 10:06 AM

Hi. I would like to have a copy of the NDA I signed. Can you please email it to me to REDACTED? Thank you.

Tue, Oct 16, 12:59 PM

Leon. You sexually harassed me, sex trafficked me, raped me, and eventually blacklisted me. I don't know for how much longer it will take me, on my own, to process the pain your caused to me and my family. The least thing you can do is to give me that document that I was forced to sign under duress and wasn't able to read before signing. Unfortunately I am still tied to you...

---

[4]     There is no way for Ms. Ganieva to be sure that the language in the second piece of paper matches the language in the first document.  Although it appeared to be the same, to this day she cannot be sure what either document contains.

16

75.     Ms. Ganieva retained legal counsel to demand that she receive a copy of the document. Her lawyer's letters to Black on February 18, 2020 and March 6, 2020 went unanswered.

76.     To this day, only Black has the NDA documents.

## IV.     Black Says Publically that He Has Never Committed Any Act of Misconduct

77.     On October 29, 2020 during an earnings call, in connection with his announcements about his future role at Apollo Management, Black publicly stated that:

> **"There has never been an allegation by anyone that I engaged in any wrongdoing, because I did not."**

78.     This false proclamation of Black's character and representation of his clean hands was extremely upsetting to Ms. Ganieva. He knew what he had done and that Ms. Ganieva considered many of his sexual acts to have been against her will and consent.

79.     Having enrolled in law school, Ms. Ganieva had a greater understanding of what Black had done to her physically and what he had coerced her into signing in connection with the non-produced confidentiality agreement.

80.     Knowing that Black was the one who had committed unlawful acts, and despite his anticipated threats to her for whatever he coerced her into signing, or that whatever money came from the mysterious E Trust into her account would cease, Ms. Ganieva finally had the courage to say what her experience with Black had been.

17

81.    On March 17, 2021, Ms. Ganieva posted on Twitter the following:



82.    Thereafter, on April 8, 2021, Bloomberg published the following article with the

statement issued by Black:

> "I foolishly had a consensual affair with Ms. Ganieva that ended
> more than seven years ago," Black said in the statement Thursday.
> "Any allegation of harassment or any other inappropriate behavior
> towards her is completely fabricated. The truth is that I have been
> extorted by Ms. Ganieva for many years and I made substantial
> monetary payments to her, based on her threats to go public
> concerning our relationship, in an attempt to spare my family from
> public embarrassment."

18

Black had previously planned to step down by the end of July as CEO of the firm he co-founded. He said that, on advice from his counsel, he asked criminal authorities several weeks ago to investigate Ganieva.[5]

83.     This statement was reprinted in countless publications.[6]

84.     For all of the reasons detailed above, everything Black said in the above statement about Ms. Ganieva is false.[7]

85.     Black's statement published on April 8, 2021 was made with malice.

---

[5]     Gillian Tan, *Black Says He Paid to Hide Affair, Denies It Led to Apollo Exit*, Bloomberg, (April 8, 2021, 10:04 PM), https://www.bloomberg.com/news/articles/2021-04-09/black-says-he-paid-to-hide-affair-denies-it-led-to-apollo-exit.

[6]     Josh Kosman, *Robert Kraft resigns from Apollo board amid Epstein controversy*, the New York Post, (April 12, 2021, 2:09 PM), https://nypost.com/2021/04/12/robert-kraft-resigns-from-apollo-board-amid-epstein-controversy/.

> In a statement to The Post, Black acknowledged that he knew Ganieva, but denied that he acted inappropriately toward her. "I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago," Black said in his statement. "Any allegation of harassment or any other inappropriate behavior towards her is completely fabricated." He also denied that her allegations influenced his decision to step away from the company faster than planned. In January, Black had signaled he would stay on as chairman after stepping down as CEO on July 31."This is entirely a personal matter; this matter has nothing to do with Apollo or my decision to step away from the firm." Black added that he believes he was being "extorted" by Ganieva because he had allegedly "made substantial monetary payments to her, based on her threats to go public concerning our relationship, in an attempt to spare my family from public embarrassment." The billionaire said he has referred the matter to "the criminal authorities" at the recommendation of his counsel and welcomes "a thorough investigation."

[7]     On April 12, 2021, the New York Post published yet another article, stating that, "[a]s exclusively reported by The Post last week, Black's unexpected exit on March 22 came just days after several directors on the private-equity giant's board learned of accusations of sexual harassment against him by a woman **he claimed was trying to shake him down over a 'consensual affair.'**" (emphasis added).

19

86.     Black knew that he issued a false statement of facts to Bloomberg or made the statement intending it be published with reckless disregard for the truth.

