# EXHIBIT 2

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

GUZEL GANIEVA,

*Plaintiff and*
*Counterclaim-Defendant,*

v.

LEON BLACK,

*Defendant and*
*Counterclaim-Plaintiff.*

Index No. 155262/2021

**ANSWER, AFFIRMATIVE**
**DEFENSES, AND**
**COUNTERCLAIMS**

## PRELIMINARY STATEMENT

The Complaint in this case is a work of fiction.

According to the allegations in her unsworn Complaint, Plaintiff and Counterclaim-Defendant Guzel Ganieva was forced into a lengthy, non-consensual relationship with Defendant and Counterclaim-Plaintiff Leon Black, who belittled, humiliated, and abused her for years before finally coercing her to take his money and sign an NDA. The irrefutable documentary evidence—including numerous recorded conversations and written communications (spoken and written by Ganieva herself)—tells a stunningly different story. For some six years, the parties in this lawsuit were involved in a casual, episodic, and completely consensual relationship, actively pursued by Ganieva herself. During that time, Ganieva consistently professed her love and appreciation for Mr. Black, while regularly extracting millions of dollars from him in money, gifts, rent, furniture, tuition, vacations—the list goes on.

In 2015, however, Ganieva decided that she wanted more, and embarked on a campaign of extortion to get it. Flatly declaring that "I don't want to have to worry about money ever again,"

she threatened to go public about their relationship—explicitly stating that she would harm Mr. Black's personal and professional life—unless he paid her a sum of *one hundred million dollars*.

Aware that he had become the victim of a criminal extortion scheme, Mr. Black began to record his conversations with Ganieva. Those recordings speak for themselves, and are devastating to Ganieva's purported claims. Mr. Black repeatedly asked Ganieva why she was claiming an entitlement to *any* money, let alone to such an eye-popping sum. Ganieva had no legitimate answer and no legitimate claim. Notably, she never—*not once*, in a series of in-person meetings during her extortion campaign, or at any other time—*claimed sexual or physical abuse of any kind*. Instead, she repeatedly warned that if he did not pay her this money, she would report their affair to Mr. Black's wife, the board of his company, and the press. *This is, of course, the very definition of extortion.* A married man, and the founder and head of a major asset management business, Mr. Black was concerned that Ganieva would do exactly as she threatened, and that the publicity could have personal and business consequences. Under this threat, Mr. Black entered into a release and confidentiality agreement with Ganieva in October 2015, in exchange for what she wanted: cash.

In that agreement, Ganieva admitted that allegations she had made against Mr. Black "are not true"; released any possible claims against Mr. Black, and agreed to keep their relationship and the agreement confidential. Over the next five and a half years, Mr. Black upheld his end of the deal, paying Ganieva exorbitant sums of money pursuant to a regular monthly schedule.

Suddenly, in March 2021—after having accepted payments month in and month out, for well over five years, totaling millions of dollars—Ganieva posted a series of tweets proclaiming, among other things, that Mr. Black had "sexually harassed and abused" her "for years." Those statements were vicious, devastating—and utterly false. Predictably, the consequences have been ruinous: branded a "predator[]", Mr. Black has suffered public and private humiliation, and has

been the subject of endless press reports rehashing the Complaint's made-up allegations. In response, Mr. Black issued a public statement in his own defense that was measured, proportionate—and utterly true. With shocking perversity—having herself breached the release and confidentiality agreement, and pocketed many millions of dollars—Ganieva then brought this spurious lawsuit.

The mendacity of Ganieva's allegations is breathtaking. The most outrageous is Ganieva's allegation that Mr. Black sexually assaulted her on July 6, 2014, a claim of the utmost seriousness that only can be understood as an attempt to destroy Mr. Black's reputation. While the Complaint alleges that Mr. Black "suddenly" "barged" into her apartment when she was too sick to walk or move, Ganieva's own text messages show that she was perfectly well when she initiated contact with Mr. Black that day—telling him "[t]his is love. I need you…"—and requested that he bring a bottle of wine to her home that evening. And the messages show that she was perfectly unsurprised when he showed up at precisely the appointed time with the wine, as requested, in order to "tuck" Ganieva into bed.

Ganieva's texts to Mr. Black following the alleged assault make the falsity of the allegations all the more clear. Indeed, the very morning after she alleges that Mr. Black brutally attacked her, Ganieva reached out to Mr. Black on her own initiative to say that "[i]t was very nice to see you last night" . . . "I love you and thank you!!!! Xoxoxoxoxo and more love." And just two days later, Ganieva, again unprompted, asked her supposed brutal rapist if he wanted to get together soon, signing the message: "Lots of love, g." In the following days and weeks, she reached out to him on numerous occasions to meet in person, with such messages as, "you are the kindest", and signing off with, "[a]lways yours….".

3

In short, Mr. Black is guilty only of extremely poor judgment in entering into an affair with Ganieva in the first instance, in making an easy target of himself throughout their relationship by lavishing her with gifts and money, and in allowing himself to be extorted rather than immediately reporting Ganieva to law enforcement. Ganieva, on the other hand, must be held to account. In her defamatory Twitter posts, Ganieva purports to invoke "#MeToo," and claims to have come forward to protect "other women." In reality, her demonstrable lies and extortion are cynical attempts to weaponize a critically important and long-overdue movement. In so doing, Ganieva has done a tragic disservice to the brave truth-tellers—the vast majority of accusers—who have survived sexual abuse.

This lawsuit will reveal who Ms. Ganieva really is; what truly motivated this hit job; and whether she is acting alone or is working in concert with, or at the behest of, a third party who might wish Mr. Black ill.

## **FACTUAL BACKGROUND**

### **The Parties' Consensual Relationship**

1.      Ganieva's allegations are false from the very start—even with respect to small-bore, gratuitous details that are squarely belied by objective fact. For instance, contrary to Ganieva's claims that Mr. Black picked her "out of a crowd in March 2008, while attending an International Women's Day event in NYC" when she was in her "early twenties" (Compl. ¶¶ 20, 21), the two in fact met at a private party thrown annually by a former colleague of Mr. Black's. Ganieva indeed admitted in a *New York Post* article published on April 8, 2021 that "she met Black at a 2008 party when she was 25 years old," yet she decided nonetheless to make different allegations in the Complaint.

4

2. Ganieva, who claimed to have been working as a model at the time, immediately began pursuing Mr. Black, who had been the founder and head of Apollo Global Management, a major alternative asset manager. The two met several times for meals before entering into a years-long consensual sexual relationship.

3. At no time prior to the initiation of their sexual relationship did Mr. Black provide for "a few 'arranged' appointments" for professional advancement (Compl. ¶ 23): for example, contrary to the allegations, Mr. Black's facilitation of a meeting with a talent agency (*id.*) did not occur, on information and belief, until years after the parties met, and was done at Ganieva's request.

4. And, contrary to her allegations, Ganieva most certainly did not tell Mr. Black "that their relationship would not be sexual" (*Id.* ¶ 24). That *never* happened; rather, Ganieva was an eager and willing participant in the parties' relationship from the start.

5. On information and belief, Ganieva had been struggling financially before she met Mr. Black. On information and belief, Ganieva reportedly had left her husband in Russia before coming to the United States, had been sued on more than one occasion for nonpayment of rent, was living in a small one-bedroom apartment with her son, and was struggling in her modeling career.

6. Ganieva apparently saw a golden ticket in Mr. Black, and persistently sought him out following their initial meeting. She quickly began pressing him for substantial payments of money and gifts. Contrary to Ganieva's bizarre framing of Mr. Black's generosity as something that he imposed upon Ganieva—as if Mr. Black could somehow force Ganieva to request, accept, and keep his money and presents—she repeatedly asked for such things as an expensive rental apartment on the Upper East Side (which she settled on only after rejecting as too small an initial

5

apartment Mr. Black had proposed); a luxury car; lavish vacations (including at the beach and to the Alps); school tuition (for acting and at Columbia University); jewelry and clothing; a Steinway piano; a $40,000 commissioned portrait of herself (which she kept hung in her apartment); and many, many gifts of cash—all totaling in the millions of dollars.

7.      In 2011 and again in 2013, Ganieva requested two loans from Mr. Black of $480,000 apiece. Mr. Black acquiesced and provided the funds pursuant to two written agreements. (Compl. ¶¶ 37, 39). Mr. Black never requested repayment of either of the loans he agreed to make to Ganieva. As is clear from recorded conversations between the parties, the request unequivocally came from Ganieva herself; there was every reason for her to have made this request, and no reason for Mr. Black to have somehow forced the money on her. (It is also hard to fathom how anyone could force someone else to take a loan in this way; that incoherence, like so many others, is left unexplained in Ganieva's Complaint).

8.      Also unexplained in the Complaint is how it was that Mr. Black could possibly have forced Ganieva into a non-consensual affair over some six years. During their relationship, Ganieva was a grown woman in her late twenties and early thirties, and a trained mathematician and international model. At no time did Ganieva work for Mr. Black or live with him, or even see him very often.

9.      Beginning in 2011, she attended Columbia University (encouraged and financed by Mr. Black), earning a degree in mathematics.

