UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LEON D. BLACK,

                    Plaintiff,

        -against-

GUZEL GANIEVA, WIGDOR LLP,
JOSH HARRIS, and STEVEN RUBENSTEIN,

                    Defendants.

Case No. 21-cv-8824 (PAE)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
JOSH HARRIS'S MOTION TO DISMISS THE AMENDED COMPLAINT**

Paul Spagnoletti
Martine M. Beamon
Matthew Cormack
Lindsay Schare
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
212-450-4000

*Attorneys for Defendant Josh Harris*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................1

LEGAL STANDARD...............................................................................9

ARGUMENT .........................................................................................10

    I.       BLACK FAILS TO ALLEGE THE ELEMENTS OF A RICO CLAIM ..............10

           A.      Black Fails to Allege the "Conduct of an Enterprise" ..............................11

           B.      Black Fails to Allege Harris Engaged in Two Predicate Acts ..................14

               1.      Black Fails to Allege Extortion Under the Hobbs Act .................14

               2.      Black Fails to Allege Any Mail or Wire Fraud............................15

           C.      Black Fails to Allege Any "Pattern of Racketeering Activity" ................18

           D.      Black Fails to Allege Harris Caused Him Any Injury ..............................21

    II.      BLACK'S RICO CONSPIRACY CLAIM SHOULD ALSO BE DISMISSED...23

    III.    BLACK'S DEFAMATION CLAIM SHOULD BE DISMISSED......................23

CONCLUSION......................................................................................25

## **TABLE OF AUTHORITIES**

### CASES

PAGE(S)

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995) ................................................................. 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................ 9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................ 9

*Chau v. Lewis*,
771 F.3d 118 (2d Cir. 2014) ............................................................ 24

*Cohen v. S.A.C. Trading Corp.*,
711 F.3d 353 (2d Cir. 2013) ............................................................ 16

*Cont'l Petrol. Corp. v. Corp. Funding Partners, LLC*,
No. 11 Civ. 7801 (PAE), 2012 WL 1231775 (S.D.N.Y. Apr. 12, 2012) .................. 18, 20, 23

*Days v. Eastchester Police Dep't*,
No. 18-CV-11538 (NSR), 2020 WL 5504433 (S.D.N.Y. Sept. 9, 2020) ................ 9

*Dep't of Econ. Dev. v. Arthur Anderson & Co.*,
924 F. Supp. 449 (S.D.N.Y. 1996) .................................................... 14

*Doe v. Baram*,
No. 20 CIV 9522 (ER), 2021 WL 4847076 (S.D.N.Y. Oct. 15, 2021) ................ 25

*D. Penguin Bros. v. City Nat'l Bank*,
587 F. App'x 663 (2d Cir. 2014) .................................................... 12, 13

*D.R.S. Trading Co. v. Fisher*,
No. 01 Civ. 8028 (WHP), 2002 WL 1482764 (S.D.N.Y. July 10, 2002) .............. 19

*In re Express Scripts Holding Co. Sec. Litig.*,
No. 16 CIV. 3338 (ER), 2018 WL 2324065 (S.D.N.Y. May 22, 2018),
*aff'd*, 773 F. App'x 9 (2d Cir. 2019) .............................................. 10

*FindTheBest.com, Inc. v. Lumen View Tech. LLC*,
20 F. Supp. 3d 451 (S.D.N.Y. 2014) ................................................ 15

*First Nationwide Bank v. Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994) .......................................................... 21

ii

*Foster v. 2001 Real Est.*,
   No. 14 CIV. 9434 (RWS), 2015 WL 7587360 (S.D.N.Y. Nov. 24, 2015) ............... 10, 11, 13

*Greenberg v. Blake*,
   No. 09 Civ. 4347 (BMC), 2010 WL 2400064 (E.D.N.Y. June 10, 2010) ............................ 12

*Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*,
   No. 15-CV-3784 (PKC), 2016 WL 6110565 (S.D.N.Y. Aug. 4, 2016) ................................ 23

*HB v. Monroe Woodbury Cent. Sch. Dist.*,
   No. 11-CV-5881 (CS), 2012 WL 4477552 (S.D.N.Y. Sept. 27, 2012) .................................. 10

*H.J. Inc. v. N.W. Bell Tel. Co.*,
   492 U.S. 229 (1989) ................................................................................................................ 18

*Hollander v. Pressreader, Inc.*,
   No. 19-CV-2130 (AJN), 2020 WL 2836189 (S.D.N.Y. May 30, 2020) ................................ 17

*Kalimantano GmbH v. Motion in Time, Inc.*,
   939 F. Supp. 2d 392 (S.D.N.Y. 2013) .............................................................................. 7, 10

*Khan v. N.Y. Times Co.*,
   269 A.D.2d 74 (1st Dep't 2000) ......................................................................................... 24

*Kim v. Kimm*,
   884 F.3d 98 (2d Cir. 2018) ........................................................................................... 15, 17

*Kimm v. Lee*,
   No. 04 CIV. 5724 (HB), 2005 WL 89386 (S.D.N.Y. Jan. 13, 2005),
   *aff'd*, 196 F. App'x 14 (2d Cir. 2006) ................................................................................ 17

*Lefkowitz v. Bank of N.Y.*,
   No. 01 Civ. 6252 VM, 2003 WL 22480049 (S.D.N.Y. Oct. 31, 2003), *rev'd on other
   grounds*, 528 F.3d 102 (2d Cir. 2007) .......................................................................... 19, 20

*Malvar Egerique v. Chowaiki*,
   No. 19 Civ. 3110 (KPF), 2020 WL 1974228 (S.D.N.Y. Apr. 24, 2020), *vacated in part
   on other grounds*, *Weiss v. David Benrimon Fine Art LLC*, No. 20-3842-CV,
   2021 WL 6128437 (2d Cir. Dec. 28, 2021) .................................................................. 16, 17

*Moss v. Morgan Stanley Inc.*,
   719 F.2d 5 (2d Cir. 1983) .................................................................................................... 21

*Motorola Credit Corp. v. Uzan*,
   322 F.3d 130 (2d Cir. 2003) ............................................................................................... 22

*Napoli v. N.Y. Post*,
   175 A.D.3d 433 (1st Dep't 2019) ........................................................................................ 25

*Nightingale Grp., LLC v. CW Capital Mgt., LLC,*
   No. 11 Civ. 9293 (PAE), 2012 WL 2674539 (S.D.N.Y. July 5, 2012) ........................... 19, 20

*Nygard v. Bacon,*
   No. 19 Civ. 1559 (LGS), 2021 WL 3721347 (S.D.N.Y. Aug. 20, 2021) ....................... 21, 22

*O'Brien v. Nat'l Prop. Analysts Partners,*
   936 F.2d 674 (2d Cir. 1991) ................................................................................. 17, 18

*Petroff Amshen LLP v. Alfa Rehab PT PC,*
   No. 19-CV-1861 (MKB)(RML), 2021 WL 960394 (E.D.N.Y. Mar. 15, 2021),
   *aff'd,* No. 21-847, 2022 WL 480475 (2d Cir. Feb. 17, 2022) ................................ 22

*Procapui-Productores de Camaroes de Icapui Ltda. v. Layani,*
   No. 07-CV-6627 (BSJ), 2008 WL 3338199 (S.D.N.Y. Jan. 11, 2008) ........................... 14, 16

*Rajaratnam v. Motley Rice, LLC,*
   449 F. Supp. 3d 45 (E.D.N.Y. 2020) ..................................................................... 24

*Ramsaran v. Abraham,*
   No. 15-CV-10182 (JPO), 2017 WL 1194482 (S.D.N.Y. Mar. 30, 2017) ........................... 24

*Rand v. Anaconda-Ericsson, Inc.,*
   794 F.2d 843 (2d Cir. 1986) ................................................................................. 21

