M3a2BlaC

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
3   LEON BLACK,
4                   Plaintiff,              New York, N.Y.
5            v.                             21 Civ. 8824 (PAE)
6   GUZEL GANIEVA, et al.,
7                   Defendants.
8   ------------------------------x        Conference
9                                          March 10, 2022
                                           9:00 a.m.
10
    Before:
11
                        HON. PAUL A. ENGELMAYER,
12
                                           District Judge
13

14                            APPEARANCES
15
16  ESTRICH GOLDIN, LLP
         Attorneys for Plaintiff
17  BY:  SUSAN ESTRICH
         ANYA GOLDIN
18
         - and -
19
20  KELLOGG HUBER HANSEN TODD EVANS & FIGEL, PLLC
         Attorneys for Plaintiff
21  BY:  REID FIGEL

22  LAW OFFICE OF KEVIN MINTZER, P.C.
         Attorneys for Defendant Ganieva
23  BY:  KEVIN T. MINTZER
         LAURA KOISTINEN
24
25
```

M3a2BlaC

1                                     APPEARANCES
                                     (continued)
2

3    RIVKIN RADLER, LLP
          Attorneys for Defendant Wigdor, LLP
4    BY:  MAX GERSHENOFF
          JANICE J. DiGENNARO
5

6    DAVIS POLK & WARDWELL, LLP
          Attorneys for Defendant Harris
7    BY:  PAUL SPAGNOLETTI
          LINDSAY SCHARE
8

9    SUSMAN GODFREY, LLP
          Attorneys for Defendant Rubenstein
10   BY:  JACOB W. BUCHDAHL

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M3a2BlaC

```
1              (Case called)
2              THE DEPUTY CLERK:  Counselors, starting at the front
3      table, state your appearance starting on my right.
4              MS. ESTRICH:  My name is Susan Estrich, may it please
5      the Court, and I represent Leon Black.
6              THE COURT:  Good morning.
7              MR. FIGEL:  Good morning, your Honor.  Reid Figel,
8      representing the plaintiff, Leon Black.
9              THE COURT:  Good morning.
10             MS. GOLDIN:  Good morning.  Anya Goldin, representing
11     the plaintiff, Leon Black.
12             THE COURT:  Good morning.  Front table may all be
13     seated.
14             I think the rest of the way we will go by defense
15     group.  So for Defendant Ganieva, who do I have, first of all,
16     at the table?
17             MR. MINTZER:  Kevin Mintzer, your Honor.
18             THE COURT:  Good morning to you.
19             MR. MINTZER:  Good morning.
20             THE COURT:  And the rest of the legal team for
21     Ms. Ganieva.
22             MR. MINTZER:  Laura Koistinen from my office.
23             THE COURT:  Good morning to you.
24             MS. KOISTINEN:  Good morning.
25             THE COURT:  For the Wigdor defendant who do I have.
```

M3a2BlaC

1              MR. GERSHENOFF:  Good morning, your Honor.  For

2     Wigdor, you have Max Gershenoff and with me today is my partner

3     Janice DiGennaro who is also appearing.

4              THE COURT:  Good morning to you.

5              MS. DiGENNARO:  Good morning.

6              THE COURT:  For defendant Josh Harris.

7              MR. SPAGNOLETTI:  Good morning, your Honor.  Paul

8     Spagnoletti, from Davis Polk.  I also have with me my colleague

9     Lindsay Schare.

10             THE COURT:  Very good.  Good morning to you.

11             And, finally, for defendant Steven Rubenstein.

12             MR. BUCHDAHL:  Good morning, your Honor.  Jacob

13    Buchdahl, from Susman Godfrey, and they sent me here all by

14    myself.

15             THE COURT:  Very good.  Well, I'm confident you are up

16    to it.  Good morning.

17             This is our initial pretrial conference, and I want to

18    welcome the by my count, ten counsel who have appeared, and

19    also their colleagues in attendance in the back.  I am glad we

20    are able to meet here in person today, and thanks to everybody

21    for arranging your schedules to be here.  Particularly in a

22    case involving this many lawyers and a formidable number of

23    items on my agenda for you, being in person is infinitely

24    better than doing this by telephone.  Trust me.

25             I have prepared, as you can see, some brief

M3a2BlaC

introductory remarks as to the ground I would like to cover

today and the order in which I would like to cover various

issues.

At the outset, a brief word about the most recent

COVID rules at the courthouse which, again, have eased up in

the past week.  The Court is now permitted to go without a

mask, and what a pleasure that is.  The one counsel who is

speaking at any given time is also at liberty to go without a

mask provided you are vaccinated.  So on that condition, if you

are speaking, feel free to take down the mask.  Everyone else,

unfortunately, still needs to wear a mask.  However, you now

need only sit three feet apart, no longer the previous six

feet, which is what these days passes for progress.

All right.  I have read all of the submissions that

have been made to date in this case, including the various

memoranda of law, which are of uniformly high quality, which

comes as no surprise, for which I thank counsel.  It is not

lost on me that, among the parties anyway, there is perhaps to

an unusual degree antagonism and the recriminations to some

degree appear to have spilled over to some of the dealings

among counsel.  Let me be as clear as I can.  I want that all

put aside today.  My goal today is really much more prosaic.

My goal is to learn about the case, a lot about the case, so as

to enable me, with all of your guidance, to manage it in the

most efficient and rational manner and to get the litigation

M3a2BlaC

1  off to a smooth start.

2      Specifically, I plan today to take up the following

3  topics in the following order:

4      First of all, I want to understand more about the case

5  that is pending in New York State Supreme Court among

6  Ms. Ganieva and Mr. Black.  It is an important background fact

7  in this case.  It has potential implications for the management

8  and timetable of this litigation, including as to discovery,

9  and there may be a need for coordination among the cases.  So I

10  will be putting questions to counsel here to educate me about

11  the state court litigation, and I expect to direct those

12  questions predominantly to counsel for Ms. Ganieva and

13  Mr. Black.

14      Second, I want to take up the issue of discovery and

15  the defense application for a stay of discovery pending the

16  resolution of the recently filed motions to dismiss.  Whether

17  and to what degree to stay discovery is really the one issue

18  that needs to be decided promptly, and I plan to decide it

19  today.  I have an initial view on the subject, but I want to

20  hear from counsel before ruling.

21      Third, although I am not inviting argument on the

22  defendants' pending motions to dismiss, I will welcome a brief

23  preview of the arguments that I can expect to receive in

24  opposition.

25      Fourth, I will have a few discrete questions for

M3a2BlaC

1    counsel bearing on the fully briefed pending motion that has

2    been made by Wigdor, LLP, for Rule 11 sanctions against

3    Mr. Black, Ms. Estrich, and the Quinn Emanuel firm.  That

4    motion is based on the racketeering claims against Wigdor in

5    the original complaint that have since been dropped.  That

6    motion is filed at Docket 33.  However, for everyone's planning

7    purposes, I do not intend to hold argument on the sanctions

8    motion today and I am not, repeat not, inviting argument on

9    that motion today.

10         My staff and I are in the process of digging into that

11   motion.  I have identified some questions for counsel today

12   that may bear on it.  Most important, simply as a matter of

13   case management, I am interested in understanding the

14   relationship, if any, between the sanctions motion and the

15   forward progress of this case.  If I later determine that oral

16   argument would be of help on the sanctions motion, I will

17   certainly alert counsel and schedule a convenient time to

18   gather.

19         I do recognize that, as to the sanctions motion, there

20   are at least three surreplies that have been filed in relation

21   to the sanctions motion — by plaintiff, at docket 66, on behalf

22   of Quinn Emanuel; by Wigdor, at docket 67; and late yesterday,

23   by plaintiff, at docket 92.  Strictly as a matter of

24   housekeeping, I need to take up whether to authorize those

25   surreplies.  I will take that up today.

M3a2BlaC

1          Fifth, and finally, having gone through those four

2     topics, I want to open the floor for any topics counsel wishes

3     to raise that I have not covered.

4          At the end of all of that, I hope to spend a few

5     minutes with counsel in my robing room off the record, without

6     a court reporter, to discuss the prospects for settlement and

7     to see if there is anything the Court can do to promote peace

8     here.

9          As I think my staff has made you aware, at 11 a.m., I

10    have a long-scheduled status conference in a criminal case.

11    Because the criminal conference involves two in-custody

12    defendants who will arrive in the custody of the marshals, it

13    has to be done on time.  So if we are still going at 11 a.m.,

14    we will need to adjourn, hopefully not for too long, to

15    accommodate that conference.

16         Finally, as a final preface, this being New York, I

17    have had professional dealings with several of the counsel who

18    have appeared in this case, all long ago, all entirely

19    satisfactory, and none giving rise to anything remotely

20    approaching a conflict or a recusal situation.  Nonetheless, in

21    the interests of full, if not excessive, disclosure, I want to

22    put the following on the record.

23         First, in the spring of 1985, as a first-year law

24    student, I took Ms. Estrich's elective on labor law, and I did

25    some limited legal research, again, as a 1L, for an article or

M3a2BlaC

1    treatise on which she was working.  I have not been in contact

2    with her since.

3            Second, while at the United States Attorney's office,

4    I overlapped and worked to a limited degree with two counsel in

5    the case — Mr. Figel who, with Ms. Estrich, represents the

6    plaintiff and with Martine Beamon, who is not here today, but

7    who represents defendant Harris.  Save perhaps crossing paths

8    at a bar event or two, I don't believe I have had any contact

9    with either of them since well before taking the bench in 2011.

10            Third, while in private practice, although we were at

11    different law firms, I, along with Mr. Buchdahl, represented a

12    white-collar defendant on his appeal of a criminal conviction

13    in the Second Circuit.  I do not recall any contact of

14    consequence with him since.

15            And finally, although not a counsel appearing in this

16    case, I noted on my review of the amended complaint that the

17    internal investigation of Apollo was done by Andrew Levander of

18    the Dechert firm.  I have crossed paths with Mr. Levander from

19    time to time as fellow members of the New York bar, although

20    not recently.  However, Mr. Levander's son worked for me as law

21    clerk in 2019 through 2020, and I am in active contact with

22    him.

23            I think that covers all of the vectors here and all of

24    the contacts I have had.  In the extremely remote circumstances

25    under which anybody thinks any of those relationships present

M3a2BlaC

1    any sort of an issue, you are at liberty to write the Court,

2    but if you have any intention to do so, please do so soon.

3         Having taken care of those lengthy preliminaries,

4    let's turn to unit one, which involves the state court

5    litigation, and I am really eager just factually to understand

6    what's going on there.

7         So let me begin -- I believe, Ms. Estrich, are you the

8    right person to speak for plaintiff on that?

9         MS. ESTRICH:  Yes, I am, your Honor.

10        THE COURT:  By the way, counsel should feel free to

11   stand or sit as you which.  The key is just to speak into the

12   mic for the benefit of the court reporter in this old, echoing

13   courtroom.

14        What's going on in the state court litigation?  What's

15   the status?

16        MS. ESTRICH:  Not much, your Honor.  There has been

17   extremely limited discovery in the state court action.  We are

18   awaiting rulings on basic motions relating to the complaint.

19        The parties are different in the state court action.

20   The state court action only involves Ms. Ganieva and Mr. Black.

21   Mr. Rubenstein and Mr. Harris are not parties to the state

22   court action.  It is at least the plaintiff's view that we have

23   been stymied in the state court action in our efforts to secure

24   discovery and that we cannot secure the relief we want or need

25   nor make the allegations that you see in our RICO complaint in

M3a2BlaC

1     the state court action.

2                 THE COURT:  Okay.  Let me slow that down and just make

3     sure I understand more granularly what's going on.

4                 As I understood it, there had been a proposed third or

5     perhaps third amended complaint that the plaintiff --

6                 MS. ESTRICH:  Correct.

7                 THE COURT:  -- sought to have received.  And as of the

8     last reference in the briefs before me, I think it had been

9     unresolved whether it had been received by the state court --

10                MS. ESTRICH:  The state court has yet to decide

11    whether to allow them to file.  It's their proposed second

12    amended complaint.

13                THE COURT:  So right now the operative complaint is a

14    first amended complaint --

15                MS. ESTRICH:  Correct.

16                THE COURT:  -- and Ms. Ganieva is trying to amend it

17    for a second time and that's --

18                MS. ESTRICH:  Yes.

19                THE COURT:  -- *sub judice*.

20                (Court reporter confers)

21                THE COURT:  Are there any other motions pending or --

22                MS. ESTRICH:  There are a number -- there is a motion

23    to quash a subpoena that Leon Black's counsel has issued to the

24    Wigdor firm that's pending.  There is a motion to strike

25    certain allegations in the complaint relating to what we view

1   as irrelevant material and --

2            THE COURT:  That's as to the first amended complaint.

3            MS. ESTRICH:  That's the first amended complaint.

4            THE COURT:  Okay.

5            MS. ESTRICH:  And then of course we have opposed the

6   second amended complaint, and that is pending.

7            THE COURT:  On grounds that look like 12(b)(6) or

8   something else?

9            MS. ESTRICH:  On grounds that it is full of scurrilous

10  fraudulent allegations and that there is no basis for further

11  amendment.

12           THE COURT:  But one way or the other --

13           MS. ESTRICH:  But one way or the other --

14           THE COURT:  -- one way or the other, whether it is the

15  second amended complaint or the first one that stands, one of

16  the two of them will be the basis for litigation.

17           MS. ESTRICH:  Correct.

18           THE COURT:  Is there any motion pending that *á la* Rule

19  12(b)(6) is aimed at the substance of the first amended

20  complaint?

21           MS. ESTRICH:  No.

22           THE COURT:  Tell me how discovery works.  Has there

23  been a schedule set or is what's going on essentially

24  unrefereed by the Court but just between counsel?

25           MS. ESTRICH:  The schedule for discovery has been

M3a2BlaC

```
1    extended.  What has been going on right now is that I think it

2    is fair to say neither side has made major productions.

3              THE COURT:  But, in other words, did the Court set a

4    timetable?

5              MS. ESTRICH:  There is a timetable for the end of

6    discovery, but the Court has not been actively supervising the

7    parties in discovery.  I think the Wigdor firm would agree with

8    me on that.

9              THE COURT:  And I will turn to them in a moment.

10             But as it relates to the timetable for discovery, are

11   there intermediate dates that were set or just an outside date?

12             MS. ESTRICH:  Just an outside date.

13             THE COURT:  What is that date now?

14             MS. ESTRICH:  Let me confer for one moment.

15             THE COURT:  Of course.

16             (Counsel confer)

17             MS. ESTRICH:  Your Honor, he has put it off some

18   months.  So it is late -- I believe it is June, but I need to

19   confer.

