UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Leon D. Black,

                            Plaintiff,

              - against -

Guzel Ganieva, Wigdor LLP, Josh Harris, and
Steven Rubenstein,

                            Defendants.

No. 21-cv-8824 (PAE)

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Susan R. Estrich
Estrich Goldin LLP
947 Berkeley St.
Santa Monica, CA 90403
(213) 399-2132
susan@estrichgoldin.com

Reid M. Figel
Michael K. Kellogg
Kellogg, Hansen, Todd, Figel
  & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
rfigel@kellogghansen.com
mkellogg@kellogghansen.com

*Attorneys for Plaintiff Leon D. Black*

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ...............................................................................................................2

    A. The Background Relationships: Ganieva and Harris ................................... 2

    B. Harris Hatches Plot and Forms War Council to Take Down Black ............. 4

    C. Ganieva Joins the Enterprise, Spreading Her Lies Further ......................... 9

    D. Ganieva and Wigdor File the First State Court Complaint with the Council's
    Support ....................................................................................................... 10

    E. Ganieva and Wigdor Amend the Complaint to Drag in Epstein, with the
    Enterprise's Support................................................................................... 12

LEGAL STANDARD......................................................................................................15

ARGUMENT ..................................................................................................................16

I.    Black Sufficiently Alleged A RICO Conspiracy By The Enterprise................16

    A. The Amended Complaint Adequately Alleges an Association-in-Fact
    Enterprise ................................................................................................... 17

    B. Each RICO Defendant "Conducted or Participated" in the Affairs of the
    Enterprise ................................................................................................... 24

    C. The Amended Complaint Adequately Alleges that the RICO Defendants
    Engaged in At Least Two Predicate RICO Acts: Extortion and Mail or Wire
    Fraud .......................................................................................................... 27

    D. The Amended Complaint Adequately Alleges that the RICO Defendants
    Engaged in a Pattern of Racketeering Activity.......................................... 36

    E. The Amended Complaint Adequately Alleges the Enterprise Caused Black
    Injury......................................................................................................... 39

II.    The RICO Claims Are Not Barred by the *Colorado River* Abstention Doctrine .............41

III.    Black Sufficiently Alleges Defamation and Defamation Per Se .......................43

    A. The Amended Complaint Adequately Alleges Defamation by Wigdor ................... 45

    B. The Amended Complaint Adequately Alleges Defamation by Rubenstein .............. 52

    C. The Amended Complaint Adequately Alleges Defamation by Harris ...................... 55

    D. Ganieva Does Not Contest the Defamation Claims Against Her .............................. 59

IV.    The *Noerr-Pennington* Doctrine Does Not Bar Black's Claims .......................................59

V.    This Court Should Exercise Supplemental Jurisdiction Over the State Law Claims
    Against All Defendants................................................................................................60

CONCLUSION..................................................................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ackerman v. Nat'l Prop. Analysts, Inc.*,
  887 F. Supp. 494 (S.D.N.Y. 1992) ..........................................................61

*AIU Ins. Co. v. Olmecs Med. Supply, Inc.*,
  2005 WL 3710370 (E.D.N.Y. Feb. 22, 2005) ........................................17

*All. of Am. Insurers v. Cuomo*,
  854 F.2d 591 (2d Cir. 1988) ............................................................41, 42

*Angermeir v. Cohen*,
  14 F. Supp. 3d 134 (S.D.N.Y. 2014) ..............................................34, 40

*Arista Records, LLC v. Tkach*,
  122 F. Supp. 3d 32 (S.D.N.Y. 2015) ......................................................59

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................15

*Bankers Tr. Co. v. Rhoades*,
  859 F.2d 1096 (2d Cir. 1988), ................................................................40

*Beauford v. Helmsley*,
  865 F.2d 1386 (2d Cir. 1989), *vacated and remanded*,
  492 U.S. 914, *adhered to on remand*, 893 F.2d 1433,
  *cert. denied*, 493 U.S. 992 (1989) ..................................................37, 38

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................15

*Bigio v. Coca-Cola Co.*,
  675 F.3d 163 (2d Cir. 2012) ..................................................................57

*Biro v. Conde Nast*,
  807 F.3d 541 (2d Cir. 2015) ..................................................................54

*Boyle v. United States*,
  556 U.S. 938 (2009) ........................................................................ *passim*

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008) ................................................................................36

*Brown v. Maxwell*,
    929 F.3d 42 (2d Cir. 2019)..................................................................48

*Buyers & Renters United to Save Harlem v. Pinnacle Grp. N.Y. LLC*,
    575 F. Supp. 2d 499 (S.D.N.Y. 2008)...................................................21

*BYD Co. Ltd. v. VICE Media LLC*,
    531 F. Supp. 3d 810 (S.D.N.Y. 2021),
    *aff'd*, 2022 WL 598973 (2d Cir. Mar. 1, 2022) .................................53

*Cain v. Bethea*,
    2007 WL 2859681 (E.D.N.Y. Aug. 17, 2007).......................................61

*Cajero Torres v. Sushi Sushi Holdings Inc.*,
    2021 WL 2158017 (S.D.N.Y. May 27, 2021) ........................................62

*Cedeno v. Pacelli*,
    192 A.D.3d 533 (1st Dep't 2021) .........................................................56

*Cedeno v. Pacelli*,
    2019 WL 4239257 (N.Y. Sup. Ct. Sept. 5, 2019), *aff'd as modified*,
    192 A.D.3d 533 (1st Dep't 2021) .........................................................56

*Colo. River Water Conservation Dist. v. United States*,
    424 U.S. 800 (1976).............................................................................41

*Comverse Tech., Inc. Derivative Litig., In re*,
    2006 WL 3193709 (E.D.N.Y. Nov. 2, 2006).........................................41

*Conte v. Newsday, Inc.*,
    703 F. Supp. 2d 126 (E.D.N.Y. 2010) ..................................................31

*Cordero-Hernández v. Hernández-Ballesteros*,
    449 F.3d 240 (1st Cir. 2006).................................................................21

*Ctr. Cadillac, Inc. v. Bank Leumi Tr. Co.*,
    808 F. Supp. 213 (S.D.N.Y. 1992), *aff'd*, 99 F.3d 401 (2d Cir. 1995) ...................35

*D. Penguin Bros., Ltd. v. City Nat'l Bank*,
    587 F. App'x 663 (2d Cir. 2014) ....................................................15, 19

*D'Addario v. D'Addario*,
    901 F.3d 80 (2d Cir. 2018)..............................................................25, 27

*Daniel v. City of New York*,
    2021 WL 5988305 (S.D.N.Y. Dec. 16, 2021) .......................................62

*De Sole v. Knoedler Gallery, LLC,*
    974 F. Supp. 2d 274 (S.D.N.Y. 2013)........................................................17

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,*
    365 U.S. 127 (1961)..............................................................................59

*Enercomp, Inc. v. McCorhill Publ'g, Inc.,*
    873 F.2d 536 (2d Cir. 1989)....................................................................60

*Entretelas Americanas S.A. v. Soler,*
    2020 WL 9815186 (S.D.N.Y. Feb. 3, 2020), *aff'd on other grounds*, 840 F.
    App'x 601 (2d Cir. 2020)........................................................................31

*Equinox Gallery Ltd. v. Dorfman,*
    306 F. Supp. 3d 560 (S.D.N.Y. 2018).......................................................23

*Ferolito v. Menashi,*
    918 F. Supp. 2d 136 (E.D.N.Y. 2013) .......................................................41

*Festinger v. Snitow Kaminetsky Rosner & Snitow, LLP,*
    2021 WL 4692779 (S.D.N.Y. July 7, 2021) ..........................................42, 43

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,*
    385 F.3d 159 (2d Cir. 2004)..........................................................18, 23, 34

*First Indem. of Am. Ins. Co. v. Shinas,*
    2009 WL 3154282 (S.D.N.Y. Sept. 30, 2009)...........................................48

*Flomenhaft v. Finkelstein,*
    127 A.D.3d 634 (1st Dep't 2015) .......................................................46, 47

*Front Inc. v. Khalil,*
    28 N.E.3d 15 (N.Y. 2015)...............................................................46, 50

*Fullwood v. Wolfgang's Steakhouse, Inc.,*
    2014 WL 6076733 (S.D.N.Y. Nov. 14, 2014) ............................................15

*Geraci v. Probst,*
    61 A.D.3d 717 (2d Dep't 2009) ..............................................................45

*German v. Fed. Home Loan Mortg. Corp.,*
    885 F. Supp. 537 (S.D.N.Y. 1995) ..........................................................42

*GICC Capital Corp. v. Tech. Fin. Grp., Inc.,*
    67 F.3d 463 (2d Cir. 1995)....................................................................37

*H.J. Inc. v. Nw. Bell Tel. Co.,*
    492 U.S. 229 (1989)............................................................................38

*Halperin v. Salvan*,
 117 A.D.2d 544 (1st Dep't 1986) ..................................................46, 48

*Kao v. British Airways, PLC*,
 2018 WL 501609 (S.D.N.Y. Jan. 19, 2018) ..................................59

*Kim v. Kimm*,
 884 F.3d 98 (2d Cir. 2018)..................................................32

*Kimm v. Lee*,
 2005 WL 89386 (S.D.N.Y. Jan. 13, 2005), *aff'd on other grounds*, 196 F.
 App'x 14 (2d Cir. 2006)..................................................32

*Knight v. Standard Chartered Bank*,
 531 F. Supp. 3d 755 (S.D.N.Y. 2021)..................................................62

*Konikoff v. Prudential Ins. Co. of Am.*,
 234 F.3d 92 (2d Cir. 2000)..................................................53

*Lacher v. Engel*,
 33 A.D.3d 10 (1st Dep't 2006) ..................................................48

*Lazzaro v. Manber*,
 701 F. Supp. 353 (E.D.N.Y. 1988) ..................................................21

*Long v. Marubeni Am. Corp.*,
 406 F. Supp. 2d 285 (S.D.N.Y. 2005)..................................................52, 56

*Lupron Mktg. & Sales Practices Litig., In re*,
 295 F. Supp. 2d 148 (D. Mass. 2003) ..................................................18

*Marek v. Old Navy (Apparel) Inc.*,
 348 F. Supp. 2d 275 (S.D.N.Y. 2004)..................................................48

*Martirano v. Frost*,
 255 N.E.2d 693 (N.Y. 1969)..................................................49

*McLaughlin v. Anderson*,
 962 F.2d 187 (2d Cir. 1992)..................................................15

*Mikhlin v. HSBC*,
 2009 WL 485667 (E.D.N.Y. Feb. 26, 2009)..................................................23

*MinedMap, Inc. v. Northway Mining, LLC*,
 2022 WL 570082 (2d Cir. Feb. 25, 2022)..................................................37

*Moore v. PaineWebber, Inc.*,
 189 F.3d 165 (2d Cir. 1999)..................................................34

*Mortg. Resolution Servicing, LLC v. JPMorgan Chase Bank, N.A.*,
2018 WL 1627257 (S.D.N.Y. Mar. 30, 2018) ........................................................19

*Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*,
701 F. Supp. 2d 568 (S.D.N.Y. 2010)....................................................................59

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ..................................................................................................42

*Moss v. Morgan Stanley Inc.*,
719 F.2d 5 (2d Cir. 1983)........................................................................................16

*Motorola Credit Corp. v. Uzan*,
274 F. Supp. 2d 481 (S.D.N.Y. 2003) ....................................................................60

*Muzio v. Inc. Vill. of Bayville*,
2006 WL 39063 (E.D.N.Y. Jan. 3, 2006) ..............................................................16

*N.Y. Transp., Inc. v. Naples Transp., Inc.*,
116 F. Supp. 2d 382 (E.D.N.Y. 2000) ...................................................................61

*Neurontin Mktg. & Sales Practices Litig., In re*,
712 F.3d 51 (1st Cir. 2013)....................................................................................40

*New England Data Servs., Inc. v. Becher*,
829 F.2d 286 (1st Cir. 1987) ..................................................................................21

*Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*,
673 F.3d 84 (2d Cir. 2012)......................................................................................41

*O'Diah v. New York City*,
2002 WL 1941179 (S.D.N.Y. Aug. 21, 2002) .......................................................61

*Palin v. New York Times Co.*,
940 F.3d 804 (2d Cir. 2019)..............................................................................44, 53

*Palmer v. Cook*,
108 N.Y.S.3d 297 (N.Y. Sup. Ct. 2019) ................................................................50

*Park S. Assocs. v. Fischbein*,
626 F. Supp. 1108 (S.D.N.Y. 1986), *aff'd*, 800 F.2d 1128 (2d Cir. 1986) ............28

*Pemrick v. Stracher*,
2007 WL 1876504 (E.D.N.Y. June 28, 2007),
*aff'd*, 331 F. App'x 17 (2d Cir. 2009)....................................................................60

*Pereira v. United States*,
347 U.S. 1 (1954).....................................................................................................35

*Pittman by Pittman v. Grayson*,
149 F.3d 111 (2d Cir. 1998)............................................................................57

*Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*,
262 F.3d 260 (4th Cir. 2001) .........................................................................40

*Primetime 24 Joint Venture v. Nat'l Broad. Co.*,
219 F.3d 92 (2d Cir. 2000).............................................................................60

*Purgess v. Sharrock*,
33 F.3d 134 (2d Cir. 1994)..............................................................................60

*Rajaratnam v. Motley Rice, LLC*,
449 F. Supp. 3d 45 (E.D.N.Y. 2020) .........................................................61, 62

*Ramsaran v. Abraham*,
2017 WL 1194482 (S.D.N.Y. Mar. 30, 2017) ................................................56

*Reves v. Ernst & Young*,
507 U.S. 170 (1993).........................................................................................24

*S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*,
84 F.3d 629 (2d Cir. 1996)..............................................................................34

*Schmuck v. United States*,
489 U.S. 705 (1989).........................................................................................35

*Sekhar v. United States*,
570 U.S. 729 (2013).........................................................................................30

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
806 F.3d 71 (2d Cir. 2015)..........................................................................39, 40

*Sheerbonnet, Ltd. v. Am. Exp. Bank Ltd.*,
17 F.3d 46 (2d Cir. 1994)................................................................................42

*Shields v. Murdoch*,
891 F. Supp. 2d 567 (S.D.N.Y. 2012).............................................................41

*Singh v. NYCTL 2009-A Trust*,
683 F. App'x 76 (2d Cir. 2017) .......................................................................59

*State Wide Photocopy, Corp. v. Tokai Fin. Servs., Inc.*,
909 F. Supp. 137 (S.D.N.Y. 1995) .................................................................21

*Stern v. Cosby*,
645 F. Supp. 2d 258 (S.D.N.Y. 2009).............................................................53

*Stevens v. New York*,
    691 F. Supp. 2d 392 (S.D.N.Y. 2009)................................................................56

*Sumitomo Copper Litig., In re* ,
    995 F. Supp. 451 (S.D.N.Y. 1998) ....................................................................35

*United Mine Workers v. Pennington*,
    381 U.S. 657 (1965)..........................................................................................59

*United States v. Avenatti*,
    2022 WL 305145 (S.D.N.Y. Feb. 1, 2022).......................................................35

*United States v. Burden*,
    600 F.3d 204 (2d Cir. 2010)..............................................................................23

*United States v. Gotti*,
    459 F.3d 296 (2d Cir. 2006)........................................................................28, 30

*United States v. Greenberg*,
    835 F.3d 295 (2d Cir. 2016)..............................................................................36

*United States v. Indelicato*,
    865 F.2d 1370 (2d Cir. 1989)......................................................................17, 38

*United States v. Perrotta*,
    313 F.3d 33 (2d Cir. 2002)................................................................................33

*United States v. Tropiano*,
    418 F.2d 1069 (2d Cir. 1969)............................................................................30

*United States v. Turkette*,
    452 U.S. 576 (1981)....................................................................................18, 19