87.     Black's decision to falsely state that Ms. Ganieva extorted him "for years" is right from the playbook of scores of wealthy and powerful men facing similar accusations.  Just a fraction of such examples are below:

- Harvey Weinstein alleged that Ambra Gutierrez fabricated claims of sexual assault in an attempt to blackmail him into a movie role.[8]

- Bill O'Reilly and Fox News preemptively sued producer Andrea Mackris for extortion after she came forward with sexual harassment allegations.[9]

- Paul Haggis accused Christine Lepera of extortion following her allegations that he raped her.[10]

- Alan Dershowitz sued Virginia Giuffre for defamation following her claims of sexual assault, claiming that she made the claims in part to **"extort private settlements from other, wealthier individuals associated with [Jeffrey] Epstein."**[11]

---

[8]     Kyle Munzenrieder, *How Tabloids Dragged Ambra Gutierrez Through the Mud After She Accused Harvey Weinstein of Groping Her*, W Magazine, (October 10, 2017), https://www.wmagazine.com/story/harvey-weinstein-ambra-gutierrez-page-six-daily-mail-smear-campaign.

[9]     Anna North, *Men like Bill O'Reilly get to make a comeback. Women who speak up about harassment lose their jobs*, Vox, (May 16, 2018, 12:30 PM), https://www.vox.com/identities/2018/5/16/17360334/bill-oreilly-returning-sexual-harassment-fox-news-back-accusers-metoo-me-too-movement.

[10]     *Post-Weinstein, These Are the Powerful Men Facing Sexual Harassment Allegations*, Glamour, (May 18, 2019), https://www.glamour.com/gallery/post-weinstein-these-are-the-powerful-men-facing-sexual-harassment-allegations.

[11]     Tom Jackman and Deanna Paul, Alan Dershowitz countersues accuser in Jeffrey Epstein case, then is sued by David Boies, The Washington Post, (November 8, 2019, 3:39 PM), https://www.washingtonpost.com/crime-law/2019/11/08/alan-dershowitz-countersues-accuser-jeffrey-epstein-case-then-is-sued-by-david-boies/.

20

- Russell Simmons claimed that a Jane Doe suing him over an alleged rape in 1988 made up the event to extort him.[12]

88.     The false and defamatory statements exposed Ms. Ganieva to hostility, contempt, ridicule and professional disgrace.

89.     In order to be admitted to the New York State bar, Ms. Ganieva must pass an ethics and moral character test. Such accusations against her will negatively impact this process and cause her severe damage.

90.      The false and defamatory statements imputed sexual immorality and involved criminal activity in connection with Ms. Ganieva. Such statements will inevitably cause her harm and damage in her ability to secure employment going forward, and in all of her relationships, personal and professional.

## FIRST CAUSE OF ACTION
### (Defamation)

91.     Ms. Ganieva hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

92.     As described above, Defendant Black has stated false information regarding, *inter alia*, the circumstances surrounding his relationship with Ms. Ganieva and payments made to Ms. Ganieva.

---

[12]     Ashley Cullins, *Russell Simmons Says Jane Doe's Rape Lawsuit is a "Vile" Extortion Attempt*, The Hollywood Reporter, (April 18, 2018, 6:31 PM). https://www.hollywoodreporter.com/business/business-news/russell-simmons-says-jane-does-rape-lawsuit-is-a-vile-extortion-attempt-1103734/.

21

93. These statements were untrue and defamatory in that they falsely reported, *inter alia*, that Ms. Ganieva and Defendant Black engaged in a wholly consensual relationship and that Ms. Ganieva extorted Defendant Black.

94. Defendant Black knew or should have known that such defamatory statements were false.

95. Defendant Black made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

96. Defendant Black's statements constitute defamation because they impugn Ms. Ganieva's honesty, trustworthiness, dependability, and professional fitness and abilities by falsely claiming, *inter alia*, that Ms. Ganieva engaged in a wholly consensual affair with Defendant Black and that Ms. Ganieva committed a crime by extorting Defendant Black.

97. Defendant Black's statements constitute defamation because they accuse Ms. Ganieva of committing a crime, namely, extortion.

98. Defendant Black's defamatory statements have harmed Ms. Ganieva's professional reputation and standing in her industry, have caused her economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost income, benefits, job security and opportunities for career advancement and have caused her embarrassment, humiliation and emotional injury.

99. As a direct and proximate result of Defendant Black's defamation, Ms. Ganieva has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and emotional distress.

22

100.     As a direct and proximate result of Defendant Black's conduct, Ms. Ganieva has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

101.     Defendant Black's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Ms. Ganieva's rights.  As such, Ms. Ganieva is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Defamation *Per Se*)

102.     Ms. Ganieva hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

103.     As described above, Defendant Black has stated false information regarding, *inter alia*, the circumstances surrounding his relationship with Ms. Ganieva and payments made to Ms. Ganieva.