10.     Although she asked Mr. Black to pre-pay for her apartment, Mr. Black did not have a key or access to it in any way. In fact, Ganieva specifically made clear at the outset of their relationship that she would not provide Mr. Black with access to her apartment, wishing for privacy and independence. Mr. Black had never asked for any other arrangement, and he of course

6

respected Ganieva's request. The two did not spend nights together, vacation together, or attend events together, other than on rare, isolated occasion. They saw each other episodically— sometimes weekly, sometimes monthly, sometimes not for long periods at a time.

11.     Ganieva traveled the world, had an active social life that did not include Mr. Black, and did exactly as she pleased, when she pleased. On more than one occasion, Ganieva would leave town or drop contact with Mr. Black for some time, only to reach out again to tell him how much she loved and missed him.

12.     In short, while the Complaint twists itself in a knot in an effort to portray a dynamic in which Mr. Black somehow overpowered, controlled, and intimidated Ganieva to do such patently absurd things as walk behind him and accept nearly one million dollars in loans, he simply had no means by which to do such things—and he did not. At any time, Ganieva could have just stopped seeing him—as she occasionally did for long stretches of time and as she did when the relationship finally came to a definitive end in 2014. Instead, as the documentary record conclusively reflects, Ganieva actively pursued Mr. Black throughout, and he lavished her with gifts, support, and praise.

13.     For example, during the course of their relationship, Ganieva repeatedly requested (including in writing) that Mr. Black help her with job interviews. As the documents make clear, Mr. Black made bona fide attempts to help her secure interviews and get a job. Yet, despite being underqualified and "unprepared" (as one interviewer put it), Ganieva believed that she was entitled to a highly competitive job at a highly competitive company, telling Mr. Black that she would settle for nothing less: "After studying a lot about Goldman Sachs I came to conclusion that a position of an analyst in Investment Banking will suit me best. I positively don't want to be in any other department." Yet Ganieva had no relevant experience, and only mediocre grades and

7

standardized testing scores, and it is unsurprising that she was unable to land the precise (and highly coveted) job at Goldman Sachs that she demanded. It is false as a matter of fact, and puzzling as a matter of logic, for Ganieva to allege that it was somehow part of some "sick plan" for Mr. Black to arrange "sham interviews" for Ganieva in an effort to "belittle and humiliate her." (Compl. ¶¶ 42, 43). As the documents show, all that Mr. Black did was try to help her. Indeed, Ganieva herself admitted as much in an interview with the *New York Post* on April 8, 2021: "He tried for some time to help her get a job, she said, but claimed he wanted favors in return."

14.     Ultimately, the parties' relationship concluded when Ganieva left New York at the end of July 2014. Far from trying to "control" Ganieva or keep her in New York, Mr. Black wrote to her that "maybe its for the best" and indeed, at her request, helped her with her visa and hefty resettlement costs. There is no truth whatsoever to Ganieva's contention that she left New York "to physically distance herself from Black." (Compl. ¶ 55). Rather, Ganieva repeatedly told Mr. Black that she had to leave for immigration-related reasons, because, on information and belief, her student visa had just expired upon her graduation from Columbia, and she had no legal status in the United States.

15.     Ganieva's claim that Mr. Black somehow tried to exert "power over her" while she was away (Compl. ¶ 57) is another fabrication. Mr. Black rarely reached out to Ganieva unprompted and often did not even respond when she reached out. For example, between November 2, 2014 and December 24, 2014—while Ganieva was thousands of miles away from Mr. Black and not engaged in a sexual relationship with him—Ganieva on her own initiative texted Mr. Black on no fewer than eight occasions, without response from Mr. Black. In these notes and in others, she wrote such things as: "*You have no idea how much I miss you and love you. It's nice*

*to know that someone like you exist in the world even tho a bit far*," and "*I love you! I do!*" (emphasis added).

### Ganieva's Extortion Campaign

16.     Up until May and June 2015, Ganieva continued to send text messages to Mr. Black proclaiming her love from afar, such as this three-part note on May 14: "*I need your love… And I need you love… Xoxo*" (emphasis added). On June 4, she sent Mr. Black this in a text: "*[m]any kisses and lots of love xoxo*" (emphasis added).

17.     Suddenly, on June 8, 2015, Ganieva sent a much more formal note, insisting that she needed to meet with him in person about a matter that she characterized, without detail, as "both urgent and important." Based on statements made by Ganieva to Mr. Black, this sudden shift in tone appears to have coincided with her failure to gain legal status in the United Kingdom; whatever the reason, Ganieva became intensely focused on getting even more money and trying to procure an expensive visa.

18.     Ultimately, at Ganieva's request, the parties met in New York on June 24, 2015, for what can only be described as a brazen shakedown by Ganieva. Ganieva warned Mr. Black that if he did not pay her a vast sum of money, she would tell the world about their affair. Shocked to his core, Mr. Black informed Ganieva that he believed that her conduct was extortionate and that he needed time to process what she was saying and to formulate a response.

19.     A number of additional in-person meetings followed, in the summer and fall of 2015: on June 26, July 21, July 24, August 12, August 14, August 19, September 17, October 15, and October 19. Understanding that he was the victim of a blatant criminal extortion scheme, Mr. Black consulted counsel, including criminal defense attorneys. The parties' conversations thereafter were monitored and recorded.

9

20.     Ganieva's demand was nothing less than *one hundred million dollars*. She boldly declared that if she did not get this amount from Mr. Black, she would go public, and ruin his family, his business, and his life. As Ganieva put it in her own words, in a recorded conversation: "*The more, the longer I wait, the more sure I become that I actually, I prefer to go public*," and "*I'm dying to talk to press about it.*"

21.     Mr. Black repeatedly asked Ganieva to explain why she was claiming a right to any money at all. Not surprisingly, Ganieva failed to identify any good faith basis for her demand. Instead, she offered two facially illegitimate rationales.

22.     First, Ganieva claimed that she was owed money on some form of palimony theory, claiming that she had been "like a wife" to him and that "for me, it was like a marriage." Based on this faulty reasoning, she claimed entitlement to half of his earnings: "When men and women in relationship for a very long time and woman doesn't work and man works, and she gets all the stress from his work, and he makes a lot of money—usually by law—she's entitled to half, OK?" She claimed that "in the marriage, I would get half of what you earned," such that she was entitled to "a couple of billions," but "I'm not asking for that, even though I think I totally deserve it."

23.     When Mr. Black repeatedly pointed out that "having an on-and-off affair" for "five years" was not "akin to a marriage," Ganieva landed on a second putative theory. While vague and multi-pronged, the argument effectively was that she had suffered "emotionally" as a result of their relationship and the fact that "our relationship didn't work." The reason for this, she said, was that "people are attacking me and humiliating me" and "all my chances for the future are limited because of the gossip that somebody is spreading," and "I'm pretty sure it's coming from you."

24.     The claims were nothing short of "paranoid," as she had to repeatedly admit even as she made them, and included the following (among many others):

- "People tried to drug" her, and she had been "poisoned."

- She was being stalked, bullied, and harassed by waiters and hairdressers and teachers and perfect strangers, who made her "feel bad." She also was being stalked by "the children of the rich. It's the high society. It's everybody from high society." Likewise, she claimed that "basically everybody in the society kind of was making fun of me."

- Several billionaires, whom she named, were threatening her and might be involved in a "conspiracy" against her. Ganieva also claimed that one of those billionaires, who had given her a job as a writer for his publication, was "making fun" of her and also had threatened to fire her unless she slept with him. She said that this individual's employees were trying to "diminish" her and make her "look in a certain way," and had twisted and re-written articles that she had authored.

- Her son was bullied at camp and at school and had choked on a piece of meat, all of which she claimed was attributable to Mr. Black and to the parties' relationship. She stated that she had withdrawn her son from a series of schools as a result of the bullying attributable to Mr. Black.

- People were saying bizarre things to her and her son, which she likewise blamed on Mr. Black. For example, she said that "someone put a German newspaper in front of my door, then the woman came knocking at my door, saying "'sorry for your loss, can you please give me money?'" In another example, she said: "Then there was this guy [who] started pursuing us.... Just some random guy, like black guy, started like harassing us." She stated that this "random guy" had told her that her son had to play basketball professionally, and when she demurred, he stated: "'You have to pay for my clothes'" and "it was just, it was just terrible."

- She had been invited to one of her son's games and "I would see all the parents kind of acting very strange and when he [her son] started shooting, they would say '[son's name], we love you, we love you' but in a very acted out manner, which made me very uncomfortable."

- She had gone to "parents' week" for a school and "everywhere I went, there were kind of jokes and assumptions were made towards me and my son that they know that I'm with you and that I am a terrible person and I have to change."

- She "had to deal with a lot of public harassment, humiliation. And—I don't know what. I think it has to be investigated. My son was harassed in every school, I am getting harassed in every corner of the world."

- She described being targeted and bullied due to their relationship, including by a teacher during an art class at Columbia. Ganieva reported an exchange in which the teacher had said "'now look at the lilies and tell me what you think about it?'" Ganieva stated that she had responded: "'well, it's so, it's done in a way where I

11

feel like I could do it.'" According to Ganieva, "the teacher says, 'no, you can't' and everybody started laughing."