*Reich v. Lopez,*
   858 F.3d 55 (2d Cir. 2017) ................................................................................. 20, 21

*Reves v. Ernst & Young,*
   507 U.S. 170 (1993) ........................................................................................... 13

*Ritchie v. N. Leasing Sys., Inc.,*
   No. 12-CV-4992 (KBF), 2016 WL 1241531 (S.D.N.Y. Mar. 28, 2016), *aff'd sub nom.*
   *Ritchie v. Taylor,* 701 F. App'x 45 (2d Cir. 2017) ................................................. 15

*Rosner v. Bank of China,*
   528 F. Supp. 2d 419 (S.D.N.Y. 2007) ................................................................... 23

*S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.,*
   84 F.3d 629 (2d Cir. 1996) ................................................................................. 15

*Santana v. Adler,*
   No. 1:17-cv-06147(AT)(SDA), 2018 WL 2172699 (S.D.N.Y. Mar. 26, 2018), *report and*
   *recommendation adopted,* 2018 WL 2170299 (S.D.N.Y. May 10, 2018) ........................ 22

*Scheidler v. Nat'l Org. for Women, Inc.,*
   537 U.S. 393 (2003) ........................................................................................... 14

*Spool v. World Child Int'l Adoption Agency*,
   520 F.3d 178 (2d Cir. 2008) ............................................................ 19, 20

*Stevens v. New York*,
   691 F. Supp. 2d 392 (S.D.N.Y. 2009) ................................................ 24

*W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch*,
   No. 03 Civ. 8606 (RWS), 2004 WL 2187069 (S.D.N.Y. Sept. 29, 2004) ...................... 16, 18

*WA Route 9, LLC v. PAF Cap. LLC*,
   136 A.D.3d 522 (1st Dep't 2016) ....................................................... 25

*Westgate Fin. Corp. v. Beinoni of N.Y. Inc.*,
   No. 10 Civ. 8102 (TPG), 2012 WL 219334 (S.D.N.Y. Jan. 25, 2012) .................................. 20

*Wild Edibles, Inc. v. Indus. Workers of the World Loc. 460/640*,
   No. 07 CIV. 9225 (LLS), 2008 WL 4548392 (S.D.N.Y. Oct. 9, 2008) ........................ 11, 12

*Yukos Cap. S.A.R.L. v. Feldman*,
   No. 15-CV-4964 (LAK), 2016 WL 183360 (S.D.N.Y. Jan. 11, 2016) ................................. 24

### STATUTES & RULES

18 U.S.C. § 1951(b)(2) ............................................................... 14

18 U.S.C. § 1964(c) .................................................................. 21

Fed. R. Civ. P. 9(b) ................................................................. 10

N.Y. Civ. Rights Law § 74 ........................................................... 25

Josh Harris, through his attorneys, respectfully submits this memorandum of law in support of his motion to dismiss, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), the claims alleged against him in the Amended Complaint ("AC") filed by Leon Black.

## PRELIMINARY STATEMENT

This Court has before it an unsustainable Amended Complaint, which not only lacks any cognizable legal claim, but reflects Leon Black's badly misguided effort to blame Josh Harris for problems that are of Black's own making, and which do not involve Harris.  Black *admits* that: Harris did not cause Black to consort with notorious pedophile Jeffrey Epstein; Harris did not cause Black to provide over $150 million to that pedophile for "tax" advice; and Harris did not cause Black to pay Guzel Ganieva in exchange for her silence.  Indeed, the Amended Complaint does not allege that Harris knows Ganieva or her representatives at all (he does not).  This Court should dismiss Black's frivolous claims *with prejudice*, and put an end to his improper efforts to enlist the federal judicial system in a public relations campaign designed to divert attention from his own self-inflicted wounds and Ganieva's state court case.

The crux of Black's frivolous RICO and defamation claims against Harris is that, six years *after* Ganieva allegedly extorted Black in 2015 and was paid millions of dollars by Black pursuant to a 2015 agreement, and a year *after* Ganieva resurfaced in 2020 with her own team of lawyers claiming that Black had sexually assaulted her, Harris supposedly came on the scene in 2021 and tried to "destroy" Black by "weaponizing Ms. Ganieva."[1]  (AC ¶¶ 1, 9, 33-39, 113.) Critically, Black does not (and cannot) allege that Harris ever even knew, met, e-mailed, talked to, or had any other communication with Ganieva, or anyone acting on her behalf, much less

---

[1] This claim appears to be premised on the fiction that Ganieva is an object to be "weaponized," rather than a person capable of making her own decisions.

facilitated her lawsuit against Black.  Thus, Black fails to allege even the existence of a racketeering "enterprise," and his RICO claims should be dismissed on that basis alone.  Equally fatal are Black's failures to allege that Harris committed any predicate act at all, much less a pattern of racketeering activity, and that Harris's conduct caused Black any injury cognizable under the RICO statute.  As far as can be discerned, Black's entire lawsuit is premised around the mistaken notion that Harris is "enraged" with Black, and that, therefore, Harris must be responsible for all of the unfortunate consequences of Black's own actions.  Aside from the fact that Harris has long since moved on from Black, and is not "enraged," the notion that such supposed animus supports legally deficient and factually bereft RICO and defamation claims, supposedly in concert with total strangers, is frivolous.

Black's Amended Complaint admits that he had already done the following, well *before* Harris is even alleged to have sought to harm Black:

- In 2008, Black began a multi-year extramarital affair with Ganieva (AC ¶ 2);

- In 2015, Black met with Ganieva in person, at which time Ganieva said that if he did not pay her $100 million, she would go public with the affair, and later that she was "dying to talk to [the] press" about their affair and "the longer I wait, the more sure I become that I actually . . . prefer to go public" (AC ¶ 34);

- In 2015, Black agreed to pay Ganieva hush money—in an arrangement he now calls "extortion"—in installments totaling about $20 million (AC ¶ 2); and

- Starting in 2015, Black paid Ganieva $9.2 million in hush money (AC ¶¶ 37-38).

Black's Amended Complaint expressly admits that all of this is true—and he does not (and cannot) allege that Harris had anything whatsoever to do with any of this misconduct. Instead, Black alleges that Harris supposedly sought to "undermine" the conclusions (AC ¶ 4) that were published by Dechert LLP in January 2021 after the Apollo Board's Conflicts Committee engaged that firm to investigate Black's relationship with Epstein.  But the Dechert

2

Report[2]—which Black references extensively in his Amended Complaint—itself found that

Black had already done the following, *before* Harris is even alleged to have harmed Black:

- Black developed a personal relationship with Epstein that began in the mid-1990s.  (Decl. Ex. A, Dechert Report at 5.)

- By 2012, Black knew that Epstein was a sex offender convicted of procuring an underage girl for prostitution and solicitation of prostitution.  (*Id.* at 6.)

- With that knowledge, Black continued to maintain a personal relationship with Epstein— which included "regular" visits in Epstein's home in New York as well as visits in Epstein's home in Florida (as well as Epstein's homes in Paris and Santa Fe, and Epstein's island in the Caribbean).  (*Id.* at 7-8.)

- Also with that knowledge, Black paid Epstein over $150 million from 2012 through 2017.  (*Id.* at 4.)

Black does not (and cannot) allege that Harris had anything whatsoever to do with any of these

pre-2021 events.

Furthermore, Black's own Amended Complaint and the Dechert Report it embraces make

absolutely clear that Black did not have a good reputation left to tarnish well *before* the existence

of the alleged RICO conspiracy.  In July 2019—*before the putative RICO conspiracy allegedly*

*began*—the U.S. Attorney's Office for the Southern District of New York issued a press release

announcing an indictment alleging that from "2002 through 2005"—when Black and Epstein

maintained their close relationship—"Epstein sexually exploited and abused dozens of underage

girls by enticing them to engage in sex acts with him in exchange for money."[3]  As Black

himself has acknowledged, after that announcement, the floodgates opened to a "tsunami" of

---

[2] Declaration of Paul Spagnoletti in Support of Defendant Josh Harris's Motion to Dismiss the Amended Complaint ("Decl."), dated March 4, 2022, Ex. A, Apollo Form 8-K (Jan. 25, 2021), Exhibit 99.1 Memorandum to Apollo Conflicts Committee from Dechert LLP (Jan. 22, 2021) ("Dechert Report").