20             THE COURT:  All right.  When you get that date --

21             MS. ESTRICH:  I will get that date for you.

22             THE COURT:  The court reporter during this brief

23   moment asked me to ask you to please wait until I am done

24   speaking --

25             MS. ESTRICH:  I'm sorry.
```

M3a2BlaC

1          THE COURT:  -- even --

2          MS. ESTRICH:  My apologies.

3          THE COURT:  Again, even if you know where I am going,

4    it is impossible for her when we speak over each other.

5          MS. ESTRICH:  My apologies.

6          THE COURT:  No worries.

7          All right.  To the extent there has been discovery,

8    what has it been?

9          MS. ESTRICH:  We have received, and I think the letter

10   we sent to you last night reflected that, we received from the

11   other side a package of text messages that had been produced by

12   Ms. Ganieva and was produced to us through Wigdor.  We have

13   also received a production from Apollo in response to our

14   requests from them.

15         THE COURT:  All right.  So you have gotten text

16   messages from --

17         MS. ESTRICH:  We have gotten no phone records.  I'm

18   sorry.

19         THE COURT:  Just breaking this down --

20         MS. ESTRICH:  I'm sorry.

21         THE COURT:  -- as to document production, you have

22   gotten text messages from Ms. Ganieva.  Have you otherwise

23   received whatever documents you have sought from Ms. Ganieva?

24         MS. ESTRICH:  No.

25         THE COURT:  And without going into gory detail, safe

M3a2BlaC

1  to assume there is a fair amount of other document discovery

2  you have sought as to her that is outstanding?

3        MS. ESTRICH:  Yes.  To correct myself, there were also

4  two pending motions relating to phone records in the state

5  court.  We have sought the phone records from AT&T and Verizon

6  which would reflect phone calls and communications by

7  Ms. Ganieva and Mr. Rubenstein, and there are motions pending

8  to quash those requests, to oppose those requests.

9        THE COURT:  Okay.  But you mentioned a moment ago

10  that, apart from getting text messages produced by Ms. Ganieva,

11  there is something else that had been produced.  What was that?

12        MS. ESTRICH:  Apollo.  We asked Apollo for certain

13  documents, and they produced those documents.

14        THE COURT:  Are they complete on their production?

15        MS. ESTRICH:  As far as I know.

16        THE COURT:  Any other document discovery in either

17  direction that has occurred in the state case?

18        MS. ESTRICH:  No.

19        THE COURT:  Has your client made any productions in

20  the state case?

21        MS. ESTRICH:  We have yet to have a confidentiality

22  protective order entered in the state case.  We are in the

23  process of reviewing the texts and e-mail messages of our own

24  client, but we are hoping and have not yet succeeded in

25  convincing the other side and the Court to enter a protective

M3a2BlaC

1    order to govern the discovery documents.

2             THE COURT:  The answer, then, is no.

3             MS. ESTRICH:  Correct.

4             THE COURT:  All right.  And it goes without saying,

5    but there has been no deposition discovery?

6             MS. ESTRICH:  That's correct.

7             THE COURT:  All right.  Initial disclosures, anything

8    in the state court?

9             MS. ESTRICH:  Nothing of substance that I know of, but

10   would reserve the right to correct that.  I have just this last

11   week applied for *pro hac vice* status in the state court, so I

12   apologize to the Court.  The reason -- Quinn Emanuel had

13   originally been representing Mr. Black in both actions and,

14   with their withdrawal, I am in some sense going to try to keep

15   an eye on that state court action so as to coordinate with the

16   federal action.

17            THE COURT:  Well, this is a subject -- Quinn Emanuel I

18   have got bucketed in a later set of discussions; but as to

19   that, since you raise it, I will just ask this.  I had

20   understood that Quinn had withdrawn in this case but not in the

21   state court action.  Is that accurate?

22            MS. ESTRICH:  That is accurate, your Honor.

23            THE COURT:  All right.  Thank you, Ms. Estrich.

24            MS. ESTRICH:  Thank you, your Honor.

25            THE COURT:  Let me, then, turn to -- I guess it makes

M3a2BlaC

1    the most sense to turn to you, Mr. Mintzer, because you

2    represent the other common -- you represent the other party to

3    that case.

4              So I am really looking factually — just move close to

5    the mic — to understand factually what's going on in the state

6    case.  Has there been any more discovery that has in fact been

7    produced other than that that Ms. Estrich set out?

8              MR. MINTZER:  So, your Honor, let me also preface this

9    by saying I do not represent Ms. Ganieva in the state court

10   case; and so, while I have become acquainted with, generally

11   speaking, what's going on and the status of the matter, which I

12   can tell you about, I cannot speak with granularity about

13   specific documents that have been produced or things of that

14   level.

15             Ms. Estrich described the case, I believe, and I was

16   having trouble, in the acoustics of the room, hearing some of

17   what she said, but as essentially not going anywhere is the

18   gist of what I thought I heard.

19             THE COURT:  Just to be more precise, what she said was

20   that there had been a partial document production by

21   Ms. Ganieva and an apparently full document production by

22   Apollo; and that, otherwise, there has been no document

23   production by anybody; and that as it relates to the Black

24   document production, it is held up by the absence of a

25   protective order.  She also said that there were pending

M3a2BlaC

1    motions to quash certain outstanding document requests.

2              MR. MINTZER:  Right.  I think there are a total of

3    seven motions that are pending, your Honor, before the state

4    court judge.  I could go through them with you if that would be

5    helpful.

6              THE COURT:  Let me just ask just for an answer to my

7    question.  Has any other discovery been produced?

8              MR. MINTZER:  I'm not aware that there have been other

9    documents that have been produced other than what counsel has

10   described.

11             THE COURT:  Okay.  And the seven motions all relate to

12   discovery?

13             MR. MINTZER:  The pending motions all relate to

14   discovery or the status of the pleadings, your Honor.

15             THE COURT:  Have you any understanding as to whether

16   that makes it realistic or unrealistic for discovery in the

17   state court case to be done by what I understand to be the

18   current deadline of June?

19             MR. MINTZER:  Without knowing when the Court is going

20   to decide the issue related to the protective order, which is

21   that motion has been pending, I believe, since December, it is

22   hard to know when the other issues can get resolved, because I

23   think that issue is presenting a bit of a bottleneck.

24             THE COURT:  Ms. Estrich presented it as an issue that

25   is affecting the production by the defendant there, Black.  I

M3a2BlaC

```
1    take it from what you have just said, in fact, it affects

2    multiple parties.

3              MR. MINTZER:  Yes, your Honor.

4              THE COURT:  So there is a common interest in getting

5    the protective order issue put to bed.

6              MR. MINTZER:  That's right, your Honor.  But the

7    issue, as I understand it -- and I'm not here to brief the

8    argument in the state court protective order, but essentially

9    Mr. Black is looking for a protective order in that case that

10   would allow him to essentially designate anything that he

11   believes is, quote, sensitive as confidential and then put the

12   onus on Ms. Ganieva to have to go and litigate with the Court

13   and file a motion for any challenge to that.

14             THE COURT:  Has the Court in that case heard argument

15   as to the merits of the protective order options?

16             MR. MINTZER:  I don't believe there has been oral

17   argument on that issue, your Honor, but I can't say that for

18   sure.

19             THE COURT:  Okay.  But the bottom line is, until the

20   protective order issue is resolved, essentially there is

21   sclerosis in discovery in that case.

22             MR. MINTZER:  I think it's fair to say that that's the

23   major impediment from my understanding of things.