*United States v. Utley*,
    2000 WL 620218 (S.D.N.Y. May 12, 2000) ....................................................35

*United States v. Zhou*,
    428 F.3d 361 (2d Cir. 2005)..............................................................................28

*Viacom Int'l Inc. v. Icahn*,
    747 F. Supp. 205 (S.D.N.Y. 1990), *aff'd*, 946 F.2d 998 (2d Cir. 1991) ................29

*Wild Edibles Inc. v. Indus. Workers of the World Local 460/640*,
    2008 WL 4548392 (S.D.N.Y. Oct. 9, 2008) .....................................................23

*Williams v. Williams*,
    246 N.E.2d 333 (N.Y. 1969)........................................................................50, 58

*Willson v. Ass'n of Graduates of the U.S. Military Acad.*,
    946 F. Supp. 294 (S.D.N.Y. 1996) ...............................................................50

**Statutes**

Hobbs Act, 18 U.S.C. § 1951.................................................................27, 28, 29

18 U.S.C. § 1341 .....................................................................................................34

18 U.S.C. § 1343 .....................................................................................................34

18 U.S.C. § 1962(a)-(c) (1976)............................................................................27

18 U.S.C. § 1964(c) ...............................................................................................39

N.Y. Civ. Rights Law § 74 ...........................................................................*passim*

N.Y. Comp. Codes R. & Regs. tit. 22, § 130-1.1........................................46

N.Y. Penal Law §§ 135.20-.25 ...........................................................................45

N.Y. Penal Law §§ 130.25-.35 ...........................................................................45

N.Y. Penal Law §§ 130.55-.65 ...........................................................................45

N.Y. Penal Law § 230.34 .....................................................................................45

N.Y. City Gender Motivated Violence Act, N.Y.C. Admin. Code § 8-101 *et seq.*........................10

N.Y. City Admin. Code § 10-1105 ..................................................................49

**Rules**

Fed R. Civ. P. 8 ......................................................................................................15

Fed. R. Civ. P. 8(a) ...............................................................................................15

Fed. R. Civ. P. 9(b) ...................................................................................15, 34, 35

Fed. R. Civ. P. 12(b)(6).........................................................................................15

**Other Authority**

Hon. Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems*
    (5th ed. 2017).........................................................................................................55

**PRELIMINARY STATEMENT**

This civil RICO and defamation case arises from Plaintiff Leon D. Black's relationships with Defendants Guzel Ganieva and Josh Harris. Over the years, Black helped both Ganieva and Harris rise to considerable wealth: giving millions of dollars in gifts to Ganieva, enabling her to pay for luxury apartments, acting classes, and expensive vacations; and bringing Harris in as a junior employee at the ground floor of Apollo Global Management, Inc. ("Apollo"), promoting him, and making him billions upon billions of dollars.

Despite all of this, both Ganieva and Harris wanted more from Black. They thus joined efforts, together with Defendant Steven Rubenstein (collectively, with Ganieva and Harris, the "RICO Defendants") and others, to achieve their goals—more money, more power—through racketeering activity: extortion and fraud. They did that by weaponizing Black's consensual relationship with Ganieva to assassinate Black's character, and extort what they wanted from him. Counseled by Defendant Wigdor LLP ("Wigdor"), and with Harris's backing, Ganieva filed one frivolous complaint after another against Black in state court. Rubenstein, directed by Harris, ensured that Ganieva's false allegations were spread widely. When Black did not cave, the enterprise increased the pressure through a false report to the authorities, automatically triggering an investigation by the Manhattan District Attorney. All throughout this continuing extortionate and fraudulent campaign, Defendants repeatedly and persistently defamed Black by spreading false information online and to the press, as well as through their sham complaints.

Having given in once to Ganieva's extortionate threats to disclose their consensual affair, Black refused to give in to her lies about abuse. Black filed this lawsuit in federal

1

court to put a stop to this scheme. The Amended Complaint includes plausible and, when required, particularized allegations of a RICO enterprise (the "Enterprise")—with Ganieva, Harris, Rubenstein, and others acting in concert to commit extortion and mail and wire fraud, in violation of federal law—and of defamation. Defendants' motions to dismiss should be denied.[1]

## BACKGROUND

### A. The Background Relationships: Ganieva and Harris

Guzel Ganieva is a Russian national, who now resides in New York City, New York. Compl. ¶ 25.[2] She first met Black at a party in 2008, after which they began a consensual affair that lasted, sporadically, for six years. *Id.* ¶ 32. During their relationship, Black paid for Ganieva's luxurious apartment on the Upper East Side of Manhattan—an apartment he never had keys to, and to which he only came when invited. *Id.* In 2014, Ganieva told Black that she was leaving the country for immigration-related reasons. *Id.* From the time she left New York in July 2014 until her return in June 2015, she continued to send Black text messages telling him that she missed him and loved him. *Id.* ¶ 33.

That shifted suddenly when Ganieva failed to gain legal status in the United Kingdom. *Id.* On June 8, 2015, Ganieva sent Black a much more formal note than her previous messages, insisting that she needed to meet with him in person about a matter she characterized, without detail, as "both urgent and important." *Id.*

---

[1] *See* Mem. of Law in Supp. of Def. Josh Harris's Mot. To Dismiss the Am. Compl., Dkt. No. 81 ("Harris MTD"); Mem. of Law in Supp. of Def. Guzel Ganieva's Mot. To Dismiss the Am. Compl., Dkt. No. 84 ("Ganieva MTD"); Def. Wigdor LLP's Mot. To Dismiss Pl.'s Third Cause of Action, Dkt. No. 87 ("Wigdor MTD"); Mem. of Law in Supp. of Def.t Steven Rubenstein's Mot. To Dismiss, Dkt. No. 89 ("Rubenstein MTD").

[2] The citations throughout are to the Amended Complaint, Dkt. No. 46 ("Compl."), the current operative complaint.

During an in-person meeting with Black on June 24, 2015, Ganieva demanded that Black pay her $100 million, otherwise she would go public with their affair. *Id.* ¶ 34. Black was well aware he was being extorted. In order to protect himself, after consulting counsel, Black recorded his future discussions with Ganieva. *Id.* ¶ 35. In those conversations, Ganieva made herself perfectly clear, saying that she would "not agree to anything less than $100 million," and threatening that "the more, the longer I wait, the more sure I become that I actually, I prefer to go public." *Id.* ¶ 34.

Black and Ganieva came to an agreement on October 19, 2015. *Id.* ¶ 37. Black agreed to pay Ganieva $100,000 monthly for 15 years; forgive approximately $1 million in loans; and provide £2 million for Ganieva to use toward obtaining legal status in the United Kingdom. *Id.* In exchange, Ganieva agreed not to publicly disclose their affair, as she had threatened. *Id.* At no point in the many hours of recorded meetings between Black and Ganieva—involving her extortionate threats and the negotiation of his ransom—had Ganieva accused Black of physically or sexually assaulting her. *Id.* ¶ 36.

It was in October 2019 that Ganieva complained to Black about their arrangement, claiming that he had forced her to sign the agreement under duress (a claim she never made in the preceding four years). *Id.* ¶ 39. Then, in March 2020, attorneys purporting to represent Ganieva sent a letter to Black stating that they had been retained "to investigate certain matters related to [Black's] prior interactions with [Ganieva]," and requesting copies of their agreement. *Id.* Black did not respond, unwilling to take the bait as Ganieva attempted to extort even more money from him; he continued to pay her under their agreement, and Ganieva continued to accept the ransom. *Id.* For five and a half years, Black paid his ransom and deposited $100,000 each month in Ganieva's account. *Id.* ¶ 38.

She accepted every single payment—totaling $9.2 million—ratifying the agreement she would later claim was forced upon her. *Id.*

Josh Harris resides in Miami-Dade County in the State of Florida. *Id.* ¶ 27. He first met Black in the mid-to-late 1980s, when Black ran the mergers and acquisitions department and then the corporate finance group at Drexel Burnham Lambert ("Drexel"), and Harris was a recent college graduate. *Id.* ¶ 3. While Harris was in business school, Black formed Apollo alongside several colleagues from Drexel, including Marc Rowan. *Id.* ¶¶ 3, 54. Harris joined the company in 1991, a year after its founding, as a junior employee. *Id.* ¶ 3. It was not until 2007—16 years after he joined—that Harris was designated a "co-founder" of Apollo, despite not in fact being present for the founding. *Id.* Meanwhile, Black served as Apollo's CEO and Chairman for the next 30 years, during which time it grew to manage $480 billion in assets. *Id.* ¶¶ 3, 124. Harris had long wanted to assume Black's role as CEO, even going as far as asking for it (and being rebuffed by Black) in 2015. *Id.* ¶ 3. Instead, Black twice offered the job to Rowan, the other "co-founder" who was actually at Apollo when it was founded. *Id.* ¶ 54.

## B. Harris Hatches Plot and Forms War Council to Take Down Black

Anxious to seize on any opportunity to undermine Black and rise to the top of Apollo, Harris began a new effort to take down Black when news broke that Jeffrey Epstein had served as Black's financial advisor. *Id.* ¶ 3. In October 2020, *The New York Times* reported that Black had paid Epstein some $50 million for tax advice. *Id.* ¶ 40. Whereas Black requested that the independent directors of Apollo formally commission an independent outside law firm to scrutinize Black's relationship with Epstein, Harris formed a war cabinet to take Black down—harming Apollo in the process. *Id.* ¶¶ 3-4.

Rather than trying to avoid the issue, Black invited Apollo's Board of Directors to hire distinguished independent counsel; the Board's independent directors ultimately retained Andrew Levander, a former Assistant U.S. Attorney for the Southern District of New York and a senior partner in the law firm Dechert LLP ("Dechert"), to investigate Black's relationship with Epstein. *Id.* ¶ 42. In all, Dechert reviewed more than 60,000 documents and interviewed numerous members of Black's family office, with Black's full cooperation. *Id.* In its final report, presented to Apollo's Board on January 24, 2021, Dechert concluded that Black had engaged in no misconduct with Epstein, but rather had engaged him for legitimate business purposes, and also found that all fees Black paid Epstein were for value received from Epstein's advice on trust and estate planning, tax issues, and operations of the family office, all consistently vetted by major law firms and other advisors. *Id.* ¶ 49.

Even before Dechert was ready to release its report, Harris's war council was continuing its preparation to take down Black. At the outset, Harris convened a group of attorneys from prominent law firms and his longtime public relations ("PR") firm, Rubenstein (directed by its president, Steven Rubenstein). *Id.* ¶¶ 4, 20, 44. Some of these law firms, and Rubenstein itself, were working for Apollo at the time. *Id.* ¶¶ 4, 28, 45. By January 7, 2021, the group had presented Harris with options for litigators, one of whom was eventually hired and joined this war council; his assignment was to take on Black on Harris's behalf in the context of Apollo's impending governance change and the forthcoming merger with Athene Holding Limited ("Athene")—an insurance company started by Rowan. *Id.* ¶¶ 43, 54. And the week Dechert released its report, Harris supplemented his team with two new media advisors: Jonathan Rosen from BerlinRosen,

and Paul Holmes from Finsbury Glover Hering. *Id.* ¶¶ 4, 44. The war council also included Apollo staff, many of whom doubled as Harris's family office employees. *Id.* ¶ 45. Many of them—including Harris and the attorneys and employees who worked for Apollo—owed fiduciary duties of care, candor, and loyalty to Apollo, which they ignored. *Id.*

This association-in-fact met secretly and intensively "by Zoom (at a minimum) daily, including nights and weekends," and in turn worked to further their goals by contacting investors and the media in an effort to attack Black and rally support around Harris. *Id.* ¶¶ 5, 45. In order to obscure their communications and activities, Harris's chief of staff (an Apollo employee) specifically directed the group, via e-mail, to "ONLY USE SLACK" when communicating with Harris, "[e]ven if [Harris] pings you on [W]hats[A]pp"—since, as the Amended Complaint alleges, Slack is a communications platform that allows users to send "self-destructing" messages. *Id.* ¶¶ 5, 47.

The war council kept careful track of media and metrics measuring the mentions, popularity, ratings, and ranking of Black, Harris, and Rowan, detailed in lengthy slide decks. *Id.* ¶ 6. Members of the Enterprise took steps to spread negative stories about Black in the media, resulting in hundreds of negative press articles, although Black was hardly a household name. *Id.* ¶ 40. They helped contact Apollo investors, suggesting they place "concerned" investor calls to Apollo. *Id.* And they helped plant additional news stories on the subject of who would replace Black, trumpeting Harris as Apollo's future leader. *Id.* ¶¶ 40-41. On October 31, 2020, just days after *The New York Times* published its story on Black and Epstein's professional relationship, *The Wall Street Journal* featured a profile on Harris, titled: "A $433 Billion Wall Street Giant Has a Reputation Problem. It's Josh

Harris's Job to Fix It." *Id.* ¶ 41. It had been placed and promoted by members of the Enterprise. *Id.*

When Harris learned that the Dechert report would clear Black of any wrongdoing, impeding Harris's efforts to remove and replace him, Harris sought to undermine its conclusions. *Id.* ¶ 50. On January 23, 2021, the day before the report was presented to the Apollo Board of Directors, Harris met with two independent directors of Apollo to tell them that the report they were about to receive was a whitewash, was not thorough, and was inadequate to support its conclusions. *Id.* But the independent directors understood that Harris was basing these claims on nothing. A.B. Krongard, an independent director and the former Executive Director of the Central Intelligence Agency, told Harris that this was "not his first rodeo," and warned that, unless Harris had additional information that Dechert did not, he should not be attacking its conclusions. *Id.* ¶ 51. At the same time, the PR arm of the Enterprise reached out to numerous media outlets—including *Bloomberg*, *The Wall Street Journal*, and the *New York Post*—to attempt to undermine the Dechert report and Black. *Id.* ¶ 53.

Now cleared by the Dechert report, Black announced that he was planning to retire as CEO when he turned 70 in July 2021, and remain as Chairman of Apollo. *Id.* ¶ 54. Much to Harris's chagrin, however, Black and the Board did not pick him as the next CEO. *Id.* Instead, Black offered the position to Rowan, who helped found Apollo, and who had previously turned down two offers to lead Apollo because he was too busy building a new insurance company, Athene. *Id.* This time, however, with Apollo planning a merger with Athene, Rowan accepted the offer to lead. *Id.* Harris, totally spurned, was furious, and he and the Enterprise set out to destroy Black. *Id.* The only question was how.

First, Harris attacked Apollo itself. Harris began to work on appointing new members to the Apollo Board who would tell him "exactly what he wanted to hear"—that is, that Harris was "the right person to be CEO." *Id.* ¶ 56. Moreover, when Black appointed two independent directors to the Apollo Board as part of a series of corporate governance enhancements announced around the time of the Dechert report's release—that is, Siddhartha Mukherjee, a world renowned physician and scientist, and Pamela Joyner, the founder of the marketing consulting company Avid Partners, LLC—the Enterprise worked to take them down. *Id.* ¶¶ 57-58. Rubenstein planted a hit job story written by Josh Kosman and published in the *New York Post*, attacking Mukherjee and questioning his independence. *Id.* ¶ 57. The article cited "'sources close to the situation'" for its (inaccurate) discussion of confidential Apollo Board processes. *Id.* The *Post* also published a defamatory article against Joyner, attacking her independence and the propriety of her serving as a board member. *Id.* ¶ 58. Apollo pushed back, emphasizing that all its directors have "impeccable credentials and offer significant value to the Apollo Board"; that "[n]o member of the board has raised any concerns regarding the qualifications or commitment of the independent directors"; that new directors were "unanimously approved after extensive due diligence"; and that "[i]t is disappointing that the integrity and independence of such highly accomplished individuals is being questioned by anonymous, unsubstantiated accusations." *Id.* ¶ 57. Unfortunately, the damage was done, and Mukherjee stepped down. *Id.*

Second, over the weekend of January 23 and 24, 2021, Harris had his war cabinet contact attorneys who might work with Ganieva to pursue spurious claims against Black, including Alex Spiro of Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel").