104.     These statements were untrue and defamatory in that they falsely reported, *inter alia*, that Ms. Ganieva and Defendant Black engaged in a wholly consensual relationship and that Ms. Ganieva extorted Defendant Black.

105.     Defendant Black knew or should have known that such defamatory statements were false.

106.     Defendant Black made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

107.     Defendant Black's statements constitute defamation per se because they impugn Ms. Ganieva's honesty, trustworthiness, dependability, and professional fitness and abilities by

23

falsely claiming, *inter alia*, that Ms. Ganieva engaged in a wholly consensual affair with Defendant Black and that Ms. Ganieva committed a crime by extorting Defendant Black.

108.    Defendant Black's statements constitute defamation because they accuse Ms. Ganieva of committing a crime, namely, extortion.

109.    Defendant Black's defamatory statements have harmed Ms. Ganieva's professional reputation and standing in her industry, have caused her economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost income, benefits, job security and opportunities for career advancement and have caused her embarrassment, humiliation and emotional injury.

110.    As a direct and proximate result of Defendant Black's defamation, Ms. Ganieva has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and emotional distress.

111.    As a direct and proximate result of Defendant Black's conduct, Ms. Ganieva has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

112.    Defendant Black's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Ms. Ganieva's rights.  As such, Ms. Ganieva is entitled to an award of punitive damages.

113.    Ms. Ganieva hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

114.    Defendant Black made defamatory statements with malice and with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

24

115.    Defendant Black's statements constitute defamation *per se* because they impugn Ms. Ganieva's honesty, trustworthiness, dependability and accuse her of a crime.

116.    Defendant Black's defamatory statements have harmed Ms. Ganieva's professional reputation and standing in her industry, have harmed her personal reputation, have caused her economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost income, benefits, job security and/or opportunities for career advancement, and have caused her embarrassment, humiliation and physical and emotional injury.

117.    As a direct and proximate result of Defendant Black's defamation, Ms. Ganieva has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and physical and emotional distress.

118.    As a direct and proximate result of Defendant Black's conduct, Ms. Ganieva has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

119.    Defendant Black's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Ms. Ganieva's rights.  Therefore, Ms. Ganieva is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Intentional Infliction of Emotional Distress)**

120.    Ms. Ganieva hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

25

121. Defendant Black engaged in conduct toward Ms. Ganieva that is extreme and outrageous so as to exceed the bounds of decency in a civilized society; namely by, *inter alia*, subjecting her to defamatory statements and publicly accusing her of the crime of extortion.

122. These actions were taken with intent to cause, or disregard for, the substantial probability of causing severe emotional distress.

123. As a direct and proximate result of Defendant Black's extreme and outrageous conduct, Ms. Ganieva has suffered severe emotional distress.

124. Defendant Black's conduct was wanton, malicious, willful and/or cruel, entitling Ms. Ganieva to an award of punitive damages.

### FOURTH CAUSE OF ACTION
**(Gender-Motivated Violence Pursuant to GMVA)**

125. Ms. Ganieva hereby repeats, reiterates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

126. The above-described conduct of Defendant Black, including, but not limited to, Defendant Black's sexual assaults and rapes of Ms. Ganieva constitutes a "crime of violence" and a "crime of violence motivated by gender" against Ms. Ganieva as defined by the New York City Gender Motivated Violence Act, N.Y.C. Admin. Code § 8-903 (2017).

127. The above-described conduct of Defendant Black, including, but not limited to, Defendant Black's sexual assaults and rapes of Ms. Ganieva, constitutes a "crime of violence" against Ms. Ganieva motivated: (i) by her gender; (ii) on the basis of her gender; and/or (iii) due, at least in part, to an animus based on her gender.

128. Defendant Black committed a "crime of violence" against Ms. Ganieva because she is a woman and, at least in part, because he has an unlawful animus towards women.

26

Defendant Black's gender-motivated animus towards women is demonstrated by, among other things, his sexually violent and abusive treatment of women.

129.    As a direct and proximate result of the aforementioned gender-motivated violence, Ms. Ganieva has sustained in the past and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory damages.

130.    Defendant Black's gender-motivated violence against Ms. Ganieva entitles her to punitive damages and an award of attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the State of New York and the City of New York;

B.      An injunction and order permanently restraining Defendant and his partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.      An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.      An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate

27

Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

E.  An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, reputational harm and harm to professional reputation, in an amount to be determined at trial, plus prejudgment interest;

F.  An award of punitive damages, and any applicable penalties and/or liquidated damages in an amount to be determined at trial;

G.  Prejudgment interest on all amounts due;

H.  An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

I.  Such other and further relief as the Court may deem just and proper.

28

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.


Dated: June 1, 2021
             New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
          Jeanne M. Christensen
          Lindsay M. Goldbrum

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
jchristensen@wigdorlaw.com
lgoldbrum@wigdorlaw.com

*Counsel for Plaintiff*

29