- She dropped out of graduate school in Russia because she had been "tortured" when "they" said that Ganieva had not known the definition of a particular word, "and then there were other inappropriate remarks and jokes towards me." The only example she could provide is that in class a teacher had referenced a well-known financier with whom Mr. Black had worked decades ago, and that "I think they were referring to you, but I don't know." When Mr. Black asked her, "why in Russia would they bring that up?," she responded "I don't know."

- She "stopped going out because I didn't to be treated like that. And like even when I went just for job interviews or I went to pick up my son, these things were happening, you know, and people were kind of making fun of me."

- She said: "I went through a lot of public humiliation. My reputation is really damaged. My son's future opportunity… Permanently…" When Mr. Black responded that this was not because of him, Ganieva replies: "No, but it's because of our relationship. It's a consequence… it's a consequence of our relationship. And, as a man, as a decent man. As a fair man, you can understand that. And you can help. It's not difficult for you to help me."… All those years I lived very badly. And you could have taken care of me…better care. You could have given me a job. You could have given me a visa…This time... I want to tell you and I want to do what's right for me. I totally deserve it. I deserve more."

25.     Numerous additional examples abound. In short, Ganieva repeatedly claimed that her reputation had been damaged, while seemingly also agreeing with Mr. Black that he had not said anything to anyone about her. Ganieva said to Mr. Black that she was "pretty sure that you are connected to all of this harassment and blame," but when asked why he would possibly do that, she simply said "I don't know." Mr. Black further asked: "why would I do that, why would you think it was me who did that and at the same time as I am supporting you? It makes no sense." To this, Ganieva responded: "No, I don't have any proof that you've done it, right, but it all comes from our relationship. If we didn't have a relationship, this wouldn't happen to me or my son." As noted, she admitted on several occasions that she might be "paranoid."

26.     Ganieva also admitted that she had not previously told Mr. Black about this alleged harassment. For example, Mr. Black said: "And all this harassment. I never heard a word of it. I

12

never heard a word of any of these issues. And it's only a year later after we haven't seen each for a year, it's coming out." She responded simply: "I'm telling you now."

27.     A small facet of these claims was a vague assertion that Mr. Black had been somehow "abusive." Ganieva clarified, however, that that her definition of "abuse" was that, according to her, Mr. Black "liked to make me feel worthless" and "to put me down and make me feel like I'm nothing." She also claimed that she believed he was "abusive" because, according to her, Mr. Black and his "friends and other people" had been "extremely unfair" to her and her son at his schools, "all over the world."

28.     Most notable is what Ganieva did not claim: she *never*—not once—claimed physical or sexual assault of any kind. When Mr. Black stated that "we were two consenting adults that had an affair," she responded only that "it just lasted a little bit too long and you got a little bit too involved." Mr. Black repeatedly and explicitly asked her: "How did I abuse you?" She *never* responded that he had been abusive in any physical or sexual way. Indeed, Mr. Black said, "you know I've never abused you," and she appeared to accede.

29.     Thus, to the limited extent that Ganieva expressed a claim of "abuse," she made clear that she was referring to "emotional" abuse, connected in some way to her feelings for Mr. Black. Indeed, even while actively extorting him, she made clear that "I will never find anybody like you." On the last day they ever met in person, her parting words included these: "*You know I still love you very much*."

### The Release and Confidentiality Agreement

30.     Over the course of ten in-person meetings in the summer and fall of 2015, the parties eventually came to agreement. At a lunch meeting at the Four Seasons restaurant on October 19, 2015, they finalized the terms they had discussed, to include payment by Mr. Black

to Ganieva of $100,000, forgiveness of approximately $1,000,000 in loans, and "other consideration to which has been agreed." That other consideration included an agreement that the $100,000 monthly payments would continue for 15 years, and that Mr. Black would provide payment of £2,000,000 for Ganieva to use toward obtaining legal status in the United Kingdom. In exchange, they agreed that Ganieva would sign a one-page release and confidentiality agreement (the "Agreement" or the "Release and Confidentiality Agreement").

31.     This one-page Agreement contains only two, very simple understandings, as is clear in the very title of the document: "**RELEASE AND CONFIDENTIALITY AGREEMENT**" (emphasis in original). In it, Ganieva admitted that the claims she had made about Mr. Black to Mr. Black—including about he had been "abusive" to her—were fabricated: "GG [Ganieva] has made certain allegations and asserted certain claims against LBD [Mr. Black], which she made under extreme stress and *which she now concedes are not true*, and which allegations and claims, if made public, would damage LDB's career, reputation and relationships with others." (Emphasis added).

32.     The first clause provides a broad and clear release:

> GG hereby releases, remises and forever discharges LDB from all matters, causes of action, claims, suits and any and all further liability or accountability, in law or equity, by reason of any matter, cause or thing whatsoever arising prior to the signing of this Agreement, contemporaneous with the signing of this Agreement or any time in the future after the signing of this Agreement.

33.     The second clause provides a broad and clear confidentiality agreement:

> GG hereby agrees, except as otherwise required by applicable law, never to disclose, directly or indirectly, to any individual, entity or other potential recipient, any information relating to (i) the allegations and claims that she has asserted against LDB, (ii) the signing, content or other attributes of this Agreement, including any consideration furnished by LDB in connection with the signing of

this Agreement and (iii) any other matters that could damage LDB's career, reputation and relationships with others.

34.     Again, the October 19, 2015 conversation was monitored and recorded. Ganieva's allegations that strain to plead duress are complete fabrications. (*See* Compl. ¶¶ 64-71). At no time, either before or during the meeting, did Mr. Black utter the phrases (which purport to be direct quotations), **"If you do not take the money, I will put you in prison"** and "**If you do not take the money, I will destroy your life**" (*id.* ¶ 3, emphasis in original; *see also id.* ¶ 63)—or anything of the sort.

35.     Even if Mr. Black did not have indisputable recorded evidence that such things simply were never said, they would defy credulity and common sense in any event: if a private citizen even had the power to do such things, it is unclear why that person would force millions of dollars upon someone instead of just doing those things. Just as with the loans, Ganieva was desperate for the money and—far from being forced to take it—she extorted it.

36.     At no time did Mr. Black threaten or intimidate Ganieva. He did not "shove[] a piece of paper across the table," and he did not tell her "she had to sign it." (Compl. ¶ 64). Ganieva in no way appeared "nervous," she had no "difficulty understanding" the Agreement, and she did not "only read it once, quickly". (*Id.* ¶¶ 65, 67). Mr. Black did not "order[] her to sign" anything. (*Id* ¶ 69). The allegation in bold that purports to be yet another quote—"**[I will be paying you] as long as you keep your mouth shut**"—simply was not said. (*Id.* ¶ 70, emphasis in original). There is a record; each of these allegations is patently false.

37.     *What actually happened at that meeting is very much the opposite of what Ganieva alleges happened.* Over the extended conversations between the parties, Ganieva well understood the terms of the Release and Confidentiality Agreement, and in fact it was Ganieva who had first suggested they should have a written instrument.

38.     At the October 19 meeting, Mr. Black presented Ganieva with the Agreement and encouraged her to "take your time" and "read it carefully"—and she did. Indeed, Ganieva took approximately 12 minutes to review the one-page document, including reading parts of it aloud and engaging in extensive discussion about it. Not only did Mr. Black explain it to her, but Ganieva made clear her understanding that "basically I cannot sue you" and that "I can't mention your name, ever, basically." As to this, Mr. Black clarified that she could "say that you know me," but that, under the terms of the Agreement, she had to refrain from discussing their relationship or her putative claims or the parties' financial arrangement.

39.     The second Agreement was an exact duplicate of the first, and Ganieva willingly signed this duplicate as well.

40.     Ganieva was elated. After the papers were signed, she spent approximately 45 minutes finishing her lunch, sharing a Grand Marnier soufflé with Mr. Black, discussing her investment and travel plans, and laughing about the fact that she was "a woman of means now."

41.     Shortly after their meeting, she texted him: "Thank you for everything. Talk soon xoxo."

42.     As per their Agreement, Mr. Black forgave a series of loans to Ganieva totaling approximately $1,000,000, made a simultaneous payment to Ganieva of $100,000, and provided "other consideration to which has been agreed"—continuing monthly payments and payment of £2,000,000 for Ganieva to use in an effort to obtain legal status in the United Kingdom. From approximately October 2015 until approximately March 2021 (after Ganieva posted her defamatory tweets), Ganieva accepted millions in monthly payments from Mr. Black pursuant to the Agreement.

43.     After the parties entered into the Agreement, Mr. Black set up a new account from which to make the monthly payments to Ganieva, which he called "E Trust." In her Complaint, Ganieva states that she "has no knowledge as to why payments began from the 'E Trust' or what it is." (Cplt. ¶ 73). To be very clear: *the "E" in "E Trust" stands for "Extortion.*"

### Ganieva's False Allegations of Sexual Abuse

44.     As noted, even when Ganieva was extorting Mr. Black in the summer and fall of 2015, she never once claimed to have been physically or sexually abused, let alone raped.