[3] Decl. Ex. B, Press Release, U.S. Attorney's Office, Southern District of New York, "Jeffrey Epstein Charged In Manhattan Federal Court With Sex Trafficking Of Minors" (July 8, 2019).

"salacious" press stories about Black's ties to Epstein, which were published *before* any RICO enterprise involving Harris is even alleged to have come into existence.[4]  During that same period, *before* Black even alleges that Harris did anything untoward, Black destroyed any credibility he had left with his ever-shifting descriptions of his relationship with Epstein:

- Just after Epstein's July 2019 arrest, Black publicly stated that Epstein had "from time-to-time" provided him professional services.  Unfortunately for Black, the following year, the *New York Times* reported their relationship was much more significant, including that Black paid Epstein over $50 million (and as much as $75 million).  Black left that record uncorrected until the Dechert Report finally disclosed that he actually paid Epstein over $150 million.  (*Compare* Decl. Ex. C at 14, *with* Ex. H, *and* Ex. A, Dechert Report at 4.)

- Though Black initially made no mention of a personal relationship with Epstein, the *New York Times* reported that the pair's "connection was deeper than Mr. Black let on," and the Dechert Report found that Black "viewed Epstein as a friend"; "attended social events" with him; "confided in Epstein on personal matters"; and "regularly visited" him.  (*Compare* Decl. Ex. C at 14, *with* Ex. H, *and* Ex. A, Dechert Report at 7.)

- Black initially said he was "completely unaware" of the conduct that was the subject of Epstein's federal charges—even though he *was* aware (for roughly a decade) of Epstein's Florida state court conviction for sex crimes with a minor.  (*Compare* Decl. Ex. A, Dechert Report at 21, *with id.* at 6.)

The grand RICO conspiracy theory Black alleges in his Amended Complaint does not pass the straight-face test.  Black would have this Court believe that—*after* Black learned that Epstein was a convicted sex offender, and *after* Black understood from Epstein that he had received a massage from an underage prostitute, and *after* Black (with full knowledge of that misconduct) made tens of millions of dollars in payments to Epstein, and *after* Black paid

---

[4] Decl. Ex. C, Apollo Q2 2019 Earnings Call Transcript (July 31, 2019) at 14 (referring to "a virtual tsunami in the press on" the Epstein issue, which was a "gift that never stops giving" for the press); Ex. D, Suzanne Woodley, "Leon Black Foundation Disputes Epstein's Role After 2008 Plea," Bloomberg (July 10, 2019); Ex. E, Kate Kelly et al., "Jeffrey Epstein's Deep Ties to Top Wall Street Figures," N.Y. Times (July 22, 2019); Ex. F, Matthew Goldstein & Jessica Silver-Greenberg, "Leon Black Plays Down Ties to Jeffrey Epstein but Is Silent on 2011 Deal," N.Y. Times (Aug. 1, 2019); Ex. G, Tommy Beer, "Virgin Islands To Subpoena Billionaire Investor Leon Black In Jeffrey Epstein Case," Forbes (Aug. 23, 2020); Ex. H, Matthew Goldstein et al., "The Billionaire Who Stood by Jeffrey Epstein," N.Y. Times (Oct. 12, 2020).

Ganieva the hush money, and *after* the U.S. Attorney's Office announced that Epstein had been indicted for "sexually exploit[ing] and abus[ing] dozens of underage girls," and *after* the press widely reported on Black's personal connection with Epstein, and *after* Ganieva resurfaced in 2020 with her own team of lawyers, and *after* the press repeatedly questioned the accuracy of Black's own public statements—Harris then came on the scene in 2021 and somehow became responsible for Black's ruined reputation based on an alleged conspiracy with Ganieva, with whom Black does not (and cannot) allege Harris ever met or communicated.

The Amended Complaint implausibly attempts to conflate two separate sets of events: (1) the events at Apollo that concluded with Black's departure and (2) the lawsuit by Ganieva seeking compensation for Black's alleged abuse. Virtually all of the allegations that involve Harris concern the former—the Apollo corporate governance story. Black's self-serving characterization of his own demise at Apollo is both wildly inaccurate and gratuitously disparaging of Harris; it is also entirely beside the point.[5] Simply put, there is absolutely nothing—in the Amended Complaint or elsewhere—that connects the resolution of the Apollo corporate governance issues with Black's baseless RICO and defamation claims.

To be sure, Black's corporate governance allegations are unremarkable insofar as they describe entirely lawful and responsible conduct on the part of Harris as a top executive and fiduciary at Apollo at a time when Black's Epstein-related problems threatened to have a catastrophic impact on the firm. Black alleges, for example, that Harris: made an "effort to evict Mr. Black from the firm [Apollo]" (AC ¶ 43); kept himself informed by working with PR firms

---

[5] The Amended Complaint contains far too many sensationalized and scandalous allegations to be addressed in this motion. Suffice it to say that, while the allegations of the Amended Complaint are assumed to be true for purposes of this motion to dismiss, Harris categorically denies Black's many outrageous claims.

to "track[] public discussion" of Black (AC ¶¶ 6, 46); and pushed for additional corporate governance changes at Apollo by corresponding with a future independent Board member about installing "independent . . . minded directors" not beholden to Black (AC ¶ 56).  Black also alleges that Harris hired lawyers to advise Harris on how he could exercise his "rights in the context of Apollo's impending governance changes" (AC ¶ 43).  In other words, looking past the empty rhetoric, the Amended Complaint alleges that Harris, along with others at Apollo, appropriately sought advice and counsel from experts and Harris exercised his judgment as a fiduciary and Executive Committee member to oppose Black's continued leadership of Apollo in light of the fact that Black's relationship with Epstein was simply disqualifying.

Black seeks to convert Harris's entirely proper discharge of his duty of care into a RICO violation—by frivolously alleging that by working with lawyers and PR firms (the so-called "war council") in the midst of the crisis Black had created, Harris participated in some illicit "enterprise."  But, of course, corporate executives routinely work with lawyers and PR firms, particularly in times of crisis, and there is no law against this routine conduct.  While Black may dislike that Harris made an "effort to evict" him from Apollo (*id.*), Congress certainly never intended for RICO to be exploited as a weapon for retaliation in a corporate governance dispute—a dispute that ended with Harris voting in favor of Marc Rowan becoming CEO.[6]

Black's filing exemplifies the need this Court has recognized to "flush out frivolous

---

[6] The governance issues were resolved approximately one year ago, and Harris at all times acted in what he believed to be the best interests of Apollo.  When all was said and done, he fully supported Rowan and Apollo senior management moving forward, fully supported the Athene merger, and fully supported governance changes implemented in 2021—and continues to be Apollo's second-largest shareholder.  The tens of paragraphs that Black dedicates to falsely recharacterizing these corporate governance deliberations, as if they somehow led to the filing of a lawsuit by Ganieva, whom Harris does not even know, do not provide even the remotest basis for RICO and defamation claims.

RICO allegations at an early stage of the litigation" given the "stigmatizing effect on those named as defendants." *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 407 (S.D.N.Y. 2013) (Engelmayer, J.) (internal quotation marks omitted). Initially, Black alleged that an unnamed "Funder" paid Ganieva to break her nondisclosure contract with him and that the "Funder" paid her lawyers at Wigdor LLP to pursue litigation against Black in state court. Black now knows from discovery in the state action that he can no longer pretend this allegation is true. So, although in this action he has now named Harris as the "Funder," he has actually *dropped all of the allegations that Harris was funding Ganieva's lawsuit* and dropped Wigdor as a RICO defendant entirely. Even though the key element of Black's "factual" theory against Harris fell apart, Black made his frivolous filing against Harris anyway—misusing the federal court system as a means to create and propagate a false press narrative about Harris.