24             THE COURT:  And there is no indication at this point

25   when that issue will be resolved.
```

M3a2BlaC

1          MR. MINTZER:  I cannot predict that, your Honor.

2          THE COURT:  Okay.  All right.  Let me, then, ask you

3    if there is anything else, just by way of simply a factual

4    explication of what's going on in the state court?  I am really

5    not looking for slings and arrows, but just a factual

6    understanding of what's going on.

7          MR. MINTZER:  Yeah.  I think, your Honor, the one

8    thing that I would note is that there are 142 docket entries in

9    the state court case.  It is being litigated aggressively.

10   Unfortunately, the progress may not be made on discovery

11   because of the issues we have identified.  But it is certainly

12   not a matter of that the parties are not aggressively pursuing

13   the case.

14         THE COURT:  Is there a single judge assigned to the

15   case?

16         MR. MINTZER:  Yeah, I believe it is Justice Cohen, and

17   it's David Cohen.

18         THE COURT:  And no indication from Justice Cohen as to

19   when the logjam that has been described by both counsel will

20   clear?

21         MR. MINTZER:  I'm not aware of that, your Honor.

22         THE COURT:  Anything else just by way of a factual

23   explication of the state court proceedings?

24         MR. MINTZER:  No, your Honor, unless my -- counsel for

25   Wigdor has anything to add.

M3a2BlaC

1          THE COURT:  All right.  I'm happy to hear from counsel

2     for Wigdor insofar as Wigdor is a lawyer in that case, but not

3     a party.  That would be Mr. Gershenoff?  Anything factually to

4     add?

5          MR. GERSHENOFF:  No, your Honor, not at this point in

6     time.

7          THE COURT:  All right.

8          Let me come back to you, Ms. Estrich.  One of the

9     issues of interest to me is the extent to which, when we get to

10     discovery, the issues in the state case and this case will

11     overlap.  And just to guide us along on that, at least at the

12     outset, it looks to me that the Ganieva-Black relationship is

13     central to both cases and can be expected to be a central

14     subject of discovery in both cases.  But once one moves out of

15     that initial hub of the circle, there are concentric circles

16     where it is a little less clear.

17          One thing I am not clear about is, for example,

18     whether in the state court case the relationship between

19     Ganieva and Black and Ganieva and Rubenstein is apt to be a

20     subject of discovery.

21          MS. ESTRICH:  I think the state court case involves

22     two claims.  One is Ms. Ganieva's claim for rape and one is her

23     claim for defamation.  There are no claims in the state court

24     case relating to what we consider the RICO enterprise, the

25     union of Mr. Harris, Mr. Rubenstein, Ms. Ganieva, etc.  So we

M3a2BlaC

1    view the cases as very different.  The state court case

2    involves two claims that are very much limited to the

3    relationship between Mr. Black and Ms. Ganieva.

4              THE COURT:  Understood.  And the question is --

5    Mr. Buchdahl, I will get to you.

6              Are you seeking discovery in the state court case as

7    it relates to the relationship or dealings between, on the one

8    hand, Ms. Ganieva and Mr. Harris and, on the other hand,

9    Mr. Gershenoff and Mr. Rubenstein?

10             MS. ESTRICH:  We have not sought discovery with

11   respect to Mr. Harris at all, and the discovery we have sought

12   with respect to Mr. Rubenstein is limited and we have received

13   no discovery whatsoever.  And Mr. Rubenstein has claimed in his

14   papers that, because he is not a party to the state court

15   action and is not a defendant, his discovery obligations are

16   limited.

17             THE COURT:  Putting aside the claims that have -- the

18   opposition that has been articulated in that case, as to

19   Harris, is it your intention to seek discovery from him in the

20   state court case.

21             MS. ESTRICH:  It is our hope, your Honor, to focus

22   discovery against Mr. Harris in the federal court case.

23             THE COURT:  I got that.  But just assume for

24   argument's sake that we are only talking about the state court

25   case.  Is it your intention to seek discovery from him?

M3a2BlaC

1          MS. ESTRICH:  Let me confer with Mr. Figel, because we

2     haven't made that decision.

3          (Counsel confer)

4          MS. ESTRICH:  As Mr. Figel has pointed out, the issues

5     in the state court case are not directly related to Mr. Harris,

6     and so any discovery we would seek would not be of the sort we

7     would be seeking here.

8          THE COURT:  You are not foreclosing seeking

9     discovery --

10         MS. ESTRICH:  I'm not -- I don't want to foreclose all

11    options in the state court, but I want to make clear that the

12    discovery we would be seeking from your Honor in this case

13    would be very much different than anything we would be seeking

14    or allowed in the state court case.

15         THE COURT:  And tell me about the discovery you have

16    sought against Mr. Rubenstein, Mr. Rubenstein in the state

17    court case.

18         MS. ESTRICH:  The discovery we sought against

19    Mr. Rubenstein was phone records to establish contact between

20    Mr. Rubenstein and Ms. Ganieva.

21         THE COURT:  Do you anticipate seeking any other

22    discovery from Mr. Rubenstein in the state court case?

23         MS. ESTRICH:  Not at this time.

24         THE COURT:  Well, that, sure, but --

25         MS. ESTRICH:  We have --

M3a2BlaC

1          THE COURT:  -- do you anticipate seeking it during the

2     course of that case?

3          MS. ESTRICH:  I don't want to foreclose the state

4     court lawyers, but at this point . . .

5          (Counsel confer)

6          MS. ESTRICH:  The defamation claim does relate to

7     Mr. Rubenstein because there are allegations in our complaint

8     in the state court and in the federal court that false claims

9     were made to the press by Mr. Rubenstein.

10          THE COURT:  He is said to have been an agent of

11     Ms. Ganieva.

12          MS. ESTRICH:  Correct.

13          THE COURT:  It would seem to stand to reason, then,

14     that if your counterpart in the state case is litigating

15     aggressively, that person would be seeking --

16          MS. ESTRICH:  Yes, your Honor.

17          THE COURT:  -- more than phone records as to

18     Mr. Rubenstein's engagement or dealings with Ms. Ganieva,

19     right?

20          MS. ESTRICH:  Certainly so, your Honor.  I can only

21     say that we have been frustrated completely in our efforts in

22     the state court.  We have moved to enter a standard

23     confidentiality order --

24          THE COURT:  Ms. Estrich, I got that.  I got that.  I

25     am really just trying to -- I hear you --

M3a2BlaC

1          MS. ESTRICH:  I understand.

2          THE COURT:  It's not for me to resolve that.  I

3    understand your frustration, but point taken.

4          Tell me about Apollo.  That's a significant part of

5    the narrative in your amended complaint here.  Is it

6    anticipated that there will be any discovery directed to Apollo

7    in the state court case?

8          MS. ESTRICH:  Only what we have done so far, as far as

9    I know.  Only the subpoenas we have issued to Apollo so far,

10   the requests we have issued to --

11         THE COURT:  And what do those subpoenas deal with?

12         MS. ESTRICH:  They deal --

13         THE COURT:  You are right, you told me about that.

14         MS. ESTRICH:  They deal with internal communications

15   inside Apollo, in and around the Dechert report, the departure

16   of Mr. Black, Mr. Harris's efforts to -- we say, to assassinate

17   Mr. Black, to take over Apollo.  I know you don't want that

18   argument today.

19         THE COURT:  Well, I'm just trying to understand the

20   degree of overlap or nonoverlap.  The significant refrain in

21   the complaint here assigns responsibility to Mr. Harris for

22   actions taken by Ms. Ganieva --

23         MS. ESTRICH:  Right.

24         THE COURT:  -- as alleged to advance Mr. Harris's

25   interest within Apollo and adverse to Mr. Black.  I think the

M3a2BlaC

1    pun occurred to us in chambers that the theory is that Harris

2    was -- the attempt was to make him black, if you will.

3                In any event, the question is, you have just

4    articulated a theory in the state court case that sounds

5    awfully similar to the one you are pursuing here.  Is there

6    going to be any discovery you are seeking here of a document

7    nature from Mr. Harris that exceeds the scope -- excuse me,

8    from Apollo that exceeds the scope of what you are seeking --

9    any discovery here that exceeds the scope of what you have

10   sought there.

11               (Counsel confer)

12               MS. ESTRICH:  I am going to ask Mr. Figel to respond

13   to that.

14               THE COURT:  Of course.

15               MR. FIGEL:  Your Honor, I am very new to the case, so

16   it comes with all the caveats of not being fully up to speed.

17               THE COURT:  You just appeared yesterday or the day

18   before.

19               MR. FIGEL:  Correct, your Honor.

20               I believe the discovery before your Honor with respect

21   to Apollo will be far broader because it will be addressed to

22   Mr. Harris's efforts to cull support for his candidacy to

23   become a successor CEO, an effort we believe occurred well

24   before the tweets alleged in the complaints.  So the discovery

25   with respect to the racketeering issues of the efforts to

M3a2BlaC

1   obtain a managerial foothold into Apollo or preserve one I

2   believe would go well beyond the discovery we sought in state

3   court.

4           THE COURT:  So at least as a matter of time frame,

5   your discovery directed to Apollo in this case would be set

6   significantly earlier than that which is relevant to the

7   Ganieva versus Black claims.

8           MR. FIGEL:  Yes.  And broader, your Honor, because it

9   would focus on Mr. Harris's efforts to talk to directors, other

10  executives within Apollo to gain support for his position.

11          THE COURT:  All right.

12          MR. FIGEL:  Some of which would be relevant to the

13  state court, but not all.

14          THE COURT:  Helpful.  Okay.  Thank you.

15          So let me then take up with the defense, fully

16  understanding that the defense disputes the validity of any

17  claims made by Mr. Black, I'm eager really to just understand

18  the ways in which the anticipated discovery on those claims,

19  again, assuming the claims survive, will be how it will differ

20  and be the same across the two cases.

21          I think it makes the most sense to begin with

22  Mr. Mintzer for Ms. Ganieva and then I will invite comment from

23  everybody else.  What's your perspective on the areas of

24  overlap and the areas of nonoverlap?

25          MR. MINTZER:  From our perspective, the claims that

M3a2BlaC

1    are made against Ms. Ganieva are essentially the same claims

2    that are being made -- that directly relate to all of the same

3    incidents that happened in the state court case, and the

4    discovery is going to have almost complete overlap in terms of

5    what the allegations are against her and Mr. Black.

6          Obviously, they brought in allegations that

7    Ms. Ganieva has had contact and has conspired with a number of

8    other people, including the codefendants, who she has never

9    met.  So of course there would have to be discovery going to

10   those issues as well.

11         THE COURT:  So your point is, as to the narrow issue

12   of the relationship between Ganieva and Black, discovery ought

13   to be more or less synchronous, but to the extent we are

14   bringing in other defendants it gets broader.

15         MR. MINTZER:  That's right, your Honor.

16         THE COURT:  Okay.  Let me turn to counsel for Wigdor.

17   Mr. Gershenoff, just speak into the mic.  Your perspective?

18         MR. GERSHENOFF:  Yes, your Honor.  Thank you very

19   much.

20         It's hard to imagine more overlapping discovery

21   between this case and the state court case than discovery that

22   is going to be applicable to Wigdor in both cases.

23         In this case, the plaintiffs are alleging that Wigdor

24   committed defamation through the pleadings in the state court

25   case.  You know, so it is obvious that the discovery in this

M3a2BlaC

1    case is going to be virtually, at least with respect to Wigdor,

2    a mirror image as far as the discovery in the state court case.

3         THE COURT:  Is that really right, though?  Wigdor is

4    not a party in that case.  There is obviously a challenging

5    privilege issue that we may or may not have to come to

6    eventually.  But assuming that the claims survive, there would

7    be, presumably, some discovery internal to Wigdor that's not

8    implicated in the state case that would be implicated here.

9    No?

10        MR. GERSHENOFF:  But all of it will turn on whether or

11   not Ms. Ganieva's allegations in the state court case are true

12   or made in good faith.  I mean, if they are true and made in

13   good faith in the state court case, then there is no defamation

14   claim against Wigdor in this case.

15        THE COURT:  And what if the opposite?

16        MR. GERSHENOFF:  And vice versa, your Honor.  It seems

17   to me that discovery is going to substantially overlap between

18   the two cases.

19        THE COURT:  Well, pause on that.  You are not

20   proposing to -- Wigdor is counsel in the state court case.

21        MR. GERSHENOFF:  Correct, your Honor.

22        THE COURT:  You are not proposing that Wigdor itself

23   would be the subject of outgoing discovery in the state court

24   case.  You are not proposing to put Wigdor partners on the

25   stand at depositions or to be producing, to the extent

M3a2BlaC

1    privilege objection is overcome, internal communications from

2    within Wigdor or Wigdor and its client, right?

3              MR. GERSHENOFF:  They have already served a subpoena

4    on Wigdor in the state court case, your Honor.  Quite to the

5    contrary.

6              THE COURT:  That's what they have served; but, from

7    your perspective, I assume that you have additional arguments

8    to resist it in the state court case that are less relevant

9    here.

10             MR. GERSHENOFF:  Well, there is a motion to quash in

11   the state court case the subpoena to Wigdor, that is correct.

12   I'm not clear, you know, so there is -- they sought discovery

13   from Wigdor in the state court case, and it's presumably the

14   same kind of discovery.

15             THE COURT:  Look.  If you accept your view of the

16   case, I understand what you are saying.  If you accept that the

17   allegations against Wigdor survive a motion to dismiss here,

18   then there would be presumably full-throated discovery limited

19   by whatever privilege objections are validly made that get at

20   what did Wigdor know and when did it know it.

21             MR. GERSHENOFF:  And --

22             THE COURT:  And that's not an issue in the state court

23   case.

24             MR. GERSHENOFF:  Well, I think that the veracity of

25   Ms. Ganieva's allegations in the state court case, it's

M3a2BlaC

1    relevant in both cases.  I'm not exactly clear on what the

2    Court's question is.

3              THE COURT:  I think you are clear on what the Court's

4    question is; you are just resisting the implication.

5              The question is, isn't it a fact that, because Wigdor

6    is a party in this case and merely counsel in the other case,

7    there is the potential in this case for discovery from Wigdor

8    that won't be produced or germane in the other -- in the state

9    court case.  That's all.

10             MR. GERSHENOFF:  Yes, there is a possibility.  It's

11   just hard for me to imagine what that discovery would look

12   like, your Honor, that wouldn't be subject, for example, to a

13   privilege objection.

14             THE COURT:  All right.  I think I understand.

15             All right.  Let me turn to counsel for Mr. Harris.

16   That's Mr. Spagnoletti.

17             MR. SPAGNOLETTI:  Thank you, your Honor.  Yes.

18             THE COURT:  Again, the focus here, I'm just trying to

19   understand not what the implications are of any overlap or

20   nonoverlap, but just what the extent of it is.  Do you have a

21   view on that?

22             MR. SPAGNOLETTI:  No, I understand the question, your

23   Honor; and I also understand that we are not at the moment

24   talking about whether discovery should be stayed.

25             THE COURT:  We will get there.

M3a2BlaC

|  |  |
|---|---|
| 1 | MR. SPAGNOLETTI:  Right.  And with respect to that, I |
| 2 | acknowledge that there is not a substantial overlap in this |
| 3 | case.  But I would say, just for completeness, that there was a |
| 4 | subpoena directed at Mr. Harris in the state court action.  I |
| 5 | don't believe that that came up in discussion with counsel |
| 6 | earlier.  I believe it was a subpoena from the Wigdor firm.  It |
| 7 | targeted discrete categories of documents relating to Mr. Black |
| 8 | and Ms. Ganieva. |
| 9 | THE COURT:  Sorry.  That's a plaintiff's subpoena in |
| 10 | the -- not a Black defense subpoena, but a plaintiff Ganieva |
| 11 | subpoena in the state court case. |
| 12 | MR. SPAGNOLETTI:  That's right, and there were no |
| 13 | documents.  That was the response. |
| 14 | THE COURT:  All right.  Thank you. |
| 15 | Finally, Mr. Buchdahl, as to Mr. Rubenstein, any |
| 16 | perspective on this? |
| 17 | MR. BUCHDAHL:  Good morning, your Honor. |
| 18 | Respectfully, and this is for everyone's benefit, it |
| 19 | is Rubenstein, |
| 20 | THE COURT:  Rubenstein. |
| 21 | MR. BUCHDAHL:  So we should probably all switch to |
| 22 | that pronunciation. |
| 23 | THE COURT:  Thank you. |
| 24 | MR. BUCHDAHL:  I also recognize the moral hazard that |
| 25 | you get to take your Mack off when you are talking, so that |

M3a2BlaC

1    probably exacerbates every lawyer's natural inclination.

2         Having said that, it is our view that the discovery

3    sought from Mr. Rubenstein in the state court case is entirely

4    coterminous with what might be sought here.  Counsel for Black

5    in the state court case served an extremely broad subpoena on

6    Mr. Rubenstein.  There were negotiations taking place about the

7    response to that subpoena.  Counsel for Black then served a

8    subpoena on Mr. Rubenstein's phone carrier to try to get the

9    extent of his phone records from the broad time period not

10   limited to any particular communications with any particular

11   person.

12         The point of all of this was to seek information about

13   the extent of Mr. Rubenstein's connections, if any, with

14   Ms. Ganieva.  Counsel for Rubenstein informed counsel for Black

15   that there were no such records because there have been no

16   communications between Mr. Rubenstein and Ms. Ganieva in the

17   history of time.

18         So it is our view that the discovery that might be

19   sought from Mr. Rubenstein here has already been sought, does

20   not exist, and is coterminous with what might happen in the

21   state court action.

22         THE COURT:  Let me see if I can pin that down, but

23   thank you.  That's helpful.

24         Because you say there are in fact no responsive

25   records, even though, in theory, Rubenstein being a party to

M3a2BlaC

1    this case, the universe of relevant materials here would be

2    broader presumably from Mr. Rubenstein if one assumes that

3    there were materials than in the state case where he is not a

4    party, because, you say, a comprehensive search has been done

5    of Rubenstein and he's got nothing responsive, in practice, the