*Id.* ¶¶ 60-61. Specifically, they asked Spiro if Quinn Emanuel was free to take a case at the request of a faction at Apollo engaged in "cagey business." *Id.* ¶ 61. The potential client, a woman who would be "'adverse' to Mr. Black," was later identified as Ganieva, who shared an interest in taking Black down. *Id.*

## C. Ganieva Joins the Enterprise, Spreading Her Lies Further

On March 17, 2021, Ganieva took to Twitter for the first and only time to post a series of false and defamatory tweets aimed at Black, with the purpose of harming him and Apollo as much as possible. *Id.* ¶ 63. She did so from a new Twitter account with only three followers: Ronan Farrow of *The New Yorker*; Matthew Goldstein of *The New York Times*; and Richard McHugh, then of NBC—all journalists who covered the #MeToo movement and/or Apollo, recruited in advance of her defamatory tweets. *Id.* ¶¶ 64-65. In the tweets, Ganieva specifically referred to Black as "Apollo Global Management's CEO and Chairman," and used the hashtags #MeToo and #LeonBlack. *Id.* ¶ 63. She tweeted that she had been "sexually harassed and abused" by Black for years; that he "could not understand [her] when [she] refused his sexual advances"; that Black "bullied, manipulated, threatened, and coerced" her; and that, "under duress, [she] was forced to sign an NDA in 2015." *Id.* Yet despite her high-profile Twitter followers, along with the other reporters Ganieva was in contact with (like Julie Brown, who broke the Epstein story, and Jodi Kantor, who broke the Weinstein story), her claims did not garner media attention. *Id.* ¶ 65. Black, for his part, stayed silent.

At this point, the Enterprise escalated the attack, knowingly eliciting a response from Black. *Id.* ¶ 66. Unable to persuade any of the prominent journalists who covered the #MeToo movement of Ganieva's *bona fides*, an interview was instead arranged with Josh Kosman—a reporter from the *New York Post* who had been highly critical of Black

in the past, and who was particularly close to Rubenstein. *Id*. In the interview, published on April 8, 2021, Ganieva claimed that Black's abuse "was over a long period of time and it was tragic." *Id*. In response, Black issued a statement to a reporter for *Bloomberg*: "I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago," adding that her allegations were "completely fabricated." *Id.* ¶ 67. He clarified that, in fact, he had "been extorted by Ms. Ganieva for many years and . . . made substantial monetary payments to her." *Id*.

### D. Ganieva and Wigdor File the First State Court Complaint with the Council's Support

The Enterprise now had public statements it could use to inappropriately haul Black into court and abuse the legal system for its own gain. On June 1, 2021, Ganieva filed a lawsuit against Black in New York Supreme Court, New York County, with the help of attorneys at Wigdor. *Id.* ¶ 72. She did so without prior notice to Black, and in contravention of Wigdor's standard litigation approach. *Id.* ¶¶ 70-71. In her sham lawsuit, Ganieva asserted four claims: two for defamation based on Black's public statement rebutting her defamatory tweets; a claim for intentional infliction of emotional distress based on abuse Black supposedly heaped on her for the duration of their affair; and a claim under the New York City Gender Motivated Violence Act ("GMVA"), based on a purported sexual assault—the centerpiece of the complaint. *Id.* ¶ 72. This assault allegedly took place on July 6, 2014, when Ganieva claims that she was unwell and was "limp and unable to move" when "suddenly" Black "barged" in to her apartment. *Id.* ¶ 73. Ganieva alleges that, after the rape, she "took her son and left New York to physically distance herself from Black." *Id.* ¶ 78.

But the text messages between Black and Ganieva—as recounted in Black's first answer in state court and in the operative Amended Complaint before this Court—tell another story. First, on June 26, 2014, Ganieva texted him: "Baby … I'm all alone. Let's get together soon. I miss you." *Id.* ¶ 73. Then, on July 6, the very night of the alleged assault, Ganieva wrote to Black, unsolicited: "This is love. I need you." *Id.* ¶ 75. Black asked if he could come over to "tuck [her] in" that night. *Id*. ¶ 76. Rather than texting that she was ill, Ganieva instead asked him to "bring a bottle of wine if you can." *Id.* ¶ 76. Black then asked if he could arrive earlier than planned, and Ganieva agreed. *Id*.

The next day, after this alleged rape, Ganieva texted Black again to profess her love: "Good morning. It was very nice to see you last night. I already feel better..... I love you and thank you!!! Xoxoxoxoxo and more love." *Id.* ¶ 77. And a few days later, on July 9 and 10, Ganieva asked her supposed-rapist if he wanted to get together again. *Id.* The texts then reveal that Black and Ganieva saw each other several times between July 6 (the night of the alleged assault) and July 30 (when she actually left New York). *Id.* ¶ 78. That day, she texted him from the plane: "I love you and miss you already." *Id.*

Ganieva's allegations regarding the NDA are no more truthful. She alleged that Black threatened her and forced her to agree to sign the NDA, and to accept millions of dollars in the process. *Id.* ¶ 80. She alleges supposed direct quotes from Black, in which he threatened: "If you do not take the money, I will put you in prison," and "[i]f you do not take the money, I will destroy your life." *Id*. But, as Black's recordings of the extortion negotiations make clear, no such thing was ever said, and Black did not in fact threaten her to accept a deal. *Id*. As discussed above, and as alleged in the Amended Complaint, the truth is clear: it was Ganieva who threatened Black, not the other way around—threatening

to go public with their affair if he did not give her 100 million dollars. *Id*. ¶ 34. And after months of negotiating, she accepted the prospect of more than 20 million dollars over the next fifteen years in exchange for her silence. *Id.* ¶¶ 81, 153.

Black offered to produce the text messages and audio recordings which put the lie to Ganieva's allegations. *Id.* ¶¶ 15, 95. In light of the sensitive nature of the discussions, he simply requested a standard protective order. *Id*. ¶ 96. Wigdor, however, refused to accept this evidence disproving Ganieva's false claims, justifying its willful blindness by claiming that the firm *never* signs protective orders to govern the disclosure of sensitive materials. *Id*. Wigdor attorney Jeanne Christensen went even further, saying this is something "which Wigdor LLP does not do." *Id*. Of course, as alleged in the Amended Complaint, that is not the case; Wigdor regularly enters into stipulations and orders for the production and exchange of confidential information. *Id*. Wigdor plainly did not want to review those documents because they would confirm what Wigdor already knew: Ganieva's court filings were blatant fabrications.

**E.      Ganieva and Wigdor Amend the Complaint to Drag in Epstein, with the Enterprise's Support**

Undeterred by the truth made available to them, Wigdor and the Enterprise instead conspired to invent new, even more salacious allegations against Black. On August 9, 2021, Ganieva filed an amended complaint in state court, adding a slate of scandalous headlines related to Epstein that have no relevance to any of her legal claims, which remained exactly the same. *Id*. ¶ 82. Rather, they detail new allegations of events that allegedly happened 13 years prior to her filing the case—somehow forgotten by Ganieva when filing her original complaint—and with not a kernel of truth to them. *Id.* Specifically, Ganieva's amended complaint contains new allegations that, in October 2008,

12

Black flew Ganieva to Palm Beach, Florida against her will. *Id.* ¶ 83. While there, Black allegedly took Ganieva to Epstein's house and coerced her into a meeting with Epstein and Black for the purpose of gratifying their sexual desire. *Id.* Ganieva's amended complaint contains additional quotations, supposedly from an associate of Epstein's, calling the two men "sex addicts." *Id.* ¶¶ 83-84.

Yet, once again, not only are these allegations lies, but they are disproven by readily available evidence. As alleged in the Amended Complaint, flight manifests from Black's plane reveal that not only did Black and Ganieva never take the same-day round trip voyage to Florida in October 2008, contrary to what is described in Ganieva's amended complaint, but also that they never even flew to Florida together at any point that entire year. *Id.* ¶ 85. And, in the recorded conversations from 2015 between Black and Ganieva, when Black questioned whether Ganieva had ever met Epstein, she mentioned nothing about this made up kidnapping. *Id.* ¶¶ 86-87. Once again, despite the contrary evidence raised in Black's answer to Ganieva's amended complaint, Wigdor refused to sign a standard protective order, shielding themselves from the truth. *Id.* ¶ 96.

In its search for any new allegations, the Enterprise came up largely empty. The best it could do was the far-fetched claim of one Jane Doe, which then became the subject of its third sham complaint. On September 20, 2021, Wigdor and Ganieva moved to amend her state-court complaint once more, this time to add unfounded allegations of an anonymous massage at Epstein's home nearly 20 years prior, for which Black allegedly paid $5,000. *Id.* ¶ 89. They also added an entire section alleging details on Black's relationship with Epstein. *Id.* ¶ 91. These allegations are all unrelated to Ganieva's causes of action, and were instead designed and intended to harm Black's reputation. *Id.* Ganieva

and Wigdor were not seeking vindication by bringing these allegations—rather, they filed three sham complaints in order to defame, extort, and cancel Black, in furtherance of the Enterprise's goal of harming him. *Id.* ¶ 90.

Wigdor's continued failure to prosecute the state action further demonstrates the malicious intent behind the state case. The court had to schedule an in-person conference on September 27, 2021, because Black's lawyers were being ignored by Wigdor. *Id.* ¶ 93. Wigdor failed to respond to calls and letters, missed discovery deadlines, and would not agree to basic items like a standard protective order. *Id.* Wigdor worked to slow the progress of discovery as much as possible, even though they represent the plaintiff. For instance, when the parties appeared for a court conference on January 7, 2022, Ganieva's lawyers made no mention of Black's subpoena for her phone records. *Id.* ¶ 94. Yet, very late that evening, they filed a motion that blocked the planned release of those records, due to be released four days later. *Id.* These actions and others like them have helped stall the progress of the case, allowing more stories—full of these unverified and untrue allegations—to spread in the mainstream and social media, with the assistance of the Enterprise. *Id.* ¶ 93.

And, if that was not enough, the Enterprise arranged for the filing of a false report to the authorities by Ganieva regarding the assault alleged in her sham state-court complaints, accompanied by a new round of media claiming that Black was being criminally "'investigated'" for rape. *Id.* ¶ 98. Of course, as the Amended Complaint alleges, the District Attorney is *obligated* to examine every complaint of sexual abuse it receives. *Id.* ¶ 99. But the Enterprise knew it could leverage this fact to generate additional negative press stories, in furtherance of its scheme to harm Black.

The Amended Complaint alleges that the conduct of the Enterprise—making false reports to the criminal authorities, filing sham complaint after sham complaint, assassinating Black in the court of public opinion, and extorting Black—caused Black considerable financial injury, and had a negative impact on the companies, boards, and foundations on which Black served.  *Id.* ¶¶ 23-24, 123-124, 146, 148.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must have pleaded "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint must only "nudge[] . . . claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, and "courts should be wary of establishing an unreasonably high bar to surviving a motion to dismiss," *Fullwood v. Wolfgang's Steakhouse, Inc.*, 2014 WL 6076733, at *7 (S.D.N.Y. Nov. 14, 2014).

"In the RICO context, a plaintiff must plead predicate acts sounding in fraud or mistake according to the particularity requirement of Rule 9(b); for other elements of a RICO claim—such as non-fraud predicate acts or . . . the existence of an 'enterprise'—a plaintiff's complaint need satisfy only the 'short and plain statement' standard of Rule 8(a)."  *D. Penguin Bros., Ltd. v. City Nat'l Bank*, 587 F. App'x 663, 666 (2d Cir. 2014).  The Second Circuit applies Rule 8(a) when extortion is alleged as a RICO predicate act.  *See McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992).  Similarly, "a claim for defamation asserted in federal court is governed by the liberal pleading requirements of

Rule 8 of the Federal Rules of Civil Procedure, not by . . . particularized pleading requirements." *Muzio v. Inc. Vill. of Bayville*, 2006 WL 39063, at *8 (E.D.N.Y. Jan. 3, 2006).

**ARGUMENT**

## I.  BLACK SUFFICIENTLY ALLEGED A RICO CONSPIRACY BY THE ENTERPRISE

The facts pleaded in the Amended Complaint adequately allege a RICO conspiracy. In order to state a claim under civil RICO, a plaintiff "must allege the existence of seven constituent elements:  (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 16-17 (2d Cir. 1983) (quoting 18 U.S.C. § 1962(a)-(c) (1976)).  Black has plausibly alleged each one of those elements, including the commission of at least two predicate acts: extortion and mail and wire fraud.

Ignoring the well-pleaded allegations of their misconduct, the RICO Defendants have moved to dismiss the Amended Complaint.  They argue that the Enterprise lacked any common purpose or relationships among the RICO Defendants.  *See* Harris MTD at 12-13; Rubenstein MTD at 6-7; Ganieva MTD at 11.  They argue that none of them operated or managed the Enterprise, *see* Harris MTD at 13; Ganieva MTD at 13-14; Rubenstein MTD at 7-8; that their conduct did not amount to either extortion or mail and wire fraud, *see* Harris MTD at 14-18; Ganieva MTD at 17-19; Rubenstein MTD at 9-12; and that the racketeering activity lacks continuity in light of the limited scope of perpetrators, victims, and goals.  *See* Harris MTD at 19; Ganieva MTD at 21; Rubenstein

MTD at 13.  They also, confusingly, argue that Black was not injured at all.  *See* Harris

MTD at 21-22; Ganieva MTD at 22.

These arguments are all unavailing.  The RICO Defendants seek to rewrite the

Amended Complaint's allegations; contest their accuracy; and seek impermissibly to

implicitly and explicitly apply heightened pleading requirements to *all* aspects of a civil

RICO claim.  This Court should deny their motions to dismiss the RICO claims.

A. **The Amended Complaint Adequately Alleges an Association-in-Fact
   Enterprise**

Contrary to the RICO Defendants' arguments, Black has alleged an association-in-

fact enterprise that is distinct from a pattern of racketeering.  "The Second Circuit has

construed 'enterprise' liberally, noting that RICO's 'language and the history suggest that

Congress sought to define the term as broadly as possible.'"  *AIU Ins. Co. v. Olmecs Med.*

*Supply, Inc*., 2005 WL 3710370, at *6 (E.D.N.Y. Feb. 22, 2005) (quoting *United States v.*

*Indelicato*, 865 F.2d 1370, 1382 (2d Cir. 1989)).  Indeed, the Supreme Court in *Boyle v.*

*United States*, 556 U.S. 938 (2009), reaffirmed the Second Circuit's liberal construction,

noting the term "enterprise" is "obviously broad," that it encompasses "*any*. . . group of

individuals associated in fact," and that "the very concept of an association in fact is

expansive."  *Id.* at 944 (alterations in original).  The *Boyle* Court held that an association-

in-fact enterprise does not need to have any particular type of organizational structure, and

only requires three structural features:  (1) "a purpose," (2) "relationships among those

associated with the enterprise," and (3) "longevity sufficient to permit these associates to

pursue the enterprise's purpose."  *Id.* at 946.  As discussed below, Black's allegations are

more than sufficient to meet this "low threshold" for pleading a RICO enterprise, *De Sole*

*v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 300 (S.D.N.Y. 2013), and the RICO Defendants' arguments to the contrary are wrong.

1. The Amended Complaint easily meets *Boyle*'s first requirement that the members of an association-in-fact enterprise share a goal or purpose. *See* 556 U.S. at 946. It alleges that the RICO Defendants joined together to take down Black personally, professionally, and financially: in fact, the Enterprise was "orchestrated . . . to take down Mr. Black . . . and destroy him" through character assassination and extortion. Compl. ¶ 1. And it explains in detail Harris's and Ganieva's personal motivations for attacking Black, which animated the Enterprise. *See, e.g., id.* ¶¶ 1-2, 4, 8. One RICO Defendant even acknowledges that the Amended Complaint pleads that the Enterprise was working as a unit with a goal to harass and harm Black. *See, e.g.*, Rubenstein MTD at 6.