45.     These claims are viciously and demonstrably false—as the documents and recordings make one hundred percent clear. Not only does Ganieva never make such an allegation in all of the recorded conversations, but the text message exchanges around the time of the alleged rape are dispositive.

46.     To begin, the allegation that, in 2008, Mr. Black took Ganieva to "a studio apartment with a mattress on the floor and no other furniture" (Compl. ¶ 27) does not read true, and it is not true. Even more preposterous is the notion that he "forced sadistic sexual acts on her without her consent and despite her saying no." (*Id.* ¶ 26).

47.     In her Complaint, Ganieva claims that "[i]n the days leading up to the July 4, 2014 weekend, Ms. Ganieva became sick and was home for a number of days unable to go to the store or cook for herself." (Compl. ¶ 47). She claims that on July 6, she was "debilitated" and "in a weakened state, having been sick for almost a week"—so weak that she "could barely walk." (*Id.* ¶¶ 48, 49). She claims that she was "limp and unable to move." (*Id.* ¶ 51). She also claims that Mr. Black came to her home as though by surprise, "suddenly" knocking at her door and then "barg[ing] in." (*Id.* ¶ 47). These are lies.

48.     Rather, Ganieva had told Mr. Black that she felt sick on July 1, but on the very next day (July 2), she wrote to him that she was already feeling "much better," that "I think I will be all done by tonight," and that "I was just thinking about you."

49.     On June 28, Ganieva had written to Mr. Black: "*Baby… I'm all alone. Let's get together soon. I miss you. Xoxo*" (emphasis added). She said she felt unwell for a day, as noted, but had recuperated by the very next day, July 2. Then, on July 6, Ganieva wrote to Mr. Black, unsolicited: "This is love. *I need you…*" (emphasis added). In response to these entreaties, Mr. Black said that he would be driving back to the city in the evening of July 6, and inquired if he could "come over and tuck you in at 10:30?" She agreed, later adding: "Aaah. Can you please bring a bottle of wine if you can?" Mr. Black later said that he was back and asked if he could come earlier (at 9:45pm), with the requested wine. Ganieva again agreed, immediately.

50.     Thus, it was Ganieva who had initially reached out to "get together" because she was "all alone," then reached out again to tell him that she loved and needed him, and invited him to bring a bottle of wine when he was to come over on the night of July 6 to tuck her into bed. Though she had not felt well for a single day on July 1, she reported that she was "much better" by July 2 and that she thought she would be "done" with what ailed her by that night—*four nights* before the parties met on July 6.

51.     Clearly, Ganieva was not unwell by July 6—let alone debilitated and weak. Clearly, she was looking forward to a pre-planned romantic evening with the wine she requested, and, clearly, it was anything but "sudden[]"when Mr. Black showed up at precisely the appointed time.

52.     There simply was no forced sex. A consensual rendezvous plainly had been contemplated by both parties, and Ganieva reached out first thing the next morning with a message

of thanks and love: "*Good morning. It was very nice to see you last night. I already feel better....
I love you and thank you!!! Xoxoxoxoxo and more love*" (emphasis added).

53.      On July 9, she reached out to Mr. Black again, asked if he wanted to get together,
and sent "lots of love." When Mr. Black did not respond, Ganieva reached out yet again the
following day, July 10, to try again to get together.

54.      The Complaint's false allegations continue. Ganieva claims that "[a]fter this rape,
Ms. Ganieva took her son and left New York to physically distance herself from Black." (Compl.
¶ 55). This, too, is untrue. In the days and weeks that followed, Ganieva repeatedly and insistently
reached out to Mr. Black on numerous occasions, asking him, and indeed "begging" him, to get
together—which they did on no fewer than three occasions over the next few weeks.

55.      Ganieva explained that she was having visa issues (apparently because, on
information and belief, her student visa had expired upon her graduation that spring), and that she
had to leave New York and return to Russia as a result.

56.      While Mr. Black told Ganieva that he was "saddened" that she had to leave, he
texted that "maybe its for the best." At her request, Mr. Black helped her set up interviews abroad
and provided financial assistance for her relocation.

57.      In the few weeks between July 6 and her departure from New York on July 31,
2014, Ganieva and Mr. Black saw each other several time, at her request. Likewise, she frequently
sent him loving messages, telling him the week after the alleged "rape" that he is "the kindest",
and signing her text with, "Always yours….".

58.      Ganieva sent Mr. Black what he characterized as "beautiful flowers" on his
birthday, the day she left New York. Mr. Black sent Ganieva a note to say that he was "very

touched by your thoughtfulness and love." Ganieva texted this from the plane, as she was departing: "I love you and miss you already."

59.     From the time Ganieva left New York in July 2014, until the day she returned to extort him in June 2015, she continued to send him adoring messages, to try to see him, and to request financial, career, and other assistance.

60.     The lies in the Complaint go on. Ganieva alleges that, while she was abroad, Mr. Black "managed to always be aware of where she was and what she was doing" and that she "continued to feel threatened by Black and his power over her." (Compl. ¶¶ 55, 57). This is nonsense.

61.     After Ganieva left New York, the record is clear that Mr. Black made minimal effort to maintain contact with her, let alone try to exert any "power over her." For example, between October 23, 2014 and February 19, 2015, Ganieva continually texted Mr. Black without response. She sent such messages to him as: "*You have no idea how much I miss you and love you. It's nice to know that someone like you exist in the world even tho a bit far,*" and "*I love you! I do!*" (emphasis added).

62.     Ganieva and Mr. Black did not have friends or a social group in common. As is explicitly clear from the recorded conversations—and as Ganieva seemed to acknowledge—Mr. Black never told anyone about their relationship. It is delusional—and, as Ganieva herself has put it, "paranoid"—for her to allege that "it seemed that no matter where she traveled, inevitably she happened to meet someone that [sic] knew Black and he managed to always be aware of where she was and what she was doing." (Compl. ¶ 55). To the extent he had any idea where she was, it was only because she so often reached out to let him know about her travels (and, at times, to request money for them). In her texts, she informed him about her exotic comings and goings,

including travel to Moscow, Rome, London, a beach vacation, and a ski junket in the French Alps at Courchevel.

63.     As noted, in her 2015 campaign of extortion, Ganieva had tried on a theory of palimony, and apparently recognized that this was not an actionable claim. She also tried on a "paranoid" theory of harassment and belittlement, but must have been counseled that, this too, is not actionable in a non-employment context. Finally, she has landed on a brand-new theory—alleging now, so many years later, that she had been raped.

64.     Seemingly mindful of the relevant 7-year statute of limitations—and clearly unaware that Mr. Black has retained their earlier text communications and recorded their later conversations—Ganieva has alighted upon July 6, 2014 as the date on which she was allegedly raped.

65.     Unfortunately for Ganieva, the documentary record reveals her for the fabulist and extortionist that she is. Mr. Black has only ever been kind, supportive, and exceedingly generous to Ganieva. Clearly, he exercised bad judgment in entering into the relationship in the first instance and in paying an exorbitant ransom to exit it; just as clearly, there is no truth to Ganieva's vicious, mercenary slander that has devasted his family, his business, and his life.

### Ganieva's Defamatory Tweets and This Frivolous Lawsuit

66.     On March 17, 2021, Ganieva posted a series of false and defamatory tweets on Twitter about Mr. Black. Ganieva's Twitter account appears to have been set up for the sole purpose of publishing the defamatory tweets. She apparently only set up the account in March 2021, and the thread of three defamatory tweets on March 17, 2021 appear to be the only tweets she has posted either before or since that date. She presently "follows" only 21 Twitter users, including several investigative reporters who have reported on sexual abuse matters, two women

who have made sexual harassment allegations in high-profile matters, and the law firm and lawyer she retained in this case. In the defamatory tweets, Ganieva pointedly refers to Mr. Black as "Apollo Global Management's CEO and Chairman, Leon Black", in an obvious effort to maximize the professional and reputational harm to Mr. Black. At the end of the thread, Ganieva included the hashtags #MeToo and #LeonBlack, similarly maximizing the reach of her defamatory tweets.

67. Ganieva's defamatory comments included: (i) that she had been "sexually harassed and abused" by Mr. Black "for years"; (ii) that Mr. Black "could not understand me when I refused his sexual advances"; (iii) that she had been "bullied, manipulated, threatened, and coerced" by Mr. Black; (iv) that, "under duress, I was forced to sign an NDA in 2015"; and (v) that she did "not want this type of predatory behavior to continue happening to other women." (Compl. ¶ 81).

68. In response, and quite understandably given the circumstances, Mr. Black publicly defended himself, including stating principally that: "I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago"; her allegations were "completely fabricated"; and "I have been extorted by Ms. Ganieva for many years and I made substantial monetary payments to her. . .". (Compl. ¶ 82).

69. Ganieva made additional false and defamatory statements of fact concerning Mr. Black in an interview with the *New York Post* on April 8, 2021, including that "Black's abuse 'was over a long period of time and it was tragic.'" Josh Kosman, *Leon Black's Surprise Apollo Global Exit Came Amid Sexual Harassment Allegation*, N.Y. Post (Apr. 8, 2021), https://nypost.com/2021/04/08/leon-black-accused-of-sexual-harassment/.