First, the Amended Complaint is bereft of any plausible allegations that Harris had any relationship with Ganieva whatsoever (the allegation that Harris "funded" Ganieva has been removed), let alone that he worked with her to do anything unlawful (he did not). Instead, Black vaguely alleges that an unnamed person, with an unexplained connection to Harris, acting at the direction of an unnamed "shadowy" faction, contacted attorney Alex Spiro—whom Black does not (and cannot) allege Harris ever met or spoke to—and asked Spiro if he could be adverse to Black on behalf of an unidentified client, with respect to matters that are unspecified. Black then alleges that some unnamed private investigators contacted Ganieva and recommended that she contact Spiro—who Ganieva did not hire[7] and who works at a law firm that represents Black.[8]

---

[7] No reading of these allegations supports the inference that Harris connected Ganieva with *Wigdor*, or is somehow responsible for facilitating her state sexual abuse claims against Black. In fact, as Black concedes, in 2020 Ganieva had retained counsel and was already actively pursuing her rights through correspondence with Black. (*See* AC ¶¶ 11, 39, 113(d).) Moreover, any insinuation that Harris was behind the investigators who showed up at Ganieva's home (….continued)

Black also alleges—without any specificity—that Harris paid public relations professionals to publicize Ganieva's publicly filed litigation against Black.  But the Amended Complaint does not establish any personal connection between Steven Rubenstein (the president of a reputable communications firm) or the "Flacks," and Ganieva or her counsel.  Even if the Court accepts the Amended Complaint's conclusory and threadbare allegations as true, Black has woefully failed to plead essential elements of his RICO claim, including the existence of an enterprise—which requires that participants functioned *as a unit*—and Harris's participation in that enterprise.

Second, Black fails to allege the predicate acts necessary to support a RICO claim, much less the requisite pattern of racketeering activity.  Black does not allege that Harris extorted him: the payments Black made to Ganieva predate any alleged involvement by Harris—and Harris is not alleged to have obtained any property from Black.  Black likewise fails to plead any facts remotely sufficient to allege mail or wire fraud.

Third, Black fails to allege that he suffered damages caused by the alleged racketeering activity.  Black paid Ganieva millions of dollars pursuant to their 2015 agreement, but he does not allege that he made those payments because of anything Harris did.  Indeed, the putative RICO enterprise is not even alleged to have existed until years later.  Black must pay to defend against Ganieva's state court lawsuit—but if the state court ultimately determines that her suit is frivolous, the proper recourse for Black is to litigate that issue and seek recovery of his fees there (not to assert a trumped-up RICO claim against Harris).  Black alleges in conclusory fashion that

(continued….)

makes no sense—that visit occurred *after* Ganieva tweeted about Black (AC ¶ 63), by which time Ganieva supposedly was already "in league with" and being advised by "others" (AC ¶ 10).

[8] Spiro's firm withdrew from representing Black in this matter after he filed his Amended Complaint, but continues to represent him in the state litigation.

he lost "business opportunities," but does not identify any opportunities or their purported value. Regardless, it is clear that Black's own misconduct, which destroyed his reputation prior to any alleged RICO enterprise, is what caused him to lose out on these phantom "opportunities."

Finally, Black's defamation claim against Harris fails for the simple reason that he does not point to a single statement made by Harris—let alone one that is untrue or defamatory.

Black tellingly acknowledges in his Amended Complaint that the alleged "conspiracy" he has advanced "may not look like a traditional RICO case."  (AC ¶ 108.)  That is because it is not a RICO case at all.  Black's attempt to misuse the federal judiciary as a means to issue a press release and to undermine Ganieva's state court case—dressed up as an Amended Complaint that tells a fictional tale about Harris in a misguided effort to divert the attention of the public, and those close to Black, away from his relationships with Epstein and Ganieva—should be dismissed swiftly and with prejudice.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In other words, unless a plaintiff's well-pleaded allegations have "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."[9]  *Twombly*, 550 U.S. at 570.

---

[9] In deciding a Rule 12(b)(6) motion, a court may "consider documents attached to the complaint, statements or documents incorporated into the complaint by reference, matters of which judicial notice may be taken, public records, and documents that the plaintiff either possessed or knew about, and relied upon, in bringing the suit."  *Days v. Eastchester Police Dep't*, No. 18-CV-11538 (NSR), 2020 WL 5504433, at *1 (S.D.N.Y. Sept. 9, 2020).  That
(….continued)

With respect to allegations sounding in fraud, Rule 9(b) imposes a heightened pleading standard, which requires plaintiffs to "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), and to "allege facts that give rise to a strong inference of fraudulent intent," *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995).

Dismissal of legally insufficient RICO claims is especially important given those claims' inevitable stigmatizing effect.  As this Court has acknowledged:

> The Court has a duty to critically assess RICO claims at the threshold, to assure that a plaintiff's claim of a RICO violation is not used improperly as a club to bludgeon settlement or surrender without reciting legally sufficient allegations. Because the mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.

*Kalimantano*, 939 F. Supp. 2d at 407 (internal quotation marks omitted).[10]

## ARGUMENT

## I.      BLACK FAILS TO ALLEGE THE ELEMENTS OF A RICO CLAIM

To state a claim for a violation of Section 1962(c) of the RICO statute, a plaintiff must plausibly allege (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity by the defendant, as well as (5) injury to the plaintiff's business or property resulting from the violation.  *Foster*, 2015 WL 7587360, at *3.  The Amended Complaint does not

---

(continued….)

includes news articles for the fact of their publication, *e.g.*, *HB v. Monroe Woodbury Cent. Sch. Dist.*, No. 11-CV-5881 (CS), 2012 WL 4477552, at *5 (S.D.N.Y. Sept. 27, 2012), and press releases and earnings call transcripts for the statements they contain, *In re Express Scripts Holding Co. Sec. Litig.*, No. 16 CIV. 3338 (ER), 2018 WL 2324065, at *1 n.1 (S.D.N.Y. May 22, 2018), *aff'd*, 773 F. App'x 9 (2d Cir. 2019).

[10] *See also Foster v. 2001 Real Est.*, No. 14 CIV. 9434 (RWS), 2015 WL 7587360, at *3 (S.D.N.Y. Nov. 24, 2015) ("Alleged RICO violations must be reviewed with appreciation of the extreme sanctions it provides, so that actions traditionally brought in state courts do not gain access to treble damages and attorney's fees in federal court simply because they are cast in terms of RICO violations." (internal quotation marks omitted)).

establish these elements, and a failure to allege any one of them is fatal to Black's RICO claim.

### A.     Black Fails to Allege the "Conduct of an Enterprise"

An association-in-fact enterprise, like the one Black claims exists here (AC ¶ 111), requires plausible allegations demonstrating both "interpersonal relationships between those associated with the enterprise" and that those related individuals shared a "common purpose." *Foster*, 2015 WL 7587360, at *4.   Additionally, RICO claims require "proof that the conspirators formed and organized a separate entity (whether formal or informal) on whose behalf they acted; it is not enough if they merely acted together to commit the wrong." *Wild Edibles, Inc. v. Indus. Workers of the World Loc. 460/640*, No. 07 CIV. 9225 (LLS), 2008 WL 4548392, at *1 (S.D.N.Y. Oct. 9, 2008).   A plaintiff must allege "solid information regarding the hierarchy, organization, and activities of the alleged enterprise, from which [the Court] could fairly conclude that its members functioned ***as a unit***." *Id.* (emphasis added) (internal quotation marks omitted).   The Amended Complaint falls well short of this standard.