6    discovery is the same.  Is that about right?

7         MR. BUCHDAHL:  The second half is correct, your Honor

8    but I am actually not sure that the allegations against

9    Mr. Rubenstein here are any broader than those stated by the

10   defense of Mr. Black in the state court case.  The notion is

11   that Mr. Rubenstein somehow participated in amplifying or

12   disseminating Ms. Ganieva's comments.  That is part of his

13   defense in the state court case.  It's the nub of his

14   relatively sparse allegations against our client in this case,

15   and they have already sought the discovery related to that

16   there.  It doesn't exist.  And so I don't even think that if

17   full blown discovery, to use the Court's phrase, were permitted

18   against Mr. Rubenstein in this federal action that it would be

19   any broader than what counsel has already requested from him in

20   the state court case.

21        THE COURT:  May I ask you, and I haven't seen the

22   subpoenas, but is your representation to me that essentially an

23   exhaustive search has been done of every material within the

24   possession, custody, and control of Mr. Rubenstein and for

25   anything, for example, mentioning Ganieva and nothing turns

M3a2BlaC

1    up?

2              MR. BUCHDAHL:  Yes, your Honor.  I think there is a

3    single time that he mentioned a tweet by Ms. Ganieva in an

4    unrelated context.  There is nothing that remotely kind of

5    rises to a level of him communicating about her claims.

6              THE COURT:  Whether we are talking about old fashioned

7    hard copy documents, e-mails, texts, tweets, calendars, that

8    search has been done and, save the item you have listed, there

9    is nothing responsive?

10             MR. BUCHDAHL:  That is my understanding, your Honor.

11             THE COURT:  All right.  Thank you.  That's helpful.

12             A couple more questions about the state court

13   proceedings, and then we will move on to the issue of discovery

14   and the requested stay here.  I have in my list to ask the

15   question about the prospects for settlement of the state court

16   case.  Raise your hand if anyone would give an answer other

17   than, for now, slim to none.  Okay.  All right.

18             Ms. Estrich, let me ask you this.  I understand that

19   at an initial point your client brought counterclaims in the

20   state court case, dropped them, and then pursued claims here

21   that pick up but then go beyond the formulation of the original

22   counterclaims.  Just briefly, why?  Why were the counterclaims

23   dropped there?

24             MS. ESTRICH:  Two reasons, your Honor.  The other side

25   made clear that they would file motions to dismiss our

M3a2BlaC

1    counterclaims which would stay all discovery, according to

2    state court rules; and so, to be practical, one of the reasons

3    the state court counterclaims were dropped was to allow

4    discovery to proceed in the state court. As I have said, the

5    hopes for discovery were perhaps overstated.

6            THE COURT: Sorry. You are saying that, under state

7    court procedure, as long as there is a motion to dismiss even

8    at a hypothetically secondary counterclaim, complete freeze in

9    the action in any way.

10            MS. ESTRICH: That was the position taken by the other

11    side.

12            The other reason, of course, is that the RICO claim

13    involved much broader and different claims than those that can

14    rise under state law.

15            THE COURT: Do you have any reason to believe that --

16    does Mr. Black have any reason to doubt that he will receive a

17    fair hearing even if it may take some time in state court?

18            MS. ESTRICH: I would not challenge in any way

19    Justice Cohen and his fairness. We have, however, been

20    extremely frustrated in the discovery process, and that

21    frustration has led us to conclude that it will be very

22    difficult to receive any kind of timely resolution in the state

23    court.

24            THE COURT: Have you taken action before Justice Cohen

25    to try to expedite the progress of this case?

M3a2BlaC

1          MS. ESTRICH:  We have certainly filed a number of

2     motions before Justice Cohen, as has the other side, but it has

3     taken months and those motions are still pending.  I don't want

4     to criticize a justice.  I know his caseload is very heavy.

5          THE COURT:  All right.  Finally, there were references

6     in various parties' papers not to the state court civil

7     proceeding, but to the prospects of criminal investigations by

8     the Manhattan district attorney of either of the two principals

9     here.  To the extent you can, is there anything that can be

10     publicly reported as to the state of any of that?

11          MS. ESTRICH:  I don't believe so, your Honor.

12          THE COURT:  I take it no charges have been brought

13     against either of the principals and there is no reason to

14     think anything is likely or imminent.  Is that fair to say?

15          MS. ESTRICH:  I think it's fair to say no charges have

16     been brought.  I'm certainly not in a position to say what the

17     Manhattan district attorney and the new district attorney plan

18     to do.

19          THE COURT:  All right.  Let me just ask Mr. Mintzer,

20     just on that last point, do you know anything?

21          MR. MINTZER:  Nothing that I could state here, your

22     Honor, that would give guidance to the Court that anything

23     could be coming, I think your question was, imminently or

24     impending.

25          THE COURT:  Look.  I'm trying to manage this case, and

M3a2BlaC

1    if there is going to be the bombshell of a criminal proceeding

2    that implicates the underlying conduct, it would be useful to

3    know that sooner rather than later.  I take it you are saying

4    you are not aware of any such thing.

5             MR. MINTZER:  I am not.

6             THE COURT:  Just show of hands if anyone is aware of

7    anything contrary.  Does anyone have any reason to think there

8    is going to be a criminal proceeding that affects the

9    management of this case?  All right.

10            All right.  Let's then pivot now.  Thank you for the

11   summary of the state court case.  Let's pivot now to the issue

12   of a discovery stay or not.

13            I will start with you, Ms. Estrich.  Assuming for

14   argument's sake that every claim of yours survives the motion

15   to dismiss.  What does discovery look like in this case?

16            MS. ESTRICH:  At this point, your Honor, we are not

17   seeking a fishing expedition.  We are not seeking broad range

18   discovery.  What we would seek at this point, consistent with

19   our understanding of the Court's practices, would be a much

20   more limited and sculpted approach to discovery, which might

21   aid all of the parties in the ultimate resolution of this case.

22   If I could ask Mr. Figel . . .

23            (Counsel confer)

24            MS. ESTRICH:  Mr. Figel wants to add one point.

25            MR. FIGEL:  I want to make sure we responded to the

M3a2BlaC

1    Court's question.  There are two pieces to that.

2                One is, we will be advocating today for a limited

3    discovery while the motions are pending.  I believe your

4    Honor's question went to the scope of discovery if the motions

5    are denied and the case goes --

6                THE COURT:  That was the question.  I'm looking at

7    the --

8                MR. FIGEL:  Yes.  I believe the discovery will be

9    quite far-reaching and extensive.

10                THE COURT:  Give me the thumbnail.  What will it look

11    like?

12                MR. FIGEL:  I think there will be discovery,

13    obviously, among the parties.  There will be discovery of

14    various -- likely discovery of various press communications.

15    There will be discovery of various internal Apollo issues, and

16    potentially discovery of third parties that have an impact on

17    the damages that Mr. Black has suffered.

18                THE COURT:  Can you elaborate on that?

19                MR. FIGEL:  I think it is premature, because I

20    don't -- I'm new to the case and I don't have guidance from the

21    client, but one of the issues here is RICO damages, which is

22    economic injury, and we would seek to prove that, and that

23    would likely involve third parties.

24                THE COURT:  Putting the focus just on liability,

25    anything more you can say that just gives me some texture as to

M3a2BlaC

1    what liability discovery looks like.

2              MR. FIGEL:  Well, I think there are a couple of

3    issues, your Honor.

4              Obviously, we will be talking about the motions to

5    dismiss and the defendants' claims, but one of the issues here

6    is an allegation that there was effectively a single victim

7    enterprise, which we think is not true; and if we need to amend

8    or we need to address that issue, we would need to have

9    additional allegations and additional facts about the scope of

10   the enterprise that's at issue here.  We don't believe

11   Mr. Black is the only victim, and we believe that there are

12   predicate acts or there may be predicate acts — I want to be

13   careful — that would go to other third parties.  So there would

14   be, I think, discovery with respect to the enterprise and

15   potential victims of the enterprise.

16             There would be discovery, and this goes --

17             THE COURT:  Right now the enterprise consists of, as

18   pled, Ganieva, Black, Rubenstein, and, although not a named

19   party, it appears to consist of, even though Wigdor has been

20   dropped, Wigdor, correct?

21             MR. FIGEL:  I think that is correct, your Honor, but

22   there are allegations with other unidentified third parties

23   that may be agents and may be participants in what we believe

24   to be the enterprise and some of the predicate acts.

25             THE COURT:  How about within Apollo?  Assuming all

M3a2BlaC

1    claims survive, what does discovery of Apollo look like.

2              MR. FIGEL:  Again, with all the caveats that I am not

3    authorized to say what our discovery would be, the -- one of

4    the core features of the alleged enterprise and the object of

5    the enterprise was to gain control or to retain managerial

6    control of Apollo by Mr. Harris.  You know, in order to do

7    that, the current complaint, I believe, fairly alleges that

8    there was an effort to damage Mr. Harris's reputation, to

9    enlist --

10             THE COURT:  To damage Mr. Black's reputation?

11             MR. FIGEL:  I'm sorry, yes, damage Mr. Black's

12   reputation, to enlist support among directors, other members of

13   management, to essentially push Mr. Black out of his position,

14   all of which caused economic harm, all of which, we believe,

15   may have involved other predicate activity.

16             THE COURT:  In other words, this angle, if you will,

17   of the case, assuming we get to discovery on all claims as

18   pled, the Apollo angle itself is a capacious area of discovery

19   because, for better or worse, you are anticipating a deep dive

20   into the internal politics of Apollo.  It would seem to me that

21   if you got what you wanted there, there have to be a lot of

22   timekeepers and a lot of electronic records that you would be

23   reviewing.  You wouldn't be, presumably, relying on just the

24   fruits of the internal investigation.

25             MR. FIGEL:  Yes, your Honor.  And again, I want to say

M3a2BlaC

1    that potentially, because obviously it's a public company, and

2    I want to be careful in terms of what I am saying in court.

3    But, yes, I do not believe that we would not seek quite

4    wide-ranging discovery from Apollo.

5         THE COURT:  I don't want to pin you down here, but I'm

6    trying to get a sense of scale.  If you got what you wanted

7    here in terms of discovery, assuming that all claims made it to

8    plenary discovery, we are looking at dozens of timekeepers,

9    whether in or out of Apollo, who would be -- third parties, as

10    well as parties, whose electronic and other materials would

11    have to be searched and produced.

12         MR. FIGEL:  Yes, your Honor.  Ms. Estrich has also

13    nodded to me that that's correct.

14         THE COURT:  And because the Apollo narrative goes back

15    some period of time, we are not only talking about a large

16    group of timekeepers, but also from a chronological

17    perspective, at least as to that dimension of things, we have

18    records that go back years.

19         MR. FIGEL:  Correct.

20         THE COURT:  Presumably each side would have an

21    interest in unpacking the developing Harris promotional

22    situation, for want of a better word.

23         MR. FIGEL:  Correct, yes.

24         THE COURT:  So if we can start with the premise that

25    what you would be seeking after the hypothetical denial of all

M3a2BlaC

1    motions to dismiss would be far reaching, Ms. Estrich, you were

2    about to say that what you are seeking now is more narrow.

3    What do you envision seeking prior to the resolution of a

4    motion to dismiss?

5          MS. ESTRICH:  Your Honor, first of all, thank you.

6    Prior to the motion to dismiss, we would seek limited

7    discovery, not depositions, document discovery aimed at further

8    establishing the connections between these individuals, between

9    the defendants, aimed at securing all documents reflecting

10   communications, whether on phone or Slack or What's App between

11   these defendants.  The defendants have all denied any

12   involvement at all in anything, and even the very limited

13   discovery we have gotten from the state court action has

14   demonstrated that Wigdor, for instance, was involved in the

15   case much earlier than the time they were retained.  We have

16   learned that.  Mr. Rubenstein made certain contacts with the

17   press, etc.

18         THE COURT:  Okay.  So just to be clear, what you are

19   proposing prior to the resolution of a motion to dismiss is

20   limited to evidence of communications among the charged

21   defendants, period, full stop.

22         MS. ESTRICH:  Well, I don't want a period, full stop.

23   That would be the primary focus.

24         THE COURT:  Let's get everything out there because if

25   you are asking -- if you are asking for limited discovery, I

M3a2BlaC

1    really need to understand what the ask is.

2         MS. ESTRICH:  We would hope to meet and confer with

3    the defendants as to the scope of the discovery, but it would

4    be limited to documents, it would be limited to documents

5    reflecting communications.  We would also like to know more

6    about Wigdor's retention in this case, because we had initially

7    thought they were retained in April and, as I said, we have now

8    learned they were involved as early as October.

9         THE COURT:  Is this the state case?

10        MS. ESTRICH:  In the state case.

11        THE COURT:  In the state case, okay.

12        MS. ESTRICH:  We would like to find out more about

13   Gigi -- Ms. Ganieva's financial records, which we have received

14   absolutely no discovery on; any evidence of payments made to

15   Wigdor in connection with this matter.  We are having

16   difficulty understanding a little bit what the -- if Wigdor has

17   been representing Ms. Ganieva for a year or longer and

18   litigating aggressively without getting paid or without making

19   any settlement demands, so we are trying to understand what the

20   relationship is.

21        We are interested in documents relating to the cagey

22   Apollo faction that apparently approached Alex Spiro, of the

23   Quinn Emanuel firm, in January of 2021 seeking representation

24   on behalf of Ms. Ganieva.  I think I can then say period, full

25   stop.

M3a2BlaC

1          THE COURT:  All right.  So those were five topics you

2     reviewed.

3          MS. ESTRICH:  Correct.

4          THE COURT:  Just focusing on the first, the

5     communications, it sounds short, as one puts it that way.

6     Communications in my world, which I see in civil and criminal

7     cases all day long, otherwise are known as e-mails, text

8     messages, social media.  It is the exception that swallows the

9     rule.

10         Is there some way you are proposing to limit

11    communications?  Because otherwise I think what you are saying

12    is, at least as to the parties here and their communications

13    carriers, we are talking about a pretty full-throated document

14    demand.

15         MS. ESTRICH:  We are only looking for communications

16    among them.  In other words, Mr. Rubenstein probably makes

17    hundreds and hundreds of phone calls a day.  I'm not interested

18    in who Mr. Rubenstein is talking to about his dozens and dozens

19    of other clients.  I am only interested in communications with

20    Ms. Ganieva for communications on her behalf.

21         THE COURT:  Just pause on that, though.  Put yourself

22    in the shoes of counsel for Mr. Rubenstein, let us say.  Let's

23    put aside communications directed at third parties that would

24    capture that communication.  The process of review, sure, at

25    some level it is just the communications which Mr. Buchdahl

M3a2BlaC

1    says is a null set.  But assuming that is factually incorrect,

2    he still needs to review ultimately a host of other

3    hypothetical communications that would bear on the issues in

4    this case, if any existed, to isolate those.

5         The concern, Ms. Estrich, is that the type of

6    discovery you are proposing here effectively forces the defense

7    counsel for that subpoena recipient to undertake a search now,

8    prior to the resolution for the motion to dismiss, and then to

9    essentially revisit the larger set later on to find other forms

10   of communication.  It sounds inefficient.

11        MS. ESTRICH:  Mr. Figel?

12        MR. FIGEL:  Do you mind if I respond?

13        THE COURT:  Go ahead.

14        MS. ESTRICH:  We are a team.

15        MR. FIGEL:  Obviously electronic discovery is an

16   enormous burden on all parties.  First of all, we would seek to

17   confer with defendants about how we could do that efficiently

18   and expeditiously.  From my general perspective, not enmeshed

19   in the details of this case, though, presumably all the

20   litigation -- in light of the litigation everybody should have

21   already frozen all of the electronic discovery.  I think any

22   responsible counsel should have done that.  Second of all,

23   presumably in preparing the motions and in preparing their own

24   defense, they presumably have some handle on what is available.

25   Mr. -- I believe it is Buchwald.

M3a2BlaC

1              MR. BUCHDAHL:  Buchdahl.

2              MR. FIGEL:  Mr. Buchdahl has done far more, so he can

3     represent there is a null set.  But once the data has been

4     collected, there are search terms that can be run that would be

5     fairly targeted to the specific issues that we think are

6     relevant at this stage of the litigation.  And just to

7     summarize it, there are allegations in the complaint, and we

8     have just received new discovery in the state court litigation

9     about how far back some of these interactions appeared to have

10    gone.

11             THE COURT:  And that state court production was from

12    whom?

13             MS. ESTRICH:  The cover letter was from the Wigdor

14    firm.

15             THE COURT:  I'm asking Mr. Figel, only for the court

16    reporter's benefit, just resist the temptation to swing away

17    from the mic.

18             MR. FIGEL:  Okay.  I apologize.

19             I believe it was from the Wigdor firm.  I assume it

20    was on behalf of Ms. Ganieva.  Because they are -- this is not

21    my area of strength, but I believe they are tweets or text