The RICO Defendants' only argument is that, even if the Enterprise worked together to target Black, there was somehow still no common purpose since, unlike Ganieva, Harris and Rubenstein were not motivated by financial gain. *See* Harris MTD at 12-13; Rubenstein MTD at 6-7; Ganieva MTD at 11. But the RICO Defendants' narrow interpretation of "common purpose" is contrary to the law: "'[c]ommon purpose' does not mean commonality of motive, it means coordinated activity in pursuit of a common objective." *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 173 (D. Mass. 2003). Even under the cases that the RICO Defendants cite, allegations that Defendants functioned as a "continuing unit" to cause harm to a victim are enough to establish common purpose. *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173-76 (2d Cir. 2004) (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981)). Moreover, narrowing the common purpose requirement to exclude situations in

which all members of the enterprise worked together to achieve a common goal, but derived different benefits, would run counter to the Supreme Court's directive in *Boyle* that "enterprise" should be "liberally construed." 556 U.S. at 944; *see also Turkette*, 452 U.S. at 583. Here, the Amended Complaint alleges that the RICO Defendants shared the common goals of spreading lies about and injuring Black, and that the Enterprise engaged in a course of conduct designed to achieve these shared goals. The law does not require more.

The RICO Defendants cite no cases to the contrary—nor do they cite any cases requiring that each Defendant must stand to benefit financially in order to establish common purpose under RICO. For example, Ganieva (at 11) cites *Mortgage Resolution Servicing, LLC v. JPMorgan Chase Bank, N.A.*, 2018 WL 1627257 (S.D.N.Y. Mar. 30, 2018). But, there, the plaintiffs failed to identify *any* goal that united the defendants and motivated their actions. 2018 WL 1627257, at *4. In contrast, the Amended Complaint alleges that all RICO Defendants had the purpose of bringing down and cancelling Black, and that they worked together to do so. In *D. Penguin Bros.*, cited by Harris (at 12-13), the court found that there was no common purpose where the plaintiffs failed to allege *any* reason why one defendant would share the stated goal of "deriving political support" for a particular entity. 587 F. App'x at 668. But, here, the Amended Complaint contains ample factual allegations about Harris's sharing the common goal of harming Black, and the reasons he shared that motivation. *See*, *e.g.*, Compl. ¶¶ 3, 4.

2.      The Amended Complaint also adequately alleges *Boyle*'s second requirement: relationships among those associated with the Enterprise. *See* 556 U.S. at 946. For example, the Amended Complaint contains detailed factual information about

how Harris convened a "war cabinet" to "destroy Mr. Black," including Rubenstein, his communications firm, and others. Compl. ¶ 4. Harris and his war cabinet joined forces with Ganieva in a "larger campaign of destruction." *Id.* ¶ 8. The Amended Complaint alleges the RICO Defendants worked together to spread Ganieva's lies to destroy Black. *See id.* ¶¶ 9, 10. It alleges that Harris's war council contacted law firms on Ganieva's behalf. *See id.* ¶ 9. It alleges facts from which one could reasonably conclude that Harris sent a lawyer to encourage Ganieva to pursue her claims against Black. *See id.* ¶¶ 9, 11. And it alleges that Harris "funded and actively encouraged" the communication of Ganieva's filings to the press. *Id.* ¶ 138.

The motions to dismiss ignore all of those (and other) well-pleaded facts showing the relationships among the RICO Defendants. For example, Harris confusingly states that the Amended Complaint "does not plausibly identify" any relationship between Harris and Ganieva, and that there is "no link between Harris and Ganieva." Harris MTD at 11-12. But he does so only by ignoring the relationships and links that are alleged, including the allegations, noted above, that Harris or one of his surrogates solicited legal representation for Ganieva (by contacting, among others, Spiro of Quinn Emanuel) in an effort to hurt Black and to further Harris's position at Apollo, and funded the dissemination of Ganieva's claims to the press. Compl. ¶¶ 9, 11, 61, 138. And Rubenstein claims that the Amended Complaint "does not . . . allege that [he] had any association with Ganieva." Rubenstein MTD at 6. But Rubenstein spoke to the press about Ganieva's case and may have been key to arranging for Ganieva to be interviewed by his favored reporter, Josh Kosman. *See*, *e.g.*, Compl. ¶¶ 17, 66. What is more, Wigdor was in communication with Ganieva to promote Ganieva's false narrative to the press as early as October 2020—although it has

repeatedly and boldly stated that it did not work with Ganieva until April 2021. *See* Dkt. No. 92, at 1-2. All of the RICO Defendants' claims are belied by the Amended Complaint's well-pleaded facts, which must be taken as true for purposes of a motion to dismiss. *See Buyers & Renters United to Save Harlem v. Pinnacle Grp. N.Y. LLC*, 575 F. Supp. 2d 499, 506 (S.D.N.Y. 2008).

Harris also claims the Amended Complaint does not adequately allege relationships among those associated with the Enterprise, because it does not identify enough instances of contact or particular communications between the RICO Defendants. *See* Harris MTD at 11-12. But that is not a basis for dismissing the Amended Complaint at the pleading stage. Conspiracies are inherently secretive, and the particulars are often known only to insiders. Courts in the Second Circuit have routinely recognized that, "where . . . a conspiracy is alleged, 'great leeway' is allowed since, by the nature of conspiracy, details may not be readily known at the time of pleading." *Lazzaro v. Manber*, 701 F. Supp. 353, 372 (E.D.N.Y. 1988); *see also State Wide Photocopy, Corp. v. Tokai Fin. Servs*., *Inc.*, 909 F. Supp. 137, 141-42 (S.D.N.Y. 1995) (declining to dismiss RICO claims based on absence of detail in the complaint where "facts [we]re peculiarly within the opposing party's knowledge") (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990).[3]

Indeed, it is especially notable that, here, Black was able to find and allege examples of those types of communications even before obtaining discovery—despite the

---

[3] In recognition of the secretive nature of conspiracies and the difficulty that secrecy poses for plaintiffs seeking to assert rightful claims against RICO enterprises, courts often find it is appropriate to grant discovery to allow plaintiffs to obtain specific information that is "likely in the exclusive control of the defendant" and to amend their claim with that additional information. *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 290-91 (1st Cir. 1987); *Cordero-Hernández v. Hernández-Ballesteros*, 449 F.3d 240, 244 (1st Cir. 2006) (recognizing that "it will often be difficult for a plaintiff to plead with specificity when the facts that would support [their] claim are solely in the possession of the defendant"). If this Court required more detail about the communications between particular RICO Defendants, this type of limited discovery would be appropriate here.

RICO Defendants' deliberate attempts to conceal and suppress evidence of their wrongful scheme. *See*, *e.g.*, Compl. ¶ 47 (Harris only allowed war council to communicate via Slack, which promotes itself as allowing self-destructing messages.); *see also id.* ¶ 17 (Ganieva and Wigdor have sought to "stall, obstruct and delay" discovery in another forum that might have revealed more specific contact between all the RICO Defendants). And many individual communications in furtherance of the conspiracy in this case would not be accessible to Black before discovery. In short, Black's inability to provide even more details of communications between the RICO Defendants should not lead to dismissal of his case—especially where, as here, Defendants have gone to great lengths to conceal their activities from Black and others.

3.      Finally, the longevity element of *Boyle* is easily satisfied. The Amended Complaint alleges that the RICO Defendants participated in an "ongoing RICO Enterprise" through which they "conduct[ed] their ongoing business," and that the Enterprise will continue to make and disseminate filings containing false and outrageous accusations regarding Black. Compl. ¶¶ 121-122. Ganieva, with the assistance of the Enterprise, has continued to file sham complaint after sham complaint, and Rubenstein continues to generate negative press coverage based on false and irrelevant allegations, which Harris continues to fund—all in furtherance of the Enterprise's shared goals. *See, e.g.*, *id.* ¶¶ 57, 89-92, 113-115. As such, the Amended Complaint alleges an Enterprise with "longevity sufficient to permit the[] associates to pursue the enterprise's purpose," and the RICO Defendants do not argue otherwise. *Boyle*, 556 U.S. at 946.

4.      Notwithstanding the Amended Complaint's allegations clearly satisfying each one of the *Boyle* elements, the RICO Defendants continue to advance other arguments,

contrary to the law, that Black fails to adequately plead an association-in-fact enterprise. Those arguments are unpersuasive.

For instance, the RICO Defendants argue that there is no information "regarding the 'hierarchy' and 'organization'" of the Enterprise, Rubenstein MTD at 6; Harris MTD at 11, and that the Amended Complaint fails to plead an actionable enterprise because the "'sole purpose of the alleged enterprise [was] to perpetuate the alleged fraud,'" Rubenstein MTD at 6. But the cases the RICO Defendants cite on this point are all pre-*Boyle* cases. *See, e.g.*, *First Capital Asset Mgmt.*, 385 F.3d at 173; *Mikhlin v. HSBC*, 2009 WL 485667, at *3 (E.D.N.Y. Feb. 26, 2009); *Wild Edibles Inc. v. Indus. Workers of the World Local 460/640*, 2008 WL 4548392, at *1 (S.D.N.Y. Oct. 9, 2008). And the Supreme Court expressly rejected the necessity of those types of allegations in *Boyle*. A RICO enterprise need not have "a structural 'hierarchy,'" "a 'chain of command,'" or "regular meetings regarding enterprise affairs." *Boyle*, 556 U.S. at 948. Indeed, "association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure," *United States v. Burden*, 600 F.3d 204, 215 (2d Cir. 2010) (quoting *United States v. Coonan*, 938 F.2d 1553, 1559 (2d Cir.1991)), and thus a complaint need not "allege that a particularly organized structure existed," *Equinox Gallery Ltd. v. Dorfman*, 306 F. Supp. 3d 560, 571 (S.D.N.Y. 2018). In short, the allegations of hierarchy that the RICO Defendants advance are not required. Even so, Black has included allegations outlining each Defendant's role in the Enterprise, *see, e.g.*, Compl. ¶ 138, including allegations that Harris headed up and funded the Enterprise, *see id.*, and allegations about how the Enterprise met and communicated, *see, e.g., id.* ¶¶ 5, 6.

In short, Black has adequately alleged all the *Boyle* requirements and has even provided additional and unrequired detail on the RICO Defendants' Enterprise. He has pleaded more than what is required to establish an association-in-fact enterprise.

**B.    Each RICO Defendant "Conducted or Participated" in the Affairs of the Enterprise**

The RICO Defendants erroneously argue that Black has not adequately pleaded their participation in the operation or management of the Enterprise. In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs" under Section 1962(c), a defendant must only "have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). It is well-established that "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management," and it "might [also] be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery." *Id.* at 184. The RICO Defendants' arguments that the allegations against them do not satisfy this low threshold all fail.

Harris, for instance, argues that "the Amended Complaint alleges that Harris has merely "*encouraged* and *assisted* the Enterprise in its efforts to extort Mr. Black,'" and there can be no civil liability for aiding and abetting a RICO claim. Harris MTD at 13 (citing Compl. ¶¶ 27, 117-118). But the Amended Complaint alleges far more than mere encouragement and assistance: it alleges that a number of firms "worked under Mr. Harris's direction" and "[u]nder Mr. Harris's and the Enterprise's direction," Compl. ¶¶ 4, 45; that Harris had "minions" and "confederates, acting on his direction," *id.* ¶¶ 9, 61, 68; and that, pursuant to his direction, members of the Enterprise (among other things) solicited and arranged legal counsel for Ganieva and planted stories (favoring Harris and

attacking Black) in the press, *id.* ¶¶ 6, 59-61. These allegations easily satisfy the "operation or management" test: at the pleading stage, RICO plaintiffs must only "plausibly allege that each defendant played '*some* part in directing the enterprise's affairs' if the RICO claim is to survive a motion to dismiss." *D'Addario v. D'Addario*, 901 F.3d 80, 103 (2d Cir. 2018) (quoting *First Capital Asset Mgmt.*, 385 F.3d at 176).

Rubenstein argues that the Amended Complaint does not satisfy the "operation or management" test because it only alleges that "Harris paid Rubenstein to engage in the most ministerial of public-relations tasks." Rubenstein MTD at 7-8. But this is also not true. The Amended Complaint alleges that "Ms. Ganieva, Mr. Rubenstein, and Mr. Harris conspired" together, Compl. ¶¶ 127, 129; the scheme "could not have occurred without the consent and knowing connivance of Ms. Ganieva, Mr. Rubenstein, and Mr. Harris together," *id.* ¶ 128; and, specifically, that "Rubenstein and his team planted a hit job story" against independent directors whom Black appointed to Apollo's Board, *id.* ¶ 57. The Amended Complaint details that Rubenstein and the Enterprise orchestrated those attacks, that the hit job story published inaccuracies about confidential Board processes, and that despite Apollo fighting back with the facts, the damage was done. *Id.* ¶¶ 57-58. There is no daylight between those allegations and the Second Circuit's holding that "actively assist[ing]" an executor who used his estate to effectuate fraudulent schemes, thereby "directly affect[ing] his management" of the estate, "may fairly be considered 'participation' in the operation or management of an enterprise." *D'Addario*, 901 F.3d at 104. And the allegations of control and intimate involvement within the Enterprise go far beyond only "work[ing] under Harris's direction" or providing basic "professional services" that do "'not require taking part in the direction of the enterprise's affairs,'" such

as a bank merely transferring funds, or firms providing basic accounting services. *See* Rubenstein MTD at 7-8 (citing *Tech. in P'ship, Inc. v. Rudin*, 2011 WL 4575237, at *4 (S.D.N.Y. Oct. 4, 2011) and *Zhu v. First Atl. Bank*, 2005 WL 2757536, at *5 (S.D.N.Y. Oct. 25, 2005)).

Finally, Ganieva argues that "nothing in the Amended Complaint supports a finding that Ganieva did anything other than to manage her own affairs for her own reasons." Ganieva MTD at 14. To the contrary, the Amended Complaint is replete with allegations that members of the Enterprise "join[ed] forces with Guzel Ganieva, to make common cause with an extortionist, to use social media and modern technology to further their attempt to retaliate against Mr. Black," Compl. ¶ 104; that they "made common cause with Ms. Ganieva, an unholy alliance in which litigation was the tinder in a larger campaign of destruction," *id.* ¶ 8; that Ganieva had "confederates," *id.* ¶ 94; that she "needed support" and that "the participants needed each other, and benefited from each other's participation" in the Enterprise, *id.* ¶ 20; that "Ms. Ganieva, Mr. Rubenstein, and Mr. Harris conspired" together, *id.* ¶ 129; and that the scheme "could not have occurred without the consent and knowing connivance of Ms. Ganieva, Mr. Rubenstein, and Mr. Harris *together*," *id.* ¶ 128 (emphasis added). The Enterprise helped Ganieva recruit legal counsel, *id.* ¶¶ 59-62, and sell her stories to the press, *id.* ¶¶ 20, 28, 114-115, 117-118, 138. In fact, Ganieva acknowledges the allegations that the Enterprise was involved with her March 2021 tweets. *See* Ganieva MTD at 20. Black also alleges that Ganieva's followers on her never-before-used Twitter account "were recruited . . . in advance of her explosive tweets," Compl. ¶¶ 64-66, signifying that Ganieva's Twitter activity was not done alone or solely for her own reasons. And that is consistent with the fact that, as early as October 2020, Wigdor

was working with Ganieva, notwithstanding its misleading statements to the contrary.  *See* Dkt. No. 92, at 1-2.