70. This frivolous, and indeed sanctionable, Complaint followed.

## ANSWERS TO SPECIFIC ALLEGATIONS

Defendant and Counterclaim-Plaintiff Leon Black denies all allegations in the Complaint, including those in any headings and footnotes, except as expressly admitted herein.

1. Denies each and every allegation in Paragraph 1 of the Complaint, except admits that the April 8, 2021 Bloomberg article contains the quoted text, and respectfully refers the Court to the April 8, 2021 Bloomberg article and Mr. Black's statement to Bloomberg for the full text and context of Mr. Black's statement to Bloomberg, and avers that Mr. Black provided the following statement to Bloomberg in connection with the article:

> I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago. Any allegation of harassment or any other inappropriate behavior towards her is completely fabricated. The truth is that I have been extorted by Ms. Ganieva for many years and I made substantial monetary payments to her, based on her threats to go public concerning our relationship, in an attempt to spare my family from public embarrassment. At my direction, my counsel referred Ms. Ganieva's conduct to the criminal authorities several weeks ago and I welcome a thorough investigation of this matter. I also want to emphasize that this is entirely a personal matter; this matter has nothing to do with Apollo or my decision to step away from the firm.

2. Denies each and every allegation in Paragraph 2 of the Complaint.

3. Denies each and every allegation in Paragraph 3 of the Complaint.

4. Denies each and every allegation in Paragraph 4 of the Complaint, and avers that Ganieva made such threats on numerous occasions, including in recorded conversations.

5. Denies each and every allegation in Paragraph 5 of the Complaint, including those contained in footnote 2, except admits that Mr. Black dined on occasion with Ganieva at restaurants and on rare occasions appeared with her at events.

6. Denies each and every allegation in Paragraph 6 of the Complaint, except admits that Mr. Black made the quoted statement during the October 29, 2020 earnings call, and

respectfully refers the Court to the October 29, 2020 earnings call transcript for the full text and context of Mr. Black's statements on that call.

7.      Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 7 of the Complaint regarding Ganieva's legal education and her state of mind. Denies each and every allegation in Paragraph 7 of the Complaint.

8.      Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 8 of the Complaint regarding Ganieva's state of mind. Denies each and every allegation in Paragraph 8 of the Complaint.

9.      Denies each and every allegation in Paragraph 9 of the Complaint, except admits that Ganieva, or someone purporting to act on Ganieva's behalf, posted the excerpted tweets on March 17, 2021, and respectfully refers the Court to the tweets for their full text and context, and admits that Mr. Black texted Ganieva the following day and asked her to call him.

10.     Denies each and every allegation in Paragraph 10 of the Complaint, including those contained in footnote 3, except admits that Mr. Black described Ganieva's conduct as extortion, and avers that such description is accurate.

11.     Denies each and every allegation in Paragraph 11 of the Complaint, except admits that Mr. Black referred Ganieva's extortion to the appropriate criminal authorities.

12.     Denies each and every allegation in Paragraph 12 of the Complaint.

13.     Denies each and every allegation in Paragraph 13 of the Complaint.

14.     Denies each and every allegation in Paragraph 14 of the Complaint.

15.     To the extent the allegations in Paragraph 15 of the Complaint call for legal conclusions, no response is required. To the extent any response is required, denies each and every allegation in Paragraph 15 of the Complaint.

16.     To the extent the allegations in Paragraph 16 of the Complaint call for legal conclusions, no response is required. To the extent any response is required, denies that Mr. Black engaged in any act or omission giving rise to the claims alleged in the Complaint, and admits that Mr. Black resides in New York State and that Ganieva purports to invoke the Court's jurisdiction.

17.     To the extent the allegations in Paragraph 17 of the Complaint call for legal conclusions, no response is required. To the extent any response is required, denies that Mr. Black engaged in any act or omission giving rise to the claims alleged in the Complaint, and admits that Ganieva purports to invoke venue in New York County.

18.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 18 of the Complaint.

19.     Denies each and every allegation in Paragraph 19 of the Complaint.

20.     Denies each and every allegation in Paragraph 20 of the Complaint, except admits that Mr. Black met Ganieva in or around March 2008, and avers that Ganieva and Mr. Black met at a party and that Ganieva sought Mr. Black out.

21.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 21 of the Complaint as to Ganieva's marital status and under what circumstances Ganieva moved from Russia to the United States, and admits that Ganieva has a son. Denies each and every remaining allegation in Paragraph 21 of the Complaint.

22.     Denies each and every allegation in Paragraph 22 of the Complaint.

23.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 23 of the Complaint as to who Ganieva "later met." Denies each and every allegation in Paragraph 23 of the Complaint.

24.     Denies each and every allegation in Paragraph 24 of the Complaint.

25.     Denies each and every allegation in Paragraph 25 of the Complaint.

26.     Denies each and every allegation in Paragraph 26 of the Complaint.

27.     Denies each and every allegation in Paragraph 27 of the Complaint.

28.     Denies each and every allegation in Paragraph 28 of the Complaint.

29.     Denies each and every allegation in Paragraph 29 of the Complaint.

30.     Denies each and every allegation in Paragraph 30 of the Complaint, and avers that Mr. Black often tried to help and support Ganieva, including by renting an apartment for her in a school district that she wanted for her son, and that, while Mr. Black initially told Ganieva he would try to help her with a recommendation for Harvard Business School, ultimately, as a result of her extortion of him, he told her he would not do so.

31.     Denies each and every allegation in Paragraph 31 of the Complaint.

32.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 32 of the Complaint, including about Ganieva's state of mind, except admits that Ganieva enrolled in an undergraduate program at around the time indicated.

33.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 33 of the Complaint as to Ganieva's state of mind. Denies each and every allegation in Paragraph 33 of the Complaint.

34.     Denies each and every allegation in Paragraph 34 of the Complaint, except admits that Mr. Black made a loan to Ganieva, pursuant to her request, in 2011.

35.     Denies each and every allegation in Paragraph 35 of the Complaint, except admits that Mr. Black made a loan to Ganieva in 2011 pursuant to Ganieva's request and that certain terms of the loan were memorialized in a one-page, signed document, and respectfully refers the Court

26

to the document referenced in Paragraph 37 of the Complaint for the document's full text and context.

36.     Denies each and every allegation in Paragraph 36 of the Complaint, and respectfully refers the Court to the document contained in Paragraph 37 of the Complaint for its full text and context.

37.     Denies each and every allegation in Paragraph 37 of the Complaint, and respectfully refers the Court to the document contained in Paragraph 37 of the Complaint for its full text and context.

38.     Denies each and every allegation in Paragraph 38 of the Complaint.

39.     Denies each and every allegation in Paragraph 39 of the Complaint, except admits that Mr. Black made a loan to Ganieva in 2013 pursuant to Ganieva's request, and respectfully refers the Court to the document contained in Paragraph 39 of the Complaint for its full text and context.

40.     Denies each and every allegation in Paragraph 40 of the Complaint.

41.     Denies each and every allegation in Paragraph 41 of the Complaint, except admits that Mr. Black helped Ganieva with her job search.

42.     Denies each and every allegation in Paragraph 42 of the Complaint.

43.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 43 of the Complaint regarding Ganieva's purported communications with Goldman Sachs, and respectfully refers the Court to those communications for their full text and context, and admits that Mr. Black helped Ganieva with her job search. Denies each and every remaining allegation in Paragraph 43 of the Complaint.

44.    Denies knowledge or information sufficient to form a belief about the truth of the allegation in Paragraph 44 of the Complaint that Ganieva "never received an offer from any financial company in New York," and admits that Mr. Black helped Ganieva with her job search. Denies each and every remaining allegation in Paragraph 44 of the Complaint.

45.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 45 of the Complaint regarding Ganieva's purported communications with Goldman Sachs, and respectfully refers the Court to those communications for their full text and context. Denies each and every allegation in Paragraph 45 of the Complaint.

46.    Denies each and every allegation in Paragraph 46 of the Complaint.

47.    Denies each and every allegation in Paragraph 47 of the Complaint, except admits that on July 6, 2014, Mr. Black returned from the Hamptons, and avers that he had previously arranged with Ganieva to visit her at her apartment on East 77th Street at an appointed time.

48.    Denies each and every allegation in Paragraph 48 of the Complaint.

49.    Denies each and every allegation in Paragraph 49 of the Complaint.

50.    Denies each and every allegation in Paragraph 50 of the Complaint.

51.    Denies each and every allegation in Paragraph 51 of the Complaint.

52.    Denies each and every allegation in Paragraph 52 of the Complaint.

53.    Denies each and every allegation in Paragraph 53 of the Complaint.

54.    Denies each and every allegation in Paragraph 54 of the Complaint.

55.    Denies each and every allegation in Paragraph 55 of the Complaint, and avers that Ganieva informed Mr. Black that her departure from New York was due to immigration issues.

56.    Denies each and every allegation in Paragraph 56 of the Complaint.

57.    Denies each and every allegation in Paragraph 57 of the Complaint.

58.    Denies each and every allegation in Paragraph 58 of the Complaint, and avers that, prior to returning to New York, Ganieva had requested to meet with Mr. Black.