As an initial matter, the allegations of the existence of an enterprise fail because the Amended Complaint does not plausibly identify ***any interpersonal relationship*** between Harris and either Ganieva or her counsel.   The Amended Complaint ***does not (and cannot) allege*** that:

- Harris ever met, or had any contact with, Ganieva;

- Harris ever had any contact with Wigdor (and indeed, Black has dropped all allegations that Harris is paying Wigdor's fees in connection with Ganieva's state case);[11]

- Harris was involved in the allegedly "extortionate" litigation strategy or delay tactics employed by Ganieva and Wigdor—despite the fact that her supposedly fraudulent lawsuit is the cornerstone of the alleged conspiracy; or that

- Ganieva had any contact with the individuals at Apollo alleged to have been involved in

---

[11] Black alleges conclusorily on "information and belief" that Wigdor was "working closely with one of the members of Mr. Harris's war council on another high profile case."  (AC ¶ 11.)

Apollo's corporate governance issues.

Nor does the Amended Complaint contain ***any allegations*** supporting the inference that Ganieva or her counsel had ***any interpersonal relationship*** with Rubenstein or any other public relations firm.  It does not plead, for example, that:

- Ganieva was involved in Harris's retention of public relations firms (which engagements occurred well before she filed her lawsuit (AC ¶ 44)); or that

- Ganieva or Wigdor ever hired, worked with, communicated with, or met Rubenstein, the "Flacks," or any public relations firm.

In short, there is no link between Harris and Ganieva or her counsel, nor is there any connection between Ganieva or her counsel and Rubenstein (or the "Flacks").  Indeed, the pleading is devoid of all detail as to "the internal organization of the alleged enterprise; the role [any] party played; the means or methods by which the enterprise operated; or how the profits were distributed between the parties."  *Greenberg v. Blake*, No. 09 Civ. 4347 (BMC), 2010 WL 2400064, at *2 (E.D.N.Y. June 10, 2010).  Black has offered no particulars, much less "solid information," from which this Court can infer that defendants were acting "as a unit," and so the claim must be dismissed.  *Wild Edibles, Inc.*, 2008 WL 4548392, at *1.

Nor does Black present a coherent theory as to what was the "common purpose" shared by Harris, his public relations team, and Ganieva.  The Amended Complaint alleges that Ganieva "hopes to increase [her] ill-gotten gains by pursuing Mr. Black through her escalating campaign of fraudulent litigation and publicity."  (AC ¶ 104.)  While Black suggests Ganieva's purpose might be to settle her litigation for the highest possible figure, there are no factual allegations from which a plausible inference can be drawn that Harris shares that purpose.  It is not alleged that there is any "profit sharing" with Ganieva or that Harris would benefit from any out-of-court settlement.  *See D. Penguin Bros. v. City Nat'l Bank*, 587 F. App'x 663, 668 (2d Cir. 2014) (dismissing claim where, *inter alia*, "any allegations that [defendant] benefited in any way from

the alleged enterprise" were "[n]otably absent"). In fact, Black's initial pleading alleged just the opposite—that a "Funder" was paying Ganieva. If anything, Ganieva's litigation is against Harris's financial interests because the publicity surrounding the case has allegedly harmed Apollo (AC ¶ 124), and Harris is Apollo's second-largest shareholder.

Rather, Black suggests that Harris was seeking to "retaliate" against Black after he did not become CEO at Apollo, and therefore "join[ed] forces" with Ganieva. (AC ¶ 104.) Even assuming defendants shared a mutual antipathy toward Black, this does not amount to sharing a "common purpose" for purposes of the RICO statute. At most, Black alleges that Ganieva and her lawyers, and Harris and his public relations team, were separately using Ganieva's lawsuit for their own respective interests. Black "fail[s] to provide a plausible basis for inferring that [defendants] acted on behalf of the *enterprise* as opposed to on behalf of [themselves] in their individual capacities, to advance their individual self-interests." *D. Penguin Bros.*, 587 F. App'x at 668 (internal quotation marks omitted); *Foster*, 2015 WL 7587360, at *4 (dismissing claim that failed to establish "association-in-fact distinct from the individuals themselves").

Equally fatal is the lack of well-pleaded allegations concerning Harris's participation "in the operation or management of the enterprise," for example, by "exert[ing] control" over its affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 184-85 (1993). The Amended Complaint makes only conclusory allegations that Harris paid and "encouraged" Rubenstein to engage in a public relations plan that benefited Ganieva, but does not allege that Harris is managing or controlling, or has any input on the content of, Ganieva's pleadings or her litigation strategy, which are at the core of the alleged enterprise. To the extent the Amended Complaint alleges that Harris has merely "***encouraged*** and ***assisted*** the Enterprise in its efforts to extort Mr. Black" (AC ¶ 27 (emphasis added); *see* AC ¶¶ 117-18), there is no civil liability for aiding and abetting a RICO

13

claim, *Dep't of Econ. Dev. v. Arthur Anderson & Co.*, 924 F. Supp. 449, 475 (S.D.N.Y. 1996).

### B.      Black Fails to Allege Harris Engaged in Two Predicate Acts

To state a RICO claim, a plaintiff must allege the defendant committed at least "two

predicate acts of 'racketeering activity.'" *Procapui-Productores de Camaroes de Icapui Ltda. v.*

*Layani*, No. 07-CV-6627 (BSJ), 2008 WL 3338199, at *2 (S.D.N.Y. Jan. 11, 2008).

The Amended Complaint contains only scant allegations of conduct by Harris including:

- "[O]n information and belief," Harris somehow "caus[ed]"—in an unidentified and unspecified manner—an unidentified "emissary" to contact law firms about legal action against Black (which is speculated to be related to Ganieva, though there is no allegation Harris connected Ganieva with Wigdor or spoke to either party); and

- "[O]n information and belief," Harris "provid[ed] payments and/or promises to pay" Rubenstein and the other public relations firms to disseminate documents publicly filed in the state court action and to inform the press of the New York County District Attorney's standard criminal investigation following Ganieva's sexual assault claims.

(AC ¶ 115.)  Because none of this conduct comes close to constituting extortion or mail/wire

fraud, the civil RICO claim as to Harris must be dismissed.

#### 1.      Black Fails to Allege Extortion Under the Hobbs Act

Extortion under the Hobbs Act requires "the obtaining of property from another, with his

consent, induced by wrongful use of actual or threatened force, violence, or fear."  18 U.S.C.

§ 1951(b)(2).  Accordingly, Black must allege that Harris pursued or received "something of

value . . . that [he] could exercise, transfer or sell." *Scheidler v. Nat'l Org. for Women, Inc.*, 537

U.S. 393, 405 (2003).  But Black does not allege that Harris received any benefit or profit from

the purported racketeering activity.  Black does not, because he cannot, claim that Harris has

extorted or attempted to extort any money (or other value) from him.  There is no authority to

support the notion that either (1) inquiring as to a lawyer's conflicts or (2) paying a public

relations firm to engage with the press concerning public materials qualifies as extortion.

Black claims that Harris's actions "assisted" Ganieva's efforts to extort Black into

14

providing "additional consideration."  (AC ¶ 117(e).)  There is no allegation that Harris was in

any way involved in Ganieva's alleged efforts to extort Black that resulted in her 2015

agreement, or offered any assistance to Ganieva before 2021.  Black repeatedly admits that

beginning in October 2015 he "allowed himself to be extorted" by Ganieva.  (AC ¶ 2; *see also id.*

¶ 8 ("Ms. Ganieva had managed to extort Mr. Black after their relationship ended" in 2014).)