22    messages.  But there are a series of communications with third

23    parties who probably -- since I don't know the protective

24    order, I should be careful about identifying -- that suggest

25    that the Wigdor firm was involved on acting on Ms. Ganieva's

M3a2BlaC

1    behalf well before the representations about their engagement.

2            THE COURT:  But the application here is essentially to

3    use either the meet-and-confer process or shortcuts of search

4    terms to limit the excess work created by two sequential

5    productions.

6            MR. FIGEL:  Right.  And for a relatively narrow

7    purpose at this stage, which is, the complaint has alleged an

8    enterprise and interaction, and we have received either in

9    court or through the motions to dismiss representations that it

10   is just not true.  There was no involvement.  There was no

11   interaction.  We think targeted discovery focused on

12   identifying whether there were such interactions and

13   communications would be of use for everybody.  If it really is

14   a null set, that informs our position.  If there are

15   communications that predate the engagement of Wigdor on behalf

16   of Ms. Ganieva and show that Mr. Rubenstein was involved

17   earlier, I'm not making representations one way or another, but

18   just identifying whether those types of communications occurred

19   I believe would facilitate an understanding and a narrowing of

20   issues in this case.

21           THE COURT:  Help me know why.  In other words, we have

22   got a motion to dismiss.  The original motion has been filed.

23   The reply will be due in a matter of weeks.  Assume it is

24   handled with dispatch by my chambers.  Why does it matter?  Why

25   do you need that material in the two to three months earlier

M3a2BlaC

1    than you would if hypothetically you survived the motion to

2    dismiss?

3        MR. FIGEL:  Well, one small point, your Honor.  One of

4    the things we are considering — we haven't made a decision — is

5    whether we would seek an amendment.  We believe there is an

6    argument.  We have an amendment as of right as to the initial

7    two new defendants in the case.

8        THE COURT:  Let's pause on that.  I issued an "amend

9    or oppose" order.  You amended.  That was your right to do so.

10   The original complaint lists Does 1, 2, and 3.  I assumed that

11   Harris and Rubenstein are among those Does.  Are they not?

12       MS. ESTRICH:  I think I would be out of my depth, your

13   Honor.

14       THE COURT:  Ms. Estrich?

15       MR. FIGEL:  May I just make one point please and then

16   turn it over?

17       THE COURT:  Sure.  Go ahead.

18       MR. FIGEL:  Whether we have the right under Rule 15 on

19   the case law I am not prepared to argue today, because I'm sure

20   your Honor knows Rule 15 permits liberal amendments.  We have

21   had motions that inform the defendants' view of the defenses,

22   and we might want to address and amend the complaint.

23       THE COURT:  Let's just ask the specific question.

24   Ms. Estrich, your initial RICO complaint against Wigdor and

25   Ganieva also was brought against three Doe defendants.  Are

M3a2BlaC

1    those in fact now known to include Harris and Rubenstein?

2        MS. ESTRICH:  Yes, your Honor.

3        THE COURT:  So even if identified as a Doe, Harris and

4    Rubenstein are now -- there is now a second -- there is an

5    amended complaint as to each of them.

6        MS. ESTRICH:  There is, your Honor.  I had intended to

7    raise this later, but the parties -- in terms of the timing,

8    the parties have reached an agreement and asked me or asked us

9    to present it to the Court.  Given Mr. Figel has just joined

10   the case, given that we received a hundred pages of briefing,

11   we reached an agreement among ourselves, which I would

12   respectfully offer to the Court, to amend the schedule.

13       Mr. Figel, do you want to?

14       The schedule would be amended such that our response

15   to the four motions to dismiss would be due on April 4 and

16   defendants' replies would be due on April 22.  All of the

17   defendants have consented to this schedule change to allow us

18   sufficient time to respond to a hundred pages --

19       THE COURT:  That is a modest request.  I will consider

20   it, but I have ever reason to assume, if it's mutual, the last

21   thing I want to do in a case where all of you are able to agree

22   is to be the one to upset that.  Let's assume that's going to

23   be granted.

24       Still in all, the real question is, all right, that

25   defers, then, the resolution of this by a month or something.

M3a2BlaC

1    If you are responding, you are presumably foregoing, then, the

2    decision to seek electively the right to amend.

3         MS. ESTRICH:  We would like to use that time period in

4    part to decide whether our appropriate response is to oppose

5    the motions to dismiss or whether, in light of the new evidence

6    we have received, which does change certain critical facts, we

7    should seek the Court's permission to amend, even if we don't

8    have an amendment as of right.  And we would do that within

9    that time period.

10        THE COURT:  Be that as it may, if the complaint may

11   yet even change, if you are proposing to amend, why should you

12   get discovery before all of this is sorted out?  We are not

13   only talking about seeking discovery before a motion to dismiss

14   is resolved; you are talking about seeking discovery before an

15   amended complaint is decided upon.

16        MS. ESTRICH:  I think what we are hoping to do, your

17   Honor, is to narrow the issues in this case, to get closer to

18   the actual facts, since we are diametrically opposed on facts,

19   and to see, as your Honor has suggested, if there is any

20   possibility that discovery may aid and effectively promote the

21   resolution of this case.

22        THE COURT:  Is all of the discovery that you would be

23   seeking here, Ms. Estrich, as an initial, preliminary matter

24   before the resolution of a motion to dismiss, discovery that

25   you would be seeking -- that you are seeking or would you

M3a2BlaC

1    seeking in the state court case?

2                MS. ESTRICH:  No.

3                THE COURT:  What is it that exceeds the scope of the

4    state court discovery?

5                MS. ESTRICH:  We have gotten no discovery --

6                THE COURT:  Not what you have gotten.  Not what you

7    have gotten.  I hear your frustration in terms of what you are

8    seeking.

9                MS. ESTRICH:  I'm sorry.  Let me confer with Mr. Figel

10   for a moment.

11               (Counsel confer)

12               MS. ESTRICH:  With all of the caveats that I have not

13   yet been admitted into the state court case and don't want to

14   speak entirely for counsel, we have much stronger arguments for

15   discovery against Mr. Harris and Mr. Rubenstein in this case

16   than we do in the state court case, and we have some very

17   different arguments against -- relating to the Wigdor firm in

18   this case where Wigdor is a defendant than we do in the state

19   court case.  So I expect our discovery requests and our

20   arguments and advocacy would be quite different in this case

21   than it is in the state court case.

22               THE COURT:  Okay.  All right.  Anything further you

23   want to say on behalf -- in support of limited discovery

24   pending the resolution of a motion to dismiss?

25               MS. ESTRICH:  Mr. Figel?

M3a2BlaC

1          MR. FIGEL:  Sorry for the Ping-Ponging.  Only to make

2    the observation that, given the positions the parties have

3    taken before your Honor are so diametrically opposed, you know,

4    an allegation that there was an enterprise that likely predated

5    Mr. Black's departure from Apollo and representations to the

6    Court that various defendants had absolutely nothing to do with

7    it, you know, if there were evidence of communications and

8    interactions in support of the racketeering and defamation

9    claims that are pending before this Court, I think it would be

10   highly probative and relevant to a resolution and a path

11   forward for this case.

12          In other words, with the parties so diametrically

13   opposed and saying we have nothing to do with it and we said,

14   yes, you did, if the phone records or some of the limited

15   discovery we are seeking shed light on that, I think it would

16   change the postures of the parties in a very constructive way.

17          THE COURT:  Just give me the imaginable evidence that

18   you get from discovery that actually is a thunderclap that

19   promotes settlement here early.

20          MR. FIGEL:  Well, I want to be careful because that I

21   am now hypothesizing.  I'm making representations.

22          THE COURT:  Understood.  Hypothesize within the area

23   of nonfantastical.

24          What is it that you could actually get from what you

25   are seeking that could actually bring this to a conclusion?

M3a2BlaC

1          MR. FIGEL:  For instance — and this one is closer to

2     the facts — in the recent discovery that we received from state

3     court, there are references in the tweets to the Wigdor firm

4     acting on behalf of Ms. Ganieva with reporters well before

5     their engagement in this case.  Why they were doing that, at

6     whose behest, and under what circumstances is very relevant.

7     If there are communications that suggest or would permit the

8     inference that Wigdor was doing that because they had

9     communications with Mr. Rubenstein or with Mr. Harris, that

10    would, I think, change the posture of the defense in this case

11    and it would also change the posture of how the Court would

12    view appropriate discovery going forward.  If, as Mr. Buchdahl

13    says, we propound discovery to Mr. Harris and it is a null set,

14    that obviously will inform our view as to what is proveable and

15    what can be responsibly pursued in discovery.

16          THE COURT:  All right.  Thank you.

17          Let me then go around the horn.  The opening question

18    is defense is seeking, I take it, a complete stay of discovery.

19    Just briefly, why?  I am particularly interested in your answer

20    insofar as you have now gotten some articulation of what the

21    limited request for discovery by the plaintiffs would be.  So

22    let's begin with -- all right, I see Mr. Gershenoff, for

23    Wigdor, you are proposing to speak first.  Everyone will get a

24    chance.  That's fine.

25          MR. GERSHENOFF:  If I may, your Honor?

M3a2BlaC

1          THE COURT:  Of course.

2          MR. GERSHENOFF:  Yes, we do believe that discovery

3     should be stayed pending the resolution of the motion to

4     dismiss.  Based on what we have heard so far, it is certainly

5     my impression that what's happened here is the plaintiff is

6     looking for discovery in order to establish whether he has a

7     claim against Wigdor as well as the other defendants rather

8     than to buttress or support a claim that actually has been

9     sufficiently and plausibly alleged.  And as the Court may know,

10    that's not usually how it is done.  You usually have the

11    evidence or have a good-faith basis for your claims before you

12    assert them.  In this case it seems to be the reverse.

13         And to the extent that they contend that they are

14    looking for only limited discovery, it did in fact seem like

15    the supposedly limited discovery that they are seeking is

16    actually very far reaching discovery.  And what's more, to the

17    extent that they contend that they are only seeking

18    communications, for example, between and among the defendants

19    in the case, well, the defendants in the case include

20    Ms. Ganieva, the plaintiff, in a first-filed state court case

21    against Mr. Black, as well as her counsel, Wigdor, in that

22    first-filed state court case.  It is our position, your Honor,

23    that if the Court were to permit discovery and proceed pending

24    the resolution of the motions to dismiss, which we do think are

25    poised to dispose of at least the claims as to Wigdor, that

M3a2BlaC

1    would make it extremely difficult, if not impossible, for

2    Wigdor to effectively represent its client in that first-filed

3    state court case.  And our concerns are heightened in that

4    context by the fact that the claims in this case are -- at

5    least against Wigdor are, in substance, that Wigdor defamed

6    Mr. Black in connection with its representation of Ms. Ganieva

7    in that first-filed state court case.

8            So we think it would be very hazardous.  It would tend

9    to chill lawyers' ability to represent their clients if this

10   sort of approach was permitted to proceed.

11           THE COURT:  What you have said raises a question which

12   is really better directed to a later stage of the case, but I

13   will ask it now.

14           Assume for argument's sake that the defamation claim

15   against Wigdor were to survive.  Put aside whether it would be

16   litigated here or if the federal claims here were to not

17   survive and a successful application for me to not exercise

18   supplemental jurisdiction were made such that the case were

19   brought in, those claims were to proceed in state court, how

20   does that work?

21           In other words, go with it and assume that there is a

22   well pled defamation claim against Wigdor at the same time that

23   Wigdor is representing Ms. Ganieva in claims that are

24   essentially integrally related with the defamation claim in

25   state court.  Just as a matter of management, even assuming

M3a2BlaC

1    within the same court, same state court, how would that work.

2            MR. GERSHENOFF:  It's hard to imagine, quite frankly,

3    your Honor.  It seems we would get bogged down in all kinds of

4    privilege in this case because in order to establish the -- if

5    the defamation claim against Wigdor were to survive in this

6    case — and of course we contend it shouldn't — but if the

7    defamation claim were to survive in this case, then the theory

8    of the defamation claim is that the state court action, which

9    was, you know, featuring a complaint that Wigdor signed,

10   constitutes defamation.  So you are going to have really

11   parallel issues being tried in two courts with a privilege

12   morass relating to the discovery from Wigdor necessary to

13   establish the defamation claim in this case.  And that's why,

14   your Honor --

15           THE COURT:  But let's assume for argument's sake again

16   that the claim were well pled, so that it is not -- it

17   shouldn't be treated under that hypothesis as a stunt but as a

18   valid basis to get relief by Mr. Black.  Under those

19   circumstances, he is entitled, assuming the motion to dismiss

20   is denied as to the defamation claim, to get discovery.  There

21   is privilege issue that would be have to be resolved inch by

22   inch, but ultimately he would be entitled to something from

23   Wigdor, whatever it would be.  The issue is just how does --

24   how do those two proceedings — the affirmative Ganieva case and

25   the Black defamation case — proceed in tandem?  How does that

M3a2BlaC

1  work?

2          MR. GERSHENOFF:  Your Honor, quite frankly, it's hard

3  for me to imagine because I would think that most of the

4  discovery, if not all of the discovery, relevant to prove the

5  defamation claim will be subject to a privilege objection, to

6  an objection -- you know, a qualified privilege objection,

7  maybe as material prepared in anticipation of litigation, if

8  not out-and-out attorney-client communications.

9          THE COURT:  One of the challenges that occurs to me —

10  and, again, this is a down-the-road issue, perhaps — is if

11  there is a circumstance under which Wigdor is ever producing

12  something for the limited purpose of this litigation and

13  whether there is a way of, under the challenging circumstances

14  here, cordoning it off from the Ganieva lawsuit.  I don't know

15  if there is even such a thing, but you can understand the

16  nature of the problem.

17          MR. GERSHENOFF:  Yes.  I think it certainly is a

18  problem, your Honor.  And more broadly, your Honor, as far as

19  the discovery in a defamation case in this court, based on the

20  notion that my client defamed Mr. Black in his pleadings in the

21  first-filed state court case, it would chill his ability to

22  represent Ms. Ganieva in that first-filed case.  And so for

23  that reason, your Honor, we think the more prudent approach in

24  this case would be to wait the few months until the motions to

25  dismiss are adjudicated before allowing discovery to proceed at

M3a2BlaC

1    least against Wigdor.

2                THE COURT:  Okay.

3                MR. GERSHENOFF:  Thank you.

4                THE COURT:  Okay.  Who wants to speak next?  All

5    right.  That's --

6                MR. MINTZER:  I will be brief, your Honor.  We --

7                THE COURT:  That's Mr. Spagnoletti?

8                MR. SPAGNOLETTI:  No.  I'm Mr. Spagnoletti.

9                MR. MINTZER:  I'm Mr. Mintzer.

10               THE COURT:  Go ahead.  Sorry.

11               MR. MINTZER:  For Ms. Ganieva, we echo the comments

12   from Wigdor's counsel.  And I would also add that Ms. Ganieva

13   hired the Wigdor firm to represent her in the state court

14   action and has an interest in working with her chosen counsel

15   to both pursue her claims and, to the extent that there were

16   any counterclaims which, as your Honor knows now, were

17   originally made in the state court claims, to defend those

18   claims.  So what we have here is satellite litigation that is

19   required because of the allegations, specious allegations that

20   they have withdrawn already in part against Wigdor, her counsel

21   in that case, have required her to get new counsel.  In order

22   to require her to start engaging in a whole discovery process

23   with new counsel, my office, you should require -- should have

24   them show that they have some claims that have merit.

25               THE COURT:  Related to that, I think what I am hearing

M3a2BlaC

1    you say is any limited discovery now getting at Wigdor and

2    Ganieva communications runs a risk of impairing the

3    attorney-client relationship between Ganieva and Wigdor in the

4    state court case, and while that may or may not become a

5    necessary thing down the road, one oughtn't get to it

6    immediately.

7         MR. MINTZER:  That is correct, your Honor.  That is

8    part of it.

9         And then the other piece of it, I would just say more

10   broadly they have taken this -- this lawsuit, from our

11   perspective, is a tactical retaliatory strike against

12   Ms. Ganieva to make it as difficult as possible for her, a

13   woman who has alleged that she was sexually abused by

14   Mr. Black, to pursue her claims.  And having had to engage

15   counsel already to defend and file a motion to dismiss twice

16   against what are, charitably speaking, thinly pled RICO claims,

17   which maybe there is a third amendment coming, we are hearing,

18   but then to start discovery --

19         THE COURT:  I didn't catch the last thing you said.

20         MR. MINTZER:  I said we are maybe talking about yet

21   another amendment to actually explain the basis of these

22   claims, so maybe there is going to be a third motion to dismiss

23   that's going to be necessary.  But to require her to not only

24   engage counsel for that purpose, but also to engage in a

25   parallel discovery process with what's going on in the state

M3a2BlaC

1  court action with new counsel, is all to the effect of and it

2  is intended to, respectfully, interfere with her right to

3  pursue that state court action, and the Court shouldn't allow