All of those statements allege that the RICO Defendants played a central role in the Enterprise's affairs, and therefore "plausibly allege that each defendant played '*some* part in directing the enterprise's affairs'" and satisfy the "operation or management" test. *D'Addario*, 901 F.3d at 103.

### C. The Amended Complaint Adequately Alleges that the RICO Defendants Engaged in At Least Two Predicate RICO Acts:  Extortion and Mail or Wire Fraud

The RICO Defendants' contention that Black's Amended Complaint fails to allege a sufficient number of RICO predicate acts, in the form of extortion and mail and wire fraud, is wrong.  To establish a substantive RICO violation, a plaintiff must show a "pattern of racketeering activity."  18 U.S.C. § 1962(a)-(c).  And, according to RICO's definitional section, such a pattern "requires at least two acts of racketeering activity."  *Id.* § 1961(5). The acts of racketeering activity that constitute the pattern must be among the various criminal offenses listed in Section 1961(1), including mail fraud in violation of Section 1341, wire fraud in violation of Section 1343, and extortion in violation of Section 1951. *Id.* § 1961(1).  Black has plausibly alleged that the RICO Defendants, in concert, committed each one of those violations.  Ganieva, with the help of Harris and Rubenstein, sought to extort millions of dollars from Black under the fear, first threatened and then concrete, of false accusations of sexual misconduct and sham complaints.  And the RICO Defendants used interstate wires and mail to spread, disseminate, and spotlight those fraudulent allegations and sham complaints.  The Amended Complaint has alleged at least two predicate RICO acts.

### 1. The Alleged Facts Are Sufficient To Plead Extortionate Acts in Violation of the Hobbs Act

The Amended Complaint plausibly alleges that Ganieva, Harris, and Rubenstein engaged in extortion in violation of the Hobbs Act, 18 U.S.C. § 1951. The Hobbs Act provides that extortion is the obtaining of property from another, with his consent, "induced by 'wrongful use of actual or threatened force, violence, or fear, or under color of official right.'" *Park S. Assocs. v. Fischbein*, 626 F. Supp. 1108, 1114 (S.D.N.Y.) (1986) (quoting 18 U.S.C. § 1951), *aff'd*, 800 F.2d 1128 (2d Cir. 1986). The inquiry into whether the element of obtaining property is met depends on "whether the defendant is (1) alleged to have carried out . . . the deprivation of a property right from another, with (2) the intent to exercise, sell, transfer, or take some other analogous action with respect to that right." *United States v. Gotti*, 459 F.3d 296, 324 (2d Cir. 2006). "At bottom, undeniably, the victim of an extortion acts from fear, whether of violence or exposure." *United States v. Zhou*, 428 F.3d 361, 371 (2d Cir. 2005). Here, there is no question that Black alleges facts capable of establishing an extortion claim, and the RICO Defendants' arguments to the contrary are meritless.

According to the Amended Complaint, Ganieva "threatened to publicize her affair with Mr. Black and make false allegations to the public that he harassed or abused her . . . with the intent to extort money from Mr. Black," coercing Black into agreeing to make millions of dollars in regular monthly payments to Ganieva between October 2015 and March 2021. Compl. ¶ 117(a)-(b). Unsatisfied, and with the help of Harris, Rubenstein, and others, Ganieva and the Enterprise "then made good on her extortionate threats" beginning in March 2021, by posting false information on Twitter, *id.* ¶¶ 63-64, 117(c); making and spreading false statements to the press, *id.* ¶¶ 53, 57-58, 66; filing and

disseminating repeated sham pleadings in state courts, *id.* ¶¶ 118-119; and making a false sexual-assault report to the Manhattan District Attorney's Office and amplifying it to the press, *id.* ¶¶ 98-99. As the Amended Complaint alleged, Harris provided the legal and financial backbone to ratchet up the extortion that began in 2015: Harris's agents sought to secure counsel for Ganieva's state-court lawsuit, *id.* ¶ 61, and Harris took care of Rubenstein's fees, *id.* ¶ 20. And the purpose of these coordinated acts—no longer merely "threatened" but "actual"—was to extort additional "property" from Black, as discussed *infra* at pp. 39-40.

The RICO Defendants worked together to coerce Black to part ways with millions of dollars in ransom, on top of legal expenses to defend against sham complaints and reports, all the while causing him loss of significant status, business, and office. Those extortionate acts were all targeted to benefit Ganieva, Harris, and Rubenstein. This is the quintessential allegation of extortion in violation of Section 1951.

Harris's and Rubenstein's arguments against the legal sufficiency of the alleged extortionate conduct are baseless. Rubenstein argues that the allegations that he "(a) disseminated Ganieva's complaints to the press, and (b) told the press that Black was under investigation by the Manhattan DA, in exchange for payment from Harris," cannot amount to extortion as a matter of law. Rubenstein MTD at 9-10. Harris similarly argues that "[t]here is no authority to support the notion that either (1) inquiring as to a lawyer's conflicts or (2) paying a public relations firm to engage with the press concerning public materials qualifies as extortion." Harris MTD at 14. But what Harris and Rubenstein are in effect arguing is that those are not "means which [are] inherently unlawful." *Viacom Int'l Inc. v. Icahn*, 747 F. Supp. 205, 211 (S.D.N.Y. 1990), *aff'd*, 946 F.2d 998 (2d Cir.

1991). Significantly, under the Hobbs Act, "activities that are not inherently unlawful can constitute wrongful means of obtaining property," because "[w]hat converts otherwise lawful business activity into 'wrongful means' is the use of that activity to obtain property to which defendants have no lawful claim." *Id.* at 211-12 (citing *United States v. Clemente*, 640 F.2d 1069, 1077-78 (2d Cir. 1981) (acknowledging that wrongful means to extort property can "embrace a broad spectrum of legitimate business transactions")). That is precisely what the Amended Complaint alleges here—and more.

Any argument that the Amended Complaint does not allege that there was an attempt to deprive Black of "property" is plainly meritless. Ganieva argues that "Black cannot show that Ganieva's public statements about him or her complaint to the District Attorney involved any attempt to obtain his property," Ganieva MTD at 17; Harris argues that Black "does not allege that Harris received any benefit or profit from the purported racketeering activity," Harris MTD at 14; and Rubenstein argues that "[t]here is no allegation that Rubenstein ever requested any property from Black whatsoever, through threats or otherwise," Rubenstein MTD at 11. But the law of this Circuit is clear that the "concept of property under the Hobbs Act" includes both "physical or tangible property or things" and "any valuable right considered as a source or element of wealth." *United States v. Tropiano*, 418 F.2d 1069, 1075 (2d Cir. 1969); *see also Sekhar v. United States*, 570 U.S. 729, 740 (2013) (Alito, J., concurring). And no immediate monetary profit is required under the law, for all that is needed is "the intent to exercise, sell, transfer, or take some other analogous action with respect to that right"—*i.e.*, an allegation that "the defendant's goal was to obtain the right for himself, rather than merely to deprive the victim of that right." *Gotti*, 459 F.3d at 324-25.

In other words, the Amended Complaint need only allege that the RICO Defendants deprived Black of property within the meaning of the extortion statute, in order to obtain that property for themselves. And the Amended Complaint makes *precisely* those allegations. For instance, the Amended Complaint alleges that Ganieva's conduct was "designed to show Mr. Black that $100,000 per month was no longer enough to prevent her from making good on her extortionate threats." Compl. ¶ 103. Similarly, through Rubenstein's help, Harris sought to push out Black from his position as CEO and Chair of Apollo in order to take on a leadership role himself, *id.* ¶¶ 56-58, and to recruit "the most aggressive attorney [his confederates] could find in New York City," in an effort to "destroy Mr. Black himself" through expensive and headline-catching litigation, *id.* ¶¶ 59-61.

Harris and Rubenstein are wrong in contending that "courts have routinely found" that acts such as "spread[ing] falsehoods about Black . . . cannot amount to federal Hobbs Act extortion or civil RICO." Rubenstein MTD at 11; *see also* Harris MTD at 14-15, 17. The cases that Harris and Rubenstein cite do not stand for the categorical proposition that this type of conduct may not be part of a larger scheme to extort property. For example, in *Entretelas Americanas S.A. v. Soler*, 2020 WL 9815186 (S.D.N.Y. Feb. 3, 2020), *aff'd on other grounds*, 840 F. App'x 601 (2d Cir. 2020), the *sole* ground for the extortion claim was allegedly false statements made in the context of a lawsuit in a foreign court, and the court held that, to the extent the plaintiff "feared" that lawsuit, that alone was not enough to amount to extortion. *Id.* at *10-11. Similarly, in *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126 (E.D.N.Y. 2010), the extortion claim was founded on allegations that the defendants threatened to print negative news stories about the plaintiff, but the court found that a

"threat[] to defame" is not enough, unless it also involves "extortionate acts" that are "induced by 'wrongful use of actual or threatened . . . fear.'" *Id.* at 137-38. And in *Kimm v. Lee*, 2005 WL 89386 (S.D.N.Y. Jan. 13, 2005), *aff'd on other grounds*, 196 F. App'x 14 (2d Cir. 2006), where the alleged extortion amounted to a threat that, if the plaintiff did not drop a lawsuit, he would be "banished from the Korean community," there was evidently no effect upon commerce or "any threat of force, violence, or fear" in order to obtain "property." *Id.* at *6. In this case, instead, the spreading of false accusations against Black is alleged to be just one of many extortionate acts to obtain property (e.g., millions of dollars) from Black. *See*, *e.g.*, Compl. ¶¶ 113-115.

The RICO Defendants' argument that, under *Kim v. Kimm*, 884 F.3d 98 (2d Cir. 2018), litigation conduct is categorically insufficient to plead extortion is similarly unavailing. According to the RICO Defendants, allegations concerning "Ganieva's 2021 lawsuit fail as a matter of law" because they cannot "constitute extortion." Harris MTD at 15; *see also* Rubenstein MTD at 10; Ganieva MTD at 18. But that is just not so. In *Kim* the court of appeals "decline[d] to reach the issue" of whether litigation activity, without more, could ever be the basis of a RICO claim. 884 F.3d at 105. Indeed, in distinguishing *Kim* from other cases in which litigation conduct *did* constitute extortion, the court of appeals noted how the defendants in those cases not only "used litigation to carry out their scheme," but "also engaged in a variety of other out-of-court actions to further this activity"—while, in *Kim*, "the entire alleged scheme involved the creation of fraudulent court documents." *Id.* By the same token, in the instant case, Black's extortion allegations are not limited to the sham litigation in the state court; rather, that litigation is just *one* among many in-court and out-of-court actions that the RICO Defendants took in

furtherance of the Enterprise. Beyond the multiple sham complaints in state court, the RICO Defendants used out-of-court threats to extort money from Black, *see* Compl. ¶¶ 113(a)-(e), 114, 115; acted on those threats by making and disseminating false sexual-assault accusations online and in the press, *see id.* ¶¶ 113(f)-(g), 114(c), 115(b); and filed a false report with the District Attorney, *see id.* ¶¶ 113(k), 114(b), 115(c).

Rubenstein's last-ditch effort, the argument that the Amended Complaint does not allege acts affecting interstate commerce (on the theory that all of the relevant events took place in New York), is similarly baseless. *See* Rubenstein MTD at 10-11. Indeed, "a showing of a very slight effect on interstate commerce is sufficient to support Hobbs Act jurisdiction." *United States v. Perrotta*, 313 F.3d 33, 36 (2d Cir. 2002) (internal quotation marks omitted). The Court of Appeals has made it clear that this low threshold could be satisfied by alleging "that the victim was targeted because of her status as an employee at a company participating in interstate commerce," *id.* at 38; *cf.* Compl. ¶¶ 2, 63 (alleging that Harris, with Rubenstein's help, and Ganieva targeted Black because of his status as CEO of Apollo); "that the harm or potential harm to the individual would deplete the assets of a company engaged in interstate commerce," *Perrotta*, 313 F.3d at 38; *cf.* Compl. ¶ 124 (alleging that Apollo, of which Black is the largest shareholder, "manages $480 billion in assets, on behalf of major institutional investors, and employs thousands of people around the world"); or "that the victim directly participated in interstate commerce," *Perrotta*, 313 F.3d at 38; *cf.* Compl. ¶ 23 (alleging that Black "has spent ten years on the Board of Trustees of Dartmouth College" and co-founded with his wife "the largest private funder of melanoma research worldwide"). In short, the Amended Complaint is replete with allegations of how the RICO Defendants' extortion scheme affected interstate commerce.

## 2. Black Has Sufficiently Alleged Mail and Wire Fraud

The Amended Complaint's allegations of mail and wire fraud are also more than sufficient. "A complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996); *see also* 18 U.S.C. §§ 1341, 1343. Although "Federal Rule of Civil Procedure 9(b) . . . applies to RICO claims for which fraud is the predicate illegal act," *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172 (2d Cir. 1999), "matters peculiarly within a defendant's knowledge may be pled on information and belief," *First Cap. Asset Mgmt.*, 385 F.3d at 179 (internal quotation marks omitted). And in "cases where plaintiffs allege that the mails or wires were simply used in furtherance of a master plan to defraud," courts have held that "particularity as to the mailings themselves is unnecessary," since "[o]nce the plaintiff alleges with particularity the circumstances constituting the fraudulent scheme, neither the reputational interests nor the notice function served by Rule 9(b) would be advanced in any material way by insisting that a complaint contain a list of letters or telephone calls." *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 146 (S.D.N.Y. 2014) (internal quotation marks omitted). Here, those allegations that must be pleaded with particularity are, indeed, more than sufficiently pleaded to survive dismissal. The RICO Defendants' arguments to the contrary are unpersuasive.

Much of the RICO Defendants' arguments boil down to the erroneous suggestion that the Amended Complaint must identify specific fraudulent statements contained in communications made via interstate mail or wire. *See, e.g.*, Rubenstein MTD at 11-12; Ganieva MTD at 19; Harris MTD at 15-18. The Supreme Court, however, has made clear

that, to satisfy the mail fraud statute, the mailings themselves need not actually contain false statements—so long as they further an underlying scheme that itself has a fraudulent purpose. *See Schmuck v. United States*, 489 U.S. 705, 715 (1989). In other words, even "innocent" mailings may "satisfy the mailing element under the mail fraud statute where the mailing is part of the execution of the scheme." *Ctr. Cadillac, Inc. v. Bank Leumi Tr. Co.*, 808 F. Supp. 213, 228 (S.D.N.Y. 1992), *aff'd*, 99 F.3d 401 (2d Cir. 1995). And the mailings need not be an essential part of the fraudulent scheme; rather, they must be an "incident to an essential part of the scheme." *Pereira v. United States*, 347 U.S. 1, 8 (1954). The same principles apply to the wire fraud statute. *See*, *e.g.*, *United States v. Utley*, 2000 WL 620218, at *1 (S.D.N.Y. May 12, 2000). In short, "[i]n cases in which the plaintiff claims that the mails or wires were simply used in furtherance of a master plan to defraud, the communications need not have contained false or misleading information themselves," and "a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications[] is sufficient to satisfy Rule 9(b)." *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998).

Black pleads with particularity that the RICO Defendants knowingly and intentionally participated in a fraudulent scheme that involved the use of mails and wires. "[I]nterstate wires" include "telephone calls, email communications, WhatsApp messages, text messages, or bank wire transfers." *United States v. Avenatti*, 2022 WL 305145, at *14 (S.D.N.Y. Feb. 1, 2022). Black alleges the existence of a scheme to defraud with particularity: after Ganieva extorted for more than five years monthly wires of $100,000 from Black, both domestically and internationally, *see* Compl. ¶ 117(b), Harris and Ganieva joined efforts, with Rubenstein's help, to set up an even grander scheme to defraud

Black.  Ganieva, with Harris's and Rubenstein's help, set out to make good on her newly invented threats in order to extract even more money from Black.  *See id.* ¶ 103.  Harris, a resident of Florida, communicated secretly and intensively with Rubenstein and others in New York over Zoom and Slack concerning those fraudulent plans.  *See id.* ¶¶ 27-28, 45, 47.  And Harris, with Rubenstein's help, knowingly and intentionally sought to assist Ganieva with her false allegations against Black by attempting to recruit the most aggressive counsel he could find.  *See id.* ¶ 59.