59.    Denies knowledge or information sufficient to form a belief about the truth of the allegation in Paragraph 59 of the Complaint, and avers that Mr. Black never requested repayment of either loan he made to Ganieva.

60.    Denies each and every allegation in Paragraph 60 of the Complaint.

61.    Denies each any every allegation in Paragraph 61 of the Complaint, and avers that Ganieva threatened to go public about their relationship unless he paid her a sum of one hundred million dollars.

62.    Denies each and every allegation in Paragraph 62 of the Complaint.

63.    Denies each and every allegation in Paragraph 63 of the Complaint.

64.    Denies each and every allegation in Paragraph 64 of the Complaint, and avers that the parties met at the Four Seasons Restaurant on October 19, 2015, that Mr. Black provided Ganieva with an Agreement containing the terms that the two previously had discussed, and that he encouraged Ganieva to take her time and to read it carefully.

65.    Denies each and every allegation in Paragraph 65 of the Complaint, and avers that Ganieva made clear that she well understood each and every term of the Agreement.

66.    Denies each and every allegation in Paragraph 66 of the Complaint.

67.    Denies each and every allegation in Paragraph 67 of the Complaint.

68.    Denies each and every allegation in Paragraph 68 of the Complaint, and avers that only Ganieva signed the Agreement.

69.    Denies each and every allegation in Paragraph 69 of the Complaint, except admits that Ganieva signed two identical copies of the Agreement.

70.     Denies each and every allegation in Paragraph 70 of the Complaint.

71.     Denies each and every allegation in Paragraph 71 of the Complaint, including those in footnote 4, except admits that Mr. Black retained both copies of the Agreement.

72.     Admits the allegations in Paragraph 72 of the Complaint.

73.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 73 of the Complaint regarding how Ganieva's bank statement recorded funds, or as to what Ganieva did or did not know. Admits that Mr. Black had previously sent funds to Ganieva and admits that, after Ganieva's extortion of him, Mr. Black set up the "E Trust" account, and that funds began to be transferred from the E Trust account beginning on or about October 22, 2015. Avers that the "E" in "E Trust" stands for "Extortion."

74.     Denies each and every allegation in Paragraph 74 of the Complaint, including each and every allegation contained in the excerpted text messages, except admits that Ganieva sent Mr. Black the October 15 and October 16, 2019 text messages quoted therein, and that Mr. Black did not respond to the text messages, and respectfully refers the Court to those text messages for their full text and context.

75.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 75 of the Complaint regarding Ganieva's retention of legal counsel and about the alleged letter dated March 6, 2020. Admits that counsel purporting to represent Ganieva sent a letter to Mr. Black on February 18, 2020, and that Mr. Black did not respond to that letter.

76.     Denies each and every allegation in Paragraph 76 of the Complaint, except admits that Mr. Black has both signed copies of the Agreement.

77.     Denies each and every allegation in Paragraph 77 of the Complaint, except admits that Mr. Black made the quoted statement during the October 29, 2020 earnings call, and

respectfully refers the Court to the October 29, 2020 earnings call transcript for the full text and context of Mr. Black's statements on that call.

78.     Denies each and every allegation in Paragraph 78 of the Complaint.

79.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 79 of the Complaint regarding Ganieva's legal education and her state of mind. Denies each and every allegation in Paragraph 79 of the Complaint.

80.     Denies each and every allegation in Paragraph 80 of the Complaint.

81.     Denies each and every allegation in Paragraph 81 of the Complaint, except admits that Ganieva, or someone purporting to act on Ganieva's behalf, posted the excerpted tweets on March 17, 2021, and respectfully refers the Court to the tweets for their full text and context.

82.     Denies each and every allegation in Paragraph 82 of the Complaint, except admits that Bloomberg published the quoted material on April 8, 2021, and respectfully refers the Court to the April 8, 2021 Bloomberg article and Mr. Black's statement to Bloomberg for the full text and context of Mr. Black's statement to Bloomberg, and avers that Mr. Black provided the following statement to Bloomberg in connection with the article:

> I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago. Any allegation of harassment or any other inappropriate behavior towards her is completely fabricated. The truth is that I have been extorted by Ms. Ganieva for many years and I made substantial monetary payments to her, based on her threats to go public concerning our relationship, in an attempt to spare my family from public embarrassment. At my direction, my counsel referred Ms. Ganieva's conduct to the criminal authorities several weeks ago and I welcome a thorough investigation of this matter. I also want to emphasize that this is entirely a personal matter; this matter has nothing to do with Apollo or my decision to step away from the firm.

83.     Denies each and every allegation in Paragraph 83 of the Complaint, except admits that additional publications also reported on the matter, including the publication cited at footnote 6, and respectfully refers the Court to those publications for their full text and context.

84.     Denies each and every allegation in Paragraph 84 of the Complaint, including those in footnote 7, except admits that the *New York Post* published the article and the quoted material in footnote 7 on April 12, 2021, and respectfully refers the Court to the article for its full text and context.

85.     To the extent the allegations in Paragraph 85 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 85 of the Complaint.

86.     To the extent the allegations in Paragraph 86 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 86 of the Complaint.

87.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 87 of the Complaint as to the "examples" listed and the "playbook" cited in Paragraph 87 of the Complaint, and respectfully refers the Court to the publications cited in the footnotes therein for their full text and context. Denies each and every allegation in Paragraph 87 of the Complaint.

88.     Denies each and every allegation in Paragraph 88 of the Complaint.

89.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 89 of the Complaint about the requirements for admission to the New York State bar. Denies each and every allegation in Paragraph 89 of the Complaint.

90.     To the extent the allegations in Paragraph 90 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 90 of the Complaint.

91.     Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Complaint, and otherwise denies each and every allegation in Paragraph 91 of the Complaint.

92.     Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Complaint, and otherwise denies each and every allegation in Paragraph 92 of the Complaint.

93.     To the extent the allegations in Paragraph 93 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 93 of the Complaint.

94.     To the extent the allegations in Paragraph 94 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 94 of the Complaint.

95.     To the extent the allegations in Paragraph 95 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 95 of the Complaint.

96.     To the extent the allegations in Paragraph 96 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 96 of the Complaint.

97.     To the extent the allegations in Paragraph 97 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 97 of the Complaint.

98.     To the extent the allegations in Paragraph 98 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 98 of the Complaint.

99.     To the extent the allegations in Paragraph 99 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 99 of the Complaint.

100.    To the extent the allegations in Paragraph 100 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 100 of the Complaint.

101.    To the extent the allegations in Paragraph 101 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 101 of the Complaint.

102.    Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Complaint, and otherwise denies each and every allegation in Paragraph 102 of the Complaint.

103.    Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Complaint, and otherwise denies each and every allegation in Paragraph 103 of the Complaint.

104.    To the extent the allegations in Paragraph 104 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 104 of the Complaint.

105.    To the extent the allegations in Paragraph 105 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 105 of the Complaint.

106.    To the extent the allegations in Paragraph 106 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 106 of the Complaint.

107.    To the extent the allegations in Paragraph 107 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 107 of the Complaint.

108.    To the extent the allegations in Paragraph 108 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 108 of the Complaint.

109.    To the extent the allegations in Paragraph 109 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 109 of the Complaint.

110.    To the extent the allegations in Paragraph 110 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 110 of the Complaint.

111.    To the extent the allegations in Paragraph 111 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 111 of the Complaint.

112.    To the extent the allegations in Paragraph 112 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 112 of the Complaint.

113.    Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Complaint, and otherwise denies each and every allegation in Paragraph 113 of the Complaint.

114.    To the extent the allegations in Paragraph 114 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 114 of the Complaint.

115.    To the extent the allegations in Paragraph 115 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 115 of the Complaint.

116.    To the extent the allegations in Paragraph 116 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 116 of the Complaint.

117.    To the extent the allegations in Paragraph 117 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 117 of the Complaint.

118.   To the extent the allegations in Paragraph 118 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 118 of the Complaint.

119.   To the extent the allegations in Paragraph 119 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 119 of the Complaint.

120.   Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Complaint, and otherwise denies each and every allegation in Paragraph 120 of the Complaint.

121.   To the extent the allegations in Paragraph 121 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 121 of the Complaint.

122.   Denies each and every allegation in Paragraph 122 of the Complaint.

123.   To the extent the allegations in Paragraph 123 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 123 of the Complaint.

124.   To the extent the allegations in Paragraph 124 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 124 of the Complaint.

125.   Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Complaint, and otherwise denies each and every allegation in Paragraph 125 of the Complaint.

126.    To the extent the allegations in Paragraph 126 of the Complaint call for legal conclusions, no response is required. Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Complaint, and otherwise denies each and every allegation in Paragraph 126 of the Complaint.

127.    To the extent the allegations in Paragraph 127 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 127 of the Complaint.

128.    To the extent the allegations in Paragraph 128 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 128 of the Complaint.

129.    To the extent the allegations in Paragraph 129 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 129 of the Complaint.

130.    To the extent the allegations in Paragraph 130 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 130 of the Complaint.

## **PRAYER FOR RELIEF**

Denies that Ganieva has suffered any cognizable injury or damages entitling her to any legal recourse, and denies that Ganieva is entitled to any such relief, whether monetary, compensatory, declarative, equitable, costs, and/or fees relating to this matter, or in any other form sought by Ganieva.