The extortion allegations relating to Ganieva's 2021 lawsuit fail as a matter of law.  Because

litigation activity (up to and including the filing of frivolous or malicious complaints) does not

amount to extortion, Harris's alleged and unspecified assistance in Ganieva's lawsuit cannot

constitute extortion either.  *See, e.g.*, *Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018)

("[A]llegations of frivolous, fraudulent, or baseless litigation activities—without more—cannot

constitute a RICO predicate act."); *Ritchie v. N. Leasing Sys., Inc.*, No. 12-CV-4992 (KBF), 2016

WL 1241531, at *13 (S.D.N.Y. Mar. 28, 2016), *aff'd sub nom. Ritchie v. Taylor*, 701 F. App'x

45 (2d Cir. 2017) (collecting cases); *FindTheBest.com, Inc. v. Lumen View Tech. LLC*, 20 F.

Supp. 3d 451, 457 (S.D.N.Y. 2014) (holding that "the instigation of meritless litigation cannot

constitute extortion under the Hobbs Act").  Moreover, in the absence of any allegation that

Harris had a "profit sharing" arrangement or otherwise stood to benefit from any "extortionate"

payments made to Ganieva, the Amended Complaint fails to allege that Harris was pursuing

"something of value," as required under the Hobbs Act.  Indeed, as discussed, Black concedes

Ganieva's litigation was against Harris's economic interests.

2.   <u>Black Fails to Allege Any Mail or Wire Fraud</u>

Nor does the Amended Complaint plead mail or wire fraud by Harris, which requires

(1) a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and

(3) the use of the U.S. mails or wires in furtherance of the scheme.  *S.Q.K.F.C., Inc. v. Bell Atl.*

*TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996).  The "gravamen" of mail or wire fraud is

the "scheme to defraud," which requires proof "that the misrepresentations were material" and "that the defendant acted with fraudulent intent." *Malvar Egerique v. Chowaiki*, No. 19 Civ. 3110 (KPF), 2020 WL 1974228, at *10 (S.D.N.Y. Apr. 24, 2020), *vacated in part on other grounds*, *Weiss v. David Benrimon Fine Art LLC*, No. 20-3842-CV, 2021 WL 6128437 (2d Cir. Dec. 28, 2021) (internal quotation marks and citations omitted).  A plaintiff must "particularize and prove **each** defendant's participation in the fraud." *Procapui-Productores*, 2008 WL 3338199, at *2 (emphasis added); *W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch*, No. 03 Civ. 8606RWS, 2004 WL 2187069, at *7 (S.D.N.Y. Sept. 29, 2004).  Rule 9(b)'s particularity requirements also apply.  *See Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013).

Black's allegations concerning an alleged associate's contact with Alex Spiro and alleged consideration paid to a public relations team to publicize Ganieva's case (AC ¶ 118(e)) fail to satisfy this standard.  Black fails to identify **any** misrepresentations made by Harris, much less any other specifics of the alleged fraud (such as who was defrauded and how).  The Amended Complaint merely alleges that Harris assisted Ganieva in "making good on her threats" and "attempting to induce" additional payments from Black "under fraudulent pretenses through interstate mails and/or wires."  (*Id*.)  These conclusory allegations are insufficient to plausibly allege a fraud, and certainly do not meet Rule 9(b)'s particularity requirements.  *See Procapui-Productores*, 2008 WL 3338199, at *3 (dismissing claim for failure to particularize the "when, where and why" aspects of mail and wire fraud predicates and identify fraudulent statements).

Courts in this Circuit have rejected similar attempts to shoehorn the filing of an allegedly "fraudulent" lawsuit, or the making of purportedly false and defamatory remarks, into the framework of a RICO claim.  The Second Circuit has made clear that where "a plaintiff alleges that a defendant engaged in a single frivolous, fraudulent, or baseless lawsuit, such litigation

16

activity alone cannot constitute a viable RICO predicate act." *Kim*, 884 F.3d at 105.  Because Ganieva's lawsuit does not qualify as mail or wire fraud or any other viable RICO predicate, Harris's attenuated relationship to the lawsuit likewise does not.[12]  Similarly, courts have rejected allegations of wire fraud that "are—at best—thinly clothed defamation claims." *Hollander v. Pressreader, Inc*., No. 19-CV-2130 (AJN), 2020 WL 2836189, at *4 (S.D.N.Y. May 30, 2020) (quoting *Kimm v. Lee*, No. 04 CIV. 5724 (HB), 2005 WL 89386, at *4 (S.D.N.Y. Jan. 13, 2005), *aff'd*, 196 F. App'x 14 (2d Cir. 2006)).  It is "firmly established" that a defamation claim does not qualify as a predicate act for purposes of civil RICO.  *Kimm*, 2005 WL 89386, at *5.  Indeed, no court has enabled a civil RICO claim to survive a motion to dismiss when the defendant's sole relevant activities had been to engage legitimate PR firms.

Second, Black fails to allege any "factual basis which gives rise to a strong inference of fraudulent intent."  *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (internal quotation marks omitted).  The alleged fraudulent scheme concocted in the Amended Complaint hinges on Black's self-serving assurances that Ganieva's litigation claims are false. But conclusory statements that "there is no way [Ganieva's] co-Defendants did not know" and "Defendants' scienter is established by the pattern of intentional and knowing material misrepresentations" (AC ¶¶ 104, 116) are insufficient.  Black never alleges facts supporting that Harris knew, or had any reason to believe, that Ganieva's claims were untrue.  The absence of such factual allegations—much less facts giving rise to a "strong inference of fraudulent intent"—is fatal to his claim.  *Malvar Egerique*, 2020 WL 1974228, at *16 (finding no

---

[12] Black attempts to distinguish *Kim* by arguing that the "Enterprise operated ***not to increase the chance of success in court, but to increase the pressure to pay the blackmailer out of court***, to brand the target, to extort him for money by convicting him in the court of public opinion."  (AC ¶ 107 (emphasis added).)  But that argument would apply to any baseless lawsuit because the filer is always seeking to achieve some beneficial out-of-court effect.

"inference of fraudulent intent" where plaintiff did not allege that defendants had any knowledge artwork at center of alleged conspiracy was stolen); *see also O'Brien*, 936 F.2d at 677 (failure to allege "particulars regarding [defendant's] purported discovery" that statement was untruthful "is the very type of unsubstantiated allegation that Rule 9(b) prohibits").

Finally, Black fails to allege even that Harris ever used U.S. mails or wires in furtherance of the alleged fraudulent scheme.[13]  *See W. 79th St. Corp.*, 2004 WL 2187069, at *7, *23 (failure to allege fraud without "allegations as to how interstate mails and wire were used by Defendants to accomplish [their] goal or which Defendants are alleged to have acted in such a manner").

### C.      Black Fails to Allege Any "Pattern of Racketeering Activity"

The "pattern of racketeering activity" element of a RICO claim requires "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. N.W. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).  To plead continued criminal activity, a plaintiff "must allege either an open-ended pattern of racketeering activity (*i.e.*, past criminal conduct coupled with an adequately pled threat of future criminal conduct) or a closed-ended pattern of racketeering activity (*i.e.*, past criminal conduct extending over a substantial period of time)."  *Cont'l Petrol. Corp. v. Corp. Funding Partners, LLC*, No. 11 CIV. 7801 (PAE), 2012 WL 1231775, at *7 (S.D.N.Y. Apr. 12, 2012) (internal quotation marks omitted). Black's RICO claim against Harris does not allege continuity or relatedness.