4  it, at least until there has been a substantial showing that

5  there is any claim with merit here, a federal claim with merit

6  here.  Because of course that's why we are in this federal

7  courthouse, because they have claimed there is a RICO

8  enterprise, right, your Honor.  And so they should have to at

9  least come forward with some substantial claim that your Honor

10  has ruled upon and thinks has some basis before they are

11  allowed to start engaging in a fishing expedition against my

12  client, other clients that have the consequences I just

13  mentioned.

14          THE COURT:  Very good.

15          Mr. Buchdahl.

16          MR. BUCHDAHL:  Thank you, your Honor.

17          Not surprisingly, we agree that all discovery should

18  be stayed pending the outcome of the motion.  As counsel just

19  mentioned, the only reason we are here is because of this RICO

20  allegation.  There is no other basis for federal jurisdiction.

21  We have collectively identified scores of legal defects in that

22  RICO pleading.

23          And I would just, aside from that, like to highlight

24  two things that I heard from plaintiff's counsel earlier.  The

25  first is this notion of an amended complaint.  As the Court

M3a2BlaC

1    suggested, particularly if the pleadings aren't settled, the

2    notion that we would potentially start discovery when there

3    might even be additional parties brought into this seems highly

4    inefficient and improper.  Mr. Rubenstein is collateral damage

5    here.  He was not mentioned in the first complaint.  He was

6    brought in as an attempt to kind of salvage deficient pleadings

7    the first time.  What I am now hearing from plaintiff's counsel

8    is that, in an attempt to salvage still deficient pleadings,

9    they might rope in additional potential defendants into this,

10   expanding the case even further and making it, in my view, even

11   less plausible.

12          THE COURT:  Point taken, but let's assume the other

13   scenario under which there isn't an attempt to amend.

14          MR. BUCHDAHL:  As far as that goes, the Court asked,

15   what is the difference between the discovery against

16   Mr. Rubenstein here and in the state court, and the response

17   was we have better arguments to get the discovery here.  That

18   is, quite frankly, why Mr. Rubenstein is a defendant here.

19   They wanted better arguments to get discovery from him because

20   they lack them in the state court action.  There is no

21   discovery to get; but, regardless, the federal claim against

22   Mr. Rubenstein, respectfully, should be dismissed before they

23   try to use it to get discovery they can't get elsewhere.

24          THE COURT:  More granularly, just -- Mr. Buchdahl, I

25   will stick with you for a moment -- as to burden, look, I

M3a2BlaC

1    appreciate that your preview is that, at the end of the day,

2    there is nothing to be got.  Nevertheless, you appear to be the

3    one counsel here who has actually taken a close look at the

4    process of getting from here to there in terms of reviewing

5    discovery, so let's indulge the proposal for pre-motion to

6    dismiss resolution of discovery by the plaintiff.  Address for

7    me, just from a practical perspective, what it would mean in

8    terms of burden and inefficiency to permit that since you have

9    gotten your hands dirty with this.

10             MR. BUCHDAHL:  Right.  So just to be precise, my hands

11   are not the dirty ones.  Mr. Rubenstein had other counsel in

12   the state court action, counsel from Loeb & Loeb, which was

13   dealing with counsel for Mr. Black and which conducted a

14   collection and review of documents.  So I should be very clear

15   that I am not basing this on my own review of the documents.

16             Having said that, of course we would be obligated to

17   review these documents again if we were asked or required by

18   the Court to conduct -- engage in discovery before there is a

19   decision on these motions.  What it would look like depends on,

20   I suppose, the outcome of the meet-and-confer that plaintiff's

21   counsel have invited.

22             But one of the oddities of this complaint, your Honor,

23   is that they allege that this attempted coup within Apollo was

24   a part of the enterprise.  All of that predated

25   Mr. Rubenstein's awareness of the existence of Ms. Ganieva.

M3a2BlaC

1          So if what they are going to ask for is all of the

2     documents relating to Mr. Rubenstein's engagement by Apollo,

3     you know, over the years, we are dealing with an extremely

4     broad request that might likely go well beyond that.  What I

5     can tell the Court is that the kind of -- in terms of between

6     the parties, right, there are obviously communications between

7     Mr. Harris and Apollo and Mr. Rubenstein.  None of those

8     involved Ms. Ganieva.

9          THE COURT:  What would be the types of topics that

10     Mr. Harris and Mr. Rubenstein would have engaged on?

11          MR. BUCHDAHL:  Public relations in connection with the

12     conduct of Apollo.

13          THE COURT:  So if the bid here were for communications

14     among the parties, strictly speaking, that picks up, you are

15     saying, a fair amount of communications between Harris and

16     Rubenstein that would need to be reviewed for responsiveness.

17          MR. BUCHDAHL:  Presumably very large amount of

18     communications.

19          THE COURT:  Could you just proffer a little bit more

20     about that to me?

21          MR. BUCHDAHL:  Mr. Rubenstein's firm was engaged by

22     Apollo for a number of years on behalf of Apollo and, in

23     connection with that, Mr. Harris was one of the executives who

24     worked closely with the firm.

25          THE COURT:  All right.  Thank you.  All right.

M3a2BlaC

1   Finally, Mr. Spagnoletti.

2           MR. SPAGNOLETTI:  Thank you, your Honor.  I won't

3   belabor the point.  I believe you have heard many arguments

4   from counsel already today.  Let me just put a fine point on a

5   few of them.

6           The standard for a stay looks at several elements.

7   One of them is whether or not there has been a strong showing

8   that the complaint lacks merit.  And I would submit that we

9   have that in spades here, your Honor.  What the plaintiff has

10  alleged is essentially a conspiracy among strangers, and what

11  they are looking for in their limited discovery is evidence of

12  that so that they can properly allege the conspiracy.  They

13  haven't done so yet.  They haven't come close to alleging an

14  enterprise.  They haven't come close to alleging a pattern of

15  racketeering.  They haven't come close to alleging requisite

16  predicate acts and so on.  I think the complaint itself is

17  facially baseless, and that's a significant weight when the

18  Court is considering whether or not a stay should be granted

19  here.

20          Another element is whether or not there is prejudice

21  to the plaintiff in the stay being put in place.  Your Honor,

22  it is very clear that there is no prejudice.  The plaintiff,

23  unlike most RICO plaintiffs, already has a head start.  They

24  have a litigation in state court.  They have taken discovery

25  from Ganieva.  They have discovery that they are seeking from

M3a2BlaC

Mr. Rubenstein.  Mr. Black hasn't subpoenaed Mr. Harris, but

Wigdor subpoenaed Mr. Harris, and we responded to that subpoena

in state court.  So they already have a head start.  They

already have some limited discovery that most RICO plaintiffs

don't have.  And in these circumstances, when their complaint

is so facially deficient, and when it is so obvious that the

limited discovery they are looking for is to plug the holes in

the very complaint that's deficient, that balance weighs

clearly in favor of there being a stay in this case.

       There will be a burden on Mr. Harris and the other

defendants.  That's another element of the stay.  There will be

a burden if we have to go through this discovery process.  Part

of it is just the burden associated with the normal blocking

and tackling of collecting documents, spending money, spending

time, reviewing the many, many documents that there probably do

exist between Mr. Harris and Mr. Rubenstein on other issues.

       But I will just remind the Court, as we set forth in

our brief, you know, this Court itself has said and cautioned a

number of times how important it is to flush out frivolous RICO

allegations at an early stage of a litigation.  I would submit

it's completely inconsistent with that goal to allow a fishing

expedition that would allow the plaintiffs to cure their

pleading deficiencies and allow discovery to go forward here.

       THE COURT:  All right.  Thank you.  One moment.

       May I just ask for defendant Black, so Ms. Estrich, I

M3a2BlaC

1    understand there is no overlap -- well, maybe there is now.  I

2    was going to ask what the level of coordination there is

3    between you and your counterpart for the same client in state

4    court?  You are now about to be in that case, so I can assume

5    that there will be perfect coordination.

6            MS. ESTRICH:  Yes, your Honor.  And I will work with

7    Mr. Figel to ensure that.

8            THE COURT:  All right.  And as to Ms. Ganieva,

9    Mr. Mintzer, you are not counsel in the state court case.  Can

10   I have your representation that, whatever the course of this

11   case will be, there will be active coordination.

12           MR. MINTZER:  Active coordination with the Wigdor

13   firm?

14           THE COURT:  With the counsel who represent your client

15   in state court.

16           MR. MINTZER:  I, of course, would endeavor to do that,

17   your Honor.

18           THE COURT:  Okay.  All right.

19           Let me just turn, then, to -- I'm going to reserve for

20   the time being on the arguments that may or may not be informed

21   by where else we go in this conference.  Let me just turn to

22   the third subject I wanted to raise involving the pending

23   motions to dismiss.

24           Ms. Estrich, understanding that they have just come

25   in, not committing you to any position here, to the extent that

M3a2BlaC

you can give me just a quick synopsis as to why you believe the

motions to dismiss are without merit, I would welcome hearing

that.  If you are not prepared to, that's fine, but I would

welcome a preview.

MS. ESTRICH:  Your Honor, I could do this for hours,

and I won't.

We believe we have pleaded well-pleaded RICO

allegations that meet the standards of the Second Circuit and

the United States Supreme Court that plead adequate predicate

acts by the defendants acting together in an effort to not only

assassinate the character of my client, but also to wrest

control of a publicly traded company and to undermine the

actions of the board.

We believe that there was not a single victim, but the

Second Circuit has held that a single victim does not

necessarily preclude a RICO case.  We believe the defendants

did in fact know each other, that they were not strangers.  We

would point to the evidence that has come out to date, evidence

showing, as we have said repeatedly, early involvement by the

Wigdor firm; evidence well pled in our complaint that

Mr. Rubenstein did in fact reach out to reporters on behalf or

in opposition to Mr. Black in an effort to, if not assassinate

his character, undermine his position.  We have evidence that

Ms. Ganieva, notwithstanding her claims, through tweets, e-mail

messages, and the like, expressed her love and affection for

M3a2BlaC

1   Mr. Black, and at no time ever mentioned sexual assault when

2   she was in the process of demanding as much as $100 million

3   from him.  So we can show, even at this early point, that for

4   each of the defendants there is reason to believe that these

5   blanket denials are at the very least somewhat deceptive and do

6   not capture the full extent of this enterprise.  I do believe

7   that we are ready to argue these issues on the motion to

8   dismiss.  We are ready to brief these issues in full.  If the

9   Court would like further briefing on discovery, we are happy to

10  provide that, but we don't think we are asking for a fishing

11  expedition right now.  We think we are asking for limited

12  discovery, and we are not asking for it to plug --

13          THE COURT:  Sorry.  Just asking about we are on the

14  motion to dismiss.

15          MS. ESTRICH:  On the motion to dismiss.  We are not

16  plugging -- we believe the complaint is well pled.  Our purpose

17  in seeking discovery is to aid in the resolution of this case

18  not to fill in the holes of the complaint.

19          THE COURT:  Let me ask you about a separate question

20  that's raised by a number of the defense motions.  A number of

21  defense motions ask the Court, assuming that the RICO and RICO

22  conspiracy claims, which are the only federal questions here,

23  were dismissed, to decline to exercise supplemental

24  jurisdiction, given the early stage of the case, and thereby

25  allow Mr. Black to pursue the state claims in state court as he

M3a2BlaC

1    once attempted to pursue some of those, if not all, as

2    counterclaims.

3           Let's just go with it.  Assume the premise of the

4    question, which is that the RICO and RICO conspiracy claims

5    were dismissed.  You have not pled diversity jurisdiction.

6    There has been no allegation about the citizenship of the

7    Wigdor members, for example, and it appears in any event that

8    there are multiple New Yorkers on different sides of the V.  So

9    under those circumstances, would you have a good-faith argument

10   why I should exercise supplemental jurisdiction if the federal

11   claims were dismissed?

12          MS. ESTRICH:  I don't want to make that argument today

13   and preclude further research, but our good-faith argument

14   would at least begin with the premise that full relief is not

15   available in the state court.

16          THE COURT:  Wait a minute.  You are not casting shade

17   on the judge there.  You are just --

18          MS. ESTRICH:  No.

19          THE COURT:  -- simply saying that for everybody the

20   case is moving at a snail's pace.

21          MS. ESTRICH:  That's correct, your Honor.

22          THE COURT:  The case that was initiated by somebody

23   else.  In other words, if the case is moving slowly in the

24   state court but ultimately to an even-handed resolution, why is

25   that a basis to exercise supplemental jurisdiction if the

M3a2BlaC

1  posture we are at is the federal claims are gone and there has

2  not been meaningful forward progress on the state claims?

3      MS. ESTRICH:  Let me give you one example.  Wigdor is

4  a defendant in this case, a defendant on a defamation claim.

5  As the Court has recognized, we have a right to make a

6  defamation claim.  Litigation is not a one-way street and

7  assuming it is a well-pled claim, we have a right to make it.

8  Where are we going to make it?  My counsel, co-counsel argues

9  that even bringing the claim in federal court interferes and

10  chills Wigdor's representation of Ms. Ganieva in the state

11  court.  Would they prefer to become a defendant in the state

12  court action?  If we were to sue Wigdor in the state court

13  action, I can promise you they would say that we were simply

14  trying to disqualify them.

15      THE COURT:  But, Ms. Estrich, that's just a matter of

16  location.  Assuming that the defamation claim by Mr. Black goes

17  forward, and I fully understand the factual basis for it, one

18  way or the other -- and assuming it goes forward as against

19  Wigdor, one way or the other some court is going to be

20  grappling with the awkwardness of Wigdor both being counsel in

21  a state court affirmative lawsuit and a defendant in a lawsuit,

22  regardless of the venue, in which its privileged material is

23  being sought.  One way or the other, some judge or judges has

24  to grapple with that.  Is there a reason to think that it is a

25  more rationally built mousetrap for me to be sorting that out

M3a2BlaC

1    here rather than one or two judges in the state court sorting

2    that out?

3         MS. ESTRICH:  We believe that it is preferrable to

4    sort it out here because we are already here.  You will by that

5    point be already invested in this case.

6         THE COURT:  Only, only hypothetically to the extent

7    you are resolving a motion to dismiss and the considerable dive

8    I am taking today.

9         MS. ESTRICH:  And the consider dive that I expect the

10   Court will take in the motion to dismiss in understanding the

11   facts, the interplay, the parties, the scope of the defamation,

12   the grounds for the defamation.  Those claims do overlap.

13        THE COURT:  But in fairness --

14        MS. ESTRICH:  It's difficult --

15        THE COURT:  -- I routinely have this issue in

16   employment for Title VII cases and very familiarly what will

17   happen is you will have the federal hook to get into court that

18   sounds in, say, Title VII and when those cases get dismissed,

19   you have got breach of contract or New York Human Rights Law

20   claims or ones that don't completely track the federal claims;

21   and it's almost an article of automatic faith that if there has

22   been no discovery in the case and the case -- the federal claim

23   has been dismissed on the pleadings, supplemental jurisdiction

24   is not exercised.  The question is what's different here?

25        MS. ESTRICH:  It will be an uphill battle for me to

M3a2BlaC

1  convince you to exercise supplemental jurisdiction.

2          THE COURT:  But I'm giving you a chance.

3          MS. ESTRICH:  But I will try and I would only ask the

4  Court's permission to try at a later date when I have

5  permission to consult with my colleagues and deal with what is

6  now a hypothetical that is one that is a difficult one.

7          THE COURT:  Okay.  Fair enough.

8          All right.  Defense, I don't know if anybody cares to

9  address anything I have just covered with Ms. Estrich, which

10  includes she gave me a short synopsis of what an opposition to

11  the motion to dismiss might look like.  Understanding that it

12  is premature and there is work to be done and an extension

13  sought and to be granted, as well as giving an initial reaction

14  to a hypothetical involving supplemental jurisdiction, no need

15  for anyone to speak about that.  If you have got something to

16  contribute, though, I am happy to hear it.

17          Mr. Buchdahl.

18          MR. BUCHDAHL:  The only thing I would say, your Honor,

19  is that Mr. Rubenstein would strongly prefer that a defamation

20  claim against him be addressed and dismissed on the merits so

21  he does not then have to go and face a third attempt to get

22  discovery from him in state court.

23          THE COURT:  Well, let's -- in that limited respect,

24  you are taking a different position from some of your

25  co-counsel.

M3a2BlaC

1          MR. BUCHDAHL:  Well, I think that --

2          THE COURT:  At least you and Mr. Harris are not

3    parties in that state court case.  Were the Court to decline to

4    exercise supplemental jurisdiction, the issue would then be

5    whether Mr. Black chooses to sue your client not in RICO but in

6    defamation, let's say, in state court, and you would be at

7    liberty to make whatever show-and-tell you wanted to in advance

8    of a pleading decision by plaintiffs in the hope of backing

9    them off the plate.

10         MR. BUCHDAHL:  And certainly there are also statute of

11   limitations questions and other issues.

12         But having said all that, again, we think that there

13   are ample grounds to dismiss that claim with prejudice on the

14   merits.

15         THE COURT:  All right.  Thank you.

16         MR. SPAGNOLETTI:  I won't repeat what Mr. Buchdahl

17   said.  We also believe that the defamation claim against

18   Mr. Harris should be dismissed with prejudice, even if the RICO