To the extent the RICO Defendants suggest that wire and mail fraud require intent to deceive Black, that is not the law.  *See*, *e.g.*, Harris MTD at 17; Rubenstein MTD at 12. Nothing in the relevant statutes "suggests that the scheme to defraud must involve the deception of the same person or entity whose money or property is the object of the scheme." *United States v. Greenberg*, 835 F.3d 295, 305-06 (2d Cir. 2016).  And "a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649-50 (2008). Here, the Amended Complaint alleged that Ganieva, Harris, and Rubenstein used mails and wires as part of a fraudulent scheme to deprive Black of money, making fraudulent misrepresentations in sham complaints to the state court, unfounded reports to the District Attorney, and false statements to the press and Apollo's leadership.  Compl. ¶¶ 9, 11, 50-51, 61, 72, 97, 138.  In short, the Amended Complaint alleges, with sufficient particularity, a scheme to defraud.

### D. The Amended Complaint Adequately Alleges that the RICO Defendants Engaged in a Pattern of Racketeering Activity

The RICO Defendants' argument that the Amended Complaint fails to allege an open-ended pattern of racketeering activity, "*i.e.*, past criminal conduct coupled with a

threat of future criminal conduct," *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995), is impossible to square with Black's allegations. "To satisfy open-ended continuity, a plaintiff need not allege that the predicates extended over a substantial period of time, but must allege that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *MinedMap, Inc. v. Northway Mining, LLC*, 2022 WL 570082, at *2 (2d Cir. Feb. 25, 2022). Here, open-ended continuity is satisfied because the Amended Complaint plainly alleges that the Enterprise's goal remains to extort property from Black and defraud not only him, but also Apollo, its clients, and the courts.

Open-ended continuity is sufficiently alleged here. The alleged goals of the Enterprise—coercing Black into paying even larger sums of money and further damaging him personally and professionally—have yet to be achieved. And the threat of false public accusations, and the specter of expensive and extensive sham litigation, remain. The false report to the District Attorney, accompanied by a round of media calls about a purported investigation, is evidence of the continuing enterprise—as are the utterly irrelevant subpoenas being issued in the state-court action, seeking gratuitous information about Epstein, designed only to smear.

Accordingly, Harris's argument that "there is no allegation that Harris [himself] will continue to pay a public relations team to publicize future case filings or that he otherwise poses a continued threat to Black" plainly misses the mark. Harris MTD at 20. The Second Circuit's decision in *Beauford v. Helmsley*, 865 F.2d 1386 (2d Cir. 1989) (en banc), shows why. There, the court of appeals held that the allegations that defendants had engaged in a one-time mailing of 8,000 copies of a fraudulent document in connection with

a condominium conversion plan was sufficient to plead a pattern of racketeering activity because "there was reason to believe that similarly fraudulent mailings would be made over an additional period of years." *Id.* at 1392, *vacated and remanded*, 492 U.S. 914, *adhered to on remand*, 893 F.2d 1433, *cert. denied*, 493 U.S. 992 (1989). That was because the condominium continued to have vacant units, suggesting that—when the complaint is "read with ordinary charity"—the fraudulent mailings were not "isolated or sporadic." *Id.* With respect to open-ended continuity, in fact, the question is whether the alleged past conduct, "by its nature[,] projects into the future with a threat of repetition." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989). That was true in *Beauford* and is plainly true here too.

The RICO Defendants' argument that there is no RICO conspiracy because the Enterprise involved a limited number of perpetrators and victims and a limited goal is similarly incorrect. *See* Harris MTD at 18-19; Ganieva MTD at 21; Rubenstein MTD at 13. The Enterprise involves a laundry list of perpetrators working to take down Black— from Harris, Rubenstein, and Ganieva, to the additional attorneys and flacks comprising the war council, and the other individuals assisting them. Regardless, as the Second Circuit has made clear, "with respect to the requirement of continuity or threat of continuity," there is no "basis in RICO or its legislative history for the proposition that a RICO violation cannot be established without proof of more than one scheme, episode, or transaction." *Indelicato*, 865 F.2d at 1383. In fact, the Second Circuit "doubt[ed] that Congress meant to exclude from the reach of RICO multiple acts of racketeering simply because they achieve their objective quickly or because they further but a single scheme." *Id.* Nor is

Black the only victim—the Enterprise, in its campaign to harm Black, put out hit pieces on Apollo's independent directors.  Compl. ¶¶ 57-58.

In sum, the nature of the alleged conduct at issue here clearly carries with it the threat of repetition:  the RICO Defendants have yet to fully achieve the goals of their RICO enterprise.  And the nature of the conspiracy itself is sufficiently expansive to meet the continuity requirement.

### E.    The Amended Complaint Adequately Alleges the Enterprise Caused Black Injury

The RICO Defendants' contention that Black did not suffer any cognizable injury simply because the Amended Complaint does not detail the dollar-and-cent amount of all of his injuries is hard to understand.  A complaint alleging a claim under RICO must plead a cognizable injury under the relevant statute—that is, an injury to the plaintiff's "business or property."  18 U.S.C. § 1964(c).  The Second Circuit has made clear that all that a RICO plaintiff must show is "that the defendant's conduct caused an actual, *quantifiable* injury." *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 94 (2d Cir. 2015) (internal quotation marks and emphasis omitted; emphasis added). Here, Black has alleged cognizable injuries under RICO to himself and to his family office, including in the form of legal costs to fight sham lawsuits and loss of business opportunities due to the extortionate and fraudulent allegations.  Those injuries are plainly *quantifiable*— and that is all that is required at the pleading stage.

It is black-letter law that Black's legal fees incurred fighting frivolous lawsuits are a cognizable RICO injury.  In fact, the Second Circuit has contemplated as RICO injuries both "an unspecified amount in legal fees and other expenses incurred in fighting defendants' frivolous lawsuits in New York state court," and "$100,000 in legal fees and

other expenses spent in overcoming bribe-induced decisions in a similar lawsuit in South Carolina." *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1105-06 (2d Cir. 1988); *see also Angermeir*, 14 F. Supp. 3d at 153 ("Plaintiffs do allege a sufficient injury . . . to the extent that they allege monetary losses in the form of legal fees they had to pay in response to Defendants' allegedly fraudulent lawsuits."). Here, the RICO Defendants do not dispute the existence of those litigation costs—nor could they, as they are alleged in the Complaint. *See* Compl. ¶ 123. This alone is enough to satisfy the injury requirement under RICO.

The RICO Defendants erroneously suggest that legal costs and loss of business, too, must be pleaded with particularity. *See, e.g.*, Harris MTD at 21-22; Ganieva MTD at 22. Those cases require only that a complaint allege that damages have accrued, thereby causing injury, and that requirement is plainly met here given Black's actual legal costs. *See, e.g.*, *Bankers Tr.*, 859 F.2d at 1106. And this requirement does not support the RICO Defendants' argument that Black's Amended Complaint should be dismissed because the alleged damages "are not quantified or detailed." Harris MTD at 22. The only relevant question at this stage is whether the racketeering activity "caused [the plaintiff] to suffer an injury," and not whether the plaintiff can identify "the precise number" of its damages. *Sergeants Benevolent*, 806 F.3d at 95. In other words, "[q]uantifying the damages caused by defendants' alleged fraud belongs to the damages phase of [the plaintiff's] RICO case," *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 51, 58 (1st Cir. 2013), and RICO only requires alleging "*some* damages, not a specific amount," *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 265 (4th Cir. 2001). Once again, in this case, the Amended Complaint plainly alleges the existence of those quantifiable damages, which have already accrued (and continue to accrue). At this stage, that is all that the law requires.

## II. THE RICO CLAIMS ARE NOT BARRED BY THE *COLORADO RIVER* ABSTENTION DOCTRINE

This case is not amenable to *Colorado River* abstention, as Wigdor suggests in passing at the conclusion of its brief. Wigdor MTD at 19 (citing *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 817 (1976)). Under the *Colorado River* doctrine, "a federal court may abstain from exercising jurisdiction over a case where there is pending a parallel state court proceeding *and* certain factors weigh in favor of abstention." *Ferolito v. Menashi*, 918 F. Supp. 2d 136, 141 (E.D.N.Y. 2013).

"The mere fact of concurrent state and federal proceedings 'does not, without more, warrant staying exercise of federal jurisdiction.'" *All. of Am. Insurers v. Cuomo*, 854 F.2d 591, 602 (2d Cir. 1988) (quoting *Colo. River*, 424 U.S. at 816). "[T]he pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction[.]" *Colo. River*, 424 U.S. at 817. "Only the clearest of justifications will warrant dismissal." *Id*. at 819. "Under the *Colorado River* doctrine, the nature of the inquiry is not whether there are reasons to exercise federal jurisdiction, but rather whether *exceptional circumstances* exist which justify dismissal in deference to a pending state court proceeding." *All. of Am. Insurers*, 854 F.2d at 603 (emphasis added). "Any doubt regarding the parallel nature of a federal and state action should be resolved in favor of the exercise of federal jurisdiction." *Shields v. Murdoch*, 891 F. Supp. 2d 567, 577 (S.D.N.Y. 2012) (quoting *In re Comverse Tech., Inc. Derivative Litig.*, 2006 WL 3193709, at *2 (E.D.N.Y. Nov. 2, 2006)); *see also Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 100 (2d Cir. 2012) ("[A]bstention is generally disfavored, and federal courts have a 'virtually unflagging obligation' to exercise their jurisdiction.") (quoting *Colo. River*, 424 U.S. at 817)).

This case does not involve "exceptional circumstances" as required for the exercise of *Colorado River* abstention. *See All. of Am. Insurers*, 854 F.2d at 603 ("some overlap of subject matter" not enough to make state and federal actions concurrent). First, the two proceedings involve different parties. *See id.* ("Similarity of parties is not the same as identity of parties."). Harris, Wigdor, and Rubenstein (three of the four defendants here) are not parties to the state court action. *See German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 563 (S.D.N.Y. 1995) (holding that a state proceeding was not concurrent to a federal proceeding "involv[ing] different parties"). Second, the proceedings involve "different subject matters and different forms of relief." *Sheerbonnet, Ltd. v. Am. Exp. Bank Ltd.*, 17 F.3d 46, 50 (2d Cir. 1994). The state case involves only Ganieva's claims against Black for defamation, intentional infliction of emotional distress, and violations of the GMVA. This case alleges federal RICO claims against Harris, Rubenstein, and Ganieva. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 (1983) ("[T]he presence of federal-law issues must always be a major consideration weighing against surrender [of federal jurisdiction]."). This case also involves defamation claims against Harris, Wigdor, Ganieva, and Rubenstein. None of those claims are currently before the state court. *See All. of Am. Insurers*, 854 F.2d at 603 ("[D]ifferences in parties and issues are strong factors against invoking exceptional circumstances as the basis for dismissal.").

Wigdor argues that the Court should exercise *Colorado River* abstention because this case involves the same facts as the state court action and because Black previously pleaded facts similar to those alleged here in his counterclaims in the state action. In support of its position, Wigdor cites a single case, *Festinger v. Snitow Kaminetsky Rosner*

42

*& Snitow, LLP*, 2021 WL 4692779 (S.D.N.Y. July 7, 2021). But the *Festinger* court reached the opposite conclusion that Wigdor's brief suggests. In *Festinger*, the court rejected defendants' contention that the court should exercise *Colorado River* abstention in a RICO case, holding, as the Court should here, that "the state-court action . . . and this action are not parallel because they do not involve substantially the same parties who are contemporaneously litigating substantially the same issue in another forum." *Id.* at *10.

Because this case involves different parties and different claims than the state court action, the Court should decline to abstain from hearing this case.

## III. BLACK SUFFICIENTLY ALLEGES DEFAMATION AND DEFAMATION PER SE

Black has adequately alleged claims of defamation under New York law against Harris, Ganieva, Rubenstein, and Wigdor. First, he alleges a series of defamatory statements in tweets published by Ganieva, made or orchestrated by one or more of the Defendants. Compl. ¶¶ 10, 63. In those statements, Ganieva defamed Black by saying he "sexually harassed and abused" her, "could not understand [her] when [she] refused his sexual advances," "bullied, manipulated, threatened, and coerced" her, and "forced [her] to sign an NDA." *Id.* ¶ 63. Second, he alleges that an interview was arranged between Ganieva and Rubenstein's close contact, Josh Kosman. *Id.* ¶ 66. In that interview, as published by Kosman in the *New York Post*, Ganieva said that "Black's abuse 'was over a long period of time and it was tragic.'" *Id.* Third, Ganieva, represented by Wigdor, has filed three sham complaints containing defamatory allegations that Black abused her during their affair and that he raped her on July 6, 2014. *Id.* ¶¶ 13, 72. In her amended complaint, Ganieva and Wigdor added gratuitous allegations regarding Black's relationship with Jeffrey Epstein that are wholly unrelated to Ganieva and her claims against Black and had

no purpose other than to sully his name. *Id*. ¶ 16. Most egregiously, her amended complaint alleges that Black kidnapped Ganieva in 2008 and took her to Palm Beach to meet with Epstein. *Id*. ¶ 83. But she pleads no cause of action against Black based on this allegation and for good reason: flight records show that it never happened, and Ganieva's own statements call into question whether she ever even met Epstein. *Id*. ¶¶ 85-87. And again in her proposed second amended complaint, she adds wholly new allegations regarding Black's purported friendship with Epstein, as well as an alleged abuse of a Jane Doe at Epstein's home nearly 20 years ago. *Id*. ¶¶ 89-92. These allegations are entirely unrelated to her claims, and were added solely to defame Black.

Black alleges defamation against Defendants Ganieva and Wigdor, notwithstanding the litigation privilege, because the entirety of the state court complaint falls outside the litigation privilege due to the sham pleading doctrine. *Id*. ¶ 74. Black further alleges that all Defendants defamed Black when they repeated these allegations, or caused them to be repeated, to members of the press. *Id*. ¶¶ 133-149. Black alleges that Defendants Ganieva, Wigdor, and Rubenstein participated in filing and publicizing the sham litigation for the purpose of causing Black severe reputational, professional, and economic harm. *Id*. ¶¶ 136-137. The Amended Complaint further alleges that Harris aided and abetted this defamation by funding and encouraging it. *Id*. ¶ 138.

In order to allege defamation under New York law, a party must show "(1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). Accusations that someone committed a serious crime are per se actionable as defamation.

*See Geraci v. Probst*, 61 A.D.3d 717, 718 (2d Dep't 2009) ("A false statement constitutes defamation per se when it charges another with a serious crime[.]"). Because Ganieva's lawsuit and the subsequent reporting on it include allegations of kidnapping, rape, sexual abuse, and sex trafficking —all serious crimes—the statements are per se actionable.[4]

Because they are the product of sham litigation orchestrated by the Defendants, none of these defamatory statements are protected. Accordingly, the Amended Complaint states a defamation claim against each defendant, and the motion to dismiss should be denied.

## A. The Amended Complaint Adequately Alleges Defamation by Wigdor

The Amended Complaint alleges that Wigdor defamed Black by making the false and per se defamatory allegations of kidnapping, rape, sexual abuse, and sex trafficking in statements in the state court complaint, the amended complaint, and the proposed second amended complaint. *See supra* at pp. 10-15; Compl. ¶¶ 133-149. The Complaint further alleges that Wigdor defamed Black when it repeated these allegations to the press, *id.* ¶ 138, and when it released a statement referring to Black as a "sexual predator[]," invited prosecutors to "go after" him, and made a statement to Forbes accusing Black of "heinous conduct" toward Ganieva and of "intimidating" her, *id.* ¶ 144. The Amended Complaint alleges that these allegations are false and defamatory per se. *Id.* ¶¶ 146-148.