## AFFIRMATIVE AND OTHER DEFENSES

### First Defense

The Complaint fails to state a claim upon which relief may be granted.

### Second Defense

Ganieva's claims are barred by the existence of a signed, valid release.

### Third Defense

Ganieva's claims are barred by waiver and/or estoppel.

### Fourth Defense

Ganieva's claims are barred, in whole or in part, based on the doctrine of unclean hands as a result of her misconduct.

### Fifth Defense

Ganieva's claims are barred by reason of her unlawful conduct.

### Sixth Defense

All of the statements Mr. Black is alleged to have made about Ganieva were either true or substantially true.

### Seventh Defense

All of the statements Mr. Black allegedly made about Ganieva were protected by his qualified privileges to make them, including the self-defense privilege and the *Chapadeau* privilege for statements involving matters of public concern, and Mr. Black's statements about Ganieva were not made with actual malice or gross irresponsibility.

### Eighth Defense

Ganieva is a limited purpose public figure, and the alleged defamatory statements were not published with an intent rising to constitutional malice and cannot be demonstrated by clear and convincing evidence.

### Ninth Defense

Any statements that Mr. Black has allegedly made about Ganieva were made in good faith.

### Tenth Defense

Ganieva's defamation claim fails because the alleged harm and damages sustained by Ganieva, if any, are the result of the acts and/or omissions of Ganieva or other entities, not of Mr. Black.

### Eleventh Defense

Ganieva's claims are barred because Mr. Black's alleged statements were not the proximate cause of Ganieva's alleged injuries.

### Twelfth Defense

The alleged defamatory statements were not published negligently, in reckless disregard of their truth, with gross irresponsibility, wantonly, or maliciously.

### Thirteenth Defense

All sexual encounters alleged to have taken place between Ganieva and Mr. Black were consensual.

### Fourteenth Defense

Ganieva's claims are barred, in whole or in part, because they implicate New York's anti-SLAPP statute, N.Y. Civil Rights Law § 76-a, and Ganieva has failed to allege actual malice.

### Fifteenth Defense

To the extent Ganieva bases her Gender-Motivated Violence Act claim on any conduct that occurred prior to June 1, 2014, those claims are barred by the applicable statute of limitations set forth in Admin. Code § 10-1105.

### Sixteenth Defense

Ganieva's claims are frivolous and are merely an attempt to preempt Mr. Black's lawful claims against her.

### Seventeenth Defense

The alleged harm and damages sustained by Ganieva, if any, are speculative.

### Eighteenth Defense

Ganieva has sustained no cognizable injury by reason of any wrongful conduct by Mr. Black. Ganieva makes only conclusory allegations of damages.

### Nineteenth Defense

Mr. Black's alleged conduct did not cause any loss of revenue or income to Ganieva. Ganieva makes only conclusory allegations of economic harm and has not alleged any facts demonstrating actual pecuniary loss or special damages.

### Twentieth Defense

Without conceding that Ganieva has suffered any damages as a result of any alleged wrongdoing by Mr. Black, Ganieva has failed to mitigate or minimize her alleged damages.

### Twenty-First Defense

Without conceding that Ganieva has suffered any damages as a result of any alleged wrongdoing by Mr. Black, any "damage" incurred by Ganieva as a result of any alleged wrongful

conduct should be offset by the value of the substantial sums of money that Ganieva unlawfully obtained from Mr. Black.

### Twenty-Second Defense

Ganieva fails to state a claim for punitive damages.

### Twenty-Third Defense

Ganieva has not adequately pleaded extreme and outrageous conduct, intent, or severe emotional distress for her intentional infliction of emotional distress claim.

### Twenty-Fourth Defense

Ganieva's intentional infliction of emotional distress claim is duplicative of her defamation claims.

Mr. Black is not knowingly waiving any affirmative defense and hereby expressly reserves the right to amend his Answer and include all such defenses as may become available or apparent during pretrial proceedings of this action.

**WHEREFORE,** Mr. Black respectfully requests that this Court:

(a)     Dismiss the Complaint in its entirety with prejudice;

(b)     Award Mr. Black the costs of defending against the suit, including reasonable attorneys' fees and expenses;

(c)     Impose sanctions on Ganieva and her attorneys pursuant to NYCRR 130-1.1 for making material false statements in the Complaint; and

(d)     Grant such other and further relief as the Court deems just and proper.

### COUNTERCLAIMS

Counterclaim-Plaintiff Leon Black for his Counterclaims, by his attorneys Perry Guha LLP, hereby alleges as follows:

1.      Mr. Black repeats and alleges Paragraphs 1 through 70 of the Factual Background section above; Paragraphs 1 through 130 of his Answers to Specific Allegations above; and his Affirmative and Other Defenses above, all as if fully restated herein.

## NATURE OF THE COUNTERCLAIMS

2.      Mr. Black brings these Counterclaims to recover from Counterclaim-Defendant Guzel Ganieva the substantial damages to Mr. Black's reputation and career flowing from Ganieva's false and defamatory statements about him, which were made in breach of a valid and enforceable Release and Confidentiality Agreement.

3.      On March 17, 2021, Ganieva made false, inflammatory, and defamatory statements on her public Twitter account against Mr. Black, whom she pointedly referred to as "Apollo Global Management's CEO and Chairman, Leon Black." Ganieva's defamatory comments included: (i) that she had been "sexually harassed and abused" by Mr. Black "for years"; (ii) that Mr. Black "could not understand me when I refused his sexual advances"; (iii) that she had been "bullied, manipulated, threatened, and coerced" by Mr. Black; (iv) that, "under duress, I was forced to sign an NDA in 2015"; and (v) that she did "not want this type of predatory behavior to continue happening to other women."

4.      Ganieva made additional false and defamatory statements of fact concerning Mr. Black in an interview with the *New York Post* on April 8, 2021, including that "Black's abuse 'was over a long period of time and it was tragic.'" Josh Kosman, *Leon Black's Surprise Apollo Global Exit Came Amid Sexual Harassment Allegation*, N.Y. Post (Apr. 8, 2021), https://nypost.com/2021/04/08/leon-black-accused-of-sexual-harassment/.

5.      In addition to being entirely false and highly defamatory, Ganieva's statements also constitute a material breach of the Release and Confidentiality Agreement that Ganieva and Mr.

43

Black entered into on October 19, 2015. Mr. Black fully performed his obligations under the Agreement, including paying Ganieva monthly from at least approximately October 2015 until Ganieva's breach in approximately March 2021, as well as additional funds. Ganieva, however, apparently unilaterally decided that she was no longer bound by the clear and unambiguous terms of the Agreement, while of course keeping the substantial sums of Mr. Black's money that she had accepted over the years.

## PARTIES

6.    Counterclaim-Plaintiff Leon Black resides in New York County, in the State of New York.

7.    Upon information and belief, Counterclaim-Defendant Guzel Ganieva resides in New York County, in the State of New York.

## JURISDICTION AND VENUE

8.    Jurisdiction within the Supreme Court of the State of New York is appropriate because the acts complained of herein took place within New York State and the parties reside within the state.

9.    Venue within New York County is appropriate pursuant to CPLR § 503 because the parties reside, and a substantial part of the events or omissions giving rise to the claim occurred, within New York County.

## FIRST COUNTERCLAIM
### (Defamation)

10.    Mr. Black repeats and alleges Paragraphs 1 through 9 of the Counterclaims section above; Paragraphs 1 through 70 of the Factual Background section above; Paragraphs 1 through 130 of his Answers to Specific Allegations above; and his Affirmative and Other Defenses above, all as if fully restated herein.

44

11.     On March 17, 2021, Ganieva made false and defamatory statements of fact concerning Mr. Black on her public Twitter account.

12.     Ganieva's statements were false and defamatory in that they falsely accused Mr. Black of abuse, and in that they falsely stated that (i) Mr. Black was a predator who "bullied, manipulated, threated, and coerced" Ganieva into a sexual relationship; (ii) that Mr. Black committed serious crimes—namely, sexual harassment, sexual assault, sexual abuse, abuse or rape—including by ignoring Ganieva's refusal of his sexual advances; (iii) that Mr. Black "forced" Ganieva to sign an "NDA" relating to Ganieva's allegations that Mr. Black "sexually harassed and abused" her; and (iv) that Mr. Black coerced Ganieva by forcing her to sign that "NDA."

13.     Ganieva made additional false and defamatory statements of fact concerning Mr. Black in an interview with the *New York Post* on April 8, 2021, including that "Black's abuse 'was over a long period of time and it was tragic.'" Josh Kosman, *Leon Black's Surprise Apollo Global Exit Came Amid Sexual Harassment Allegation*, N.Y. Post (Apr. 8, 2021), https://nypost.com/2021/04/08/leon-black-accused-of-sexual-harassment/

14.     All of these statements were published without privilege or authorization. Ganieva knew or should have known that such defamatory statements were false.

15.     Ganieva made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity. Ganieva's statements were also made with gross irresponsibility.