As a threshold matter, "[c]ourts have uniformly and consistently held that schemes" like

---

[13] Black cannot argue that this requirement is satisfied by payments Harris might have made to public relations firms.  First, Black does not set out with any particularity that any payment Harris allegedly made to a public relations firm was effectuated using the mails or wires, much less how such payment was linked to the purported racketeering enterprise.  Second, Black does not even allege definitively that Harris made any payments to a public relations firm at all— instead stating on "information and belief" that the public relations firms "were paid (or ***promised to be paid***) by Mr. Harris."  (AC ¶¶ 20 (emphasis added), 118(e).)

the one alleged here "involving a single, narrow purpose and one or few participants directed towards a single victim do not satisfy the RICO requirement of a closed or open pattern of continuity." *Lefkowitz v. Bank of N.Y.*, No. 01 Civ. 6252 VM, 2003 WL 22480049, at *8 (S.D.N.Y. Oct. 31, 2003), *rev'd on other grounds*, 528 F.3d 102 (2d Cir. 2007); *D.R.S. Trading Co. v. Fisher*, No. 01 Civ. 8028 (WHP), 2002 WL 1482764, at *4 (S.D.N.Y. July 10, 2002) (concluding scheme involving "limited number of perpetrators, small number of victims, and limited goal . . . cannot support a claim of open-ended or closed-ended continuity"). Black cannot allege the continuity element on this basis alone.[14]

Black cannot establish closed-ended continuity for the additional reason that the putative enterprise was allegedly formed only last year. "[C]losed-ended continuity is primarily a temporal concept" and the relevant time period "is the time during which RICO predicate activity occurred." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008). In the Second Circuit, a "period of less than two years" is not a "substantial period of time" sufficient to find closed-ended continuity. *Nightingale Grp., LLC v. CW Capital Mgt., LLC*, No. 11 Civ. 9293 (PAE), 2012 WL 2674539, at *6 (S.D.N.Y. July 5, 2012) (internal quotation marks omitted). While Black is purposefully vague about dates, the alleged predicate

---

[14] Black's attempt to sidestep well-settled law by alleging that Apollo "was victimized as well" (AC ¶ 124) does not assist his claim. First, this is irrelevant because none of the alleged predicate acts were directed at Apollo. Second, to the extent Apollo was "deprived of the services of its founder and Chairman," *i.e.*, Black (*see id.*), it was due to Black's own decision to step down in March 2021. In addition, though Black now claims he retired out of concern that an April 8, 2021 press story about his affair with Ganieva would damage him (AC ¶ 67), that article was published weeks *after* he announced in March 2021 that he was retiring. At the time, he said he was stepping down due to his and his wife's health issues, and he reiterated to the press in April 2021 that Ganieva "had nothing to do with . . . [his] decision to step away from the firm." (Decl. Ex. I, Gillian Tan, "Black Says He Paid to Hide Affair, Denies It Led to Apollo Exit," Bloomberg (Apr. 8, 2021) (cited in AC ¶ 67).) Third, Harris is a founder of Apollo, as well as its second-largest shareholder, and thus Black implausibly suggests that Harris participated in a RICO conspiracy in which Harris himself was a victim.

activities began no earlier than January 2021, when Harris's unnamed emissary supposedly reached out to law firms about claims against Black (AC ¶ 9), and extended into the fall of 2021 (AC ¶¶ 117-18, 122). This nine- or ten-month period falls far short of what the law requires. *See, e.g.*, *Spool*, 520 F.3d at 184 (16-month period insufficient); *Nightingale Grp.*, 2012 WL 2674539, at *7 (13-month period insufficient); *Westgate Fin. Corp. v. Beinoni of N.Y. Inc.*, No. 10 Civ. 8102 (TPG), 2012 WL 219334, at *3 (S.D.N.Y. Jan. 25, 2012) (one-year period insufficient); *Cont'l Petroleum Corp.*, 2012 WL 1231775, at *7 (9-month period insufficient).

Black also fails to allege open-ended continuity, which requires "a threat of continuing criminal activity beyond the period during which the predicate acts were performed," *Cont'l Petroleum Corp.*, 2012 WL 1231775, at *7 (internal quotation marks omitted), because there is no allegation that Harris will continue to pay a public relations team to publicize future case filings or that he otherwise poses a continued threat to Black. Black's conclusory allegations that defendants will continue to make filings in the state litigation and the press will continue to publish them (AC ¶ 122) fail to address future conduct *by Harris*. Even if these allegations referenced Harris, they would fail because the state court litigation is *inherently terminable*. *Spool*, 520 F.3d at 186 (holding "inherently terminable" scheme did not pose threat of continued criminal activity, thereby precluding open-ended continuity); *Lefkowitz*, 2003 WL 22480049, at *9 (concluding once administration of estate ended, the alleged threat of future criminal activity presumably would end with it).[15]

---

[15] In addition, the alleged predicate acts are not "related." Predicates must be related to each other ("horizontal relatedness") and to the enterprise as a whole ("vertical relatedness"). *Reich v. Lopez*, 858 F.3d 55, 60 (2d Cir. 2017). The RICO claims against Ganieva are premised in large part on her alleged "extortionate" conduct during her years-long affair with Black (AC ¶ 113(a-e)), which the Amended Complaint does not link to Harris. And, as discussed above, Black fails to adequately link the predicate acts related to Ganieva's state court case (filing an allegedly false complaint and claim with the District Attorney, and self-promoting, in the hope of receiving

(....continued)

### D.    Black Fails to Allege Harris Caused Him Any Injury

Finally, Black's RICO claim against Harris fails because he does not allege any cognizable injury.  A RICO "plaintiff must allege that he was 'injured in his business or property *by reason of* a violation of section 1962.'"  *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (quoting 18 U.S.C. § 1964(c)) (emphasis in original).  In addition, a plaintiff must plead facts demonstrating an "amount of damages" that is "clear and definite."  *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994).

In the Amended Complaint, Black identifies his damages as including: (1) "a £2 million payment [to Ganieva in 2015]"; (2) "forgiveness of two loans of $480,000 [to Ganieva] that had been accruing interest at 5% per annum for two and four years, respectively," dating from 2015; (3) "monthly payments of $100,000 from October 2015 through March 2021"; (4) "substantial costs defending against Defendants' sham lawsuits and media campaign"; and (5) "loss of business opportunities."[16]  (AC ¶ 123.)

The first three items—and the only ones that are even arguably pleaded with the requisite specificity—concern monies paid to Ganieva pursuant to an October 2015 settlement between

---

(continued....)

additional payments (AC ¶ 113(f-k))) with Harris's alleged predicate acts (asking an associate to reach out to an attorney about unspecified claims against Black, and encouraging Apollo's longstanding and reputable public relations firm to spread bad press against Black (AC ¶ 115(a-c))).  Harris also was not "enabled to commit" the alleged predicate acts "solely because of his position in the enterprise or his involvement in or control over [its] affairs, or because the offense[s] related to" its activities.  *Reich*, 858 F.3d at 61 (internal quotation marks omitted).

[16] Allegations concerning Apollo's putative reputational injuries (AC ¶ 124) are insufficient for at least two reasons.  First, RICO only compensates victims for injury to their "business or property."  18 U.S.C. § 1964(c).  Black does not identify any quantifiable, non-speculative harm to Apollo.  *See Nygard v. Bacon*, No. 19 Civ. 1559 (LGS), 2021 WL 3721347, at *4 (S.D.N.Y. Aug. 20, 2021).  Second, any injury to Apollo is an injury to a third party, not to Black's business or property.  *See Rand v. Anaconda-Ericsson, Inc.*, 794 F.2d 843, 849 (2d Cir. 1986) (shareholders lacked standing to assert RICO claim against corporation's creditor).

Ganieva and Black.  This settlement predates the alleged formation of the RICO enterprise, and has no connection to Harris whatsoever.

The remaining damages that Black claims—the "substantial costs" of defending himself and the "loss of business opportunities"—are both insufficiently definite for the purposes of civil RICO because they are not quantified or detailed in any way.  With respect to the litigation costs, in the absence of any well-pleaded allegation that Harris filed, or is otherwise directing, the state court litigation against Black, Harris cannot be held responsible for the costs of defending that suit.  And any costs that Black incurs in the state lawsuit are not compensable under civil RICO because the extent of Black's injury depends on the outcome of the state court proceedings.[17] *See Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135-36 (2d Cir. 2003).