19   claims against Mr. Harris are dismissed, just because the

20   defamation claim is so facially inadequate.  There is not even

21   a statement that is alleged to be made by Mr. Harris.

22         THE COURT:  But I take it, from a functional point of

23   view, the reason both of you are asking that if the RICO claims

24   are dismissed that I should reach the claims as against your

25   client, state law claims, is because it makes the difference

M3a2BlaC

1    between whether your client is out from under entirely or has

2    to face the prospect of facing a similar state court claim in

3    state court, an argument that's not available to Ms. Ganieva.

4            MR. SPAGNOLETTI:  That's absolutely right, your Honor.

5    There is a judicial economy overall to this Court addressing

6    the defamation claims in the motion to dismiss with respect to

7    Mr. Harris and Mr. Rubenstein just so that the parties don't

8    have to go through this all again.  The Court will already be

9    up to speed, presumably, on the legal issues relating to those

10   claims in connection with the motion to dismiss.

11           THE COURT:  All right.  Thank you.  All right.  Let me

12   see how we are doing.  All right.

13           Let's then turn to just a few issues I have to take up

14   with respect to the sanctions motion.  But, again, I really

15   don't want to argue that.  I am really trying to keep the

16   temperature down.  Let me just ask, as you can tell I am really

17   just trying to think about the moving parts of the case.

18           Ms. Estrich, understanding that you oppose the

19   sanctions motion, is there any interplay between when the Court

20   resolves that motion and the forward process of this litigation

21   regardless of whether there is limited discovery or not?

22           (Counsel confer)

23           MS. ESTRICH:  Your Honor, I would think, and I say

24   this respectfully — because this is certainly your purview, not

25   mine — that it would make far more sense to decide the motion

M3a2BlaC

1    to dismiss first, because that is the occasion for making the

2    arguments on the merits as to our RICO claim.

3          THE COURT:  But that used to be more so when the RICO

4    claim against Wigdor was the subject of the motion to dismiss.

5    With that having been dropped, the analysis that I will have to

6    do on the motion to dismiss, whether it is the RICO claim on

7    the current complaint or if you were permitted to do a new one,

8    is different.  It's not about Wigdor, and some of the arguments

9    in the sanctions motion are keyed to the fact that the claim's

10   made against Wigdor.

11         MS. ESTRICH:  Some, but not all.  And many of the

12   arguments in the RICO -- in the sanctions motion exactly mirror

13   the arguments I saw in the motions to dismiss which we recently

14   received.  They go through the elements of the RICO claim and

15   say you didn't meet this element, you didn't meet this element,

16   you didn't meet this element.

17         THE COURT:  Sure, but a lot of it is the proposition

18   Wigdor is a law firm.  A RICO claim against a law firm for

19   litigation or litigation adjacent activities is viewed under

20   different standards.  That's gone from the analysis I will have

21   to do.

22         MS. ESTRICH:  Yes, it is, your Honor.  But also now

23   newly a part of the analysis you will have to do is the fact

24   that many of the claims made in that Rule 11 motion are

25   premised on the fact that Wigdor was not involved in this case

M3a2BlaC

1    until April of 2021.  We now know that that is simply not true.

2    In October and November of 2020 --

3              THE COURT:  Why --

4              (Indiscernible crosstalk)

5              MS. ESTRICH:  I apologize.

6              THE COURT:  I know there is a lot you want to say, but

7    I'm really just trying to get at whether there is urgency to

8    resolving it.  In some cases there is an urgency when there is

9    a first swipe at a Rule 11 early in a case to get it out of

10   there just to calm things down to promote settlement.  That

11   doesn't appear to be where we are at right now.  I am trying to

12   figure out if functionally there is -- it makes a difference as

13   to the forward progress of this case when the sanctions motion

14   is resolved.

15             MS. ESTRICH:  We do not think so.  Since Wigdor is no

16   longer a RICO defendant, we do not think functionally it

17   matters whether you decide this.  And Quinn Emanuel, by the

18   way, is no longer representing Mr. Black in this court.  We

19   don't see any functional necessity to the decision of the

20   Rule 11.

21             THE COURT:  And a possibly related case question, I

22   didn't understand anybody to be seeking discovery on the Rule

23   11 question.  Is that true as to you?

24             MS. ESTRICH:  That's true as to us.

25             THE COURT:  Let me, then, just turn then to counsel

M3a2BlaC

| 1 | for Wigdor.  Mr. Gershenoff, those two issues.  First of all,
| 2 | is there any rhyme or reason to when the sanctions motion gets
| 3 | resolved?  Does it have any effect on the forward progress of
| 4 | this case?
| 5 | MR. GERSHENOFF:  We -- well, we think it is ripe for
| 6 | review.  Obviously the sanctions motion was directed towards
| 7 | the original complaint and original claims against Wigdor.
| 8 | THE COURT:  I'm not asking whether it is ripe for
| 9 | review, but I'm trying to understand whether it matters that it
| 10 | get done at the threshold.
| 11 | MR. GERSHENOFF:  We think it should be decided at the
| 12 | threshold, your Honor.  This is a case in which a plaintiff
| 13 | went abroad and made scandalous RICO allegations against
| 14 | opposing counsel in a first-filed case.
| 15 | THE COURT:  Sorry.  That gets to whether it is to be
| 16 | granted or not.  I'm asking whether it makes a difference for
| 17 | it to be resolved now or some time after the motion to dismiss
| 18 | is resolved.
| 19 | MR. GERSHENOFF:  I don't think that it makes a
| 20 | difference whether it is decided now or after -- before or
| 21 | after the motion to dismiss is decided.  I'm not so sure that
| 22 | the motion to dismiss is connected to the sanctions motion.
| 23 | THE COURT:  If one hypothesized that the RICO claims
| 24 | were dismissed and that I was presented with a motion not to --
| 25 | request to not exercise supplemental jurisdiction, even

M3a2BlaC

1    assuming supplemental jurisdiction were declined and the cases

2    were dismissed in favor of potential refiling in state court,

3    the sanctions motion would and could stay with me, correct?

4            MR. GERSHENOFF:  Yes, it could, your Honor.

5            THE COURT:  All right.  And you are not seeking

6    discovery on the Rule 11 motion, are you?

7            MR. GERSHENOFF:  No.  The rule 11 motion is addressed

8    to the face of the original complaint.

9            THE COURT:  Okay.

10           Back, then, to you, Ms. Estrich.  I have got a few

11   other questions relating to the sanctions motion.

12           Can you say why you withdrew ultimately the RICO

13   claims against Wigdor?

14           MS. ESTRICH:  At the time we withdrew the claims,

15   Wigdor had attested that they were not retained and not

16   involved in this case until April and, in an abundance of

17   caution, given that denial, we felt it appropriate to take that

18   denial on face value and to remove Wigdor from the RICO

19   complaint.

20           THE COURT:  Okay.  Why did you not withdraw those

21   claims within the 21-day safe harbor?  The timing of your

22   withdrawal of them has produced this cottage industry of

23   litigation here that appears to me to have been utterly

24   avoidable for you and me.  Why was it withdrawn afterwards?

25           MS. ESTRICH:  As the Court might well understand, I am

M3a2BlaC

1    limited in my ability to answer that question by concerns of

2    privilege and work product.

3            THE COURT:  Is there anything you can say?

4            MS. ESTRICH:  It took that time to reach that

5    conclusion.

6            THE COURT:  I note that Quinn withdrew essentially the

7    day before, if I have got it right, the first public

8    articulation of the intention to withdraw the RICO claim

9    against Wigdor was made.  I think that's chronologically right.

10   Is there a connection between those events?

11           MS. ESTRICH:  Absolutely none.  The reason Quinn

12   withdrew is evident, I think, on the face of the complaint,

13   that after the filing of the first complaint, Quinn Emanuel

14   became aware that one of its partners had been approached by an

15   emissary from Josh Harris's office or Josh Harris's world, that

16   they had been approached by an emissary to take on

17   representation of Ms. Ganieva in January, and that put them in

18   a position of a perceived conflict where they could not sign

19   the complaint in which they were clearly a -- perhaps a party,

20   a witness, a participant.

21           THE COURT:  May I ask you, it looks as if that was

22   made known to Quinn some time before the date at which it

23   withdrew.

24           MS. ESTRICH:  That was made known to Quinn before the

25   date it withdrew, and it did not believe that it had a conflict

1    until the partner who had been walled off behind a Chinese wall

2    was --

3           THE COURT:  I think we now call it an ethical wall,

4    but --

5           MS. ESTRICH:  Ethical wall.  I'm sorry.  My apologies.

6    I meant no disrespect.

7           THE COURT:  I know you didn't, and I use the same

8    expression.

9           MS. ESTRICH:  That partner -- that they could not sign

10   a complaint when a partner in their own firm was taking issue

11   with their doing so.

12          THE COURT:  I'm trying to understand, though, the

13   timing --

14          MS. ESTRICH:  And that was the timing was that day,

15   your Honor, when the partner who had, up until that point, been

16   totally excluded from any contact with the case was informed

17   and given a copy of the complaint that was about to be filed by

18   his own law firm and said that he did not feel comfortable with

19   that complaint filed by his own law firm and his own role from

20   it.

21          THE COURT:  His law firm had filed the original

22   complaint?

23          MS. ESTRICH:  Correct.

24          THE COURT:  You are saying this is Mr. Spiro, right?

25   That's who we are talking about?

M3a2BlaC

1          MS. ESTRICH:  Mr. Spiro, yes.

2          THE COURT:  You are saying that he had been unaware of

3     the filing of the original complaint?

4          MS. ESTRICH:  He was not involved at all.

5          THE COURT:  And not aware of it.

6          MS. ESTRICH:  Apparently not.  I can't speak to his

7     awareness.  I only know that Quinn Emanuel was not aware when

8     it signed the original complaint that they had this potential

9     conflict.

10          THE COURT:  I see.  So then after the original

11     complaint is filed, Mr. Spiro's having had the potential to

12     represent Ms. Ganieva becomes known to Quinn Emanuel.

13          MS. ESTRICH:  Correct.

14          THE COURT:  But it doesn't withdraw at that point

15     until it --

16          MS. ESTRICH:  No.

17          THE COURT:  -- until it essentially reaches the wall

18     and presents that fact to Mr. Spiro.

19          MS. ESTRICH:  Correct, your Honor.

20          THE COURT:  And then what is -- and that happens, you

21     say, the same day that Quinn withdraws?

22          MS. ESTRICH:  That happened within hours.

23          THE COURT:  How is it that Quinn can be counsel, then,

24     for Mr. Black in the state court proceeding?

25          MS. ESTRICH:  I don't want to speak for Quinn Emanuel.

M3a2BlaC

I was formerly a partner there, but I am no longer.  But the

position that Quinn Emanuel has taken and that Mr. Black has

taken is that the relationship between Josh Harris and Quinn

Emanuel on behalf of Ms. Ganieva is not an issue in --

THE COURT:  Josh Harris?

MS. ESTRICH:  Josh Harris was the one who sent an

emissary to Mr. Spiro on behalf of a cagey Apollo faction

interested in securing representation for a woman adverse to

Leon Black.

THE COURT:  Sorry.  I interrupted you.  Continue.

MS. ESTRICH:  Well, that is a major factual point in

this court where we are trying to establish a RICO claim.

There is no such claim in the state court.

THE COURT:  Is your understanding that Mr. Spiro never

actually made contact with Ms. Ganieva but merely, from your

perspective, considered taking on the representation as

proposed by Mr. Harris.

MS. ESTRICH:  That is my understanding, your Honor.

THE COURT:  And so the basis for drawing the line

between Quinn's nonparticipation here and there has to do with,

in effect, he never actually represented or even spoke with

Ms. Ganieva about representing her.  Those would create more of

a conflict issue in being adverse to her.

MS. ESTRICH:  Correct.  There were also allegations, I

should point out to the Court, that have been made by the

1    Wigdor firm that Mr. Spiro sent investigators to Ms. Ganieva's

2    home to encourage her, after she had made the tweets, to bring

3    an action against Leon Black and to use Mr. Spiro.  All of that

4    is something we would like to understand better in this action,

5    but is not relevant in the state court action.

6         THE COURT:  All right.  All right.  Okay.

7         There is a suggestion in the papers that, in effect,

8    after the safe harbor deadline but before there was any public

9    commitment to drop the RICO claim against Wigdor, that

10   plaintiff effectively said -- plaintiff's counsel said to

11   defense counsel we will drop the RICO claim against Wigdor if

12   you drop the, I guess, pending sanctions motion or the

13   anticipated sanctions motion.  Did that happen?

14        MS. ESTRICH:  We believe those conversations were

15   protected under the federal rules as an effort to reach some

16   resolution as to the issues in this case.  I believe that

17   conversation did occur, but that it was a privileged

18   conversation.  But it showed up, of course, in the papers and

19   is now a matter of public record.

20        THE COURT:  Right.  Okay.  In your -- from your

21   perspective, what relevance as to the sanctions motion does the

22   fact of later dropping the contested RICO claim against Wigdor

23   have?  Is it simply a matter of it goes to if there were

24   sanctions -- sanctionable conduct found, it goes to damages or

25   is there a different way in which it is germane?

M3a2BlaC

1          MS. ESTRICH:  Your Honor, technically, as you well

2     understand, and technically the fact that we withdrew after the

3     21-day period makes the motion ripe as it stood and makes it

4     amenable, I think, as a practical matter, in terms of the

5     Court's evaluation of the seriousness of our wrongdoing and our

6     good faith.  The fact that we have tried in good faith to

7     address these claims even if we didn't do it within the 21 days

8     is certainly a factor that the Court has discretion to

9     consider.

10          THE COURT:  Look, I found it interesting.  It's an

11     unusual fact pattern to have the claim dropped outside the safe

12     harbor period and not that far outside of it, and I have the

13     reaction, not the least of which is from my chambers'

14     perspective, that this was completely avoidable and you have

15     indicated to me that there are reasons that are within the

16     privilege that you would in some respects like to explain but

17     have chosen not to.

18          MS. ESTRICH:  That's correct, your Honor.  And I

19     apologize to you and the Court for any additional burden we

20     caused.

21          THE COURT:  It --

22          MS. ESTRICH:  We tried in good faith to do our best.

23          THE COURT:  Look.  The practice point for everybody in

24     the room is the 21-day safe harbor is, frankly, a wise

25     amendment to an earlier rule, but it's got an on/off switch at

M3a2BlaC

1  21 days, and we are seeing the consequences of acting outside

2  the deadline.

3          MS. ESTRICH:  I understand, your Honor.

4          THE COURT:  All right.

5          Okay.  Counsel, I don't have other questions about the

6  sanctions motion, and I am really avoiding seeking any argument

7  or commentary about it.

8          That being said, I put some factual questions to

9  plaintiff's counsel.  I want to give the defense an

10  opportunity.  If there is something factually you want to put

11  on the table, you are at liberty to do so, but I will shut you

12  down if we get into argument because I'm really not seeking

13  that.

14          All right.  Mr. Gershenoff.

15          MR. GERSHENOFF:  Your Honor, we would only point out

16  that, as a result of the failure to withdraw the RICO claims

17  against Wigdor within the 21-day safe harbor period, Wigdor was

18  obligated to file an extensive motion to dismiss the RICO

19  claims; and then on the day when the opposition to the

20  sanctions brief was due, or maybe it was just the day before,

21  as the Court noted, Quinn Emanuel did withdraw.  We haven't

22  heard an argument or an explanation as to why Quinn Emanuel had

23  a conflict in this case, or at least not one that I thought had

24  the ring of authority to it for why Quinn Emanuel, you know,

25  had a conflict that precluded them from representing Mr. Black

M3a2BlaC

1  in this case but yet continues to be able to represent

2  Mr. Black in the state court case.  It seems like it was

3  pretextual, your Honor.  That's how it looks on the face of

4  things.

5          And, you know, although we don't relish the idea of

6  bringing sanctions motions against opposing counsel, we would

7  note for the Court that in this case they asserted racketeering

8  claims against opposing counsel in a first-filed case.  And you

9  heard Ms. Estrich say that they have supposedly discovered new

10  evidence which somehow, you know, revealed to them that, you

11  know, that their RICO claims may have had merit back when they

12  asserted them but, your Honor, as we pointed out in the

13  sanctions motion, and I'm not going to get into argument, the

14  RICO claims were defective for multiple independent reasons.

15  They never should have been asserted in the first place.  They

16  were withdrawn belatedly and only after -- and, by the way, it

17  is not -- and this is an additional fact, I'm not intending to

18  make argument, but after we sent the safe harbor letter, which

19  the Court has seen set forth chapter and verse whether RICO

20  claims were defective and sanctionable, rather than withdraw

21  the claims, what we got instead was a letter from Ms. Estrich

22  which announced that, you know, our arguments lacked any merit

23  and they wouldn't withdraw the RICO claims.  Then we had to

24  make a motion to dismiss, and only then did they withdraw the

25  RICO claims.  So we would say, your Honor, that in that factual

M3a2BlaC

1    scenario the 21-day safe harbor period should mean what it

2    says.

3        THE COURT:  Let me just ask you — thank you — you are

4    still pursuing the sanctions against all three of the targets

5    of that motion — Ms. Estrich, Quinn notwithstanding its

6    withdrawal, and Mr. Black, correct?

7        MR. GERSHENOFF:  Oh, of course; and, in fact, we think

8    that Quinn Emanuel's withdrawal on what appears to be a pretext

9    only underscores why their conduct in this case also is

10   sanctionable.

11       THE COURT:  Is there any basis for differentiating

12   among those three or is the analysis identical.

13       MR. GERSHENOFF:  No.  We would say that the analysis

14   is identical because all of their names appeared at the end of

15   the offensive pleading.  It was flying under all of their

16   flags, your Honor, at the time when it was made, and we would

17   say that they are all responsible for it.

18       THE COURT:  Okay.  The final thing I want to take up