Wigdor seeks dismissal of the defamation claim arguing that, under the New York litigation privilege, none of the statements made in the three sham state court complaints it has filed—even if defamatory per se—are actionable because they were made in the course

---

[4] *See* N.Y. Penal Law §§ 135.20-.25 (kidnapping); *id*. §§ 130.25-.35 (rape); *id*. §§ 130.55-.65 (sexual abuse); *id*. § 230.34 (sex trafficking).

of judicial proceedings. Wigdor MTD at 6. It similarly argues that Section 74 of the New York Civil Rights Law protects Wigdor's repetition of these per se defamatory statements outside of the judicial proceedings. *Id.* at 10-11. Because Wigdor filed these sham complaints, neither the litigation privilege nor Section 74 provide a defense against Black's defamation claims.

New York law recognizes that litigation privilege "is capable of abuse and will not be conferred where the underlying lawsuit was a sham action brought solely to defame the defendant." *Flomenhaft v. Finkelstein*, 127 A.D.3d 634, 638 (1st Dep't 2015); *see also Halperin v. Salvan*, 117 A.D.2d 544, 548 (1st Dep't 1986) (holding that the litigation privilege may be "lost if abused"). A defamation claim based on statements included in a complaint that constitutes a sham pleading is actionable against both the plaintiff in the underlying lawsuit and her attorneys (here, Wigdor). *See Flomenhaft*, 127 A.D.3d at 639. In addition, allegations in a complaint are unprotected "where an attorney's statements are so needlessly defamatory as to warrant the inference of express malice." *Front Inc. v. Khalil*, 28 N.E.3d 15, 18 (N.Y. 2015) (internal quotation marks omitted). In such an instance, "the privilege has been abused and 'protection is withdrawn.'" *Id.*

The allegations in Black's Amended Complaint readily establish that, under the sham litigation doctrine, the per se defamatory statements Wigdor made about Black made in the state court complaint, Compl. ¶¶ 136-137, and then repeated outside of judicial proceedings, *id.* ¶¶ 138, 144, are actionable. The Amended Complaint adequately alleges that the state court case is a sham. Black alleges that Ganieva—assisted by Wigdor—brought the state court action and included false claims against Black solely to defame, extort, and cancel him. *Id.* ¶¶ 90-91. The allegations in Ganieva's complaints are so

serious and so damning that Wigdor had an obligation to investigate their validity before filing. N.Y. Comp. Codes R. & Regs. tit. 22, § 130-1.1 ("[C]onduct is frivolous if . . . it asserts material factual statements that are false."). Not only did Wigdor fail to substantiate Ganieva's claims, it proceeded in such a way as to indicate that it knew or recklessly disregarded their falsity.

As an initial matter, Wigdor completely changed its standard litigation strategy, which is to exercise maximum leverage to settle a case and agree to a non-disclosure before making the allegations public. Its own website boasts: "Because we have a reputation for obtaining multi-million verdicts, we are able to settle the majority of our cases without the need for even filing complaints." Compl. ¶ 70. Yet Wigdor never sought pre-litigation damages for Ganieva; instead it pursued a course of maximum exposure in order to magnify the harm to Black. *Id.* ¶ 71. Since filing the complaint, Wigdor (although representing the plaintiff) has engaged in a variety of dilatory tactics inconsistent with pursuing a bona fide claim, including ignoring communications and stonewalling discovery. *Id.* ¶¶ 17, 93-94. For example, Wigdor refused to review tape recordings and text messages that demonstrated that the rape claims were false and unsupportable upon the signing of a standard protective order. *Id.* ¶¶ 95-96. Once it had reviewed those materials, Wigdor would no longer have been able to pretend that Ganieva's case had any legitimate basis.

These allegations—coupled with direct evidence of the falsity of the complaints' allegations—are more than sufficient to plead that the state court litigation is a sham. *See Flomenhaft*, 127 A.D.3d at 638 ("[O]n a motion to dismiss a defamation action because of the privilege, the complaint must be construed in a light most favorable to the plaintiff and

. . . where there is a question as to the applicability of the privilege, the issue should be decided at trial."); *Lacher v. Engel*, 33 A.D.3d 10, 13 (1st Dep't 2006) ("[T]he privilege is limited to statements which are not only pertinent to the subject matter of the lawsuit but are made 'in good faith and without malice.'") (quoting *Halperin*, 117 A.D.2d at 548)); *Halperin*, 117 A.D.2d at 547 (holding that an allegation that a lawsuit was a sham was "arguably substantiated" by the fact that the plaintiff had not moved forward with the lawsuit).

Moreover, Wigdor larded up the proposed second amended complaint with irrelevant material that takes that pleading outside of any otherwise applicable litigation privilege. "It is a well established principle of New York law that statements made in judicial and quasi-judicial proceedings are privileged and may not be actionable *so long as they are pertinent to the controversy*." *Marek v. Old Navy (Apparel) Inc.*, 348 F. Supp. 2d 275, 281 (S.D.N.Y. 2004) (emphasis added). "While common law courts have generally interpreted the litigation privilege broadly, they nevertheless maintain an important . . . limitation on its scope: to qualify for the privilege, a statement must be material and pertinent to the question involved. . . . It follows, then, that immaterial and impertinent statements are . . . actionable, particularly when they are so needlessly defamatory as to warrant the inference of express malice. . . . We think the judicial system would be well served were our common law courts to revitalize this crucial qualification to the litigation privilege." *Brown v. Maxwell*, 929 F.3d 42, 53 n.47 (2d Cir. 2019); *see also First Indemn. of Am. Ins. Co. v. Shinas*, 2009 WL 3154282, at *11 (S.D.N.Y. Sept. 30, 2009) (holding that an action for defamation based on allegation in a complaint may lie "where the statement is 'so obviously [not pertinent] . . . and so needlessly defamatory as to warrant

the inference of express malice'") (alterations in original) (quoting *Martirano v. Frost*, 255 N.E.2d 693, 694 (N.Y. 1969)).

Here, the complaints in the state case are padded with irrelevant, but inflammatory, material that is "so needlessly defamatory as to warrant the inference of express malice." *Martirano*, 255 N.E.2d at 694; *see also id.* (holding that a statement made in a legal proceeding may be actionable if it is "so outrageously out of context as to permit one to conclude, from the mere fact that the statement was uttered, that it was motivated by no other desire than to defame"). These include gratuitous allegations about Black's friendship with Epstein that have no relevance to Ganieva's alleged rape claim, and were included for no purpose other than to embarrass Black. Compl. ¶¶ 89-91. For example, the proposed second amended complaint mentions Jeffrey Epstein more than 170 times. *Id.* ¶ 16. It also includes a section entitled "Other Evidence of Black's Close Ties to Epstein's Private Conduct." *Id.* ¶ 91. Ganieva also introduced allegations in the amended complaint that, in 2008, Black abducted Ganieva and took her, against her will, to Palm Beach, Florida and that Black threatened to plant drugs on Ganieva and frame her for a crime if she ever talked about the trip. *Id.* ¶¶ 83-84, 88.

Again, Black can prove the falsity of these claims. There was no trip to Florida on or about the date in question, and statements by Ganieva call into question whether she even met Epstein. *Id*. ¶¶ 18, 85-87. Beyond this, none of the extensive allegations about Epstein have any relevance to the specific causes of action Ganieva has alleged in the proposed second amended complaint. These gratuitous allegations relate to events that supposedly took place in 2008, well outside the GMVA's statute of limitations, and are not similar or related to any of the claims at issue. *See* N.Y. City Admin. Code § 10-1105 ("A

civil action under this chapter shall be commenced within seven years after the alleged crime of violence motivated by gender occurred.").  Ganieva does not mention the alleged 2008 kidnapping in her GMVA causes of action.  Wigdor included these allegations in its proposed pleading solely to smear Black based on his past association with Epstein.  Compl. ¶ 16.  Because those allegations have nothing to do with the specific gender-motivated violence cause of action, the Court may draw an inference that they are malicious and actionable as defamation.  *See Front*, 28 N.E.3d at 18 ("[W]here an attorney's statements are 'so needlessly defamatory as to warrant the inference of express malice' the privilege has been abused and 'protection is withdrawn.'") (quoting *Youmans v. Smith*, 47 N.E. 265 (N.Y. 1897)); *Palmer v. Cook*, 108 N.Y.S.3d 297, 313 (N.Y. Sup. Ct. 2019) ("Matters that are unnecessary to the viability of the cause of action and would cause undue prejudice to the defendants should be stricken from the pleading.") (brackets omitted).

Wigdor has also claimed immunity from defamation liability for its extra-judicial statements based on Section 74.  But the sham litigation exception applies here as well, and precludes Wigdor from invoking those statutory protections.  Under New York law, one who "maliciously institute[s] a judicial proceeding alleging false and defamatory charges, and . . . then circulate[s] a press release or other communication based thereon [cannot] escape liability by invoking the statute."  *Williams v. Williams*, 246 N.E.2d 333, 337 (N.Y. 1969); *see also Willson v. Ass'n of Graduates of the U.S. Military Acad.*, 946 F. Supp. 294, 297 (S.D.N.Y. 1996) ("The privilege does not extend, however, to parties who maliciously institute a proceeding alleging false and defamatory charges and publicize them in the press.") (brackets omitted).  Because Black has adequately alleged that the litigation is a sham, instigated for the purpose of defaming him and gaining a reporting privilege,

Wigdor's statements to the press—including that Black was a "sexual predator," that he committed "heinous conduct" towards Ganieva, and that he raped a Jane Doe 20 years ago—are not privileged and are all actionable. Compl. ¶ 144.

In *Williams*, the Court of Appeals explained that the exception to Section 74 was necessary in order to protect against the improper litigation practices that Wigdor is alleged to have practiced here. As in *Williams*, Wigdor invokes Section 74 as a shield to protect itself from liability for defaming Black by filing a lawsuit full of false and defamatory allegations, and then seeking to exert an extra-litigation advantage by communicating those defamatory allegations to the press. Black has alleged that the lawsuits were shams. *See id.* ¶ 107 ("The lawsuit qua lawsuit was a sham, beside the point. The legal claims would fall flat in court. . . . But this Enterprise operated not to increase the chance of success *in* court, but to increase the pressure to pay the blackmailer *out* of court, to brand the target, to extort him for money by convicting him in the court of public opinion long before any proceedings at all on the merits."); *see also id.* ¶ 136 ("Wigdor LLP's pleadings (actual and proposed) filed on behalf of Ms. Ganieva were shams. Wigdor LLP and Ms. Ganieva . . . included in [in the complaints] defamatory and libelous statements about Mr. Black that were made (i) without any good faith basis, (ii) without conducting anything akin to a remotely adequate investigation (if any investigation was done at all), (iii) in direct defiance and conscious disregard of contemporaneous documentary evidence, (iv) in bad faith and with malice, and (v) with the sole purpose of causing Mr. Black severe reputational, professional, and economic harm."). Viewed in the light most favorable to Black, these allegations are more than sufficient to state a claim for defamation under a theory of sham litigation.

Because Black has adequately alleged that the state court case is a sham, Ganieva's rape allegation is not protected by the litigation privilege and is actionable as per se defamation. The allegations of kidnapping and sex trafficking in 2008 are actionable as defamation not only because the litigation is a sham, but also because they are irrelevant to the complaint and are made as gratuitous smears included only to abuse the privilege afforded to statements made in legal proceedings. The Court should find that these allegations state a claim for defamation and deny Wigdor's motion to dismiss.

## B. The Amended Complaint Adequately Alleges Defamation by Rubenstein

Black has adequately alleged that Rubenstein defamed him by causing Ganieva's defamatory statements about Black to be reported in the press. At the outset, Rubenstein argues that all of the statements attributed to him in the Amended Complaint—except for those in connection with Ganieva's pre-filing interview with the *New York Post*, which he simply denies—are privileged under Section 74 as fair and true reports of judicial proceedings. But, as Rubenstein himself acknowledges, and as already demonstrated above, the litigation privilege does not protect "sham pleadings." Where, as here, there is the "deliberate institution of baseless litigation for the precise purpose of fabricating a reporting privilege," Section 74 offers no protection. *Long v. Marubeni Am. Corp.*, 406 F. Supp. 2d 285, 295 (S.D.N.Y. 2005). That is exactly what the Amended Complaint alleges as to Rubenstein. The Complaint alleges that the sham complaints were filed "in coordination with . . . Rubenstein," Amended Compl. ¶ 137, that they were riddled with false and defamatory allegations, and that they "were made exclusively for the purpose of attempting to cloak the allegations in them with the appearance of such protections, immunities or privileges," *id.* ¶ 139. At the motion to dismiss stage, these allegations must

be accepted as true and they are sufficient to state a claim that the contents of the filings—which were per se defamatory—were not privileged under the sham litigation doctrine. Just as a lawyer and a client cannot claim the protections of Section 74 upon filing of a sham lawsuit, a press agent should not be permitted to claim the protections of Section 74 in communicating the contents of a filing to press when the agent himself has coordinated the filing of the sham lawsuit.

Rubenstein argues that because Black is a public figure, the actual malice standard applies, and that the Amended Complaint does not adequately plead that Rubenstein acted with actual malice. Rubenstein MTD at 21-22. On the contrary, the Amended Complaint readily alleges that Rubenstein acted with actual malice. To show actual malice, a plaintiff must demonstrate that the defamatory statement was "made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 818 (S.D.N.Y. 2021) (quoting *Palin*, 940 F.3d at 809); *see also Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 99 (2d Cir. 2000) (Actual malice means publication "with [a] high degree of awareness of [the publication's] probable falsity" or while "the defendant in fact entertained serious doubts as to the truth of [the] publication"), *aff'd*, 2022 WL 598973 (2d Cir. Mar. 1, 2022) (brackets in original). In order to show a reckless disregard for the truth, "[t]he allegations . . . must 'permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [the] publication." *BYD*, 531 F. Supp. 3d at 822 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). In determining whether a defendant acted with actual malice, New York courts consider whether there are any obvious reasons to doubt the truthfulness of the

defendant's source or the accuracy of the source's report. *Stern v. Cosby*, 645 F. Supp. 2d 258, 278 (S.D.N.Y. 2009).

Regardless of whether actual malice was needed, that standard was clearly met. Black alleged that Rubenstein defamed him by publicizing Ganieva's allegations, and did so with (at least) reckless disregard for the truth. Black has pleaded "'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' actual malice." *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) (brackets in original) (quoting *Twombly*, 550 U.S. at 556). Black has alleged that Rubenstein was part of a "war council" convened by Harris "to destroy Mr. Black in retaliation and retribution." Compl. ¶ 4. Black has further alleged that Rubenstein was " . . . actively advancing the campaign to cancel Mr. Black, by promoting Ms. Ganieva's story to the press, and seeking to secure coverage favorable to Mr. Harris and negative to Mr. Black—all in an effort to create a media narrative that would help force Mr. Black out as Chairman of Apollo." *Id*. ¶ 28. The Amended Complaint further alleges that Rubenstein was "[a]ware of Ms. Ganieva's lies," and that "Rubenstein and the Flacks pushed stories and articles to promote her lies, including setting up an interview with the New York Post." *Id*. ¶ 135. These allegations are sufficient to allege that Rubenstein, as a member of the war council, which was formed to gin up stories without regard to truth or falsity, acted with reckless disregard for whether Ganieva's allegations were true. At a minimum, the allegations in the Amended Complaint support a reasonable inference that Rubenstein was reckless in evaluating whether Ganieva's allegations were truthful.