16.     Ganieva's false statements were defamatory because they have exposed Mr. Black to public contempt, aversion or disgrace, and induced a poor opinion of his good name and business reputation.

17.     Ganieva's false statements were defamatory because they intentionally assert, imply, and create the reasonable inference that Mr. Black had committed the serious crimes of rape, sexual abuse, sexual harassment, abuse, and coercion.

18.     Ganieva's false and defamatory statements have further caused Mr. Black harm insofar as they (i) have caused Mr. Black to spend time and resources responding to and rebutting the false statements; (ii) harmed Mr. Black's professional reputation; (iii) harmed Mr. Black's personal reputation; and (iv) damaged Mr. Black's relationship with his family.

19.     Ganieva's false and defamatory statements have harmed Mr. Black's professional reputation and standing in his industry, have caused him economic harm, have caused him to incur special damages, including lost income, benefits, job security, and opportunities for career advancement, and have caused him embarrassment, humiliation, and other emotional injury.

20.     As a direct and proximate result of Ganieva's defamation, Mr. Black has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of public esteem, public disgrace, and emotional distress.

21.     As a direct and proximate result of Ganieva's conduct, Mr. Black has suffered, and continues to suffer, harm for which he is entitled to an award of monetary damages and other relief.

22.     Ganieva's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Mr. Black's rights. Thus, Mr. Black is also entitled to an award of punitive damages.

## SECOND COUNTERCLAIM
### (Defamation *Per Se*)

23.     Mr. Black repeats and alleges Paragraphs 1 through 22 of the Counterclaims section above; Paragraphs 1 through 70 of the Factual Background section above; Paragraphs 1 through

130 of his Answers to Specific Allegations above; and his Affirmative and Other Defenses above, all as if fully restated herein.

24.     On March 17, 2021, Ganieva made false and defamatory statements of fact concerning Mr. Black on her public Twitter account.

25.     Ganieva's statements were false and defamatory in that they falsely accused Mr. Black of abuse, and in that they falsely stated that (i) Mr. Black was a predator who "bullied, manipulated, threated, and coerced" Ganieva into a sexual relationship; (ii) that Mr. Black committed serious crimes—namely, sexual harassment, sexual assault, sexual abuse, abuse or rape—including by ignoring Ganieva's refusal of his sexual advances; (iii) that Mr. Black "forced" Ganieva to sign an "NDA" relating to Ganieva's allegations that Mr. Black "sexually harassed and abused" her; and (iv) that Mr. Black coerced Ganieva by forcing her to sign that "NDA."

26.     Ganieva made additional false and defamatory statements of fact concerning Mr. Black in an interview with the *New York Post* on April 8, 2021, including that "Black's abuse 'was over a long period of time and it was tragic.'" Josh Kosman, *Leon Black's Surprise Apollo Global Exit Came Amid Sexual Harassment Allegation*, N.Y. Post (Apr. 8, 2021), https://nypost.com/2021/04/08/leon-black-accused-of-sexual-harassment/.

27.     All of these statements were published without privilege or authorization. Ganieva knew or should have known that such defamatory statements were false.

28.     Ganieva made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity. Ganieva's statements were also made with gross irresponsibility.

29.     Ganieva's false statements were defamatory because they have exposed Mr. Black to public contempt, aversion or disgrace, and induced a poor opinion of his good name and business reputation.

30.     Ganieva's false statements were also defamatory *per se* because they intentionally assert, imply, and create the reasonable inference that Mr. Black had committed the serious crimes of rape, sexual abuse, sexual harassment, abuse, and coercion.

31.     Ganieva's false and defamatory statements have further caused Mr. Black harm insofar as they (i) have caused Mr. Black to spend time and resources responding to and rebutting the false statements; (ii) harmed Mr. Black's professional reputation; (iii) harmed Mr. Black's personal reputation; and (iv) damaged Mr. Black's relationship with his family.

32.     Ganieva's false and defamatory statements have harmed Mr. Black's professional reputation and standing in his industry, have caused him economic harm, have caused him to incur special damages, including lost income, benefits, job security, and opportunities for career advancement, and have caused him embarrassment, humiliation, and other emotional injury.

33.     As a direct and proximate result of Ganieva's defamation, Mr. Black has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of public esteem, public disgrace, and emotional distress.

34.     As a direct and proximate result of Ganieva's conduct, Mr. Black has suffered, and continues to suffer, harm for which he is entitled to an award of monetary damages and other relief.

35.     Ganieva's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Mr. Black's rights. Thus, Mr. Black also is entitled to an award of punitive damages.

## THIRD COUNTERCLAIM
### (Breach of Contract)

36.     Mr. Black repeats and alleges Paragraphs 1 through 35 of the Counterclaims section above; Paragraphs 1 through 70 of the Factual Background section above; Paragraphs 1 through 130 of his Answers to Specific Allegations above; and his Affirmative and Other Defenses above, all as if fully restated herein.

37.     The Release and Confidentiality Agreement is a valid and enforceable contract between Mr. Black and Ganieva.

38.     The Release and Confidentiality Agreement asserts that the allegations and claims that precipitated the Release and Confidentiality Agreement were made by Ganieva "under extreme stress and which she now concedes are not true and . . . if made public, would damage [Mr. Black's] career, reputation and relationship with others".

39.     Paragraph 1 of the Release and Confidentiality Agreement provides that Ganieva "hereby releases, remises and forever discharges [Mr. Black] from all matters, causes of action, claims, suits and any and all further liability or accountability, in law or equity, by reason of any matter, cause or thing whatsoever arising prior to the signing of this Agreement, contemporaneous with the signing of this Agreement or any time in the future after the signing of this Agreement."

40.     Paragraph 2 of the Release and Confidentiality Agreement prohibits Ganieva from "disclos[ing], directly or indirectly, to any individual, entity or other potential recipient, any information relating to (i) the allegations and claims that she has asserted against [Mr. Black], (ii) the signing, content or other attributes of this Agreement…and (iii) any other matters that could damage [Mr. Black's] career, reputation and relationships with others."

41.     Mr. Black had fully performed his obligations under the Release and Confidentiality Agreement. Mr. Black provided consideration to Ganieva, as set forth in the

Release and Confidentiality Agreement, including: (i) an immediate payment to Ganieva of $100,000; (ii) forgiveness of approximately $1,000,000 in loans; and (iii) "other consideration to which has been agreed," which consisted of monthly payments to Ganieva from at least approximately October 2015 until approximately March 2021 (right after Ganieva posted her defamatory tweets, in breach of the Release and Confidentiality Agreement).

42.     In total, Ganieva has accepted millions of dollars in payments from Mr. Black pursuant to the Release and Confidentiality Agreement. Ganieva had never sought to repudiate the Agreement.

43.     By filing this lawsuit, Ganieva breached Paragraph 1 of the Release and Confidentiality Agreement.

44.     Ganieva breached each of the three provisions in Paragraph 2 of the Release and Confidentiality Agreement by publicly disclosing to the *New York Post* and on her public Twitter account information related to (i) "the allegations and claims she ha[d] asserted against [Mr. Black]"—such as allegations of abusiveness, (ii) "the signing, content or other attributes of [the Release and Confidentiality Agreement]"—*i.e.* by claiming that Mr. Black "forced" Ganieva to sign an "NDA"; and (iii) "other matters that could damage [Mr. Black's] career, reputation and relationship with others."

45.     Ganieva's breaches of Paragraphs 1 and 2 are material breaches and have caused Mr. Black material harm.

46.     Ganieva's statements in violation of the Release and Confidentiality Agreement have also caused, and continue to cause, financial loss and damage to Mr. Black, for which Ganieva must compensate Black in an amount to be determined at trial.

50

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim-Plaintiff Leon Black hereby requests judgment against Counterclaim-Defendant Guzel Ganieva as follows:

(a)     Enter judgment on his Counterclaims in Mr. Black's favor;

(b)     Enter a declaratory judgment that the actions of Ganieva complained of herein violate the laws of the State of New York and the City of New York;

(c)     Award Mr. Black damages, in an amount to be determined at trial, plus prejudgment interest, to compensate Mr. Black for all monetary and/or economic damages;

(d)     Award Mr. Black damages for any and all other monetary and/or non-monetary losses suffered by him, including, but not limited to, loss of income, reputational harm and harm to professional reputation, in an amount to be determined at trial, plus prejudgment interest;

(e)     Award Mr. Black punitive damages, and any applicable penalties and/or liquidated damages in an amount to be determined at trial;

(f)     Award Mr. Black attorneys' fees, costs, and disbursements incurred in bringing these Counterclaims; and

(g)     Grant to Mr. Black any such further relief as the Court deems just and proper.

51

## JURY DEMAND

Counterclaim Plaintiff Leon Black hereby demands a trial by jury on all issues.

Dated: July 19, 2021
      New York, New York

Respectfully submitted,

_____

E. Danya Perry
Peter A. Gwynne
PERRY GUHA LLP
35 East 62nd Street
New York, New York 10065
Email: dperry@perryguha.com
Email: pgwynne@perryguha.com
Telephone: (212) 399-8330
Facsimile: (212) 399-8331

*Attorney for Defendant and Counterclaim-Plaintiff Leon Black*