Black's threadbare assertion that he suffered a "loss of business opportunities" is insufficiently definite to plead a civil RICO injury in the absence of any specific instances where Black lost income.  *See, e.g.*, *Nygard*, 2021 WL 3721347, at *6 (dismissing RICO claims for failure to "allege facts demonstrating that the alleged loss of business opportunities resulted in quantifiable and non-speculative harm"); *Petroff Amshen LLP v. Alfa Rehab PT PC*, No. 19-CV-1861 (MKB)(RML), 2021 WL 960394, at *12 (E.D.N.Y. Mar. 15, 2021), *aff'd*, No. 21-847, 2022 WL 480475 (2d Cir. Feb. 17, 2022) (failure to allege injury where "allegations fail to identify specific instances of lost business and only conclusorily allege potential lost clients based on reputational harm").  Regardless, these supposed lost opportunities—if any exist— would be attributable to Black's own misconduct, namely choosing to maintain and cultivate a

---

[17] To the extent Black claims the costs of responding to the press as civil RICO damages, such damages are improper, as "reputational harm is not a cognizable injury under RICO."  *Santana v. Adler*, No. 1:17-cv-06147(AT)(SDA), 2018 WL 2172699, at *7 (S.D.N.Y. Mar. 26, 2018), *report and recommendation adopted*, 2018 WL 2170299 (S.D.N.Y. May 10, 2018).

relationship with Epstein, a known sex offender, and conducting an affair with Ganieva that culminated in nearly $10 million in hush money payments.  Indeed, as the Amended Complaint acknowledges, and the public record confirms, Black's relationship with Epstein had been the focus of sustained media attention for months before the alleged racketeering activities took place.  (*See, e.g.*, AC ¶¶ 40, 41; Decl. Exs. C-H.)  Under these circumstances, it is hard to imagine how the alleged enterprise caused Black any incremental injury.

## II.      BLACK'S RICO CONSPIRACY CLAIM SHOULD ALSO BE DISMISSED

"[A] complaint must adequately state a claim under §§ 1962(a), (b), or (c) in order for the Court to find a violation of § 1962(d)."  *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 428 (S.D.N.Y. 2007).  Because Black has failed to allege any underlying Section 1962 claim, the Court must also dismiss his Section 1962(d) conspiracy claim.  *See, e.g.*, *Cont'l Petroleum Corp.*, 2012 WL 1231775, at *8.  Moreover, even had Black adequately alleged a RICO claim as to another defendant, his conspiracy claim as to Harris would still fail because the Amended Complaint contains no well-pleaded allegations that Harris "knew about and agreed to facilitate" a pattern of racketeering activity, as required to establish liability under Section 1962(d).  *Id.* (internal quotation marks omitted).  Indeed, the Amended Complaint does not (and cannot) allege that Harris ever met or spoke to Ganieva or her counsel.  Black's conclusory on "information and belief" allegations that Harris agreed to conspire with the other defendants (AC ¶ 127) are insufficient to establish a conscious agreement among the defendants to commit the predicate acts.  *See Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*, No. 15-CV-3784 (PKC), 2016 WL 6110565, at *9 (S.D.N.Y. Aug. 4, 2016) (dismissing Section 1962(d) claim where plaintiffs failed to plausibly allege that defendants were aware of each other's existence).

## III.     BLACK'S DEFAMATION CLAIM SHOULD BE DISMISSED

The allegations against Harris regarding the defamation claim cannot survive a Rule

12(b)(6) motion because the Amended Complaint does not identify a single statement Harris made concerning Black, much less a defamatory statement.[18] *See Chau v. Lewis*, 771 F.3d 118, 127 (2d Cir. 2014) (elements of defamation include, among other things, a "defamatory factual statement concerning the plaintiff"); *Yukos Cap. S.A.R.L. v. Feldman*, No. 15-CV-4964 (LAK), 2016 WL 183360, at *1 (S.D.N.Y. Jan. 11, 2016) (explaining that to allege defamation the complaint must provide a defendant adequate notice of the communications complained of).

Black's defamation allegations rest on the theory that statements made in Ganieva's state court pleadings (and related statements to the public) were false and defamatory.  (AC ¶¶ 143-44.)  But "[i]t is axiomatic that a defendant cannot be held liable for a libelous statement that [he] did not write or publish," *Khan v. N.Y. Times Co.*, 269 A.D.2d 74, 80 (1st Dep't 2000), and Black does not allege that ***Harris*** said anything, let alone something defamatory.  The only roles that Harris is alleged to have played are "coordinat[ing]" with the other defendants on Ganieva's pleadings, and "fund[ing] and actively encourag[ing]" them to communicate those pleadings to the press.  (AC ¶¶ 137-38.)  But these allegations do not (and cannot) satisfy the requirement of pleading an actionable statement for purposes of a defamation claim.  Courts have repeatedly held that "bare allegations that [one] supported, encouraged, and relied on the alleged false statements, without more, do not meet the pleading threshold imposed by *Iqbal* and *Twombly*." *Stevens v. New York*, 691 F. Supp. 2d 392, 399 (S.D.N.Y. 2009); *see Ramsaran v. Abraham*, No. 15-CV-10182 (JPO), 2017 WL 1194482, at *4 (S.D.N.Y. Mar. 30, 2017) (rejecting allegations that defendant "aided, abetted, supported, and contributed" to co-defendant's statements).

---

[18] If the Court dismisses the federal RICO claims, judicial economy, convenience, and fairness support exercising supplemental jurisdiction over Black's threadbare defamation claim as to Harris and dismissing it.  *Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d 45, 81 (E.D.N.Y. 2020) (adjudicating and dismissing state law defamation claim after dismissing RICO claims).

Even if the Amended Complaint had identified a statement by Harris relating to Ganieva's state court pleadings, that statement would be immune from liability because under Section 74 of the New York Civil Rights Law, a "civil action cannot be maintained . . . for the publication of a fair and true report of any judicial proceeding." N.Y. Civ. Rights Law § 74. Black's claim is barred by Section 74 because he does not allege that any of the publicity surrounding Ganieva's state lawsuit misstated or mischaracterized her pleadings. *Doe v. Baram*, No. 20 CIV. 9522 (ER), 2021 WL 4847076, at *5 (S.D.N.Y. Oct. 15, 2021) (press release that "accurately convey[ed] the content already pleaded in the Complaint" was "a true and fair report of judicial proceedings immune under Section 74"). Even assuming Black is correct that Ganieva's claims are a "sham," he still provides no reason why Section 74's protections do not apply as to Harris. The Amended Complaint does not contain a single well-pleaded allegation that Harris played any role in preparing Ganieva's alleged "sham" pleadings. *WA Route 9, LLC v. PAF Cap. LLC*, 136 A.D.3d 522, 522 (1st Dep't 2016) (statements about sham pleading were immune where defendant did not participate in drafting pleading); *see Napoli v. N.Y. Post*, 175 A.D.3d 433, 434 (1st Dep't 2019) (same). Indeed, the fact remains that Black does not (and cannot) allege that Harris ever met or spoke to Ganieva or her representatives.

## CONCLUSION

The Amended Complaint does not come close to alleging a cognizable claim. The Court should reject Black's efforts to use this forum to blame Harris for problems that are of Black's own making and should grant Harris's motion and dismiss these meritless claims *with prejudice*. Black has already amended his pleading in response to two motions to dismiss and a motion for sanctions, which put him on notice of his claims' multiple and significant pleading defects. There is no reason to believe he will be able to cure these defects, but every reason to expect he will continue to peddle these false narratives in any available forum to serve his own PR agenda.

Dated: March 4, 2022
      New York, New York

Respectfully submitted,

**DAVIS POLK & WARDWELL LLP**


By: */s/ Paul Spagnoletti*
Paul Spagnoletti
Martine M. Beamon
Matthew Cormack
Lindsay Schare
450 Lexington Avenue
New York, New York 10017
212-450-4000

*Attorneys for Defendant Josh Harris*