19   as to that, and then we are going to take a break before the

20   criminal case and resume, just involves the three surreplies.

21   Counsel, it would be my inclination to accept all three just in

22   the interest of making a -- resolving this more fulsomely.  I

23   do note that plaintiff's submission from yesterday is in the

24   nature of a letter seeking leave to file a surreply but asks

25   that the letter itself be received.  With respect, the letter

M3a2BlaC

1    looks like the surreply and I am assuming, Ms. Estrich, that,

2    save perhaps attaching the documentation that you are referring

3    to in that letter, there is nothing more that a surreply would

4    do, correct?

5         MS. ESTRICH:  Correct, your Honor.

6         THE COURT:  Let me just see.  Mr. Gershenoff, you are

7    rising.

8         MR. GERSHENOFF:  Your Honor, may I just be heard on

9    that?  As the movant on the motion, your Honor, we would

10   ordinarily have the last word, and while we do not want to

11   burden the Court with surreply after surreply, we would

12   respectfully request to submit a response of no more than two

13   pages within three days.

14        THE COURT:  All right.  I think that is reasonable.

15   Look.  You have made a serious allegation of sanctions against

16   two law firms and an adverse party.  I would rather resolve

17   that motion with more information not less.  It seems to me the

18   smart call here.

19        Ms. Estrich, what I would like you to do is I'm going

20   to authorize all the surreplies that I identified earlier.

21   Ms. Estrich, because your letter references, I guess, documents

22   by Bates numbers, but I don't think it attached them in your

23   letter, I would like to receive them.  I pass no judgment about

24   whether those are properly filed under seal or not.  They may

25   be perfectly fair game for public filing.  Would you please,

M3a2BlaC

1   tomorrow, file your letter with any referenced attachments?

2           And then, Mr. Gershenoff, you are seeking until what,

3   next Tuesday, Wednesday, to file a letter response within the

4   length you suppose.

5           MR. GERSHENOFF:  Tuesday would be fine.  No more than

6   a couple of pages.

7           THE COURT:  Authorized.  But, counsel, can I assume

8   that the door at that point closes on further filings on this?

9           All right.  Anyone have anything else to say about the

10  sanctions motion?

11          All right.  Counsel my criminal case is soon to be

12  upon us.  Here is what I would like to do.  Let's adjourn until

13  noon.  I hope to come out at noon both approving your motion

14  schedule and I expect, but I'm not sure, with a short

15  explanation of how I propose to proceed with respect to the

16  discovery stay.  All of that will be on the record, and if

17  somebody has come up with anything else we need to take up,

18  that will be your opportunity to do it.  So I will open the

19  floor to counsel if there is anything else that is productively

20  raised today.

21          After that I'm going to excuse our court reporter and

22  I would like, futile though it may be, to take a few minutes

23  with counsel in the robing room just to see whether anything

24  can be done to prevent us getting closer to DEFCON 1.

25          Okay.  Thanks.  We stand adjourned.

M3a2BlaC

1          (Recess)

2          THE COURT:  Welcome back, everyone.

3          Where we left off before the break was that I covered

4     the four topics that I wanted to cover with you, and the next

5     item on my agenda is really to open the floor in case there are

6     other issues that counsel want to raise.

7          I might add that to the extent that during the break

8     people thought of responses to questions that I had put to you

9     that you wish you had done differently, here is your chance for

10    a mulligan.  Let's go around and see if anyone has anything to

11    raise.

12         MS. ESTRICH:  Yes, your Honor.  We would request

13    permission, having received four briefs on the motion to

14    dismiss, to file one opposition, an omnibus opposition to all

15    four briefs.

16         THE COURT:  On the schedule that --

17         MS. ESTRICH:  Yes, on the schedule.

18         THE COURT:  Of course.  That makes sense.  And spoiler

19    coming, I approve the schedule --

20         MS. ESTRICH:  Thank you very much.

21         THE COURT:  -- that you have agreed to and, as a

22    general matter, when counsel come together and agree on things,

23    the Court is well advised to be deferential to that.  So I

24    approved the schedule.  Just for housekeeping why don't you

25    submit a letter on the docket of the case that I can so order.

M3a2BlaC

1          Anything else from the of plaintiff?

2          MS. ESTRICH:  No, your Honor.

3          THE COURT:  Then just going around the horn,

4    Mr. Mintzer, for Ms. Ganieva?

5          MR. MINTZER:  Nothing further, your Honor.

6          THE COURT:  Mr. Gershenoff for Wigdor?

7          MR. GERSHENOFF:  Nothing further, your Honor.

8          THE COURT:  Mr. Spagnoletti for Mr. Harris?

9          MR. SPAGNOLETTI:  Nothing further, your Honor.

10          THE COURT:  And Mr. Black for Rubenstein?

11          MR. BUCHDAHL:  No, your Honor.

12          THE COURT:  Then I want to just put on the record a

13    ruling with respect to the application for a stay of discovery,

14    and I think that will then exhaust what I have on the record,

15    and I will take a few minutes then with counsel in the robing

16    room.

17          All right.  Under Federal Rule of Civil Procedure

18    26(c), "a Court has discretion to stay discovery for good

19    cause," citing, among a million other cases, *Boelter v. Hearst*

20    *Communications, Inc.*, 2016 WL 361554 at *4 (S.D.N.Y. Jan. 28,

21    2016.)  "Courts typically consider the breadth of the discovery

22    sought, the burden of responding to, the prejudice that would

23    result to the party opposing the stay, and the strength of the

24    pending motion forming the basis of the request to stay," again

25    citing among many cases *Hertz Global Holdings Inc. v. National*

M3a2BlaC

1    *Union Fire Insurance Company of Pittsburgh*, 2020 WL 6642188, at

2    *1 (S.D.N.Y. Nov. 12, 2020).  "The moving party bears the

3    burden of demonstrating good cause under Rule 26(c)," citing

4    *Ema Financial, LLC v. Vystar Corp.*, 336 F.R.D. 75, 79 (S.D.N.Y.

5    2020).

6           I have carefully considered the application by the

7    defense for a stay of discovery as well as plaintiff's

8    responses to it.  I have been informed by a number of source

9    materials.  The parties addressed it briefly in the proposed --

10   the letter attending to the proposed case management plan.

11   It's been implicit in a number of the written submissions I

12   have received to date, and of course it was covered explicitly

13   today.

14          I find that the defendants have demonstrated good

15   cause, and I am going to grant defendants' request to stay all

16   discovery pending the resolution by this Court of the pending

17   motions to dismiss.

18          As a general -- and to elaborate, look, as a general

19   practice, where I am presented with a viable motion to dismiss

20   that has the potential to significantly narrow the scope of the

21   case, it is my customary practice to stay discovery pending

22   resolution of the motion pending some sharpening of the

23   parameters of the case.  Such is the case here.  The motions to

24   dismiss that have been filed are, at least as to the RICO and

25   RICO conspiracy claims, at a minimum colorable, and that's just

M3a2BlaC

1  based on an initial review.  I don't -- it should not be

2  read -- no more should be read into that, but based on an

3  initial review, I'm certainly prepared to say that much.

4          Were I to grant a motion to dismiss on the sole

5  federal claims in this case, the issue would then arise whether

6  the Court should exercise supplemental jurisdiction in the

7  case.  I appreciate that there are defendants here who would

8  ask that I go beyond that and to engage, with motions to

9  dismiss, some of the state law claims.  Regardless of whether I

10 did that or not, the issue would then arise whether or not to

11 exercise supplemental jurisdiction on those state law claims

12 that survived, whether or not I reviewed all, some, or none of

13 them.  And I have to say there is a very substantial

14 possibility that if the state federal law claims were all

15 dismissed, I would choose not to exercise supplemental

16 jurisdiction.  There is compelling authority from the circuit,

17 followed by a huge body of district court decisions, that when

18 a case is really at its insipient stages, when little has

19 happened other than the sort of housekeeping we are doing now

20 and reviewing a motion to dismiss, it is generally the better

21 practice to decline to exercise supplemental jurisdiction.  So

22 I have to acknowledge the real possibility that the scope of

23 this case will narrow and that, upon its narrowing, I may not

24 even be the judge in charge of it at that point.

25         Were the state law -- were the federal claims

1    dismissed, the issue would look different as to what discovery

2    is warranted by such claims as do survive, and that is so even

3    if one assumes that every state law claim ultimately cleared a

4    motion to dismiss whether evaluated by me or evaluated by a

5    state court judge.

6         As a result, just the analysis of what is relevant

7    responsive discovery would be very, very different from the way

8    the case presents now.

9         I should add, as well, that were the Court to decline

10   to exercise supplemental jurisdiction, there would yet be an

11   intermediate step.  The Court's resulting bottom line would be

12   a dismissal without prejudice.  The plaintiffs would then have

13   to determine which, if any, of those state law claims, and

14   potentially other ones, to pursue in state court.

15        The bottom line is that the remaining, surviving

16   contours of the case as pursued in state court may look very,

17   very different from the case as it presents now which makes

18   embarking on discovery now a fraught and uncertain and

19   potentially very wasteful venture.

20        In addition, although I appreciate the spirit of the

21   plaintiff's request to limit discovery to document discovery

22   and, within that universe, to limit it to certain categories, I

23   can't in good conscious say that the discovery requests that

24   were articulated are truly limited.  On the contrary, at least

25   some of them have the capacity to yield quite a substantial

M3a2BlaC

amount of responsive material or to occasion a rather good

amount of work by either defense counsel or third party

counsel.

         For example, the initial requests really were for

communications among the defendants.  It is easily expressed.

But when one burrows into that a little bit, one realizes this

presumably means phone records, texts, tweets, calendar

invitations, Slack messages and what people of a certain age

used to call e-mail.  There might even be hard copy records.

         And, for example, as between Harris and Rubenstein,

there is every reason to expect that that universe of materials

will be voluminous.  Counsel credibly represented that their

business relationship extends back some years.  The review

process, the process of harvesting and reviewing those

materials would be substantial even if the number of materials

that prove responsive in this case turned out to be narrow.

And it isn't even really a sure thing that communications

between those two people could be -- that are relevant could be

tested by, for example, using the word Ganieva.  There are

presumably any number of theories of relevance among the

communications between Harris and Rubenstein that the plaintiff

would contend could be relevant regardless of whether that name

is used, all of which is simply a way of illustrating the point

that it sounds deceptively easy.  It actually, I think, would

be arduous.  And I speak with the experience of having done a

M3a2BlaC

1    lot of time in private practice in my prior life and have some

2    idea just how much work a very short document demand can cause.

3          Plaintiff is also seeking discovery with respect to

4    Ganieva's retention of Wigdor in the state case.  As I think

5    the colloquy underscored, that request, although understandable

6    if one assumes that the claims in this case fully survive, has

7    the potential to open up a Pandora's box of hard questions

8    whether involving privilege, whether involving the interplay

9    between the state and federal cases, and it has at least some

10   potential, if not policed right, to compromise the ability of

11   Wigdor to continue to represent Ganieva in the state

12   litigation.  There is an imaginable circumstance under which

13   there are good reasons for that representation to be called

14   into question, but my handling of early case discovery oughtn't

15   be the provocation for that.

16          Those records themselves have the potential to be

17   voluminous.  Essentially until the scale of Black's viable

18   plausibly pled claims against Wigdor is decided by a court, it

19   seems to me problematic to open up discovery that probes into

20   the attorney-client relationship, given the potential

21   collateral damage that that exercise could do.

22          I note, as well, that in plaintiff's category of

23   ostensibly limited discovery are Ganieva's financial records

24   and the source of payments made to her lawyers.  Again, there

25   are potential issues with respect to the privilege implicated

M3a2BlaC

by a request there.  I can only imagine that the process of
supervising objections to discovery like that would be onerous.
It's premature to go there.

Finally, to the extent that plaintiff proposed that
the meet-and-confer process would be some form of antidote
here, count me a skeptic.  Depending on the scope of the
claims, of the limited requests that were available, I think
one could imagine a cottage industry of discovery disputes
arising right away.  As some indicator, it's been proffered to
me that we already have seven unresolved discovery disputes
among just two of the five parties here or in a case that
involves just two of the five parties here in state court.  I
don't have a lot of confidence that the parties would quickly
get to "yes" on an agreed formulation of the disputes here.  By
the time we worked through all of that, there is every
possibility I would be near or close to done with the
resolution of the motions to dismiss.

As to prejudice, plaintiff has not demonstrated
cognizable, important harm by waiting a few months to begin
such discovery as might occur here assuming that the federal
claims survive or I otherwise chose to exercise supplemental
jurisdiction.  I appreciate plaintiff's point that it would be
useful and informative to know more about the dealings here;
but, frankly, until it is clear that there are well-pled claims
in this case, plaintiff's interest in the documents, its

M3a2BlaC

1    competitive value to plaintiff is not a compelling reason to

2    initiate discovery.

3         And to the extent that the suggestion is made that

4    production of limited documents now could meaningfully advance

5    the settlement process, count me a skeptic.  I'm just not

6    feeling any vibes here that suggest to me that limited

7    production along the lines of that proposed or something

8    narrower is really likely to break the logjam.  I will take up

9    privately with counsel whether there is some way to resolve

10   this case before things get -- go from bad to worse, but it

11   isn't clear to me that the answer there is limited document

12   production at this point.

13        In the meantime I would note that plaintiff does have

14   the vantage of having begun discovery in state court where

15   there is some overlap in the factual areas particularly

16   involving the dealings between Black and Ganieva.  There is an

17   overlap between the claims there and the claims here.  I

18   understand that plaintiff is frustrated by what sounds like a

19   terribly slow process of discovery.  That would not happen in

20   this court.  I'm sorry that you are experiencing that, and I

21   regret that because justice delayed is justice denied

22   regardless of the merits of the case.

23        Nonetheless, as a formal matter, you have got that

24   forum, and I encourage plaintiff, if you continue to be

25   frustrated by the pace of discovery there, to pursue any

M3a2BlaC

1    remedies available to you in that forum.

2            To the extent there is an issue about the protective

3    order, because I am staying discovery, this is not germane

4    here, but I will offer the following as a practice point.  I

5    have and the district has essentially a standard issue

6    protective order that enables producing parties to classify

7    documents as attorneys' eyes only or heightened levels of

8    confidentiality, and it doesn't presuppose what's going to fit

9    in each category.  It simply defers to the act of production

10   the classification.  And in the event there is a dispute about

11   that, there is an app for that.  It is called going to the

12   district court and raising a discovery dispute.

13           I would strongly encourage, to the extent that we have

14   got common parties here, you to think about entering into a

15   protective order along those lines that essentially deflects

16   until there is a document-specific issue what the proper

17   classification is for the document.  That will allow you to

18   move forward and get a lot of documents produced that are

19   frankly outside the scope of fair dispute as to whether any

20   heightened classification attaches to them.

21           As a final matter, and this is not necessary to the

22   decision, I will note that plaintiff's counsel floated the

23   possibility of seeking leave to file a third complaint, a

24   second amended complaint.  By no means by addressing this am I

25   indicating that that would be granted, but should an amended

M3a2BlaC

1    complaint, yet a new one, be sought and authorized, that would

2    be yet another reason to defer discovery.  Under those

3    circumstances, who knows what the claims would be in the third

4    amended -- the third complaint, whether they would be narrower

5    or broader than the ones amongst the existing parties, whether

6    a party would be dropped, whether a party would be added.

7            But the protean nature of the case, for all these

8    reasons, strongly counsels against discovery.  So, frankly,

9    consistent with my practice in cases where I see a plausible

10   motion to dismiss coming that has the capacity to change the

11   contours of the case meaningfully, I order discovery stayed

12   pending a resolution by this Court on the pending motion to

13   dismiss.

14           All right.  Therein ends the ruling.

15           Does anyone have anything to raise before I excuse our

16   court reporter?  No?  All right.

17           Before we adjourn, let me just thank counsel.  I

18   realize that this is a hotly contested case, but I have been

19   the beneficiary both in the written submission so far and in

20   the orderly, effective, and energetic presentations today of

21   top flight advocacy, and I am happy to have you before me.

22           I'm going to set up in my robing room, and

23   Mr. Smallman will bring you in in a minute or two.  I think we

24   have seats for ten lawyers in there.  It will be a little bit

25   tight.  Much as I would like other members of your teams to be

M3a2BlaC

1  able to access the brief discussion that will ensue, we just

2  don't have room for everybody so let's keep it to the people

3  who appeared.

4           Thank you.

5                                oOo

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25