Black has alleged that Rubenstein "actively advanc[ed] the campaign[,] . . . promot[ed] Ms. Ganieva's story to the press, and s[ought] to secure coverage favorable to

Mr. Harris and negative to Mr. Black—all in an effort to create a media narrative that would help force Mr. Black out as Chairman of Apollo." *Id*. ¶ 28. Rubenstein's long-time service to Harris was the reason that he became involved in and promoted Ganieva's story. *Id*. ¶ 44. Black alleges that Rubenstein planted Ganieva's story—which repeated Ganieva's false allegation that "Black's abuse 'was over a long period of time and it was tragic'"— in the *New York Post* in an article written by Josh Kosman, a reporter with whom Rubenstein had a long-term relationship. *Id*. ¶ 66.[5] And he did so after multiple reporters—including Ronan Farrow, Matt Goldstein, Richard McHugh, and Julie Brown— "passed on the story." *Id*. ¶¶ 64-65. According to the Amended Complaint, "[a]ware of Ms. Ganieva's lies, Mr. Rubenstein and the Flacks pushed stories and articles to promote her lies, including setting up an interview with the New York Post." Compl. ¶ 135. The Amended Complaint further alleges that "[t]hese continued lies . . . were made to cause Mr. Black reputational, professional and economic harm." *Id*. These allegations are sufficient to state a claim for defamation. *See* Hon. Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 7.1 (5th ed. 2017) ("[O]ne who republishes a defamatory statement [originally made by another] 'adopts' it as his own and is liable in equal measure.").

### C. The Amended Complaint Adequately Alleges Defamation by Harris

Black has adequately alleged that Harris defamed him. According to the Amended Complaint, Harris "coordinated" with the other Defendants on the state court pleadings

---

[5] Rubenstein argues that Black has failed to "provide any detail on when or to whom Rubenstein allegedly made any defamatory statements." Rubenstein MTD at 18. In fact the Amended Complaint details that Rubenstein used his long-term relationship with Kosman to arrange for an interview with Ganieva and to publicize her allegations. Compl. ¶ 66.

"not because [he] had a good faith basis to reasonably believe that [Ganieva] had any passably legitimate claim for redress, but because [he] wanted to publicize and disseminate lurid, scandalous and calumnious accusations about Mr. Black," Compl. ¶ 137, and he "funded and actively encouraged" Rubenstein and Wigdor to communicate the contents of those pleadings to the press, *id.* ¶ 138. The Amended Complaint further alleges that "Mr. Harris and his confederates made it their business to frame and spread Ms. Ganieva's lies," *id.* ¶ 9, and that Harris "encourag[ed] press coverage regarding Ms. Ganieva's false allegations," *id.* ¶ 117(e). Accordingly, the Amended Complaint alleges that Harris is liable for the defamatory statements in the state court complaints, *id.* ¶ 137, as well as for the communication of the substance of those filings to the press, *id.* ¶ 138.

Harris claims that he cannot be liable for defamation because he is not personally alleged to have said anything defamatory. Harris misleadingly cites *Ramsaran v. Abraham*, 2017 WL 1194482 (S.D.N.Y. Mar. 30, 2017), and *Stevens v. New York*, 691 F. Supp. 2d 392, 399 (S.D.N.Y. 2009), to suggest that there is no aiding and abetting liability for defamation under New York law. Harris MTD at 24. But aiding and abetting defamation is actionable under New York law, and the Amended Complaint clearly alleges that Harris aided and abetted the false and defamatory statements made by Wigdor and Ganieva in the state court action. The Amended Complaint further alleges that Harris caused those defamatory statements to be repeated to the press and to be reported. *See Cedeno v. Pacelli*, 192 A.D.3d 533, 534 (1st Dep't 2021) ("The court correctly declined to dismiss the aiding and abetting defamation claim."); *Long*, 406 F. Supp. 2d at 298 ("A defamatory statement is uttered not merely by the person from whose e-mail account it is sent, but by anyone who participates in its publication[.]"). In *Cedeno v. Pacelli*, 2019 WL 4239257, at *4

(N.Y. Sup. Ct. Sept. 5, 2019), *aff'd as modified*, 192 A.D.3d 533 (1st Dep't 2021), for instance, a New York court permitted a defamation action to go forward against two defendants who were alleged to have caused unidentified John Does to post false and defamatory online reviews of the plaintiff's law practice. That is just like what is alleged here. Under New York law, these allegations are sufficient to plead that Harris caused others to make defamatory statements, even if he did not make the statements himself.

The Amended Complaint adequately alleges that Harris aided and abetted the defamatory statements of the other Defendants. To establish aiding and abetting liability, a complaint must allege: "(1) the existence of an underlying tort; (2) the defendant's knowledge of the underlying tort; and (3) that the defendant provided substantial assistance to advance the underlying tort's commission." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 172 (2d Cir. 2012) (brackets omitted); *see also Pittman by Pittman v. Grayson*, 149 F.3d 111, 122-23 (2d Cir. 1998) (indicating that this standard applies to all claims for aiding and abetting a tort). As set forth above, the Amended Complaint alleges that Black was defamed: Ganieva defamed him through her tweets, Wigdor and Ganieva defamed him through the state court complaints, and Rubenstein and Wigdor defamed him by repeating those defamatory statements to the media. Harris aided and abetted these defamatory statements. The Amended Complaint alleges that Wigdor filed the complaint in the state action "in coordination with Mr. Harris . . . not because they had a good faith basis to reasonably believe that their client had any passably legitimate claim for redress, but because they wanted to publicize and disseminate lurid, scandalous and calumnious accusations about Mr. Black." Compl. ¶ 137. Black further alleges that Harris "funded and actively encouraged" Wigdor and Rubenstein's defamatory communications to the

press. *Id.* ¶¶ 117(e), 138. Black alleges that Harris provided payments, promises of future business, and/or promises to pay to Mr. Rubenstein and the Flacks "as consideration for their dissemination of the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media, and t[old] the press that the Manhattan District Attorney's Office had opened a criminal investigation into Mr. Black, and encourag[ed] press coverage regarding Ms. Ganieva's false allegations." *Id.* ¶ 117(e). These allegations are plainly sufficient to support a claim that Harris both knew that Rubenstein and Wigdor were committing defamation and that he substantially assisted the commission of that tort. Thus, Black has adequately alleged that Harris aided and abetted defamation.

Like Wigdor, Harris argues for dismissal based on the litigation privilege. Harris MTD at 23-25. But, just as with Wigdor and Ganieva, Harris cannot claim protection for coordinating the filing of a complaint and for repeating the allegations in a complaint that he had no good faith basis to believe were true. As discussed above, *supra* at pp. 45-52, statements made in a complaint can be actionable if the litigation is a sham, and Black has alleged that the complaints were filed "in coordination" with Harris, because he "wanted to publicize and disseminate lurid, scandalous and calumnious accusations about Mr. Black." *Id.* ¶ 137. Black has also alleged that Harris "funded and actively encouraged" Wigdor and Rubenstein in the communication of the substance of the sham complaint to the press. *Id.* ¶ 138. And, as discussed above, *supra* at pp. 50-51, an individual cannot avoid liability for defamation by filing a lawsuit making defamatory allegations, publicizing those allegations, and claiming the protection of Section 74. *See Williams*, 246 N.E.2d at 337.

**D.      Ganieva Does Not Contest the Defamation Claims Against Her**

Ganieva has not argued that Black's defamation allegations are deficient.  Rather, she argues that the Court should dismiss the RICO claims against her, and that the Court should decline to exercise supplemental jurisdiction over the defamation claim.  Ganieva MTD at 25.  As a result, if the Court upholds the RICO claims, the defamation claim against her should proceed because she has waived any challenge to the sufficiency of the pleadings.  *Kao v. British Airways, PLC*, 2018 WL 501609, at *5 (S.D.N.Y. Jan. 19, 2018) ("Plaintiffs' failure to oppose Defendants' specific argument in a motion to dismiss is deemed waiver of that issue."); *Arista Records, LLC v. Tkach*, 122 F. Supp. 3d 32, 38-39 (S.D.N.Y. 2015) (finding that when a party fails to oppose specific arguments, then the party waives those issues).  Regardless, as discussed below, this Court should continue to exercise supplemental jurisdiction over these claims.

**IV.    THE *NOERR-PENNINGTON* DOCTRINE DOES NOT BAR BLACK'S CLAIMS**

Contrary to the suggestion Ganieva makes at the conclusion of her brief, Ganieva MTD at 24-25, the *Noerr-Pennington* doctrine does not preclude this suit from proceeding for the same reason that New York's litigation privilege also does not apply.  Under *Noerr-Pennington*, false statements made in petitions to the government are generally protected from liability.  *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 669-70 (1965); *see also Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 701 F. Supp. 2d 568, 593 (S.D.N.Y. 2010) ("[T]he right to petition protects '[t]he rights to complain to public officials and to seek administrative and judicial relief.'") (quoting *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994)).  However, there is an exception to *Noerr-Pennington* for litigation

that is a "sham":  "The sham litigation exception applies . . . where the litigation is 'objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.'"  *Singh v. NYCTL 2009-A Tr.*, 683 F. App'x 76, 78 (2d Cir. 2017) (quoting *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993)).  "The relevant issue is whether the legal challenges are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival."  *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 101 (2d Cir. 2000) (internal quotation marks omitted).

The complaint adequately alleges that the sham litigation exception applies, stating that "Wigdor LLP and Ms. Ganieva knew that the pleadings had no basis in fact" and were "brought solely to defame," Compl. ¶¶ 90, 136, and that the litigation activity was designed to "publicize and disseminate lurid, scandalous and calumnious accusations about Mr. Black," *id*. ¶ 137.  Because the Amended Complaint adequately alleges that the state court litigation is a sham, the *Noerr-Pennington* doctrine does not bar this federal litigation.

## V.  THIS COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION OVER THE STATE LAW CLAIMS AGAINST ALL DEFENDANTS

Contrary to the Defendants' arguments, this Court should exercise its discretion and assert supplemental jurisdiction over Black's state law claims.  "[T]he exercise of supplemental jurisdiction is left to the discretion of the district court," which may "weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants."  *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994).  Fairness to litigants includes exercising jurisdiction where the "plaintiff would now be barred from filing claims . . . in state court due to the expiration of the relevant . . . statute of limitations."  *Pemrick v. Stracher*, 2007 WL 1876504, at *5 (E.D.N.Y. June 28, 2007),

*aff'd*, 331 F. App'x 17 (2d Cir. 2009). The dismissal of federal claims "does not automatically mandate dismissal of pendent state claims," *Enercomp, Inc. v. McCorhill Publ'g, Inc.*, 873 F.2d 536, 545 (2d Cir. 1989), particularly where "the state claims do not raise novel or complex issues of state law," *Motorola Credit Corp. v. Uzan*, 274 F. Supp. 2d 481, 497 (S.D.N.Y. 2003), *aff'd in part, vacated in part on other grounds, remanded*, 388 F.3d 39 (2d Cir. 2004).

Courts in the Second Circuit routinely retain supplemental jurisdiction over state common-law claims after dismissal of federal RICO claims, including in early stages of litigation. *See*, *e.g.*, *Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d 45, 81 (E.D.N.Y. 2020) (dismissing RICO claims and exercising supplemental jurisdiction over state law defamation claim); *O'Diah v. New York City*, 2002 WL 1941179, at *14 (S.D.N.Y. Aug. 21, 2002). That is often "in the interests of judicial economy, convenience and fairness to the litigants," *Ackerman v. Nat'l Prop. Analysts, Inc.*, 887 F. Supp. 494, 510 (S.D.N.Y. 1992), and because of "the time and effort already invested in th[e] matter by the parties and the Court, the burden that serving multiple defendants in a state court action would impose on plaintiffs[,] and the serious nature of plaintiffs' allegations," *N.Y. Transp., Inc. v. Naples Transp., Inc.*, 116 F. Supp. 2d 382, 390 (E.D.N.Y. 2000); *see also Cain v. Bethea*, 2007 WL 2859681, at *57 (E.D.N.Y. Aug. 17, 2007), *report and recommendation adopted in relevant part*, 2007 WL 2846914 (E.D.N.Y. Sept. 26, 2007).

The same is true here. Considerations of judicial economy, convenience, and fairness mitigate against Black having to refile and relitigate his state law claims in state court. Black faces a short one-year statute of limitations for defamation based on the March 2021 tweets. Counsel for at least one defendant has suggested that they will argue that

Black's defamation claim will be time-barred if refiled in state court.  *See* Initial Pretrial Conf. Hr'g Tr. at 74:2-11 (Mar. 10, 2022), Dkt. No. 98.  Moreover, this Court is already familiar with the relevant issues, having spent hours familiarizing itself with this case, and is well equipped to handle ordinary defamation, breach of contract, and unjust enrichment claims that do not raise novel or complex issues of state law.  As the parties have acknowledged, the state court case is moving slowly, with seven unresolved motions and discovery disputes, and involves different parties than the instant federal court action.  The multiple additional parties here have already invested time and effort litigating in federal court.  Therefore, overall efficiency and fairness would be served by this Court retaining supplemental jurisdiction over Black's state law claims.

The RICO Defendants cite to a series of decisions for the proposition that supplemental jurisdiction is not proper here, but those cases are inapposite.  Ganieva's citation to this Court's decision in *Knight v. Standard Chartered Bank*, 531 F. Supp. 3d 755 (S.D.N.Y. 2021), and Rubenstein's reliance on *Daniel v. City of New York*, 2021 WL 5988305 (S.D.N.Y. Dec. 16, 2021), and *Cajero Torres v. Sushi Sushi Holdings Inc.*, 2021 WL 2158017 (S.D.N.Y. May 27, 2021) are misplaced.  *See* Ganieva MTD at 25; Rubenstein MTD at 22-23.  Those cases involved state *statutory* claims that, as this Court noted in *Knight*, "would benefit from further development in the state courts"—something that is not true with respect to a common law defamation claim.  531 F. Supp. 3d at 774.  Moreover, Harris's suggestion that this Court should exercise supplemental jurisdiction over the defamation claim in order to dismiss it like in *Rajaratnam*, Harris MTD at 24 & n.18, is unpersuasive because the court there disposed of the defamation claim purely on

timeliness grounds, *see* 449 F. Supp. 3d at 81-85, which are inapplicable here. In short, this Court should exercise supplemental jurisdiction over Black's state law claims.

**CONCLUSION**

Notwithstanding the baseless protests that the Defendants raise in their motions to dismiss, the Amended Complaint plainly and adequately alleges claims for civil RICO and defamation. Their relationships with Black brought Ganieva and Harris considerable wealth. But both Ganieva and Harris wanted more from Black. Joining efforts with Rubenstein and Wigdor, they set out to extract *more* power and *more* money from Black through extortion and fraud. They ensured that Ganieva's false allegations against Black were spread widely, substantially increasing the pressure on Black as he resisted their continuing extortionate and fraudulent campaign. And, throughout that campaign, Defendants repeatedly and persistently defamed Black through their sham complaints and by spreading false information online, to the press, and within Apollo. The Amended Complaint, in sum, sets out plausible and, when required, particularized allegations of a RICO enterprise and of defamation. Accordingly, Defendants' motions to dismiss Plaintiff's Amended Complaint should be denied.

Dated: April 4, 2022

Respectfully submitted,

*/s/ Reid M. Figel*

| | |
|---|---|
| Susan R. Estrich | Reid M. Figel |
| Estrich Goldin LLP | Michael K. Kellogg |
| 947 Berkeley St. | Kellogg, Hansen, Todd, Figel |
| Santa Monica, CA 90403 | & Frederick, P.L.L.C. |
| (213) 399-2132 | 1615 M Street, N.W., Suite 400 |
| susan@estrichgoldin.com | Washington, D.C. 20036 |
| | (202) 326-7900 |
| | rfigel@kellogghansen.com |
| | mkellogg@kellogghansen.com |

*Attorneys for Plaintiff Leon D. Black*