# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Leon D. Black,<br><br>                              Plaintiff,<br><br>          v.<br><br>Guzel Ganieva, Wigdor LLP, Joshua Harris,<br>and Steven Rubenstein,<br><br>                              Defendants. | No. 1:21-cv-08824-PAE |

**[PROPOSED] SECOND AMENDED COMPLAINT**

Plaintiff Leon D. Black, by and through his undersigned attorneys, for his Second Amended Complaint against Defendants Joshua Harris, Steven Rubenstein, Guzel Ganieva, and Wigdor LLP ("Wigdor"), alleges on information and belief as follows:

**INTRODUCTION**

1.     At all times relevant to this Second Amended Complaint, Defendant Joshua Harris was an officer and director of Apollo Global Management, Inc. ("Apollo"), with an obligation to place the interests of Apollo and its shareholders ahead of his personal ambition.  Harris's duties to Apollo included the duties of loyalty, honesty, and candor to his fellow officers and directors and, most fundamentally, a duty to subordinate his personal interests to the best interests of Apollo and its shareholders.  Defendant Steven Rubenstein, Apollo's media consultant and agent, owed Apollo similar fiduciary duties.  Harris and Rubenstein violated these duties by devising a fraudulent scheme to wrest managerial control of Apollo from Plaintiff Leon D. Black, Apollo's founder, CEO, and Chairman.  Defendant Guzel Ganieva, in coordination with Harris and Rubenstein, made additional defamatory and false statements about Black, including through sham legal proceedings, that Defendants used to deceive and damage Apollo.  Harris, Rubenstein, and

1

Ganieva's operation and management of this unlawful scheme – which continues to this day – violates the federal Racketeer Influenced and Corrupt Organizations Act ("RICO").

2.      Defendants' fraudulent scheme to force Black's resignation from Apollo was centered on a secret strategy to manufacture and publicize false and defamatory stories about Black.  Defendants carried out this scheme through an association-in-fact enterprise, assembled and funded by Harris, that included highly-skilled lawyers, media consultants, financial advisors, and others – some of whom were in fact being paid by and owed fiduciary duties to Apollo.  The goal of the Defendants' scheme was to humiliate and defame Black – and therefore Apollo – to such an extent that Black would have no choice but to resign from the company he founded to spare Apollo from further financial and reputational injury.  Ganieva, who was then extorting millions of dollars from Black in exchange for keeping secret a consensual relationship that ended many years earlier, publicized additional false and defamatory information about Black that was essential to the success of the scheme.  Defendants concocted and publicized a series of defamatory statements and lies that placed significant additional pressure on Black and Apollo, and positioned Ganieva to extort even more money from Black.  Ganieva and Defendant Wigdor, Ganieva's lawyers, then filed sham litigation falsely accusing Black of serious criminal conduct.

3.      Defendants' campaign to unseat Black and to extort money on behalf of Ganieva began at least as early as the fall of 2020 (and likely earlier), as Harris came to realize that Black would likely support Marc Rowan, Harris's rival at Apollo, to be Black's successor.  Harris repeatedly asked Black to name him as the next Apollo CEO, but Black declined to do so.  Black had long supported Rowan to be his successor and the issue had crystallized by the fall of 2020, at which point Apollo was evaluating a possible merger with Athene Holding Ltd. ("Athene"), an insurance company founded by Rowan that over time became one of Apollo's principal sources of

investment capital.  During the fall of 2020, Harris lobbied against Black's proposed merger and succession plans – plans that Apollo's Board later agreed were in the best interests of Apollo – because they undermined Harris's personal ambitions.

4.      On October 12, 2020, The New York Times published an article stating that, years earlier, Black had made payments totaling as much as $50 million to Jeffrey Epstein, and suggested that it was "not clear what kind of services Mr. Epstein provided to Mr. Black."  Black publicly explained the nature of the financial and tax planning services Epstein had provided to Black and his family office.  Black believed he had nothing to hide, and consequently asked Apollo to conduct a full investigation.   In response, Apollo's independent directors retained Dechert, LLP ("Dechert"), a highly reputable law firm – independent of both Black and Apollo – to conduct a thorough investigation of Epstein's relationship with Black and Apollo.

5.      Harris, Rubenstein, and Ganieva, working through Harris's enterprise, sought to inflict unrelenting financial, professional, and personal harm on Apollo and Black, and thereby force his resignation from Apollo.  Harris and Rubenstein promoted the publication of unfavorable articles about Black, and planted flattering stories about Harris, profiling him as Black's likely successor.

6.      These initial efforts to force Black's resignation were unsuccessful.  By mid-January 2021, Harris had learned that Dechert's report would exonerate Black.  Harris also learned that Apollo's Board intended to go forward with the Athene merger, that Black would continue his leadership role as Apollo's CEO until his 70th birthday in July 2021, and that thereafter Black would serve indefinitely as Apollo's Board Chair.  Harris also learned that the Apollo Board would appoint Rowan as CEO when Black stepped down in July 2021.  Harris knew that, unless he could force Black out of Apollo before July 2021, he would never succeed Black as CEO.

7.     Defendants then escalated their campaign against Black and Apollo, engaging in even more fraudulent attacks.  Among other things, Harris sought to undermine the integrity of the Dechert report, contacting Apollo's independent directors and falsely characterizing the report – the culmination of a three-month-long investigation led by one of the country's most established law firms – as a "whitewash."  The day before the Dechert report was released, Harris and Rubenstein, working through an emissary, solicited a new lawyer for Ganieva who would commence and prosecute sham litigation against Black.  Harris worked to undermine Black's support on Apollo's Board by nominating a new director who had provided Harris with assurances in advance that he would support Harris as Black's successor, without disclosing this arrangement to Apollo.  Harris and Rubenstein also planted stories disparaging two other independent directors who Harris perceived to be loyal to Black, again without disclosure and in clear violation of their fiduciary duties to Apollo.

8.     On March 17, 2021, Ganieva – a first-time Twitter user with only three followers, each coincidentally a member of the press – posted a series of tweets in which she falsely accused Black of sexual harassment and abuse.  Recognizing that the carefully-tagged tweets were clearly part of an ongoing, coordinated campaign, Black resigned for the good of Apollo, losing the considerable financial benefits he was receiving as Chairman and CEO.  Black's resignation deprived Apollo of Black's decades of experience and judgment, as well as his widely recognized investing acumen.  Ganieva and Wigdor then commenced sham litigation against Black, seeking to extort greater payments from Black.  That litigation – which Black is vigorously defending against – is ongoing to this day.  Wigdor has opposed the entry of the most routine confidentiality order, one of its excuses to not review evidence that would expose its own client's lies.  Rather, Ganieva and Wigdor have sought at every opportunity to delay the litigation and frustrate the

discovery process, thereby preventing the truth about Ganieva's litigation conduct and false allegations from being exposed.

9.      This action seeks to hold Harris, Rubenstein, Ganieva, and Wigdor accountable for their criminal, defamatory scheme against Black and Apollo.

## PARTIES

10.     Plaintiff Leon D. Black resides in New York County, in the State of New York. Black founded Apollo Global Management, Inc. in 1990 and since that time has been Apollo's largest shareholder.  As of April 1, 2022, Apollo had a market capitalization of approximately $37 billion, and approximately $500 billion in assets under management.  For more than 30 years, until March 21, 2021, Black served as Apollo's CEO and as the Chairman of its Board of Directors.

11.     In addition to his work at Apollo, Black has spent the last three decades working as a dedicated philanthropist and one of our nation's leading benefactors of the arts, education, and cancer research.  He served for 20 years on the Board of Mt. Sinai Hospital, 15 years on the Board of the Metropolitan Museum of Art, and 10 years on the Board of Trustees of Dartmouth College. Black served as a Trustee of the Museum of Modern Art ("MoMA") for approximately 25 years, and from 2016 to 2021 served as co-Chairman or Chairman of MoMA.  He has also been one of MoMA's most generous supporters.  At the outset of the pandemic, Black and his family funded $20 million for the Healthcare Heroes campaign, providing meals for front-line workers at the hundreds of hospitals in the five boroughs of New York City.  Some 14 years ago, Black and his wife, Debra, co-founded the Melanoma Research Alliance, which became the largest private funder of melanoma research in the world.  Melanoma is the most deadly form of skin cancer, the fastest-growing cancer in the world, and a cancer that had been, for too many, a death sentence. The Melanoma Research Alliance has directly invested more than $130 million to advance cutting edge research into immunotherapy for melanoma.  Through that funding, the Melanoma Research

Alliance has supported clinical trials and patent applications, leading to some 13 new FDA-approved therapies for melanoma, and has made important progress in using immunotherapy to treat more than 30 other cancers.  As a result of his hard work and generosity, Black and his family have long enjoyed the respect of peers in the worlds of business, the arts, and medical research, as well as among Jewish leaders and people affiliated with his alma mater.

12.     Defendant Joshua Harris currently resides in Miami-Dade County, in the State of Florida.

13.     Defendant Steven Rubenstein resides in New York County, in the State of New York.

14.     Defendant Guzel Ganieva is a Russian national who currently resides in New York County, in the State of New York.

15.     Harris, Rubenstein, and Ganieva (together, the "RICO Defendants"), have each committed multiple criminal acts as part of a fraudulent, extortionate scheme designed to defraud Apollo and other third-parties, to inflict financial and reputational harm on Apollo and Black, and to force Black's resignation and separation from Apollo.

16.     Defendant Wigdor LLP maintains its principal place of business in New York County, in the State of New York.

**JURISDICTION AND VENUE**

17.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), as a substantial number of the events giving rise to this action occurred in this District.

18.     This Court has subject matter jurisdiction over Black's racketeering claims under 28 U.S.C. § 1331 and 18 U.S.C. § 1964.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Black's defamation *per se*, unjust enrichment, and breach of contract claims.  The relief sought in this suit seeks, among other things, monetary damages in excess of $75,000.

## FACTUAL ALLEGATIONS

### Apollo Global Management

19.     Black founded Apollo, a Delaware corporation, in 1990 to manage investment capital on behalf of institutional investors, focusing on leveraged buyouts, corporate restructurings, and credit positions, as well as taking minority positions in growth-oriented companies.

20.     Black had previously spent 13 years at Drexel Burnham Lambert ("Drexel"), where he served as the head of Drexel's Mergers & Acquisitions group and thereafter led its 500-member Corporate Finance group.

21.     Black is a visionary investor, who spearheaded Apollo's phenomenal growth from a shared office in 1990 into one of the nation's pre-eminent alternative asset managers.  This success was the direct result of Black's strategy of creating a contrarian, value-oriented investment approach to private equity, credit-oriented capital markets, real estate, and distressed investments. Investors trusted Black's vision; in 2001, Apollo obtained $3.7 billion in investor commitments to Apollo Investment Fund V, followed by $10 billion in Fund VI, $15 billion in Fund VII, $18 billion in Fund VIII, and $25 billion in Fund IX in 2017.  Apollo compiled a stunning track record of investment success, including a gross internal rate of return of 39% in its traditional private equity funds from inception through December 31, 2020.  Apollo, under Black's leadership, was in the vanguard of the transformation of the pure leveraged buyout model of the 1980's into today's broad-based "alternative asset" approach.  Apollo was a pioneer in finding the best risk-reward investment opportunities across the capital structures of good companies.  For example, the Executive Life transaction in 1991 was a revolutionary development for the private equity industry.  Apollo acquired a $6 billion portfolio of 400 positions in debt investments, including numerous investments in private equity and also in distressed corporate restructurings, on which it earned a substantial return.  Apollo was one of the first private equity companies to go public,

7

and, as importantly, became the largest global alternative asset manager of credit platforms.  In addition, Apollo was one of the first private equity firms to transition to permanent capital, building the Athene and Athora Holding Ltd. insurance platforms under the leadership of Rowan and James Belardi.  All of these transformative changes in the last 30 years were first-mover initiatives by Apollo under Black's leadership, and they are now all broadly emulated by most of the other major players in the alternative investment world.

22.     Black was a mentor to Harris, trained him, and gave him increasing levels of responsibility and significant amounts of equity in Apollo.  Over time, Harris and Rowan became Apollo's two largest shareholders after Black.  In 2007 – 17 years after he founded Apollo – Black designated Harris a "co-founder" of Apollo, despite the fact that Harris joined the firm as a junior analyst several years after Apollo's founding.  Until March 21, 2021, Harris reported directly to Black.

23.     Harris's principal responsibilities at Apollo included acting as a senior investor in Apollo's private equity business, and, since 2015, functioning essentially as the firm's chief operating officer.  While Harris was hard working and competent in handling Apollo's internal operations, he was less effective as a creative or strategic thinker or investor, particularly as compared to Rowan.  He also stifled growth by continuously delaying important decisions.  Black was concerned that Harris would not foster the positive corporate culture or strategic vision necessary for increased growth, and that Harris had created an abusive, "Whiplash" culture at Apollo.

24.     In or about 2002, Harris created HRS Management, a family investment office, to oversee the personal fortune he accumulated through his work under Black at Apollo.  Harris devoted significant amounts of time and resources to HRS Management, and over time expanded

his investment holdings.  Harris purchased an NBA team, the Philadelphia 76ers, in 2011; then an NHL team, the New Jersey Devils, in 2013; and an English Premier League soccer team, Crystal Palace F.C., in 2015.

25.     Over time, Harris formed and developed a cadre of professional advisors, including lawyers, financial advisors, accountants, and public relations specialists (collectively, an "enterprise" within the meaning of 18 U.S.C. § 1961(4)), that operated to protect, promote, and burnish Harris's public image; to advance his business and financial interests; and to provide a variety of services necessary to accomplish Harris's goals.  Harris's business interests outside of Apollo, supported by his cadre of advisors, expanded to include businesses and investments valued at billions of dollars and that operated in, and affected, interstate and foreign commerce.

26.     For many years, Apollo retained RUBENSTEIN, a firm founded by Defendant Steven Rubenstein's late father, to provide it with public relations and media consulting advice, and to enhance Apollo's public profile.  Apollo placed trust and confidence in RUBENSTEIN to act as its agent with respect to a wide range of important and sensitive issues.  RUBENSTEIN had duties, as Apollo's fiduciary, to refrain from taking actions that might harm Apollo, and to inform Apollo of information it learned that would be important to Apollo.  For years, and up until April 2021, Apollo paid RUBENSTEIN a monthly retainer of approximately $90,000 per month.  Steven Rubenstein was employed by RUBENSTEIN and served Apollo.  In that capacity, Rubenstein had access to highly sensitive corporate information, and was expected to exercise discretion and judgment to protect and promote Apollo's interests.  As Apollo's agent, Rubenstein owed Apollo common law agency and fiduciary duties, including the duty of loyalty and an unremitting duty of candor.

**The Growth of Apollo**

27.     On March 29, 2011, Apollo conducted an initial public offering and registered its common stock for trading on the New York Stock Exchange.  Black was Apollo's Chairman of the Board and CEO.  Rowan and Harris assumed seats on Apollo's Board of Directors, and served as Senior Managing Directors.  As an officer and director of a publicly traded company, Harris owed agency and fiduciary duties to Apollo and its shareholders, including duties of loyalty, candor, and care.  The duty of candor required Harris to disclose all material information relevant to any Apollo matter.  Black, Rowan, and Harris also served on Apollo's executive committee, which was charged with making critical decisions regarding investments, long-term strategy, and personnel.

28.     Beginning in 2009, and with Black's full support, Rowan embarked on a business initiative that would, over time, fundamentally reshape Apollo's business model.  Rowan helped co-found Athene, a retirement savings company that issues, reinsures, and acquires retirement savings products.  Athene's retirement savings products were structured and designed to appeal to the increasing number of individuals and institutions seeking to fund their retirement needs, and included annuities that were offered to retail investors.  In short, the investors paid premiums to Athene, which in return guaranteed a fixed income stream at a later date.  Athene invested the premiums it received with Apollo, which generated investment returns that enabled Athene to pay its annuity obligations.

29.     Athene's business model created significant new capital-raising opportunities for Apollo.  Whereas Apollo previously sought to raise capital primarily from large institutional investors – such as sovereigns, state pension funds, and other institutional investors, known as Limited Partners or LPs – Athene provided Apollo with a steadier, growing, and ultimately far

larger capital base.  Under Rowan's leadership, Athene grew and became a significant and stable source of investment capital for Apollo.  As of December 31, 2011, approximately $8.5 billion of Apollo's $75.2 billion in total assets under management were sourced from Athene.  Nearly a decade later, by December 31, 2020, approximately 50% of Apollo's revenue was sourced from Athene, making a merger the logical next step.

30.     Harris understood that as Athene grew and became a more significant business relationship for Apollo, Rowan became a more critical contributor to Apollo's success.  Rowan also became more important and influential to Black.

31.     In September 2019, Apollo purchased 33% of the common stock of Athene, in a transaction Harris initially argued against but that proved spectacularly successful for Apollo.  A year later, Harris was reluctant to move forward with the merger of the two companies, and created multiple obstacles to Black's and Rowan's plan for the merger.  At the same time, Harris also expressed reluctance towards, despite his later approval of, a series of corporate governance initiatives that Black believed were necessary to demonstrate Apollo's ongoing commitment to best-in-class governance.  These initiatives included transitioning decision-making at Apollo to a one-share-one-vote structure.  Harris also initially opposed Black's proposal to expand Apollo's Board so that it was comprised of a majority of independent directors.  Harris resisted these and other changes that reduced his level of control over Apollo.

### Black's Prior Relationship with Ganieva

32.     Black met Defendant Guzel Ganieva at a party both attended in 2008.  From 2008 until 2014, Black and Ganieva engaged in a sporadic, consensual affair.

33.     Ganieva's communications with Black between 2008 and 2014 were marked by consistent expressions of love and affection on her part.  Black paid for Ganieva's apartment, paid for her acting lessons, financed expensive vacations, paid for a $40,000 portrait of her, and even

purchased a Steinway piano for her and her son.  He also made a series of loans to her, and attempted to assist her in finding employment in the finance industry.  In July 2014, Ganieva told Black she needed to leave the country for immigration-related reasons, and departed for Russia on July 31, 2014.  From the plane, Ganieva texted Black, "I love you and miss you already."  For eleven months thereafter, Ganieva sent texts to Black from abroad stating how she missed him and longed to be together.

34.     On June 8, 2015, Ganieva sent Black a formally worded note insisting that she needed to meet with him in person about a matter that she characterized, without detail, as "both urgent and important."  Based on statements she later made to Black, this sudden shift in tone appears to have coincided with her failure to gain legal status in the United Kingdom.

35.     On June 24, 2015, Ganieva met Black in person in New York City.  Ganieva threatened Black, telling him that if he did not pay her $100 million, she would disclose their personal and sexual relationship to Black's wife and children, and to the public.

36.     Black understood that Ganieva was extorting him.  Black consulted attorneys, including criminal defense counsel.  Black thereafter recorded his future conversations with Ganieva.

37.     On August 12, 2015, Ganieva met Black at the Four Seasons restaurant in New York City.  Ganieva again demanded money from Black, threatening that, "the longer I wait, the more sure I become that I actually, I prefer to go public," and that, "I'm dying to talk to press about it."  Ganieva repeated her demand for $100 million.  She also exhibited signs of delusion, claiming that various prominent people – from international philanthropist Len Blavatnik to former New York Mayor Michael Bloomberg to ailing publisher and developer Mort Zuckerman – were following or harassing her at Black's direction, musings that she herself suggested were paranoid.

38. On August 14, 2015, Ganieva met Black at Le Bernardin in New York City. Ganieva again extorted Black, informing him: "I will not agree to anything less than $100 million." Ganieva knew Black was married. Ganieva knew Black had children. Ganieva knew Black was a prominent business leader. And she knew that her threat to publicize their affair – and to do so in a way that mischaracterized the relationship – would instill fear in Black because of the potential damage to his family and his business.

39. During the August 14, 2015 meeting, Ganieva justified her demand for $100 million by referencing a news report she saw about a woman who received $18 million when she was fired after sleeping with her boss, a "Wall Streeter," only four times. Ganieva explained that, in her view, her demand for $100 million was justified because she believed her sporadic affair with Black was "like a marriage."

40. On October 19, 2015, Ganieva again met Black at the Four Seasons restaurant in New York City. Black and Ganieva finalized the terms of a resolution to her extortion demands under which Ganieva agreed not to publicly disclose their affair. In exchange for Ganieva dropping her threat, Black agreed to pay Ganieva $100,000 per month for 15 years, forgive $1,000,000 in loans, and provide £2,000,000 for Ganieva to use toward obtaining legal status in the United Kingdom.

41. Black made payments to Ganieva thereafter every month for five and a half years. Ganieva accepted every payment. Between October 2015 and March 2020, Ganieva received a total of $9.2 million. On at least one occasion during that time, she reached out to Black to ask for a favor; on January 29, 2016, she emailed Black her Harvard Business School application asking for his support. He declined.

42. In October 2019, after four years in which there was no other direct contact between

Black and Ganieva other than her accepting the $100,000 payments each month, Ganieva sent Black a text message complaining about their arrangement, and claiming that he had forced her to sign the agreement under duress. Ganieva had never made that claim during the preceding four years. Black did not respond. He continued to pay her $100,000 per month, and Ganieva continued to accept the payments.

43.    On November 15, 2019, Ganieva emailed Jodi Kantor of The New York Times, a prominent journalist. Ganieva falsely told Kantor that Black had sexually abused her. After speaking to Kantor by phone, Ganieva emailed her on November 19, 2019, writing, "I thought about it and I still think it is important to me to have a sense of control of the article. I think I can move forward only if I have a legal power to stop it at any time before it gets published. I would also need to see it just before it goes in print." Kantor did not report on Ganieva's claims.

44.    On November 20, 2019, after demanding "legal power" to control the reporting of her allegations, Ganieva emailed Ronan Farrow of The New Yorker, another prominent journalist. Ganieva repeated the same false claims of sexual abuse. Farrow did not respond to Ganieva's message. Farrow did not publish Ganieva's claims.

45.    On June 4, 2020, Ganieva emailed Julie Brown of the Miami Herald, claiming abuse by "one of the very high profile Epstein associates," and alleging that, "[a]t some point they and Weinstein conspired to retaliate and harass me into silence." Brown did not publish Ganieva's claims.

46.    On February 18, 2020, David Liston, an attorney, sent Black a letter, stating that Ganieva "has retained our firm to investigate certain matters related to your prior interactions with her and to advise and represent her in connection with same." Liston sent a follow-up letter on March 6, 2020. Black, uncertain whether this was a legitimate demand from Ganieva's counsel,

and concerned about whether the request reflected a continuation of Ganieva's extortion, did not respond.  Black continued to pay Ganieva $100,000 per month, and Ganieva continued to accept the payments.

### Harris's Motive To Remove Black

47.    During the summer and fall of 2020, Apollo was engaged in an extensive analysis of the possibilities of a merger with Athene.  At that time, approximately $184 billion of Apollo's $455.5 billion in assets under management were sourced from Athene.  Over the course of roughly a decade, assets under management by Apollo, and sourced from Athene, had increased 20 times over.  The potential benefits of the merger to Apollo were significant, particularly given Apollo's significant equity stake in Athene.  A merger of Apollo and Athene, an event directly attributable to Rowan's strategic vision for Athene, represented a serious threat to Harris's ambitions to succeed Black as Apollo's CEO.

48.    As a result, Harris steadfastly opposed the potential merger initiative, despite the manifest benefits to Apollo's business.  Harris understood that a successful merger would effectively end his hopes of succeeding Black as CEO, and that his influence and control over Apollo were coming to an end.

49.    As the merger discussions progressed, and Black approached his 70th birthday, the issue of succession at Apollo came into sharper focus.  As Harris well knew, Black thought Harris was capable of managing Apollo's day-to-day operations, but that he lacked the strategic vision and growth-oriented focus to be an effective successor.  Indeed, many in Apollo's senior management thought Harris was stifling growth.  In 2015, Black had rebuffed Harris when Harris asked to be anointed as Black's successor, believing Harris would be the wrong choice for the job. Black asked Rowan to become Apollo's CEO in 2015 and again in 2019 when Apollo purchased one-third of Athene's common stock.  Both times, Rowan declined.  In the fall of 2020, Black

raised the possibility with Rowan a third time, in a private conversation that took place in the midst of Apollo's internal discussions of the potential merger of Athene and Apollo.  Rowan for the first time agreed that, depending on how discussions concerning the merger unfolded, becoming Apollo's CEO might be the right decision.  Harris was not privy to the conversation, and Black never asked Harris to consider the possibility that he might one day replace Black.

50.     On October 12, 2020, The New York Times published a story detailing Black's relationship with Jeffrey Epstein.  The article, authored by Matthew Goldstein, reported that Black had paid Epstein "at least $50 million" and that "[i]t was not clear what kind of services Mr. Epstein provided to Mr. Black."

**Ganieva's Engagement with Wigdor**

51.     As early as September 29, 2020, Ganieva initiated contact with Goldstein, the author of the October 12, 2020 article.

52.     On October 1, 2020, Ganieva sent Goldstein a text message on WhatsApp, asking whether sharing her "story" anonymously was an option.  Goldstein informed her, "[i]t is possible for us not to use your name but we would still need to document everything.  All the text messages you have from Leon and would need to talk to any friends you talked to about the situation.  We need to do that to assure the reader your story stands up and can be backed up by contemporaneous factors."

53.     The October 12, 2020 New York Times story regarding Black's connection to Epstein included no mention of or reference to Ganieva, anonymously or otherwise.

54.     On October 30, 2020, Ganieva sent a WhatsApp message to Goldstein, stating: "Did you speak to Wigdor?  He is reaching out about a reporter wanting to speak to me."  Ganieva's message referred to Douglas Wigdor, the co-founder of Defendant Wigdor LLP.  Wigdor markets

itself as skilled in utilizing the litigation process to extract pre-complaint settlements. As Wigdor's website states: "Because we have a reputation for obtaining multi-million dollar verdicts, we are able to settle the majority of our cases without the need for even filing complaints."

55.     Goldstein responded to Ganieva's message about Wigdor, writing, "[w]e are supposed to talk. But not sure if there is another reporter on this too from another publication." Goldstein continued, "[t]ho I'm pretty certain it's me. Are you ok with him talking to me on background."

56.     On November 5, 2020, Ganieva confirmed she would permit Wigdor to speak to Goldstein on her behalf, stating, "P.S. I will let [W]igdor know that if you want to speak with him you can."

57.     On November 10, 2020, Goldstein confirmed his plans to speak to Wigdor, writing to Ganieva, "[h]ey there. Talking to Wigdor tomorrow afternoon. He wanted to review his notes. Let's talk on Wednesday if you are free or Thursday sorta wanted to wait until I spoke to Doug."

58.     On November 16, 2020, Goldstein informed Ganieva, again via WhatsApp message, that he "[h]ad good chat with Wigdor over the weekend."

59.     On January 10, 2022, Wigdor represented that it was "frivolous" to argue that it had conspired with public relations flacks as early as March 2021, "before Ms. Ganieva ever retained Wigdor." (ECF No. 33-1 at 11.) Wigdor represented that Ganieva formally retained the firm in April 2021. But those representations were misleading at best. Wigdor was at a minimum actively communicating with Ganieva as early as October 2020 and was speaking with reporters on Ganieva's behalf. Wigdor was coordinating Ganieva's press strategy and working to promote her lies long before Ganieva formally retained the firm in April 2021.

**Harris's Unsuccessful Attempt To Buy the New York Mets**

60.     In July 2020, Harris – then the owner of the New Jersey Devils and Philadelphia 76ers – was reported to be bidding on acquiring the New York Mets.  Harris's principal competitor was Steve Cohen, the billionaire founder of SAC Capital.  On August 12, 2020, as the bidding war between Harris and Cohen was escalating, Josh Kosman of the New York Post published an article entitled, "Discrimination claims haunting Steve Cohen's dream of owning the Mets."  Kosman – who would later conduct and publish an "exclusive interview" with Ganieva, and who is known to be close to Defendant Rubenstein, who trumpets his purported influence with the New York Post – reported that multiple "complaints by ex-female employees" of Cohen's hedge fund had been filed in recent months.

61.     According to the article, Kosman learned of these complaints when "a man using technology to disguise his voice" called Kosman to provide information about these allegations. According to the article, the mystery caller suggested the complaints "could have a negative impact on Cohen's bid for the Mets."  The Kosman article reported that a "source close to a rival bidder," stated that the story was "[expletive] huge" and that "'[a]ll the [other Major League Baseball] owners need is another excuse' to refuse Cohen the team."

62.     Kosman's article explicitly identified two complaints against Cohen's office filed with the Connecticut Commission on Human Rights and Opportunities.  One of those complainants was represented by Jeanne Christensen of Defendant Wigdor, the very same lawyer who is representing Ganieva in state court against Black.

**The Enterprise Positions Harris as Black's Successor**

63.     In the weeks that followed The New York Times's article on Black's links to Epstein, a wave of negative articles were written about Black, a man who, while well-known in

the business community, is hardly a household name. Meanwhile, on October 28, 2020, the Financial Times published a story positioning Harris as Black's successor entitled, "Investors imagine private equity group Apollo after Leon Black." According to the article, an internal Apollo email responding to The New York Times article and signed by Harris "seemed to mark a passage of power at the formidable Wall Street firm." The article quoted a "former insider" as saying, "'[i]t's all Josh now.'"

64.     On October 31, 2020, in the midst of this barrage of negative reporting about Black, The Wall Street Journal published a flattering profile of Harris entitled, "A $433 Billion Wall Street Giant Has a Reputation Problem. It's Josh Harris's Job to Fix It." Harris and members of the enterprise worked secretly with The Wall Street Journal, and were the source of its reporting about Apollo's purported "cutthroat culture and rough-edged image," and about Harris "trying to move past the firm's reputation for using sharp elbows to pursue profits at all costs." Harris and members of the enterprise were also the source of the statement that Harris was "trying to modernize [Apollo's] corporate structure, creating a broader shared power arrangement that could one day form the basis of the succession plan." In fact, within Apollo, much of senior management was puzzled by the article because Harris was known to have opposed the corporate governance reforms mentioned in the article, and was viewed as contributing to an intense and abusive environment at Apollo.

65.     Many of Apollo's limited partners were large public pension funds that Harris expected would be concerned about Black's reported links to Epstein. An exodus of important institutional investors would have put tremendous pressure on Black to leave. But, despite Harris's efforts to stoke investor concerns, no flood of withdrawals followed. Among other things, Black's response to The New York Times story encouraged Apollo's investors to reserve their judgment

and keep faith with Black's long track record of investment success and leadership.

**Black Urges Apollo To Conduct an Independent Investigation of the Epstein Allegations**

66.     Black responded to the issues raised in The New York Times article and in the barrage of negative follow-up articles by confronting them directly.  Knowing that he had nothing to hide, he invited the independent directors of Apollo to investigate his relationship with Epstein. In a statement to The New York Times, Black explained that the payments were for tax and estate planning services.  Black's statement went on to say that Black "continue[d] to be appalled by the conduct that led to the criminal charges against Mr. Epstein," and "deeply regret[ted] having any involvement with him."

67.     On or about October 20, 2020, Black attended a regularly scheduled meeting of Apollo's Board of Directors.  At the meeting, Black stated that "it is in the best interests of Apollo, our employees, our shareholders and our LPs for there to be an independent review.  Proceeding in this manner is the best way to assure all of our stakeholders that they have all of the relevant facts."  Black requested that the Board's Conflicts Committee (comprised of the independent directors) retain outside counsel to conduct a thorough review of his relationship with Epstein and independently confirm that Epstein never did any business with Apollo.

68.     To evaluate whether Black's stewardship of Apollo continued to be in the best interest of its shareholders, Apollo delegated exclusive responsibility for investigating these issues to Apollo's independent directors on the Conflicts Committee.  Apollo excluded management directors from overseeing the investigation to ensure the credibility and integrity of the investigation's results.  The independent directors on Apollo's Conflicts Committee retained Andrew Levander, a widely-respected former Assistant United States Attorney for the Southern District of New York, of Dechert to conduct an investigation.  The Conflicts Committee retained Dechert to investigate not only the relationship between Black and Epstein, but also "the financial

or other relationship, if any, between Apollo . . . and Epstein."

69.     Black cooperated fully with the investigation conducted on behalf of Apollo's independent directors.  Black provided thousands of documents and sat for an in-depth interview, and directed members of his family office to do the same.  During an intensive investigation spanning several months, the independent investigators reviewed more than 60,000 documents dating back to 1998, and conducted more than 20 witness interviews, including an interview of Harris.  Apollo's independent directors directed substantial corporate resources – including millions of dollars and a considerable investment of both their own time and that of Apollo management – to ensure the investigation's thoroughness and rigor.

70.     Following the October 12, 2020 New York Times article, the Apollo Board made a number of business judgments that it believed were in the best interests of Apollo and its shareholders.  Among other things, Apollo elected to permit Black to continue to serve as CEO and Chairman of Apollo; ratified Black's ongoing efforts to pursue the possibility of merging with Athene; and agreed to Black's request that the independent directors conduct a thorough, independent investigation about the relationship between Black and Epstein.  In a public filing on October 21, 2020, Apollo stated: "The Company fully supports this review and looks forward to the Committee completing its work and releasing its conclusions expeditiously."

71.     Apollo intended to rely on the results of the investigation to make significant judgments on behalf of the company and its shareholders.  Depending on the outcome of the investigation, Apollo might, among other possibilities, sever all association with Black, or allow him to maintain his leadership position at Apollo.  These judgments were of the highest consequence.  As Apollo disclosed to investors, the "success of our business depends on the efforts, judgment and personal reputations of our Managing Partners," including Black.  Accordingly,

"[t]he loss of the services" of Black "would have a material adverse effect on us, including our ability to retain and attract investors."  Indeed, investors in several of Apollo's funds had the right to terminate their commitment period in the event that certain "'key persons,'" including Black, were no longer able to "devote the requisite time to our businesses."

72.     Given the importance of these issues, Apollo devoted substantial resources to ensure the Dechert investigation and its findings were conducted and presented with the utmost thoroughness and integrity.  Apollo paid substantial legal fees to Dechert for its work on behalf of the independent directors.

**Harris Undermines Confidence in the Independent Investigation**

73.     Rather than respect Apollo's decision to delegate responsibility for conducting a full and fair investigation to Apollo's independent directors, Harris, working through the enterprise and in flagrant violation of his fiduciary duties, engaged in secret efforts to interfere, influence, and discredit the investigation.  These efforts included using the assistance of outside lawyers and media consulting firms – including firms that were then working as agents and fiduciaries of Apollo – to undermine confidence in the competence and sufficiency of the Dechert investigation. By doing so, Harris deprived Apollo of the value of an important corporate asset, one created through the expenditure of significant time, money, and resources.

74.     These efforts included retaining two other prominent crisis management and public relations firms in addition to RUBENSTEIN – BerlinRosen (a firm that specifically promotes itself for its ability to "blunt the opposition's efforts" and "leverage the media" in litigation, with the "speed and intensity of a political campaign"), and Finsbury Glover Hering (a global crisis management firm), to assist the enterprise.  The enterprise also retained the services of three prominent law firms, at least two of which were also representing Apollo at the time.  These professionals worked in a coordinated effort through the enterprise to discredit Black, to

undermine the work of Apollo's independent directors, and to challenge Apollo's decisions on critical strategic issues. These efforts were conducted in secret and were contrary to the interests of Apollo and its shareholders.

75.     As the Dechert investigation proceeded, Harris secretly approached Rowan. Harris told Rowan that Black's links to Epstein and the Dechert report might become damaging to Apollo. Harris proposed to Rowan that the two become co-CEOs immediately. Rowan responded to Harris that the better course of action would be to wait for the conclusions of the Dechert report and, in the interim, to empower Scott Kleinman and Jim Zelter with more operational authority. Harris did not agree.

76.     On January 7, 2021, Evan Zemsky, who was employed by Apollo as Harris's Chief of Staff, but who was secretly working on behalf of the enterprise, sent himself an email attaching a presentation prepared for Harris. The presentation identified four prominent litigators, including Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), to consider to initiate litigation against Black or Apollo. The litigators came expressly recommended by the law firms working with the enterprise, including firms that owed Apollo duties at the time, and the presentation included commentary as to the strengths and weaknesses of each as adversaries to Black and Apollo.

77.     On or about January 19, 2021, as the investigation commissioned by Apollo's independent directors approached its conclusion, members of the enterprise began to meet daily, and sometimes multiple times per day.

78.     On or about January 23, 2021, Harris learned that the Dechert report would be highly favorable to Black, and that facts favorable to Black would be presented in a public report. Rather than respecting the judgment of Apollo and its independent directors, and in circumvention

of the corporate governance processes that Apollo had put in place with respect to these issues, Harris improperly reached out to at least two of Apollo's independent directors, falsely stating that Dechert's forthcoming report was a whitewash and not thorough enough, and urging them to reject it before even reviewing it.  Harris, who did not have access to the evidence available to the committee, had no legitimate basis to disparage the investigation or its conclusions.

79.     On or about January 23, 2021, Harris spoke to A.B. Krongard, a former Executive Director of the CIA, and one of the three independent directors who had hired Dechert to conduct the investigation.  Harris made disparaging remarks about the integrity of the investigation and criticized its conclusions.  Krongard responded by telling Harris that this was "not his first rodeo," and warned Harris that if he did not have evidence that was unavailable to Dechert, it was improper for him to criticize the investigation by the independent directors, or interfere with Dechert's presentation of its report to the Apollo Board.

80.     Harris had no information that the independent investigators did not have access to, because Dechert had interviewed Harris in the course of its investigation.  Further, Harris had agency, fiduciary, and other duties to disclose all relevant information to the independent directors.

81.     During his discussions with Krongard and other independent directors, Harris was subject to the duties of undivided loyalty, candor, and care.  At no time did Harris inform any of the independent directors that at the same time he was criticizing the Dechert report and the work of Apollo's independent directors, he was secretly engaged in extensive efforts, through the enterprise, to inflict financial and reputational harm on Black and Apollo, and thereby force Black's resignation from Apollo.

82.     On the same day that Harris spoke to Krongard, an emissary of Harris's approached Alex Spiro of Quinn Emanuel, one of the four firms identified by the enterprise in its search for

aggressive litigators.  According to the emissary to Spiro, he was being sought out on behalf of a faction at Apollo engaged in "cagey business" and looking for a litigator who could be "adverse to Leon Black" on behalf of a woman later identified as Ganieva.

83.    In addition to failing to disclose his efforts to secure representation for Ganieva, at no time did Harris inform the independent directors that some of the professionals he had secretly retained to work through the enterprise – including Rubenstein – were also Apollo's agents and were being paid by Apollo.  Nor did he inform the independent directors that he was secretly engaged in efforts to investigate Black's relationship with Epstein and was engaged in other efforts that were circumventing and undermining Apollo's well considered governance processes.  But he was, as reflected in a March 21, 2021 email from Zemsky discussing an ongoing search for "knowledge of additional allegations" against Black, and the January 23, 2021 approach to Spiro to represent Ganieva, "adverse to Leon Black."  During his discussions with Krongard and other directors, Harris was subject to the duties of undivided loyalty, candor, and care.

**The Independent Investigation Exonerates Black and Apollo of Wrongdoing**

84.    Dechert presented the findings of its independent investigation to Apollo's Board of Directors on January 24, 2021.

85.    Dechert informed the Apollo Board that it found "no evidence that Black or any employee of [Black's] Family Office or Apollo was involved in any way with Epstein's criminal activities at any time."  Dechert found "no evidence that Epstein ever introduced Black, or offered to introduce Black, to any underage woman."  Dechert also found "no evidence suggesting knowledge of any other of Epstein's criminal activity or the scope and details of such activity, at any time prior to such activities being publicly reported."

86.    Dechert explained that the fees Black paid Epstein were for "Epstein's legitimate advice on trust and estate planning, tax issues, issues relating to artwork, Black's airplane, Black's

yacht, and other similar matters, philanthropic issues, and the operation of the Family Office." The report found that "such advice was vetted consistently by Black's other advisors" – including several major law firms – and that the fees paid "were intended to be proportional to the value provided," value that "witnesses generally agreed . . . conferred more than $1 billion and as much as $2 billion or more in value to Black."

87.    The investigators, consistent with the mandate of the independent directors, also thoroughly reviewed any ties between Apollo and Epstein.  Their report found that other than an Epstein-linked entity purchasing a de minimis amount of Apollo stock, there was "no evidence of Epstein or any Epstein entity having any relationship with Apollo or any Apollo-managed fund."

88.    In addition to reviewing the Dechert report, the Board also made several critical personnel and governance decisions at the January 24, 2021 meeting.  First, the Board supported the executive committee's decision to appoint Rowan to succeed Black as CEO on or before Black's 70th birthday.  According to Apollo, Rowan's appointment reflected "the complexion and continued evolution of our business, and [Rowan's] unique contributions to the growth of Apollo as credit and our permanent capital vehicles," – a reference to Athene, among other initiatives – "now make up over 70% of our more than $455b AUM."  Second, the Board decided to add a total of six new directors, two management directors – Apollo co-Presidents Kleinman and Zelter – and four independent directors.  Two of the four new independent directors, Pamela Joyner and Siddhartha Mukherjee, were proposed by Black and appointed at the meeting.  Third, during the meeting, Black requested that the Board consider additional measures to enhance corporate governance, including changing the voting structure of Apollo shares "to ensure that the voting rights of our shareholders align with their economic interests," and taking steps to better "empower the full Board to oversee all aspects of the company."  Taken together, these decisions dramatically

reduced Harris's influence and control over Apollo's affairs.

89.     On January 25, 2021, Apollo publicly disclosed the results of the Dechert report, emphasizing the thoroughness of the investigation.   Apollo also announced that Black would remain Chairman of the Board, and would retire as CEO on or before his 70th birthday in July of 2022.  Finally, Apollo announced that the executive committee appointed Rowan to be Apollo's next CEO.

### The Enterprise Escalates Efforts To Remove Black

90.     On January 26, 2021, at 3:45am, Harris forwarded the Apollo announcement to participants in the enterprise, including Rubenstein.  One of the lawyers responded, "You ok?"

91.     Given the events of January 25, 2021, Black remained the major impediment to Harris's ambition to succeed Black as Apollo's CEO.  It was therefore essential to Harris that Black be removed as CEO as soon as possible; that Black not be permitted to retain the role of Chairman of the Board; that directors loyal and sympathetic to Black be removed; and that Black's premature departure be used as the occasion to appoint Harris as co-CEO.

92.     As detailed below, Harris, Rubenstein, and other members of the enterprise escalated their efforts to execute on the fraudulent scheme to inflict economic and reputational harm on Black and Apollo, weaken Black's support at Apollo, and force his separation from the company.  Among the methods by which members of the enterprise sought to accomplish these goals was to attack the conclusions of the independent investigation.  Members of the enterprise began to undermine Black's support on Apollo's Board and worked to appoint directors supportive of Harris.  Finally, the enterprise manufactured and disseminated flat out lies to discredit Black.

93.     Members of the enterprise worked in secret, in order to disguise their disloyalty to Apollo and its shareholders.  On January 27, 2021, Harris's Chief of Staff (and Apollo employee) Zemsky wrote, in an email from his Apollo email address, "ONLY USE SLACK WHEN

COMMUNICATING WITH JOSH . . . Even if JH pings you on whatsapp – it should go to slack." Slack is a communications platform that allows users to send what it describes as "self destructing messages." Zemsky's email strongly suggests the enterprise's communications were too sensitive, and too clearly against Apollo's interests, to be carried out on Apollo's servers, or to be recorded in any form.

94.    The enterprise, through Rubenstein and the other media consultants, contacted numerous media outlets, including Bloomberg, The Wall Street Journal, and the New York Post. Among the purposes of these contacts was to undermine the Dechert report and to call into question the report's conclusion that Black had no involvement in or even knowledge of any of Epstein's criminal activities.

95.    On January 25, 2021, Harris was in communication with one of his potential nominees to the Apollo Board.  During the course of their discussions about the Dechert report and the Board's decision to permit Black to remain at Apollo, the future Board member stated in an email exchange with Harris: "You are absolutely right.  There's only one reasonable explanation for why Black made all those payments to Epstein."  The potential Board member continued, "you are the right person to be CEO."  He wrote, "I wish there was something I could do to help you." He then observed that, in "looking at the bios of your board members," they were not the right people to advance Harris, and suggested that Harris needed "independent . . . minded directors." Like himself.

96.    Later the same day, Harris forwarded the future Board member's email to a lawyer advising the enterprise – a lawyer whose firm Apollo was paying significant fees – who responded to the suggestion that Harris should have been appointed CEO, and that the pro-Black composition of the Apollo Board was Harris's main impediment to becoming CEO, by writing, "[e]xactly."

97.     On January 27, 2021, Harris and the future Board member spoke via Zoom.  After the call, the future Board member told Harris that he needed to ensure that the newly-appointed Apollo directors would have "safety in numbers," and "strong peers."  He then suggested how Apollo's Board could be restructured in a way that would enable Harris to cause Black to be removed.  Referencing Harris's attempts to discredit the Dechert report and Harris's desire to remove Black, the future Board member wrote, "[i]f things break, they break fast.  Everything correlates.  Consider what happened to Harvey Weinstein's firm.  There will be lots more digging into these stories."  Soon thereafter, Harris appointed him to the Apollo Board, where he serves to this day.

98.     On April 25, 2021, Kosman, who was a longstanding close professional contact of Rubenstein, published an article in the New York Post impugning the independence of Joyner and Mukherjee, Black's nominees to serve as independent directors.  The story cited "sources close to the situation" for its (inaccurate) discussion of confidential Apollo Board processes.

99.     Apollo issued a statement included in the story, stating that all its directors had "impeccable credentials and offer significant value to the Apollo Board"; that "[n]o member of the board has raised any concerns regarding the qualifications or commitment of the independent directors"; that new directors were "unanimously approved after extensive due diligence"; and that "[i]t is disappointing that the integrity and independence of such highly accomplished individuals is being questioned by anonymous, unsubstantiated accusations."  Mukherjee announced shortly thereafter that he would step down.

### Ganieva's Defamatory Public Statements About Black

100.    On or about March 11, 2021, the Twitter account @GuzelGanieva3 was created.

101.    Between March 11, 2021 and March 17, 2021, Ganieva, with help from others, composed a series of tweets in which she would publicly and falsely accuse Black of criminal acts,

including sexual abuse, threats, harassment, and other unlawful behavior.  Before Ganieva posted any tweets, only three other Twitter users followed her account: Ronan Farrow of The New Yorker, Matthew Goldstein of The New York Times, and Richard McHugh, then of NBC.  It is unlikely that these three well-credentialed reporters – each of whom had published articles regarding sexual harassment allegations – happened upon Ganieva's newly created account by accident.  Rather, the initial followers were presumably, and indeed most probably, invited or recruited by the enterprise in advance of Ganieva's planned attack on Black, in order to generate additional unfavorable reporting on Black.

102.    On March 17, 2021, Ganieva posted three tweets.  She wrote: "Although I am a private person, in light of the recent media coverage, I think I have an obligation to make a statement regarding Apollo Global Management's CEO and Chairman, Leon Black.  I was sexually harassed and abused by him for years.  It started in 2008 when I met with him to discuss work.  While he understood my career aspirations, he could not understand me when I refused his sexual advances.  I was bullied, manipulated, threatened, and coerced.  Similarly, under duress, I was forced to sign an NDA in 2015.  I am breaking my silence now because I do not want this type of predatory behavior to continue happening to other women.  #MeToo #LeonBlack."  The conspicuous reference to "Apollo Global Management" constitutes strong circumstantial evidence that Ganieva's tweets were designed to apply pressure on Apollo to remove Black.

103.    However, none of Ganieva's three hand-picked followers on Twitter published anything in response to Ganieva's false allegations.  They were not the only ones to say no: not only Farrow, Goldstein, and McHugh, but also Julie Brown of the Miami Herald, who was responsible for breaking the Epstein story, and to whom Ganieva emailed her false accusations on multiple occasions, including in the weeks before the tweets, and Jodi Kantor of The New York

Times, whom Ganieva contacted in 2019.

104.    On March 25, 2021, Ganieva sent Goldstein of The New York Times a WhatsApp message stating: "Two PIs showed up in my place yesterday. They passed through the doorman by showing a badge.  They told me that they work for a lawyer Alex Spiro and he wants to represent me."  As described above, in January 2021 an emissary of Harris seeking representation for Ganieva on behalf of a faction at Apollo engaged in "cagey business" had reached out to Spiro. Following Ganieva's tweets, Spiro attempted to secure Ganieva as a client.

### Black's Resignation from Apollo

105.    Black learned about Ganieva's tweets shortly after March 17, 2021.  Black learned that Harris, too, knew about the tweets at that time, despite the fact that they had not been widely liked, retweeted, or commented on.

106.    Black discussed the tweets with Rowan, his chosen successor.  In light of the serious nature of the allegations, and their potential adverse impact on Apollo's business, Black and Rowan agreed Black needed to resign as Chairman and CEO to protect Apollo.  Black thought it was in the best interests of Apollo to defend himself without involving Apollo in the fight.  Black planned to continue to play an informal advisory role at Apollo, lending his several decades of investment experience and acumen to the firm.

107.    On March 21, 2021, Black resigned as CEO, Director, and Chairman.  As a result, Black lost his office, health insurance, and other valuable benefits including administrative support and a car and driver.  Black was formally cut off from an institution he spent his life building, and in which he remains the single largest shareholder.

108.    Stripped of his role as Chairman and forced to transition from the CEO role months ahead of schedule, Black nevertheless remained committed to the company to which he had devoted his life.  The week of March 29, 2021, Black attended, in his capacity as Apollo's largest

shareholder, a meeting with certain Apollo executives.  As described below, shortly thereafter, Black's attendance at the informal meeting – which was not press-worthy – somehow made its way into the press.

109.     Black's suspicions that Ganieva's tweets were part of an orchestrated attack to remove him from Apollo were soon confirmed.  On April 8, 2021, Kosman published an "exclusive interview" with Ganieva.  The New York Post article included Ganieva's false claim that "Black's abuse 'was over a long period of time and it was tragic.'"

110.     On or about April 8, 2021, Black issued a statement regarding his relationship with Ganieva: "I foolishly had a consensual affair with Ganieva that ended more than seven years ago. Any allegation of harassment or any other inappropriate behavior towards her is completely fabricated."  Black also stated that Ganieva had extorted him for years and that he had "made substantial monetary payments to her, based on her threats to go public concerning our relationship, in an attempt to spare my family from public embarrassment."

111.     Days after Ganieva's defamatory statement to the New York Post was published, Black was subject to yet another press attack.  On April 13, 2021, the Financial Times published an article entitled "Leon Black attended Apollo Global meeting days after resignation."  The article suggested that Black's attendance was improper, and that his continued presence "could undermine [Apollo's] efforts . . . to emerge from the shadow of its billionaire co-founder."  The article did not mention that it was in the best interests of the company for Black to continue providing his unique knowledge and insight to members of Apollo's executive committee.

112.     In response to the story, Apollo and Black severed even informal ties.  Apollo was deprived of the benefit of the financial genius, strategic vision, and operational competence that had generated tens of billions of dollars in shareholder value over the prior 30 years.

**Ganieva and Wigdor's Sham Litigation**

113.    On or around April 9, 2021, Ganieva formally retained Wigdor.  However, Wigdor had been advising Ganieva at least as early as October 2020 in connection with her efforts to generate negative press stories about Black.  It is not clear why Wigdor and Ganieva waited until April 2021 to execute a formal engagement letter, or whether anyone other than Ganieva was involved in that decision.  Wigdor did not reach out to Black before filing Ganieva's complaint, nor did it make a settlement demand.  Wigdor would go on to file not one but three different complaints on behalf of Ganieva, each of which was laden with lies disproven by Ganieva's own statements, which Black had recorded and preserved.

114.    On June 1, 2021, Ganieva and Wigdor filed the first of these complaints in New York Supreme Court, New York County.  (*See generally* Complaint, *Ganieva v. Black*, No. 155262/2021 (N.Y. Sup. Ct. June 1, 2021) ("Original Compl."), attached hereto as Ex. 1.)  The Original Complaint asserted four claims: two for defamation based on Black's public statement rebutting her defamatory tweets; a claim for intentional infliction of emotional distress based on abuse Black supposedly heaped on her during the duration of their affair; and a claim under the New York City Gender Motivated Violence Act based on a purported sexual assault, the centerpiece of the Original Complaint.  (*Id*. ¶¶ 91-130.)

115.    The assault supposedly took place seven years earlier, on July 6, 2014, when the Original Complaint alleges that Black "barged" into Ganieva's apartment "suddenly" and without warning.  (*Id*. ¶ 47.)  Ganieva then allegedly became unwell and was "limp and unable to move." (*Id.* ¶¶ 47, 51.)  Ganieva made these allegations even though contemporaneous text messages show that she had invited Black to her apartment.  Ganieva had texted Black, "Baby . . . I'm all alone. Let's get together soon. I miss you. Xoxo," and on the evening of July 6, had asked Black to bring her a bottle of wine.  (Answer, *Ganieva v. Black*, No. 155262/2021, ¶ 49 (N.Y. Sup. Ct. July 19,

33

2021) ("Answer"), attached hereto as Ex. 2.)

116.    Within hours of Wigdor filing Ganieva's Original Complaint, the New York Post's Josh Kosman, who had earlier coordinated with Rubenstein to publish Ganieva's April 2021 "exclusive interview," published an article quoting Ganieva's false allegations at length.  The next day, Kosman authored yet another article about Ganieva's sham complaint.  Rehashing Ganieva's false allegations, Kosman, paraphrasing "legal experts," commented that the "silver lining" of Ganieva's suit was that it did not "mention Epstein, and therefore doesn't provide grounds for digging into matter pertaining to the dead pedophile."

117.    Black responded to the Original Complaint with an Answer filed on July 19, 2021. The Answer contradicted the Original Complaint's claims with Ganieva's own words.  A week before the supposed assault, on June 28, Ganieva sent the text suggesting she and Black should get together "soon."  Then, on July 6, the day of the supposed assault, it was Ganieva who wrote to Black, unsolicited: "This is love.  I need you."  (Ex. 2, Answer ¶ 49.)

118.    In response, Black said that he would be driving back to New York City the evening of July 6, and inquired if he could "come over and tuck you in at 10:30?"  (*Id.*)  Ganieva responded, "[a]aah. Can you please bring a bottle of wine if you can?"  (*Id.*)  He agreed.

119.    Ganieva reached out to Black first thing the following morning with a message of thanks and love: "Good morning. It was very nice to see you last night. I already feel better . . . . I love you and thank you!!! Xoxoxoxoxo and more love."  (*Id.* ¶ 52.)  And on July 9, she thanked Black again, asked if he wanted to get together, and sent "lots of love."  (*Id.* ¶ 53.)  When Black did not respond, Ganieva reached out yet again the next day to try to get together.  (*Id.*)

120.    Contrary to the claim in the Original Complaint that "[a]fter this rape, Ganieva took her son and left New York to physically distance herself from Black," (Ex. 1, Original Compl.

¶ 55), Ganieva and Black saw each other several times, at her request, between July 6, when Black supposedly raped her, and July 30, when she texted him from the plane as she was departing: "I love you and miss you already." (Ex. 2, Answer ¶ 58.) Black's Answer – entirely corroborated by contemporaneous text messages – exposed the allegation of sexual assault as a fraudulent sham.

121.   Ganieva's claims that Black defamed her in a public statement in which he accurately described her extortion are no less of a sham. Truth is an absolute defense to defamation. Ganieva's extortion was captured on tape. In the summer of 2015, Ganieva repeatedly warned that if Black did not pay her $100 million, she would report their affair to Black's wife, the Apollo Board, and the press.

122.   Ganieva also alleged that she was threatened by Black and that he forced her to accept the agreement to pay her $100,000 per month in exchange for Ganieva not publicizing their relationship. Her Original Complaint offers supposed direct quotations from Black in this regard: "If you do not take the money, I will put you in prison," and "[i]f you do not take the money, I will destroy your life." (Ex. 1, Original Compl. ¶ 3; *see also id.* ¶ 63.) Black's recordings of his conversations with Ganieva demonstrate the falsity of these claims. The recordings make clear that Ganieva was pleased with the arrangement. After agreeing to accept millions of dollars in exchange for not speaking publicly about their affair, she discussed her investment and travel plans, and laughed about the fact that she was "a woman of means now." (Ex. 2, Answer ¶ 40.) Shortly after their meeting, she texted him: "[t]hank you for everything. Talk soon xoxo." (*Id.* ¶ 41.)

### Ganieva's Amended Complaint

123.   Black's Answer set forth detailed evidence demonstrating that Ganieva's allegations were false. On August 9, 2021, in what was solely a malicious attempt to injure Black further, Ganieva and Wigdor filed an Amended Complaint almost twice as long as the original.

(*See* Am. Compl., *Ganieva v. Black*, No. 155262/2021 (N.Y. Sup. Ct. Aug. 9, 2021) ("Am. Compl."), attached hereto as Ex. 3.)   The new allegations focused almost entirely on Jeffrey Epstein, who was barely mentioned in the Original Complaint.   The new allegations were scandalous, intentionally headline-grabbing, and, most importantly, entirely fabricated.   The newfound allegations regarding Epstein appear nowhere in any of the actual Causes of Action asserted in any iteration of Ganieva's complaints, and are not relevant to any claim.   The allegations serve only to defame Black, and not to advance any legitimate litigation objective.

124.    In her Amended Complaint, Ganieva alleged being kidnapped by Black in October 2008, flown against her will to Palm Beach, Florida on Black's private plane, taken to Epstein's home there, and coerced into a meeting with Epstein, Black, and one of Epstein's associates, Sarah Kellen, for the purpose of gratifying Epstein's sexual desire.  (Ex. 3, Am. Compl. ¶¶ 75-108.) During that meeting, Kellen supposedly told Ganieva that Epstein and Black were "sex addicts." (*Id*. ¶ 97.)  These allegations are demonstrably false.

125.    Although the Amended Complaint contains boldfaced, block-text quotations supposedly from Kellen, it identifies no documentation, recordings, or other memorialization of the alleged conversation between Ganieva and Kellen some 13 years ago.  (*Id*.)  And like so much of the various complaints Ganieva filed, the alleged quotations from Kellen are fabrications. Kellen had no such conversation with Ganieva; indeed, Kellen never met Ganieva.

126.    Black's Answer to the Amended Complaint (Answer to Am. Compl., *Ganieva v. Black*, No. 155262/2021 (N.Y. Sup. Ct. Sept. 8, 2021), attached hereto as Ex. 4), again conclusively debunked Ganieva's lies.  Black used flight manifests to establish that he and Ganieva never took the same-day round trip flight to Florida in October 2008 that is described in the Amended Complaint.  In fact, they never flew to Florida together at any point that entire year.

Another lie.  Moreover, the contemporaneous recordings of Black and Ganieva from the summer of 2015, shortly after she began extorting him, call into question the Amended Complaint's allegation that Ganieva ever even met Epstein, let alone that their meeting was the result of a kidnapping by Black.

127.   Faced with documentary evidence that the core allegations in the Amended Complaint were also false, Ganieva on September 20, 2021 filed a proposed Second Amended Complaint.  (*See* Second Amended Compl., *Ganieva v. Black*, No. 155262/2021 (N.Y. Sup. Ct. Sept. 20, 2021) ("Second Am. Compl."), attached hereto as Ex. 5.)

128.   Ganieva and Wigdor's proposed Second Amended Complaint offers a new round of unfounded and defamatory allegations, including several that have nothing to do with Ganieva's claims.   These gratuitous allegations include a tale of an anonymous massage at Epstein's Manhattan home some two decades ago for which the Jane Doe referenced was supposedly paid $5,000, and an entire section labeled, "Other Evidence of Black's Close Ties to Epstein's Private Conduct."  (*Id.* ¶¶ 145-150.)  Ganieva and Wigdor added these extraneous allegations to apply additional settlement pressure on Black.

129.   Wigdor's representation of Ganieva has been marked by a variety of dilatory tactics inconsistent with pursuing a bona fide claim.  On September 27, 2021, an in-person conference was called because Black's lawyers' letters and phone calls were simply being ignored.  Discovery deadlines passed with no action.  Wigdor also falsely claimed that it does not, as a matter of firm practice, sign protective orders to govern the disclosure of sensitive materials.  Wigdor relied on this false claim both to block progress on discovery and as a pretext to ignore the tape recordings, texts, and other information that demonstrate Ganieva engaged in illegal extortion.

130.   Ganieva and her confederates have refused to provide the most basic items that a

party seeks in discovery – items including phone records showing the existence (not the substance) of her communications with Rubenstein, among others.  Ganieva's attorneys at Wigdor have even blocked discovery of her own telephone and related records in the weeks and months leading up to the Original Complaint.  At a court appearance in the state court action, on January 7, 2022, Ganieva's lawyers at Wigdor made no mention of seeking to contest Black's subpoena for her phone records, and then made a motion late that very evening that blocked the planned release of Ms. Ganieva's phone records, due four days later.

131.    The limited phone records requested will reveal in greater detail Ganieva's coordination with the other members of the enterprise.  Indeed, the limited discovery provided since the filing of Black's Amended Complaint in this action (ECF No. 46) has revealed that, contrary to Wigdor's suggestion, Ganieva and Wigdor worked together to spread her false claims to the press as early as October 2020.

132.    Ganieva and Wigdor recently proposed extending discovery until at least January 2023; delaying the filing of dispositive motions until July 2023; and thereby effectively delaying any judicial resolution of the litigation for nearly two years.  As the state court action hangs in limbo as a result of Ganieva's and Wigdor's obstructionism, the enterprise continues to spread defamatory stories in both the mainstream press and on social media.

**Ganieva Makes a False Report to the Manhattan District Attorney**

133.    In or around the early fall of 2021, Ganieva filed a false report with the Manhattan District Attorney, claiming Black raped and sexual assaulted her.  As a matter of policy, the Manhattan District Attorney is obligated to examine every complaint of sex abuse, regardless of merit.  On October 25, 2021, Vanity Fair's Gabe Sherman published an article titled, "Billionaire Leon Black is Being Investigated by the Manhattan D.A., Sources Say."

134.    Members of the enterprise, through Ganieva's state court action and related press

coverage, continue to target Black, and will continue to do so until their extortion succeeds or the law intervenes.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Civil Racketeer Influenced and Corrupt Organizations Act (RICO)
### 18 U.S.C. § 1962(c)
### (Against Harris, Rubenstein, and Ganieva)

135.    Black incorporates each of the allegations set forth above as if they were repeated and fully stated herein.

136.    Black is a person within the meaning of 18 U.S.C. § 1961(3).

137.    Harris, Rubenstein, and Ganieva (the RICO Defendants), each violated RICO, 18 U.S.C. § 1962(c).

138.    Each RICO Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

139.    On or before 2002 and continuing until the filing of this Second Amended Complaint, Harris was the funder, leader, and head of an association-in-fact enterprise formed to pursue the common purpose of advancing Harris's personal, financial, and reputational interests. At all relevant times, the enterprise was engaged in, and the activities of the enterprise affected, interstate and foreign commerce.  The enterprise was comprised of, among others:

    a.   HRS Management;

    b.   Certain individuals employed by HRS Management and/or Apollo;

    c.   Various lawyers and law firms, including Wigdor;

    d.   Various public relations professionals and public relations firms including Steven Rubenstein, RUBENSTEIN, BerlinRosen, and Finsbury Glover Hering;

    e.   Other professional advisors; and

      f.   Other individuals, including Ganieva.

140.   The RICO Defendants each conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs.

141.   Harris conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs, in that Harris:

      a.   Identified the goals of the enterprise, which included advancing his personal, financial, professional, and reputational interests;

      b.   Organized, funded, directed, and deployed the resources of the enterprise;

      c.   Utilized and directed employees of the Harris family office, Apollo employees, and legal, accounting, financial, and public relations advisors, including individuals and entities with agency, fiduciary, and other duties to Apollo, to conduct and participate in the enterprise's affairs;

      d.   Devised the schemes and artifices to defraud, set forth above;

      e.   Attempted to discredit the conclusions of the Dechert investigation conducted on behalf of Apollo's independent directors;

      f.   Delegated responsibility and managerial control over portions of the enterprise's affairs to Rubenstein, who Harris tasked with working in coordination with other enterprise members to generate media coverage favorable to Harris and harmful to Black and Apollo;

      g.   Directed Rubenstein to take actions on behalf of the enterprise in violation of Rubenstein's agency, fiduciary, and other duties to Apollo, in order to further the fraudulent schemes and artifices to defraud devised by Harris;

      h.   Entered, indirectly and through intermediaries, into a secret relationship with

Ganieva and her advisors to participate, directly and indirectly, in the enterprise's affairs and to further the schemes and artifices to defraud, described above;

i.  Assisted, indirectly and through intermediaries, Ganieva in her ongoing efforts to harass, embarrass, intimidate, and instill fear in Black by threatening to reveal to Black's family and the public, information about her personal and sexual relationship with Black and about Black's private payments to her;

j.  Facilitated, indirectly and through intermediaries, Ganieva in making defamatory and other misleading, false, embarrassing, and damaging statements about Black to the media;

k.  Facilitated, indirectly and through intermediaries, Ganieva in retaining lawyers to commence sham litigation against Black; and

l.  Misappropriated information and other valuable assets and property of Apollo, and diverted those Apollo resources to further his personal financial and professional interests, and to further the fraudulent schemes and artifices to defraud, described above.

142.  Rubenstein conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs, in that Rubenstein:

a.  Managed interactions between the enterprise and the media, including, but not limited to, representatives of the New York Post, The Wall Street Journal, Bloomberg, Vanity Fair, and the Financial Times, to generate favorable reporting about Harris, and unfavorable reporting about Black and Apollo that was contrary to the interests of Apollo and its shareholders, to further the

schemes and artifices to defraud, described above;

b.   While retained by Apollo, secretly participated in the operation and management of the enterprise's affairs by communicating with members of the media to generate negative and embarrassing reports about Black and Apollo that were contrary to the interests of Apollo and its shareholders;

c.   While retained by Apollo, engaged, directly and indirectly, in secret communications with the media to cause those outlets to publish information harmful to individuals Black recommended appointing to Apollo's Board of Directors, in order to limit the ability of Black and his supporters at Apollo from impeding Harris's efforts to become the CEO or co-CEO of Apollo; and

d.   In violation of his agency and fiduciary duties to Apollo, worked to publicize information about Ganieva's sham litigation.

143.   Ganieva conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs, in that Ganieva:

a.   Coordinated through intermediaries with Harris and Rubenstein in their efforts to intimidate, harass, embarrass, instill fear in, and extort Black;

b.   Publicized personal and embarrassing information about Black, including information about her personal and sexual relationship with Black, and made defamatory, misleading, false, and damaging statements about Black;

c.   On March 17, 2021, posted false and defamatory statements on Twitter, including statements that that she was "sexually harassed and abused by [Black] for years," that "[i]t started in 2008 when [she] met with [Black] to discuss work," that she "refused [Black's] sexual advances," that Black "bullied,

manipulated, threatened, and coerced" her, that Black "forced [her] to sign an NDA in 2015," and that Black engaged in "predatory behavior";

d.   Coordinated with Rubenstein to set up an interview with the New York Post in which she made false and defamatory statements, including a statement that Black had "abuse[d]" her "'over a long period of time and it was tragic,'" statements later published in an April 8, 2021 New York Post article;

e.   Authorized and continues to pursue a sham litigation campaign targeted at and designed to extort additional money and property from Black, in which Ganieva:

- Directed Wigdor to file a sham complaint in New York Supreme Court on or about June 1, 2021, seeking damages on her behalf, and publicizing her affair with Black, including detailed personal and sexual allegations, and falsely accusing Black of abuse, harassment, and sexual assault;

- Directed Wigdor to file an Amended Complaint on or about August 9, 2021, seeking damages on her behalf, and repeating and embellishing her earlier false claims of abuse, harassment, and sexual assault with gratuitous and false references to Epstein; and

- Directed Wigdor to file a proposed Second Amended Complaint on or about September 20, 2021, seeking damages on her behalf, and again repeating and further embellishing her false claims with additional gratuitous and false references to Epstein;

f.   Made a false report to the Manhattan District Attorney's Office claiming that Black raped and sexually assaulted her, and coordinated with Wigdor to

promote media coverage of the mandatory investigation triggered by the report; and

g. Accepted extortionate payments of $100,000 each in January 2021, February 2021, and March 2021 pursuant to her extortion agreement with Black.

144. Defendants' scienter is established by the pattern of racketeering predicate acts set forth below, and by their intentional and knowing material misrepresentations, described herein.

145. The RICO Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c).

<u>Defendant Harris</u>

146. Harris conducted and participated, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, in violation of both federal and state law, including, but not limited to, the following predicate offenses:

*Wire Fraud in Violation of 18 U.S.C. § 1343*

147. Harris, in breach of his agency, fiduciary, and other duties to Apollo, did willfully and knowingly devise, and with Rubenstein and Ganieva did execute and attempt to execute, various schemes and artifices to defraud and to obtain money and property from Apollo and Black by means of false and fraudulent pretenses, representations, and promises, to wit, Harris:

a. Deceptively made untruthful, defamatory, and negative statements about Black to officers and directors of Apollo;

b. Deceptively made untruthful and negative statements about the Dechert report to officers and directors of Apollo, depriving Apollo of the full value of a report it spent considerable corporate resources preparing;

c.  Made and caused to be made untruthful, defamatory, and negative statements to third-parties about Black and Apollo that were contrary to the best interests of Apollo;

d.  Unlawfully misappropriated confidential, valuable, and material information of Apollo concerning Black's ongoing relationship with Apollo, and secretly caused that information to be shared with the media;

e.  Concealed from Apollo his direct and indirect involvement in encouraging the publication of negative, unflattering, untruthful, and defamatory information about Black and his personal life;

f.  Concealed from Apollo his direct and indirect involvement in identifying litigation counsel to represent Ganieva in potential litigation against Black, and encouraging Ganieva to file and prosecute the sham litigation against Black that included information designed to inflict financial and reputational harm on Black and Apollo;

g.  Concealed from Apollo his direct and indirect involvement in encouraging the publication of untruthful, defamatory, and negative information about the Apollo independent directors who Harris considered loyal to Black, in order to pressure those individuals to resign as directors of Apollo;

h.  Concealed from Apollo that his nominee to serve as an independent director of Apollo had previously provided assurances that he would support Harris to succeed Black as CEO; and

i.  Concealed from Apollo his efforts to undermine the right of Apollo to control, through its internal corporate governance processes, its public disclosures and

exercise of business judgment with respect to Black's ongoing role at Apollo, thereby depriving Apollo of money and property.

148.    Harris, with intent to defraud, knowingly and intentionally made these false statements and material omissions with the intent that Apollo's officers and directors, and other third-parties, would rely on them, in order to further his scheme and artifice to deprive Black and Apollo of money and property; including by forcing Black's resignation as CEO and Chairman of Apollo.

149.    Harris, for the purpose of executing his scheme and artifice to defraud and to deprive Black and Apollo of money and property, did transmit and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit:

    a.   Communications with members of the enterprise by email, telephone, videoconference, and other methods of communication by wire, radio, and television transmission in interstate and foreign commerce, including, but not limited to:

      • Zoom conference calls among members of the enterprise on dates including, but not limited to:

        • January 21, 2021;

        • January 22, 2021;

        • January 24, 2021;

        • January 25, 2021; and

        • January 26, 2021;

- A January 26, 2021 email sent by Harris at 3:45am to members of the enterprise with subject "Fwd: Apollo Firmwide Updates and Continued Evolution";

b.  Communications with directors, officers, and employees of Apollo by email, telephone, videoconference, and other methods of communication by wire, radio, and television transmission in interstate and foreign commerce; and

c.  Communications with a future Apollo Board member by email, telephone, videoconference, and other methods of communication by wire, radio, and television transmission in interstate and foreign commerce including, but not limited to:

  - A January 25, 2021 email between Harris and a future Apollo Board member with subject, "Outrageous";

  - A January 27, 2021 email exchange between Harris and a future Apollo Board member with subject, "board"; and

  - A March 15, 2021 Zoom call between Harris and a future Apollo Board member.

150.    Each of the foregoing communications using the means and instrumentalities of wire, radio, and television in interstate and foreign commerce were in furtherance of the various schemes and artifices to defraud.  Each constitutes a separate and additional violation of 18 U.S.C. § 1343, and each constitutes a separate predicate act in a pattern of racketeering acts.

*Extortion in Violation of the Hobbs Act, 18 U.S.C. § 1951*

151.    Harris willfully and knowingly engaged, directly and indirectly, in actions intended to deprive Black of money and property, with his consent, which was induced and brought about

by the actions of Harris, Rubenstein, and Ganieva that were intended to cause, and did cause, Black embarrassment, intimidation, and fear, unless he made financial payments to Ganieva in response to her threats and demands.

Defendant Rubenstein

152.    Rubenstein conducted and participated, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, in violation of both federal and state law, including, but not limited to, the following predicate offenses:

*Wire Fraud in Violation of 18 U.S.C. § 1343*

153.    Rubenstein, in breach of his agency, fiduciary, and other duties to Apollo, did willfully and knowingly devise, and with Harris and Ganieva did execute and attempt to execute, various schemes and artifices to defraud, and to obtain money and property from Black and Apollo by means of false and fraudulent pretenses, representations, and promises, to wit, Rubenstein:

    a.    Unlawfully misappropriated confidential, valuable, and material information of Apollo concerning Black and his relationship with Apollo, as well as other valuable information from Apollo; and secretly caused that information to be shared with the media in order to encourage its publication;

    b.    Disseminated negative, false, and defamatory information to the media regarding the private and personal life of Black, for the purpose of causing false and defamatory information to be published;

    c.    Concealed from Apollo his direct and indirect involvement in encouraging the publication of negative, unflattering, untruthful, and defamatory information about Black's personal life and relationship to Apollo, and about Apollo;

    d.    Concealed from Apollo his direct and indirect involvement in identifying

litigation counsel to represent Ganieva in potential litigation against Black, and encouraging Ganieva to file and prosecute the sham litigation against Black that included information designed to cause harm to Black and Apollo;

e.  Disseminated Ganieva's Original Complaint, Amended Complaint, and proposed Second Amended Complaint;

f.  In violation of his fiduciary and agency duties to Apollo, encouraged the publication of untruthful, defamatory, and negative information about the Apollo independent directors who Harris considered loyal to Black, in order to pressure those individuals to resign as directors of Apollo; and

g.  Concealed from Apollo his efforts to compromise the right of Apollo to control, through its internal corporate governance processes, its public disclosures and exercise of business judgment with respect to Black's ongoing role at Apollo.

154.   Rubenstein, with intent to defraud, knowingly and intentionally made these false statements and material omissions with the intent that Apollo's officers and directors, and other third-parties, would rely on them, in order to further his scheme and artifice to deprive Black and Apollo of money and property; including by forcing Black's resignation as CEO and Chairman of Apollo.

155.   Rubenstein, for the purpose of executing his scheme and artifice to defraud and to deprive Black and Apollo of money and property, did transmit and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit:

a.  Communications with members of the enterprise by email, telephone, and videoconference, and other methods of communication by wire, radio, and

television transmission in interstate and foreign commerce including, but not limited to:

- Zoom conference calls among members of the enterprise on dates including, but not limited to:

    - January 21, 2021;

    - January 22, 2021;

    - January 24, 2021;

    - January 25, 2021; and

    - January 26, 2021;

- A January 31, 2021 email exchange involving Rubenstein and Zemsky, and other members of the enterprise, with subject, "Talking points for JH/MR convo"; and

  b. Communications with members of the media by email, telephone, and videoconference, and other methods of communication by wire, radio, and television transmission in interstate and foreign commerce.

156.    Each of the foregoing communications using the means and instrumentalities of wire, radio, and television in interstate and foreign commerce were in furtherance of the various schemes and artifices to defraud.  Each constitutes a separate and additional violation of 18 U.S.C. § 1343, and each constitutes a separate predicate act in a pattern of racketeering acts.

*Extortion in Violation of the Hobbs Act, 18 U.S.C. § 1951*

157.    Rubenstein willfully and knowingly engaged, directly and indirectly, in actions intended to deprive Black of money and property, with his consent, which was induced and brought about by the actions of Rubenstein, Harris, and Ganieva that were intended to cause, and did cause,

Black embarrassment, intimidation, and fear, unless he made financial payments to Ganieva in response to her threats and demands.

Defendant Ganieva

158.     Ganieva conducted and participated, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, in violation of both federal and state law, including, but not limited to, the following predicate offenses:

*Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341, 1343*

159.     Ganieva did willfully and knowingly devise, and with Harris and Rubenstein did execute and attempt to execute, various schemes and artifices to defraud, and to obtain money and property from Apollo and Black by means of false and fraudulent pretenses, representations, and promises, and carried out these schemes through the following fraudulent misrepresentations and material omissions, including:

> a.  Posted affirmative misrepresentations and defamatory statements regarding her personal relationship with Black on Twitter;
>
> b.  Made affirmative misrepresentations and defamatory statements to members of the media, with the intent that those affirmative misrepresentations and defamatory statements be published; and
>
> c.  Directed Wigdor to file a sham Original Complaint, Amended Complaint, and proposed Second Amended Complaint.

160.     With intent to defraud, knowingly and intentionally made these false statements with the intent that Apollo and third-parties would rely on them, in order to further her scheme and artifice to deprive Black and Apollo of money and property, including by forcing Black's resignation as CEO and Chairman of Apollo.

161.    Ganieva, for the purpose of executing her schemes and artifices to defraud and to obtain money and property from Black and Apollo, did transmit and caused to be transmitted by means of the mails or wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit:

    a.   Communications with members of the media by email, telephone, and videoconference, and other methods of communication by wire, radio, and television transmission in interstate and foreign commerce including, but not limited to:

- Emails to Miami Herald reporter Julie Brown on March 4, 2021, March 5, 2021, and April 5, 2021 with subject, "Dear Julie"; and

- WhatsApp message to Bloomberg reporter Gillian Tan on April 9, 2021 stating, "[i]n response to Mr. Black's statements I stand by what I said in my tweets on March 17, 2021";

    b.   Postings to social media;

- Three tweets on March 17, 2021 including false, negative, and defamatory statements about her private and consensual relationship with Black; and

    c.   Electronic and other filings related to the state court action including, but not limited to:

- Original Complaint filed on June 1, 2021;

- Amended Complaint filed on August 9, 2021; and

- Proposed Second Amended Complaint filed on September 20, 2021.

162.    Each of the foregoing communications using the mail or means and

instrumentalities of wire, radio, and television in interstate and foreign commerce were in furtherance of the various schemes and artifices to defraud, and each constitutes a separate predicate act in a pattern of racketeering acts.

*Extortion in Violation of the Hobbs Act, 18 U.S.C. § 1951*

163.    Ganieva did willfully and knowingly engage in a scheme and artifice to deprive Black of money and property, with his consent, which was induced and brought about actions by Ganieva that were intended to cause, and did cause, Black to experience fear over expected economic harm and personal injury unless he made financial payments to Ganieva in response to her threats and demands, to wit:

   a.   Starting in or around June of 2015, and continuing after she joined the enterprise, Ganieva made repeated threats to publicize her affair with Black and make false allegations to the public that he harassed or abused her.  Ganieva engaged in this unlawful conduct with the intent to extort money from Black by instilling fear in Black that any refusal to continue these payments would result in substantial financial, reputational, and emotional damage to Black and his family;

   b.   No later than January 2021, Ganieva became a member of the association-in-fact enterprise led and directed by Harris.  In January, February, and March 2021 Ganieva continued to receive extortionate payments of $100,000 per month based on her earlier threat that if Black did not make the payments, she would publicize her affair with Black and make false allegations that he harassed or abused her; and

   c.   Ganieva attempted to extort Black into increasing the amount of the extortion payments to her by, among other things:

   •   On March 17, 2021, making the false posts on Twitter, described above;

   •   On or around April 8, 2021, making false statements to the New York Post,

described above;

• Causing the filing and dissemination of the Original Complaint, Amended Complaint, and proposed Second Amended Complaint; and

• Making a false report to the Manhattan District Attorney's Office that Black raped and sexually assaulted her.

164.     Each of the RICO Defendants engaged in multiple predicate acts, as described above. The conduct of each of the RICO Defendants constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

165.     The racketeering predicate acts identified above were related to one another and formed a pattern of racketeering activity in that they (a) were in furtherance of common goals, including to injure Black and Apollo and benefit Harris; (b) used similar methods to perpetrate the fraud and extortion; (c) had similar participants; (d) had the same victim or victims; and (e) were continuous.

166.     The RICO Defendants' racketeering acts pose a threat of continuing criminal activity. Ganieva will likely continue to make litigation filings and public statements that include false and defamatory accusations regarding Black, and the enterprise will continue to disseminate information regarding those filings to the media to harm Black. Ganieva, with the assistance of other members of the enterprise, will likely continue to use the state court litigation and related media coverage as a vehicle to attempt to extort additional money from Black. Members of the enterprise will likely continue to make efforts to conceal their activities on behalf of the enterprise, by engaging in unlawful conduct to prevent facts about their activities from becoming known and to avoid accountability in litigation for their actions.

167.     Black has been injured in his business or property by reasons of the RICO

Defendants' violations of 18 U.S.C. § 1962(c).  Among other things, the RICO Defendants' fraudulent and extortionate conduct had the intended effect of causing Black to lose his position as CEO and Chairman of Apollo and to be deprived of the significant financial and other benefits he received from those positions.  Black has also suffered damages insofar as he has incurred substantial costs defending against the RICO Defendants' sham lawsuits and media campaign. Black has also suffered loss of business opportunities as a result of the RICO Defendants' wrongdoing.  These injuries to Black were a direct, proximate, and reasonably foreseeable result of the RICO Defendants' violation of 18 U.S.C. § 1962(c).

168.    Black is not the only victim of the RICO Defendants' pattern of racketeering. Apollo – which manages approximately $500 billion in assets, on behalf of major institutional investors, and employs thousands of people around the world – has been deprived of money and property as well.  Harris was an officer of Apollo, promoted for years as a "co-founder" of the firm, and remains a member of its Board.  The enterprise's conduct resulted in Apollo being deprived of money and property, and suffering significant reputational harm, including being deprived of the services of its founder and Chairman.

169.    As a result of Defendants' violations of 18 U.S.C. § 1962(c), Black is entitled to treble damages, plus interest, costs, and attorneys' fees in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
### Civil RICO Conspiracy, 18 U.S.C. § 1962(d)
### (Against Harris, Rubenstein, and Ganieva)

170.    Black incorporates each of the allegations set forth above as if they were repeated and fully stated here.

171.    In violation of 18 U.S.C. § 1962(d), the RICO Defendants conspired to violate 18 U.S.C. § 1962(c) in that they knowingly agreed and conspired together and with others to conduct

or participate, directly or indirectly, in the affairs of an enterprise through the pattern of racketeering activity, described above.

172.    In violation of 18 U.S.C. § 1962(d), the frauds that were perpetrated, the extortion conduct, and the continuance of this scheme, could not have occurred without the consent and knowing agreement of the RICO Defendants working together.

173.    In violation of 18 U.S.C. § 1962(d), as part of and in furtherance of their conspiracy, the RICO Defendants conspired in the commission of the many predicate acts described above, with the knowledge that they furthered a pattern of racketeering activity.  As part of and in furtherance of their conspiracy, in violation of 18 U.S.C. § 1962(d), the RICO Defendants agreed to and did commit at least two predicate acts of racketeering.  Further in violation of 18 U.S.C. § 1962(d), each of Harris, Rubenstein, and Ganieva's actions are attributable to the other.

174.    No RICO Defendant has withdrawn or otherwise disassociated from the conspiracy at issue or from the other conspirators.

175.    Black has been injured in business or property by reasons of the RICO Defendants' violations of 18 U.S.C. § 1962(d).  Among other things, the RICO Defendants' fraudulent and extortionate conduct had the intended effect of causing Black to lose his position as CEO and Chairman of Apollo and to be deprived of the significant financial and other benefits he received from those positions.  Black has also suffered damages insofar as he has incurred substantial costs defending against the RICO Defendants' sham lawsuits and media campaign.  Black has also suffered loss of business opportunities as a result of the RICO Defendants' wrongdoing.  These injuries to Black were a direct, proximate, and reasonably foreseeable result of the RICO Defendants' violation of 18 U.S.C. § 1962(d).

176.    As a result of the RICO Defendants' violations of 18 U.S.C. § 1962(d), Black is

entitled to treble damages, plus interest, costs, and attorneys' fees.

### THIRD CAUSE OF ACTION
### Defamation *Per Se*
### (Against All Defendants)

177.    Black incorporates each of the allegations set forth above as if they were repeated and fully stated here.

178.    Ganieva publicly accused Black on Twitter of sexually harassing and abusing her for years, knowing that those accusations were false, with the intent to cause Black severe reputational, professional, and economic harm.

179.    Beginning on or about November 15, 2019, Ganieva secretly made statements to reporters and other members of the media and falsely claimed that Black had harassed, abused, drugged, and raped her.  She made these statements knowing them to be false and with the intent, and purpose, of causing Black severe reputational, professional, and economic harm, including compelling Black to resign from Apollo and damaging him financially.

180.    Aware of Ganieva's false and defamatory statements about Black, Rubenstein and Harris, directly and indirectly, repeated those statements while knowing them to be false, and encouraged the reporting and publication of stories and articles that repeated Ganieva's statements. Rubenstein and Harris caused an article to be placed in the New York Post detailing Ganieva's claims.  Rubenstein and Harris made these statements, directly and indirectly, for the purpose of causing Black reputational, professional, and economic harm.

181.    Wigdor's pleadings (actual and proposed) filed on behalf of Ganieva constitute sham litigation made for the purpose of evading defamation liability.  Wigdor and Ganieva knew that the pleadings contained false and defamatory statements that had no basis in fact, but they filed the pleadings nonetheless for the purpose of publicizing the false and defamatory statements

about Black while seeking to avoid defamation liability.  Wigdor and Ganieva made these defamatory and libelous statements about Black (i) without any good faith basis, (ii) without conducting an adequate investigation (if any investigation was done at all), (iii) while ignoring and refusing to consider, and in direct defiance and conscious disregard of, documentary evidence that contradicted those statements, (iv) in bad faith and with actual malice, and (v) with the sole purpose of causing Black severe reputational, professional, and economic harm.

182.    Wigdor filed those state court complaints on behalf of Ganieva and in coordination with Harris and Rubenstein not because they had a good faith basis to reasonably believe that their client had any passably legitimate claim for redress, but because they wanted to publicize and disseminate lurid, scandalous, and calumnious accusations about Black and to extract a favorable settlement from him.

183.    Wigdor, Ganieva, Rubenstein, and Harris, directly and indirectly, communicated the substance of each filing to the press.

184.    The allegations in the complaints were not in any way made in furtherance of any *bona fide* litigation objective.

185.    Defendants are in no way entitled to any protections, immunities, or privileges with respect to the allegations in their complaints because those filings were made exclusively for the purpose of cloaking the allegations in them with such protections, immunities, or privileges.

186.    The allegations in all three iterations of the complaint are written defamatory and libelous statements of purported fact concerning Black, and are utterly false, as conclusively shown by contemporaneous documentary evidence that has been offered to Wigdor for review, and that Wigdor has deliberately refused to view and has never rebutted.

187.    The allegations in the complaints amount to defamation and libel *per se* under the

law as they allege that Black committed serious crimes, including sexual assault and kidnapping, and thus damages are presumed.

188.    The defamatory statements in Defendants' pleadings include, but are not limited to: that Black raped Ganieva; that Black "sexually harassed and abused" Ganieva "for years"; that Black "bullied, manipulated, threatened, and coerced" Ganieva; that Black kidnapped Ganieva and flew her to Epstein's home for purported sex trafficking; that Black previously raped an unidentified woman that he met through Epstein; that Black is a "sadist"; and that Black threatened Ganieva to sign the NDA, saying "[i]f you do not take the money, I will put you in prison" and "[i]f you do not take the money, I will destroy your life."

189.    Ganieva's statements to the public and the press also amount to defamation and libel *per se* under the law as they allege that Black committed serious crimes, including sexual assault, and thus damages are presumed.  These allegations include, but are not limited to, Ganieva's tweets accusing Black of "sexually harass[ing] and abus[ing]" her;  Ganieva's statements to the New York Post that Black abused her "over a long period of time and it was tragic"; Christensen's statement branding Black as a "sexual predator[]" and inviting prosecutors to "go after" him; Christensen's participation in telephone interviews with news organizations, including a statement to Forbes accusing Black of "heinous conduct" towards Ganieva and of "intimidating" her; and allegations that Black raped a Jane Doe 20 years ago.

190.    The allegations in the pleadings were published without privilege or authorization to a third-party.

191.    In publishing those defamatory and libelous allegations, and repeating those lies to the press and the public, Harris, Rubenstein, Wigdor, and Ganieva wrongfully and willfully intended by such publication to injure Black's personal and business reputation.

192.     At the time Harris, Rubenstein, Wigdor, and Ganieva directly and indirectly uttered and caused to be published the defamatory and libelous matter set out above, Defendants acted with actual malice because they knew  the allegations in the pleadings were false or, in the alternative, they failed to take any reasonable steps to ascertain the accuracy of the allegations and instead published them with reckless or grossly negligent disregard for whether they were true or not.

193.     As a direct result of the foregoing defamatory and libelous statements, in Defendants' sham pleadings and to the press, Black has suffered injury to his personal and business reputation.

194.     Because of the wanton, willful, and malicious nature of the foregoing wrongful conduct, Black is entitled to recover punitive damages.

## FOURTH CAUSE OF ACTION
### Breach of Contract
#### (Against Ganieva)

195.     Black incorporates each of the allegations set forth above as if they were repeated and fully stated here.

196.     Black and Ganieva entered into a non-disclosure agreement on October 19, 2015.

197.     The contract consists of a one-page document entitled, "Release and Confidentiality Agreement."  Ganieva signed the document.

198.     Under the agreement, Black agreed to forgive two loans of $480,000 each that he had made to Ganieva that had been accruing interest at 5% per annum for two and four years, respectively; make a simultaneous payment to Ganieva of $100,000; and to provide Ganieva with "other consideration," which Black and Ganieva agreed that day would consist of £2 million to secure Ganieva a United Kingdom visa, as well as payments of $100,000 a month for 15 years.

199.    In exchange, Ganieva agreed to release Black from "all matters, causes of action, claims, suits and any and all further liability or accountability, in law or equity, by reason of any matter, cause or thing whatsoever arising prior to the signing of this Agreement, contemporaneous with the signing of this Agreement or any time in the future after the signing of this Agreement."

200.    Ganieva further agreed "never to disclose, directly or indirectly, to any individual, entity or other potential recipient, any information relating to (i) the allegations and claims that she has asserted against [Black], (ii) the signing, content or other attributes of this Agreement, including any consideration furnished by [Black] in connection with the signing of this Agreement and (iii) any other matters that could damage [Black's] career, reputation and relationship with others."

201.    Before signing the contract, Ganieva read the document for as long as she wanted. She asked questions about its terms, which Black answered.  And she negotiated the amount of money she would receive from Black.

202.    Ganieva acquiesced to the terms of the contract by intentionally accepting $100,000 each month from October 2015 through March 2021.  At no time from October 2015 through March 2021 did Ganieva repudiate the contract or refuse the benefits of the contract.

203.     Black faithfully performed under the agreement for more than five years, from October 2015 through March 2021, providing all consideration set forth in the agreement, including monthly payments of $100,000.

204.    Beginning on or about November 15, 2019, Ganieva breached the contract by making statements to reporters and other members of the media regarding the matter covered by the contract.

205.    On March 17, 2021, Ganieva publicly violated the terms of the contract by tweeting

that Black had "sexually harassed and abused" her for years and that she "was forced to sign an NDA in 2015."

206.    Ganieva has thereafter continued to violate the agreement on numerous occasions, including by making or authorizing the statements and legal claims in the court filings and press statements pleaded herein.

207.    By breaching their agreement, Ganieva has caused Black damages.

### FIFTH CAUSE OF ACTION
### <u>Unjust Enrichment</u>
### (Against Ganieva)

208.    Black incorporates each of the allegations set forth above as if they were repeated and fully stated here.

209.    Pursuant to the agreement, Black paid Ganieva $9,251,084.00 from October 2015 through March 2021.

210.    Ganieva was enriched by these payments, at Black's expense.

211.    Ganieva willfully broke the terms of the agreement, depriving Black of what he had bargained for – that is, Ganieva's silence as to their affair and the resolution of their agreement.

212.    Ganieva continued to accept payments from Black even though she knew that she breached the agreement as early as November 2019.

213.    It is against equity and good conscience for Ganieva to be allowed to keep the money she extorted from Black after breaking the terms of their agreement.

### <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff Leon D. Black hereby requests judgment against Defendants Joshua Harris, Steven Rubenstein, Guzel Ganieva, and Wigdor LLP as follows:

a)   Enter judgment on the claims in Black's favor;

b)   Award Black damages, in an amount to be determined at trial, plus prejudgment interest,

to compensate Black for all monetary and/or economic damages;

c) Award Black damages for any and all other monetary and/or non-monetary losses suffered by him, including, but not limited to, loss of income, reputational harm, lost business and financial opportunities, and harm to professional reputation, in an amount to be determined at trial, plus prejudgment interest;

d) Award punitive damages for the Defendants' gross wanton, malicious, and outrageous misconduct in an amount to be determined at trial;

e) Award Black treble damages;

f) Award attorneys' fees, costs, and disbursements incurred as a result of this action; and

g) Award such other, further, and different relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Black demands a jury trial for all claims and issues in this action that are triable as a matter of right to a jury.

Dated:  April 18, 2022

Respectfully submitted,

/s/ Susan R. Estrich

| | |
|---|---|
| Reid M. Figel | Susan R. Estrich |
| Michael K. Kellogg | Estrich Goldin LLP |
| Kellogg, Hansen, Todd, Figel | 947 Berkeley St. |
|    & Frederick, P.L.L.C. | Santa Monica, CA 90403 |
| 1615 M Street, N.W., Suite 400 | (213) 399-2132 |
| Washington, D.C. 20036 | susan@estrichgoldin.com |
| (202) 326-7900 | |
| rfigel@kellogghansen.com | |
| mkellogg@kellogghansen.com | |

*Attorneys for Plaintiff Leon D. Black*

# Exhibit 1

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

------------------------------------------------------------------ x

GUZEL GANIEVA,

                                    Plaintiff,

                v.

LEON BLACK;

                                    Defendant.

------------------------------------------------------------------ x

**SUMMONS**

Plaintiff designates
NEW YORK COUNTY
as the place of trial

The basis of the venue is: Residence of
Plaintiff and a substantial part of the
events giving rise to Plaintiff's claims took
place in New York County

To the above-named Defendant:

      **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve
a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of
appearance on the Plaintiff's attorney within twenty (20) days after service of this summons,
exclusive of the day of service (or within thirty (30) days after the service is complete if this
summons is not personally delivered to you within the State of New York); and in case of your
failure to appear or answer, judgment will be taken against you by default for the relief
demanded in the complaint.

Dated: June 1, 2021
      New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
      Jeanne M. Christensen
      Lindsay M. Goldbrum

85 Fifth Avenue
New York, NY 10003
Telephone:  (212) 257-6800
Facsimile:  (212) 257-6845
jchristensen@wigdorlaw.com
lgoldbrum@wigdorlaw.com

*Counsel for Plaintiff*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

```
-----------------------------------------------------------------------X
GUZEL GANIEVA,                                    :
                                                  :
                            Plaintiff,            :      Civil Action No.:
                                                  :
           v.                                     :
                                                  :      COMPLAINT
LEON BLACK,                                        :
                                                  :
                            Defendant.            :      Jury Trial Demanded
-----------------------------------------------------------------------X
```

Plaintiff Guzel Ganieva ("Plaintiff") brings this Complaint against Leon Black ("Black" or "Defendant"), and hereby alleges as follows:

### PRELIMINARY STATEMENT

1.      On April 8, 2021, Bloomberg published an article that contained the following statements by Defendant Leon Black about Plaintiff Guzel Ganieva:

> "I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago," Black said in the statement Thursday. "Any allegation of harassment or any other inappropriate behavior towards her is completely fabricated. **The truth is that I have been extorted by Ms. Ganieva for many years and I made substantial monetary payments to her, based on her threats to go public concerning our relationship**, in an attempt to spare my family from public embarrassment."
>
> Black had previously planned to step down by the end of July as CEO of the firm he co-founded. He said that, on advice from his counsel, he asked criminal authorities several weeks ago to investigate Ganieva.[1]

---

[1]      Gillian Tan, *Black Says He Paid to Hide Affair, Denies It Led to Apollo Exit*, Bloomberg, (April 8, 2021, 10:04 PM), https://www.bloomberg.com/news/articles/2021-04-09/black-says-he-paid-to-hide-affair-denies-it-led-to-apollo-exit, (emphasis added).

1

2.      Everything that Black said in the above statement about Ms. Ganieva is false. First, Black did not have "a consensual affair" with Ms. Ganieva. Second, any telling of "harassment" or "inappropriate behavior" by Black towards Ms. Ganieva is not fabricated. As described below, such words do not come close to the appalling forced sexual misconduct that Black inflicted on her.  Third, Black has never been "extorted by Ms. Ganieva," much less for "many years."  Disgustingly, he used his extreme power and wealth to coerce her into signing a non-disclosure agreement ("NDA") in October 2015 precisely because he knew what he had done to her was shocking, evil and exposed him to potential criminal charges.

3.      The only repeated threats for many years came from Black to Ms. Ganieva that if she did not sign the NDA, take his hush money and retreat into silence forever, she would feel the brunt of his true wrath.  He said many times to her:

**"If you do not take the money, I will put you in prison."**

**"If you do not take the money, I will destroy your life."**

4.      Fourth, Ms. Ganieva never "threatened to go public" about Black regarding anything.  As the people within Black's inner circle know, the suggestion that Black attempted to spare his family public embarrassment about a purported extramarital relationship is ridiculous.

5.      For years, Black ate countless meals with Ms. Ganieva in 5-star restaurants, took her to Broadway shows, numerous art shows, museum exhibitions, private parties, the movies, including the premier of The King's Speech and even sat beside her while he cheered for the New York Knicks at MSG.  In the midst of all these very public outings, Black never once worried about sparing his family from public embarrassment.[2]  In fact, he never worried about people

---

[2] Nor did he care about being seen out with other young women, often of Russian descent, in addition to Ms. Ganieva.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 69 of 349

associating him with Ms. Ganieva because he enjoyed being seen with her in public. What Black has worried about, however, is being exposed for the sadist that he is.

6.      On October 29, 2020 during an earnings call, in connection with his announcements about his future role at Apollo Management, Black publically stated:

> **"There has never been an allegation by anyone that I engaged in any wrongdoing, because I did not."**

7.      This false claim of Black's was the tipping point for Ms. Ganieva.  Having recently educated herself in law school and knowing that many of his sexual acts were against her will and without her consent, she no longer was willing to stand by and allow him to escape accountability.

8.      Knowing that her public outing of his disgusting conduct would end any further monetary payments from Black, she did so regardless.

9.      On March 17, 2021, Ms. Ganieva bravely posted on Twitter that Black was a "predator" that had "sexually harassed and abused" her for years. The next morning, Black texted Ms. Ganieva to call him immediately.  She refused.

10.     Knowing that he could no longer control her into silence, Black resorted to the age-old playbook used by wealthy and powerful men – he made a preemptive claim of extortion.[3]

11.     This textbook strategy involves overpowering the female accuser by victimizing her one more time in a public way with threats of criminal charges.  As demonstrated by Black, this is accomplished by going to the "criminal authorities" to accuse Ms. Ganieva of extortion

---

[3]      Too many examples exist to include here of wealthy male sexual harassers re-victimizing their victims by accusing these women of extortion after they came forward.  A number of high profile examples are detailed *infra* at ¶ 87.  Threats of extortion are potentially far more damaging and frightening to a female accuser than threats of a civil lawsuit for defamation, an option that numerous men accused of sexual misconduct use for similar reasons.

3

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 70 of 349

and placing her on the legal defensive before she can take any legal action against him – just in case she planned on doing so.

12.     Although heinous and disgusting, Ms. Ganieva had been threatened by Black for years that if she disobeyed him, he would **"put her in prison"** and to speak out would be **"suicide."**

13.     For too long, wealthy men like Black have enjoyed an unequal access to justice unavailable to the average citizen and non-millionaires. Knowing the right lawyers and politicians provided Black with the ability to do exactly as he said:

**"Ask criminal authorities to investigate Ganieva."**

14.     Threatening that a criminal charge will be brought against Ms. Ganieva first will not save Black from the truth about what he has done. The truth will reveal a violent, sadistic side to Black that he has shielded from public view for decades.

15.     Black defamed Ms. Ganieva by making the above statements.

## JURISDICTION AND VENUE

16.     The Court has personal jurisdiction pursuant to Civil Practice Law and Rules ("CPLR") § 301, *inter alia*, because Plaintiff and Defendant reside in New York.

17.     Venue is proper in this County pursuant to CPLR § 503 because a substantial part of the events giving rise to Plaintiff's claims took place in New York County.

## PARTIES

18.     Plaintiff Guzel Ganieva resides in the state of New York, New York County.

19.     Defendant Leon Black resides in the state of New York, Westchester County.

4

## FACTUAL ALLEGATIONS

**I.**    **Leon Black's Orchestrated Secrecy of His Sexual Violence and Deviance**

20.    Like a master chess player, Black was many moves ahead of Ms. Ganieva from the moment he met her.  Black picked Ms. Ganieva out of a crowd in March 2008, while attending an International Women's Day event in NYC.

21.    A single mother in her early twenties, having moved from Russia to the United States by herself, it was easy work for Black to convince Ms. Ganieva to dine with him at La Grenouille where he planned to tell her how he could help her with her future.

22.    This is exactly what Black did.

23.    It was a choreographed plan that allowed him to quickly gain Ms. Ganieva's trust. Common sense suggests that he had used this tactic before, and in fact, Ms. Ganieva later met at least two other women that were similarly involved with Black.  Over the course of several dinners, Black repeated proclamations about her innate talent and intellect, and combined with a few "arranged" appointments, for example with the Creative Artists Agency, LLC in Los Angeles, he quickly gained her gratitude and admiration.

24.    Ms. Ganieva was flattered that a successful businessman would find her conversation and company enjoyable. As the person in charge of thousands of employees, Ms. Ganieva believed Black understood the value and importance of reliable, secure employment and intended to help her move beyond modeling.  Naïvely, Ms. Ganieva believed that Black was not interested in her sexually, simply because she told him that their relationship would not be sexual.

25.    Black, however, is a ruthless planner and a man that gets what he wants. It was not long before he managed to secure his ability to get Ms. Ganieva alone with him, out of sight from the public or his own employees.

5

Case 1:21-cv-08824-PAE Document 105-1 Filed 04/18/22 Page 72 of 349

26.     Once he did, Black forced sadistic sexual acts on her without her consent and despite her saying no.

27.     The first time it happened, in 2008, Black took Ms. Ganieva to a studio apartment with a mattress on the floor and no other furniture. Humiliated and in shock, Ms. Ganieva never uttered a word about he had done to her.

28.     In a sad but predictable pattern, for the next several years Ms. Ganieva endured a cycle of intimidation, abuse and humiliation by Black that on numerous occasions included forced sexual conduct against her will. Many of these instances were perpetrated by Black in order for him to indulge in sadistic sexual acts that were physically painful to Ms. Ganieva and to which she never consented. In addition to causing intentional physical pain, Black engaged in these acts because he derived pleasure from humiliating and debasing Ms. Ganieva.

29.     After these acts of violence, Ms. Ganieva would tell Black to never speak to her or contact her again. Inevitably, after waiting weeks and sometimes several months, being a master manipulator, Black would engage in remorseful and conciliatory behavior, relentlessly – until he could induce her to meet him again.

30.     Black's persuasion tactics included endless promises such as: to help with Ms. Ganieva's child's educational opportunities; to finance a movie for her that she could produce or direct, after convincing her that acting was too difficult a business; to purchase a townhouse and turn it into an art museum that Ms. Ganieva could manage or be a director of; and to help her with an application to Harvard Business School because of his strong relationships there. She believed his promises, and in fact, she was aware that Black had purchased an art gallery and hired another woman that he had been involved with to run the gallery.

31.     Despite Black's periods of remorseful and conciliatory behavior, he nevertheless also engaged in textbook harasser conduct.  Specific details about each instance of Black's derogatory and controlling conduct towards Ms. Ganieva are too much to include in this Complaint.  By way of example only, it included such things as:

- Ubiquitous belittling;

- Falsely accusing her of being jealous to deflect from his own hideous conduct;

- Pretending not to listen to or understand Ms. Ganieva when she said something he did not like, especially when it involved her attempts at cutting off communication;

- Forcing her to walk behind him;

- Forcing her to wait for his permission to speak;

- Punishing her by yelling and screaming if she did not speak to him "nicely";

- Insisting that she speak to him in a pleasing, pleasant or otherwise "happy" and "nice" manner and yelling at her if she failed to do so;

- Insisting that her text messages also be sufficiently pleasant;

- Criticizing her appearance by saying she needed to lose weight or improve certain parts of her body;

- Criticizing her clothing and make-up;

- Berating her for refusing to agree to threesomes with other women and Black;

- Intentionally making her feel stupid and inferior to him; and

- Physically intimidating her by such acts as clenching his fists, pounding nearby pieces of furniture, repetitive

7

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 74 of 349

cracking of his knuckles and otherwise using his formidable 6'5" and 300+ pound body to intimidate her.

## II.     <u>Ms. Ganieva Returns to College</u>

32.     In 2011, Ms. Ganieva enrolled in school to finish her undergraduate degree in math. She hoped that a degree would allow her to find a job outside of modeling.

33.     Ms. Ganieva believed that going to school would occupy more of her time and make her less available to Black. Other efforts to distance from him included cutting off most of her hair, believing that Black would find her unattractive. Unfortunately, these efforts had thus far been mostly futile.

34.     As it turned out, Black said that he was in favor of her returning to college, and used the situation to convince Ms. Ganieva to sign a "loan" with Black.

### A.     <u>The First $480,000 Loan</u>

35.     One day in 2011, Black told Ms. Ganieva that he had arranged a loan for her. Despite being a financial titan with teams of lawyers at his disposal, Black presented to her a one-page document, set forth below.

36.     As stated, the "loan" included a 5% interest rate and was payable on June 1, 2016.

37.     Of course, such an amount of money was unfathomable to Ms. Ganieva and she protested that she would never be able to pay it back. Financial control – a tried-and true tactic to achieve dominance over another, was a method Black knew intimately and understood would place Ms. Ganieva in his debt forever.

8



38.    Critically, it would ensure that his criminal behavior would remain silenced.

B.    The Second $480,000 Loan

39.    Unsurprisingly, Black followed this initial loan with another one just like it in

2013:

LOAN AGREEMENT BETWEEN LEON BLACK and GUZEL GANIEVA

On this day, May 24, 2013 Leon Black ("the Lender") agrees to make a loan of
$480,000 ("the principal") to Guzel Ganieva ("the Borrower") on the following terms.
The principal amount will be lent over a period of two (2) years, extending over eight (8)
intervals of three (3) months each, to be disbursed by bank wire transfer at the beginning
of each interval:

| | | |
|---|---|---|
| $60,000 | on | June 1, 2013 |
| $60,000 | on | September 1, 2013 |
| $60,000 | on | December 1, 2013 |
| $60,000 | on | March 1, 2014 |
| $60,000 | on | June 1, 2014 |
| $60,000 | on | September 1, 2014 |
| $60,000 | on | December 1, 2014 |
| $60,000 | on | March 1, 2015 |

The principal loan will be repaid in full on June 1, 2018 and will carry a simple
interest rate of 5% per annum, also to be repaid on June 1, 2018.

The Lender and Borrower have read and fully understand the terms of this
Agreement and hereby consent to such terms in full.

Leon Black                          Guzel Ganieva

Dated: May 24, 2013

10

40.     The two "loans" and his ability to force repayment of such an amount allowed Black to exert even greater control over Ms. Ganieva. Black knew the magnitude of the harm that he had inflicted on Ms. Ganieva over the years. This money, at least in his twisted mind, was a way of excusing himself.

41.     After Ms. Ganieva finished her math degree, Black reignited his charade of promises to help her find a "real job" outside of modeling. He convinced her that with all of his powerful Wall Street connections, he would find her a job.

42.     Pathetically, Ms. Ganieva believed all of his promises and pursued leads for jobs arranged by Black for over a year. In hindsight Ms. Ganieva knows that none of these arranged interviews were meant to be legitimate. Rather, it was all part of Black's sick plan to make her feel grateful to him on the one hand, but also allow him to belittle and humiliate her after each job rejection.

43.     Too many examples exist of these sham interviews to detail herein, but Black used his connections at Goldman Sachs and other financial powerhouses to arrange appointments for her. On the surface, such interviews appeared well-meaning, such as this example:

> **From:** REDACTED, Jenna L. [HCM]
> **Sent:** Wednesday, May 07, 2014 11:33 AM
> **To:** 'Guzel Ganieva'
> **Subject:** RE: Goldman Sachs Interview Opportunity
>
> Hello Guzel,
> Just following up to the voicemail I recently left. Curious if you are available to come onsite this
> **Friday May 9th from 11am to 1:30pm**?
> Please let me know. Thank you, Jenna

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 78 of 349

> On Wednesday, May 7, 2014, REDACTED, Jenna L.
> <Jenna.REDACTED@gs.com> wrote:
> Hello Guzel,
> Please see your interview details below:
> **Friday, May 9th, 2014**
> Interviewer Time Details:
> Dana Bunting 11:00am EST 32/201
> *HCM TBD 11:30am EST 32/201*
> Pete Lyon & Alison Mass 12:00pm EST 32/201
> Julie Silverman 1:00pm EST 32/301
> Please keep in mind that all schedules are subject to change. When
> you arrive to our building at **200 West Street in New York**, our
> security team will direct you.

44.     As Black knew would happen, Ms. Ganieva never received an offer from any

financial company in New York.  Desperate for work and falling for Black's claims that he was

the only person that could help her, Ms. Ganieva even interviewed for jobs in London and

Moscow that Black arranged, including at Goldman Sachs in London and Moscow.

45.     Predictably, Ms. Ganieva was rejected. By way of example only, one such

rejection email is as follows:

> On Saturday, November 29, 2014, REDACTED, Pete
> <Pete.REDACTED@gs.com> wrote:
> Thanks Guzel…in short, I think we just have to be patient for
> now…we have explored many options internally and, given the
> macro environment, there are no open jobs at Goldman Sachs right
> now that work for/are a fit for you…I also saw Paolo a few weeks
> ago in NYC and he told me he would keep his eyes open for you in
> Moscow with clients of his if they have roles/openings that make
> sense but that there were no immediate openings he was aware
> of…I wish we had better news but I think we just need to hang
> tight for now and if something opens that makes sense then Paolo
> and/or I will be in touch…thanks a lot."

46.     After yet another failed job interview, in desperation Ms. Ganieva even asked

Black if she could work as a receptionist at one of these companies.  This idea was rejected by

Black.  Clearly, Black preferred her instability and dependence.  In fact, after yet another failed

12

INDEX NO. 155262/2021
RECEIVED NYSCEF: 06/01/2021

Goldman Sachs interview, Black said in a perversely happy manner that he knew her "world is shitty." Black then used the opportunity to remind her that he is the "only one" who can help her escape her "miserable life."

### III.  The Rape in July 2014

47.    In the days leading up to the July 4, 2014 weekend, Ms. Ganieva became sick and was home for a number of days unable to go to the store or cook for herself. At the time, her child was away at summer camp. On Sunday, July 6, 2014, Black came from the Hamptons to her apartment on East 77th Street. Although Ms. Ganieva did not buzz him through the building entrance, one of her neighbors must have done so, because suddenly he was knocking at her apartment door. When Ms. Ganieva opened the door, Black barged in, pushing her off to the side.

48.    Ms. Ganieva was weak and could barely walk. Disturbingly, when Black realized what a debilitated state she was in, he became happy.

49.    Aware that Black wanted to have sex with her, Ms. Ganieva quickly began protesting that she could not and would not have sex with him. She tried to tell him that she was in a weakened state, having been sick for almost a week.

50.    Never a match for his physical size and strength, on this day in particular Ms. Ganieva knew what fate was in store.

51.    At over 6'5" and 300+ pounds, Black had no difficulty dragging Ms. Ganieva into the bedroom and throwing her on her back on the bed. She was limp and unable to move.

52.    Despite her begging him to leave, he took off her clothes and his own. Inexplicably, he spared Ms. Ganieva the pain of his usual sadistic rituals and quickly got on top

Case 1:21-cv-08824-PAE Document 105-1 Filed 04/18/22 Page 80 of 349

of her and forced his penis into her vagina against her will. Disgustingly, when Black was done, as he stood up and put his clothes back on, he angrily said:

**"Now I have fucked you."**

53. Black then walked out – leaving Ms. Ganieva naked and unable to move on her bed.

54. Ms. Ganieva was no match for the cunning and masterful manipulation of Black or his repeated and unwanted sexual conduct.

55. After this rape, Ms. Ganieva took her son and left New York to physically distance herself from Black. Unfortunately, she was unable to fully escape his influence as it seemed that no matter where she traveled, inevitably she happened to meet someone that knew Black and he managed to always be aware of where she was and what she was doing.

56. In this regard, Black often called Ms. Ganieva to let her know that he knew she had been at a certain event the night before, who she had been with and what she had been wearing.

57. No matter the physical distance between them, Ms. Ganieva continued to feel threatened by Black and his power over her. Of course, this was precisely what he wanted.

58. It was no surprise to Black that when Ms. Ganieva was back in New York City in 2015, she asked to meet him. Ms. Ganieva wanted to know what she could do to be able to live her life without his continued involvement. Having planned for years about his ability to silence her for what he had done, Black was prepared to talk to her, especially knowing that her two "loans" were coming due.

59. Of course, Ms. Ganieva did not have one million dollars to repay Black.

60. Of course, she was no match for his power, connections, control and money.

14

61.     Although intimidated by him, Ms. Ganieva repeated her prior messages that she did not want Black's money – she wanted him to leave her and her child alone, for good.

62.     Black was relentless.  Black urged Ms. Ganieva to take money he was offering her in exchange for nothing "horrible" to happen to her or her child.

63.     It was not an offer because refusing Black was not an option.  He reminded Ms. Ganieva that if she did not take the "deal," i.e., his hush money, he would make sure she ended up **"in prison"** or he would **"destroy her life."**

64.     At the Four Seasons hotel on October 18, 2015, he shoved a piece of paper across the table and told her she had to sign it.

65.     Ms. Ganieva was nervous and had difficulty understanding what it said.  She understood that it involved confidentiality -- what she later learned was a nondisclosure agreement ("NDA").

66.     Black "agreed" to allegedly forgive her loans.

67.     As to the other terms, she only read it once, quickly, and is unsure what other language is included in the document.

68.     There was no space on the document for Black to sign, only Ms. Ganieva.

69.     After she signed, he handed her another piece of paper which looked to be a copy of what she just signed.  He ordered her to sign this also.

70.     He then said to her:

        **"[I will be paying you] as long as you keep your mouth shut."**

15

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 82 of 349

71.     Black refused to give her a copy.  He left with the documents.[4]

72.     From that time until April 2021, Ms. Ganieva received regular payments from Black, via wire from an account called "E Trust."

73.     Prior to November 2015, whenever Black transferred money into her account, her bank statement recorded the funds as from "Leon D. Black," or "J. Black Trust Account."  Ms. Ganieva has no knowledge as to why payments began from the "E Trust" or what it is.

74.     Over the years, the only contact Ms. Ganieva had with Black was to ask numerous times to obtain a copy of what she signed that day. He refused to respond.  By way of example only, in 2019 she wrote to him:



Mon, Oct 15, 10:06 AM

Hi. I would like to have a copy of the NDA I signed. Can you please email it to me to [REDACTED]? Thank you.

Tue, Oct 16, 12:59 PM

Leon. You sexually harassed me, sex trafficked me, raped me, and eventually blacklisted me. I don't know for how much longer it will take me, on my own, to process the pain your caused to me and my family. The least thing you can do is to give me that document that I was forced to sign under duress and wasn't able to read before signing. Unfortunately I am still tied to you...

---

[4]     There is no way for Ms. Ganieva to be sure that the language in the second piece of paper matches the language in the first document.  Although it appeared to be the same, to this day she cannot be sure what either document contains.

16

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 83 of 349

75.     Ms. Ganieva retained legal counsel to demand that she receive a copy of the document. Her lawyer's letters to Black on February 18, 2020 and March 6, 2020 went unanswered.

76.     To this day, only Black has the NDA documents.

## IV.     Black Says Publically that He Has Never Committed Any Act of Misconduct

77.     On October 29, 2020 during an earnings call, in connection with his announcements about his future role at Apollo Management, Black publically stated that:

> **"There has never been an allegation by anyone that I engaged in any wrongdoing, because I did not."**

78.     This false proclamation of Black's character and representation of his clean hands was extremely upsetting to Ms. Ganieva.  He knew what he had done and that Ms. Ganieva considered many of his sexual acts to have been against her will and consent.

79.     Having enrolled in law school, Ms. Ganieva had a greater understanding of what Black had done to her physically and what he had coerced her into signing in connection with the non-produced confidentiality agreement.

80.     Knowing that Black was the one who had committed unlawful acts, and despite his anticipated threats to her for whatever he coerced her into signing, or that whatever money came from the mysterious E Trust into her account would cease, Ms. Ganieva finally had the courage to say what her experience with Black had been.

17

81.    On March 17, 2021, Ms. Ganieva posted on Twitter the following:



82.    Thereafter, on April 8, 2021, Bloomberg published the following article with the

statement issued by Black:

> "I foolishly had a consensual affair with Ms. Ganieva that ended
> more than seven years ago," Black said in the statement Thursday.
> "Any allegation of harassment or any other inappropriate behavior
> towards her is completely fabricated. The truth is that I have been
> extorted by Ms. Ganieva for many years and I made substantial
> monetary payments to her, based on her threats to go public
> concerning our relationship, in an attempt to spare my family from
> public embarrassment."

18

Black had previously planned to step down by the end of July as CEO of the firm he co-founded. He said that, on advice from his counsel, he asked criminal authorities several weeks ago to investigate Ganieva.[5]

83.     This statement was reprinted in countless publications.[6]

84.     For all of the reasons detailed above, everything Black said in the above

statement about Ms. Ganieva is false.[7]

85.     Black's statement published on April 8, 2021 was made with malice.

---

[5]     Gillian Tan, *Black Says He Paid to Hide Affair, Denies It Led to Apollo Exit*, Bloomberg, (April 8, 2021, 10:04 PM), https://www.bloomberg.com/news/articles/2021-04-09/black-says-he-paid-to-hide-affair-denies-it-led-to-apollo-exit.

[6]     Josh Kosman, *Robert Kraft resigns from Apollo board amid Epstein controversy*, the New York Post, (April 12, 2021, 2:09 PM), https://nypost.com/2021/04/12/robert-kraft-resigns-from-apollo-board-amid-epstein-controversy/.

In a statement to The Post, Black acknowledged that he knew Ganieva, but denied that he acted inappropriately toward her. "I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago," Black said in his statement. "Any allegation of harassment or any other inappropriate behavior towards her is completely fabricated." He also denied that her allegations influenced his decision to step away from the company faster than planned. In January, Black had signaled he would stay on as chairman after stepping down as CEO on July 31. "This is entirely a personal matter; this matter has nothing to do with Apollo or my decision to step away from the firm." Black added that he believes he was being "extorted" by Ganieva because he had allegedly "made substantial monetary payments to her, based on her threats to go public concerning our relationship, in an attempt to spare my family from public embarrassment." The billionaire said he has referred the matter to "the criminal authorities" at the recommendation of his counsel and welcomes "a thorough investigation."

[7]     On April 12, 2021, the New York Post published yet another article, stating that, "[a]s exclusively reported by The Post last week, Black's unexpected exit on March 22 came just days after several directors on the private-equity giant's board learned of accusations of sexual harassment against him by a woman **he claimed was trying to shake him down over a 'consensual affair.'**" (emphasis added).

19

86.    Black knew that he issued a false statement of facts to Bloomberg or made the statement intending it be published with reckless disregard for the truth.

87.    Black's decision to falsely state that Ms. Ganieva extorted him "for years" is right from the playbook of scores of wealthy and powerful men facing similar accusations.  Just a fraction of such examples are below:

- Harvey Weinstein alleged that Ambra Gutierrez fabricated claims of sexual assault in an attempt to blackmail him into a movie role.[8]

- Bill O'Reilly and Fox News preemptively sued producer Andrea Mackris for extortion after she came forward with sexual harassment allegations.[9]

- Paul Haggis accused Christine Lepera of extortion following her allegations that he raped her.[10]

- Alan Dershowitz sued Virginia Giuffre for defamation following her claims of sexual assault, claiming that she made the claims in part to **"extort private settlements from other, wealthier individuals associated with [Jeffrey] Epstein."**[11]

---

[8]    Kyle Munzenrieder, *How Tabloids Dragged Ambra Gutierrez Through the Mud After She Accused Harvey Weinstein of Groping Her*, W Magazine, (October 10, 2017), https://www.wmagazine.com/story/harvey-weinstein-ambra-gutierrez-page-six-daily-mail-smear-campaign.

[9]    Anna North, *Men like Bill O'Reilly get to make a comeback. Women who speak up about harassment lose their jobs*, Vox, (May 16, 2018, 12:30 PM), https://www.vox.com/identities/2018/5/16/17360334/bill-oreilly-returning-sexual-harassment-fox-news-back-accusers-metoo-me-too-movement.

[10]    *Post-Weinstein, These Are the Powerful Men Facing Sexual Harassment Allegations*, Glamour, (May 18, 2019), https://www.glamour.com/gallery/post-weinstein-these-are-the-powerful-men-facing-sexual-harassment-allegations.

[11]    Tom Jackman and Deanna Paul, Alan Dershowitz countersues accuser in Jeffrey Epstein case, then is sued by David Boies, The Washington Post, (November 8, 2019, 3:39 PM), https://www.washingtonpost.com/crime-law/2019/11/08/alan-dershowitz-countersues-accuser-jeffrey-epstein-case-then-is-sued-by-david-boies/.

20

- Russell Simmons claimed that a Jane Doe suing him over an alleged rape in 1988 made up the event to extort him.[12]

88.    The false and defamatory statements exposed Ms. Ganieva to hostility, contempt, ridicule and professional disgrace.

89.    In order to be admitted to the New York State bar, Ms. Ganieva must pass an ethics and moral character test.  Such accusations against her will negatively impact this process and cause her severe damage.

90.     The false and defamatory statements imputed sexual immorality and involved criminal activity in connection with Ms. Ganieva. Such statements will inevitably cause her harm and damage in her ability to secure employment going forward, and in all of her relationships, personal and professional.

**FIRST CAUSE OF ACTION**
**(Defamation)**

91.    Ms. Ganieva hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

92.    As described above, Defendant Black has stated false information regarding, *inter alia*, the circumstances surrounding his relationship with Ms. Ganieva and payments made to Ms. Ganieva.

---

[12]    Ashley Cullins, *Russell Simmons Says Jane Doe's Rape Lawsuit is a "Vile" Extortion Attempt*, The Hollywood Reporter, (April 18, 2018, 6:31 PM). https://www.hollywoodreporter.com/business/business-news/russell-simmons-says-jane-does-rape-lawsuit-is-a-vile-extortion-attempt-1103734/.

21

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 88 of 349

93.     These statements were untrue and defamatory in that they falsely reported, *inter alia*, that Ms. Ganieva and Defendant Black engaged in a wholly consensual relationship and that Ms. Ganieva extorted Defendant Black.

94.     Defendant Black knew or should have known that such defamatory statements were false.

95.     Defendant Black made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

96.     Defendant Black's statements constitute defamation because they impugn Ms. Ganieva's honesty, trustworthiness, dependability, and professional fitness and abilities by falsely claiming, *inter alia*, that Ms. Ganieva engaged in a wholly consensual affair with Defendant Black and that Ms. Ganieva committed a crime by extorting Defendant Black.

97.     Defendant Black's statements constitute defamation because they accuse Ms. Ganieva of committing a crime, namely, extortion.

98.     Defendant Black's defamatory statements have harmed Ms. Ganieva's professional reputation and standing in her industry, have caused her economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost income, benefits, job security and opportunities for career advancement and have caused her embarrassment, humiliation and emotional injury.

99.     As a direct and proximate result of Defendant Black's defamation, Ms. Ganieva has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and emotional distress.

22

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 89 of 349

100.    As a direct and proximate result of Defendant Black's conduct, Ms. Ganieva has

suffered, and continues to suffer, harm for which she is entitled to an award of monetary

damages and other relief.

101.    Defendant Black's defamatory statements were malicious, willful, wanton, and

done with reckless disregard for Ms. Ganieva's rights.  As such, Ms. Ganieva is entitled to an

award of punitive damages.

### SECOND CAUSE OF ACTION
**(Defamation *Per Se*)**

102.    Ms. Ganieva hereby repeats, reiterates and re-alleges each and every allegation in

all of the preceding paragraphs as if fully set forth herein.

103.    As described above, Defendant Black has stated false information regarding, *inter

alia*, the circumstances surrounding his relationship with Ms. Ganieva and payments made to

Ms. Ganieva.

104.    These statements were untrue and defamatory in that they falsely reported, *inter

alia*, that Ms. Ganieva and Defendant Black engaged in a wholly consensual relationship and

that Ms. Ganieva extorted Defendant Black.

105.    Defendant Black knew or should have known that such defamatory statements

were false.

106.    Defendant Black made such defamatory statements with knowledge of their

falsity and/or with a reckless disregard for their truth or falsity.

107.    Defendant Black's statements constitute defamation per se because they impugn

Ms. Ganieva's honesty, trustworthiness, dependability, and professional fitness and abilities by

23

falsely claiming, *inter alia*, that Ms. Ganieva engaged in a wholly consensual affair with Defendant Black and that Ms. Ganieva committed a crime by extorting Defendant Black.

108.    Defendant Black's statements constitute defamation because they accuse Ms. Ganieva of committing a crime, namely, extortion.

109.    Defendant Black's defamatory statements have harmed Ms. Ganieva's professional reputation and standing in her industry, have caused her economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost income, benefits, job security and opportunities for career advancement and have caused her embarrassment, humiliation and emotional injury.

110.    As a direct and proximate result of Defendant Black's defamation, Ms. Ganieva has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and emotional distress.

111.    As a direct and proximate result of Defendant Black's conduct, Ms. Ganieva has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

112.    Defendant Black's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Ms. Ganieva's rights. As such, Ms. Ganieva is entitled to an award of punitive damages.

113.    Ms. Ganieva hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

114.    Defendant Black made defamatory statements with malice and with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

24

115.    Defendant Black's statements constitute defamation *per se* because they impugn Ms. Ganieva's honesty, trustworthiness, dependability and accuse her of a crime.

116.    Defendant Black's defamatory statements have harmed Ms. Ganieva's professional reputation and standing in her industry, have harmed her personal reputation, have caused her economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost income, benefits, job security and/or opportunities for career advancement, and have caused her embarrassment, humiliation and physical and emotional injury.

117.    As a direct and proximate result of Defendant Black's defamation, Ms. Ganieva has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and physical and emotional distress.

118.    As a direct and proximate result of Defendant Black's conduct, Ms. Ganieva has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

119.    Defendant Black's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Ms. Ganieva's rights.  Therefore, Ms. Ganieva is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

120.    Ms. Ganieva hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

25

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 92 of 349

121.    Defendant Black engaged in conduct toward Ms. Ganieva that is extreme and outrageous so as to exceed the bounds of decency in a civilized society; namely by, *inter alia*, subjecting her to defamatory statements and publicly accusing her of the crime of extortion.

122.    These actions were taken with intent to cause, or disregard for, the substantial probability of causing severe emotional distress.

123.    As a direct and proximate result of Defendant Black's extreme and outrageous conduct, Ms. Ganieva has suffered severe emotional distress.

124.    Defendant Black's conduct was wanton, malicious, willful and/or cruel, entitling Ms. Ganieva to an award of punitive damages.

### FOURTH CAUSE OF ACTION
### (Gender-Motivated Violence Pursuant to GMVA)

125.     Ms. Ganieva hereby repeats, reiterates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

126.    The above-described conduct of Defendant Black, including, but not limited to, Defendant Black's sexual assaults and rapes of Ms. Ganieva constitutes a "crime of violence" and a "crime of violence motivated by gender" against Ms. Ganieva as defined by the New York City Gender Motivated Violence Act, N.Y.C. Admin. Code § 8-903 (2017).

127.    The above-described conduct of Defendant Black, including, but not limited to, Defendant Black's sexual assaults and rapes of Ms. Ganieva, constitutes a "crime of violence" against Ms. Ganieva motivated: (i) by her gender; (ii) on the basis of her gender; and/or (iii) due, at least in part, to an animus based on her gender.

128.    Defendant Black committed a "crime of violence" against Ms. Ganieva because she is a woman and, at least in part, because he has an unlawful animus towards women.

26

Defendant Black's gender-motivated animus towards women is demonstrated by, among other things, his sexually violent and abusive treatment of women.

129.    As a direct and proximate result of the aforementioned gender-motivated violence, Ms. Ganieva has sustained in the past and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory damages.

130.    Defendant Black's gender-motivated violence against Ms. Ganieva entitles her to punitive damages and an award of attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the State of New York and the City of New York;

B.    An injunction and order permanently restraining Defendant and his partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.    An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.    An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate

27

Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

      E.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, reputational harm and harm to professional reputation, in an amount to be determined at trial, plus prejudgment interest;

      F.      An award of punitive damages, and any applicable penalties and/or liquidated damages in an amount to be determined at trial;

      G.      Prejudgment interest on all amounts due;

      H.      An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

      I.      Such other and further relief as the Court may deem just and proper.

28

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: June 1, 2021
      New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
    Jeanne M. Christensen
    Lindsay M. Goldbrum

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
jchristensen@wigdorlaw.com
lgoldbrum@wigdorlaw.com

*Counsel for Plaintiff*

29

# Exhibit 2

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

GUZEL GANIEVA,

*Plaintiff and*
*Counterclaim-Defendant,*

v.

LEON BLACK,

*Defendant and*
*Counterclaim-Plaintiff.*

Index No. 155262/2021

**ANSWER, AFFIRMATIVE**
**DEFENSES, AND**
**COUNTERCLAIMS**

**PRELIMINARY STATEMENT**

The Complaint in this case is a work of fiction.

According to the allegations in her unsworn Complaint, Plaintiff and Counterclaim-Defendant Guzel Ganieva was forced into a lengthy, non-consensual relationship with Defendant and Counterclaim-Plaintiff Leon Black, who belittled, humiliated, and abused her for years before finally coercing her to take his money and sign an NDA. The irrefutable documentary evidence—including numerous recorded conversations and written communications (spoken and written by Ganieva herself)—tells a stunningly different story. For some six years, the parties in this lawsuit were involved in a casual, episodic, and completely consensual relationship, actively pursued by Ganieva herself. During that time, Ganieva consistently professed her love and appreciation for Mr. Black, while regularly extracting millions of dollars from him in money, gifts, rent, furniture, tuition, vacations—the list goes on.

In 2015, however, Ganieva decided that she wanted more, and embarked on a campaign of extortion to get it. Flatly declaring that "I don't want to have to worry about money ever again,"

she threatened to go public about their relationship—explicitly stating that she would harm Mr. Black's personal and professional life—unless he paid her a sum of *one hundred million dollars*.

Aware that he had become the victim of a criminal extortion scheme, Mr. Black began to record his conversations with Ganieva. Those recordings speak for themselves, and are devastating to Ganieva's purported claims. Mr. Black repeatedly asked Ganieva why she was claiming an entitlement to *any* money, let alone to such an eye-popping sum. Ganieva had no legitimate answer and no legitimate claim. Notably, she never—*not once*, in a series of in-person meetings during her extortion campaign, or at any other time—*claimed sexual or physical abuse of any kind*. Instead, she repeatedly warned that if he did not pay her this money, she would report their affair to Mr. Black's wife, the board of his company, and the press. *This is, of course, the very definition of extortion.* A married man, and the founder and head of a major asset management business, Mr. Black was concerned that Ganieva would do exactly as she threatened, and that the publicity could have personal and business consequences. Under this threat, Mr. Black entered into a release and confidentiality agreement with Ganieva in October 2015, in exchange for what she wanted: cash.

In that agreement, Ganieva admitted that allegations she had made against Mr. Black "are not true"; released any possible claims against Mr. Black, and agreed to keep their relationship and the agreement confidential. Over the next five and a half years, Mr. Black upheld his end of the deal, paying Ganieva exorbitant sums of money pursuant to a regular monthly schedule.

Suddenly, in March 2021—after having accepted payments month in and month out, for well over five years, totaling millions of dollars—Ganieva posted a series of tweets proclaiming, among other things, that Mr. Black had "sexually harassed and abused" her "for years." Those statements were vicious, devastating—and utterly false. Predictably, the consequences have been ruinous: branded a "predator[]", Mr. Black has suffered public and private humiliation, and has

2

INDEX NO. 155262/2021
RECEIVED NYSCEF: 07/19/2021
Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 99 of 349

been the subject of endless press reports rehashing the Complaint's made-up allegations. In response, Mr. Black issued a public statement in his own defense that was measured, proportionate—and utterly true. With shocking perversity—having herself breached the release and confidentiality agreement, and pocketed many millions of dollars—Ganieva then brought this spurious lawsuit.

The mendacity of Ganieva's allegations is breathtaking. The most outrageous is Ganieva's allegation that Mr. Black sexually assaulted her on July 6, 2014, a claim of the utmost seriousness that only can be understood as an attempt to destroy Mr. Black's reputation. While the Complaint alleges that Mr. Black "suddenly" "barged" into her apartment when she was too sick to walk or move, Ganieva's own text messages show that she was perfectly well when she initiated contact with Mr. Black that day—telling him "[t]his is love. I need you…"—and requested that he bring a bottle of wine to her home that evening. And the messages show that she was perfectly unsurprised when he showed up at precisely the appointed time with the wine, as requested, in order to "tuck" Ganieva into bed.

Ganieva's texts to Mr. Black following the alleged assault make the falsity of the allegations all the more clear. Indeed, the very morning after she alleges that Mr. Black brutally attacked her, Ganieva reached out to Mr. Black on her own initiative to say that "[i]t was very nice to see you last night" . . . "I love you and thank you!!!! Xoxoxoxoxo and more love." And just two days later, Ganieva, again unprompted, asked her supposed brutal rapist if he wanted to get together soon, signing the message: "Lots of love, g." In the following days and weeks, she reached out to him on numerous occasions to meet in person, with such messages as, "you are the kindest", and signing off with, "[a]lways yours….".

Case 1:21-cv-08824-PAE Document 105-1 Filed 04/18/22 Page 100 of 349

In short, Mr. Black is guilty only of extremely poor judgment in entering into an affair with Ganieva in the first instance, in making an easy target of himself throughout their relationship by lavishing her with gifts and money, and in allowing himself to be extorted rather than immediately reporting Ganieva to law enforcement. Ganieva, on the other hand, must be held to account. In her defamatory Twitter posts, Ganieva purports to invoke "#MeToo," and claims to have come forward to protect "other women." In reality, her demonstrable lies and extortion are cynical attempts to weaponize a critically important and long-overdue movement. In so doing, Ganieva has done a tragic disservice to the brave truth-tellers—the vast majority of accusers—who have survived sexual abuse.

This lawsuit will reveal who Ms. Ganieva really is; what truly motivated this hit job; and whether she is acting alone or is working in concert with, or at the behest of, a third party who might wish Mr. Black ill.

## **FACTUAL BACKGROUND**

### **The Parties' Consensual Relationship**

1. Ganieva's allegations are false from the very start—even with respect to small-bore, gratuitous details that are squarely belied by objective fact. For instance, contrary to Ganieva's claims that Mr. Black picked her "out of a crowd in March 2008, while attending an International Women's Day event in NYC" when she was in her "early twenties" (Compl. ¶¶ 20, 21), the two in fact met at a private party thrown annually by a former colleague of Mr. Black's. Ganieva indeed admitted in a *New York Post* article published on April 8, 2021 that "she met Black at a 2008 party when she was 25 years old," yet she decided nonetheless to make different allegations in the Complaint.

2.      Ganieva, who claimed to have been working as a model at the time, immediately

began pursuing Mr. Black, who had been the founder and head of Apollo Global Management, a

major alternative asset manager. The two met several times for meals before entering into a years-

long consensual sexual relationship.

3.      At no time prior to the initiation of their sexual relationship did Mr. Black provide

for "a few 'arranged' appointments" for professional advancement (Compl. ¶ 23): for example,

contrary to the allegations, Mr. Black's facilitation of a meeting with a talent agency (*id.*) did not

occur, on information and belief, until years after the parties met, and was done at Ganieva's

request.

4.      And, contrary to her allegations, Ganieva most certainly did not tell Mr. Black "that

their relationship would not be sexual" (*Id.* ¶ 24). That *never* happened; rather, Ganieva was an

eager and willing participant in the parties' relationship from the start.

5.      On information and belief, Ganieva had been struggling financially before she met

Mr. Black. On information and belief, Ganieva reportedly had left her husband in Russia before

coming to the United States, had been sued on more than one occasion for nonpayment of rent,

was living in a small one-bedroom apartment with her son, and was struggling in her modeling

career.

6.      Ganieva apparently saw a golden ticket in Mr. Black, and persistently sought him

out following their initial meeting. She quickly began pressing him for substantial payments of

money and gifts. Contrary to Ganieva's bizarre framing of Mr. Black's generosity as something

that he imposed upon Ganieva—as if Mr. Black could somehow force Ganieva to request, accept,

and keep his money and presents—she repeatedly asked for such things as an expensive rental

apartment on the Upper East Side (which she settled on only after rejecting as too small an initial

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 102 of 349

apartment Mr. Black had proposed); a luxury car; lavish vacations (including at the beach and to the Alps); school tuition (for acting and at Columbia University); jewelry and clothing; a Steinway piano; a $40,000 commissioned portrait of herself (which she kept hung in her apartment); and many, many gifts of cash—all totaling in the millions of dollars.

7.      In 2011 and again in 2013, Ganieva requested two loans from Mr. Black of $480,000 apiece. Mr. Black acquiesced and provided the funds pursuant to two written agreements. (Compl. ¶¶ 37, 39). Mr. Black never requested repayment of either of the loans he agreed to make to Ganieva. As is clear from recorded conversations between the parties, the request unequivocally came from Ganieva herself; there was every reason for her to have made this request, and no reason for Mr. Black to have somehow forced the money on her. (It is also hard to fathom how anyone could force someone else to take a loan in this way; that incoherence, like so many others, is left unexplained in Ganieva's Complaint).

8.      Also unexplained in the Complaint is how it was that Mr. Black could possibly have forced Ganieva into a non-consensual affair over some six years. During their relationship, Ganieva was a grown woman in her late twenties and early thirties, and a trained mathematician and international model. At no time did Ganieva work for Mr. Black or live with him, or even see him very often.

9.      Beginning in 2011, she attended Columbia University (encouraged and financed by Mr. Black), earning a degree in mathematics.

10.     Although she asked Mr. Black to pre-pay for her apartment, Mr. Black did not have a key or access to it in any way. In fact, Ganieva specifically made clear at the outset of their relationship that she would not provide Mr. Black with access to her apartment, wishing for privacy and independence. Mr. Black had never asked for any other arrangement, and he of course

6

respected Ganieva's request. The two did not spend nights together, vacation together, or attend events together, other than on rare, isolated occasion. They saw each other episodically—sometimes weekly, sometimes monthly, sometimes not for long periods at a time.

11.     Ganieva traveled the world, had an active social life that did not include Mr. Black, and did exactly as she pleased, when she pleased. On more than one occasion, Ganieva would leave town or drop contact with Mr. Black for some time, only to reach out again to tell him how much she loved and missed him.

12.     In short, while the Complaint twists itself in a knot in an effort to portray a dynamic in which Mr. Black somehow overpowered, controlled, and intimidated Ganieva to do such patently absurd things as walk behind him and accept nearly one million dollars in loans, he simply had no means by which to do such things—and he did not. At any time, Ganieva could have just stopped seeing him—as she occasionally did for long stretches of time and as she did when the relationship finally came to a definitive end in 2014. Instead, as the documentary record conclusively reflects, Ganieva actively pursued Mr. Black throughout, and he lavished her with gifts, support, and praise.

13.     For example, during the course of their relationship, Ganieva repeatedly requested (including in writing) that Mr. Black help her with job interviews. As the documents make clear, Mr. Black made bona fide attempts to help her secure interviews and get a job. Yet, despite being underqualified and "unprepared" (as one interviewer put it), Ganieva believed that she was entitled to a highly competitive job at a highly competitive company, telling Mr. Black that she would settle for nothing less: "After studying a lot about Goldman Sachs I came to conclusion that a position of an analyst in Investment Banking will suit me best. I positively don't want to be in any other department." Yet Ganieva had no relevant experience, and only mediocre grades and

standardized testing scores, and it is unsurprising that she was unable to land the precise (and

highly coveted) job at Goldman Sachs that she demanded. It is false as a matter of fact, and

puzzling as a matter of logic, for Ganieva to allege that it was somehow part of some "sick plan"

for Mr. Black to arrange "sham interviews" for Ganieva in an effort to "belittle and humiliate her."

(Compl. ¶¶ 42, 43). As the documents show, all that Mr. Black did was try to help her. Indeed,

Ganieva herself admitted as much in an interview with the *New York Post* on April 8, 2021: "He

tried for some time to help her get a job, she said, but claimed he wanted favors in return."

14.     Ultimately, the parties' relationship concluded when Ganieva left New York at the

end of July 2014. Far from trying to "control" Ganieva or keep her in New York, Mr. Black wrote

to her that "maybe its for the best" and indeed, at her request, helped her with her visa and hefty

resettlement costs. There is no truth whatsoever to Ganieva's contention that she left New York

"to physically distance herself from Black." (Compl. ¶ 55). Rather, Ganieva repeatedly told Mr.

Black that she had to leave for immigration-related reasons, because, on information and belief,

her student visa had just expired upon her graduation from Columbia, and she had no legal status

in the United States.

15.     Ganieva's claim that Mr. Black somehow tried to exert "power over her" while she

was away (Compl. ¶ 57) is another fabrication. Mr. Black rarely reached out to Ganieva

unprompted and often did not even respond when she reached out. For example, between

November 2, 2014 and December 24, 2014—while Ganieva was thousands of miles away from

Mr. Black and not engaged in a sexual relationship with him—Ganieva on her own initiative texted

Mr. Black on no fewer than eight occasions, without response from Mr. Black. In these notes and

in others, she wrote such things as: "*You have no idea how much I miss you and love you. It's nice*

8

*to know that someone like you exist in the world even tho a bit far*," and "*I love you! I do!*"
(emphasis added).

### Ganieva's Extortion Campaign

16.     Up until May and June 2015, Ganieva continued to send text messages to Mr. Black proclaiming her love from afar, such as this three-part note on May 14: "*I need your love… And I need you love… Xoxo*" (emphasis added). On June 4, she sent Mr. Black this in a text: "*[m]any kisses and lots of love xoxo*" (emphasis added).

17.     Suddenly, on June 8, 2015, Ganieva sent a much more formal note, insisting that she needed to meet with him in person about a matter that she characterized, without detail, as "both urgent and important." Based on statements made by Ganieva to Mr. Black, this sudden shift in tone appears to have coincided with her failure to gain legal status in the United Kingdom; whatever the reason, Ganieva became intensely focused on getting even more money and trying to procure an expensive visa.

18.     Ultimately, at Ganieva's request, the parties met in New York on June 24, 2015, for what can only be described as a brazen shakedown by Ganieva. Ganieva warned Mr. Black that if he did not pay her a vast sum of money, she would tell the world about their affair. Shocked to his core, Mr. Black informed Ganieva that he believed that her conduct was extortionate and that he needed time to process what she was saying and to formulate a response.

19.     A number of additional in-person meetings followed, in the summer and fall of 2015: on June 26, July 21, July 24, August 12, August 14, August 19, September 17, October 15, and October 19. Understanding that he was the victim of a blatant criminal extortion scheme, Mr. Black consulted counsel, including criminal defense attorneys. The parties' conversations thereafter were monitored and recorded.

20.     Ganieva's demand was nothing less than *one hundred million dollars*. She boldly declared that if she did not get this amount from Mr. Black, she would go public, and ruin his family, his business, and his life. As Ganieva put it in her own words, in a recorded conversation: "*The more, the longer I wait, the more sure I become that I actually, I prefer to go public*," and "*I'm dying to talk to press about it.*"

21.     Mr. Black repeatedly asked Ganieva to explain why she was claiming a right to any money at all. Not surprisingly, Ganieva failed to identify any good faith basis for her demand. Instead, she offered two facially illegitimate rationales.

22.     First, Ganieva claimed that she was owed money on some form of palimony theory, claiming that she had been "like a wife" to him and that "for me, it was like a marriage." Based on this faulty reasoning, she claimed entitlement to half of his earnings: "When men and women in relationship for a very long time and woman doesn't work and man works, and she gets all the stress from his work, and he makes a lot of money—usually by law—she's entitled to half, OK?" She claimed that "in the marriage, I would get half of what you earned," such that she was entitled to "a couple of billions," but "I'm not asking for that, even though I think I totally deserve it."

23.     When Mr. Black repeatedly pointed out that "having an on-and-off affair" for "five years" was not "akin to a marriage," Ganieva landed on a second putative theory. While vague and multi-pronged, the argument effectively was that she had suffered "emotionally" as a result of their relationship and the fact that "our relationship didn't work." The reason for this, she said, was that "people are attacking me and humiliating me" and "all my chances for the future are limited because of the gossip that somebody is spreading," and "I'm pretty sure it's coming from you."

24.     The claims were nothing short of "paranoid," as she had to repeatedly admit even as she made them, and included the following (among many others):

10

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 107 of 349

- "People tried to drug" her, and she had been "poisoned."

- She was being stalked, bullied, and harassed by waiters and hairdressers and teachers and perfect strangers, who made her "feel bad." She also was being stalked by "the children of the rich. It's the high society. It's everybody from high society." Likewise, she claimed that "basically everybody in the society kind of was making fun of me."

- Several billionaires, whom she named, were threatening her and might be involved in a "conspiracy" against her. Ganieva also claimed that one of those billionaires, who had given her a job as a writer for his publication, was "making fun" of her and also had threatened to fire her unless she slept with him. She said that this individual's employees were trying to "diminish" her and make her "look in a certain way," and had twisted and re-written articles that she had authored.

- Her son was bullied at camp and at school and had choked on a piece of meat, all of which she claimed was attributable to Mr. Black and to the parties' relationship. She stated that she had withdrawn her son from a series of schools as a result of the bullying attributable to Mr. Black.

- People were saying bizarre things to her and her son, which she likewise blamed on Mr. Black. For example, she said that "someone put a German newspaper in front of my door, then the woman came knocking at my door, saying "'sorry for your loss, can you please give me money?'" In another example, she said: "Then there was this guy [who] started pursuing us…. Just some random guy, like black guy, started like harassing us." She stated that this "random guy" had told her that her son had to play basketball professionally, and when she demurred, he stated: "'You have to pay for my clothes'" and "it was just, it was just terrible."

- She had been invited to one of her son's games and "I would see all the parents kind of acting very strange and when he [her son] started shooting, they would say '[son's name], we love you, we love you' but in a very acted out manner, which made me very uncomfortable."

- She had gone to "parents' week" for a school and "everywhere I went, there were kind of jokes and assumptions were made towards me and my son that they know that I'm with you and that I am a terrible person and I have to change."

- She "had to deal with a lot of public harassment, humiliation. And—I don't know what. I think it has to be investigated. My son was harassed in every school, I am getting harassed in every corner of the world."

- She described being targeted and bullied due to their relationship, including by a teacher during an art class at Columbia. Ganieva reported an exchange in which the teacher had said "'now look at the lilies and tell me what you think about it?'" Ganieva stated that she had responded: "'well, it's so, it's done in a way where I

11

feel like I could do it.'" According to Ganieva, "the teacher says, 'no, you can't' and everybody started laughing."

- She dropped out of graduate school in Russia because she had been "tortured" when "they" said that Ganieva had not known the definition of a particular word, "and then there were other inappropriate remarks and jokes towards me." The only example she could provide is that in class a teacher had referenced a well-known financier with whom Mr. Black had worked decades ago, and that "I think they were referring to you, but I don't know." When Mr. Black asked her, "why in Russia would they bring that up?," she responded "I don't know."

- She "stopped going out because I didn't to be treated like that. And like even when I went just for job interviews or I went to pick up my son, these things were happening, you know, and people were kind of making fun of me."

- She said: "I went through a lot of public humiliation. My reputation is really damaged. My son's future opportunity… Permanently…" When Mr. Black responded that this was not because of him, Ganieva replies: "No, but it's because of our relationship. It's a consequence… it's a consequence of our relationship. And, as a man, as a decent man. As a fair man, you can understand that. And you can help. It's not difficult for you to help me."… All those years I lived very badly. And you could have taken care of me…better care. You could have given me a job. You could have given me a visa…This time... I want to tell you and I want to do what's right for me. I totally deserve it. I deserve more."

25.     Numerous additional examples abound. In short, Ganieva repeatedly claimed that her reputation had been damaged, while seemingly also agreeing with Mr. Black that he had not said anything to anyone about her. Ganieva said to Mr. Black that she was "pretty sure that you are connected to all of this harassment and blame," but when asked why he would possibly do that, she simply said "I don't know." Mr. Black further asked: "why would I do that, why would you think it was me who did that and at the same time as I am supporting you? It makes no sense." To this, Ganieva responded: "No, I don't have any proof that you've done it, right, but it all comes from our relationship. If we didn't have a relationship, this wouldn't happen to me or my son." As noted, she admitted on several occasions that she might be "paranoid."

26.     Ganieva also admitted that she had not previously told Mr. Black about this alleged harassment. For example, Mr. Black said: "And all this harassment. I never heard a word of it. I

12

never heard a word of any of these issues. And it's only a year later after we haven't seen each for a year, it's coming out." She responded simply: "I'm telling you now."

27.     A small facet of these claims was a vague assertion that Mr. Black had been somehow "abusive." Ganieva clarified, however, that that her definition of "abuse" was that, according to her, Mr. Black "liked to make me feel worthless" and "to put me down and make me feel like I'm nothing." She also claimed that she believed he was "abusive" because, according to her, Mr. Black and his "friends and other people" had been "extremely unfair" to her and her son at his schools, "all over the world."

28.     Most notable is what Ganieva did not claim: she *never*—not once—claimed physical or sexual assault of any kind. When Mr. Black stated that "we were two consenting adults that had an affair," she responded only that "it just lasted a little bit too long and you got a little bit too involved." Mr. Black repeatedly and explicitly asked her: "How did I abuse you?" She *never* responded that he had been abusive in any physical or sexual way. Indeed, Mr. Black said, "you know I've never abused you," and she appeared to accede.

29.     Thus, to the limited extent that Ganieva expressed a claim of "abuse," she made clear that she was referring to "emotional" abuse, connected in some way to her feelings for Mr. Black. Indeed, even while actively extorting him, she made clear that "I will never find anybody like you." On the last day they ever met in person, her parting words included these: "*You know I still love you very much*."

### The Release and Confidentiality Agreement

30.     Over the course of ten in-person meetings in the summer and fall of 2015, the parties eventually came to agreement. At a lunch meeting at the Four Seasons restaurant on October 19, 2015, they finalized the terms they had discussed, to include payment by Mr. Black

to Ganieva of $100,000, forgiveness of approximately $1,000,000 in loans, and "other consideration to which has been agreed." That other consideration included an agreement that the $100,000 monthly payments would continue for 15 years, and that Mr. Black would provide payment of £2,000,000 for Ganieva to use toward obtaining legal status in the United Kingdom. In exchange, they agreed that Ganieva would sign a one-page release and confidentiality agreement (the "Agreement" or the "Release and Confidentiality Agreement").

31.    This one-page Agreement contains only two, very simple understandings, as is clear in the very title of the document: "**<u>RELEASE AND CONFIDENTIALITY AGREEMENT</u>**" (emphasis in original). In it, Ganieva admitted that the claims she had made about Mr. Black to Mr. Black—including about he had been "abusive" to her—were fabricated: "GG [Ganieva] has made certain allegations and asserted certain claims against LBD [Mr. Black], which she made under extreme stress and *which she now concedes are not true*, and which allegations and claims, if made public, would damage LDB's career, reputation and relationships with others." (Emphasis added).

32.    The first clause provides a broad and clear release:

> GG hereby releases, remises and forever discharges LDB from all matters, causes of action, claims, suits and any and all further liability or accountability, in law or equity, by reason of any matter, cause or thing whatsoever arising prior to the signing of this Agreement, contemporaneous with the signing of this Agreement or any time in the future after the signing of this Agreement.

33.    The second clause provides a broad and clear confidentiality agreement:

> GG hereby agrees, except as otherwise required by applicable law, never to disclose, directly or indirectly, to any individual, entity or other potential recipient, any information relating to (i) the allegations and claims that she has asserted against LDB, (ii) the signing, content or other attributes of this Agreement, including any consideration furnished by LDB in connection with the signing of

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 111 of 349

this Agreement and (iii) any other matters that could damage LDB's career, reputation and relationships with others.

34.     Again, the October 19, 2015 conversation was monitored and recorded. Ganieva's allegations that strain to plead duress are complete fabrications. (*See* Compl. ¶¶ 64-71). At no time, either before or during the meeting, did Mr. Black utter the phrases (which purport to be direct quotations), **"If you do not take the money, I will put you in prison"** and "**If you do not take the money, I will destroy your life**" (*id.* ¶ 3, emphasis in original; *see also id.* ¶ 63)—or anything of the sort.

35.     Even if Mr. Black did not have indisputable recorded evidence that such things simply were never said, they would defy credulity and common sense in any event: if a private citizen even had the power to do such things, it is unclear why that person would force millions of dollars upon someone instead of just doing those things. Just as with the loans, Ganieva was desperate for the money and—far from being forced to take it—she extorted it.

36.     At no time did Mr. Black threaten or intimidate Ganieva. He did not "shove[] a piece of paper across the table," and he did not tell her "she had to sign it." (Compl. ¶ 64). Ganieva in no way appeared "nervous," she had no "difficulty understanding" the Agreement, and she did not "only read it once, quickly". (*Id.* ¶¶ 65, 67). Mr. Black did not "order[] her to sign" anything. (*Id* ¶ 69). The allegation in bold that purports to be yet another quote—"**[I will be paying you] as long as you keep your mouth shut"**—simply was not said. (*Id.* ¶ 70, emphasis in original). There is a record; each of these allegations is patently false.

37.     *What actually happened at that meeting is very much the opposite of what Ganieva alleges happened.* Over the extended conversations between the parties, Ganieva well understood the terms of the Release and Confidentiality Agreement, and in fact it was Ganieva who had first suggested they should have a written instrument.

15

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 112 of 349

38.     At the October 19 meeting, Mr. Black presented Ganieva with the Agreement and encouraged her to "take your time" and "read it carefully"—and she did. Indeed, Ganieva took approximately 12 minutes to review the one-page document, including reading parts of it aloud and engaging in extensive discussion about it. Not only did Mr. Black explain it to her, but Ganieva made clear her understanding that "basically I cannot sue you" and that "I can't mention your name, ever, basically." As to this, Mr. Black clarified that she could "say that you know me," but that, under the terms of the Agreement, she had to refrain from discussing their relationship or her putative claims or the parties' financial arrangement.

39.     The second Agreement was an exact duplicate of the first, and Ganieva willingly signed this duplicate as well.

40.     Ganieva was elated. After the papers were signed, she spent approximately 45 minutes finishing her lunch, sharing a Grand Marnier soufflé with Mr. Black, discussing her investment and travel plans, and laughing about the fact that she was "a woman of means now."

41.     Shortly after their meeting, she texted him: "Thank you for everything. Talk soon xoxo."

42.     As per their Agreement, Mr. Black forgave a series of loans to Ganieva totaling approximately $1,000,000, made a simultaneous payment to Ganieva of $100,000, and provided "other consideration to which has been agreed"—continuing monthly payments and payment of £2,000,000 for Ganieva to use in an effort to obtain legal status in the United Kingdom. From approximately October 2015 until approximately March 2021 (after Ganieva posted her defamatory tweets), Ganieva accepted millions in monthly payments from Mr. Black pursuant to the Agreement.

16

43.     After the parties entered into the Agreement, Mr. Black set up a new account from which to make the monthly payments to Ganieva, which he called "E Trust." In her Complaint, Ganieva states that she "has no knowledge as to why payments began from the 'E Trust' or what it is." (Cplt. ¶ 73). To be very clear: *the "E" in "E Trust" stands for "Extortion.*"

## Ganieva's False Allegations of Sexual Abuse

44.     As noted, even when Ganieva was extorting Mr. Black in the summer and fall of 2015, she never once claimed to have been physically or sexually abused, let alone raped.

45.     These claims are viciously and demonstrably false—as the documents and recordings make one hundred percent clear. Not only does Ganieva never make such an allegation in all of the recorded conversations, but the text message exchanges around the time of the alleged rape are dispositive.

46.     To begin, the allegation that, in 2008, Mr. Black took Ganieva to "a studio apartment with a mattress on the floor and no other furniture" (Compl. ¶ 27) does not read true, and it is not true. Even more preposterous is the notion that he "forced sadistic sexual acts on her without her consent and despite her saying no." (*Id.* ¶ 26).

47.     In her Complaint, Ganieva claims that "[i]n the days leading up to the July 4, 2014 weekend, Ms. Ganieva became sick and was home for a number of days unable to go to the store or cook for herself." (Compl. ¶ 47). She claims that on July 6, she was "debilitated" and "in a weakened state, having been sick for almost a week"—so weak that she "could barely walk." (*Id.* ¶¶ 48, 49). She claims that she was "limp and unable to move." (*Id.* ¶ 51). She also claims that Mr. Black came to her home as though by surprise, "suddenly" knocking at her door and then "barg[ing] in." (*Id.* ¶ 47). These are lies.

17

48.     Rather, Ganieva had told Mr. Black that she felt sick on July 1, but on the very next day (July 2), she wrote to him that she was already feeling "much better," that "I think I will be all done by tonight," and that "I was just thinking about you."

49.     On June 28, Ganieva had written to Mr. Black: "*Baby… I'm all alone. Let's get together soon. I miss you. Xoxo*" (emphasis added). She said she felt unwell for a day, as noted, but had recuperated by the very next day, July 2. Then, on July 6, Ganieva wrote to Mr. Black, unsolicited: "This is love. *I need you…*" (emphasis added). In response to these entreaties, Mr. Black said that he would be driving back to the city in the evening of July 6, and inquired if he could "come over and tuck you in at 10:30?" She agreed, later adding: "Aaah. Can you please bring a bottle of wine if you can?" Mr. Black later said that he was back and asked if he could come earlier (at 9:45pm), with the requested wine. Ganieva again agreed, immediately.

50.     Thus, it was Ganieva who had initially reached out to "get together" because she was "all alone," then reached out again to tell him that she loved and needed him, and invited him to bring a bottle of wine when he was to come over on the night of July 6 to tuck her into bed. Though she had not felt well for a single day on July 1, she reported that she was "much better" by July 2 and that she thought she would be "done" with what ailed her by that night—*four nights* before the parties met on July 6.

51.     Clearly, Ganieva was not unwell by July 6—let alone debilitated and weak. Clearly, she was looking forward to a pre-planned romantic evening with the wine she requested, and, clearly, it was anything but "sudden[]"when Mr. Black showed up at precisely the appointed time.

52.     There simply was no forced sex. A consensual rendezvous plainly had been contemplated by both parties, and Ganieva reached out first thing the next morning with a message

of thanks and love: "*Good morning. It was very nice to see you last night. I already feel better....*
*I love you and thank you!!! Xoxoxoxoxo and more love*" (emphasis added).

53.     On July 9, she reached out to Mr. Black again, asked if he wanted to get together,
and sent "lots of love." When Mr. Black did not respond, Ganieva reached out yet again the
following day, July 10, to try again to get together.

54.     The Complaint's false allegations continue. Ganieva claims that "[a]fter this rape,
Ms. Ganieva took her son and left New York to physically distance herself from Black." (Compl.
¶ 55). This, too, is untrue. In the days and weeks that followed, Ganieva repeatedly and insistently
reached out to Mr. Black on numerous occasions, asking him, and indeed "begging" him, to get
together—which they did on no fewer than three occasions over the next few weeks.

55.     Ganieva explained that she was having visa issues (apparently because, on
information and belief, her student visa had expired upon her graduation that spring), and that she
had to leave New York and return to Russia as a result.

56.     While Mr. Black told Ganieva that he was "saddened" that she had to leave, he
texted that "maybe its for the best." At her request, Mr. Black helped her set up interviews abroad
and provided financial assistance for her relocation.

57.     In the few weeks between July 6 and her departure from New York on July 31,
2014, Ganieva and Mr. Black saw each other several time, at her request. Likewise, she frequently
sent him loving messages, telling him the week after the alleged "rape" that he is "the kindest",
and signing her text with, "Always yours….".

58.     Ganieva sent Mr. Black what he characterized as "beautiful flowers" on his
birthday, the day she left New York. Mr. Black sent Ganieva a note to say that he was "very

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 116 of 349

touched by your thoughtfulness and love." Ganieva texted this from the plane, as she was departing: "I love you and miss you already."

59.     From the time Ganieva left New York in July 2014, until the day she returned to extort him in June 2015, she continued to send him adoring messages, to try to see him, and to request financial, career, and other assistance.

60.     The lies in the Complaint go on. Ganieva alleges that, while she was abroad, Mr. Black "managed to always be aware of where she was and what she was doing" and that she "continued to feel threatened by Black and his power over her." (Compl. ¶¶ 55, 57). This is nonsense.

61.     After Ganieva left New York, the record is clear that Mr. Black made minimal effort to maintain contact with her, let alone try to exert any "power over her." For example, between October 23, 2014 and February 19, 2015, Ganieva continually texted Mr. Black without response. She sent such messages to him as: "*You have no idea how much I miss you and love you. It's nice to know that someone like you exist in the world even tho a bit far,*" and "*I love you! I do!*" (emphasis added).

62.     Ganieva and Mr. Black did not have friends or a social group in common. As is explicitly clear from the recorded conversations—and as Ganieva seemed to acknowledge—Mr. Black never told anyone about their relationship. It is delusional—and, as Ganieva herself has put it, "paranoid"—for her to allege that "it seemed that no matter where she traveled, inevitably she happened to meet someone that [sic] knew Black and he managed to always be aware of where she was and what she was doing." (Compl. ¶ 55). To the extent he had any idea where she was, it was only because she so often reached out to let him know about her travels (and, at times, to request money for them). In her texts, she informed him about her exotic comings and goings,

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 117 of 349

including travel to Moscow, Rome, London, a beach vacation, and a ski junket in the French Alps at Courchevel.

63.     As noted, in her 2015 campaign of extortion, Ganieva had tried on a theory of palimony, and apparently recognized that this was not an actionable claim. She also tried on a "paranoid" theory of harassment and belittlement, but must have been counseled that, this too, is not actionable in a non-employment context. Finally, she has landed on a brand-new theory—alleging now, so many years later, that she had been raped.

64.     Seemingly mindful of the relevant 7-year statute of limitations—and clearly unaware that Mr. Black has retained their earlier text communications and recorded their later conversations—Ganieva has alighted upon July 6, 2014 as the date on which she was allegedly raped.

65.     Unfortunately for Ganieva, the documentary record reveals her for the fabulist and extortionist that she is. Mr. Black has only ever been kind, supportive, and exceedingly generous to Ganieva. Clearly, he exercised bad judgment in entering into the relationship in the first instance and in paying an exorbitant ransom to exit it; just as clearly, there is no truth to Ganieva's vicious, mercenary slander that has devasted his family, his business, and his life.

### Ganieva's Defamatory Tweets and This Frivolous Lawsuit

66.     On March 17, 2021, Ganieva posted a series of false and defamatory tweets on Twitter about Mr. Black. Ganieva's Twitter account appears to have been set up for the sole purpose of publishing the defamatory tweets. She apparently only set up the account in March 2021, and the thread of three defamatory tweets on March 17, 2021 appear to be the only tweets she has posted either before or since that date. She presently "follows" only 21 Twitter users, including several investigative reporters who have reported on sexual abuse matters, two women

21

who have made sexual harassment allegations in high-profile matters, and the law firm and lawyer she retained in this case. In the defamatory tweets, Ganieva pointedly refers to Mr. Black as "Apollo Global Management's CEO and Chairman, Leon Black", in an obvious effort to maximize the professional and reputational harm to Mr. Black. At the end of the thread, Ganieva included the hashtags #MeToo and #LeonBlack, similarly maximizing the reach of her defamatory tweets.

67.     Ganieva's defamatory comments included: (i) that she had been "sexually harassed and abused" by Mr. Black "for years"; (ii) that Mr. Black "could not understand me when I refused his sexual advances"; (iii) that she had been "bullied, manipulated, threatened, and coerced" by Mr. Black; (iv) that, "under duress, I was forced to sign an NDA in 2015"; and (v) that she did "not want this type of predatory behavior to continue happening to other women." (Compl. ¶ 81).

68.     In response, and quite understandably given the circumstances, Mr. Black publicly defended himself, including stating principally that: "I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago"; her allegations were "completely fabricated"; and "I have been extorted by Ms. Ganieva for many years and I made substantial monetary payments to her. . .". (Compl. ¶ 82).

69.     Ganieva made additional false and defamatory statements of fact concerning Mr. Black in an interview with the *New York Post* on April 8, 2021, including that "Black's abuse 'was over a long period of time and it was tragic.'" Josh Kosman, *Leon Black's Surprise Apollo Global Exit Came Amid Sexual Harassment Allegation*, N.Y. Post (Apr. 8, 2021), https://nypost.com/2021/04/08/leon-black-accused-of-sexual-harassment/.

70.     This frivolous, and indeed sanctionable, Complaint followed.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 119 of 349

## ANSWERS TO SPECIFIC ALLEGATIONS

Defendant and Counterclaim-Plaintiff Leon Black denies all allegations in the Complaint, including those in any headings and footnotes, except as expressly admitted herein.

1.      Denies each and every allegation in Paragraph 1 of the Complaint, except admits that the April 8, 2021 Bloomberg article contains the quoted text, and respectfully refers the Court to the April 8, 2021 Bloomberg article and Mr. Black's statement to Bloomberg for the full text and context of Mr. Black's statement to Bloomberg, and avers that Mr. Black provided the following statement to Bloomberg in connection with the article:

> I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago. Any allegation of harassment or any other inappropriate behavior towards her is completely fabricated. The truth is that I have been extorted by Ms. Ganieva for many years and I made substantial monetary payments to her, based on her threats to go public concerning our relationship, in an attempt to spare my family from public embarrassment. At my direction, my counsel referred Ms. Ganieva's conduct to the criminal authorities several weeks ago and I welcome a thorough investigation of this matter. I also want to emphasize that this is entirely a personal matter; this matter has nothing to do with Apollo or my decision to step away from the firm.

2.      Denies each and every allegation in Paragraph 2 of the Complaint.

3.      Denies each and every allegation in Paragraph 3 of the Complaint.

4.      Denies each and every allegation in Paragraph 4 of the Complaint, and avers that Ganieva made such threats on numerous occasions, including in recorded conversations.

5.      Denies each and every allegation in Paragraph 5 of the Complaint, including those contained in footnote 2, except admits that Mr. Black dined on occasion with Ganieva at restaurants and on rare occasions appeared with her at events.

6.      Denies each and every allegation in Paragraph 6 of the Complaint, except admits that Mr. Black made the quoted statement during the October 29, 2020 earnings call, and

23

respectfully refers the Court to the October 29, 2020 earnings call transcript for the full text and context of Mr. Black's statements on that call.

7.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 7 of the Complaint regarding Ganieva's legal education and her state of mind. Denies each and every allegation in Paragraph 7 of the Complaint.

8.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 8 of the Complaint regarding Ganieva's state of mind. Denies each and every allegation in Paragraph 8 of the Complaint.

9.    Denies each and every allegation in Paragraph 9 of the Complaint, except admits that Ganieva, or someone purporting to act on Ganieva's behalf, posted the excerpted tweets on March 17, 2021, and respectfully refers the Court to the tweets for their full text and context, and admits that Mr. Black texted Ganieva the following day and asked her to call him.

10.    Denies each and every allegation in Paragraph 10 of the Complaint, including those contained in footnote 3, except admits that Mr. Black described Ganieva's conduct as extortion, and avers that such description is accurate.

11.    Denies each and every allegation in Paragraph 11 of the Complaint, except admits that Mr. Black referred Ganieva's extortion to the appropriate criminal authorities.

12.    Denies each and every allegation in Paragraph 12 of the Complaint.

13.    Denies each and every allegation in Paragraph 13 of the Complaint.

14.    Denies each and every allegation in Paragraph 14 of the Complaint.

15.    To the extent the allegations in Paragraph 15 of the Complaint call for legal conclusions, no response is required. To the extent any response is required, denies each and every allegation in Paragraph 15 of the Complaint.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 121 of 349

16.      To the extent the allegations in Paragraph 16 of the Complaint call for legal conclusions, no response is required. To the extent any response is required, denies that Mr. Black engaged in any act or omission giving rise to the claims alleged in the Complaint, and admits that Mr. Black resides in New York State and that Ganieva purports to invoke the Court's jurisdiction.

17.      To the extent the allegations in Paragraph 17 of the Complaint call for legal conclusions, no response is required. To the extent any response is required, denies that Mr. Black engaged in any act or omission giving rise to the claims alleged in the Complaint, and admits that Ganieva purports to invoke venue in New York County.

18.      Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 18 of the Complaint.

19.      Denies each and every allegation in Paragraph 19 of the Complaint.

20.      Denies each and every allegation in Paragraph 20 of the Complaint, except admits that Mr. Black met Ganieva in or around March 2008, and avers that Ganieva and Mr. Black met at a party and that Ganieva sought Mr. Black out.

21.      Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 21 of the Complaint as to Ganieva's marital status and under what circumstances Ganieva moved from Russia to the United States, and admits that Ganieva has a son. Denies each and every remaining allegation in Paragraph 21 of the Complaint.

22.      Denies each and every allegation in Paragraph 22 of the Complaint.

23.      Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 23 of the Complaint as to who Ganieva "later met." Denies each and every allegation in Paragraph 23 of the Complaint.

24.      Denies each and every allegation in Paragraph 24 of the Complaint.

25

25.     Denies each and every allegation in Paragraph 25 of the Complaint.

26.     Denies each and every allegation in Paragraph 26 of the Complaint.

27.     Denies each and every allegation in Paragraph 27 of the Complaint.

28.     Denies each and every allegation in Paragraph 28 of the Complaint.

29.     Denies each and every allegation in Paragraph 29 of the Complaint.

30.     Denies each and every allegation in Paragraph 30 of the Complaint, and avers that Mr. Black often tried to help and support Ganieva, including by renting an apartment for her in a school district that she wanted for her son, and that, while Mr. Black initially told Ganieva he would try to help her with a recommendation for Harvard Business School, ultimately, as a result of her extortion of him, he told her he would not do so.

31.     Denies each and every allegation in Paragraph 31 of the Complaint.

32.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 32 of the Complaint, including about Ganieva's state of mind, except admits that Ganieva enrolled in an undergraduate program at around the time indicated.

33.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 33 of the Complaint as to Ganieva's state of mind. Denies each and every allegation in Paragraph 33 of the Complaint.

34.     Denies each and every allegation in Paragraph 34 of the Complaint, except admits that Mr. Black made a loan to Ganieva, pursuant to her request, in 2011.

35.     Denies each and every allegation in Paragraph 35 of the Complaint, except admits that Mr. Black made a loan to Ganieva in 2011 pursuant to Ganieva's request and that certain terms of the loan were memorialized in a one-page, signed document, and respectfully refers the Court

26

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 123 of 349

to the document referenced in Paragraph 37 of the Complaint for the document's full text and context.

36.     Denies each and every allegation in Paragraph 36 of the Complaint, and respectfully refers the Court to the document contained in Paragraph 37 of the Complaint for its full text and context.

37.     Denies each and every allegation in Paragraph 37 of the Complaint, and respectfully refers the Court to the document contained in Paragraph 37 of the Complaint for its full text and context.

38.     Denies each and every allegation in Paragraph 38 of the Complaint.

39.     Denies each and every allegation in Paragraph 39 of the Complaint, except admits that Mr. Black made a loan to Ganieva in 2013 pursuant to Ganieva's request, and respectfully refers the Court to the document contained in Paragraph 39 of the Complaint for its full text and context.

40.     Denies each and every allegation in Paragraph 40 of the Complaint.

41.     Denies each and every allegation in Paragraph 41 of the Complaint, except admits that Mr. Black helped Ganieva with her job search.

42.     Denies each and every allegation in Paragraph 42 of the Complaint.

43.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 43 of the Complaint regarding Ganieva's purported communications with Goldman Sachs, and respectfully refers the Court to those communications for their full text and context, and admits that Mr. Black helped Ganieva with her job search. Denies each and every remaining allegation in Paragraph 43 of the Complaint.

27

Case 1:21-cv-08824-PAE    Document 105-1    Filed 04/18/22    Page 124 of 349

44.      Denies knowledge or information sufficient to form a belief about the truth of the allegation in Paragraph 44 of the Complaint that Ganieva "never received an offer from any financial company in New York," and admits that Mr. Black helped Ganieva with her job search. Denies each and every remaining allegation in Paragraph 44 of the Complaint.

45.       Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 45 of the Complaint regarding Ganieva's purported communications with Goldman Sachs, and respectfully refers the Court to those communications for their full text and context. Denies each and every allegation in Paragraph 45 of the Complaint.

46.      Denies each and every allegation in Paragraph 46 of the Complaint.

47.      Denies each and every allegation in Paragraph 47 of the Complaint, except admits that on July 6, 2014, Mr. Black returned from the Hamptons, and avers that he had previously arranged with Ganieva to visit her at her apartment on East 77th Street at an appointed time.

48.      Denies each and every allegation in Paragraph 48 of the Complaint.

49.      Denies each and every allegation in Paragraph 49 of the Complaint.

50.      Denies each and every allegation in Paragraph 50 of the Complaint.

51.      Denies each and every allegation in Paragraph 51 of the Complaint.

52.      Denies each and every allegation in Paragraph 52 of the Complaint.

53.      Denies each and every allegation in Paragraph 53 of the Complaint.

54.      Denies each and every allegation in Paragraph 54 of the Complaint.

55.      Denies each and every allegation in Paragraph 55 of the Complaint, and avers that Ganieva informed Mr. Black that her departure from New York was due to immigration issues.

56.      Denies each and every allegation in Paragraph 56 of the Complaint.

57.      Denies each and every allegation in Paragraph 57 of the Complaint.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 125 of 349

58.     Denies each and every allegation in Paragraph 58 of the Complaint, and avers that, prior to returning to New York, Ganieva had requested to meet with Mr. Black.

59.     Denies knowledge or information sufficient to form a belief about the truth of the allegation in Paragraph 59 of the Complaint, and avers that Mr. Black never requested repayment of either loan he made to Ganieva.

60.     Denies each and every allegation in Paragraph 60 of the Complaint.

61.     Denies each any every allegation in Paragraph 61 of the Complaint, and avers that Ganieva threatened to go public about their relationship unless he paid her a sum of one hundred million dollars.

62.     Denies each and every allegation in Paragraph 62 of the Complaint.

63.     Denies each and every allegation in Paragraph 63 of the Complaint.

64.     Denies each and every allegation in Paragraph 64 of the Complaint, and avers that the parties met at the Four Seasons Restaurant on October 19, 2015, that Mr. Black provided Ganieva with an Agreement containing the terms that the two previously had discussed, and that he encouraged Ganieva to take her time and to read it carefully.

65.     Denies each and every allegation in Paragraph 65 of the Complaint, and avers that Ganieva made clear that she well understood each and every term of the Agreement.

66.     Denies each and every allegation in Paragraph 66 of the Complaint.

67.     Denies each and every allegation in Paragraph 67 of the Complaint.

68.     Denies each and every allegation in Paragraph 68 of the Complaint, and avers that only Ganieva signed the Agreement.

69.     Denies each and every allegation in Paragraph 69 of the Complaint, except admits that Ganieva signed two identical copies of the Agreement.

70.     Denies each and every allegation in Paragraph 70 of the Complaint.

71.     Denies each and every allegation in Paragraph 71 of the Complaint, including those in footnote 4, except admits that Mr. Black retained both copies of the Agreement.

72.     Admits the allegations in Paragraph 72 of the Complaint.

73.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 73 of the Complaint regarding how Ganieva's bank statement recorded funds, or as to what Ganieva did or did not know. Admits that Mr. Black had previously sent funds to Ganieva and admits that, after Ganieva's extortion of him, Mr. Black set up the "E Trust" account, and that funds began to be transferred from the E Trust account beginning on or about October 22, 2015. Avers that the "E" in "E Trust" stands for "Extortion."

74.     Denies each and every allegation in Paragraph 74 of the Complaint, including each and every allegation contained in the excerpted text messages, except admits that Ganieva sent Mr. Black the October 15 and October 16, 2019 text messages quoted therein, and that Mr. Black did not respond to the text messages, and respectfully refers the Court to those text messages for their full text and context.

75.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 75 of the Complaint regarding Ganieva's retention of legal counsel and about the alleged letter dated March 6, 2020. Admits that counsel purporting to represent Ganieva sent a letter to Mr. Black on February 18, 2020, and that Mr. Black did not respond to that letter.

76.     Denies each and every allegation in Paragraph 76 of the Complaint, except admits that Mr. Black has both signed copies of the Agreement.

77.     Denies each and every allegation in Paragraph 77 of the Complaint, except admits that Mr. Black made the quoted statement during the October 29, 2020 earnings call, and

Case 1:21-cv-08824-PAE  Document 105-1  Filed 04/18/22  Page 127 of 349

respectfully refers the Court to the October 29, 2020 earnings call transcript for the full text and context of Mr. Black's statements on that call.

78.     Denies each and every allegation in Paragraph 78 of the Complaint.

79.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 79 of the Complaint regarding Ganieva's legal education and her state of mind. Denies each and every allegation in Paragraph 79 of the Complaint.

80.     Denies each and every allegation in Paragraph 80 of the Complaint.

81.     Denies each and every allegation in Paragraph 81 of the Complaint, except admits that Ganieva, or someone purporting to act on Ganieva's behalf, posted the excerpted tweets on March 17, 2021, and respectfully refers the Court to the tweets for their full text and context.

82.     Denies each and every allegation in Paragraph 82 of the Complaint, except admits that Bloomberg published the quoted material on April 8, 2021, and respectfully refers the Court to the April 8, 2021 Bloomberg article and Mr. Black's statement to Bloomberg for the full text and context of Mr. Black's statement to Bloomberg, and avers that Mr. Black provided the following statement to Bloomberg in connection with the article:

> I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago. Any allegation of harassment or any other inappropriate behavior towards her is completely fabricated. The truth is that I have been extorted by Ms. Ganieva for many years and I made substantial monetary payments to her, based on her threats to go public concerning our relationship, in an attempt to spare my family from public embarrassment. At my direction, my counsel referred Ms. Ganieva's conduct to the criminal authorities several weeks ago and I welcome a thorough investigation of this matter. I also want to emphasize that this is entirely a personal matter; this matter has nothing to do with Apollo or my decision to step away from the firm.

83.     Denies each and every allegation in Paragraph 83 of the Complaint, except admits that additional publications also reported on the matter, including the publication cited at footnote 6, and respectfully refers the Court to those publications for their full text and context.

84.     Denies each and every allegation in Paragraph 84 of the Complaint, including those in footnote 7, except admits that the *New York Post* published the article and the quoted material in footnote 7 on April 12, 2021, and respectfully refers the Court to the article for its full text and context.

85.     To the extent the allegations in Paragraph 85 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 85 of the Complaint.

86.     To the extent the allegations in Paragraph 86 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 86 of the Complaint.

87.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 87 of the Complaint as to the "examples" listed and the "playbook" cited in Paragraph 87 of the Complaint, and respectfully refers the Court to the publications cited in the footnotes therein for their full text and context. Denies each and every allegation in Paragraph 87 of the Complaint.

88.     Denies each and every allegation in Paragraph 88 of the Complaint.

89.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 89 of the Complaint about the requirements for admission to the New York State bar. Denies each and every allegation in Paragraph 89 of the Complaint.

Case 1:21-cv-08824-PAE Document 105-1 Filed 04/18/22 Page 129 of 349

90.     To the extent the allegations in Paragraph 90 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 90 of the Complaint.

91.     Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Complaint, and otherwise denies each and every allegation in Paragraph 91 of the Complaint.

92.     Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Complaint, and otherwise denies each and every allegation in Paragraph 92 of the Complaint.

93.     To the extent the allegations in Paragraph 93 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 93 of the Complaint.

94.     To the extent the allegations in Paragraph 94 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 94 of the Complaint.

95.     To the extent the allegations in Paragraph 95 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 95 of the Complaint.

96.     To the extent the allegations in Paragraph 96 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 96 of the Complaint.

97.     To the extent the allegations in Paragraph 97 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 97 of the Complaint.

98.     To the extent the allegations in Paragraph 98 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 98 of the Complaint.

99.     To the extent the allegations in Paragraph 99 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 99 of the Complaint.

100.    To the extent the allegations in Paragraph 100 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 100 of the Complaint.

101.    To the extent the allegations in Paragraph 101 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 101 of the Complaint.

102.    Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Complaint, and otherwise denies each and every allegation in Paragraph 102 of the Complaint.

103.    Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Complaint, and otherwise denies each and every allegation in Paragraph 103 of the Complaint.

Case 1:21-cv-08824-PAE  Document 105-1  Filed 04/18/22  Page 131 of 349

104.    To the extent the allegations in Paragraph 104 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 104 of the Complaint.

105.    To the extent the allegations in Paragraph 105 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 105 of the Complaint.

106.    To the extent the allegations in Paragraph 106 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 106 of the Complaint.

107.    To the extent the allegations in Paragraph 107 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 107 of the Complaint.

108.    To the extent the allegations in Paragraph 108 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 108 of the Complaint.

109.    To the extent the allegations in Paragraph 109 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 109 of the Complaint.

110.    To the extent the allegations in Paragraph 110 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 110 of the Complaint.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 132 of 349

111.     To the extent the allegations in Paragraph 111 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 111 of the Complaint.

112.     To the extent the allegations in Paragraph 112 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 112 of the Complaint.

113.     Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Complaint, and otherwise denies each and every allegation in Paragraph 113 of the Complaint.

114.     To the extent the allegations in Paragraph 114 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 114 of the Complaint.

115.     To the extent the allegations in Paragraph 115 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 115 of the Complaint.

116.     To the extent the allegations in Paragraph 116 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 116 of the Complaint.

117.     To the extent the allegations in Paragraph 117 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 117 of the Complaint.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 133 of 349

118.     To the extent the allegations in Paragraph 118 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 118 of the Complaint.

119.     To the extent the allegations in Paragraph 119 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 119 of the Complaint.

120.     Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Complaint, and otherwise denies each and every allegation in Paragraph 120 of the Complaint.

121.     To the extent the allegations in Paragraph 121 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 121 of the Complaint.

122.     Denies each and every allegation in Paragraph 122 of the Complaint.

123.     To the extent the allegations in Paragraph 123 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 123 of the Complaint.

124.     To the extent the allegations in Paragraph 124 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 124 of the Complaint.

125.     Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Complaint, and otherwise denies each and every allegation in Paragraph 125 of the Complaint.

126.    To the extent the allegations in Paragraph 126 of the Complaint call for legal conclusions, no response is required. Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Complaint, and otherwise denies each and every allegation in Paragraph 126 of the Complaint.

127.    To the extent the allegations in Paragraph 127 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 127 of the Complaint.

128.    To the extent the allegations in Paragraph 128 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 128 of the Complaint.

129.    To the extent the allegations in Paragraph 129 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 129 of the Complaint.

130.    To the extent the allegations in Paragraph 130 of the Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 130 of the Complaint.

## **PRAYER FOR RELIEF**

Denies that Ganieva has suffered any cognizable injury or damages entitling her to any legal recourse, and denies that Ganieva is entitled to any such relief, whether monetary, compensatory, declarative, equitable, costs, and/or fees relating to this matter, or in any other form sought by Ganieva.

## AFFIRMATIVE AND OTHER DEFENSES

### First Defense

The Complaint fails to state a claim upon which relief may be granted.

### Second Defense

Ganieva's claims are barred by the existence of a signed, valid release.

### Third Defense

Ganieva's claims are barred by waiver and/or estoppel.

### Fourth Defense

Ganieva's claims are barred, in whole or in part, based on the doctrine of unclean hands as a result of her misconduct.

### Fifth Defense

Ganieva's claims are barred by reason of her unlawful conduct.

### Sixth Defense

All of the statements Mr. Black is alleged to have made about Ganieva were either true or substantially true.

### Seventh Defense

All of the statements Mr. Black allegedly made about Ganieva were protected by his qualified privileges to make them, including the self-defense privilege and the *Chapadeau* privilege for statements involving matters of public concern, and Mr. Black's statements about Ganieva were not made with actual malice or gross irresponsibility.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 136 of 349

## Eighth Defense

Ganieva is a limited purpose public figure, and the alleged defamatory statements were not published with an intent rising to constitutional malice and cannot be demonstrated by clear and convincing evidence.

## Ninth Defense

Any statements that Mr. Black has allegedly made about Ganieva were made in good faith.

## Tenth Defense

Ganieva's defamation claim fails because the alleged harm and damages sustained by Ganieva, if any, are the result of the acts and/or omissions of Ganieva or other entities, not of Mr. Black.

## Eleventh Defense

Ganieva's claims are barred because Mr. Black's alleged statements were not the proximate cause of Ganieva's alleged injuries.

## Twelfth Defense

The alleged defamatory statements were not published negligently, in reckless disregard of their truth, with gross irresponsibility, wantonly, or maliciously.

## Thirteenth Defense

All sexual encounters alleged to have taken place between Ganieva and Mr. Black were consensual.

## Fourteenth Defense

Ganieva's claims are barred, in whole or in part, because they implicate New York's anti-SLAPP statute, N.Y. Civil Rights Law § 76-a, and Ganieva has failed to allege actual malice.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 137 of 349

### Fifteenth Defense

To the extent Ganieva bases her Gender-Motivated Violence Act claim on any conduct that occurred prior to June 1, 2014, those claims are barred by the applicable statute of limitations set forth in Admin. Code § 10-1105.

### Sixteenth Defense

Ganieva's claims are frivolous and are merely an attempt to preempt Mr. Black's lawful claims against her.

### Seventeenth Defense

The alleged harm and damages sustained by Ganieva, if any, are speculative.

### Eighteenth Defense

Ganieva has sustained no cognizable injury by reason of any wrongful conduct by Mr. Black. Ganieva makes only conclusory allegations of damages.

### Nineteenth Defense

Mr. Black's alleged conduct did not cause any loss of revenue or income to Ganieva. Ganieva makes only conclusory allegations of economic harm and has not alleged any facts demonstrating actual pecuniary loss or special damages.

### Twentieth Defense

Without conceding that Ganieva has suffered any damages as a result of any alleged wrongdoing by Mr. Black, Ganieva has failed to mitigate or minimize her alleged damages.

### Twenty-First Defense

Without conceding that Ganieva has suffered any damages as a result of any alleged wrongdoing by Mr. Black, any "damage" incurred by Ganieva as a result of any alleged wrongful

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 138 of 349

conduct should be offset by the value of the substantial sums of money that Ganieva unlawfully obtained from Mr. Black.

### Twenty-Second Defense

Ganieva fails to state a claim for punitive damages.

### Twenty-Third Defense

Ganieva has not adequately pleaded extreme and outrageous conduct, intent, or severe emotional distress for her intentional infliction of emotional distress claim.

### Twenty-Fourth Defense

Ganieva's intentional infliction of emotional distress claim is duplicative of her defamation claims.

Mr. Black is not knowingly waiving any affirmative defense and hereby expressly reserves the right to amend his Answer and include all such defenses as may become available or apparent during pretrial proceedings of this action.

**WHEREFORE,** Mr. Black respectfully requests that this Court:

(a)     Dismiss the Complaint in its entirety with prejudice;

(b)     Award Mr. Black the costs of defending against the suit, including reasonable attorneys' fees and expenses;

(c)     Impose sanctions on Ganieva and her attorneys pursuant to NYCRR 130-1.1 for making material false statements in the Complaint; and

(d)     Grant such other and further relief as the Court deems just and proper.

### COUNTERCLAIMS

Counterclaim-Plaintiff Leon Black for his Counterclaims, by his attorneys Perry Guha LLP, hereby alleges as follows:

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 139 of 349

1.      Mr. Black repeats and alleges Paragraphs 1 through 70 of the Factual Background section above; Paragraphs 1 through 130 of his Answers to Specific Allegations above; and his Affirmative and Other Defenses above, all as if fully restated herein.

## NATURE OF THE COUNTERCLAIMS

2.      Mr. Black brings these Counterclaims to recover from Counterclaim-Defendant Guzel Ganieva the substantial damages to Mr. Black's reputation and career flowing from Ganieva's false and defamatory statements about him, which were made in breach of a valid and enforceable Release and Confidentiality Agreement.

3.      On March 17, 2021, Ganieva made false, inflammatory, and defamatory statements on her public Twitter account against Mr. Black, whom she pointedly referred to as "Apollo Global Management's CEO and Chairman, Leon Black." Ganieva's defamatory comments included: (i) that she had been "sexually harassed and abused" by Mr. Black "for years"; (ii) that Mr. Black "could not understand me when I refused his sexual advances"; (iii) that she had been "bullied, manipulated, threatened, and coerced" by Mr. Black; (iv) that, "under duress, I was forced to sign an NDA in 2015"; and (v) that she did "not want this type of predatory behavior to continue happening to other women."

4.      Ganieva made additional false and defamatory statements of fact concerning Mr. Black in an interview with the *New York Post* on April 8, 2021, including that "Black's abuse 'was over a long period of time and it was tragic.'" Josh Kosman, *Leon Black's Surprise Apollo Global Exit Came Amid Sexual Harassment Allegation*, N.Y. Post (Apr. 8, 2021), https://nypost.com/2021/04/08/leon-black-accused-of-sexual-harassment/.

5.      In addition to being entirely false and highly defamatory, Ganieva's statements also constitute a material breach of the Release and Confidentiality Agreement that Ganieva and Mr.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 140 of 349

Black entered into on October 19, 2015. Mr. Black fully performed his obligations under the

Agreement, including paying Ganieva monthly from at least approximately October 2015 until

Ganieva's breach in approximately March 2021, as well as additional funds. Ganieva, however,

apparently unilaterally decided that she was no longer bound by the clear and unambiguous terms

of the Agreement, while of course keeping the substantial sums of Mr. Black's money that she had

accepted over the years.

## PARTIES

6.      Counterclaim-Plaintiff Leon Black resides in New York County, in the State of

New York.

7.      Upon information and belief, Counterclaim-Defendant Guzel Ganieva resides in

New York County, in the State of New York.

## JURISDICTION AND VENUE

8.      Jurisdiction within the Supreme Court of the State of New York is appropriate

because the acts complained of herein took place within New York State and the parties reside

within the state.

9.      Venue within New York County is appropriate pursuant to CPLR § 503 because

the parties reside, and a substantial part of the events or omissions giving rise to the claim occurred,

within New York County.

## FIRST COUNTERCLAIM
### (Defamation)

10.     Mr. Black repeats and alleges Paragraphs 1 through 9 of the Counterclaims section

above; Paragraphs 1 through 70 of the Factual Background section above; Paragraphs 1 through

130 of his Answers to Specific Allegations above; and his Affirmative and Other Defenses above,

all as if fully restated herein.

Case 1:21-cv-08824-PAE Document 105-1 Filed 04/18/22 Page 141 of 349

11. On March 17, 2021, Ganieva made false and defamatory statements of fact concerning Mr. Black on her public Twitter account.

12. Ganieva's statements were false and defamatory in that they falsely accused Mr. Black of abuse, and in that they falsely stated that (i) Mr. Black was a predator who "bullied, manipulated, threated, and coerced" Ganieva into a sexual relationship; (ii) that Mr. Black committed serious crimes—namely, sexual harassment, sexual assault, sexual abuse, abuse or rape—including by ignoring Ganieva's refusal of his sexual advances; (iii) that Mr. Black "forced" Ganieva to sign an "NDA" relating to Ganieva's allegations that Mr. Black "sexually harassed and abused" her; and (iv) that Mr. Black coerced Ganieva by forcing her to sign that "NDA."

13. Ganieva made additional false and defamatory statements of fact concerning Mr. Black in an interview with the *New York Post* on April 8, 2021, including that "Black's abuse 'was over a long period of time and it was tragic.'" Josh Kosman, *Leon Black's Surprise Apollo Global Exit Came Amid Sexual Harassment Allegation*, N.Y. Post (Apr. 8, 2021), https://nypost.com/2021/04/08/leon-black-accused-of-sexual-harassment/

14. All of these statements were published without privilege or authorization. Ganieva knew or should have known that such defamatory statements were false.

15. Ganieva made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity. Ganieva's statements were also made with gross irresponsibility.

16. Ganieva's false statements were defamatory because they have exposed Mr. Black to public contempt, aversion or disgrace, and induced a poor opinion of his good name and business reputation.

17.     Ganieva's false statements were defamatory because they intentionally assert, imply, and create the reasonable inference that Mr. Black had committed the serious crimes of rape, sexual abuse, sexual harassment, abuse, and coercion.

18.     Ganieva's false and defamatory statements have further caused Mr. Black harm insofar as they (i) have caused Mr. Black to spend time and resources responding to and rebutting the false statements; (ii) harmed Mr. Black's professional reputation; (iii) harmed Mr. Black's personal reputation; and (iv) damaged Mr. Black's relationship with his family.

19.     Ganieva's false and defamatory statements have harmed Mr. Black's professional reputation and standing in his industry, have caused him economic harm, have caused him to incur special damages, including lost income, benefits, job security, and opportunities for career advancement, and have caused him embarrassment, humiliation, and other emotional injury.

20.     As a direct and proximate result of Ganieva's defamation, Mr. Black has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of public esteem, public disgrace, and emotional distress.

21.     As a direct and proximate result of Ganieva's conduct, Mr. Black has suffered, and continues to suffer, harm for which he is entitled to an award of monetary damages and other relief.

22.     Ganieva's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Mr. Black's rights. Thus, Mr. Black is also entitled to an award of punitive damages.

## SECOND COUNTERCLAIM
### (Defamation *Per Se*)

23.     Mr. Black repeats and alleges Paragraphs 1 through 22 of the Counterclaims section above; Paragraphs 1 through 70 of the Factual Background section above; Paragraphs 1 through

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 143 of 349

130 of his Answers to Specific Allegations above; and his Affirmative and Other Defenses above, all as if fully restated herein.

24.     On March 17, 2021, Ganieva made false and defamatory statements of fact concerning Mr. Black on her public Twitter account.

25.     Ganieva's statements were false and defamatory in that they falsely accused Mr. Black of abuse, and in that they falsely stated that (i) Mr. Black was a predator who "bullied, manipulated, threated, and coerced" Ganieva into a sexual relationship; (ii) that Mr. Black committed serious crimes—namely, sexual harassment, sexual assault, sexual abuse, abuse or rape—including by ignoring Ganieva's refusal of his sexual advances; (iii) that Mr. Black "forced" Ganieva to sign an "NDA" relating to Ganieva's allegations that Mr. Black "sexually harassed and abused" her; and (iv) that Mr. Black coerced Ganieva by forcing her to sign that "NDA."

26.     Ganieva made additional false and defamatory statements of fact concerning Mr. Black in an interview with the *New York Post* on April 8, 2021, including that "Black's abuse 'was over a long period of time and it was tragic.'" Josh Kosman, *Leon Black's Surprise Apollo Global Exit Came Amid Sexual Harassment Allegation*, N.Y. Post (Apr. 8, 2021), https://nypost.com/2021/04/08/leon-black-accused-of-sexual-harassment/.

27.     All of these statements were published without privilege or authorization. Ganieva knew or should have known that such defamatory statements were false.

28.     Ganieva made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity. Ganieva's statements were also made with gross irresponsibility.

29.     Ganieva's false statements were defamatory because they have exposed Mr. Black to public contempt, aversion or disgrace, and induced a poor opinion of his good name and business reputation.

30.     Ganieva's false statements were also defamatory *per se* because they intentionally assert, imply, and create the reasonable inference that Mr. Black had committed the serious crimes of rape, sexual abuse, sexual harassment, abuse, and coercion.

31.     Ganieva's false and defamatory statements have further caused Mr. Black harm insofar as they (i) have caused Mr. Black to spend time and resources responding to and rebutting the false statements; (ii) harmed Mr. Black's professional reputation; (iii) harmed Mr. Black's personal reputation; and (iv) damaged Mr. Black's relationship with his family.

32.     Ganieva's false and defamatory statements have harmed Mr. Black's professional reputation and standing in his industry, have caused him economic harm, have caused him to incur special damages, including lost income, benefits, job security, and opportunities for career advancement, and have caused him embarrassment, humiliation, and other emotional injury.

33.     As a direct and proximate result of Ganieva's defamation, Mr. Black has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of public esteem, public disgrace, and emotional distress.

34.     As a direct and proximate result of Ganieva's conduct, Mr. Black has suffered, and continues to suffer, harm for which he is entitled to an award of monetary damages and other relief.

35.     Ganieva's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Mr. Black's rights. Thus, Mr. Black also is entitled to an award of punitive damages.

## THIRD COUNTERCLAIM
### (Breach of Contract)

36.     Mr. Black repeats and alleges Paragraphs 1 through 35 of the Counterclaims section above; Paragraphs 1 through 70 of the Factual Background section above; Paragraphs 1 through 130 of his Answers to Specific Allegations above; and his Affirmative and Other Defenses above, all as if fully restated herein.

37.     The Release and Confidentiality Agreement is a valid and enforceable contract between Mr. Black and Ganieva.

38.     The Release and Confidentiality Agreement asserts that the allegations and claims that precipitated the Release and Confidentiality Agreement were made by Ganieva "under extreme stress and which she now concedes are not true and . . . if made public, would damage [Mr. Black's] career, reputation and relationship with others".

39.     Paragraph 1 of the Release and Confidentiality Agreement provides that Ganieva "hereby releases, remises and forever discharges [Mr. Black] from all matters, causes of action, claims, suits and any and all further liability or accountability, in law or equity, by reason of any matter, cause or thing whatsoever arising prior to the signing of this Agreement, contemporaneous with the signing of this Agreement or any time in the future after the signing of this Agreement."

40.     Paragraph 2 of the Release and Confidentiality Agreement prohibits Ganieva from "disclos[ing], directly or indirectly, to any individual, entity or other potential recipient, any information relating to (i) the allegations and claims that she has asserted against [Mr. Black], (ii) the signing, content or other attributes of this Agreement…and (iii) any other matters that could damage [Mr. Black's] career, reputation and relationships with others."

41.     Mr. Black had fully performed his obligations under the Release and Confidentiality Agreement. Mr. Black provided consideration to Ganieva, as set forth in the

INDEX NO. 155262/2021
RECEIVED NYSCEF: 07/19/2021
Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 146 of 349

Release and Confidentiality Agreement, including: (i) an immediate payment to Ganieva of $100,000; (ii) forgiveness of approximately $1,000,000 in loans; and (iii) "other consideration to which has been agreed," which consisted of monthly payments to Ganieva from at least approximately October 2015 until approximately March 2021 (right after Ganieva posted her defamatory tweets, in breach of the Release and Confidentiality Agreement).

42.     In total, Ganieva has accepted millions of dollars in payments from Mr. Black pursuant to the Release and Confidentiality Agreement. Ganieva had never sought to repudiate the Agreement.

43.     By filing this lawsuit, Ganieva breached Paragraph 1 of the Release and Confidentiality Agreement.

44.     Ganieva breached each of the three provisions in Paragraph 2 of the Release and Confidentiality Agreement by publicly disclosing to the *New York Post* and on her public Twitter account information related to (i) "the allegations and claims she ha[d] asserted against [Mr. Black]"—such as allegations of abusiveness, (ii) "the signing, content or other attributes of [the Release and Confidentiality Agreement]"—*i.e.* by claiming that Mr. Black "forced" Ganieva to sign an "NDA"; and (iii) "other matters that could damage [Mr. Black's] career, reputation and relationship with others."

45.     Ganieva's breaches of Paragraphs 1 and 2 are material breaches and have caused Mr. Black material harm.

46.     Ganieva's statements in violation of the Release and Confidentiality Agreement have also caused, and continue to cause, financial loss and damage to Mr. Black, for which Ganieva must compensate Black in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Counterclaim-Plaintiff Leon Black hereby requests judgment against Counterclaim-Defendant Guzel Ganieva as follows:

(a)     Enter judgment on his Counterclaims in Mr. Black's favor;

(b)     Enter a declaratory judgment that the actions of Ganieva complained of herein violate the laws of the State of New York and the City of New York;

(c)     Award Mr. Black damages, in an amount to be determined at trial, plus prejudgment interest, to compensate Mr. Black for all monetary and/or economic damages;

(d)     Award Mr. Black damages for any and all other monetary and/or non-monetary losses suffered by him, including, but not limited to, loss of income, reputational harm and harm to professional reputation, in an amount to be determined at trial, plus prejudgment interest;

(e)     Award Mr. Black punitive damages, and any applicable penalties and/or liquidated damages in an amount to be determined at trial;

(f)     Award Mr. Black attorneys' fees, costs, and disbursements incurred in bringing these Counterclaims; and

(g)     Grant to Mr. Black any such further relief as the Court deems just and proper.

## JURY DEMAND

Counterclaim Plaintiff Leon Black hereby demands a trial by jury on all issues.

Dated: July 19, 2021
     New York, New York

Respectfully submitted,

_____

E. Danya Perry
Peter A. Gwynne
PERRY GUHA LLP
35 East 62nd Street
New York, New York 10065
Email: dperry@perryguha.com
Email: pgwynne@perryguha.com
Telephone: (212) 399-8330
Facsimile: (212) 399-8331

*Attorney for Defendant and Counterclaim-*
*Plaintiff Leon Black*

# Exhibit 3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------------X

GUZEL GANIEVA,

                           Plaintiff,

                    v.

LEON BLACK,

                         Defendant.

-----------------------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:

Civil Action
No.:155262/2021

**AMENDED COMPLAINT**

**Jury Trial Demanded**

Plaintiff Guzel Ganieva ("Plaintiff") brings this Amended Complaint against Defendant

Leon Black ("Black" or "Defendant"), and hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.      On April 8, 2021, Bloomberg published an article that contained the following

statements by Defendant Leon Black about Plaintiff Guzel Ganieva:

> "I foolishly had a consensual affair with Ms. Ganieva that ended
> more than seven years ago," Black said in the statement Thursday.
> "Any allegation of harassment or any other inappropriate behavior
> towards her is completely fabricated. **The truth is that I have been
> extorted by Ms. Ganieva for many years and I made substantial
> monetary payments to her, based on her threats to go public
> concerning our relationship**, in an attempt to spare my family from
> public embarrassment."
>
> Black had previously planned to step down by the end of July as
> CEO of the firm he co-founded. He said that, on advice from his
> counsel, he asked criminal authorities several weeks ago to
> investigate Ganieva.[1]

2.      Everything that Black said in the above statement about Ms. Ganieva is false. First,

---

[1]     Gillian Tan, *Black Says He Paid to Hide Affair, Denies It Led to Apollo Exit*, Bloomberg,
(April 8, 2021, 10:04 PM), https://www.bloomberg.com/news/articles/2021-04-09/black-says-he-paid-to-hide-affair-denies-it-led-to-apollo-exit, (emphasis added).

1

Black did not have "a consensual affair" with Ms. Ganieva. Second, any telling of "harassment" or "inappropriate behavior" by Black towards Ms. Ganieva is not fabricated. As described below, such words do not come close to the appalling forced sexual misconduct that Black inflicted on her. Third, Black has never been "extorted by Ms. Ganieva," much less for "many years." Disgustingly, he used his extreme power and wealth to coerce her into signing a non-disclosure agreement ("NDA") in October 2015 precisely because he knew what he had done to her was shocking, evil and exposed him to potential criminal charges.

3.      The only repeated threats for many years came from Black to Ms. Ganieva that if she did not sign the NDA, take his hush money and retreat into silence forever, she would feel the brunt of his true wrath. He said many times to her:

> **"If you do not take the money, I will put you in prison."**

> **"If you do not take the money, I will destroy your life."**

4.      Fourth, Ms. Ganieva never "threatened to go public" about Black regarding anything. As the people within Black's inner circle know, the suggestion that Black attempted to spare his family public embarrassment about their involvement is ridiculous.

5.      For years, Black ate countless meals with Ms. Ganieva in 5-star restaurants, took her to Broadway shows, numerous art shows, museum exhibitions, private parties, the movies, including the premier of The King's Speech and even sat beside her while he cheered for the New York Knicks at MSG. In the midst of all these very public outings, Black never once worried about sparing his family from public embarrassment.[2] In fact, he never worried about people associating

---

[2]      Nor did he care about being seen out with other young women, often of Russian descent, in addition to Ms. Ganieva.

him with Ms. Ganieva because he enjoyed being seen with her in public. What Black has worried about, however, is being exposed for the sadist that he is.

6.      On October 29, 2020 during an earnings call, in connection with his announcements about his future role at Apollo Global Management ("Apollo"), Black publicly stated:

> "**There has never been an allegation by anyone that I engaged in any wrongdoing, because I did not.**"

7.      This and similar subsequent false claims by Black, including his January 25, 2021 statement in connection with his "retirement" as CEO of Apollo in which he stated, "I did not engage in any wrongdoing or inappropriate conduct" in relation to Jeffrey Epstein, served as the tipping point for Ms. Ganieva. Having recently educated herself in law school and knowing that many of Black's sexual acts were against her will and without her consent, she no longer was willing to stand by and allow him to escape accountability.

8.      Knowing that her public outing of his disgusting conduct would surely end any further monetary payments from Black, *i.e.*, his "hush money," she did so regardless.

9.      On March 17, 2021, Ms. Ganieva bravely posted on Twitter that Black was a "predator" that had "sexually harassed and abused" her for years. The next morning, Black texted Ms. Ganieva to call him immediately. She refused.

10.     Knowing that he could no longer control her into silence, Black resorted to a tact that has been used by wealthy and powerful men like him who had committed sexual misconduct – he made a preemptive claim of extortion.[3]

---

[3]     Too many examples exist to include here of wealthy male sexual harassers re-victimizing their victims by accusing these women of extortion after they came forward. A number of high profile examples, some of whom also have close ties to Black as described below, are detailed *infra* at ¶ 232. Threats of extortion are potentially far more damaging and frightening to a female accuser

11.     By making a baseless or manufactured "extortion" claim, the female accuser is victimized one more time in a public way, often including threats of criminal charges.  As demonstrated by Black, this is accomplished by his going to the "criminal authorities" to accuse Ms. Ganieva of extortion and placing her on the legal defensive before she can take any legal action against him – just in case she planned on or considered doing so.

12.     Although heinous and disgusting, Ms. Ganieva had been threatened by Black for years that if she disobeyed him, he would **"put her in prison,"** and to speak out would be **"suicide."**

13.     For too long, wealthy and powerful men like Black have enjoyed an unequal and grossly imbalanced access to justice unavailable to the average man or woman and non-millionaires.  Knowing the right lawyers and politicians provided Black with the ability to do exactly as he said:

**"Ask criminal authorities to investigate Ganieva."**

14.     Threatening that a criminal charge will be brought against Ms. Ganieva first will not save Black from the truth about what he has done.  Nor will she be deterred by any baseless, retaliatory and unlawful counterclaims that have been asserted against her in this action, despite the immense potential liability and risks these claims could mean.  As chronicled below, the truth will reveal a violent, abusive, predatory, vindictive and brutal side to Black that he has shielded from public view for decades.

15.     Black defamed Ms. Ganieva by making the above statements.

## JURISDICTION AND VENUE

---

than threats of a civil lawsuit for defamation, an option that numerous men accused of sexual misconduct use for similar reasons.

4

INDEX NO. 155262/2021
Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 154 of 349
RECEIVED NYSCEF: 08/09/2021

16.     The Court has personal jurisdiction pursuant to Civil Practice Law and Rules ("CPLR") § 301, *inter alia*, because Plaintiff and Defendant reside in New York.

17.     Venue is proper in this County pursuant to CPLR § 503 because a substantial part of the events giving rise to Plaintiff's claims took place in New York County.

**PARTIES**

18.     Plaintiff Guzel Ganieva resides in the state of New York, New York County.

19.     Defendant Leon Black resides in the state of New York, New York County.

**FACTUAL ALLEGATIONS**

I.      **Leon Black's Orchestrated Secrecy of His Sexual Violence and Deviance**

20.     Like a master chess player, Black was many moves ahead of Ms. Ganieva from the moment he met her.  Black picked Ms. Ganieva out of a crowd on March 8, 2008, while attending an International Women's Day event held at Donald Engel's UES home.[4]  Ms. Ganieva was invited by a woman who she knew through modeling. This woman also knew Black.  The event included Russian musicians and a number of other Russian-speaking guests, including other models.

21.     A single mother in her early twenties (she was 25), having moved from Russia to the United States by herself, it was easy work for Black to convince Ms. Ganieva to dine with him at La Grenouille where he planned to tell her how he could help her with her "future."

22.     This is exactly what Black did.

23.     It was a choreographed plan that allowed him to quickly gain Ms. Ganieva's trust.

---

[4]     Donald Engel knew Black from Drexel Burnham.  It has been alleged that it was Donald Engel who arranged for the beautiful "girls" to be present at the infamous annual Drexel Burnham conferences "that came to be known as the "the predators' ball."  Linette Lopez, *Here's What Happened When I Went To Vegas With 1,800 Hedge Fund Managers*, (May 22, 2014), https://www.businessinsider.com/what-hedge-fund-managers-do-in-vegas-2014-5.

5

Common sense suggests that he had used this tactic before, and in fact, Ms. Ganieva later met at least two other women that were similarly involved with Black. Over the course of several dinners, Black repeatedly praised Ms. Ganieva on her innate talent and intellect, "arranged" a few appointments for her, for example, one with the Creative Artists Agency, LLC ("CAA") in Los Angeles. These efforts helped him quickly gain her gratitude and admiration.

24.     Ms. Ganieva was pleased that a successful businessman that she admired found her conversation and company enjoyable. As the person in charge of thousands of employees, Ms. Ganieva believed Black understood the value and importance of reliable, secure employment, and intended to help her move beyond simply modeling. Naïvely, Ms. Ganieva believed that Black was not interested in her sexually, particularly because she told him that their relationship would not be sexual.

25.     It was her intention and hope that Black would serve as a mentor to her professionally.

26.     Black, however, is a ruthless planner and a man that gets what he wants. It was not long before he managed to secure his ability to get Ms. Ganieva alone with him, out of sight from the public or his own employees.

27.     Once he did, Black forced sadistic sexual acts on her, some of which are described below, without her consent and despite her saying "no."

28.     The first time it happened, in 2008, Black took Ms. Ganieva to a studio apartment with a mattress on the floor and no other furniture. Black said that a young woman lived there. Humiliated and in shock, Ms. Ganieva never uttered a word about what he had done to her.

29.     In a sad but predictable pattern, for the next several years Ms. Ganieva endured a cycle of intimidation, abuse and humiliation by Black that on numerous occasions included forced

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 156 of 349

sexual conduct against her will.  As described below, many of these instances were perpetrated by

Black in order for him to indulge in sadistic sexual acts that were physically painful to Ms. Ganieva

and to which she never consented.  In addition to causing intentional physical pain, Black engaged

in these acts because he derived pleasure from humiliating and debasing Ms. Ganieva.

30.     After these acts of violence, Ms. Ganieva would tell Black to never speak to her or

contact her again.  Inevitably, after waiting weeks and sometimes several months, being a master

manipulator, Black would engage in remorseful and conciliatory behavior, relentlessly – until he

could induce her to meet him again.

31.     Black's persuasion tactics included endless promises in line with the mentor that

she wanted him to be for her, such as: to help with Ms. Ganieva's child's educational opportunities;

to finance a movie for her that she could produce or direct, after convincing her that acting was too

difficult a business; to purchase a townhouse and turn it into an art museum that Ms. Ganieva could

manage or be a director of; and to help her with an application to Harvard Business School because

of his strong relationships there.  She believed his promises, and in fact, she was aware that Black

had purchased an art gallery and hired another woman that he had been sexually involved with to

run the gallery.

32.     Even during these periods of overt remorseful and conciliatory behavior, Black

nevertheless engaged in textbook harasser conduct.  Specific details about each instance of Black's

derogatory and controlling conduct towards Ms. Ganieva are too much to include in this Amended

Complaint, but by way of example only, included such things as:

- Ubiquitous, constant belittling;

- Falsely accusing her of being jealous to deflect from his own
  hideous conduct;

7

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 157 of 349

- Pretending not to listen to or understand Ms. Ganieva when she said something he did not like, especially when it involved her attempts at cutting off communication;

- Forcing her to walk behind him;

- Forcing her to wait for his permission to speak;

- Punishing her by yelling and screaming if she did not speak to him "nicely";

- Insisting that she speak to him in a pleasing, pleasant or otherwise "happy" and "nice" manner and yelling at her if she failed to do so;

- Insisting that her text messages also be sufficiently pleasant;

- Criticizing her appearance by saying she needed to lose weight or improve certain parts of her body;

- Criticizing her clothing and make-up;

- Berating her for refusing to agree to threesomes with other women and Black;

- Intentionally making her feel stupid and inferior to him; and

- Physically intimidating her by such acts as clenching his fists, pounding nearby pieces of furniture, repetitive cracking of his knuckles and otherwise using his formidable 6'5" and 300+ pound body to intimidate her.

## II.   <u>Black's Violent Sexual Acts Against Ms. Ganieva</u>

33.    Black, the powerful and ruthless Wall Street titan, was also ruthless and overpowering in his sexual conquests.

34.    Unfortunately for Ms. Ganieva, during many, but not all, of her sexual experiences with Black, he [REDACTED] on Ms. Ganieva in order to achieve sexual arousal and gratification.

8

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 158 of 349

35.     Ms. Ganieva made it known to Black that she did not consent to his abnormal and atypical behaviors.  Black knew she did not consent.

36.     REDACTED

37.     REDACTED

38.     REDACTED

39.     The first time Black did this, Ms. Ganieva had no idea what was happening – REDACTED

40.     On some occasions, the pain was so extreme that Ms. Ganieva believes she lost consciousness or fainted.

41.     This practice of physically hurting her, REDACTED was something from which Black derived pleasure and arousal, and knew caused Ms. Ganieva pain and distress.

9

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 159 of 349

42.    REDACTED

43.    REDACTED

44.    REDACTED

45.    Black, because of his abnormal and atypical sexual needs, was extremely concerned about keeping this information secret.  At the same time, Black's violent sexual behavior was a powerful way for him to exert complete physical, mental and emotional control over Ms. Ganieva and her body.

46.    At all times, Ms. Ganieva constantly feared Black.  When they were alone, she feared him physically and was unable to reject his sexual advances, too afraid to anger him or cause his temper to flare.  There were times when Ms. Ganieva physically submitted to his physical force without saying anything, afraid he would seriously hurt her.

47.    She experienced fear mentally and emotionally even when not in his physical presence.  She was always worried that she was not doing things exactly the way Black wanted her to do them.  By way of example only, Black had strong opinions about everything she did – from the way she spoke to him, to her tone of voice and what she said, to where she went on vacation, and what jobs she applied for.  In her experience, upsetting him was dangerous and she did her best to avoid it.

48.    REDACTED

10

REDACTED

49. The fear was exhausting but Ms. Ganieva felt she could not disobey Black for fear of her physical safety.

**III.**    **Leon Black's Public Statements About His Relationship with Jeffrey Epstein**

50. There has been, and remains, much mystery surrounding the infamous Jeffrey Epstein ("Epstein"), and just how he became an ultra-wealthy and powerfully connected person.

51. Indeed, Epstein had a modest upbringing in Coney Island, New York, did not complete college, and first worked as a high school math teacher in Manhattan. Nonetheless, he somehow rose to become an extremely wealthy person, with properties all over the world, including a seven-story townhouse in the Upper East Side, a private island in the United States Virgin Islands, a massive home in ritzy Palm Beach, Florida, and his own compound in New Mexico that he was allegedly building into its own city.

52. Not only was he wealthy, but Epstein is believed to have had close personal ties to some of the world's most powerful politicians, businessmen, and celebrity figures, including, but not limited to, former Presidents Bill Clinton and Donald Trump, Prince Andrew, Duke of York, billionaire businessman Les Wexner, and countless others.

53. Mystery has also surrounded how Epstein received only a mild "slap on the wrist" despite operating an alleged sophisticated sex trafficking ring in Palm Beach, Florida. Numerous young women had come forward and accused him of engaging in sex acts with them while they were minors. Epstein ultimately pled guilty in 2008 to just one count of soliciting an underage

prostitute, and ultimately spent 13 months out of an 18-month sentence in the Palm Beach County Stockade.

54.    After renewed public outcry concerning Epstein's heinous conduct and the sweetheart prosecution deal he received in 2008, Epstein was arrested again on July 6, 2019, when his private jet landed in New Jersey's Teterboro airport.  Manhattan federal prosecutors charged Epstein with sex trafficking and conspiracy to commit sex trafficking.

55.    Following Epstein's arrest, Leon Black told Apollo investors (Apollo is the publicly traded hedge fund with over $400 billion in assets under management founded by Black where he served as then-Chairman and Chief Executive Officer ("CEO")), during a July 31, 2019 earnings call that he **"was completely unaware of and [was] deeply troubled by the conduct** that is now the subject of the federal criminal charges brought against [Epstein]." (emphasis added).

56.    On August 10, 2019, after he was denied bail, Epstein was found dead in his jail cell in the Manhattan Correctional Center.  New York's Chief Medical Examiner determined that Epstein committed suicide by hanging.

57.    Then, on October 12, 2020, the *New York Times* published an article[5] revealing that Black, one of the world's wealthiest persons with a net worth estimated at close to $10 billion, had paid Epstein tens of millions of dollars *after* Epstein's 2008 conviction.

58.    In response, Black, in an October 12, 2020, letter to Apollo's Limited Partners, stated again that:

---

[5]    Matthew Goldstein, Steve Eder and David Enrich, *The Billionaire Who Stood by Jeffrey Epstein,* (Oct. 12, 2020), https://www.nytimes.com/2020/10/12/business/leon-black-jeffrey-epstein.html.

12

"I was completely unaware of, and continue to be appalled by, the reprehensible conduct that surfaced at the end of 2018 and led to the federal criminal charges brought against Epstein."

"There has never been an allegation by anyone, including the *New York Times,* that I engaged in any wrongdoing or inappropriate conduct."

59.     Later that month, during an October 29, 2020, earnings call ("October 2020 earnings call"), Black reiterated that:

"there has never been an allegation by anyone that I engaged in any wrongdoing, because I did not.  And any suggestion of blackmail or any other connection to Epstein's reprehensible conduct is categorically untrue."[6]

60.     Black also said:

**"Had I known any of the facts about Epstein's sickening and repulsive conduct, <u>which I learned in late 2018, more than a year after I stopped working with them</u>, I never would have had anything to do with him."**  (emphasis added)

61.     Following the October 12, 2020 *New York Times* article, Apollo hired the law firm of Dechert LLP ("Dechert") to "investigate" Epstein's ties to Black and to Apollo.

62.     Dechert was also tasked with creating a report to submit to the Securities and Exchange Commission ("SEC") (the "Report").

63.     On or around January 22, 2021, Dechert released its Report[7] which recounted Black's claim that, while he was aware of Epstein's 2008 guilty plea, he "understood from Epstein that these offenses arose from *a single instance* in which Epstein had received a *massage* from a

---

[6]     A full transcript of the call and Black's prepared remarks is available here: https://www.fool.com/earnings/call-transcripts/2020/10/30/apollo-global-management-llc-apo-q3-2020-earnings/.

[7]     https://www.sec.gov/Archives/edgar/data/1411494/000119312521016405/d118102dex991.htm ("Exhibit 99.1").

13

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 163 of 349

17-year-old *prostitute*." (Report at 6, emphasis added). Of course, it was widely reported that Epstein had had sex with *countless* underaged girls, and not merely a massage on one occasion from a *prostitute*.

64.     Black claimed to Dechert that, as a result of what Epstein supposedly told him about the nature of his conviction, he thought it would "not be inappropriate to maintain a personal and professional relationship with Epstein" because: (i) Black believed Epstein had made a single "mistak[e]"; (ii) "numerous prominent figures" "continued to maintain social and business relationships with Epstein"; and (iii) because Black "believes in rehabilitation, and in giving people second chances," while "name-dropping" his relationships with Michael Milken and Martha Stewart. *Id.*

65.     Black admitted to Dechert that, up until the fall of 2018, he maintained a relationship with Epstein, whom he viewed "as a friend worthy of trust" that he confided on personal matters, attended social events with, and introduced to his family. *Id.* at 7.

66.     While Black admitted that he knew Epstein had "eclectic tastes" and "often *employed* attractive women," he claimed he did not believe that any of the women in Epstein's *employ* were underage," and was "repulsed" by the details of Epstein's crimes. *Id.* at 8 (emphasis added).

67.     Throughout Dechert's *Alice in Wonderland* narrative, the Report repeatedly (and conveniently) emphasizes that between the years 2008-2010, "**Black had no client relationship with Epstein at the time.**" *Id.* at 6.

68.     The Report further revealed that Black paid Epstein, between 2012 and 2017, a total of **$158 million** (*id.* at 4), which Black claimed were payments made to compensate Epstein — who possessed neither a college degree, nor any advanced degrees related to tax advisement or

14

INDEX NO. 155262/2021
RECEIVED NYSCEF: 08/09/2021

Case 1:21-cv-08824-PAE Document 105-1 Filed 04/18/22 Page 164 of 349

estate planning — "for the overall value he believed Epstein was providing to him through Epstein's advice on trust and estate planning, tax issues, philanthropic issues, and the operation of [Black's] Family [wealth management] Office." *Id.* at 17.

69. Despite taking on the appearance of a legitimate independent investigation, as Dechert must admit, any "conclusions" contained in the Report were based on nothing more than voluntary statements provided by willing participants, who likely prepared heavily with counsel about what they said and produced to Dechert, and may have even had counsel present when they spoke to Dechert. Nobody testified under oath or provided sworn statements under the penalty of perjury, and it is unclear what access, if any, Dechert had to all relevant documents and evidence.

70. Further, these "Good Samaritans" who volunteered to speak to Dechert were none other than Black's *posse*, consisting of Paul Weiss lawyers (supposedly the best and brightest legal minds in the world, but who were consistently outshined by Epstein, who could only come up with a $2 billion tax solution for Black), Apollo Global Management partners and associates, and other people with personal, professional and/or financial interests aligned with Black's.

71. Following the Report, in a January 25, 2021, statement, Black maintained that, "**I was completely unaware of Mr. Epstein's abhorrent misconduct that came to light in late 2018,**" and repeated, "**I did not engage in any wrongdoing or inappropriate conduct.**"

72. In what can only be described as the epitome of irony, disingenuousness and "trolling" based on how Black horrifically abused Ms. Ganieva and, upon information and belief, other women with whom he has had been involved, Black also stated that:

> "Having reflected at great length on my *professional* relationship with Mr. Epstein, … I have also decided that one way I can begin to address the grievous error of having maintained a *professional* relationship with Mr. Epstein is to pledge $200 million towards initiatives that seek to achieve *gender equality and protect and*

15

> *empower women*, including … helping *survivors of domestic violence, sexual assault and human trafficking*." (emphasis added)

73.     Though Black has, conveniently, tried to distance himself from Epstein in the wake of Epstein's death and the revelation of more sordid details about Epstein's criminal affairs, and though Black has tried his best, with the help of a well-crafted public relations and legal team, to make it appear that his and Epstein's relationship was only "professional," in reality, the two had an extremely close personal friendship, and Epstein was Black's **"best friend."**

74.     As detailed below, this relationship regularly delved into nefarious waters, and directly contradicts Black's statements to the public, to investors on the October 2020 earnings call, and to lawyers at Dechert.[8]

## IV.     Black Flies Ms. Ganieva From New York City to Jeffrey Epstein's Home in Palm Beach, Florida While Epstein Was Serving His Prison Sentence in the Palm Beach County Stockade

75.     One morning, in or about mid-to-late October 2008,[9] Black picked up Ms. Ganieva purportedly to take her to lunch.  After she got in the car, however, Black told her that they were not going to lunch in Manhattan.  Rather, he was taking her on a "trip" to Florida to see a "friend" of Black's.

76.     He refused to tell her where they were going, who they were visiting, or the reason for the visit.

---

[8]     A subpoena has been served on Dechert to obtain statements made by Black and by the voluntary witnesses specific to certain allegations set forth *infra*.

[9]     To identify the precise date, which Ms. Ganieva cannot specifically recall, subpoenas have been served on Teterboro Airport (TEB) for records of Black's flights to Palm Beach International Airport ("PBI") in this period, as well as on PBI for any records about Black's air travel. Additional subpoenas have been served on Fixed Base Operators ("FBO") at PBI for aircraft hangar storage, maintenance, or refueling of the aircraft used for Black's turnaround flight.

16

77.     Black and Ms. Ganieva were driven to Teterboro Airport ("TEB"), located in New Jersey, where he and Ms. Ganieva boarded a small private jet.

78.     Once on the plane, Black finally told Ms. Ganieva where they were going and who they were going to see.  Black told her that they were flying down to Palm Beach to visit his "friend" Jeffrey Epstein.

79.     As referenced to above, earlier that year, on or about June 30, 2008, Epstein pleaded guilty to a felony charge of solicitation of prostitution involving a minor.  After being jailed full-time at Palm Beach County Stockade, at some point approximately three months in, Epstein was permitted to leave the jail on "work release" for up to 12 hours a day, six days a week.

80.     In addition to allegedly going to a work office, Epstein was permitted to spend hours away at "doctor's visits," as well as his Palm Beach home.

81.     Although Epstein pled guilty to one count of soliciting an underage prostitute, by the time he began his jail sentence, news about his sex trafficking ring had been widely reported on for several years.  Additionally, several civil lawsuits had been filed against him.

82.     Evidence strongly suggested that Epstein operated a sophisticated sex trafficking ring which involved minors, including girls as young as 12 and 14, in which he and his associates would recruit and groom underaged and/or economically disadvantaged girls and young women from the West Palm Beach, Florida and other surrounding areas to come over to Epstein's Palm Beach mansion in order to engage in sex acts with him.

83.     Repeatedly during their relationship, Black would confide in Ms. Ganieva, unsolicited, that Epstein was his **"best friend,"** as if it was a badge of honor for him.

17

INDEX NO. 155262/2021
RECEIVED NYSCEF: 08/09/2021

Case 1:21-cv-08824-PAE Document 105-1 Filed 04/18/22 Page 167 of 349

84.     Notably, based on the timing of Black's trip to Palm Beach, Epstein would have only recently been allowed to leave the jail house on "work release."[10] Of course, whereas Epstein was known to have multiple sexual partners a day, during the three months he could not leave jail, Epstein, conceivably, had less ability to engage in sexual conduct with women.

85.     During the flight to Palm Beach, after Black disclosed where he was taking her, Black sternly warned Ms. Ganieva not to tell anyone that he was flying her down to meet with Epstein.

86.     Disgustingly, Black threatened that he would plant drugs on Ms. Ganieva and frame her for a crime if she did talk about it.

87.     When Ms. Ganieva said that such threats would not work on her, Black doubled down on his threats, acknowledged that planting "minor" drugs on her would probably not be problematic, but said he would frame her with possessing "very serious" drugs that would make her family and son ashamed of her.  Black specifically used heroin as an example of an illicit drug that would be problematic for her if he planted it on her.  Afraid to make him angrier, Ms. Ganieva did not talk back.

88.     It is deeply concerning that Black's scheme to bring Ms. Ganieva to Epstein's home was something he planned, and did do, without her knowledge.  It was wholly without her consent and even worse, by the time he told her, Ms. Ganieva was powerless to do anything about it. Black's threats to frame her for a "crime," *i.e.*, by planting drugs, such as heroin, on her, is behavior

---

[10]     Epstein's work release began on October 10, 2008.  See DOJ, Office of Professional Responsibility (OPR) Report, November 2020, at 114-115 (investigation into whether prosecutors in the U.S. Attorney's Office for the Southern District of Florida improperly resolved a federal investigation into the criminal conduct of Jeffrey Epstein) ("DOJ Report").  The Palm Beach County Sheriff's office permitted this arrangement, allowing Epstein to work out of an office for a newly formed nonprofit called The Florida Science Foundation.  Id. at 116-117.

18

that falls squarely within the definition of New York Penal Law Section §230.34 "Sex Trafficking" ("a person is guilty of sex trafficking if he or she […] engag[es] in a scheme … by means of instilling fear in the person [of one of eight consequences, including] "accus[ing] some person of a crime or cause criminal charges to be instituted against some person.") N.Y. Pen. L. §230.4(3)(d).

89.     After arriving at PBI, a driver affiliated with a car service picked up Ms. Ganieva and Black in a dark car, possibly a Mercedes-Benz manufactured vehicle, and drove them to Epstein's Palm Beach mansion.

90.     When Black and Ms. Ganieva arrived at Epstein's home, Ms. Ganieva saw that there was a sheriff's deputy standing outside the door.  Under the terms of the "work release" program, a prisoner like Epstein was required to pay for the services of a sheriff's deputy or similar law enforcement officer who would escort and monitor the prisoner while they were on "work release." Black even confirmed to Ms. Ganieva that the man was "a prison guard" hired to escort Epstein to and from his "work release."  The deputy smiled sheepishly at Black and Ms. Ganieva as they entered Epstein's home.[11]

91.     Black and Ms. Ganieva were greeted by Sarah Kellen ("Kellen").  Ms. Ganieva had never met Kellen before and had no idea who she was.

92.     Media reports have described Kellen as a close associate and "lieutenant" of Epstein's.  Some reports have described her as one of Epstein's victims, who also happened to

---

[11]     It was later disclosed that Epstein paid the Sheriff's office more than $128,000 for off-duty deputies wearing business suits to "guard" Epstein while he was on work release.  Additionally, the "office" for the nonprofit at which Epstein allegedly worked turned out to be the office of Jack Goldberger, one of Epstein's defense lawyers.  The "supervisor" responsible for monitoring Epstein's work previously had submitted sworn filings with the IRS that Epstein worked one hour per week for no pay.  That same supervisor, as part of Epstein's application for work release, represented that Epstein would work six days a week, twelve hours per day.  DOJ Report, at 116-117.

19

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 169 of 349

work for him.  Kellen is thought to be one of the unindicted co-conspirators in Epstein's sex

trafficking ring, shielded from prosecution under Epstein's 2007 "Non-Prosecution Agreement"

with the government.

93.      Kellen has also been described as Epstein's "personal assistant," who scheduled and

managed the teenage girls and young women who came in and out of Epstein's houses, including

collecting contact information, taking messages, arranging travel, and escorting the girls and

women to Epstein's room.  Prison records also show that Kellen repeatedly visited Epstein while

he was in prison.  Kellen has not been criminally prosecuted for her role in Epstein's sex trafficking

ring.[12]

94.      Ms. Ganieva soon found herself alone with Black and Epstein in a room that

appeared to be an office.  Black and Epstein were situated close to one another, each facing Ms.

Ganieva while in almost supine positions, as if they were waiting for her to get on top of them.

Indeed, Black indicated with his eyes that he wanted Ms. Ganieva to come and lay in between him

and Epstein.  Alarmed and shocked, Ms. Ganieva remembers standing in front of them unable to

---

[12]      Kellen, however, has been identified, and her alleged conduct described in detail, in
numerous civil lawsuits filed against Epstein.  For example, one civil complaint states that,
"Epstein's plan and scheme reflected a particular pattern and method.  The underage victim would
be brought to Epstein's (Palm Beach) mansion, where she would be introduced to Sarah Kellen,
Epstein's assistant.  Ms. Kellen would then bring the girl up a flight of stairs to a bedroom that
contained a massage table… [t]he girl would then find herself alone in the room with Epstein, who
would be wearing only a towel…Epstein would then perform one or more lewd, lascivious and
sexual acts…"  *Jane Doe 7 v. Jeffrey Epstein*, Index No. 08-cv-80993 (S. Dist. FL 2008), Dkt. No.
1 (Complaint) at p. 3; *see also Jane Doe No. 1 v. Jeffrey Epstein, et. al*, Index No. 9:08-cv-80804-
KAM (S. Dist. FL 2008), Dkt. No. 26 (Opinion and Order Remanding Case to State Court), at p. 3
("Plaintiff was introduced to Kellen, who led her up the stairs to the room with the massage
table…Kellen set up the massage table, laid out the massage oils, told Plaintiff that Epstein would
be in shortly, and then left the room.")

20

say anything while they just stared up at her, saying nothing, but clearly expecting her to *do something*.

95.     As she continued to stand there in silence, Black became visibly annoyed.  He eventually told her to leave the room.

96.     After Black said this, Kellen suddenly appeared and took Ms. Ganieva into what appeared to be a living room.  Kellen first tried to make small talk, and asked Ms. Ganieva for her email address because she wanted to send Ms. Ganieva a good website to shop for clothes.

97.     Kellen then sat Ms. Ganieva down and said, in a serious but soft, feminine tone:

> **"You have to understand that [Jeffrey and Leon] are sex addicts."**
>
> **"You have to let them do whatever they want with you, and you have to let them be with multiple sexual partners if that's what they want."**
>
> **"They are very powerful, and if you don't do what they want you to do, there will be consequences that I do not want for you."**

98.     Kellen again said to her, "*you know*….[pausing] …. something may happen to you," as her voice trailed off.

99.     Although Epstein was on work release, the heightened scrutiny of his behavior and whereabouts made his earlier pattern of cycling in underaged girls from economically disadvantaged homes in West Palm Beach on a daily basis — sometimes three or four girls a day — no longer an option.  Since he was being monitored by law enforcement, he needed to be more discreet, and could not merely enlist his associates to procure for and bring him the same young, often underaged, women that he was accustomed to having sex with.

100.    Although Black knew better than to ever actually say aloud <u>why</u> he brought Ms. Ganieva down there, all the way from New York City to Epstein (without her consent), at the time,

Ms. Ganieva was caught off-guard and too bewildered to appreciate exactly what was happening to her.

101.    Ms. Ganieva was disgusted, and she let Kellen know this.  Ms. Ganieva knew that by not submitting to Epstein, she would cause Epstein and Black to be very upset, and that there would be consequences for her refusal.

102.    Soon thereafter, Black and Epstein came into the room where Ms. Ganieva sat with Kellen.  The four of them sat around a table, with Black on Ms. Ganieva's left, Kellen on her right, and Epstein across from her where he could look directly at her and size her up.  An attempt at awkward conversation was made.  Ms. Ganieva recalls saying something about the financial crisis and remarking about the federal government's bailout of large financial institutions and the impact on jobs.  Black made a comment about a couch he had bought for Ms. Ganieva's apartment.  Epstein asked her a question and creepily referred to her as "love."

103.    Kellen then, in front of the men this time, brought up again her earlier comment about how Black and Epstein are addicted to sex.  This time, in response to the comment, Ms. Ganieva said that sex addiction was like any addiction in that you want to have it more often and with more frequency, but at some point, it will catch up and affect your life.

104.    Ms. Ganieva noticed that her voice was getting louder and she became very self-aware that she was in a precarious situation.  It is no wonder that Black refused to tell her about this planned trip until they were on his aircraft.  Black was bringing her down to Florida without her consent, to satisfy the sex needs of Epstein, his "best friend."

105.    When it became clear that Ms. Ganieva would not be engaging in sex with Epstein, Epstein and Black became angry and upset with Ms. Ganieva.  Not long after, Black and Ms.

22

Ganieva left Epstein's home and went back to PBI.  Black was so furious he refused to speak to her.

106.    The total visit lasted no more than two hours.

107.    Back on the private plane, Ms. Ganieva was silent, still shaken from her encounter with Epstein.  Black, visibly angry with Ms. Ganieva and her refusal to submit to Epstein, did not speak to her, but forcibly shoved food into Ms. Ganieva's mouth.

108.    While this was the first time Black brought Ms. Ganieva to meet with Epstein, it was not the only time Epstein crept into their relationship.

## V.      Black's Relationship with Epstein was Used as a Tool to Control Ms. Ganieva

109.    Despite Black's public statements to the contrary, Black would regularly boast about how "great" a friend Epstein was.  He would regularly regale Ms. Ganieva with stories about Epstein's New Mexico compound with wonderment and reveal how Epstein flew around "pretty and very young girls" in his private jet, which Black described as "just jaw dropping."

110.    In particular, Black appeared most impressed by how Epstein was allegedly creating his own town in New Mexico, which he said meant that Epstein would have "his own schools," be in "control of his own hospitals," and have "his own police force."  Black seemed enthralled by the power and authority Epstein was amassing in this town that Epstein envisioned and captivated by how Epstein would effectively be "above the law" there.

111.    On one occasion, when Ms. Ganieva asked Black how Epstein makes his money, Black bizarrely told her: "he takes care of the little girls."  When Ms. Ganieva gave Black a puzzled look, Black stared into her eyes and repeated that Epstein does take care of "little girls" (using a condescending and suggestive tone), and said he was "doing a great job with it."

23

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 173 of 349

112.    Ms. Ganieva understood this to mean that Epstein, widely regarded as a master manipulator and "fixer," or someone who makes arrangements for other people, especially of an illicit or devious kind, was providing Black with advice and resources to help manage the women Black was involved in outside of his marriage.  Of course, this included Ms. Ganieva.

113.    Included in the idea of "managing" such affairs, was the implied reference to ensuring that Black's secrets remained secret.

114.    Indeed, on many other occasions, often while Black was texting with Epstein, he would reiterate to Ms. Ganieva how his "**best friends**" were Epstein and Harvey Weinstein, the disgraced Hollywood film producer and convicted sex offender.

115.    Worse, Black would mention that these men were helping him to **"do"** Ms. Ganieva.

116.    When asked what he meant by this, Black said that Epstein and Weinstein gave "very good advice," and knew how to "take care" of problems.

117.    Black also would tell Ms. Ganieva that Epstein and Weinstein were "recording her" and even making a movie about her.  In an effort to veil his threats, Black would chide her and say, "what kind of director do you prefer?"  As always, Ms. Ganieva took his threats seriously.  She believed that if she obeyed Black, he would not make good on his threats.  If she did not, however, there would be consequences.

118.    Such comments were yet another reference to how Epstein, and apparently also Weinstein, provided Black with advice about how to manipulate and control Ms. Ganieva and he other women with whom Black was involved, some of whom are discussed below.

119.    Black also made multiple comments to Ms. Ganieva about Epstein's sexual proclivities, dispelling any notion that Black did not know the true extent of Epstein's depravity.

24

INDEX NO. 155262/2021
RECEIVED NYSCEF: 08/09/2021

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 174 of 349

120.    By way of example only, in early 2014, while at a café in New York, Ms. Ganieva criticized Black's friendship with Epstein.  Black rebuked Ms. Ganieva.  Superfluously, he said, "you are too old for [Epstein], he likes them young."  He then added, "he wouldn't be interested in you."

121.    Black once similarly made a comment about a woman with whom he allegedly had been having a sexual relationship.  This woman, Jane Doe 1, was an attractive, Russian-speaking woman, and only a few years older than Ms. Ganieva.  Black referred to Ms. Doe 1 as now being "too old" for him.

122.    Black also told Ms. Ganieva that Epstein had an attraction to ballerinas.  Disgustingly, Black boasted to her that he introduced Epstein to dancers at a ballet company that Black had connections to, and to which Epstein had apparently donated money.  Appalled, Ms. Ganieva never asked for more information.[13]

123.    Black constantly made it a point to remind Ms. Ganieva about how close he was with Epstein, and how well-connected Epstein was to rich and powerful people.  Black wanted her to believe that he was behind her introductions to other powerful men who had ties to Epstein, including Prince Andrew, and the aforementioned Weinstein.

124.    Based on Black's best friend status with Epstein, it is certain that he knew Ghislaine Maxwell ("Maxwell").  Maxwell has been dubbed as Epstein's "madam," and has been charged by the federal government with the crimes of enticement of minors and sex trafficking of underage girls, stemming from her connection to Epstein's sex trafficking ring.  Among other criminal acts,

---

[13]    Years later, it was reported that Epstein preyed on young dancers using the promise of advancing their careers.  Claire Lampen, *Report: Jeffrey Epstein Used NYC Dance Studios As Recruiting Grounds*, (Sept. 3, 2019), https://gothamist.com/news/report-jeffrey-epstein-used-nyc-dance-studios-recruiting-grounds

Maxwell has been accused of personally recruiting and grooming underaged girls and young vulnerable women to have sex with Epstein and Epstein's friends.

125.    In the fall of 2013, Ms. Ganieva was approached by Maxwell at a restaurant/lounge. On the day in question, Maxwell aggressively tried to speak with Ms. Ganieva, and told her that she wanted to "**make [Ms. Ganieva] a global citizen**."

126.    Maxwell told Ms. Ganieva that she wanted to "help [her] get a passport" and that she "must call her."  Maxwell then handed Ms. Ganieva her business card.  Ms. Ganieva had no idea who Maxwell was, or that she was connected to Epstein, and thought her behavior was intrusive and bizarre.  Ms. Ganieva never contacted Maxwell.

127.    Upon information and belief, Black had pushed Maxwell on Ms. Ganieva, likely through Epstein, after Ms. Ganieva repeatedly rebuked Black's attempts to "help" Ms. Ganieva with her immigration status, which would have only pulled Ms. Ganieva further within Black's grip and control.

128.    Notably, on multiple occasions, including during the 2015 discussions in which Black pressured Ms. Ganieva into agreeing to a non-disclosure agreement described below, Black threatened Ms. Ganieva against talking about Epstein and Epstein's relationship with Black.

129.    Black would warn that Ms. Ganieva would **"die"** if she ever spoke about Epstein and Epstein's relationship with Black, and that he would pay people to destroy Ms. Ganieva's life if she ever did so.

## VI.    Black's "Conveyor Belt of Women" and the Absurdity of His Extortion Defense

130.    For many reasons, Black's claim that Ms. Ganieva attempted to extort him by threatening to make their relationship publicly known, which allegedly induced him to pay her money, is provably false.

26

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 176 of 349

131.    Perhaps the biggest flaw in Black's manufactured narrative is that, like Ms. Ganieva, Black made no attempt to keep secret the many women with whom he was involved throughout the years.  As he often bragged to Ms. Ganieva, Black had a "**conveyor belt of women**" available to him.

132.    Black did not attempt to keep these women hidden from anyone, much less his family.  Black openly traveled in social circles, including with Epstein, where men with excessive wealth like him had access to an endless supply of available, single young attractive women.  It was no secret among those that know Black that he had a preference for Russian-speaking women, including many like Ms. Ganieva, who were young, had modeling experience, and may have newly arrived in the U.S. and thus did not have an extensive family or support system here.

133.    Quite simply, if Black was trying to hide the fact that he was involved with women other than his wife, including young, Russian-speaking models, he did an extremely poor job, particularly for someone who founded and ruthlessly ran a publicly traded global hedge fund with $400 billion in assets under management.

134.    Worse, there were occasions where Ms. Ganieva found herself attending the same social functions as Black and his wife.  Black made absolutely no effort to keep his wife and Ms. Ganieva away from one another.  Black openly pursued Ms. Ganieva at these events in front of his wife.  By way of example only, this included an event in the Hamptons that took place in the summer of 2011.

135.    In that same summer, Black brought Ms. Ganieva over to his home in the Hamptons and tried to convince her to sleep with him in the house.  When Ms. Ganieva asked Black where his wife was, he told her that she was in the "main house."  In other words, Black had brought Ms.

27

Ganieva to his home in order to sleep with her in what was apparently a guest house, all while his wife was next door in the main house.

136.    On another occasion, as Black and Ms. Ganieva were either entering or exiting Black's studio apartment located in a building on the southwest corner of 72nd and Park Avenue where they would usually meet, they encountered Black's wife on the street as she was walking towards her car.  Black did not act surprised or worried in any way.  In fact, there would have been no reason to be surprised given that the apartment in which Black lived with his family was located in a building on the *northwest* corner of 72nd and Park Avenue, *i.e.*, directly across from his studio. Black even brought Ms. Ganieva to the apartment where Black and his family lived.

137.    Surely if Black was worried about his wife or family knowing about his relationship with Ms. Ganieva, he would have chosen an apartment slightly farther away from where they all lived to meet Ms. Ganieva.

138.    Black even brought Ms. Ganieva to his family's home in Bedford, New York, demonstrating that his relationship with Ms. Ganieva was anything but secretive.

139.    Black also openly told Ms. Ganieva about the other women with whom he was involved.  Ms. Ganieva even met several of the other women in Black's life.

140.    For instance, a Russian woman that Ms. Ganieva knew, Jane Doe 2, had confided in her about problems with a man with whom she was involved.  At the time, Ms. Ganieva had yet to meet Black.  Ms. Doe 2 confided in Ms. Ganieva that she was "exhausted" by a man with whom she was in a relationship with and could not wait to move on her with life because she could no longer endure him any longer.  Ms. Doe 2 kept repeating the words, "**I just cannot**." Ms. Ganieva had no idea that Ms. Doe 2 was referring to Black.  Ms. Ganieva thought that Ms. Doe 2 looked fragile, frightened and very jumpy, as if she had suffered from post-traumatic stress disorder.

28

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 178 of 349

141.    It was only a few months later that Black told Ms. Ganieva that he had been sexually involved with Ms. Doe 2 "for years."

142.    Ms. Doe 2 told Ms. Ganieva that she was introduced to Black by Epstein.  Ms. Doe 2 further told her that Epstein gave her advice about how to handle her relationship with Black.

143.     Upon information, Ms. Doe 2 was another victim of abuse and misconduct at the hands of Black.

144.    It defies credibility for Black to message to the public that he merely had a "professional" relationship with Epstein when Epstein was introducing Black to single young women with whom Black then became involved in relationships.

145.    Moreover, at the previously mentioned summer 2011 social event at the Hamptons in which Ms. Ganieva encountered Black and his wife, Black was also seen hugging and being affectionate with a Russian woman named Jane Doe 3.  It was obvious that Black was involved with Ms. Doe 3.

146.    Another Russian woman that knew Ms. Ganieva and Ms. Doe 3, told Ms. Ganieva that she should behave more like Ms. Doe 3 when it came to Black, implying that Ms. Doe 3 knew how to "do all the right things" with Black.

147.    Black was clearly not afraid to show affection for another woman in his wife's presence, nor to boast to Ms. Ganieva about his other relationships to make it clear to her that he regarded her as expendable and easily replaceable.

148.    Further, in or about late 2011, early 2012, while Black continued to pursue Ms. Ganieva no matter how many times she tried to end the intimacy and abuse cycle, Black also became sexually involved with another Russian-speaking model, Jane Doe 4, who was even younger than Ms. Ganieva.

29

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 179 of 349

149.    Black in no way attempted to hide his sexual relationship with Ms. Doe 4 from Ms. Ganieva, or anyone else.  In fact, one day in the fall of 2012, while Ms. Ganieva was walking on a Manhattan street, she encountered Black walking along with Ms. Doe 4.  No effort to avoid her was made.

150.    Perhaps not shockingly, like Ms. Ganieva, Black paid for Ms. Doe 4 to attend Columbia University.[14]

151.    Ms. Doe 4 would come up to Ms. Ganieva at Columbia and at social events and try to speak with her.  Ms. Ganieva thought it was strange and inappropriate that Ms. Doe 4 did this and tried to avoid her.

152.    Bizarrely, Black moved Ms. Doe 4 into an apartment near where Ms. Ganieva lived, and even bought her a Steinway piano, just as he had for Ms. Ganieva.

153.    Again, Black made no effort to hide his relationship with Ms. Doe 4, but rather openly flaunted it.

---

[14]    Significantly, Black also financed the college tuition for Ms. Doe 2 – at the same time he was doing so for Ms. Doe 4 and Ms. Ganieva.  Black's claim that it was Ms. Ganieva who asked him for money to help with school is false.  Presumably, Black will claim that Ms. Doe 2 and Ms. Doe 4 also were the ones to ask Black for thousands of dollars to fund their education in the U.S. – which provided them the ability to remain in the U.S., despite their lack of citizenship.  Epstein similarly offered to and did in fact foot education costs for numerous young women that he sexually assaulted.  Tara Palmieri, *The Women Who Enabled Jeffrey Epstein*, POLITICO, (May 14, 2021), https://www.politico.com/news/magazine/2021/05/14/jeffrey-epstein-investigation-women-487157, ("In an email to POLITICO, Oh characterized Epstein's offers of tuition and the SoHo studio as tools of his 'prolonged and repeated' sexual abuse."); *New Jeffrey Epstein Accuser Calls on Prince Andrew to Talk*, BBC, (Nov. 19, 2019), https://www.bbc.com/news/world-us-canada-50469409, ("Many of the women's accounts allege they were recruited to give massages to Epstein, with the massages leading to sexual abuse.  Many also include promises made by Epstein to help them with things like college tuition, medical expenses or advancing their careers.")

30

154.    Disgustingly, he would chastise and try to guilt Ms. Ganieva for not having threesomes with him.  Black would compare Ms. Ganieva to Ms. Doe 4, who according to Black, had threesomes with Black.

155.    The above is simply a sampling of Black's "conveyor belt of women."

156.    Like his relationship with Ms. Ganieva, Black took these women to high end restaurants, and attended social events and art exhibits together.  He took them shopping and spent thousands of dollars on them.  There is simply no way that Black was afraid of people seeing him in public with these women.

157.    Importantly, Black financially supported some of these women.  Black would do this in order to hold financial control over these women.  He would offer them a small glimpse at a better life, but only under his terms, and for so long as he could continue to manipulate and control them.  Black purposely made it so that these women became indebted to him, which enabled him to do whatever he wanted to do with or asked of them without fear of them speaking out about his conduct.

158.    In short, Black had no legitimate concern if a woman said publicly that she and Black were involved or otherwise had sexual relations – because he did not try to keep this a secret.

159.    This of course begs the question of what Black was actually concerned about becoming revealed to prompt him to want to silence Ms. Ganieva.

**VII.    Ms. Ganieva Returns to College**

160.    In 2011, Ms. Ganieva enrolled in school to finish her undergraduate degree in math. She hoped that a degree would allow her to find a job outside of modeling.

161.    Ms. Ganieva believed that going to school would occupy more of her time and make her less available to Black.  Other efforts to distance from him included cutting off most of her hair,

31

believing that Black would find her unattractive.  Unfortunately, these efforts had thus far been mostly futile.

162.    As it turned out, Black said that he was in favor of her returning to college, and used the situation to convince Ms. Ganieva to sign a "loan" with Black.

A.    The First $480,000 Loan

163.    One day in 2011, Black told Ms. Ganieva that he had arranged a loan for her. Despite being a financial titan with teams of lawyers at his disposal, Black presented a one-page document to her, set forth below.

164.    As stated, the "loan" included a 5% interest rate and was payable on June 1, 2016.

165.    Of course, such an amount of money was unfathomable to Ms. Ganieva and she protested that she would never be able to pay it back.  Financial control – a tried-and true tactic to achieve dominance over another, was a method Black knew intimately and understood would place Ms. Ganieva in his debt forever.

32



**LOAN AGREEMENT BETWEEN LEON BLACK and GUZEL GANIEVA**

On this day, June 2, 2011, Leon Black ("the Lender") agrees to make a loan of $480,000 ("the principal") to Guzel Ganieva ("the Borrower") on the following terms.

The principal amount will be lent over a period of two (2) years, extending over eight (8) intervals of three (3) months each, to be disbursed by bank wire transfer at the beginning of each interval:

| | | |
|---|---|---|
| $60,000 | on | June 6, 2011 |
| $60,000 | on | September 1, 2011 |
| $60,000 | on | December 1, 2011 |
| $60,000 | on | March 1, 2012 |
| $60,000 | on | June 1, 2012 |
| $60,000 | on | September 1, 2012 |
| $60,000 | on | December 1, 2012 |
| $60,000 | on | March 1, 2013 |

The principal loan will be repaid in full on June 1, 2016 and will carry a simple interest rate of 5% per annum, also to be repaid on June 1, 2016.

The Lender and Borrower have read and fully understand the terms of this Agreement and hereby consent to such terms in full.

Leon Black                     Guzel Ganieva

Dated: June 2, 2011

166.    Critically, it would ensure that his criminal and deviant behavior would remain silenced.

33

B.     The Second $480,000 Loan

167.    Unsurprisingly, Black followed this initial loan with another one just like it in 2013:



168.    The two "loans," and his ability to force repayment of such an amount, allowed Black

to exert even greater control over Ms. Ganieva. Black knew the magnitude of the harm that he had inflicted on Ms. Ganieva over the years. This money, at least in his twisted mind, was a way of excusing himself.

169. After Ms. Ganieva finished her math degree, Black reignited his charade of promises to help her find a job. He convinced her that with all of his powerful Wall Street connections, he would find her a job.

170. Pathetically, Ms. Ganieva believed all of his promises and pursued leads for jobs arranged by Black for over a year. In hindsight Ms. Ganieva knows that none of these arranged interviews were meant to be legitimate. Rather, it was all part of Black's sick plan to make her feel grateful to him on the one hand, but also allow him to belittle and humiliate her after each job rejection.

171. Too many examples exist of these sham interviews to detail herein, but Black used his connections at Goldman Sachs and other financial powerhouses to arrange appointments for her. On the surface, such interviews appeared well-meaning, such as this example:

> **From:** Havis, Jenna L. [HCM]
> **Sent:** Wednesday, May 07, 2014 11:33 AM
> **To:** 'Guzel Ganieva'
> **Subject:** RE: Goldman Sachs Interview Opportunity
>
> Hello Guzel,
> Just following up to the voicemail I recently left. Curious if you are available to come onsite this
> **Friday May 9th from 11am to 1:30pm**?
> Please let me know. Thank you, Jenna
>
> On Wednesday, May 7, 2014, Havis, Jenna L.
> <Jenna.Havis@gs.com> wrote:
> Hello Guzel,
> Please see your interview details below:
> **Friday, May 9th, 2014**
> Interviewer Time Details:

35

> Dana Bunting 11:00am EST 32/201
> *HCM TBD 11:30am EST 32/201*
> Pete Lyon & Alison Mass 12:00pm EST 32/201
> Julie Silverman 1:00pm EST 32/301
> Please keep in mind that all schedules are subject to change. When you arrive to our building at **200 West Street in New York**, our security team will direct you.

172.    As Black knew would happen, Ms. Ganieva never received an offer from any financial company in New York.  Desperate for work and falling for Black's claims that he was the only person that could help her, Ms. Ganieva even interviewed for jobs in London and Moscow that Black arranged, including at Goldman Sachs in London and Moscow.

173.    Predictably, Ms. Ganieva was rejected.  By way of example only, one such rejection email is as follows:

> On Saturday, November 29, 2014, Lyon, Pete <Pete.Lyon@gs.com> wrote:
> Thanks Guzel…in short, I think we just have to be patient for now…we have explored many options internally and, given the macro environment, there are no open jobs at Goldman Sachs right now that work for/are a fit for you…I also saw Paolo a few weeks ago in NYC and he told me he would keep his eyes open for you in Moscow with clients of his if they have roles/openings that make sense but that there were no immediate openings he was aware of…I wish we had better news but I think we just need to hang tight for now and if something opens that makes sense then Paolo and/or I will be in touch…thanks a lot."

174.    After yet another failed job interview, in desperation, Ms. Ganieva even asked Black

36

if she could work as a receptionist at one of these companies.  This idea was rejected by Black.

Clearly, Black preferred her instability and dependence.  In fact, after yet another failed Goldman

Sachs interview, Black said, in a perversely happy manner, that he knew her "world is shitty."

Black then used the opportunity to remind her that he is the "only one" who can help her escape

her "miserable life."

## VIII.   Black Rapes Ms. Ganieva, and Concocts a Scheme to Insulate Himself from Liability and Frame Ms. Ganieva as an Extortionist

175.    Ms. Ganieva always made her objection to sex with Black known.  This did not

deter Black.  He continued to force sex upon Ms. Ganieva even though he knew that it was against

her will.  As detailed above, that was part of how Black became sexually aroused and derived

pleasure.

176.    Black, understandably, was concerned about this specific information becoming

public, especially since it had gone on for several years.

177.    In the days leading up to the July 4, 2014 weekend, Ms. Ganieva became sick and

was home for a number of days, unable to go to the store or cook for herself.  At the time, her child

was away at summer camp.  On Sunday, July 6, 2014, Black came from the Hamptons to her

apartment on East 77th Street.  Although Ms. Ganieva did not buzz him through the building

entrance, one of her neighbors must have done so, because suddenly he was knocking at her

apartment door.  When Ms. Ganieva opened the door, Black barged in, pushing her off to the side.

178.    Ms. Ganieva was weak and could barely walk.  Disturbingly, when Black realized

what a debilitated state she was in, he became happy.

179.    Aware that Black wanted to have sex with her, Ms. Ganieva quickly began

protesting that she could not and would not have sex with him.  She tried to tell him that she was

37

in a weakened state, having been sick for almost a week.

180.    Never a match for his physical size and strength, on this day in particular Ms. Ganieva knew what fate was in store.

181.    At over 6'5" and more than 300 pounds, Black had no difficulty dragging Ms. Ganieva into the bedroom and throwing her on her back on the bed. She was limp and unable to move.

182.    Despite her begging him to leave, he took off her clothes and his own. Inexplicably, he spared Ms. Ganieva the pain of his usual sadistic rituals described in detail above, quickly got on top of her and forced his penis into her vagina against her will. Disgustingly, when Black was done, as he stood up and put his clothes back on, he angrily said:

**"Now I have fucked you."**

183.    Black then walked out – leaving Ms. Ganieva naked and unable to move on her bed.

184.    Ms. Ganieva was no match for the cunning and masterful manipulation of Black or his repeated and unwanted sexual conduct.

185.    Perhaps after coming to the realization that he had "gone too far" this time when he raped Ms. Ganieva on July 6, 2014, Black "huddled up" again with his legal team – some of whom, upon information and belief, also served as Epstein's lawyers – to come up with a scheme to insulate Black from criminal liability for his actions towards Ms. Ganieva.

186.    The plan was to manufacture evidence that would counter the narrative that Black forced himself onto Ms. Ganieva, and to paint Ms. Ganieva as an extortionist if she ever gained the courage to report his vile behavior.

187.    Soon after the rape, knowing that Ms. Ganieva wanted to leave New York City, Black told her he was going to give her extra money to make this happen, suggesting it would be a

38

substantial amount.  As anyone would be, and as Black knew she would be, Ms. Ganieva was

extremely grateful and appreciative, as she had been wanting to leave with her son.  As part of this

substantial gift of money, he commanded her to send him text messages saying that she loved him.

When Ms. Ganieva spoke to a close family member about Black's promise of money, she

mentioned his order that she had to send texts like this.   At the time, not knowing his nefarious

plans, it seemed odd but not worrisome, as Black had always insisted that Ms. Ganieva be

affectionate when she messaged him.

188.    Of course, beneath this facade was the reality that Black had, in fact, been

physically, sexually and emotionally abusive towards Ms. Ganieva for years.

189.    Bank records confirm that Black deposited a payment of $500,000 into Ms.

Ganieva's bank account on July 30, 2014.  Not long after, another deposit in excess of $150,000

was made by Black.

190.    Then, in 2015, after Ms. Ganieva returned to the U.S. from Russia, the second leg

of Black's plan – to frame Ms. Ganieva as an extortionist – went into motion.

191.    Following the July 2014 rape, Ms. Ganieva took her son and left New York to

physically distance herself from Black.  Unfortunately, she was unable to fully escape his influence

as it seemed that no matter where she traveled, inevitably, she happened to meet someone that knew

Black, including people that worked with Black at Apollo, and Black managed to always know

where she was and what she was doing.

192.    In this regard, Black often called Ms. Ganieva to tell her than he knew that she had

been at a certain event the night before, knew with whom she had been, even what she wore.

193.    No matter the physical distance between them, Ms. Ganieva never stopped feeling

threatened by Black and his power and control over her.  Of course, this was precisely what he

wanted.

194.    It was no surprise to Black that when Ms. Ganieva was back in New York City in 2015, she asked to meet him.  Ms. Ganieva wanted to know what she could do to be able to live her life without his continued involvement.  Having planned for years about how to silence Ms. Ganieva from revealing what he had done, Black was prepared to speak with her, especially knowing that her two "loans" were coming due, and that she of course did not have one million dollars to repay him.

195.    Black claims that he surreptitiously recorded select conversations with Ms. Ganieva. It remains to be seen which specific conversations (and which parts thereof) were and were not recorded.

196.    Black knew that he had violently and viciously raped Ms. Ganieva in July 2014, and that he had physically, mentally and emotionally abused her for years.

197.    During their conversations, Black would speak about how she, Ms. Ganieva, could "harm him" if she "spoke about our relationship."  Black would also say, "I want to provide for you for the rest of your life.  What is your number?  How much do you need to be taken care of?"

198.    Feeling pressured to respond, Ms. Ganieva blurted out a number.  This made Black happy.  Clearly, the "fix" was in, and Black was giddy about Ms. Ganieva having "taken the bait."

199.    Black and Ms. Ganieva met a few additional times in 2015.  During some meetings, Black would scream, "I want to give you money… Say that you are blackmailing me."  Black offered to make regular payments to Ms. Ganieva over a period of years so long as she agreed to meet with his lawyers and sign a document.

200.    Ms. Ganieva told Black that she did not want to receive regular payments from him and would not meet with his lawyers or sign any documents.  Ms. Ganieva did not want to be bound

40

INDEX NO. 155262/2021
Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 190 of 349 RECEIVED NYSCEF: 08/09/2021

to Black, and simply wanted to move on with her life and try to forget what Black had done to her.

Ms. Ganieva made it clear that all she wanted was for Black's harassment of and control over her

to stop, and for her remaining loan obligations to be forgiven since, as Black was well aware, she

was in no financial position to repay them.

201. Black was relentless. Black urged Ms. Ganieva to take money he was offering her

in exchange for nothing "horrible" to happen to her or her child.

202. Simply put, it was never an actual offer because refusing Black was not an option.

He reminded Ms. Ganieva that if she did not take the "deal," *i.e.*, his hush money, he would make

sure she ended up **"in prison"** or he would **"destroy her life."**

203. Black also attempted to goad Ms. Ganieva into speaking about who and when people

connected with Black had harassed her. Ms. Ganieva repeated stories about people she had

encountered who claimed to or appeared to know Black, and how some of them had mistreated her.

Black sought to extract more and more details about some of these incidents. This was all of course

a ploy on Black's part to make Ms. Ganieva seem paranoid (and he would become elated and giggle

when Ms. Ganieva said something that he thought made her seem so), in support of his quest to

frame Ms. Ganieva for extortion, all coming to light now.

204. Black eventually told Ms. Ganieva that he would pay her $100,000 every month and

a certain sum of money to help with her immigration status, but only if she agreed to make it seem

like it was *her* idea that Black pay her substantial sums of money in exchange for her silence.

205. Black told Ms. Ganieva that she would receive continuing payments for as long as

she kept her mouth shut about all the things Black had done and said to her, as well as what she

knew about Black's relationship to Epstein. Black threatened Ms. Ganieva's safety if she did not

agree to this arrangement.

41

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 191 of 349

206.    Eventually, after friends of Ms. Ganieva pressured her into agreeing to Black's proposal for fear of what he would do to her if she refused, Ms. Ganieva reached out to Black, told him she did not want to fight with him any further, and would accept his money.

207.    Black then set up one last meeting at the Four Seasons restaurant on October 18, 2015, where he presented Ms. Ganieva with a one-page document.

208.    Ms. Ganieva was nervous and had difficulty understanding what it said.  She understood that it involved confidentiality -- what she later learned is referred to as a nondisclosure agreement ("NDA").

209.    Black "agreed" to allegedly forgive her loans.

210.    As to the other terms, she only read them once, quickly, and is unsure what other language is included in the document.

211.    There was no space on the document for Black to sign; only Ms. Ganieva.

212.    After she signed, he handed her another piece of paper which looked to be a copy of what she just signed.  He ordered her to sign this also.

213.    He then said to her:

**"[I will be paying you] as long as you keep your mouth shut."**

214.    Black refused to give her a copy.  He left with the documents.[15]

215.    While Ms. Ganieva desperately wanted to get out of there, Black forced her to wait while a dessert that took over 20 minutes to prepare came out.

---

[15]    There is no way for Ms. Ganieva to be sure that the language in the second piece of paper matches the language in the first document.  Although it appeared to be the same, to this day she cannot be sure what either document contains.

42

INDEX NO. 155262/2021
RECEIVED NYSCEF: 08/09/2021

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 192 of 349

216.     While Black apparently made recordings of their conversations that he claims support his version of what happened, in reality, it was Black who was heavy-handedly trying to force Ms. Ganieva to keep silent about his years-long sexual, mental and emotional abuse in exchange for hush money.

217.     From that time until April 2021, Ms. Ganieva received regular payments from Black, via wire from an account called "E Trust."

218.     Prior to November 2015, whenever Black transferred money into her account, her bank statement recorded the funds as from "Leon D. Black," or "J. Black Trust Account." Ms. Ganieva has no knowledge as to why payments began from the "E Trust," where the money from it originated, and why it was called "E Trust."

219.     Over the years, Ms. Ganieva asked Black numerous times to obtain a copy of what she signed that day. He refused to respond. By way of example only, in 2019 she wrote to him:

43

Mon, Oct 15, 10:06 AM

Hi. I would like to have a copy of the NDA I signed. Can you please email it to me to ⬛⬛⬛⬛⬛⬛⬛? Thank you.

Tue, Oct 16, 12:59 PM

Leon. You sexually harassed me, sex trafficked me, raped me, and eventually blacklisted me. I don't know for how much longer it will take me, on my own, to process the pain your caused to me and my family. The least thing you can do is to give me that document that I was forced to sign under duress and wasn't able to read before signing. Unfortunately I am still tied to you...

220.    Ms. Ganieva even retained legal counsel to demand that she receive a copy of the document. Her lawyer's February 18, 2020 and March 6, 2020 letters to Black remain unanswered.

221.    To this day, only Black has the NDA documents.

## IX.    Black Says Publicly that He Has Never Committed Any Act of Misconduct

222.    On October 29, 2020, during an earnings call, in connection with his announcements about his future role at Apollo Management, Black publicly stated that:

> **"There has never been an allegation by anyone that I engaged in any wrongdoing, because I did not."**

223.    This false proclamation, and similar ones shortly thereafter, including in his above-

44

mentioned January 25, 2021 "retirement" announcement, of Black's character and representation of his clean hands deeply upset Ms. Ganieva. Black knew what he had done to her, and that Ms. Ganieva considered many of his sexual acts to have been against her will and consent.

224.    Having enrolled in law school, Ms. Ganieva had a greater understanding of what Black had done to her physically and what he had coerced her into signing in connection with the non-produced confidentiality agreement.

225.    Knowing that Black was the one who had committed unlawful acts on her and likely other vulnerable women, and despite the threats he made to her to coerce her into signing, or knowing that whatever money she received from the mysterious E Trust may cease, Ms. Ganieva finally had the courage to say what her experience with Black had been.

45

226.    On March 17, 2021, Ms. Ganieva posted on Twitter the following:



227.    Thereafter, on April 8, 2021, Bloomberg published an article containing the

following statement by Black:

> "I foolishly had a consensual affair with Ms. Ganieva that ended
> more than seven years ago," Black said in the statement Thursday.
> "Any allegation of harassment or any other inappropriate behavior
> towards her is completely fabricated. The truth is that I have been
> extorted by Ms. Ganieva for many years and I made substantial
> monetary payments to her, based on her threats to go public
> concerning our relationship, in an attempt to spare my family from
> public embarrassment."

> Black had previously planned to step down by the end of July as
> CEO of the firm he co-founded. He said that, on advice from his

46

counsel, he asked criminal authorities several weeks ago to investigate Ganieva.[16]

228.    This statement was reprinted in countless publications.[17]

229.    For all of the reasons detailed above, everything Black said in the above statement about Ms. Ganieva is false.[18]

230.    Black's statement published on April 8, 2021 was made with malice.

231.    Black knew that he issued a false statement of facts to Bloomberg or made the

---

[16]    Gillian Tan, *Black Says He Paid to Hide Affair, Denies It Led to Apollo Exit*, Bloomberg, (April 8, 2021, 10:04 PM), https://www.bloomberg.com/news/articles/2021-04-09/black-says-he-paid-to-hide-affair-denies-it-led-to-apollo-exit.

[17]    Josh Kosman, *Robert Kraft resigns from Apollo board amid Epstein controversy*, the New York Post, (April 12, 2021, 2:09 PM), https://nypost.com/2021/04/12/robert-kraft-resigns-from-apollo-board-amid-epstein-controversy/.

> In a statement to The Post, Black acknowledged that he knew Ganieva, but denied that he acted inappropriately toward her. "I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago," Black said in his statement. "Any allegation of harassment or any other inappropriate behavior towards her is completely fabricated." He also denied that her allegations influenced his decision to step away from the company faster than planned. In January, Black had signaled he would stay on as chairman after stepping down as CEO on July 31. "This is entirely a personal matter; this matter has nothing to do with Apollo or my decision to step away from the firm." Black added that he believes he was being "extorted" by Ganieva because he had allegedly "made substantial monetary payments to her, based on her threats to go public concerning our relationship, in an attempt to spare my family from public embarrassment." The billionaire said he has referred the matter to "the criminal authorities" at the recommendation of his counsel and welcomes "a thorough investigation."

[18]    On April 12, 2021, the New York Post published yet another article, stating that, "[a]s exclusively reported by The Post last week, Black's unexpected exit on March 22 came just days after several directors on the private-equity giant's board learned of accusations of sexual harassment against him by a woman **he claimed was trying to shake him down over a 'consensual affair.'**" (emphasis added).

47

statement intending it be published with reckless disregard for the truth.

232.    Black's decision to falsely state that Ms. Ganieva extorted him "for years" is right

from the playbook of scores of wealthy and powerful men, a number of whom have ties to Black,

who have faced similar accusations.  Just a fraction of such examples are below:

- Harvey Weinstein alleged that Ambra Gutierrez fabricated claims of sexual assault in an attempt to blackmail him into a movie role.[19]

- Bill O'Reilly and Fox News preemptively sued producer Andrea Mackris for extortion after she came forward with sexual harassment allegations.[20]

- Paul Haggis accused Christine Lepera of extortion following her allegations that he raped her.[21]

- Alan Dershowitz sued Virginia Giuffre for defamation following her claims of sexual assault, claiming that she made the claims in part to **"extort private settlements from other, wealthier individuals associated with [Jeffrey] Epstein."**[22]

---

[19]    Kyle Munzenrieder, *How Tabloids Dragged Ambra Gutierrez Through the Mud After She Accused Harvey Weinstein of Groping Her*, W Magazine, (October 10, 2017), https://www.wmagazine.com/story/harvey-weinstein-ambra-gutierrez-page-six-daily-mail-smear-campaign.

[20]    Anna North, *Men like Bill O'Reilly get to make a comeback. Women who speak up about harassment lose their jobs*, Vox, (May 16, 2018, 12:30 PM), https://www.vox.com/identities/2018/5/16/17360334/bill-oreilly-returning-sexual-harassment-fox-news-back-accusers-metoo-me-too-movement.

[21]    *Post-Weinstein, These Are the Powerful Men Facing Sexual Harassment Allegations*, Glamour, (May 18, 2019), https://www.glamour.com/gallery/post-weinstein-these-are-the-powerful-men-facing-sexual-harassment-allegations.

[22]    Tom Jackman and Deanna Paul, Alan Dershowitz countersues accuser in Jeffrey Epstein case, then is sued by David Boies, The Washington Post, (November 8, 2019, 3:39 PM), https://www.washingtonpost.com/crime-law/2019/11/08/alan-dershowitz-countersues-accuser-jeffrey-epstein-case-then-is-sued-by-david-boies/.

48

- Russell Simmons claimed that a Jane Doe suing him over an alleged rape in 1988 made up the event to extort him.[23]

233.    The false and defamatory statements exposed Ms. Ganieva to hostility, contempt, ridicule and professional disgrace.

234.    In order to be admitted to the New York State bar, Ms. Ganieva must pass an ethics and moral character test.  Such accusations against her will negatively impact this process and cause her severe damage.

235.    The false and defamatory statements imputed sexual immorality and involved criminal activity in connection with Ms. Ganieva. Such statements will inevitably cause her harm and damage in her ability to secure employment going forward, and in all of her relationships, personal and professional.

## X.    **Black Asserts Retaliatory Counterclaims**

236.    On June 1, 2021, Ms. Ganieva filed the instant lawsuit alleging defamation and gender-motivated violence.

237.    On July 19, 2021, Black, in a blatant act of retaliation, filed baseless counterclaims against Ms. Ganieva for defamation, defamation *per se*, and breach of contract (the "Counterclaims") because she protested the years of abuse she suffered at Black's hands and his attempts to besmirch her name.

238.    Black commenced the Counterclaims only after Ms. Ganieva brought this action against him.  At the time the tweets were made, on March 17, 2021, this case had not been filed

---

[23]    Ashley Cullins, *Russell Simmons Says Jane Doe's Rape Lawsuit is a "Vile" Extortion Attempt*, The Hollywood Reporter, (April 18, 2018, 6:31 PM). https://www.hollywoodreporter.com/business/business-news/russell-simmons-says-jane-does-rape-lawsuit-is-a-vile-extortion-attempt-1103734/.

49

and nowhere were the allegations about Black's conduct involving violations of the GMVA discussed or alleged by Ganieva publicly.

239.     Black's intentions are clear, he is attempting to make good on his promise, that if Ms. Ganieva did not comply with his whims, he would "destroy [her] life."

240.     Black has chosen to bully, threaten and intimidate by causing Ms. Ganieva to fear that she may owe him substantial life-altering money as a result of the Counterclaims.

241.     To make matters worse, Black audaciously seeks to hold Ms. Ganieva legally liable for breach of contract under an alleged contract that Ms. Ganieva is not even in possession of and has been requesting a copy of for years.  Incredulously, despite repeated requests by counsel for Ms. Ganieva, Black has continued to fail to produce the NDA to Ms. Ganieva to this very day.

242.     The GMVA protects victims of violence that are specifically "motivated by gender," which occurs when the act is "committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender."

243.     While the GMVA does not expressly contain an anti-retaliation provision, the lack of express "anti-retaliation" language has not prevented courts from reading robust anti-retaliation protections into statutes to further their remedial purpose.[24]

244.     Clearly, based on the purpose of the GMVA and how courts have interpreted similar statutes, the GMVA prohibits retaliation.

## FIRST CAUSE OF ACTION
### (Defamation)

---

[24]     For example, 20 USC § 1681 ("Title IX"), the federal law prohibiting sex discrimination in education, contains no anti-retaliation language. Nevertheless, in *Jackson v. Birmingham Board of Education*, the United States Supreme Court held that the law prohibited retaliation against a third-party teacher because, "if retaliation were not prohibited, Title IX's enforcement scheme would unravel." (544 US 167, 180 (2004)).

50

245.    Ms. Ganieva hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

246.    As described above, Defendant Black has stated false information regarding, *inter alia*, the circumstances surrounding his relationship with Ms. Ganieva and payments made to Ms. Ganieva.

247.    These statements were untrue and defamatory in that they falsely reported, *inter alia*, that Ms. Ganieva and Defendant Black engaged in a wholly consensual relationship and that Ms. Ganieva extorted Defendant Black.

248.    Defendant Black knew or should have known that such defamatory statements were false.

249.    Defendant Black made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

250.    Defendant Black's statements constitute defamation because they impugn Ms. Ganieva's honesty, trustworthiness, dependability, and professional fitness and abilities by falsely claiming, *inter alia*, that Ms. Ganieva engaged in a wholly consensual affair with Defendant Black and that Ms. Ganieva committed a crime by extorting Defendant Black.

251.    Defendant Black's statements constitute defamation because they accuse Ms. Ganieva of committing a crime, namely, extortion.

252.    Defendant Black's defamatory statements have harmed Ms. Ganieva's professional reputation and standing in her industry, have caused her economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost income, benefits, job security

51

and opportunities for career advancement and have caused her embarrassment, humiliation and emotional injury.

253.    As a direct and proximate result of Defendant Black's defamation, Ms. Ganieva has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and emotional distress.

254.    As a direct and proximate result of Defendant Black's conduct, Ms. Ganieva has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

255.    Defendant Black's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Ms. Ganieva's rights.  As such, Ms. Ganieva is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Defamation *Per Se*)

256.    Ms. Ganieva hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

257.    As described above, Defendant Black has stated false information regarding, *inter alia*, the circumstances surrounding his relationship with Ms. Ganieva and payments made to Ms. Ganieva.

258.    These statements were untrue and defamatory in that they falsely reported, *inter alia*, that Ms. Ganieva and Defendant Black engaged in a wholly consensual relationship and that Ms. Ganieva extorted Defendant Black.

259.    Defendant Black knew or should have known that such defamatory statements were false.

52

260.    Defendant Black made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

261.    Defendant Black's statements constitute defamation per se because they impugn Ms. Ganieva's honesty, trustworthiness, dependability, and professional fitness and abilities by falsely claiming, *inter alia*, that Ms. Ganieva engaged in a wholly consensual affair with Defendant Black and that Ms. Ganieva committed a crime by extorting Defendant Black.

262.    Defendant Black's statements constitute defamation because they accuse Ms. Ganieva of committing a crime, namely, extortion.

263.    Defendant Black's defamatory statements have harmed Ms. Ganieva's professional reputation and standing in her industry, have caused her economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost income, benefits, job security and opportunities for career advancement and have caused her embarrassment, humiliation and emotional injury.

264.    As a direct and proximate result of Defendant Black's defamation, Ms. Ganieva has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and emotional distress.

265.    As a direct and proximate result of Defendant Black's conduct, Ms. Ganieva has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

266.    Defendant Black's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Ms. Ganieva's rights.  As such, Ms. Ganieva is entitled to an award of punitive damages.

267.    Ms. Ganieva hereby repeats and re-alleges each and every allegation in all of the

53

preceding paragraphs, as though fully set forth herein.

268.    Defendant Black made defamatory statements with malice and with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

269.    Defendant Black's statements constitute defamation *per se* because they impugn Ms. Ganieva's honesty, trustworthiness, dependability and accuse her of a crime.

270.    Defendant Black's defamatory statements have harmed Ms. Ganieva's professional reputation and standing in her industry, have harmed her personal reputation, have caused her economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost income, benefits, job security and/or opportunities for career advancement, and have caused her embarrassment, humiliation and physical and emotional injury.

271.    As a direct and proximate result of Defendant Black's defamation, Ms. Ganieva has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and physical and emotional distress.

272.    As a direct and proximate result of Defendant Black's conduct, Ms. Ganieva has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

273.    Defendant Black's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Ms. Ganieva's rights.  Therefore, Ms. Ganieva is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

274.    Ms. Ganieva hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

54

Case 1:21-cv-08824-PAE Document 105-1 Filed 04/18/22 Page 204 of 349

275.    Defendant Black engaged in conduct toward Ms. Ganieva that is extreme and outrageous so as to exceed the bounds of decency in a civilized society; namely by, *inter alia*, subjecting her to defamatory statements and publicly accusing her of the crime of extortion.

276.    These actions were taken with intent to cause, or disregard for, the substantial probability of causing severe emotional distress.

277.    As a direct and proximate result of Defendant Black's extreme and outrageous conduct, Ms. Ganieva has suffered severe emotional distress.

278.    Defendant Black's conduct was wanton, malicious, willful and/or cruel, entitling Ms. Ganieva to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Gender-Motivated Violence Pursuant to GMVA)

279.    Ms. Ganieva hereby repeats, reiterates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

280.    The above-described conduct of Defendant Black, including, but not limited to, Defendant Black's sexual assaults and rapes of Ms. Ganieva constitutes a "crime of violence" and a "crime of violence motivated by gender" against Ms. Ganieva as defined by the New York City Gender Motivated Violence Act, N.Y.C. Admin. Code § 8-901 *et seq.* (2017).

281.    The above-described conduct of Defendant Black, including, but not limited to, Defendant Black's sexual assaults and rapes of Ms. Ganieva, constitutes a "crime of violence" against Ms. Ganieva motivated: (i) by her gender; (ii) on the basis of her gender; and/or (iii) due, at least in part, to an animus based on her gender.

282.    Defendant Black committed a "crime of violence" against Ms. Ganieva because she is a woman and, at least in part, because he has an unlawful animus towards women.  Defendant

55

Black's gender-motivated animus towards women is demonstrated by, among other things, his sexually violent and abusive treatment of women.

283.    As a direct and proximate result of the aforementioned gender-motivated violence, Ms. Ganieva has sustained in the past and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory damages.

284.    Defendant Black's gender-motivated violence against Ms. Ganieva entitles her to punitive damages, as well as an award of attorneys' fees and costs.

### FIFTH CAUSE OF ACTION
### (Retaliation Pursuant to GMVA)

285.    Ms. Ganieva hereby repeats, reiterates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

286.    The above-described conduct of Defendant Black, including, but not limited to, Defendant Black's filing of counterclaims against Ms. Ganieva, constitutes retaliation under the GMVA.

287.    Defendant Black committed retaliation in violation of the GMVA by filing counterclaims against Ms. Ganieva as a result of her protected action of filing GMVA claims against Black .

288.    A cause of action for retaliation furthers the remedial purpose of the GMVA.

289.    As a direct and proximate result of the aforementioned retaliation in violation of the GMVA, Ms. Ganieva has sustained in the past and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory damages.

56

290.    Defendant Black's retaliation against Ms. Ganieva entitles her to punitive damages, as well as an award of attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the State of New York and the City of New York;

B.    An injunction and order permanently restraining Defendant and his partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.    An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.    An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

E.    An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, reputational harm and harm to professional reputation, in an amount to be determined at trial, plus prejudgment interest;

F.    An award of punitive damages, and any applicable penalties and/or liquidated damages in an amount to be determined at trial;

57

G.     Prejudgment interest on all amounts due;

H.     Dismissal of the Defendant's retaliatory counterclaims, and costs and fees incurred in defense thereof;

I.     An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

J.     Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: August 9, 2021
      New York, New York           Respectfully submitted,

          **WIGDOR LLP**

By: _____
          Jeanne M. Christensen
          Tanvir H. Rahman
          Lindsay M. Goldbrum

          85 Fifth Avenue
          New York, NY  10003
          Telephone:  (212) 257-6800
          Facsimile:  (212) 257-6845
          jchristensen@wigdorlaw.com
          trahman@wigdorlaw.com
          lgoldbrum@wigdorlaw.com

          *Counsel for Plaintiff*

58

# Exhibit 4

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

GUZEL GANIEVA,

                    *Plaintiff,*

          v.

LEON BLACK,

                    *Defendant.*

Index No. 155262/2021

**AMENDED ANSWER AND**
**AFFIRMATIVE DEFENSES**

## PRELIMINARY STATEMENT

Drawing on Plaintiff Guzel Ganieva's own words in contemporaneous writings and recordings, Defendant Leon Black's prior Answer in this case exposed Ganieva as a fabulist and her initial Complaint as a work of fiction. Having been caught red-handed, Plaintiff and her counsel have chosen to double down in their Amended Complaint, adding reams of brand-new, tabloid-style allegations brimming with purple prose and breathless rhetorical flair. Rather than retract the spurious allegations in her first Complaint, Plaintiff and her counsel have spun a whole new yarn that is even less believable and even more disprovable than their initial story. These new allegations, wholly irrelevant to Ganieva's claims, have been crafted without even the slightest connection to reality or regard for the truth.

Perhaps most remarkably, the centerpiece of Plaintiff's new filing is the gratuitous inclusion of page after page of allegations involving Jeffrey Epstein, rendered in shocking detail —none of which are even mentioned in the original Complaint. It speaks volumes that these outlandish allegations are only now appearing for the very first time, and only after Plaintiff's original pleading was shown to be a cynical, irresponsible, and sanctionable pack of lies. Rather than respond to the evidence in Mr. Black's Answer, Ganieva simply invented an entirely new set

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 210 of 349

of allegations that she now deems central to her case, but that she did not bother to include in her initial pleading in June.

To be perfectly clear: the new allegations are just as demonstrably false as the allegations in the first Complaint, from start to finish. While a lurid potboiler starring Jeffrey Epstein may be good for grabbing tabloid headlines, the overwhelming and irrefutable evidence in this case betrays the utter falsity of these allegations.

- At the heart of the Amended Complaint is the new allegation that Mr. Black forcibly kidnapped Ganieva on his private plane to visit Jeffrey Epstein in Florida in October 2008, when Epstein was permitted to leave prison on "work release." ***But the aircraft records and flight manifests refute this fabricated story.***

- Also central to the Amended Complaint is a seamy story involving Epstein's "associate," Sarah Kellen, who allegedly conveyed a series of veiled threats to Ganieva of the "consequences" that would befall Ganieva should she refuse the sexual demands that Mr. Black and Epstein supposedly conveyed with their eyes (but not with their words). As noted, the alleged meeting involving Ms. Kellen, Mr. Black, Ganieva, and Epstein *never* happened. And in the face of these unsworn allegations by Ganieva, Mr. Black has every reason to expect that Ms. Kellen (a third party who has no relationship with Mr. Black) will confirm that these events never happened. Assuming Ms. Kellen's truthful testimony, ***the alleged eyewitness to Ganieva's fantastical tale will repudiate the story from beginning to end.***

- And once again, Ganieva's own contemporaneous recorded words put the lie to her sham pleading. As she was extorting Mr. Black, and inventing paranoid fantasies that numerous famous and powerful people were targeting her in bizarre ways around the globe, Mr. Black asked Ganieva—on tape—if she had ever even met Epstein. Common sense dictates that Mr. Black would never have asked such a question were the events described in the Amended Complaint true. It also dictates that, had Ganieva in fact experienced the harrowing kidnapping she now recounts, she immediately would have raised that unforgettable episode in response to Mr. Black's question. Instead, in that recording, Ganieva responded that she had never met Epstein, and then suggested in a muddled way that he had once called her. ***The recorded conversation further exposes Ganieva's story for the lie that it is.***

The Amended Complaint hardly stops there. In the latest edition of her pleadings, Ganieva now makes claim after claim against Mr. Black about events that should have been memorable, but that nevertheless had eluded Ganieva in her first telling just two months earlier. Newly imbued

2

with the powers of magical thinking, mind-reading, and photographic recall—down to remarkably precise quotations, facial expressions, and vocal intonations—Ganieva suddenly remembers shocking acts of sexual torture and threats to traffic her, plant heroin on her, manufacture evidence against her, and even kill her that somehow did not find their way into the original Complaint. The allegations in the Amended Complaint are so facially and farcically false that they collapse under their own weight.

The premise of the unsworn Amended Complaint remains wholly illogical: in her telling, Ganieva supposedly was forced into a years-long relationship with Black, who purportedly belittled, humiliated, and abused her before finally "coercing" her to sign an NDA and take his money—as if someone could be forced to take money. Mr. Black demonstrated in his initial Answer that the irrefutable documentary evidence—including numerous recorded conversations and written communications (spoken and written by Ganieva herself)—tells a stunningly different story. Remarkably, Ganieva in her Amended Complaint does not even address the evidence cited in Mr. Black's Answer that flatly contradicts her pleadings, other than to make vague and conspiratorial suggestions that Mr. Black and his "posse" of lawyers somehow coerced Ganieva into writing those texts and speaking those words.

At bottom, there is no disputing this central fact: for some six years, the parties in this lawsuit were involved in a casual, episodic, and completely consensual relationship, initiated and actively pursued by Ganieva herself. During that time, Ganieva consistently professed her love and appreciation for Mr. Black, while regularly extracting millions of dollars from him in money, gifts, rent, furniture, tuition, vacations—the list goes on and on.

In 2015, however, Ganieva decided that she wanted more, and embarked on an illicit campaign of extortion to get it. Flatly declaring that "I don't want to have to worry about money

ever again," she threatened to go public about their relationship—explicitly stating that she would harm Mr. Black's personal and professional life—unless he paid her a sum of *one hundred million dollars*.

Aware that he had become the victim of a criminal extortion scheme, Mr. Black began to record his conversations with Ganieva. Those recordings speak for themselves and are devastating to both Ganieva's original and new allegations. Mr. Black repeatedly asked Ganieva why she was claiming an entitlement to *any* money, let alone to such an eye-popping sum. Ganieva had no legitimate answer and no legitimate claim. Notably, she never—*not once*, in a series of recorded in-person meetings during her extortion campaign, nor at any other time—*claimed, or even alluded to, sexual or physical abuse of any kind; never once raised that she had been kidnapped and taken to Florida; and never once invoked any of the litany of misdeeds she now alleges*.

To the contrary, Ganieva repeatedly warned that if Mr. Black did not pay her this outrageous sum of money, she would report their affair to Mr. Black's wife, the board of his public company, and the press. *This is, of course, the very definition of extortion.* A married man, and the founder and head of a major asset management business, Mr. Black was legitimately and understandably concerned that Ganieva would do exactly as she threatened, and that the publicity could have personal and business consequences. Under this threat, Mr. Black entered into a release and confidentiality agreement with Ganieva in October 2015. As part of their agreement, Mr. Black agreed to give Ganieva what she was demanding: substantial amounts of additional cash beyond the millions Mr. Black already had voluntarily gifted her.

In that agreement, Ganieva explicitly admitted that allegations she had made against Mr. Black "are not true"; released any possible claims against Mr. Black; and agreed to keep their relationship and the agreement strictly confidential. Over the next five and a half years, Mr. Black

4

fully upheld his end of the deal, paying Ganieva millions of dollars pursuant to a regular monthly schedule. She did not complain or raise any issues, or otherwise suggest that Mr. Black had at any point engaged in any wrongdoing whatsoever.

Suddenly, in March 2021—after having accepted millions of dollars, month in and month out—Ganieva posted a series of tweets proclaiming, among other things, that Mr. Black had "sexually harassed and abused" her "for years." Those statements were vicious, devastating—and false. Predictably, the consequences have been ruinous: branded a "predator[]", Mr. Black has suffered public and private humiliation, and has been the subject of endless press reports rehashing the manufactured allegations in Ganieva's pleadings—which no doubt was the desired outcome.

When Ganieva's tweets were first reported, Mr. Black quite reasonably issued a public statement in his own defense that was measured, proportionate—and true. Despite having herself violated the release and confidentiality agreement, and pocketed many millions of dollars, Ganieva then brought this spurious lawsuit. Even more perversely, after Mr. Black did what defendants so often do in responding to a complaint—he filed his own meritorious counterclaims rightly calling out Ganieva's contractual breaches and defamatory statements—Ganieva's Amended Complaint now goes so far as to add a legally frivolous claim for "retaliation." Her position is that she may unilaterally breach an agreement that Mr. Black honored for years by paying her millions of dollars; besmirch Mr. Black's name with impunity while keeping those millions; sue for defamation when he defends his name; allege retaliation with yet another claim when he countersues in response to her suit; and gin up a set of even more fantastical allegations in response to the undeniable evidence proffered by Mr. Black. Thankfully, that is not how our justice system works. To the contrary, that sort of conduct is impermissible, and appropriately subject to sanction and legal action.

5

The mendacity of Ganieva's claims is breathtaking. Perhaps the most outrageous is Ganieva's allegation that Mr. Black sexually assaulted her on July 6, 2014, a claim of the utmost seriousness that only can be understood as an attempt to destroy Mr. Black's reputation. While the Amended Complaint alleges that Mr. Black "suddenly" "barged" into her apartment when she was supposedly too sick to walk or move, Ganieva's own text messages offer the definitive truth: that Ganieva was perfectly well when she herself initiated contact with Mr. Black that day—texting him "[t]his is love. I need you…"—and affirmatively requested that he bring a bottle of wine to her home that evening to "tuck" her into bed. The messages further make clear that Ganieva was perfectly unsurprised—and in fact, delighted—when he showed up at precisely the appointed time with the wine, as requested.

Ganieva's texts to Mr. Black following the alleged assault make the falsity of the allegations all the clearer. Indeed, the very morning after she alleges that Mr. Black brutally attacked her, Ganieva reached out to Mr. Black on her own initiative to say that "*[i]t was very nice to see you last night"* . . . *"I love you and thank you!!!! Xoxoxoxoxo and more love*." And just two days later, Ganieva, again unprompted, asked her supposed brutal rapist if he wanted to get together soon, signing the message: "*Lots of love, g.*" In the following days and weeks, she reached out to him on numerous occasions to meet in person, with such messages as, "*you are the kindest*", and signing off with, "*[a]lways yours….*".

In her Amended Complaint, which followed Mr. Black's initial Answer (which, in turn, revealed the texts and the recordings), Ganieva does not even attempt to dispute the veracity of this evidence. In fact, at no point in the Amended Complaint does Ganieva even acknowledge the incompatibility of her fabricated allegations in the initial Complaint with the contemporaneous text messages and recorded conversations between her and Mr. Black. Instead, she retrofits her

pleadings and jury-rigs them with preposterous new conspiracy theories in an attempt to explain away the texts and recordings. Now she claims that soon after the "rape," Mr. Black and his team of white-shoe lawyers "'huddled up'" to "come up with a scheme to insulate Black from criminal liability." That "plan was to manufacture evidence that would counter the narrative that Black forced himself onto Ganieva," and consisted of Mr. Black "command[ing] her to send him messages that she loved him." Clearly, there is no possible basis for this allegation: neither Ganieva nor her lawyers can have the slightest idea what Mr. Black or his lawyers did or said or thought. It reads like (bad) fiction.

In any event, putting aside the audacity and inanity of the allegation that Mr. Black and his lawyers engaged in this type of criminal conspiracy, it is a logical impossibility. To take just one facet of the story, neither Mr. Black nor any of his lawyers could have caused Ganieva to tell Mr. Black *before* the alleged rape that she loved and needed him, and then forced her to invite Mr. Black over to share a glass of wine before tucking her into bed.

Likewise, Ganieva's desperate new attempts to defend against her incriminating recorded statements are so nonsensical that they are difficult even to parse. Ganieva's new allegation appears to be that, by "scream[ing]" at her to "'[s]ay that you are blackmailing me,'" Mr. Black somehow forced Ganieva to demand the sum of one hundred million dollars, and was "giddy" when she "took the bait." This allegation likewise can scarcely be dignified with a response. Faced with the black-and-white proof of her falsehoods, she contrives explanations for her own recorded words that would be laughable were the claims not so serious.

In short, Mr. Black is guilty only of extremely poor judgment in entering into an affair with Ganieva in the first instance, in making an easy target of himself by lavishing her with gifts and money throughout their relationship, and in allowing himself to be extorted rather than

immediately reporting Ganieva to law enforcement. Ganieva must be held to account for her wrongdoing and, with her counsel, for their sanctionable litigation misconduct. In her defamatory Twitter posts, Ganieva purports to invoke "#MeToo," and claims to have come forward to protect "other women." In reality, her demonstrable lies and extortion are cynical attempts to weaponize a critically important and long-overdue movement. In so doing, Ganieva has done a tragic disservice to the brave truth-tellers—the vast majority of accusers—who have survived sexual abuse.

This lawsuit will reveal who Ganieva really is; what truly motivated this hit job; and whether she is working in concert with, or at the behest of, a third party or third parties who might wish Mr. Black ill and who are willing to promote and facilitate Ganieva's tactics to suit their own wrongful ends.

## **FACTUAL BACKGROUND**

### **The Parties' Consensual Relationship**

1.        Ganieva's allegations are false from the very start—even with respect to small-bore, gratuitous details that are squarely belied by objective fact and the irrefutable, contemporaneous documentary evidence that Ganieva does not even meaningfully attempt to impugn. To begin, the initial Complaint alleged that Mr. Black picked her "out of a crowd in March 2008, while attending an International Women's Day event in NYC" when she was in her "early twenties" (Amended Complaint ("AC") ¶¶ 20, 21). After Mr. Black alleged in his initial Answer that, in fact, the two had met at a private party thrown annually by a former colleague of Mr. Black's when she was 25, she now admits this much. (*Id.*). Though she still tries in her Amended Complaint to create the false impression that she was in attendance at some sort of feminist rally, she was there for one purpose: to meet a rich man like Mr. Black.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 217 of 349

2.      On information and belief, Mr. Black was hardly the first nor the last of Ms. Ganieva's deep-pocketed targets.

3.      Ganieva, who claimed to have been working as a model at the time, immediately began pursuing Mr. Black, who had been the founder and head of Apollo Global Management, a publicly traded major alternative asset manager. The two met several times for meals before entering into a years-long consensual sexual relationship.

4.      At no time prior to the initiation of their sexual relationship did Mr. Black "'arrange[]' a few appointments" for Ganieva. (AC ¶ 23) (Internal quotations in original).[1] For example, contrary to the allegations, Mr. Black's facilitation of a meeting with a talent agency (*id.*) did not occur, on information and belief, until years after the parties met, and was done at Ganieva's request.

5.      And, contrary to her allegations, Ganieva most certainly did not tell Mr. Black "that their relationship would not be sexual." (*Id.* ¶ 24). True to form, Ganieva has no proof whatsoever that this *ever* happened. And it never did. Rather, as the objective evidence confirms, Ganieva was an eager and willing participant in the parties' relationship from the start.

6.      On information and belief, Ganieva had been struggling financially before she met Mr. Black. On information and belief, Ganieva reportedly had left her husband in Russia before

---

[1] The Amended Complaint liberally and seemingly randomly places quotations marks around certain words, turns of phrase, and full sentences. For example, the allegation that Mr. Black "'arranged' a few appointments" for Ganieva (AC ¶ 23) (internal quotations in original) is both untrue and puzzling. Does this purport to be a direct quote? If so, who is being quoted and in what context? Or are these scare quotes? Are they meant to be ironic? Rhetorical? Here, as in scores of other occasions within the Amended Complaint, the meaning of the quoted language is inscrutable at best and sanctionable at worst: quotations in a court filing should not be haphazardly tossed about as though verbatim. Words—*and allegations in court filings*—should be verified and they should matter. They should not casually and cavalierly be tossed about as though without meaning or consequence.

coming to the United States, had been sued on more than one occasion for nonpayment of rent, was living in a small one-bedroom apartment with her son, and was struggling in her modeling career.

7.      Ganieva apparently saw a golden ticket in Mr. Black, and persistently sought him out following their initial meeting. She quickly began pressing him for substantial payments of money and gifts. Contrary to Ganieva's bizarre framing of Mr. Black's generosity as something that he imposed upon Ganieva—as if Mr. Black could somehow force Ganieva to request, accept, and keep his money and presents—she frequently asked for such things as an expensive rental apartment on the Upper East Side (which she settled on only after rejecting as too small an initial apartment Mr. Black had proposed); a luxury car; lavish vacations (including at the beach and to the Alps); school tuition (for acting and at Columbia University); jewelry and clothing; a Steinway piano; a $40,000 commissioned portrait of herself (which she kept hung in her apartment); and many, many gifts of cash—all totaling in the millions of dollars.

8.      In 2011 and again in 2013, Ganieva requested two loans from Mr. Black of $480,000 apiece. Mr. Black acquiesced and provided the funds pursuant to two written agreements. (AC ¶¶ 165, 167). Mr. Black never requested repayment of either of the loans he agreed to make to Ganieva. As was made explicitly clear in recorded conversations between the parties, the request unequivocally came from Ganieva herself; there was every reason for her to have made this request, and no reason for Mr. Black to have somehow forced the money on her. (It is also hard to fathom how anyone could force someone else to take a loan in this way; that incoherence, like so many others, is left unexplained in Ganieva's Amended Complaint).

9.      Also unexplained in the Amended Complaint is how Mr. Black could possibly have forced Ganieva into a non-consensual affair over some six years. During their relationship,

Ganieva was a grown woman in her late twenties and early thirties, and a trained mathematician and international model. At no time did Ganieva work for Mr. Black or live with him, or even see him very often.

10.     Beginning in 2011, Ganieva decided to resume her undergraduate studies after a long hiatus and attended Columbia University (encouraged and financed by Mr. Black), earning a degree in mathematics.

11.     While Mr. Black agreed to Ganieva's request that he prepay for her apartment, he did not have a key or access to it in any way. In fact, Ganieva specifically made clear at the outset of their relationship that she preferred not to provide Mr. Black with access to her apartment, wishing for privacy and independence. Mr. Black had never asked for any other arrangement, and he of course respected Ganieva's request. The two did not spend nights together, vacation together, or attend events together, other than on rare, isolated occasion. They saw each other episodically—sometimes weekly, sometimes monthly, sometimes not for long periods at a time.

12.     Ganieva worked, attended school, traveled the world, had an active social life that did not include Mr. Black, and did exactly as she pleased, when she pleased. On more than one occasion, Ganieva would leave town or drop contact with Mr. Black for some time, only to reach out again to tell him how much she loved and missed him and re-initiate the relationship.

13.     In short, while the Amended Complaint twists itself in a knot in an effort to portray a dynamic in which Mr. Black somehow overpowered, controlled, and intimidated Ganieva to do such patently absurd things as walk behind him and accept nearly one million dollars in loans, he simply had no means by which to do such things—and he did not. At any time, Ganieva could have just stopped seeing him—as she occasionally did for long stretches of time and as she ultimately did when the relationship came to a definitive end in 2014. Instead, as the documentary

record conclusively reflects, Ganieva actively pursued Mr. Black throughout, and he lavished her with gifts, support, and praise.

14.    For example, during the course of their relationship, Ganieva repeatedly requested (including in writing) that Mr. Black help her with job interviews. As the documents make clear, Mr. Black made bona fide attempts to help her secure interviews and get a job. Yet, despite being underqualified and "unprepared" (as one interviewer put it), Ganieva believed that she was entitled to a highly competitive job at a highly competitive company, telling Mr. Black that she would settle for nothing less: "After studying a lot about Goldman Sachs I came to conclusion that a position of an analyst in Investment Banking will suit me best. I positively don't want to be in any other department." Yet Ganieva had no relevant experience, and only mediocre grades and standardized test scores, and it is unsurprising that she was unable to land the precise (and highly coveted) job at Goldman Sachs that she demanded. It is false as a matter of fact, and puzzling as a matter of logic, for Ganieva to allege that it was somehow part of some "sick plan" for Mr. Black to arrange "sham interviews" for Ganieva in an effort to "belittle and humiliate her." (AC ¶¶ 170, 171). As the documents show, all that Mr. Black did was try to help her. Indeed, Ganieva herself admitted as much in an interview with the *New York Post* on April 8, 2021: "He tried for some time to help her get a job, she said, but claimed he wanted favors in return."

15.    Ultimately, the parties' relationship concluded when Ganieva left New York at the end of July 2014. Far from trying to "control" Ganieva or keep her in New York, Mr. Black wrote to her that "maybe its for the best," and indeed, at her request, helped her with her visa and hefty resettlement costs. Clearly, *she could have left at any time* and Mr. Black had no ability, or desire, to keep her close or to control her. There is no truth whatsoever to Ganieva's contention that she left New York "to physically distance herself from Black." (AC ¶ 191). Rather, Ganieva repeatedly

told Mr. Black that she was leaving for immigration-related reasons, because, on information and belief, her student visa had expired upon her graduation from Columbia and she had no legal status in the United States.

16. Ganieva's claim that Mr. Black somehow tried to exert "power over her" after she moved abroad (AC ¶ 193) is yet another fabrication. The documents show that Mr. Black rarely reached out to Ganieva unprompted and often did not even respond when she reached out. For example, between November 2, 2014 and December 24, 2014—while Ganieva was thousands of miles away from Mr. Black and not engaged in any physical relationship with him—Ganieva on her own initiative texted Mr. Black on no fewer than eight occasions, without response from Mr. Black. In these notes and in others, she wrote such things as: "*You have no idea how much I miss you and love you. It's nice to know that someone like you exist in the world even tho a bit far,*" *and "I love you! I do!*" (Emphasis added).

17. In her Amended Complaint, Ganieva attempts to explain away her many loving text messages that Mr. Black quoted in his Answer: to this end, she actually alleges that, from across the globe, Mr. Black had somehow "commanded her to send text messages saying that she loved him," and *that* is why she sent him so many adoring messages for so long. (AC ¶ 187). She also alleges—this time, truthfully, as Mr. Black had pleaded in his Answer—that Mr. Black had provided her with generous resettlement costs. (*Id.* ¶ 189). Of course, the fact that Mr. Black was so supportive of her long-distance move is wholly inconsistent with Ganieva's false allegation that Mr. Black wanted to maintain "control" over her. Nor could he possibly have maintained such control from halfway around the world.

18. As noted, Ganieva's Amended Complaint is rife with such false allegations of control, despite that Mr. Black had no means of control. Ganieva adds a new lie in her Amended

Complaint that is silly, but telling. Seemingly prompted by a detail contained in Mr. Black's Answer about how the parties had shared a soufflé during the final shake-down meeting—but somehow forgetting that there is a *recording* of this conversation (despite that Mr. Black's initial Answer made clear that one exists)—Ganieva adds to her new pleading the gratuitous claim that, while she "desperately wanted to get out of there, Black *forced* her to wait while a dessert that took over 20 minutes to prepare came out." (AC ¶ 215) (Emphasis added). Yet, in the recording, Mr. Black can be heard politely asking Ganieva if she wanted dessert (literally saying: "So… dessert?"), to which she responded—of her own free will—that they "could share a soufflé." Then, when Mr. Black asked her "what flavor?", she chose Grand Marnier. Ganieva also ordered peppermint tea—again, of her own free will and without Mr. Black "forc[ing]" her to do so. This head-scratching allegation by Ganieva shows the casual ease with which she lies and claims use of force—and the similar nonchalance with which her lawyers are prepared to facilitate and sign their name to those lies—about even the simplest and smallest of details. In the same way that Mr. Black did not "*force*" a grown woman with free agency to order a particular dessert, he did not "*force*" Ganieva to do *any* of the things she claims in her pleadings. The documents and recordings (and common sense) make *all* of this clear.

### Ganieva's Extortion Campaign

19. From the time Ganieva left New York in July 2014, up until she returned in June 2015, she continued to send text messages to Mr. Black proclaiming her love from afar, such as this three-part note on May 14, 2015: "*I need your love… And I need you love… Xoxo*". (Emphasis added). On June 4, 2015, she sent Mr. Black this in a text: "*[m]any kisses and lots of love xoxo*". (Emphasis added).

14

20.     Suddenly, on June 8, 2015, Ganieva sent a much more formal note, insisting that she needed to meet with him in person about a matter that she characterized, without detail, as "both urgent and important." Based on statements made by Ganieva to Mr. Black, this sudden shift in tone appears to have coincided with her failure to gain legal status in the United Kingdom; whatever the reason, Ganieva became intensely focused on getting even more money and trying to procure an expensive visa.

21.     Ultimately, at Ganieva's request, the parties met in New York on June 24, 2015, for what can only be described as a brazen shakedown by Ganieva. Ganieva warned Mr. Black that if he did not pay her a vast sum of money, she would tell the world about their affair. Shocked to his core, Mr. Black informed Ganieva that he believed that her conduct was extortionate and that he needed time to process what she was saying and to formulate a response.

22.     A number of additional in-person meetings followed, in the summer and fall of 2015: on June 26, July 21, July 24, August 12, August 14, August 19, September 17, October 15, and October 19. Understanding that he was the victim of a blatant criminal extortion scheme, Mr. Black consulted counsel with criminal law expertise. The parties' conversations thereafter were monitored and recorded.

23.     Ganieva's demand was nothing less than *one hundred million dollars*. She boldly declared that if she did not get this amount from Mr. Black, she would go public and ruin his family, his business, and his life. As Ganieva put it in her own words, in a recorded conversation: "*The more, the longer I wait, the more sure I become that I actually, I prefer to go public*," and "*I'm dying to talk to press about it.*"

15

24.     Mr. Black repeatedly asked Ganieva to explain why she was claiming a right to any money at all. Not surprisingly, Ganieva failed to identify any good faith basis for her demand. Instead, she offered two facially illegitimate rationales.

25.     First, Ganieva claimed that she was owed money on some form of palimony theory, claiming that she had been "like a wife" to him and that "for me, it was like a marriage." Based on this false premise and faulty reasoning, she claimed entitlement to half of his earnings: "When men and women in relationship for a very long time and woman doesn't work and man works, and she gets all the stress from his work, and he makes a lot of money—usually by law—she's entitled to half, ok?" She claimed that "in the marriage, I would get half of what you earned," such that she was entitled to "a couple of billions," but "I'm not asking for that, even though I think I totally deserve it."

26.     When Mr. Black repeatedly pointed out that "having an on-and-off affair" for "five years" was not "akin to a marriage," Ganieva landed on a second putative theory. While vague and multi-pronged, the argument effectively was that she had suffered "emotionally" as a result of their relationship and the fact that "our relationship didn't work." The reason for this, she said, was that "people are attacking me and humiliating me" and "all my chances for the future are limited because of the gossip that somebody is spreading," and "I'm pretty sure it's coming from you."

27.     The claims were nothing short of "paranoid," as Ganieva had to repeatedly admit even as she made them, and included the following (among many others):

- "People tried to drug" her, and she had been "poisoned."

- She was being stalked, bullied, and harassed by waiters and hairdressers and teachers and perfect strangers, who made her "feel bad." She also was being stalked by "the children of the rich. It's the high society. It's everybody from high society." Likewise, she claimed that "basically everybody in the society kind of was making fun of me."

16

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 225 of 349

- Several billionaires, whom she named, were threatening her, defaming her, treating her "a very disrespectful way," and might be involved in a "conspiracy" against her. Ganieva also claimed that one of those billionaires, who had given her a job as a writer for his publication, was "making fun" of her and also had threatened to fire her unless she slept with him. She said that this individual's employees were trying to "diminish" her and make her "look in a certain way," and had twisted and re-written articles that she had authored.

- Her son was bullied at camp and at school and had choked on a piece of meat, all of which she claimed was attributable to Mr. Black and to the parties' relationship. She stated that she had withdrawn her son from a series of schools as a result of the bullying attributable to Mr. Black.

- People were saying strange things to her and her son, which she likewise blamed on Mr. Black. For example, she said that "someone put a German newspaper in front of my door, then the woman came knocking at my door, saying "'sorry for your loss, can you please give me money?'" In another example, she said: "Then there was this guy [who] started pursuing us…. Just some random guy, like black guy, started like harassing us." She stated that this "random guy" had told her that her son had to play basketball professionally and this guy "was all dressed up and he was very sexual to me and to my son and when I refused to join the team, he said 'but you have to pay for my clothes,'" and "it was just, it was just terrible."

- She had been invited to one of her son's games and "I would see all the parents kind of acting very strange and when he [her son] started shooting, they would say '[son's name], we love you, we love you' but in a very acted out manner, which made me very uncomfortable."

- She had gone to "parents' week" for a school and "everywhere I went, there were kind of jokes and assumptions were made towards me and my son that they know that I'm with you and that I am a terrible person and I have to change."

- She "had to deal with a lot of public harassment, humiliation. And—I don't know what. I think it has to be investigated. My son was harassed in every school, I am getting harassed in every corner of the world."

- She described being targeted and bullied due to her relationship with Mr. Black, including by a teacher during an art class at Columbia. Ganieva reported an exchange in which the teacher had said "'now look at the lilies and tell me what you think about it?'" Ganieva stated that she had responded: "'well, it's so, it's done in a way where I feel like I could do it.'" According to Ganieva, "the teacher says, 'no, you can't' and everybody started laughing."

- She dropped out of graduate school in Russia because she had been "tortured" when "they" said that Ganieva had not known the definition of a particular word, "and then there were other inappropriate remarks and jokes towards me." The only

17

example she could provide is that in class a teacher had referenced a well-known financier with whom Mr. Black had worked decades ago, and that "I think they were referring to you, but I don't know." When Mr. Black asked her, "why in Russia would they bring that up?", she responded "I don't know."

- She "stopped going out because I didn't want to be treated like that. And like even when I went just for job interviews or I went to pick up my son, these things were happening, you know, and people were kind of making fun of me."

- She said: "I went through a lot of public humiliation. My reputation is really damaged. My son's future opportunity… Permanently…" When Mr. Black responded that this was not because of him, Ganieva replies: "No, but it's because of our relationship. It's a consequence… it's a consequence of our relationship. And, as a man, as a decent man. As a fair man, you can understand that. And you can help. It's not difficult for you to help me… All those years I lived very badly. And you could have taken care of me…better care. You could have given me a job. You could have given me a visa…This time... I want to tell you and I want to do what's right for me. I totally deserve it. I deserve more."

28.    Numerous additional examples abound. In short, Ganieva repeatedly claimed that her reputation had been damaged, while seemingly also agreeing with Mr. Black that he had not said anything to anyone about her. Ganieva said to Mr. Black that she was "pretty sure that you are connected to all of this harassment and blame," but when asked why he would possibly do that, she simply said "I don't know." Mr. Black further asked: "why would I do that, why would you think it was me who did that and at the same time as I am supporting you? It makes no sense." To this, Ganieva responded: "No, I don't have any proof that you've done it, right, but it all comes from our relationship. If we didn't have a relationship, this wouldn't happen to me or my son." As noted, she admitted on several occasions that she might be "paranoid."

29.    Ganieva also admitted that she had not previously told Mr. Black about this alleged harassment. For example, Mr. Black said: "And all this harassment. I never heard a word of it. I never heard a word of any of these issues. And it's only a year later after we haven't seen each for a year, it's coming out." She responded simply: "I'm telling you now."

Case 1:21-cv-08824-PAE  Document 105-1  Filed 04/18/22  Page 227 of 349

30.      A small facet of these claims was a vague assertion that Mr. Black had been somehow "abusive." Ganieva clarified, however, that that her definition of "abuse" was that, according to her, Mr. Black "liked to make me feel worthless" and "to put me down and make me feel like I'm nothing." She also claimed that she believed he was "abusive" because, according to her, Mr. Black and his "friends and other people" had been "extremely unfair" to her and her son at his schools, "all over the world."

31.      Most notable is what Ganieva did not claim: she *never*—not once—claimed physical or sexual assault of any kind. When Mr. Black stated that "we were two consenting adults that had an affair," she responded only that "it just lasted a little bit too long and you got a little bit too involved." Again and again, Mr. Black explicitly asked her: "How did I abuse you?" She *never* responded that he had been abusive in any physical or sexual way. Indeed, Mr. Black said, "you know I've never abused you," to which she appeared to accede by stating "okay."

32.      Thus, to the limited extent that Ganieva expressed a claim of "abuse," she made clear that she was referring to "emotional" abuse, connected in some way to her feelings for Mr. Black. Indeed, even while actively extorting him, she made clear that "I will never find anybody like you." After Ganieva had successfully extorted Mr. Black, her parting words to him on the last day the parties ever met in person included these: "*You know I still love you very much.*"

## The Release and Confidentiality Agreement

33.      Over the course of ten in-person meetings in the summer and fall of 2015, the parties eventually came to agreement. At a lunch meeting at the Four Seasons restaurant on October 19, 2015, they finalized the terms they had discussed, to include payments by Mr. Black to Ganieva of $100,000, forgiveness of approximately $1,000,000 in loans, and "other consideration to which has been agreed." That other consideration included an agreement that the

19

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 228 of 349

$100,000 monthly payments would continue for 15 years, and that Mr. Black would provide

payment of £2,000,000 for Ganieva to use toward obtaining legal status in the United Kingdom.

In exchange, they agreed that Ganieva would sign a one-page release and confidentiality

agreement (the "Agreement" or the "Release and Confidentiality Agreement").[2]

34.     This one-page Agreement contains only two, very simple understandings, as is clear

in the very title of the document: "**RELEASE AND CONFIDENTIALITY AGREEMENT**".

(Emphasis in original). In it, Ganieva admitted that the claims she had made about Mr. Black to

Mr. Black—including that he had been "abusive" to her—were fabricated: "GG [Ganieva] has

made certain allegations and asserted certain claims against LBD [Mr. Black], which she made

under extreme stress and *which she now concedes are not true*, and which allegations and claims,

if made public, would damage LDB's career, reputation and relationships with others." (Emphasis

added).

35.     The first clause provides a broad and clear release:

> GG hereby releases, remises and forever discharges LDB from all
> matters, causes of action, claims, suits and any and all further
> liability or accountability, in law or equity, by reason of any matter,
> cause or thing whatsoever arising prior to the signing of this
> Agreement, contemporaneous with the signing of this Agreement or
> any time in the future after the signing of this Agreement.

36.     The second clause provides a broad and clear confidentiality agreement:

> GG hereby agrees, except as otherwise required by applicable law,
> never to disclose, directly or indirectly, to any individual, entity or
> other potential recipient, any information relating to (i) the

---

[2] In her Amended Complaint, Ganieva alleges that "[i]ncredulously [sic], despite requested
requests by counsel for Ms. Ganieva, Black has continued to fail to produce the NDA to this very
day." (AC ¶ 241). This is nonsense. Counsel for Mr. Black has offered to provide a copy of the
Agreement to counsel for Ganieva, subject only to the terms of a garden-variety, standard court-
ordered protective agreement or an interim agreement between the parties not to publicize
documents produced in litigation, and provided a draft of such an agreement to counsel for
Ganieva. "Incredulously," counsel for Ganieva has refused even to discuss such an agreement.

20

allegations and claims that she has asserted against LDB, (ii) the signing, content or other attributes of this Agreement, including any consideration furnished by LDB in connection with the signing of this Agreement and (iii) any other matters that could damage LDB's career, reputation and relationships with others.

37.    Again, the October 19, 2015 conversation was monitored and recorded. Ganieva's allegations that strain to plead duress are complete fabrications. (AC ¶¶ 210-214). At no time, either before or during the meeting, did Mr. Black utter the phrases (which purport to be direct quotations), **"'If you do not take the money, I will put you in prison'"** and **"'If you do not take the money, I will destroy your life'"** (*Id.* ¶ 3, internal quotations and emphasis in original; *see also id.* ¶ 202)—or anything of the sort.

38.    Even if Mr. Black did not have indisputable recorded evidence that such things simply were never said, they would defy credulity and common sense in any event: if a private citizen even had the power to do such things, it is unclear why that person would force millions of dollars upon someone instead of just doing those things. Just as with the loans, Ganieva was desperate for the money and—far from being forced to take it—she extorted it.

39.    At no time did Mr. Black threaten or intimidate Ganieva. In Ganieva's initial Complaint, she falsely claimed that Mr. Black had "shoved a piece of paper across the table and told her she had to sign it." In one of the very few rollbacks in the Amended Complaint, Ganieva now claims that "he presented Ganieva with a one-page document" (AC ¶ 207). Contrary to the allegations in the Amended Complaint and consistent with the recorded conversations, Ganieva in no way appeared "nervous," she had no "difficulty understanding" the Agreement, and she did not "only read it once, quickly". (*Id.* ¶¶ 208, 210). Mr. Black did not "order[] her to sign" anything. (*Id.* ¶ 212). The allegation in bold that purports to be yet another verbatim quote— **"'[I will be**

**paying you] as long as you keep your mouth shut'"**—simply was not said. (*Id.* ¶ 213, internal

quotations and emphasis in original). There is a record; each of these allegations is patently false.

40.     *What actually happened at that meeting is very much the opposite of what Ganieva*

*alleges happened.* Over the extended conversations between the parties, Ganieva well understood

the terms of the Release and Confidentiality Agreement, and in fact it was Ganieva who had first

suggested they should have a written instrument.

41.     At the October 19, 2015 meeting, Mr. Black presented Ganieva with the Agreement

and encouraged her to "take your time" and "read it carefully"—and she did. Indeed, Ganieva took

approximately 12 minutes to review the one-page document, including reading parts of it aloud

and engaging in extensive discussion about it. Not only did Mr. Black explain it to her, but Ganieva

made clear her understanding that "basically I cannot sue you" and that "I can't mention your

name, ever, basically." As to this, Mr. Black clarified that she could "say that you know me," but

that, under the terms of the Agreement, she had to refrain from discussing their relationship or her

putative claims or the parties' financial arrangement.

42.     The second Agreement was an exact duplicate of the first, and Ganieva willingly

signed this duplicate as well.

43.     Ganieva was elated. After the papers were signed, she spent approximately 45

minutes finishing her lunch, sharing a Grand Marnier soufflé with Mr. Black, discussing her

investment and travel plans, and laughing about the fact that she was "a woman of means now."

44.     Shortly after their meeting, she texted him: "Thank you for everything. Talk soon

xoxo."

45.     As per their Agreement, Mr. Black forgave a series of loans to Ganieva totaling

approximately $1,000,000, made a simultaneous payment to Ganieva of $100,000, and provided

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 231 of 349

"other consideration to which has been agreed"—continuing monthly payments and payment of £2,000,000 for Ganieva to use in an effort to obtain legal status in the United Kingdom. From approximately October 2015 until approximately March 2021 (when Ganieva posted her defamatory tweets), Ganieva accepted millions in monthly payments from Mr. Black pursuant to the Agreement.

46.    After the parties entered into the Agreement, Mr. Black set up a new account from which to make the monthly payments to Ganieva, which he called "E Trust." In her Amended Complaint, Ganieva states that she "has no knowledge as to why payments began from the 'E Trust' or what it is." (AC ¶ 218). To be very clear: *the "E" in "E Trust" stands for "Extortion."*

## Ganieva's Newly Minted Allegations of Sexual Abuse

47.    As noted, even when Ganieva was extorting Mr. Black in the summer and fall of 2015, she never once claimed to have been physically or sexually abused, let alone raped.

48.    These claims are viciously and demonstrably false—as the documents and recordings make one hundred percent clear. Not only does Ganieva never make such an allegation in all of the recorded conversations, but the text message exchanges surrounding the time of the alleged rape are dispositive.

49.    To begin, the allegation that, in 2008, Mr. Black took Ganieva to "a studio apartment with a mattress on the floor and no other furniture" (AC ¶ 28) does not read true, and it is not true. Even more preposterous is the notion that Mr. Black "forced sadistic sexual acts on her without her consent and despite her saying 'no.'" (*Id.* ¶ 27). In her initial Complaint, Ganieva states only (albeit repeatedly) that Mr. Black was "disgusting" and "sadistic." After Mr. Black filed both his Answer and a motion to strike such gratuitous and improper language, Ganieva has doubled down again—this time concocting horrific acts of sadistic torture.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 232 of 349

50.     In her Amended Complaint, Ganieva claims that "[i]n the days leading up to the July 4, 2014 weekend, Ms. Ganieva became sick and was home for a number of days unable to go to the store or cook for herself." (AC ¶ 177). She claims that on July 6, she was "debilitated" and "in a weakened state, having been sick for almost a week"—so weak that she "could barely walk." (*Id.* ¶¶ 178, 179). She claims that she was "limp and unable to move." (*Id.* ¶ 181). She also claims that Mr. Black came to her home as though by surprise, "suddenly" knocking at her door and then "barg[ing] in." (*Id.* ¶ 177). These are lies.

51.     Rather, Ganieva had told Mr. Black that she felt sick on July 1, but on the very next day (July 2), she wrote to him that she was already feeling "much better," that "I think I will be all done by tonight," and that "I was just thinking about you."

52.     On June 28, Ganieva had written to Mr. Black: "*Baby… I'm all alone. Let's get together soon. I miss you. Xoxo*". (Emphasis added). She said she felt unwell for a day, as noted, but had recuperated by the very next day, July 2. Then, on July 6, Ganieva wrote to Mr. Black, unsolicited: "This is love. *I need you*…". (Emphasis added). In response to these entreaties, Mr. Black said that he would be driving back to the city in the evening of July 6, and inquired if he could "come over and tuck you in at 10:30?" She agreed, later adding: "Aaah. Can you please bring a bottle of wine if you can?" Mr. Black later said that he was back and asked if he could come earlier (at 9:45pm), with the requested wine. Ganieva again agreed, immediately.

53.     Thus, it was Ganieva who had initially reached out to "get together" because she was "all alone," then reached out again to tell him that she loved and needed him, and invited him to bring a bottle of wine when he was to come over on the night of July 6 to tuck her into bed. Though she had not felt well for a single day, on July 1, she reported that she was "much better"

24

INDEX NO. 155262/2021
RECEIVED NYSCEF: 09/08/2021
Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 233 of 349

by July 2 and that she thought she would be "done" with what ailed her by the night of July 2—

four nights before the parties met on July 6.

54.    Clearly, Ganieva was not unwell by July 6—let alone debilitated and weak. Clearly,

she was looking forward to a pre-planned romantic evening with the wine she requested, and,

clearly, it was anything but "sudden[]"when Mr. Black showed up at precisely the appointed time.

55.    There simply was no forced sex. A consensual rendezvous plainly had been

contemplated by both parties, and Ganieva reached out first thing the very next morning after the

alleged "rape" with a message of thanks and love: "*Good morning. It was very nice to see you last

night. I already feel better.... I love you and thank you!!! Xoxoxoxoxo and more love*". (Emphasis

added).

56.    On July 9, she reached out to Mr. Black *again*, asked if he wanted to get together,

and sent "lots of love." When Mr. Black did not respond, Ganieva reached out *yet again* the

following day, July 10, to get together.

57.    The Amended Complaint's false allegations continue. Ganieva claims that "[a]fter

this rape, Ms. Ganieva took her son and left New York to physically distance herself from Black."

(AC ¶ 191). This, too, is untrue. In the days and weeks that followed, Ganieva repeatedly and

insistently reached out to Mr. Black on numerous occasions, asking him, and indeed "begging"

him, to get together—which they did on no fewer than three occasions over the next few weeks.

58.    Ganieva explained that she was having visa issues (apparently because, on

information and belief, her student visa had expired upon her graduation that spring), and that she

had to leave New York and return to Russia as a result.

Case 1:21-cv-08824-PAE Document 105-1 Filed 04/18/22 Page 234 of 349

59.     While Mr. Black told Ganieva that he was "saddened" that she had to leave, he texted that "maybe its for the best." At her request, Mr. Black helped her set up interviews abroad and provided financial assistance for her relocation.

60.     As noted, in the few weeks between July 6 and her departure from New York on July 31, 2014, Ganieva and Mr. Black saw each other several times, at her request. Likewise, she frequently sent him loving messages, telling him the week after the alleged "rape" that he is "the kindest", and signing her text with, "Always yours….".

61.     Ganieva sent Mr. Black what he characterized as "beautiful flowers" on his birthday, the day she left New York. Mr. Black sent Ganieva a note to say that he was "very touched by your thoughtfulness and love." Ganieva texted this from the plane, as she was departing: "I love you and miss you already."

62.     From the time Ganieva left New York in July 2014, until the day she returned to extort him in June 2015, she continued to send him adoring messages, to try to see him, and to request financial, career, and other assistance.

63.     The lies in the Amended Complaint go on. Ganieva alleges that, while she was abroad, Mr. Black "managed to always be aware of where she was and what she was doing" and that she "continued to feel threatened by Black and his power over her." (AC ¶¶ 191, 193). This is nonsense.

64.     After Ganieva left New York, the record is clear that Mr. Black made minimal effort to maintain contact with her, let alone try to exert any "power over her." For example, between October 23, 2014 and February 19, 2015, Ganieva continually texted Mr. Black without response. She sent such messages to him as: *"You have no idea how much I miss you and love you.*

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 235 of 349

*It's nice to know that someone like you exist in the world even tho a bit far,*" and "*I love you! I do!*" (Emphasis added).

65.     Ganieva and Mr. Black did not have friends or a social group in common. As is explicitly clear from the recorded conversations—and as Ganieva seemed to acknowledge—Mr. Black never told anyone about their relationship. It is delusional—and, as Ganieva herself has put it, "paranoid"—for her to allege that "it seemed that no matter where she traveled, inevitably, she happened to meet someone that [sic] knew Black, including people that worked with Black at Apollo, and Black managed to always know where she was and what she was doing." (AC ¶ 191). To the extent Mr. Black had any idea where Ms. Ganieva was, it was only because she so often reached out to let him know about her travels (and, at times, to request money for them). In her texts, she volunteered information to him about her exotic comings and goings, including her travels to Moscow, Rome, London, a beach vacation, and a ski junket in the French Alps at Courchevel.

66.     As noted, in her 2015 campaign of extortion, Ganieva had tried on a theory of palimony, and apparently recognized that this was not an actionable claim. She also tried on a "paranoid" theory of harassment and belittlement, but must have been counseled that, this too, is not actionable in a non-employment context. And, so, finally she has landed on a brand-new theory—alleging now, so many years later, that she had been raped.

67.     Seemingly mindful of the relevant 7-year statute of limitations—and clearly unaware when she filed her initial Complaint that Mr. Black has retained their earlier text communications and recorded their later conversations—Ganieva has alighted upon July 6, 2014 as the date on which she was allegedly raped.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 236 of 349

68.   Unfortunately for Ganieva, the documentary record reveals her for the fabulist and extortionist that she is. Mr. Black has only ever been kind, supportive, and exceedingly generous to Ganieva. Clearly, he exercised bad judgment in entering into the relationship in the first instance and in paying an exorbitant ransom to exit it; just as clearly, there is no truth to Ganieva's mercenary slander that has devastated his family, his business, and his life.

## Ganieva's Defamatory Tweets and This Frivolous Lawsuit

69.   On March 17, 2021, Ganieva posted a series of false and defamatory tweets on Twitter about Mr. Black. Ganieva's Twitter account appears to have been set up for the sole purpose of publishing the defamatory tweets. She only set up the account in March 2021, and the thread of three defamatory tweets on March 17, 2021 appear to be the only tweets she has posted either before or since that date. She presently follows only 21 Twitter users, including several investigative reporters who have reported on sexual abuse matters, two women who have made sexual harassment allegations in high-profile matters, and the law firm and lawyer she retained in this case. In the defamatory tweets, Ganieva pointedly refers to Mr. Black as "Apollo Global Management's CEO and Chairman, Leon Black", in an obvious effort to maximize the professional and reputational harm to Mr. Black. At the end of the thread, Ganieva included the hashtags #MeToo and #LeonBlack, similarly attempting to maximize the reach of her defamatory tweets.

70.   Ganieva's defamatory comments included: (i) that she had been "sexually harassed and abused" by Mr. Black "for years"; (ii) that Mr. Black "could not understand me when I refused his sexual advances"; (iii) that she had been "bullied, manipulated, threatened, and coerced" by Mr. Black; (iv) that, "under duress, I was forced to sign an NDA in 2015"; and (v) that she did "not want this type of predatory behavior to continue happening to other women." (AC ¶ 226).

71.     In response, and quite understandably given the circumstances, Mr. Black publicly defended himself, including stating principally that: "I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago"; her allegations were "completely fabricated"; and "I have been extorted by Ms. Ganieva for many years and I made substantial monetary payments to her. . .". (AC ¶ 227).

72.     Ganieva made additional false and defamatory statements of fact concerning Mr. Black in an interview with the *New York Post* on April 8, 2021, including that "Black's abuse 'was over a long period of time and it was tragic.'" Josh Kosman, *Leon Black's Surprise Apollo Global Exit Came Amid Sexual Harassment Allegation*, N.Y. Post (Apr. 8, 2021), https://nypost.com/2021/04/08/leon-black-accused-of-sexual-harassment/.

73.     Ganieva followed this with her frivolous initial Complaint. Mr. Black responded in a detailed Answer, pointing, in particular, to specific documentary and recorded evidence that lays waste to each of Ganieva's claims. Now Ganieva has filed her Amended Complaint, in which she manages not only to further lie in allegation after allegation, but to lie in ways and about matters that have exactly nothing to do with the claims and everything to do with sensationalism and spectacle.

### Ganieva's Fictitious Amended Complaint

74.     In her Amended Complaint, Ganieva for the first time adds a preposterous number of allegations that she apparently has only just recalled since the filing of her initial Complaint. The wholesale amendment of a complaint in response to an answer is quite unusual, and here—most unusually—the Amended Complaint has mushroomed to add some 154 new paragraphs of freshly-hatched "factual" allegations as compared to the 90 paragraphs in the initial Complaint, for a grand total of 244 paragraphs. And, now that Ganieva has had a miraculous sudden recall of

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 238 of 349

now-critical events, her recollections are recounted with detailed precision. As noted, one major

category of new recall is the sexual sadism of which she falsely accuses Mr. Black, something she

would have been expected to include in her initial Complaint given the nature of her claims.

75.     Another major category of new allegations in the Amended Complaint relates to

Mr. Black's purported "'**conveyor belt of women**'"—an expression that Ganieva ridiculously

claims that Mr. Black "often" used. (AC ¶ 131) (Internal quotations and emphasis in original).

These brand-new allegations are irrelevant and clearly designed only to further publicly harass and

shame Mr. Black and his family. And Ganieva's premise for larding the pleadings with this new

set of allegations is spurious. In the recorded conversations, Ganieva repeatedly makes clear her

belief that her power over Mr. Black lay in his desire to avoid publicizing their affair to the press,

his business, and his wife and family. Ganieva's threats to Mr. Black's family, repeatedly and on

tape, are explicit in those recordings—as is his intense desire to defuse this threat.

76.     But by far the most notable, and most truly bizarre, category of newly minted

allegations is found in Ganieva's pages-long frolic-and-detour about Jeffrey Epstein. In what is a

caricature of a frivolous pleading, this section of the Amended Complaint actually begins with a

discursive biography of Epstein and his "modest upbringing," winds through a history of Epstein's

criminal conduct, and struggles to implicate Black and his "*posse*" (AC ¶ 70) (emphasis in original)

in all manner of sexual corruption, trafficking, conspiracy, and cover-up—despite one lick of

proof. The tabloid-ready allegations are punctuated with randomly placed quotation marks,

curiously highlighted text, and lurid mixed metaphors that do not even attempt to tether themselves

to reality or to the claims.

77.     Ganieva's motivation for attempting to retrofit Epstein into her Amended

Complaint is as clear as her motivation for gratuitously salting into her pleadings a litany of other

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 239 of 349

controversial and notorious figures who also have nothing to do with her claims: it is classic

distraction, obfuscation, and attempted guilt by association, and it has no place in a court pleading.

78.     Moreover, and more fundamentally, Ganieva's desperate ploy not only is irrelevant

to the point of frivolity; it is a lie. Borrowing details from published reports (for just one example,

there are numerous accounts of Epstein bringing in women for sex while sheriff's deputies stood

guard outside) and concocting others (down to the "sheepish[]" grin of a deputy and to the "serious

but soft, feminine tone" of alleged co-conspirator Sarah Kellen), Ganieva imagines an entire fever

dream that *never happened*. This will be proven at trial; in the meantime, it suffices to say that the

lies virtually fly off the page.

79.     Mr. Black simply did not kidnap Ganieva or threaten to plant "'very serious'" drugs

on Ganieva. (AC ¶ 87) (Internal quotations in original). He did not fly her down for a two-hour

encounter in Florida for the purpose of lying "almost supine" in an office next to Jeffrey Epstein,

"indicat[ing] to Ganev "with his eyes" that he and Epstein wanted her to "*do something.*" (AC ¶

94) (Emphasis in original). He did not tell her that his "'**best friends**'" (internal quotations and

emphasis in original) Jeffrey Epstein and Harvey Weinstein "were helping him to '**do**' Ms.

Ganieva" (internal quotations and emphasis in original), "'recording her'" (internal quotations in

original), or "making a movie about her," whatever any of these things might possibly mean. (AC

¶¶ 114-17). The prose is laughably lurid,[3] unrealistically detailed,[4] and internally nonsensical.[5]

---

[3] To take just one of many possible examples, there is this: "Alarmed and shocked, Ms. Ganieva
remembers"—now—"standing in front of them unable to say anything while they just stared up at
her, saying nothing, but clearly expecting her to *do something.*" (AC ¶ 94) (Emphasis in original).
[4] Just one example: In her "serious but soft, feminine tone," Kellen said: "'*you know*…[pausing]…
something may happen to you,' as her voice trailed off." (AC ¶¶ 97-99) (Internal quotations and
emphasis in original).
[5] An example: Black became "visibly annoyed" when she just stood before him and Epstein
without responding to the sexual overture he was making "with his eyes," and told her to leave the
room. (AC ¶¶ 94-95). According to the story, they then adjourned to another room and engaged in

And, yet, Ganieva and her lawyers—notwithstanding their ethical obligations—think nothing of presenting them to this Court as truth.

80.     And, like many of the other lies in her pleadings, this one is exposed by the evidence in this case, including Ganieva's own words. In one of the recorded conversations, Ganieva spoke about how a number of billionaires supposedly had "defamed" and "threaten[ed] her by "treat[ing] her] in a very disrespectful way." She spouted off four names, including Epstein's, to which Mr. Black expressed incredulity and noted that he was unaware that she even knew two of them—one of whom was Epstein. Specifically, he stated: "I didn't even know you knew [billionaire #1]… I knew you knew [billionaire #2]. *Did you ever meet Epstein?*" To this, she immediately responded, "No, but he called me." The rest of her response is garbled, though she appears to then state that she had been to his "place" and spoken with a "girl." It goes without saying that both parties would have quite well remembered that Ganieva and Epstein had met if Mr. Black had forcibly taken Ganieva to join in a threesome with Epstein in Miami. It would have made no sense for Mr. Black to have asked the question, and equally no sense for Ganieva to have failed to raise the alleged trip in response.

81.     Likewise, both the flight records and, on information and belief, truthful testimony from Sarah Kellen will confirm that *the trip described in Ganieva's Amended Complaint simply did not happen.*

---

a conversation around a table about the financial and jobs markets, until "Epstein and Black became angry and upset with Ms. Ganieva" when it became clear to them—once again, apparently—that she would not be having sex with them. (AC ¶¶ 102-105). And according to the story, Mr. Black and Ganieva then turned right around and flew back home, as Mr. Black wordlessly but "forcibly shoved food into Ms. Ganieva's mouth." (AC ¶¶ 105-107). Not only is none of this true, it does not even have the patina of truth.

82.     Another notable new addition to the Amended Complaint is Ganieva's revisionist attempt to explain away the devastating documentary and recorded evidence set forth in Mr. Black's Answer.

83.     In his Answer, Mr. Black laid bare both the small lies and the big ones surrounding Ganieva's allegation of rape. As noted, the text communications make clear that he did not barge in to Ganieva's apartment while she was sick and too weak to move and overbear her will; rather, she invited him over for a drink to tuck her in, and sent him her love and thanks first thing the following morning. In her Amended Complaint, Ganieva has an incredible response to these facts: she alleges that "[p]erhaps" Mr. Black had come to the "realization that he had 'gone too far' this time, and so he "'huddled up' again with his legal team … to come up with a scheme to insulate Black from criminal liability". (AC ¶ 185) (Internal quotations in original).

84.     This criminal conspiracy, according to Ganieva, was to "manufacture evidence" by having Mr. Black somehow "command[] her to send him text messages saying that she loved him." (AC ¶¶ 186-87). This is absurdist for so many reasons that it almost does not bear response. Ganieva does not even try to allege any possible basis for how she got wind of this wild conspiracy theory. And Ganieva had been sending Mr. Black such messages for years before the alleged rape and the alleged criminal cover-up. And Ganieva does not even attempt to explain away her lies about having been sick and debilitated and surprised by Mr. Black barging in on her; indeed, she repeats these lies in her Amended Complaint. Nor does she explain why Mr. Black, who she alleges had been brutalizing and raping her for years, would suddenly fear that he had "'gone too far' this time"—which, indeed, allegedly was one of the few times when "he spared Ms. Ganieva the pain of his usual sadistic rituals." (AC ¶ 182) (Internal quotations in original). These are not only lies, they are poorly crafted ones.

Case 1:21-cv-08824-PAE    Document 105-1    Filed 04/18/22    Page 242 of 349

85.     Equally fanciful are Ganieva's attempts to explain away the recorded conversations. Although it is difficult to parse, Ganieva's claim seems to be that she traveled back to New York in June 2015 for the sole purpose of finding out "what she could do to be able to live her life without his continued involvement" (AC ¶ 194)—but definitely not to demand money from him. The claim does not bother to account for the fact that, at this time, Mr. Black had not been involved with or even seen Ganieva for nearly one year, and barely even responded to her many messages during this period. After Ganieva asked to meet with Mr. Black for the purpose of getting out of her life someone who already was solidly out of it—but definitely not to demand money from him—she claims that Mr. Black seized upon this opportunity to force money upon her.

86.     Thus, Ganieva alleges that: "Feeling pressured to respond" to Mr. Black's demands that she request money that she very much did not want, she effectively was forced to "blurt[ed] out a number" (AC ¶ 198)—of *one hundred million dollars,* no less. "Clearly," she reasons (as though logic applied here), "the 'fix' was in, and Black was giddy about Ms. Ganieva having 'taken the bait.'" (*Id.*) (Internal quotations in original). According to Ganieva's story, apparently over her repeated protests that she definitely did not want his money, Mr. Black "would scream" at her that "'I want to give you money… *Say that you are blackmailing me*.'" (*Id.* at ¶ 199) (Internal quotations in original; emphasis added). According to Ganieva's theory of the case, she told Mr. Black that she was blackmailing him—which she indeed did do, explicitly, repeatedly, aggressively, and on tape—only because he forced her to do this. This is simply gibberish, and wholly belied by the recorded conversations.

87.     Just as nonsensical is Ganieva's similar explanation for the hours of dialogue in which she recounts having been bullied around the globe by waiters, billionaires, hairdressers, teachers, strangers, and so on. The recordings are clear that Ganieva needed no "goad[ing]" (AC

34

¶ 203) to launch into this parade of horribles (and certainly at no time during the hours of conversation recording the extortion campaign did Mr. Black appeared "elated" and "giggl[y]"). (*Id.*).

88.     As will be shown in this case, Ganieva has a history of inventing tales of bullying, harassment, disrespect—and worse—in the hopes of winning a payday for herself. To take just one relatively benign example for present purposes: Ganieva recently filed an affidavit in an action she brought against a college preparatory agency that she believed had ineffectively tutored her son, in which she used language identical to some of the language she uses against Mr. Black. In that affidavit, she swore repeatedly under oath that numerous employees of the agency had "yelled" at her, "attempt[ed] to bully" her, "disregarded" her, treated her "rudely," were "shockingly disrespectful" to her, and "blamed" her and her son for the employees' own shortcomings. She claimed that her "son is still traumatized by the ineffectiveness" of the agency's tutoring. She lost that case.

## ANSWERS TO SPECIFIC ALLEGATIONS

Defendant Leon Black denies all allegations in the Amended Complaint, including those in any headings, subheadings, and footnotes, except as expressly admitted herein. All allegations in the Amended Complaint involving unnamed and unidentified individuals also are denied until such time as such individuals are identified. Further, to the extent that Mr. Black has no memory as to an allegation, he herein denies knowledge or information sufficient to form a belief about the truth of such allegation.

1.     Denies each and every allegation in Paragraph 1 of the Amended Complaint, including those contained in footnote 1, except admits that the April 8, 2021 *Bloomberg* article contains the quoted text, and respectfully refers the Court to the April 8, 2021 *Bloomberg* article

and Mr. Black's statement to *Bloomberg* for the full text and context of Mr. Black's statement to Bloomberg, and avers that Mr. Black provided the following statement to *Bloomberg* in connection with the article:

> I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago. Any allegation of harassment or any other inappropriate behavior towards her is completely fabricated. The truth is that I have been extorted by Ms. Ganieva for many years and I made substantial monetary payments to her, based on her threats to go public concerning our relationship, in an attempt to spare my family from public embarrassment. At my direction, my counsel referred Ms. Ganieva's conduct to the criminal authorities several weeks ago and I welcome a thorough investigation of this matter. I also want to emphasize that this is entirely a personal matter; this matter has nothing to do with Apollo or my decision to step away from the firm.

2.      Denies each and every allegation in Paragraph 2 of the Amended Complaint.

3.      Denies each and every allegation in Paragraph 3 of the Amended Complaint.

4.      Denies each and every allegation in Paragraph 4 of the Amended Complaint, and avers that Ganieva made such threats on numerous occasions, including in recorded conversations.

5.      Denies each and every allegation in Paragraph 5 of the Amended Complaint, including those contained in footnote 2, except admits that Mr. Black dined on occasion with Ganieva at restaurants and on rare occasions appeared with her at events.

6.      Denies each and every allegation in Paragraph 6 of the Amended Complaint, except admits that Mr. Black made the quoted statement during the October 29, 2020 earnings call, and respectfully refers the Court to the October 29, 2020 earnings call transcript for the full text and context of Mr. Black's statements on that call.

7.      Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 7 of the Amended Complaint regarding Ganieva's legal education and her state of mind. Denies each and every allegation in Paragraph 7 of the Amended Complaint, except

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 245 of 349

admits that Mr. Black made the quoted statement on or about January 25, 2021, and respectfully refers the Court to a transcript of the statement for the full text and context of Mr. Black's statement.

8.      Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 8 of the Amended Complaint regarding Ganieva's state of mind. Denies each and every allegation in Paragraph 8 of the Amended Complaint.

9.      Denies each and every allegation in Paragraph 9 of the Amended Complaint, including each and every allegation contained in the excerpted tweets, except admits that Ganieva, or someone purporting to act on Ganieva's behalf, posted the excerpted tweets on March 17, 2021, respectfully refers the Court to the tweets for their full text and context, and admits that Mr. Black texted Ganieva the following day and asked her to call him.

10.     Denies each and every allegation in Paragraph 10 of the Amended Complaint, including those contained in footnote 3, except admits that Mr. Black described Ganieva's conduct as extortion, and avers that such description is accurate.

11.     Denies each and every allegation in Paragraph 11 of the Amended Complaint, except admits that Mr. Black referred Ganieva's extortion to the appropriate criminal authorities.

12.     Denies each and every allegation in Paragraph 12 of the Amended Complaint.

13.     Denies each and every allegation in Paragraph 13 of the Amended Complaint.

14.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 14 of the Amended Complaint regarding Ganieva's state of mind. Denies each and every allegation in Paragraph 14 of the Amended Complaint.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 246 of 349

15.     To the extent the allegations in Paragraph 15 of the Amended Complaint call for legal conclusions, no response is required. To the extent any response is required, denies each and every allegation in Paragraph 15 of the Amended Complaint.

16.     To the extent the allegations in Paragraph 16 of the Amended Complaint call for legal conclusions, no response is required. To the extent any response is required, denies that Mr. Black engaged in any act or omission giving rise to the claims alleged in the Amended Complaint, and admits that Mr. Black resides in New York State and that Ganieva purports to invoke the Court's jurisdiction.

17.     To the extent the allegations in Paragraph 17 of the Amended Complaint call for legal conclusions, no response is required. To the extent any response is required, denies that Mr. Black engaged in any act or omission giving rise to the claims alleged in the Amended Complaint, and admits that Ganieva purports to invoke venue in New York County.

18.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 18 of the Amended Complaint.

19.     Admits the allegation in paragraph 19 of the Amended Complaint.

20.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 20 of the Amended Complaint as to who invited Ganieva to the party at Donald Engel's home. Denies each and every allegation in Paragraph 20 of the Amended Complaint and in Footnote 4, except admits that Mr. Black and Ganieva met in or around March 2008 at a party at Donald Engel's home and that Mr. Black knew Donald Engel from Drexel Burnham, and avers that Ganieva sought out Mr. Black.

21.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 21 of the Amended Complaint as to Ganieva's marital status and under

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 247 of 349

what circumstances Ganieva moved from Russia to the United States. Denies each and every allegation in Paragraph 21 of the Amended Complaint, except admits that Ganieva has a son and that she told him that she was 25 years old in March 2008.

22.     Denies each and every allegation in Paragraph 22 of the Amended Complaint.

23.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 23 of the Amended Complaint as to who Ganieva "later met." Denies each and every allegation in Paragraph 23 of the Amended Complaint.

24.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 24 of the Amended Complaint as to Ganieva's state of mind. Denies each and every allegation in Paragraph 24 of the Amended Complaint.

25.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 25 of the Amended Complaint as to Ganieva's state of mind. Denies each and every allegation in Paragraph 25 of the Amended Complaint.

26.     Denies each and every allegation in Paragraph 26 of the Amended Complaint.

27.     Denies each and every allegation in Paragraph 27 of the Amended Complaint.

28.     Denies each and every allegation in Paragraph 28 of the Amended Complaint.

29.     Denies each and every allegation in Paragraph 29 of the Amended Complaint.

30.     Denies each and every allegation in Paragraph 30 of the Amended Complaint.

31.     Denies each and every allegation in Paragraph 31 of the Amended Complaint, and avers that Mr. Black often tried to help and support Ganieva, including by financing an apartment rental for her in a school district that she wanted for her son, and that, while Mr. Black initially told Ganieva he would try to help her with a recommendation for Harvard Business School, ultimately, as a result of her extortion of him, he told her he would not do so.

32.     Denies each and every allegation in Paragraph 32 of the Amended Complaint.

33.     Denies each and every allegation in Paragraph 33 of the Amended Complaint.

34.     Denies each and every allegation in Paragraph 34 of the Amended Complaint.

35.     Denies each and every allegation in Paragraph 35 of the Amended Complaint.

36.     Denies each and every allegation in Paragraph 36 of the Amended Complaint.

37.     Denies each and every allegation in Paragraph 37 of the Amended Complaint.

38.     Denies each and every allegation in Paragraph 38 of the Amended Complaint.

39.     Denies each and every allegation in Paragraph 39 of the Amended Complaint.

40.     Denies each and every allegation in Paragraph 40 of the Amended Complaint.

41.     Denies each and every allegation in Paragraph 41 of the Amended Complaint.

42.     Denies each and every allegation in Paragraph 42 of the Amended Complaint.

43.     Denies each and every allegation in Paragraph 43 of the Amended Complaint.

44.     Denies each and every allegation in Paragraph 44 of the Amended Complaint.

45.     Denies each and every allegation in Paragraph 45 of the Amended Complaint.

46.     Denies each and every allegation in Paragraph 46 of the Amended Complaint.

47.     Denies each and every allegation in Paragraph 47 of the Amended Complaint.

48.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 48 of the Amended Complaint as to the information contained in published studies or the DSM-V. To the extent the allegations in Paragraph 48 of the Amended Complaint call for legal conclusions, no response is required. Denies each and every allegation in Paragraph 48 of the Amended Complaint.

49.     Denies each and every allegation in Paragraph 49 of the Amended Complaint.

50.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 50 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 50 of the Amended Complaint.

51.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 51 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 51 of the Amended Complaint, except admits that Epstein had or used several residences, including in New York, the U.S. Virgin Islands, Florida, and New Mexico.

52.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 52 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 52 of the Amended Complaint.

53.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 53 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 53 of the Amended Complaint, excepts admits that Epstein pled guilty in 2008 and that numerous women have publicly come forward to accuse Epstein of unlawful sex acts.

54.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 54 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 54 of the Amended Complaint, except admits that it has been widely reported that Epstein was arrested and charged in 2019.

55.     Denies each and every allegation in Paragraph 55 of the Amended Complaint, except admits that Mr. Black made the quoted statement during the July 31, 2019 earnings call, and respectfully refers the Court to the July 31, 2019 earnings call transcript for the full text and context of Mr. Black's statements on that call.

41

INDEX NO. 155262/2021
RECEIVED NYSCEF: 09/08/2021

56.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 56 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 56 of the Amended Complaint, except admits that Epstein died in prison.

57.     Denies each and every allegation in Paragraph 57 of the Amended Complaint, except admits that the *New York Times* published the article cited in footnote 5 on October 12, 2020, and respectfully refers the Court to the article for its full text and context.

58.     Denies each and every allegation in Paragraph 58 of the Amended Complaint, except admits that Mr. Black made the quoted statement in an October 12, 2020 letter to Apollo's Limited partners, and respectfully refers the Court to the October 12, 2020 letter for the full text and context of Mr. Black's statements.

59.     Denies each and every allegation in Paragraph 59 of the Amended Complaint, including those contained in footnote 6, except admits that Mr. Black made the quoted statement during the October 29, 2020 earnings call, and respectfully refers the Court to the October 29, 2020 earnings call transcript for the full text and context of Mr. Black's statements on that call.

60.     Denies each and every allegation in Paragraph 60 of the Amended Complaint, except admits that Mr. Black made the quoted statement during the October 29, 2020 earnings call, and respectfully refers the Court to the October 29, 2020 earnings call transcript for the full text and context of Mr. Black's statements on that call.

61.     Denies each and every allegation in Paragraph 61 of the Amended Complaint, except admits that Apollo hired Dechert LLP to conduct an independent investigation.

62.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 62 of the Amended Complaint as to what Dechert LLP was "tasked with," but admits that a memorandum from Dechert LLP was filed with the SEC on January 22, 2021.

63.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 63 of the Amended Complaint as to what was "widely reported," and when it was reported. Denies each and every allegation in Paragraph 63 of the Amended Complaint, including those contained in footnote 7, except admits that a memorandum from Dechert LLP was filed with the SEC on January 22, 2021, and respectfully refers the Court to the January 22, 2021 memorandum for the full text and context of the memorandum.

64.    Denies each and every allegation in Paragraph 64 of the Amended Complaint, except admits that a memorandum from Dechert LLP was filed with the SEC on January 22, 2021, avers that the quoted term "name-dropping" does not appear in the memorandum, and respectfully refers the Court to the January 22, 2021 memorandum for the full text and context of the memorandum.

65.    Denies each and every allegation in Paragraph 65 of the Amended Complaint, except admits that a memorandum from Dechert LLP was filed with the SEC on January 22, 2021, and respectfully refers the Court to the January 22, 2021 memorandum for the full text and context of the memorandum.

66.    Denies each and every allegation in Paragraph 66 of the Amended Complaint, except admits that a memorandum from Dechert LLP was filed with the SEC on January 22, 2021, and respectfully refers the Court to the January 22, 2021 memorandum for the full text and context of the memorandum.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 252 of 349

67.     Denies each and every allegation in Paragraph 67 of the Amended Complaint, except admits that a memorandum from Dechert LLP was filed with the SEC on January 22, 2021, and respectfully refers the Court to the January 22, 2021 memorandum for the full text and context of the memorandum.

68.     Denies each and every allegation in Paragraph 68 of the Amended Complaint, except admits that a memorandum from Dechert LLP was filed with the SEC on January 22, 2021, and respectfully refers the Court to the January 22, 2021 memorandum for the full text and context of the memorandum.

69.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 69 of the Amended Complaint as to the basis for Dechert LLP's conclusions. Denies each and every allegation in Paragraph 69 of the Complaint, except admits that a memorandum from Dechert LLP was filed with the SEC on January 22, 2021, and respectfully refers the Court to the January 22, 2021 memorandum for the full text and context of the memorandum.

70.     Denies each and every allegation in Paragraph 70 of the Amended Complaint, except admits that a memorandum from Dechert LLP was filed with the SEC on January 22, 2021, and respectfully refers the Court to the January 22, 2021 memorandum for the full text and context of the memorandum.

71.     Denies each and every allegation in Paragraph 71 of the Amended Complaint, except admits that Mr. Black made the quoted statement on January 25, 2021, and respectfully refers the Court to the January 25, 2021 statement for the full text and context of Mr. Black's statement.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 253 of 349

72.     Denies each and every allegation in Paragraph 72 of the Amended Complaint, except admits that Mr. Black made the quoted statement on January 25, 2021, and respectfully refers the Court to the January 25, 2021 statement for the full text and context of Mr. Black's statement.

73.     Denies each and every allegation in Paragraph 73 of the Amended Complaint, except admits that Mr. Black had a professional and personal relationship with Epstein.

74.     Denies each and every allegation in Paragraph 74 of the Amended Complaint, including those contained in footnote 8, except admits that Plaintiff has purported to issue a subpoena to Dechert LLP, which she also has purported to have since withdrawn.

75.     Denies each and every allegation in Paragraph 75 of the Amended Complaint including those contained in footnote 9, except admits that Plaintiff has purported to issue subpoenas to the third parties identified in footnote 9, which she also has purported to have since withdrawn.

76.     Denies each and every allegation in Paragraph 76 of the Amended Complaint.

77.     Denies each and every allegation in Paragraph 77 of the Amended Complaint.

78.     Denies each and every allegation in Paragraph 78 of the Amended Complaint.

79.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 79 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 79 of the Amended Complaint, except admits that Epstein had pleaded guilty and had been sentenced to a term in prison.

80.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 80 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 80 of the Amended Complaint.

81.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 81 of the Amended Complaint as to Jeffrey Epstein and what had been "widely reported." Denies each and every allegation in Paragraph 81 of the Amended Complaint.

82.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 82 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 82 of the Amended Complaint.

83.     Denies each and every allegation in Paragraph 83 of the Amended Complaint.

84.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 84 of the Amended Complaint, including those contained in footnote 10, as to Jeffrey Epstein. Denies each and every allegation in Paragraph 84 of the Amended Complaint.

85.     Denies each and every allegation in Paragraph 85 of the Amended Complaint.

86.     Denies each and every allegation in Paragraph 86 of the Amended Complaint.

87.     Denies each and every allegation in Paragraph 87 of the Amended Complaint.

88.     Denies each and every allegation in Paragraph 88 of the Amended Complaint.

89.     Denies each and every allegation in Paragraph 89 of the Amended Complaint.

90.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 90 of the Amended Complaint, including those contained in footnote 11, as to Jeffery Epstein. Denies each and every allegation in Paragraph 90 of the Amended Complaint.

91.     Denies each and every allegation in Paragraph 91 of the Amended Complaint.

92.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 92 of the Amended Complaint as to the contents of media reports and as to Ms. Kellen. Denies each and every allegation in Paragraph 92 of the Amended Complaint.

Case 1:21-cv-08824-PAE    Document 105-1    Filed 04/18/22    Page 255 of 349

93.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 93 of the Amended Complaint, including those contained in footnote 12, as to Ms. Kellen. Denies each and every allegation in Paragraph 93 of the Amended Complaint, including those contained in footnote 12.

94.     Denies each and every allegation in Paragraph 94 of the Amended Complaint.

95.     Denies each and every allegation in Paragraph 95 of the Amended Complaint.

96.     Denies each and every allegation in Paragraph 96 of the Amended Complaint.

97.     Denies each and every allegation in Paragraph 97 of the Amended Complaint.

98.     Denies each and every allegation in Paragraph 98 of the Amended Complaint.

99.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 99 of the Amended Complaint as to Jeffrey Epstein. Denies each and every allegation in Paragraph 99 of the Amended Complaint.

100.    Denies each and every allegation in Paragraph 100 of the Amended Complaint.

101.    Denies each and every allegation in Paragraph 101 of the Amended Complaint.

102.    Denies each and every allegation in Paragraph 102 of the Amended Complaint.

103.    Denies each and every allegation in Paragraph 103 of the Amended Complaint.

104.    Denies each and every allegation in Paragraph 104 of the Amended Complaint.

105.    Denies each and every allegation in Paragraph 105 of the Amended Complaint.

106.    Denies each and every allegation in Paragraph 106 of the Amended Complaint.

107.    Denies each and every allegation in Paragraph 107 of the Amended Complaint.

108.    Denies each and every allegation in Paragraph 108 of the Amended Complaint.

109.    Denies each and every allegation in Paragraph 109 of the Amended Complaint.

110.    Denies each and every allegation in Paragraph 110 of the Amended Complaint.

111.    Denies each and every allegation in Paragraph 111 of the Amended Complaint.

112.    Denies each and every allegation in Paragraph 112 of the Amended Complaint.

113.    Denies each and every allegation in Paragraph 113 of the Amended Complaint.

114.    Denies each and every allegation in Paragraph 114 of the Amended Complaint.

115.    Denies each and every allegation in Paragraph 115 of the Amended Complaint.

116.    Denies each and every allegation in Paragraph 116 of the Amended Complaint.

117.    Denies each and every allegation in Paragraph 117 of the Amended Complaint.

118.    Denies each and every allegation in Paragraph 118 of the Amended Complaint.

119.    Denies each and every allegation in Paragraph 119 of the Amended Complaint.

120.    Denies each and every allegation in Paragraph 120 of the Amended Complaint.

121.    Denies each and every allegation in Paragraph 121 of the Amended Complaint.

122.    Denies each and every allegation in Paragraph 122 of the Amended Complaint.

123.    Denies each and every allegation in Paragraph 123 of the Amended Complaint.

124.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 124 of the Amended Complaint as to the accusations against Ghislaine Maxwell. Denies each and every allegation in Paragraph 124 of the Amended Complaint, except admits that Mr. Black knew Ghislaine Maxwell.

125.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 125 of the Amended Complaint.

126.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 126 of the Amended Complaint.

Case 1:21-cv-08824-PAE  Document 105-1  Filed 04/18/22  Page 257 of 349

127.    Denies each and every allegation in Paragraph 127 of the Amended Complaint, and avers that Ganieva repeatedly sought Mr. Black's financial and other help in connection with her immigration status.

128.    Denies each and every allegation in Paragraph 128 of the Amended Complaint.

129.    Denies each and every allegation in Paragraph 129 of the Amended Complaint.

130.    Denies each and every allegation in Paragraph 130 of the Amended Complaint.

131.    Denies each and every allegation in Paragraph 131 of the Amended Complaint.

132.    Denies each and every allegation in Paragraph 132 of the Amended Complaint.

133.    Denies each and every allegation in Paragraph 133 of the Amended Complaint, except admits that Mr. Black was CEO of Apollo Global Management during the relevant time frame.

134.    Denies knowledge or information sufficient to form a belief about the truth of the allegation in Paragraph 134 that "there were occasions where Ms. Ganieva found herself attending the same social functions as Black and his wife." Denies each and every allegation in Paragraph 134 of the Amended Complaint.

135.    Denies knowledge or information sufficient to form a belief about the truth of the allegation in Paragraph 135 that Ganieva was ever at Mr. Black's home in the Hamptons. Denies each and every allegation in Paragraph 135 of the Amended Complaint.

136.    Denies knowledge or information sufficient to form a belief about the truth of the allegation in Paragraph 136 that Ganieva was ever at Mr. Black's apartment in New York City. Denies each and every allegation in Paragraph 136 of the Amended Complaint.

137.    Denies each and every allegation in Paragraph 137 of the Amended Complaint.

Case 1:21-cv-08824-PAE  Document 105-1  Filed 04/18/22  Page 258 of 349

138.    Denies knowledge or information sufficient to form a belief about the truth of the
allegation in Paragraph 138 that Ganieva was ever at Mr. Black's home in Bedford. Denies each
and every allegation in Paragraph 136 of the Amended Complaint.

139.    Denies knowledge or information sufficient to form a belief about the truth of the
allegations in Paragraph 139 as to who Ganieva met. Denies each and every allegation in Paragraph
139 of the Amended Complaint.

140.    Denies each and every allegation in Paragraph 140 of the Amended Complaint.

141.    Denies each and every allegation in Paragraph 141 of the Amended Complaint.

142.    Denies each and every allegation in Paragraph 142 of the Amended Complaint.

143.    Denies each and every allegation in Paragraph 143 of the Amended Complaint.

144.    Denies each and every allegation in Paragraph 144 of the Amended Complaint.

145.    Denies each and every allegation in Paragraph 145 of the Amended Complaint.

146.    Denies each and every allegation in Paragraph 146 of the Amended Complaint.

147.    Denies each and every allegation in Paragraph 147 of the Amended Complaint.

148.    Denies each and every allegation in Paragraph 148 of the Amended Complaint.

149.    Denies each and every allegation in Paragraph 149 of the Amended Complaint.

150.    Denies knowledge or information sufficient to form a belief about the truth of the
allegations in footnote 14 of the Amended Complaint as to Jeffrey Epstein. Denies each and every
allegation in Paragraph 150 of the Amended Complaint, including those contained in footnote 14.

151.    Denies each and every allegation in Paragraph 151 of the Amended Complaint.

152.    Denies each and every allegation in Paragraph 152 of the Amended Complaint.

153.    Denies each and every allegation in Paragraph 153 of the Amended Complaint.

154.    Denies each and every allegation in Paragraph 154 of the Amended Complaint.

50

155.    Denies each and every allegation in Paragraph 155 of the Amended Complaint.

156.    Denies each and every allegation in Paragraph 156 of the Amended Complaint.

157.    Denies each and every allegation in Paragraph 157 of the Complaint.

158.    Denies each and every allegation in Paragraph 158 of the Amended Complaint.

159.    Denies each and every allegation in Paragraph 159 of the Amended Complaint.

160.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 160 of the Amended Complaint, including about Ganieva's state of mind. Denies each and every allegation in Paragraph 160 of the Amended Complaint, except admits that Ganieva enrolled in an undergraduate program at around the time indicated.

161.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 161 of the Amended Complaint as to Ganieva's state of mind. Denies each and every allegation in Paragraph 161 of the Amended Complaint.

162.    Denies each and every allegation in Paragraph 162 of the Amended Complaint, except admits that Mr. Black made a loan to Ganieva, pursuant to her request, in 2011.

163.    Denies each and every allegation in Paragraph 163 of the Amended Complaint, except admits that Mr. Black made a loan to Ganieva in 2011 pursuant to Ganieva's request and that certain terms of the loan were memorialized in a one-page, signed document, and respectfully refers the Court to the document referenced in Paragraph 165 of the Amended Complaint for the document's full text and context.

164.    Denies each and every allegation in Paragraph 164 of the Amended Complaint, and respectfully refers the Court to the document contained in Paragraph 165 of the Amended Complaint for its full text and context.

165.    Denies each and every allegation in Paragraph 165 of the Amended Complaint, and respectfully refers the Court to the document contained in Paragraph 165 of the Amended Complaint for its full text and context.

166.    Denies each and every allegation in Paragraph 166 of the Amended Complaint.

167.    Denies each and every allegation in Paragraph 167 of the Amended Complaint, except admits that Mr. Black made a loan to Ganieva in 2013 pursuant to Ganieva's request, and respectfully refers the Court to the document contained in Paragraph 167 of the Amended Complaint for its full text and context.

168.    Denies each and every allegation in Paragraph 168 of the Amended Complaint.

169.    Denies each and every allegation in Paragraph 169 of the Amended Complaint, except admits that Mr. Black helped Ganieva with her job search.

170.    Denies each and every allegation in Paragraph 170 of the Amended Complaint.

171.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 171 of the Amended Complaint regarding Ganieva's purported communications with Goldman Sachs, and respectfully refers the Court to those communications for their full text and context. Denies each and every allegation in Paragraph 171 of the Amended Complaint, except admits that Mr. Black helped Ganieva with her job search.

172.    Denies knowledge or information sufficient to form a belief about the truth of the allegation in Paragraph 172 of the Amended Complaint that Ganieva "never received an offer from any financial company in New York." Denies each and every allegation in Paragraph 172 of the Amended Complaint, except admits that Mr. Black helped Ganieva with her job search.

173.    Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 173 of the Amended Complaint regarding Ganieva's purported

52

communications with Goldman Sachs, and respectfully refers the Court to those communications for their full text and context. Denies each and every allegation in Paragraph 173 of the Amended Complaint.

174.    Denies each and every allegation in Paragraph 174 of the Amended Complaint.

175.    Denies each and every allegation in Paragraph 175 of the Amended Complaint.

176.    Denies each and every allegation in Paragraph 176 of the Amended Complaint.

177.    Denies each and every allegation in Paragraph 177 of the Amended Complaint, except admits that on July 6, 2014, Mr. Black returned from the Hamptons, and avers that he had previously arranged with Ganieva to visit her at her apartment on East 77th Street at an appointed time.

178.    Denies each and every allegation in Paragraph 178 of the Amended Complaint.

179.    Denies each and every allegation in Paragraph 179 of the Amended Complaint.

180.    Denies each and every allegation in Paragraph 180 of the Amended Complaint.

181.    Denies each and every allegation in Paragraph 181 of the Amended Complaint.

182.    Denies each and every allegation in Paragraph 182 of the Amended Complaint.

183.    Denies each and every allegation in Paragraph 182 of the Amended Complaint.

184.    Denies each and every allegation in Paragraph 184 of the Amended Complaint.

185.    Denies each and every allegation in Paragraph 185 of the Amended Complaint.

186.    Denies each and every allegation in Paragraph 186 of the Amended Complaint.

187.    Denies each and every allegation in Paragraph 187 of the Amended Complaint.

188.    Denies each and every allegation in Paragraph 188 of the Amended Complaint.

189.     Denies each and every allegation in Paragraph 189 of the Amended Complaint, excepts admits that, at Ganieva's request, Mr. Black provided approximately those sums at approximately those times to Ganieva.

190.     Denies each and every allegation in Paragraph 190 of the Amended Complaint.

191.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 191 of the Amended Complaint regarding whether Ganieva "happened to meet someone that knew Black." Denies each and every allegation in Paragraph 191 of the Amended Complaint, and avers that Ganieva informed Mr. Black that her departure from New York was due to immigration issues.

192.     Denies each and every allegation in Paragraph 192 of the Amended Complaint.

193.     Denies each and every allegation in Paragraph 193 of the Amended Complaint.

194.     Denies each and every allegation in Paragraph 194 of the Amended Complaint, and avers that, prior to returning to New York, Ganieva had requested to meet with Mr. Black and that Mr. Black never requested repayment of either loan he made to Ganieva.

195.     Denies each and every allegation in Paragraph 196 of the Amended Complaint, except admits that Mr. Black recorded his conversations with Ganieva after he became aware of her plans to extort money from him, and avers that Ganieva threatened to go public about their relationship unless he paid her a sum of one hundred million dollars.

196.     Denies each and every allegation in Paragraph 196 of the Amended Complaint.

197.     Denies each and every allegation in Paragraph 197 of the Amended Complaint, and avers that Ganieva threatened to go public about their relationship unless Mr. Black paid her a sum of one hundred million dollars.

Case 1:21-cv-08824-PAE    Document 105-1    Filed 04/18/22    Page 263 of 349

198.    Denies each and every allegation in Paragraph 198 of the Amended Complaint, and avers that Ganieva threatened to go public about their relationship unless Mr. Black paid her a sum of one hundred million dollars.

199.    Denies each and every allegation in Paragraph 199 of the Amended Complaint, except admits that Mr. Black met with Ganieva on several occasions in 2015 in person, and avers that those dates were: June 26, July 21, July 24, August 12, August 14, August 19, September 17, October 15, and October 19, and avers that Ganieva threatened to go public about their relationship unless Mr. Black paid her a sum of one hundred million dollars.

200.    Denies each and every allegation in Paragraph 200 of the Amended Complaint, and avers that Ganieva threatened to go public about their relationship unless Mr. Black paid her a sum of one hundred million dollars.

201.    Denies each and every allegation in Paragraph 201 of the Amended Complaint.

202.    Denies each and every allegation in Paragraph 202 of the Amended Complaint.

203.    Denies each and every allegation in Paragraph 203 of the Amended Complaint, except admits that Ganieva told many "stories about people she had encountered who claimed to or appeared to know Black, and how some of them had mistreated her."

204.    Denies each and every allegation in Paragraph 204 of the Amended Complaint, except admits that Mr. Black agreed "that he would pay her $100,000 every month and a certain sum of money to help with her immigration status" pursuant to a written agreement between the parties.

205.    Denies each and every allegation in Paragraph 205 of the Amended Complaint.

206.    Denies each and every allegation in Paragraph 206 of the Amended Complaint.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 264 of 349

207.    Denies each and every allegation in Paragraph 207 of the Amended Complaint, and avers that the parties met at the Four Seasons Restaurant on October 19, 2015, that Mr. Black provided Ganieva with an Agreement containing the terms that the two previously had discussed, and that he encouraged Ganieva to take her time and to read it carefully.

208.    Denies each and every allegation in Paragraph 208 of the Amended Complaint, and avers that Ganieva made clear that she well understood each and every term of the Agreement.

209.    Denies each and every allegation in Paragraph 209 of the Amended Complaint.

210.    Denies each and every allegation in Paragraph 210 of the Amended Complaint.

211.    Denies each and every allegation in Paragraph 211 of the Amended Complaint, and avers that only Ganieva signed the Agreement.

212.    Denies each and every allegation in Paragraph 212 of the Amended Complaint, except admits that Ganieva signed two identical copies of the Agreement.

213.    Denies each and every allegation in Paragraph 213 of the Amended Complaint.

214.    Denies each and every allegation in Paragraph 214 of the Amended Complaint, including those in footnote 15, except admits that Mr. Black retained both copies of the Agreement.

215.    Denies each and every allegation in Paragraph 215 of the Amended Complaint, and avers that Ganieva proposed sharing a soufflé of her choosing.

216.    Denies each and every allegation in Paragraph 216 of the Amended Complaint, except admits that conversations between Mr. Black and Ganieva were consensually monitored and recorded, and avers that Ganieva threatened to go public about their relationship unless he paid her a sum of one hundred million dollars.

217.    Admits the allegations in Paragraph 217 of the Amended Complaint.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 265 of 349

218.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 218 of the Amended Complaint regarding how Ganieva's bank statement recorded funds, or as to what Ganieva did or did not know. Denies each and every allegation in Paragraph 218 of the Amended Complaint, except admits that Mr. Black had previously sent funds to Ganieva; that due to Ganieva's extortion of him, Mr. Black set up the "E Trust" account; and that funds began to be transferred from the E Trust account beginning on or about October 22, 2015. Avers that the "E" in "E Trust" stands for "Extortion."

219.     Denies each and every allegation in Paragraph 219 of the Amended Complaint, including each and every allegation contained in the excerpted text messages, except admits that Ganieva sent Mr. Black the October 15 and October 16, 2019 text messages quoted therein, and that Mr. Black did not respond to the text messages, and respectfully refers the Court to those text messages for their full text and context.

220.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 220 of the Amended Complaint regarding Ganieva's retention of legal counsel and about the alleged letter dated March 6, 2020. Denies each and every allegation in Paragraph 220 of the Amended Complaint, except admits that counsel purporting to represent Ganieva sent a letter to Mr. Black on February 18, 2020, and that Mr. Black did not respond to that letter.

221.     Denies each and every allegation in Paragraph 221 of the Amended Complaint, except admits that both signed copies of the Agreement are in Mr. Black's custody or control. Avers that counsel for Mr. Black has offered to provide a copy of the Agreement to counsel for Ganieva, subject to the terms of a standard court-ordered protective agreement or an interim agreement between the parties not to publicize documents produced in litigation, and provided a

draft of such an agreement to counsel for Ganieva. Avers that counsel for Ganieva refused to discuss such an agreement.

222.     Admits the allegation in Paragraph 222 of the Amended Complaint that Mr. Black made the quoted statement during the October 29, 2020 earnings call, and respectfully refers the Court to the October 29, 2020 earnings call transcript for the full text and context of Mr. Black's statements on that call.

223.     Denies each and every allegation in Paragraph 223 of the Amended Complaint.

224.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 224 of the Amended Complaint regarding Ganieva's legal education and her state of mind. Denies each and every allegation in Paragraph 224 of the Amended Complaint.

225.     Denies each and every allegation in Paragraph 225 of the Amended Complaint.

226.     Denies each and every allegation in Paragraph 226 of the Amended Complaint, including each and every allegation contained in the excerpted tweets, except admits that Ganieva, or someone purporting to act on Ganieva's behalf, posted the excerpted tweets on March 17, 2021, and respectfully refers the Court to the tweets for their full text and context.

227.     Denies each and every allegation in Paragraph 227 of the Amended Complaint, including those contained in footnote 16, except admits that *Bloomberg* published the quoted material on April 8, 2021, and respectfully refers the Court to the April 8, 2021 *Bloomberg* article and Mr. Black's statement to *Bloomberg* for the full text and context of Mr. Black's statement to *Bloomberg*, and avers that Mr. Black provided the following statement to *Bloomberg* in connection with the article:

> I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago. Any allegation of harassment or any other inappropriate behavior towards her is completely fabricated. The truth is that I have been extorted by Ms. Ganieva for many years and

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 267 of 349

> I made substantial monetary payments to her, based on her threats to go public concerning our relationship, in an attempt to spare my family from public embarrassment. At my direction, my counsel referred Ms. Ganieva's conduct to the criminal authorities several weeks ago and I welcome a thorough investigation of this matter. I also want to emphasize that this is entirely a personal matter; this matter has nothing to do with Apollo or my decision to step away from the firm.

228.  Denies each and every allegation in Paragraph 228 of the Amended Complaint, including those contained in footnote 17, except admits that additional publications also reported on the matter, including the publication cited at footnote 17, and respectfully refers the Court to those publications for their full text and context.

229.  Denies each and every allegation in Paragraph 229 of the Amended Complaint, including those contained in footnote 18, except admits that the *New York Post* published the article and the quoted material in footnote 18, and respectfully refers the Court to the article for its full text and context.

230.  To the extent the allegations in Paragraph 230 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 230 of the Amended Complaint.

231.  To the extent the allegations in Paragraph 231 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 231 of the Amended Complaint.

232.  Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 232 of the Amended Complaint as to the "examples" listed and the "playbook" cited in Paragraph 232 of the Amended Complaint, and respectfully refers the Court to the publications cited in footnotes 19-23 therein for their full text and context. Denies each and every allegation in Paragraph 232 of the Amended Complaint.

233.     Denies each and every allegation in Paragraph 233 of the Amended Complaint.

234.     Denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 234 of the Amended Complaint about the requirements for admission to the New York State bar. Denies each and every allegation in Paragraph 234 of the Amended Complaint.

235.     To the extent the allegations in Paragraph 235 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 235 of the Amended Complaint.

236.     Denies each and every allegation in Paragraph 236 of the Amended Complaint, except admits that Ganieva filed the initial Complaint in this action on June 1, 2021, and respectfully refers the Court to that Complaint for its full text and context. Avers that the original Complaint was nullified by the filing of the Amended Complaint by Ganieva and is no longer operative.

237.     Denies each and every allegation in Paragraph 237 of the Amended Complaint, except admits that on July 19, 2021, Mr. Black filed Counterclaims with his Answer to the original Complaint and respectfully refers the Court to that Answer and Counterclaims for their full text and context. Avers that those Counterclaims were nullified by the filing of the Amended Complaint by Ganieva and are no longer operative.

238.     Denies each and every allegation in Paragraph 238 of the Amended Complaint, except admits that on July 19, 2021, Mr. Black filed Counterclaims with his Answer to the original Complaint and respectfully refers the Court to that Answer and Counterclaims for their full text and context. Avers that those Counterclaims were nullified by the filing of the Amended Complaint by Ganieva and are no longer operative.

239.     Denies each and every allegation in Paragraph 239 of the Amended Complaint.

240.     Denies each and every allegation in Paragraph 240 of the Amended Complaint.

241.     Denies each and every allegation in Paragraph 241 of the Amended Complaint. Avers that counsel for Mr. Black has offered to provide a copy of the Agreement to counsel for Ganieva, subject to the terms of a standard court-ordered protective agreement or an interim agreement between the parties not to publicize documents produced in litigation, and provided a draft of such an agreement to counsel for Ganieva. Avers that counsel for Ganieva refused to discuss such an agreement.

242.     To the extent the allegations in Paragraph 242 of the Amended Complaint call for legal conclusions, no response is required. To the extent any response is required, denies each and every allegation in Paragraph 242 of the Amended Complaint, except admits that NYC Admin. Code §§ 10-1103 & 10-1104 contains the quoted language.

243.     To the extent the allegations in Paragraph 243 of the Amended Complaint call for legal conclusions, no response is required. To the extent any response is required, denies each and every allegation in Paragraph 243 of the Amended Complaint, including those contained in footnote 24, except admits that the GMVA does not contain an anti-retaliation provision.

244.     To the extent the allegations in Paragraph 244 of the Amended Complaint call for legal conclusions, no response is required. To the extent any response is required, denies each and every allegation in Paragraph 244 of the Amended Complaint, except admits that the GMVA does not contain an anti-retaliation provision.

245.     Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Amended Complaint, and otherwise denies each and every allegation in Paragraph 245 of the Amended Complaint.

INDEX NO. 155262/2021
RECEIVED NYSCEF: 09/08/2021

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 270 of 349

246.    Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Amended Complaint, and otherwise denies each and every allegation in Paragraph 246 of the Amended Complaint.

247.    To the extent the allegations in Paragraph 247 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 247 of the Amended Complaint.

248.    To the extent the allegations in Paragraph 248 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 248 of the Amended Complaint.

249.    To the extent the allegations in Paragraph 249 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 249 of the Amended Complaint.

250.    To the extent the allegations in Paragraph 250 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 250 of the Amended Complaint.

251.    To the extent the allegations in Paragraph 251 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 251 of the Amended Complaint.

252.    To the extent the allegations in Paragraph 252 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 252 of the Amended Complaint.

253.   To the extent the allegations in Paragraph 253 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 253 of the Amended Complaint.

254.   To the extent the allegations in Paragraph 254 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 254 of the Amended Complaint.

255.   To the extent the allegations in Paragraph 255 call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 255 of the Amended Complaint.

256.   Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Amended Complaint, and otherwise denies each and every allegation in Paragraph 256 of the Amended Complaint.

257.   Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Amended Complaint, and otherwise denies each and every allegation in Paragraph 257 of the Amended Complaint.

258.   To the extent the allegations in Paragraph 258 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 258 of the Amended Complaint.

259.   To the extent the allegations in Paragraph 259 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 259 of the Amended Complaint.

260.     To the extent the allegations in Paragraph 260 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 260 of the Amended Complaint.

261.     To the extent the allegations in Paragraph 261 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 261 of the Amended Complaint.

262.     To the extent the allegations in Paragraph 262 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 262 of the Amended Complaint.

263.     To the extent the allegations in Paragraph 263 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 263 of the Amended Complaint.

264.     To the extent the allegations in Paragraph 264 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 264 of the Amended Complaint.

265.     To the extent the allegations in Paragraph 265 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 265 of the Amended Complaint.

266.     To the extent the allegations in Paragraph 266 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 266 of the Amended Complaint.

267.    Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Amended Complaint, and otherwise denies each and every allegation in Paragraph 267 of the Amended Complaint.

268.    To the extent the allegations in Paragraph 268 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 268 of the Amended Complaint.

269.    To the extent the allegations in Paragraph 269 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 269 of the Amended Complaint.

270.    To the extent the allegations in Paragraph 270 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 270 of the Amended Complaint.

271.    To the extent the allegations in Paragraph 271 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 271 of the Amended Complaint.

272.    To the extent the allegations in Paragraph 272 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 272 of the Amended Complaint.

273.    To the extent the allegations in Paragraph 273 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 273 of the Amended Complaint.

274.    Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Amended Complaint, and otherwise denies each and every allegation in Paragraph 274 of the Amended Complaint.

275.    To the extent the allegations in Paragraph 275 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 275 of the Amended Complaint.

276.    Denies each and every allegation in Paragraph 276 of the Amended Complaint.

277.    To the extent the allegations in Paragraph 277 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 277 of the Amended Complaint.

278.    To the extent the allegations in Paragraph 278 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 278 of the Amended Complaint.

279.    Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Amended Complaint, and otherwise denies each and every allegation in Paragraph 279 of the Amended Complaint.

280.    To the extent the allegations in Paragraph 280 of the Amended Complaint call for legal conclusions, no response is required. Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Amended Complaint, and otherwise denies each and every allegation in Paragraph 280 of the Amended Complaint.

281.    To the extent the allegations in Paragraph 281of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 281 of the Amended Complaint.

282.     To the extent the allegations in Paragraph 282 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 282 of the Amended Complaint.

283.     To the extent the allegations in Paragraph 283 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 283 of the Amended Complaint.

284.     To the extent the allegations in Paragraph 284 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 284 of the Amended Complaint.

285.     Mr. Black incorporates by reference his pleadings in response to the preceding Paragraphs of the Amended Complaint, and otherwise denies each and every allegation in Paragraph 285 of the Amended Complaint.

286.     To the extent the allegations in Paragraph 286 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 286 of the Amended Complaint.

287.     To the extent the allegations in Paragraph 287 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 287 of the Amended Complaint.

288.     To the extent the allegations in Paragraph 288 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 288 of the Amended Complaint.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 276 of 349

289.    To the extent the allegations in Paragraph 289 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 289 of the Amended Complaint.

290.    To the extent the allegations in Paragraph 290 of the Amended Complaint call for legal conclusions, no response is required. To the extent a response is required, denies each and every allegation in Paragraph 290 of the Amended Complaint.

## PRAYER FOR RELIEF

Denies that Ganieva has suffered any cognizable injury or damages entitling her to any legal recourse, and denies that Ganieva is entitled to any such relief, whether monetary, compensatory, punitive, declarative, equitable, costs, and/or fees relating to this matter, or in any other form sought by Ganieva.

## AFFIRMATIVE AND OTHER DEFENSES

### First Defense

The Amended Complaint fails to state a claim upon which relief may be granted.

### Second Defense

Ganieva's claims are barred by the existence of a signed, valid release.

### Third Defense

Ganieva's claims are barred by waiver and/or estoppel.

### Fourth Defense

Ganieva's claims are barred, in whole or in part, based on the doctrine of unclean hands as a result of her misconduct.

### Fifth Defense

Ganieva's claims are barred by reason of her unlawful conduct.

68

Case 1:21-cv-08824-PAE    Document 105-1    Filed 04/18/22    Page 277 of 349

## **Sixth Defense**

All of the statements Mr. Black is alleged to have made about Ganieva were either true or substantially true.

## **Seventh Defense**

All of the statements Mr. Black allegedly made about Ganieva were protected by his qualified privileges to make them, including the self-defense privilege and the *Chapadeau* privilege for statements involving matters of public concern, and Mr. Black's statements about Ganieva were not made with actual malice or gross irresponsibility.

## **Eighth Defense**

Ganieva is a limited purpose public figure, and the alleged defamatory statements were not published with an intent rising to constitutional malice and cannot be demonstrated by clear and convincing evidence.

## **Ninth Defense**

Any statements that Mr. Black has allegedly made about Ganieva were made in good faith.

## **Tenth Defense**

Ganieva's defamation claim fails because the alleged harm and damages sustained by Ganieva, if any, are the result of the acts and/or omissions of Ganieva or other entities, not of Mr. Black.

## **Eleventh Defense**

Ganieva's claims are barred because Mr. Black's alleged statements were not the proximate cause of Ganieva's alleged injuries.

69

### Twelfth Defense

The alleged defamatory statements were not published negligently, in reckless disregard of their truth, with gross irresponsibility, wantonly, or maliciously.

### Thirteenth Defense

All sexual encounters alleged to have taken place between Ganieva and Mr. Black were consensual.

### Fourteenth Defense

Ganieva's claims are barred, in whole or in part, because they implicate New York's anti-SLAPP statute, N.Y. Civil Rights Law § 76-a, and Ganieva has failed to allege actual malice.

### Fifteenth Defense

To the extent Ganieva bases her Gender-Motivated Violence Act claim on any conduct that occurred prior to June 1, 2014, those claims are barred by the applicable statute of limitations set forth in Admin. Code § 10-1105.

### Sixteenth Defense

Ganieva's claims are frivolous and are merely an attempt to preempt Mr. Black's lawful claims against her.

### Seventeenth Defense

The alleged harm and damages sustained by Ganieva, if any, are speculative.

### Eighteenth Defense

Ganieva has sustained no cognizable injury by reason of any wrongful conduct by Mr. Black. Ganieva makes only conclusory allegations of damages.

### Nineteenth Defense

Mr. Black's alleged conduct did not cause any loss of revenue or income to Ganieva. Ganieva makes only conclusory allegations of economic harm and has not alleged any facts demonstrating actual pecuniary loss or special damages.

### Twentieth Defense

Without conceding that Ganieva has suffered any damages as a result of any alleged wrongdoing by Mr. Black, Ganieva has failed to mitigate or minimize her alleged damages.

### Twenty-First Defense

Without conceding that Ganieva has suffered any damages as a result of any alleged wrongdoing by Mr. Black, any "damage" incurred by Ganieva as a result of any alleged wrongful conduct should be offset by the value of the substantial sums of money that Ganieva unlawfully obtained from Mr. Black.

### Twenty-Second Defense

Ganieva fails to state a claim for punitive damages.

### Twenty-Third Defense

Ganieva has not adequately pleaded extreme and outrageous conduct, intent, or severe emotional distress for her intentional infliction of emotional distress claim.

### Twenty-Fourth Defense

Ganieva's intentional infliction of emotional distress claim is duplicative of her defamation claims.

71

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 280 of 349

## **Twenty-Fifth Defense**

Ganieva fails to state a claim for retaliation under the GMVA, including because there is no anti-retaliation provision in the GMVA, because Mr. Black's filing of counterclaims was not retaliatory, and because the original filing of such counterclaims has been nullified.

Mr. Black is not knowingly waiving any affirmative defense and hereby expressly reserves the right to amend his Answer and include all such defenses as may become available or apparent during pretrial proceedings of this action.

**WHEREFORE,** Mr. Black respectfully requests that this Court:

(a)     Dismiss the Amended Complaint in its entirety with prejudice;

(b)     Award Mr. Black the costs of defending against the suit, including reasonable attorneys' fees and expenses;

(c)     Impose sanctions on Ganieva and her attorneys pursuant to NYCRR 130-1.1 for engaging in frivolous conduct, making material factually false statements, engaging in conduct undertaken primarily to harass and maliciously injure Mr. Black, and failing to conduct reasonable inquiry and diligence; and

(d)     Grant such other and further relief as the Court deems just and proper.

Dated: September 8, 2021
         New York, New York

Respectfully submitted,

E. Danya Perry
Peter A. Gwynne
PERRY GUHA LLP
35 East 62nd Street
New York, New York 10065
Email: dperry@perryguha.com
Telephone: (212) 399-8330
Facsimile: (212) 399-8331

*Attorneys for Defendant Leon Black*

# Exhibit 5

# Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------------X

GUZEL GANIEVA,                                  :
                                                :
                        Plaintiff,              :        Civil Action
                                                :        No.:155262/2021
              v.                                :
                                                :
LEON BLACK,                                     :        **[PROPOSED] SECOND**
                                                :        **AMENDED COMPLAINT**
                        Defendant.              :
                                                :        **Jury Trial Demanded**

-----------------------------------------------------------------------X

Plaintiff Guzel Ganieva ("Plaintiff") brings this Second Amended Complaint against

Defendant Leon Black ("Black" or "Defendant"), and hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      On April 8, 2021, Bloomberg published an article that contained the following

statements by Defendant Leon Black about Plaintiff Guzel Ganieva:

> "I foolishly had a consensual affair with Ms. Ganieva that ended
> more than seven years ago," Black said in the statement Thursday.
> "Any allegation of harassment or any other inappropriate behavior
> towards her is completely fabricated. **The truth is that I have been
> extorted by Ms. Ganieva for many years and I made substantial
> monetary payments to her, based on her threats to go public
> concerning our relationship,** in an attempt to spare my family from
> public embarrassment."

> Black had previously planned to step down by the end of July as
> CEO of the firm he co-founded. He said that, on advice from his
> counsel, he asked criminal authorities several weeks ago to
> investigate Ganieva.[1]

---

[1]     Gillian Tan, *Black Says He Paid to Hide Affair, Denies It Led to Apollo Exit*, Bloomberg,
(April 8, 2021, 10:04 PM), https://www.bloomberg.com/news/articles/2021-04-09/black-says-he-
paid-to-hide-affair-denies-it-led-to-apollo-exit, (emphasis added).

2.  Everything that Black said in the above statement about Ms. Ganieva is false. First, Black did not have "a consensual affair" with Ms. Ganieva. Second, any telling of "harassment" or "inappropriate behavior" by Black towards Ms. Ganieva is not fabricated. As described below, such words do not come close to the appalling forced sexual misconduct that Black inflicted on her. Third, Black has never been "extorted by Ms. Ganieva," much less for "many years." Disgustingly, he used his extreme power and wealth to coerce her into signing a non-disclosure agreement ("NDA") in October 2015 precisely because he knew what he had done to her was shocking, evil and exposed him to potential criminal charges.

3.  The only repeated threats for many years came from Black to Ms. Ganieva that if she did not sign the NDA, take his hush money and retreat into silence forever, she would feel the brunt of his true wrath. He said many times to her:

**"If you do not take the money, I will put you in prison."**

**"If you do not take the money, I will destroy your life."**

4.  Fourth, Ms. Ganieva never "threatened to go public" about Black regarding anything. As the people within Black's inner circle know, the suggestion that Black attempted to spare his family public embarrassment about their involvement is ridiculous.

5.  For years, Black ate countless meals with Ms. Ganieva in 5-star restaurants, took her to Broadway shows, numerous art shows, museum exhibitions, private parties, the movies, including the premier of The King's Speech and even sat beside her while he cheered for the New York Knicks at MSG. In the midst of all these very public outings, Black never once worried about sparing his family from public embarrassment.[2] In fact, he never worried about people associating

---

[2]  Nor did he care about being seen out with other young women, often of Russian descent, in addition to Ms. Ganieva.

him with Ms. Ganieva because he enjoyed being seen with her in public. What Black has worried about, however, is being exposed for the sadist that he is.

6.      On October 29, 2020 during an earnings call, in connection with his announcements about his future role at Apollo Global Management ("Apollo"), Black publicly stated:

> "**There has never been an allegation by anyone that I engaged in any wrongdoing, because I did not.**"

7.      This and similar subsequent false claims by Black, including his January 25, 2021 statement in connection with his "retirement" as CEO of Apollo in which he stated, "I did not engage in any wrongdoing or inappropriate conduct" in relation to Jeffrey Epstein served as the tipping point for Ms. Ganieva. Having recently educated herself in law school and knowing that many of Black's sexual acts were against her will and without her consent, she no longer was willing to stand by and allow him to escape accountability.

8.      Knowing that her public outing of his disgusting conduct would surely end any further monetary payments from Black, *i.e.*, his "hush money," she did so regardless.

9.      On March 17, 2021, Ms. Ganieva bravely posted on Twitter that Black was a "predator" that had "sexually harassed and abused" her for years. The next morning, Black texted Ms. Ganieva to call him immediately. She refused.

10.     Knowing that he could no longer control her into silence, Black resorted to a tact that has been used by wealthy and powerful men like him who had committed sexual misconduct – he made a preemptive claim of extortion.[3]

---

[3]     Too many examples exist to include here of wealthy male sexual harassers re-victimizing their victims by accusing these women of extortion after they came forward. A number of high profile examples, some of whom also have close ties to Black as described below, are detailed *infra* at ¶ 232. Threats of extortion are potentially far more damaging and frightening to a female accuser

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 286 of 349

11.     By making a baseless or manufactured "extortion" claim, the female accuser is victimized one more time in a public way, often including threats of criminal charges.  As demonstrated by Black, this is accomplished by his going to the "criminal authorities" to accuse Ms. Ganieva of extortion and placing her on the legal defensive before she can take any legal action against him – just in case she planned on or considered doing so.

12.     Although heinous and disgusting, Ms. Ganieva had been threatened by Black for years that if she disobeyed him, he would **"put her in prison,"** and to speak out would be **"suicide."**

13.     For too long, wealthy and powerful men like Black have enjoyed an unequal and grossly imbalanced access to justice unavailable to the average man or woman and non-millionaires.  Knowing the right lawyers and politicians provided Black with the ability to do exactly as he said:

**"Ask criminal authorities to investigate Ganieva."**

14.     Threatening that a criminal charge will be brought against Ms. Ganieva first will not save Black from the truth about what he has done.  Nor will she be deterred by any baseless, retaliatory and unlawful counterclaims that have been asserted against her in this action, despite the immense potential liability and risks these claims could mean.  As chronicled below, the truth will reveal a violent, abusive, predatory, vindictive and brutal side to Black that he has shielded from public view for decades.

15.     Black defamed Ms. Ganieva by making the above statements.

---

than threats of a civil lawsuit for defamation, an option that numerous men accused of sexual misconduct use for similar reasons.

4

## JURISDICTION AND VENUE

16.    The Court has personal jurisdiction pursuant to Civil Practice Law and Rules

("CPLR") § 301, *inter alia*, because Plaintiff and Defendant reside in New York.

17.    Venue is proper in this County pursuant to CPLR § 503 because a substantial part

of the events giving rise to Plaintiff's claims took place in New York County.

## PARTIES

18.    Plaintiff Guzel Ganieva resides in the state of New York, New York County.

19.    Defendant Leon Black resides in the state of New York, New York County.

## FACTUAL ALLEGATIONS

**I.**    **Leon Black's Orchestrated Secrecy of His Sexual Violence and Deviance**

20.    Like a master chess player, Black was many moves ahead of Ms. Ganieva from the

moment he met her.  Black picked Ms. Ganieva out of a crowd on March 8, 2008, while attending

an International Women's Day event held at Donald Engel's UES home.[4]  Ms. Ganieva was invited

by a woman who she knew through modeling. This woman also knew Black.  The event included

Russian musicians and a number of other Russian-speaking guests, including other models.

21.    A single mother in her early twenties (she was 25), having moved from Russia to

the United States by herself, it was easy work for Black to convince Ms. Ganieva to dine with him

at La Grenouille where he planned to tell her how he could help her with her "future."

22.    This is exactly what Black did.

---

[4]    Donald Engel knew Black from Drexel Burnham.  It has been alleged that it was Donald
Engel who arranged for the beautiful "girls" to be present at the infamous annual Drexel Burnham
conferences that came to be known as the "the predators' ball."  Linette Lopez, *Here's What
Happened When I Went To Vegas With 1,800 Hedge Fund Managers*, (May 22, 2014),
https://www.businessinsider.com/what-hedge-fund-managers-do-in-vegas-2014-5.

5

23.     It was a choreographed plan that allowed him to quickly gain Ms. Ganieva's trust. Common sense suggests that he had used this tactic before, and in fact, Ms. Ganieva later met at least two other women that were similarly involved with Black.  Over the course of several dinners, Black repeatedly praised Ms. Ganieva on her innate talent and intellect, "arranged" a few appointments for her, for example, one with the Creative Artists Agency, LLC ("CAA") in Los Angeles.  These efforts helped him quickly gain her gratitude and admiration.

24.     Ms. Ganieva was pleased that a successful businessman that she admired found her conversation and company enjoyable.  As the person in charge of thousands of employees, Ms. Ganieva believed Black understood the value and importance of reliable, secure employment, and intended to help her move beyond simply modeling.  Naïvely, Ms. Ganieva believed that Black was not interested in her sexually, particularly because she told him that their relationship would not be sexual.

25.     It was her intention and hope that Black would serve as a mentor to her professionally.

26.     Black, however, is a ruthless planner and a man that gets what he wants.  It was not long before he managed to secure his ability to get Ms. Ganieva alone with him, out of sight from the public or his own employees.

27.     Once he did, Black forced sadistic sexual acts on her, some of which are described below, without her consent and despite her saying "no."

28.     The first time it happened, in 2008, Black took Ms. Ganieva to a studio apartment with a mattress on the floor and no other furniture.  Black said that a young woman lived there. Humiliated and in shock, Ms. Ganieva never uttered a word about what he had done to her.

6

29.     In a sad but predictable pattern, for the next several years Ms. Ganieva endured a cycle of intimidation, abuse and humiliation by Black that on numerous occasions included forced sexual conduct against her will.  As described below, many of these instances were perpetrated by Black in order for him to indulge in sadistic sexual acts that were physically painful to Ms. Ganieva and to which she never consented.  In addition to causing intentional physical pain, Black engaged in these acts because he derived pleasure from humiliating and debasing Ms. Ganieva.

30.     After these acts of violence, Ms. Ganieva would tell Black to never speak to her or contact her again.  Inevitably, after waiting weeks and sometimes several months, being a master manipulator, Black would engage in remorseful and conciliatory behavior, relentlessly – until he could induce her to meet him again.

31.     Black's persuasion tactics included endless promises in line with the mentor that she wanted him to be for her, such as: to help with Ms. Ganieva's child's educational opportunities; to finance a movie for her that she could produce or direct, after convincing her that acting was too difficult a business; to purchase a townhouse and turn it into an art museum that Ms. Ganieva could manage or be a director of; and to help her with an application to Harvard Business School because of his strong relationships there.  She believed his promises, and in fact, she was aware that Black had purchased an art gallery and hired another woman that he had been sexually involved with to run the gallery.

32.     Even during these periods of overt remorseful and conciliatory behavior, Black nevertheless engaged in textbook harasser conduct.  Specific details about each instance of Black's derogatory and controlling conduct towards Ms. Ganieva are too much to include in this Amended Complaint, but by way of example only, included such things as:

7

- Ubiquitous, constant belittling;

- Falsely accusing her of being jealous to deflect from his own hideous conduct;

- Pretending not to listen to or understand Ms. Ganieva when she said something he did not like, especially when it involved her attempts at cutting off communication;

- Forcing her to walk behind him;

- Forcing her to wait for his permission to speak;

- Punishing her by yelling and screaming if she did not speak to him "nicely";

- Insisting that she speak to him in a pleasing, pleasant or otherwise "happy" and "nice" manner and yelling at her if she failed to do so;

- Insisting that her text messages also be sufficiently pleasant;

- Criticizing her appearance by saying she needed to lose weight or improve certain parts of her body;

- Criticizing her clothing and make-up;

- Berating her for refusing to agree to threesomes with other women and Black;

- Intentionally making her feel stupid and inferior to him; and

- Physically intimidating her by such acts as clenching his fists, pounding nearby pieces of furniture, repetitive cracking of his knuckles and otherwise using his formidable 6'5" and 300+ pound body to intimidate her.

## II.   **Black's Violent Sexual Acts Against Ms. Ganieva**

33.     Black, the powerful and ruthless Wall Street titan, was also ruthless and overpowering in his sexual conquests.

34.     Unfortunately for Ms. Ganieva, during many, but not all, of her sexual experiences with Black, he REDACTED on Ms. Ganieva in order to achieve sexual arousal and gratification.

35.     Ms. Ganieva made it known to Black that she did not consent to his abnormal and atypical behaviors.  Black knew she did not consent.

36.     

37.     REDACTED

38.     REDACTED

39.     The first time Black did this, Ms. Ganieva had no idea what was happening – REDACTED

40.     On some occasions, the pain was so extreme that Ms. Ganieva believes she lost consciousness or fainted.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 292 of 349

41.     This practice of physically hurting her,  was something from which Black derived pleasure and arousal, and knew caused Ms. Ganieva pain and distress.

42.     REDACTED

43.     REDACTED

44.     REDACTED

45.     Black, because of his abnormal and atypical sexual needs, was extremely concerned about keeping this information secret.  At the same time, Black's violent sexual behavior was a powerful way for him to exert complete physical, mental and emotional control over Ms. Ganieva and her body.

46.     At all times, Ms. Ganieva constantly feared Black.  When they were alone, she feared him physically and was unable to reject his sexual advances, too afraid to anger him or cause his temper to flare.  There were times when Ms. Ganieva physically submitted to his physical force without saying anything, afraid he would seriously hurt her.

47.     She experienced fear mentally and emotionally even when not in his physical presence.  She was always worried that she was not doing things exactly the way Black wanted her to do them.  By way of example only, Black had strong opinions about everything she did – from the way she spoke to him, to her tone of voice and what she said, to where she went on vacation, and what jobs she applied for.  In her experience, upsetting him was dangerous and she did her best to avoid it.

48.     REDACTED

49.     The fear was exhausting but Ms. Ganieva felt she could not disobey Black for fear of her physical safety.

50.     Upon information and belief, Ms. Ganieva was not the only woman who endured this specific sexual violence at the hands of Black.

51.     One woman, who has elected to be identified only as "Jane Doe," was also a victim of Black, whom she met through Jeffrey Epstein ("Epstein").

52.     In 1999, Ms. Doe was a single mother living in New Jersey with her child and commuting into midtown for a low wage position as a receptionist. She had suffered some financial setbacks and was in credit card debt.

53.     Sometime in or around 2000, Ms. Doe was introduced to Epstein by an acquaintance, a Ukrainian woman. The Ukrainian woman had called Ms. Doe repeatedly, telling her that she needed to meet this rich man, that he could help her financially and that she wanted to give him Ms. Doe's number. She initially ignored these calls. However, Ms. Doe received calls from someone named Maxwell. This woman told Ms. Doe that she really should meet Epstein, he was a powerful businessman who could help her. At the time, Ms. Doe was trying to create a skincare product but she needed financial help.

11

54.     Eventually Ms. Doe made an appointment with Maxwell to meet Epstein. She did so one day after work.

55.     When Ms. Doe arrived at 9 East 71 Street, she first met with Maxwell in an office, which had a large desk and an expensive-looking rug.  Maxwell appeared busy and distracted, but made sure to tell Ms. Doe that she was going to be introducing her to Epstein, who "picks models for Victoria's Secret."  This was strange to Ms. Doe, because although she looked much younger than her age and continued to do some modeling, she was no longer the right age to be seriously considered as a Victoria's Secret model.

56.     When Ms. Doe met Epstein, he told her all about how he "make[s] money for rich guys" and is a philanthropist.  As Ms. Doe thought about telling Epstein of her skincare product, Epstein said, "I am a massage slut…I get 2-3 massages a day, lots of women do it and they do very well."

57.     Epstein said that he would pay Ms. Doe $300 to give him a massage in a bikini for 20 minutes.  This was almost more than she earned in an entire week.

58.     Ms. Doe did so and he paid her $300.  He masturbated and wanted her to perform oral sex on him but she refused.

59.     Over the course of months, including until at least late December 2001, Ms. Doe gave Epstein massages on approximately 3-4 occasions.  Each time Epstein paid Ms. Doe $300. During these encounters, Epstein tried to convince Ms. Doe to perform oral sex on him.  Each time, Ms. Doe refused. Epstein was not happy with Ms. Doe and said she needed "to do more."

60.     Ms. Doe recalls being asked to go to Epstein's not long after September 11, 2001. She was there with a number of other guests.  The event stands out in her mind because Epstein made a vulgar and disgusting remark about the young models stranded in NYC after September

12

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 295 of 349

11, 2001. Specifically, Epstein began talking about how bad it was for foreign models who had come for fashion week and now could not leave. He said that the modeling agencies had stranded these women with no help or money.  Disgustingly, Epstein remarked that these young girls, mostly teenagers, were in such dire financial straits that they would take $100 to get "fucked up the ass."

61.     Ms. Doe also recalls that in early December 2001, she went to Miami to see the U2 "Heart" tour.  While there, Epstein called Ms. Doe out of the blue and asked her what she was doing.  Ms. Doe told him that she was just "hanging out."  Epstein said that he was in Florida and offered to fly her back to New Jersey on his plane with him.  Ms. Doe did not know how Epstein even knew she was in Florida.  Ms. Doe told Epstein that she had a plane ticket and politely declined.  Epstein was insistent that she come with him.  Ms. Doe refused, fearful of whether or not Epstein would actually fly her to New Jersey or elsewhere.  It was clear that Epstein was angry at Ms. Doe for refusing to fly back to Florida with him.

62.     Following Ms. Doe's trip to Florida, Epstein called her several times to give him a massage.  Ms. Doe declined, knowing that Epstein needed her to "do more" if he was going to pay her for a massage. However, a few months later, Ms. Doe was in desperate need for money and called Epstein for help.  Epstein sent a messenger who hand delivered a card to Ms. Doe that contained $300.  The card was engraved with the words "compliments of Jeffrey Epstein."  Ms. Doe did not have to give Epstein a massage for this payment.

63.     Shortly thereafter, Epstein called Ms. Doe and said that he was going to introduce her to someone else that may be able to "help" her.

64.     Epstein did not provide a name and she did not ask.  Ms. Doe agreed to come to Epstein's townhouse late one afternoon during the work week.

65.     There, Ms. Doe first met Black, still not knowing his name, in the hallway near the kitchen of Epstein's townhouse. He was in a business suit.  He did not introduce himself.

66.     Ms. Doe and Black took the elevator up to the third floor together to Epstein's "massage room," where Ms. Doe previously had given Epstein a massage while wearing a bikini. Black led the way.

67.     Once in the room, Black gave Ms. Doe $300, money she presumed was for a massage.  Black appeared at ease, like he knew his way around the massage room and had been there before. Black took off all of his clothes, which she also believed was for the massage she was supposed to give him.

68.     Immediately it was clear that Black had plans other than Ms. Doe giving him a massage while wearing a bikini.  He insisted that he wanted to orally copulate Ms. Doe and significantly pressured her to get on the massage table.  Black was huge – over 6'4" and 300 pounds.  He made several vulgar and disgusting comments, including repeating something about "the delicacy of kings" or the "delight of kings" in connection with "going down on a woman."

69.     The next thing she knew, Black spun her sideways on the massage table, and pushed her in a backbend over the side of the table in an incredibly painful position.

70.     Quickly, it became extremely difficult for Ms. Doe to breath, she had blood rushing to her head and she tried to yell out but was unable to.  She was afraid that she would be dropped on her head.

71.     In shock, Ms. Doe had not consented to this violent and aggressive sexual act.  Black then placed ███████ REDACTED ███████.  Ms. Doe was in terrible pain and had no idea what exactly he was doing to cause it.  Ms. Doe was not sure if Black had forced some large, terribly painful object into her vagina or ███████ REDACTED ███████

14

███████REDACTED███████. She experienced tearing pain.  Ms. Doe was in such agony that she could barely speak or breathe. She had never experienced anything like that before.

72.     At some point, while she remained upside down, Black was "finished."

73.     When Black was finished, he got dressed as if nothing had happened.  Ms. Doe went into the bathroom, in excruciating pain from the rape and in shock. She managed to get her clothes on and walk out of Epstein's home with Black.  When they exited, Ms. Doe realized it was now dark outside.

74.     After Black and Ms. Doe walked outside, Black turned to Ms. Doe and said, "I am Black."  Ms. Doe looked at Black with a confused look, because she did not know his name previously and thought he was referring to his race.  Black then said "Black, my name is Leo Black."  Ms. Doe then parroted Black by saying, "my name is [Doe], [Jane Doe]."  Black then pointed to a town car and said, "this is me."  He got into the back seat of the car and drove away.

75.     Ms. Doe, who had no medical insurance, was left to deal with the physical aftermath of what he had done on her own.  Her vagina was grossly swollen and torn. She used ice, and also took baths in an attempt to help her vagina heal.  She used over the counter products to help with the pain and to help prevent infection from the cuts and tears. For several weeks, it was painful and difficult to urinate.

76.     Weeks after the violent assault, Black called Ms. Doe.  She was shocked, because she had not given Black her phone number, and assumed that Epstein must have given it to him. Black said that he wanted Ms. Doe to meet him in New York City for lunch because he "just want[ed] to talk."

77.     Ms. Doe refused but Black was persistent.  She eventually agreed to meet him for lunch, in a public place.  They met in a restaurant located in the basement of 9 West 57th Street.

NEW YORK COUNTY CLERK 09/20/2021 06:01 PM

Ms. Doe became upset when she saw Black and started reliving the rape and sexual assault. She became so upset that she could not eat, and began crying loudly. People in the restaurant noticed and looked at the two of them. Black was visibly concerned that Ms. Doe was making a scene and tried to get her to calm down. Unable to do so, Ms. Doe left the restaurant.

78.     A few weeks later, Black called Ms. Doe again to see if she would meet him. Black said he just wanted to talk. He told her he felt "bad." Ms. Doe refused. He called again. She refused again. Finally, the third time he called, Black asked Ms. Doe to come meet him and again said that he just wanted to talk to her and "want[ed] to give her something." At the time, Ms. Doe was depressed, and allowed herself to be convinced to see him. She said she would only meet him in a public place.

79.     They met at the restaurant located in the lobby of the St. Regis Hotel. It was a Sunday evening.

80.     The two sat down and after a short conversation, without warning, Black simply placed an envelope in her lap. It contained $5,000. Ms. Doe was shocked. Black told her that the money was to help with her credit card debt.

81.     Unbeknownst to Ms. Doe, this was a "test."

82.     Predictably, not long after the dinner Black called Ms. Doe and said, "I want to see you." Ms. Doe asked why. She knew she would never allow herself to be in a position where he could physically harm her again, Ms. Doe asked him if he was trying to give her more money. Taken aback, Black exclaimed "I just gave you $5,000!"

83.     Ms. Doe refused to see him again. She failed his test.

84.     A few months later, Ms. Doe was walking down the street when Black came walking out of an exclusive, members only restaurant.  Black recognized Ms. Doe immediately and said to her, "you look great! How are you?"  Ms. Doe answered quickly that she was fine and kept walking.

85.     A couple of weeks after Black raped her, she confided in a friend about what happened.  This friend reacted poorly and told her that if she told anyone what Black had done, no one would believe her.  From then on, Ms. Doe decided she would not tell her story.  Until now.

III.     **Leon Black's Public Statements About His Relationship with Jeffrey Epstein**

86.     There has been, and remains, much mystery surrounding the infamous Epstein, and just how he became an ultra-wealthy and powerfully connected person.

87.     Indeed, Epstein had a modest upbringing in Coney Island, New York, did not complete college, and first worked as a high school math teacher in Manhattan.  Nonetheless, he somehow rose to become an extremely wealthy person, with properties all over the world, including a seven-story townhouse in the Upper East Side, a private island in the United States Virgin Islands, a massive home in ritzy Palm Beach, Florida, and his own compound in New Mexico that he was allegedly building into its own city.

88.     Not only was he wealthy, but Epstein is believed to have had close personal ties to some of the world's most powerful politicians, businessmen, and celebrity figures, including, but not limited to, former Presidents Bill Clinton and Donald Trump, Prince Andrew, Duke of York, billionaire businessman Les Wexner, and countless others.

89.     Mystery has also surrounded how Epstein received only a mild "slap on the wrist" despite operating an alleged sophisticated sex trafficking ring in Palm Beach, Florida.  Numerous young women had come forward and accused him of engaging in sex acts with them while they were minors.  Epstein ultimately pled guilty in 2008 to just one count of soliciting an underage

17

prostitute, and ultimately spent 13 months out of an 18-month sentence in the Palm Beach County Stockade.

90.     After renewed public outcry concerning Epstein's heinous conduct and the sweetheart prosecution deal he received in 2008, Epstein was arrested again on July 6, 2019, when his private jet landed in New Jersey's Teterboro airport.  Manhattan federal prosecutors charged Epstein with sex trafficking and conspiracy to commit sex trafficking.

91.     Following Epstein's arrest, Black told Apollo investors (Apollo is the publicly traded hedge fund with over $400 billion in assets under management founded by Black where he served as then-Chairman and Chief Executive Officer ("CEO")), during a July 31, 2019 earnings call that he **"was completely unaware of and [was] deeply troubled by the conduct** that is now the subject of the federal criminal charges brought against [Epstein]." (emphasis added).

92.     On August 10, 2019, after he was denied bail, Epstein was found dead in his jail cell in the Manhattan Correctional Center.  New York's Chief Medical Examiner determined that Epstein committed suicide by hanging.

93.     Then, on October 12, 2020, the *New York Times* published an article[5] revealing that Black, one of the world's wealthiest persons with a net worth estimated at close to $10 billion, had paid Epstein tens of millions of dollars *after* Epstein's 2008 conviction.

94.     In response, Black, in an October 12, 2020, letter to Apollo's Limited Partners, stated again that:

---

[5]     Matthew Goldstein, Steve Eder and David Enrich, *The Billionaire Who Stood by Jeffrey Epstein,* (Oct. 12, 2020), https://www.nytimes.com/2020/10/12/business/leon-black-jeffrey-epstein.html.

"I was completely unaware of, and continue to be appalled by, the reprehensible conduct that surfaced at the end of 2018 and led to the federal criminal charges brought against Epstein."

"There has never been an allegation by anyone, including the *New York Times,* that I engaged in any wrongdoing or inappropriate conduct."

95.    Later that month, during an October 29, 2020, earnings call ("October 2020 earnings call"), Black reiterated that:

"there has never been an allegation by anyone that I engaged in any wrongdoing, because I did not. And any suggestion of blackmail or any other connection to Epstein's reprehensible conduct is categorically untrue."[6]

96.    Black also said:

**"Had I known any of the facts about Epstein's sickening and repulsive conduct, <u>which I learned in late 2018, more than a year after I stopped working with them</u>, I never would have had anything to do with him."** (emphasis added)

97.    Following the October 12, 2020 *New York Times* article, Apollo hired the law firm of Dechert LLP ("Dechert") to "investigate" Epstein's ties to Black and to Apollo.

98.    Dechert was also tasked with creating a report to submit to the Securities and Exchange Commission ("SEC") (the "Report").

99.    On or around January 22, 2021, Dechert released its Report[7] which recounted Black's claim that, while he was aware of Epstein's 2008 guilty plea, he "understood from Epstein that these offenses arose from *a single instance* in which Epstein had received a *massage* from a

---

[6]    A full transcript of the call and Black's prepared remarks is available here: https://www.fool.com/earnings/call-transcripts/2020/10/30/apollo-global-management-llc-apo-q3-2020-earnings/.

[7]    https://www.sec.gov/Archives/edgar/data/1411494/000119312521016405/d118102dex99 1.htm ("Exhibit 99.1").

17-year-old *prostitute*." (Report at 6, emphasis added). Of course, it was widely reported that Epstein had had sex with *countless* underaged girls, and not merely a massage on one occasion from a *prostitute*.

100.     Black claimed to Dechert that, as a result of what Epstein supposedly told him about the nature of his conviction, he thought it would "not be inappropriate to maintain a personal and professional relationship with Epstein" because: (i) Black believed Epstein had made a single "mistak[e]"; (ii) "numerous prominent figures" "continued to maintain social and business relationships with Epstein"; and (iii) because Black "believes in rehabilitation, and in giving people second chances," while "name-dropping" his relationships with Michael Milken and Martha Stewart. *Id.*

101.     Black admitted to Dechert that, up until the fall of 2018, he maintained a relationship with Epstein, whom he viewed "as a friend worthy of trust" that he confided on personal matters, attended social events with, and introduced to his family. *Id.* at 7.

102.     While Black admitted that he knew Epstein had "eclectic tastes" and "often *employed* attractive women," he claimed he did not believe that any of the women in Epstein's *employ* were underage," and was "repulsed" by the details of Epstein's crimes. *Id.* at 8 (emphasis added).

103.     Throughout Dechert's *Alice in Wonderland* narrative, the Report repeatedly (and conveniently) emphasizes that between the years 2008-2010, "**Black had no client relationship with Epstein at the time.**" *Id.* at 6.

104.     The Report further revealed that Black paid Epstein, between 2012 and 2017, a total of **$158 million** (*id.* at 4), which Black claimed were payments made to compensate Epstein — who possessed neither a college degree, nor any advanced degrees related to tax advisement or

20

estate planning — "for the overall value he believed Epstein was providing to him through Epstein's advice on trust and estate planning, tax issues, philanthropic issues, and the operation of [Black's] Family [wealth management] Office." *Id.* at 17.

105.    Despite taking on the appearance of a legitimate independent investigation, as Dechert must admit, any "conclusions" contained in the Report were based on nothing more than voluntary statements provided by willing participants, who likely prepared heavily with counsel about what they said and produced to Dechert, and may have even had counsel present when they spoke to Dechert.  Nobody testified under oath or provided sworn statements under the penalty of perjury, and it is unclear what access, if any, Dechert had to all relevant documents and evidence.

106.    Further, these "Good Samaritans" who volunteered to speak to Dechert were none other than Black's *posse*, consisting of Paul Weiss lawyers (supposedly the best and brightest legal minds in the world, but who were consistently outshined by Epstein, who could only come up with a $2 billion tax solution for Black), Apollo Global Management partners and associates, and other people with personal, professional and/or financial interests aligned with Black's.

107.    Following the Report, in a January 25, 2021, statement, Black maintained that, "**I was completely unaware of Mr. Epstein's abhorrent misconduct that came to light in late 2018,**" and repeated, "**I did not engage in any wrongdoing or inappropriate conduct.**"

108.    In what can only be described as the epitome of irony, disingenuousness and "trolling" based on how Black horrifically abused Ms. Ganieva and, upon information and belief, other women with whom he has had been involved, Black also stated that:

> "Having reflected at great length on my *professional* relationship with Mr. Epstein, … I have also decided that one way I can begin to address the grievous error of having maintained a *professional* relationship with Mr. Epstein is to pledge $200 million towards initiatives that seek to achieve *gender equality and protect and*

*empower women*, including … helping *survivors of domestic violence, sexual assault and human trafficking*." (emphasis added)

109. Though Black has, conveniently, tried to distance himself from Epstein in the wake of Epstein's death and the revelation of more sordid details about Epstein's criminal affairs, and though Black has tried his best, with the help of a well-crafted public relations and legal team, to make it appear that his and Epstein's relationship was only "professional," in reality, the two had an extremely close personal friendship, and Epstein was Black's **"best friend."**

110. As detailed herein, this relationship regularly delved into nefarious waters, and directly contradicts Black's statements to the public, to investors on the October 2020 earnings call, and to lawyers at Dechert.[8]

## IV. Black Flies Ms. Ganieva From New York City to Jeffrey Epstein's Home in Palm Beach, Florida While Epstein Was Serving His Prison Sentence in the Palm Beach County Stockade

111. One morning, in or about mid-to-late October 2008,[9] Black picked up Ms. Ganieva purportedly to take her to lunch. After she got in the car, however, Black told her that they were not going to lunch in Manhattan. Rather, he was taking her on a "trip" to Florida to see a "friend" of Black's.

112. He refused to tell her where they were going, who they were visiting, or the reason for the visit.

---

[8] A subpoena has been served on Dechert to obtain statements made by Black and by the voluntary witnesses specific to certain allegations set forth *infra*.

[9] To identify the precise date, which Ms. Ganieva cannot specifically recall, subpoenas have been served on Teterboro Airport (TEB) for records of Black's flights to Palm Beach International Airport ("PBI") in this period, as well as on PBI for any records about Black's air travel. Additional subpoenas have been served on Fixed Base Operators ("FBO") at PBI for aircraft hangar storage, maintenance, or refueling of the aircraft used for Black's turnaround flight.

113.    Black and Ms. Ganieva were driven to Teterboro Airport ("TEB"), located in New Jersey, where he and Ms. Ganieva boarded a small private jet.

114.    Once on the plane, Black finally told Ms. Ganieva where they were going and who they were going to see.  Black told her that they were flying down to Palm Beach to visit his "friend" Jeffrey Epstein.

115.    As referenced to above, earlier that year, on or about June 30, 2008, Epstein pleaded guilty to a felony charge of solicitation of prostitution involving a minor.  After being jailed full-time at Palm Beach County Stockade, at some point approximately three months in, Epstein was permitted to leave the jail on "work release" for up to 12 hours a day, six days a week.

116.    In addition to allegedly going to a work office, Epstein was permitted to spend hours away at "doctor's visits," as well as his Palm Beach home.

117.    Although Epstein pled guilty to one count of soliciting an underage prostitute, by the time he began his jail sentence, news about his sex trafficking ring had been widely reported on for several years.  Additionally, several civil lawsuits had been filed against him.

118.    Evidence strongly suggested that Epstein operated a sophisticated sex trafficking ring which involved minors, including girls as young as 12 and 14, in which he and his associates would recruit and groom underaged and/or economically disadvantaged girls and young women from the West Palm Beach, Florida and other surrounding areas to come over to Epstein's Palm Beach mansion in order to engage in sex acts with him.

119.    Repeatedly during their relationship, Black would confide in Ms. Ganieva, unsolicited, that Epstein was his **"best friend,"** as if it was a badge of honor for him.

23

120.     Notably, based on the timing of Black's trip to Palm Beach, Epstein would have only recently been allowed to leave the jail house on "work release."[10]  Of course, whereas Epstein was known to have multiple sexual partners a day, during the three months he could not leave jail, Epstein, conceivably, had less ability to engage in sexual conduct with women.

121.     During the flight to Palm Beach, after Black disclosed where he was taking her, Black sternly warned Ms. Ganieva not to tell anyone that he was flying her down to meet with Epstein.

122.     Disgustingly, Black threatened that he would plant drugs on Ms. Ganieva and frame her for a crime if she did talk about it.

123.     When Ms. Ganieva said that such threats would not work on her, Black doubled down on his threats, acknowledged that planting "minor" drugs on her would probably not be problematic, but said he would frame her with possessing "very serious" drugs that would make her family and son ashamed of her.  Black specifically used heroin as an example of an illicit drug that would be problematic for her if he planted it on her.  Afraid to make him angrier, Ms. Ganieva did not talk back.

124.     It is deeply concerning that Black's scheme to bring Ms. Ganieva to Epstein's home was something he planned, and did do, without her knowledge.  It was wholly without her consent and even worse, by the time he told her, Ms. Ganieva was powerless to do anything about it.  Black's threats to frame her for a "crime," *i.e.*, by planting drugs, such as heroin, on her, is behavior

---

[10]     Epstein's work release began on October 10, 2008.  See DOJ, Office of Professional Responsibility (OPR) Report, November 2020, at 114-115 (investigation into whether prosecutors in the U.S. Attorney's Office for the Southern District of Florida improperly resolved a federal investigation into the criminal conduct of Jeffrey Epstein) ("DOJ Report").  The Palm Beach County Sheriff's office permitted this arrangement, allowing Epstein to work out of an office for a newly formed nonprofit called The Florida Science Foundation.  Id. at 116-117.

that falls squarely within the definition of New York Penal Law Section §230.34 "Sex Trafficking" ("a person is guilty of sex trafficking if he or she […] engag[es] in a scheme … by means of instilling fear in the person [of one of eight consequences, including] "accus[ing] some person of a crime or cause criminal charges to be instituted against some person.") N.Y. Pen. L. §230.4(3)(d).

125.    After arriving at PBI, a driver affiliated with a car service picked up Ms. Ganieva and Black in a dark car, possibly a Mercedes-Benz manufactured vehicle, and drove them to Epstein's Palm Beach mansion.

126.    When Black and Ms. Ganieva arrived at Epstein's home, Ms. Ganieva saw that there was a sheriff's deputy standing outside the door.  Under the terms of the "work release" program, a prisoner like Epstein was required to pay for the services of a sheriff's deputy or similar law enforcement officer who would escort and monitor the prisoner while they were on "work release." Black even confirmed to Ms. Ganieva that the man was "a prison guard" hired to escort Epstein to and from his "work release."  The deputy smiled sheepishly at Black and Ms. Ganieva as they entered Epstein's home.[11]

127.    Black and Ms. Ganieva were greeted by Sarah Kellen ("Kellen").  Ms. Ganieva had never met Kellen before and had no idea who she was.

128.    Media reports have described Kellen as a close associate and "lieutenant" of Epstein's.  Some reports have described her as one of Epstein's victims, who also happened to

---

[11]    It was later disclosed that Epstein paid the Sheriff's office more than $128,000 for off-duty deputies wearing business suits to "guard" Epstein while he was on work release.  Additionally, the "office" for the nonprofit at which Epstein allegedly worked turned out to be the office of Jack Goldberger, one of Epstein's defense lawyers.  The "supervisor" responsible for monitoring Epstein's work previously had submitted sworn filings with the IRS that Epstein worked one hour per week for no pay.  That same supervisor, as part of Epstein's application for work release, represented that Epstein would work six days a week, twelve hours per day.  DOJ Report, at 116-117.

work for him.  Kellen is thought to be one of the unindicted co-conspirators in Epstein's sex trafficking ring, shielded from prosecution under Epstein's 2007 "Non-Prosecution Agreement" with the government.

129.    Kellen has also been described as Epstein's "personal assistant," who scheduled and managed the teenage girls and young women who came in and out of Epstein's houses, including collecting contact information, taking messages, arranging travel, and escorting the girls and women to Epstein's room.  Prison records also show that Kellen repeatedly visited Epstein while he was in prison.  Kellen has not been criminally prosecuted for her role in Epstein's sex trafficking ring.[12]

130.    Ms. Ganieva soon found herself alone with Black and Epstein in a room that appeared to be an office.  Black and Epstein were situated close to one another, each facing Ms. Ganieva while in almost supine positions, as if they were waiting for her to get on top of them. Indeed, Black indicated with his eyes that he wanted Ms. Ganieva to come and lay in between him and Epstein.  Alarmed and shocked, Ms. Ganieva remembers standing in front of them unable to

---

[12]    Kellen, however, has been identified, and her alleged conduct described in detail, in numerous civil lawsuits filed against Epstein.  For example, one civil complaint states that, "Epstein's plan and scheme reflected a particular pattern and method.  The underage victim would be brought to Epstein's (Palm Beach) mansion, where she would be introduced to Sarah Kellen, Epstein's assistant.  Ms. Kellen would then bring the girl up a flight of stairs to a bedroom that contained a massage table… [t]he girl would then find herself alone in the room with Epstein, who would be wearing only a towel…Epstein would then perform one or more lewd, lascivious and sexual acts…" *Jane Doe 7 v. Jeffrey Epstein*, Index No. 08-cv-80993 (S. Dist. FL 2008), Dkt. No. 1 (Complaint) at p. 3; *see also Jane Doe No. 1 v. Jeffrey Epstein, et. al*, Index No. 9:08-cv-80804-KAM (S. Dist. FL 2008), Dkt. No. 26 (Opinion and Order Remanding Case to State Court), at p. 3 ("Plaintiff was introduced to Kellen, who led her up the stairs to the room with the massage table…Kellen set up the massage table, laid out the massage oils, told Plaintiff that Epstein would be in shortly, and then left the room.")

say anything while they just stared up at her, saying nothing, but clearly expecting her to *do something*.

131.    As she continued to stand there in silence, Black became visibly annoyed.  He eventually told her to leave the room.

132.    After Black said this, Kellen suddenly appeared and took Ms. Ganieva into what appeared to be a living room.  Kellen first tried to make small talk, and asked Ms. Ganieva for her email address because she wanted to send Ms. Ganieva a good website to shop for clothes.

133.    Kellen then sat Ms. Ganieva down and said, in a serious but soft, feminine tone:

> **"You have to understand that [Jeffrey and Leon] are sex addicts."**
>
> **"You have to let them do whatever they want with you, and you have to let them be with multiple sexual partners if that's what they want."**
>
> **"They are very powerful, and if you don't do what they want you to do, there will be consequences that I do not want for you."**

134.    Kellen again said to her, "***you know****….*[pausing] …. something may happen to you," as her voice trailed off.

135.    Although Epstein was on work release, the heightened scrutiny of his behavior and whereabouts made his earlier pattern of cycling in underaged girls from economically disadvantaged homes in West Palm Beach on a daily basis — sometimes three or four girls a day — no longer an option.  Since he was being monitored by law enforcement, he needed to be more discreet, and could not merely enlist his associates to procure for and bring him the same young, often underaged, women that he was accustomed to having sex with.

136.    Although Black knew better than to ever actually say aloud <u>why</u> he brought Ms. Ganieva down there, all the way from New York City to Epstein (without her consent), at the time,

Ms. Ganieva was caught off-guard and too bewildered to appreciate exactly what was happening to her.

137.    Ms. Ganieva was disgusted, and she let Kellen know this. Ms. Ganieva knew that by not submitting to Epstein, she would cause Epstein and Black to be very upset, and that there would be consequences for her refusal.

138.    Soon thereafter, Black and Epstein came into the room where Ms. Ganieva sat with Kellen. The four of them sat around a table, with Black on Ms. Ganieva's left, Kellen on her right, and Epstein across from her where he could look directly at her and size her up. An attempt at awkward conversation was made. Ms. Ganieva recalls saying something about the financial crisis and remarking about the federal government's bailout of large financial institutions and the impact on jobs. Black made a comment about a couch he had bought for Ms. Ganieva's apartment. Epstein asked her a question and creepily referred to her as "love."

139.    Kellen then, in front of the men this time, brought up again her earlier comment about how Black and Epstein are addicted to sex. This time, in response to the comment, Ms. Ganieva said that sex addiction was like any addiction in that you want to have it more often and with more frequency, but at some point, it will catch up and affect your life.

140.    Ms. Ganieva noticed that her voice was getting louder and she became very self-aware that she was in a precarious situation. It is no wonder that Black refused to tell her about this planned trip until they were on his aircraft. Black was bringing her down to Florida without her consent, to satisfy the sex needs of Epstein, his "best friend."

141.    When it became clear that Ms. Ganieva would not be engaging in sex with Epstein, Epstein and Black became angry and upset with Ms. Ganieva. Not long after, Black and Ms.

28

Ganieva left Epstein's home and went back to PBI. Black was so furious he refused to speak to her.

142.    The total visit lasted no more than two hours.

143.    Back on the private plane, Ms. Ganieva was silent, still shaken from her encounter with Epstein. Black, visibly angry with Ms. Ganieva and her refusal to submit to Epstein, did not speak to her, but forcibly shoved food into Ms. Ganieva's mouth.

144.    While this was the first time Black brought Ms. Ganieva to meet with Epstein, it was not the only time Epstein crept into their relationship.

## V.    Other Evidence of Black's Close Ties to Epstein's Private Conduct

145.    Beginning in 2005, police in Palm Beach, Florida began recovering phone messages taken from Epstein's trash. These "trash pulls," yielded phone messages about the daily activities taking place at Epstein's Palm Beach home, including dozens of messages about scheduling and arranging girls to come to 358 El Brillo Way for the purpose of providing topless, bikini bottoms only or completely naked "massages." According to deposition testimony of Palm Beach Detective Joseph Recarey on June 21, 2016, the phone messages provided "critical evidence" that led to the identification of the identities of underage victims:

> Question to Det. Recarey: when you would see females' names and telephone numbers, would you take those telephone numbers and match it to – to a person?
>
> Recarey: We would do our best to identify who that person was.
>
> Question to Det. Recarey:  and is that one way in which you discovered the identities of some of the others that soon came to be known as victims?

Recarey: Correct.

<u>See</u> Notice of Documents Ordered Unsealed by Order of January 19, 2021, Exhibit F, at 12, *Giuffre v. Maxwell,* No. 15 Civ. 7433 (S.D.N.Y. Jan. 27, 2021), ECF No. 1201-15.

> Question to Det. Recarey:  Did you find names of other witnesses and people that you knew to have been associated with the house in those message pads?
>
> Recarey: Yes.
>
> Q: And so what was the evidentiary value to you of those message pads collected from Jeffrey Epstein's home in the search warrant?
>
> Recarey:  It was very important to corroborate what the victims had already told me as to calling in and for work.

See *id.* at 78:25-79:15.

146.    Included in the phone messages that were introduced as evidence in multiple civil cases against Epstein, as well as Ghislaine Maxwell, was the following message:



147.    This message, taken by Epstein's housekeeper Louella Rabuyo ("LER") on February 24, 2005 at 11:19 am, said that a female had called for Leon because she needed his number, and she left her number.  The female's name and number were redacted.

148.    At a minimum, the message reveals that as far back as 2005, Epstein's Palm Beach housekeeper Ms. Rabuyo knew Black as "Leon" and considered it part of her daily duties to take messages for "Leon," about an exchange of phone numbers with a woman, and to pass such information on to Epstein.

149.    Upon belief, the Palm Beach police were responsible for making the redactions of names and numbers from the phone messages obtained in trash pulls that were produced in various civil court proceedings, including the above message.

150.    On July 15, 2021, the court in *Giuffre v. Maxwell,* No. 15 Civ. 7433 (S.D.N.Y.), unsealed thousands of pages of previously confidential documents.  This specific phone message was released as part of that production and is available on the court's docket.

## VI.    Black's Relationship with Epstein was Used as a Tool to Control Ms. Ganieva

151.    Despite Black's public statements to the contrary, Black would regularly boast about how "great" a friend Epstein was.  He would regularly regale Ms. Ganieva with stories about Epstein's New Mexico compound with wonderment and reveal how Epstein flew around "pretty and very young girls" in his private jet, which Black described as "just jaw dropping."

152.    In particular, Black appeared most impressed by how Epstein was allegedly creating his own town in New Mexico, which he said meant that Epstein would have "his own schools," be in "control of his own hospitals," and have "his own police force."  Black seemed enthralled by the power and authority Epstein was amassing in this town that Epstein envisioned and captivated by how Epstein would effectively be "above the law" there.

153.    On one occasion, when Ms. Ganieva asked Black how Epstein makes his money, Black bizarrely told her: "he takes care of the little girls."  When Ms. Ganieva gave Black a puzzled

look, Black stared into her eyes and repeated that Epstein does take care of "little girls" (using a condescending and suggestive tone), and said he was "doing a great job with it."

154.    Ms. Ganieva understood this to mean that Epstein, widely regarded as a master manipulator and "fixer," or someone who makes arrangements for other people, especially of an illicit or devious kind, was providing Black with advice and resources to help manage the women Black was involved in outside of his marriage.  Of course, this included Ms. Ganieva.

155.    Included in the idea of "managing" such affairs, was the implied reference to ensuring that Black's secrets remained secret.

156.    Indeed, on many other occasions, often while Black was texting with Epstein, he would reiterate to Ms. Ganieva how his "**best friends**" were Epstein and Harvey Weinstein, the disgraced Hollywood film producer and convicted sex offender.

157.    Worse, Black would mention that these men were helping him to **"do"** Ms. Ganieva.

158.    When asked what he meant by this, Black said that Epstein and Weinstein gave "very good advice," and knew how to "take care" of problems.

159.    Black also would tell Ms. Ganieva that Epstein and Weinstein were "recording her" and even making a movie about her.  In an effort to veil his threats, Black would chide her and say, "what kind of director do you prefer?"  As always, Ms. Ganieva took his threats seriously.  She believed that if she obeyed Black, he would not make good on his threats.  If she did not, however, there would be consequences.

160.    Such comments were yet another reference to how Epstein, and apparently also Weinstein, provided Black with advice about how to manipulate and control Ms. Ganieva and he other women with whom Black was involved, some of whom are discussed below.

161.    Black also made multiple comments to Ms. Ganieva about Epstein's sexual proclivities, dispelling any notion that Black did not know the true extent of Epstein's depravity.

162.    By way of example only, in early 2014, while at a café in New York, Ms. Ganieva criticized Black's friendship with Epstein.  Black rebuked Ms. Ganieva.  Superfluously, he said, "you are too old for [Epstein], he likes them young."  He then added, "he wouldn't be interested in you."

163.    Black once similarly made a comment about a woman with whom he allegedly had been having a sexual relationship.  This woman, Jane Doe 1, was an attractive, Russian-speaking woman, and only a few years older than Ms. Ganieva.  Black referred to Ms. Doe 1 as now being "too old" for him.

164.    Black also told Ms. Ganieva that Epstein had an attraction to ballerinas. Disgustingly, Black boasted to her that he introduced Epstein to dancers at a ballet company that Black had connections to, and to which Epstein had apparently donated money.  Appalled, Ms. Ganieva never asked for more information.[13]

165.    Black constantly made it a point to remind Ms. Ganieva about how close he was with Epstein, and how well-connected Epstein was to rich and powerful people.  Black wanted her to believe that he was behind her introductions to other powerful men who had ties to Epstein, including Prince Andrew, and the aforementioned Weinstein.

166.    Based on Black's best friend status with Epstein, it is certain that he knew Ghislaine Maxwell ("Maxwell").  Maxwell has been dubbed as Epstein's "madam," and has been charged by

---

[13]    Years later, it was reported that Epstein preyed on young dancers using the promise of advancing their careers.  Claire Lampen, *Report: Jeffrey Epstein Used NYC Dance Studios As Recruiting Grounds*, (Sept. 3, 2019), https://gothamist.com/news/report-jeffrey-epstein-used-nyc-dance-studios-recruiting-grounds

the federal government with the crimes of enticement of minors and sex trafficking of underage girls, stemming from her connection to Epstein's sex trafficking ring. Among other criminal acts, Maxwell has been accused of personally recruiting and grooming underaged girls and young vulnerable women to have sex with Epstein and Epstein's friends.

167.     In the fall of 2013, Ms. Ganieva was approached by Maxwell at a restaurant/lounge. On the day in question, Maxwell aggressively tried to speak with Ms. Ganieva, and told her that she wanted to "**make [Ms. Ganieva] a global citizen**."

168.     Maxwell told Ms. Ganieva that she wanted to "help [her] get a passport" and that she "must call her." Maxwell then handed Ms. Ganieva her business card. Ms. Ganieva had no idea who Maxwell was, or that she was connected to Epstein, and thought her behavior was intrusive and bizarre. Ms. Ganieva never contacted Maxwell.

169.     Upon information and belief, Black had pushed Maxwell on Ms. Ganieva, likely through Epstein, after Ms. Ganieva repeatedly rebuked Black's attempts to "help" Ms. Ganieva with her immigration status, which would have only pulled Ms. Ganieva further within Black's grip and control.

170.     Notably, on multiple occasions, including during the 2015 discussions in which Black pressured Ms. Ganieva into agreeing to a non-disclosure agreement described below, Black threatened Ms. Ganieva against talking about Epstein and Epstein's relationship with Black.

171.      Black would warn that Ms. Ganieva would **"die"** if she ever spoke about Epstein and Epstein's relationship with Black, and that he would pay people to destroy Ms. Ganieva's life if she ever did so.

**VII.**     **Black's "Conveyor Belt of Women" and the Absurdity of His Extortion Defense**

172.     For many reasons, Black's claim that Ms. Ganieva attempted to extort him by threatening to make their relationship publicly known, which allegedly induced him to pay her money, is provably false.

173.     Perhaps the biggest flaw in Black's manufactured narrative is that, like Ms. Ganieva, Black made no attempt to keep secret the many women with whom he was involved throughout the years. As he often bragged to Ms. Ganieva, Black had a "**conveyor belt of women**" available to him.

174.     Black did not attempt to keep these women hidden from anyone, much less his family. Black openly traveled in social circles, including with Epstein, where men with excessive wealth like him had access to an endless supply of available, single young attractive women. It was no secret among those that know Black that he had a preference for Russian-speaking women, including many like Ms. Ganieva, who were young, had modeling experience, and may have newly arrived in the U.S. and thus did not have an extensive family or support system here.

175.     Quite simply, if Black was trying to hide the fact that he was involved with women other than his wife, including young, Russian-speaking models, he did an extremely poor job, particularly for someone who founded and ruthlessly ran a publicly traded global hedge fund with $400 billion in assets under management.

176.     Worse, there were occasions where Ms. Ganieva found herself attending the same social functions as Black and his wife. Black made absolutely no effort to keep his wife and Ms. Ganieva away from one another. Black openly pursued Ms. Ganieva at these events in front of his wife. By way of example only, this included an event in the Hamptons that took place in the summer of 2011.

35

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 318 of 349

177.     In that same summer, Black brought Ms. Ganieva over to his home in the Hamptons and tried to convince her to sleep with him in the house.  When Ms. Ganieva asked Black where his wife was, he told her that she was in the "main house."  In other words, Black had brought Ms. Ganieva to his home in order to sleep with her in what was apparently a guest house, all while his wife was next door in the main house.

178.     On another occasion, as Black and Ms. Ganieva were either entering or exiting Black's studio apartment located in a building on the southwest corner of 72nd and Park Avenue where they would usually meet, they encountered Black's wife on the street as she was walking towards her car.  Black did not act surprised or worried in any way.  In fact, there would have been no reason to be surprised given that the apartment in which Black lived with his family was located in a building on the *northwest* corner of 72nd and Park Avenue, *i.e.*, directly across from his studio. Black even brought Ms. Ganieva to the apartment where Black and his family lived.

179.     Surely if Black was worried about his wife or family knowing about his relationship with Ms. Ganieva, he would have chosen an apartment slightly farther away from where they all lived to meet Ms. Ganieva.

180.     Black even brought Ms. Ganieva to his family's home in Bedford, New York, demonstrating that his relationship with Ms. Ganieva was anything but secretive.

181.     Black also openly told Ms. Ganieva about the other women with whom he was involved.  Ms. Ganieva even met several of the other women in Black's life.

182.     For instance, a Russian woman that Ms. Ganieva knew, Jane Doe 2, had confided in her about problems with a man with whom she was involved.  At the time, Ms. Ganieva had yet to meet Black.  Ms. Doe 2 confided in Ms. Ganieva that she was "exhausted" by a man with whom she was in a relationship with and could not wait to move on her with life because she could no

longer endure him any longer.  Ms. Doe 2 kept repeating the words, "**I just cannot**." Ms. Ganieva had no idea that Ms. Doe 2 was referring to Black.  Ms. Ganieva thought that Ms. Doe 2 looked fragile, frightened and very jumpy, as if she had suffered from post-traumatic stress disorder.

183.    It was only a few months later that Black told Ms. Ganieva that he had been sexually involved with Ms. Doe 2 "for years."

184.    Ms. Doe 2 told Ms. Ganieva that she was introduced to Black by Epstein.  Ms. Doe 2 further told her that Epstein gave her advice about how to handle her relationship with Black.

185.     Upon information, Ms. Doe 2 was another victim of abuse and misconduct at the hands of Black.

186.    It defies credibility for Black to message to the public that he merely had a "professional" relationship with Epstein when Epstein was introducing Black to single young women with whom Black then became involved in relationships.

187.    Moreover, at the previously mentioned summer 2011 social event at the Hamptons in which Ms. Ganieva encountered Black and his wife, Black was also seen hugging and being affectionate with a Russian woman named Jane Doe 3.  It was obvious that Black was involved with Ms. Doe 3.

188.    Another Russian woman that knew Ms. Ganieva and Ms. Doe 3, told Ms. Ganieva that she should behave more like Ms. Doe 3 when it came to Black, implying that Ms. Doe 3 knew how to "do all the right things" with Black.

189.    Black was clearly not afraid to show affection for another woman in his wife's presence, nor to boast to Ms. Ganieva about his other relationships to make it clear to her that he regarded her as expendable and easily replaceable.

190.    Further, in or about late 2011, early 2012, while Black continued to pursue Ms. Ganieva no matter how many times she tried to end the intimacy and abuse cycle, Black also became sexually involved with another Russian-speaking model, Jane Doe 4, who was even younger than Ms. Ganieva.

191.    Black in no way attempted to hide his sexual relationship with Ms. Doe 4 from Ms. Ganieva, or anyone else.  In fact, one day in the fall of 2012, while Ms. Ganieva was walking on a Manhattan street, she encountered Black walking along with Ms. Doe 4.  No effort to avoid her was made.

192.    Perhaps not shockingly, like Ms. Ganieva, Black paid for Ms. Doe 4 to attend Columbia University.[14]

193.    Ms. Doe 4 would come up to Ms. Ganieva at Columbia and at social events and try to speak with her.  Ms. Ganieva thought it was strange and inappropriate that Ms. Doe 4 did this and tried to avoid her.

194.    Bizarrely, Black moved Ms. Doe 4 into an apartment near where Ms. Ganieva lived, and even bought her a Steinway piano, just as he had for Ms. Ganieva.

---

[14]    Significantly, Black also financed the college tuition for Ms. Doe 2 – at the same time he was doing so for Ms. Doe 4 and Ms. Ganieva.  Black's claim that it was Ms. Ganieva who asked him for money to help with school is false.  Presumably, Black will claim that Ms. Doe 2 and Ms. Doe 4 also were the ones to ask Black for thousands of dollars to fund their education in the U.S. – which provided them the ability to remain in the U.S., despite their lack of citizenship.  Epstein similarly offered to and did in fact foot education costs for numerous young women that he sexually assaulted.  Tara Palmieri, *The Women Who Enabled Jeffrey Epstein*, POLITICO, (May 14, 2021), https://www.politico.com/news/magazine/2021/05/14/jeffrey-epstein-investigation-women-487157, ("In an email to POLITICO, Oh characterized Epstein's offers of tuition and the SoHo studio as tools of his 'prolonged and repeated' sexual abuse."); *New Jeffrey Epstein Accuser Calls on Prince Andrew to Talk*, BBC, (Nov. 19, 2019), https://www.bbc.com/news/world-us-canada-50469409, ("Many of the women's accounts allege they were recruited to give massages to Epstein, with the massages leading to sexual abuse.  Many also include promises made by Epstein to help them with things like college tuition, medical expenses or advancing their careers.")

195.     Again, Black made no effort to hide his relationship with Ms. Doe 4, but rather openly flaunted it.

196.     Disgustingly, he would chastise and try to guilt Ms. Ganieva for not having threesomes with him.  Black would compare Ms. Ganieva to Ms. Doe 4, who according to Black, had threesomes with Black.

197.     The above is simply a sampling of Black's "conveyor belt of women."

198.     Like his relationship with Ms. Ganieva, Black took these women to high end restaurants, and attended social events and art exhibits together.  He took them shopping and spent thousands of dollars on them.  There is simply no way that Black was afraid of people seeing him in public with these women.

199.     Importantly, Black financially supported some of these women.  Black would do this in order to hold financial control over these women.  He would offer them a small glimpse at a better life, but only under his terms, and for so long as he could continue to manipulate and control them.  Black purposely made it so that these women became indebted to him, which enabled him to do whatever he wanted to do with or asked of them without fear of them speaking out about his conduct.

200.     In short, Black had no legitimate concern if a woman said publicly that she and Black were involved or otherwise had sexual relations – because he did not try to keep this a secret.

201.     This of course begs the question of what Black was actually concerned about becoming revealed to prompt him to want to silence Ms. Ganieva.

## VIII.   Ms. Ganieva Returns to College

202.    In 2011, Ms. Ganieva enrolled in school to finish her undergraduate degree in math. She hoped that a degree would allow her to find a job outside of modeling.

203.    Ms. Ganieva believed that going to school would occupy more of her time and make her less available to Black.  Other efforts to distance from him included cutting off most of her hair, believing that Black would find her unattractive.  Unfortunately, these efforts had thus far been mostly futile.

204.    As it turned out, Black said that he was in favor of her returning to college, and used the situation to convince Ms. Ganieva to sign a "loan" with Black.

### A.    The First $480,000 Loan

205.    One day in 2011, Black told Ms. Ganieva that he had arranged a loan for her. Despite being a financial titan with teams of lawyers at his disposal, Black presented a one-page document to her, set forth below.

206.    As stated, the "loan" included a 5% interest rate and was payable on June 1, 2016.

207.    Of course, such an amount of money was unfathomable to Ms. Ganieva and she protested that she would never be able to pay it back.  Financial control – a tried-and true tactic to achieve dominance over another, was a method Black knew intimately and understood would place Ms. Ganieva in his debt forever.



LOAN AGREEMENT BETWEEN LEON BLACK and GUZEL GANIEVA

On this day, June 2, 2011, Leon Black ("the Lender") agrees to make a loan of $480,000 ("the principal") to Guzel Ganieva ("the Borrower") on the following terms.

The principal amount will be lent over a period of two (2) years, extending over eight (8) intervals of three (3) months each, to be disbursed by bank wire transfer at the beginning of each interval:

| | | |
|---|---|---|
| $60,000 | on | June 6, 2011 |
| $60,000 | on | September 1, 2011 |
| $60,000 | on | December 1, 2011 |
| $60,000 | on | March 1, 2012 |
| $60,000 | on | June 1, 2012 |
| $60,000 | on | September 1, 2012 |
| $60,000 | on | December 1, 2012 |
| $60,000 | on | March 1, 2013 |

The principal loan will be repaid in full on June 1, 2016 and will carry a simple interest rate of 5% per annum, also to be repaid on June 1, 2016.

The Lender and Borrower have read and fully understand the terms of this Agreement and hereby consent to such terms in full.

_____          _____
Leon Black                                      Guzel Ganieva

Dated: June 2, 2011

208.    Critically, it would ensure that his criminal and deviant behavior would remain silenced.

B.    The Second $480,000 Loan

209.    Unsurprisingly, Black followed this initial loan with another one just like it in 2013:

**LOAN AGREEMENT BETWEEN LEON BLACK and GUZEL GANIEVA**

On this day, May 24, 2013 Leon Black ("the Lender") agrees to make a loan of $480,000 ("the principal") to Guzel Ganieva ("the Borrower") on the following terms. The principal amount will be lent over a period of two (2) years, extending over eight (8) intervals of three (3) months each, to be disbursed by bank wire transfer at the beginning of each interval:

| | | |
|---|---|---|
| $60,000 | on | June 1, 2013 |
| $60,000 | on | September 1, 2013 |
| $60,000 | on | December 1, 2013 |
| $60,000 | on | March 1, 2014 |
| $60,000 | on | June 1, 2014 |
| $60,000 | on | September 1, 2014 |
| $60,000 | on | December 1, 2014 |
| $60,000 | on | March 1, 2015 |

The principal loan will be repaid in full on June 1, 2018 and will carry a simple interest rate of 5% per annum, also to be repaid on June 1, 2018.

The Lender and Borrower have read and fully understand the terms of this Agreement and hereby consent to such terms in full.

_____               _____
Leon Black                                        Guzel Ganieva

Dated: May 24, 2013

210.   The two "loans," and his ability to force repayment of such an amount, allowed Black to exert even greater control over Ms. Ganieva.  Black knew the magnitude of the harm that he had inflicted on Ms. Ganieva over the years.  This money, at least in his twisted mind, was a way of excusing himself.

211.   After Ms. Ganieva finished her math degree, Black reignited his charade of promises to help her find a job.  He convinced her that with all of his powerful Wall Street connections, he would find her a job.

212.   Pathetically, Ms. Ganieva believed all of his promises and pursued leads for jobs arranged by Black for over a year.  In hindsight Ms. Ganieva knows that none of these arranged interviews were meant to be legitimate.  Rather, it was all part of Black's sick plan to make her feel grateful to him on the one hand, but also allow him to belittle and humiliate her after each job rejection.

213.   Too many examples exist of these sham interviews to detail herein, but Black used his connections at Goldman Sachs and other financial powerhouses to arrange appointments for her.  On the surface, such interviews appeared well-meaning, such as this example:

> **From:** Havis, Jenna L. [HCM]
> **Sent:** Wednesday, May 07, 2014 11:33 AM
> **To:** 'Guzel Ganieva'
> **Subject:** RE: Goldman Sachs Interview Opportunity
>
> Hello Guzel,
> Just following up to the voicemail I recently left. Curious if you are available to come onsite this
> **Friday May 9th from 11am to 1:30pm**?
> Please let me know. Thank you, Jenna
>
> On   Wednesday,   May   7,   2014,   Havis,   Jenna   L.
> <Jenna.Havis@gs.com> wrote:
> Hello Guzel,
> Please see your interview details below:

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 326 of 349

> **Friday, May 9th, 2014**
> Interviewer Time Details:
> Dana Bunting 11:00am EST 32/201
> *HCM TBD 11:30am EST 32/201*
> Pete Lyon & Alison Mass 12:00pm EST 32/201
> Julie Silverman 1:00pm EST 32/301
> Please keep in mind that all schedules are subject to change. When you arrive to our building at **200 West Street in New York**, our security team will direct you.

214.    As Black knew would happen, Ms. Ganieva never received an offer from any financial company in New York.  Desperate for work and falling for Black's claims that he was the only person that could help her, Ms. Ganieva even interviewed for jobs in London and Moscow that Black arranged, including at Goldman Sachs in London and Moscow.

215.    Predictably, Ms. Ganieva was rejected.  By way of example only, one such rejection email is as follows:

> On  Saturday,  November  29,  2014,  Lyon,  Pete <Pete.Lyon@gs.com> wrote:
> Thanks Guzel…in short, I think we just have to be patient for now…we have explored many options internally and, given the macro environment, there are no open jobs at Goldman Sachs right now that work for/are a fit for you…I also saw Paolo a few weeks ago in NYC and he told me he would keep his eyes open for you in Moscow with clients of his if they have roles/openings that make sense but that there were no immediate openings he was aware of…I wish we had better news but I think we just need to hang tight for now and if something opens that makes sense then Paolo and/or I will be in touch…thanks a lot.

216.    After yet another failed job interview, in desperation, Ms. Ganieva even asked Black if she could work as a receptionist at one of these companies.  This idea was rejected by Black.  Clearly, Black preferred her instability and dependence.  In fact, after yet another failed Goldman Sachs interview, Black said, in a perversely happy manner, that he knew her "world is shitty."

Black then used the opportunity to remind her that he is the "only one" who can help her escape her "miserable life."

## IX.   Black Rapes Ms. Ganieva, and Concocts a Scheme to Insulate Himself from Liability and Frame Ms. Ganieva as an Extortionist

217.   Ms. Ganieva always made her objection to sex with Black known.  This did not deter Black.  He continued to force sex upon Ms. Ganieva even though he knew that it was against her will.  As detailed above, that was part of how Black became sexually aroused and derived pleasure.

218.   Black, understandably, was concerned about this specific information becoming public, especially since it had gone on for several years.

219.   In the days leading up to the July 4, 2014 weekend, Ms. Ganieva became sick and was home for a number of days, unable to go to the store or cook for herself.  At the time, her child was away at summer camp.  On Sunday, July 6, 2014, Black came from the Hamptons to her apartment on East 77th Street.  Although Ms. Ganieva did not buzz him through the building entrance, one of her neighbors must have done so, because suddenly he was knocking at her apartment door.  When Ms. Ganieva opened the door, Black barged in, pushing her off to the side.

220.   Ms. Ganieva was weak and could barely walk.  Disturbingly, when Black realized what a debilitated state she was in, he became happy.

221.   Aware that Black wanted to have sex with her, Ms. Ganieva quickly began protesting that she could not and would not have sex with him.  She tried to tell him that she was in a weakened state, having been sick for almost a week.

222.   Never a match for his physical size and strength, on this day in particular Ms. Ganieva knew what fate was in store.

223.     At over 6'5" and more than 300 pounds, Black had no difficulty dragging Ms. Ganieva into the bedroom and throwing her on her back on the bed.  She was limp and unable to move.

224.     Despite her begging him to leave, he took off her clothes and his own. Inexplicably, he spared Ms. Ganieva the pain of his usual sadistic rituals described in detail above, quickly got on top of her and forced his penis into her vagina against her will.  Disgustingly, when Black was done, as he stood up and put his clothes back on, he angrily said:

**"Now I have fucked you."**

225.     Black then walked out – leaving Ms. Ganieva naked and unable to move on her bed.

226.     Ms. Ganieva was no match for the cunning and masterful manipulation of Black or his repeated and unwanted sexual conduct.

227.     Perhaps after coming to the realization that he had "gone too far" this time when he raped Ms. Ganieva on July 6, 2014, Black "huddled up" again with his legal team – some of whom, upon information and belief, also served as Epstein's lawyers – to come up with a scheme to insulate Black from criminal liability for his actions towards Ms. Ganieva.

228.     The plan was to manufacture evidence that would counter the narrative that Black forced himself onto Ms. Ganieva, and to paint Ms. Ganieva as an extortionist if she ever gained the courage to report his vile behavior.

229.     Soon after the rape, knowing that Ms. Ganieva wanted to leave New York City, Black told her he was going to give her extra money to make this happen, suggesting it would be a substantial amount.  As anyone would be, and as Black knew she would be, Ms. Ganieva was extremely grateful and appreciative, as she had been wanting to leave with her son.  As part of this substantial gift of money, he commanded her to send him text messages saying that she loved him.

When Ms. Ganieva spoke to a close family member about Black's promise of money, she mentioned his order that she had to send texts like this. At the time, not knowing his nefarious plans, it seemed odd but not worrisome, as Black had always insisted that Ms. Ganieva be affectionate when she messaged him.

230. Of course, beneath this facade was the reality that Black had, in fact, been physically, sexually and emotionally abusive towards Ms. Ganieva for years.

231. Bank records confirm that Black deposited a payment of $500,000 into Ms. Ganieva's bank account on July 30, 2014. Not long after, another deposit in excess of $150,000 was made by Black.

232. Then, in 2015, after Ms. Ganieva returned to the U.S. from Russia, the second leg of Black's plan – to frame Ms. Ganieva as an extortionist – went into motion.

233. Following the July 2014 rape, Ms. Ganieva took her son and left New York to physically distance herself from Black. Unfortunately, she was unable to fully escape his influence as it seemed that no matter where she traveled, inevitably, she happened to meet someone that knew Black, including people that worked with Black at Apollo, and Black managed to always know where she was and what she was doing.

234. In this regard, Black often called Ms. Ganieva to tell her than he knew that she had been at a certain event the night before, knew with whom she had been, even what she wore.

235. No matter the physical distance between them, Ms. Ganieva never stopped feeling threatened by Black and his power and control over her. Of course, this was precisely what he wanted.

236. It was no surprise to Black that when Ms. Ganieva was back in New York City in 2015, she asked to meet him. Ms. Ganieva wanted to know what she could do to be able to live

her life without his continued involvement.  Having planned for years about how to silence Ms. Ganieva from revealing what he had done, Black was prepared to speak with her, especially knowing that her two "loans" were coming due, and that she of course did not have one million dollars to repay him.

237.    Black claims that he surreptitiously recorded select conversations with Ms. Ganieva. It remains to be seen which specific conversations (and which parts thereof) were and were not recorded.

238.    Black knew that he had violently and viciously raped Ms. Ganieva in July 2014, and that he had physically, mentally and emotionally abused her for years.

239.    During their conversations, Black would speak about how she, Ms. Ganieva, could "harm him" if she "spoke about our relationship."  Black would also say, "I want to provide for you for the rest of your life.  What is your number?  How much do you need to be taken care of?"

240.    Feeling pressured to respond, Ms. Ganieva blurted out a number.  This made Black happy.  Clearly, the "fix" was in, and Black was giddy about Ms. Ganieva having "taken the bait."

241.    Black and Ms. Ganieva met a few additional times in 2015.  During some meetings, Black would scream, "I want to give you money… Say that you are blackmailing me."  Black offered to make regular payments to Ms. Ganieva over a period of years so long as she agreed to meet with his lawyers and sign a document.

242.    Ms. Ganieva told Black that she did not want to receive regular payments from him and would not meet with his lawyers or sign any documents.  Ms. Ganieva did not want to be bound to Black, and simply wanted to move on with her life and try to forget what Black had done to her. Ms. Ganieva made it clear that all she wanted was for Black's harassment of and control over her

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 331 of 349

to stop, and for her remaining loan obligations to be forgiven since, as Black was well aware, she was in no financial position to repay them.

243.     Black was relentless.  Black urged Ms. Ganieva to take money he was offering her in exchange for nothing "horrible" to happen to her or her child.

244.     Simply put, it was never an actual offer because refusing Black was not an option. He reminded Ms. Ganieva that if she did not take the "deal," *i.e.*, his hush money, he would make sure she ended up **"in prison"** or he would **"destroy her life."**

245.     Black also attempted to goad Ms. Ganieva into speaking about who and when people connected with Black had harassed her.  Ms. Ganieva repeated stories about people she had encountered who claimed to or appeared to know Black, and how some of them had mistreated her. Black sought to extract more and more details about some of these incidents.  This was all of course a ploy on Black's part to make Ms. Ganieva seem paranoid (and he would become elated and giggle when Ms. Ganieva said something that he thought made her seem so), in support of his quest to frame Ms. Ganieva for extortion, all coming to light now.

246.     Black eventually told Ms. Ganieva that he would pay her $100,000 every month and a certain sum of money to help with her immigration status, but only if she agreed to make it seem like it was *her* idea that Black pay her substantial sums of money in exchange for her silence.

247.     Black told Ms. Ganieva that she would receive continuing payments for as long as she kept her mouth shut about all the things Black had done and said to her, as well as what she knew about Black's relationship to Epstein.  Black threatened Ms. Ganieva's safety if she did not agree to this arrangement.

248.    Eventually, after friends of Ms. Ganieva pressured her into agreeing to Black's proposal for fear of what he would do to her if she refused, Ms. Ganieva reached out to Black, told him she did not want to fight with him any further, and would accept his money.

249.    Black then set up one last meeting at the Four Seasons restaurant on October 18, 2015, where he presented Ms. Ganieva with a one-page document.

250.    Ms. Ganieva was nervous and had difficulty understanding what it said.   She understood that it involved confidentiality -- what she later learned is referred to as a nondisclosure agreement ("NDA").

251.    Black "agreed" to allegedly forgive her loans.

252.    As to the other terms, she only read them once, quickly, and is unsure what other language is included in the document.

253.    There was no space on the document for Black to sign; only Ms. Ganieva.

254.    After she signed, he handed her another piece of paper which looked to be a copy of what she just signed.   He ordered her to sign this also.

255.    He then said to her:

**"[I will be paying you] as long as you keep your mouth shut."**

256.    Black refused to give her a copy.   He left with the documents.[15]

257.    While Ms. Ganieva desperately wanted to get out of there, Black forced her to wait while a dessert that took over 20 minutes to prepare came out.

---

[15]    There is no way for Ms. Ganieva to be sure that the language in the second piece of paper matches the language in the first document.   Although it appeared to be the same, to this day she cannot be sure what either document contains.

50

258.    While Black apparently made recordings of their conversations that he claims support his version of what happened, in reality, it was Black who was heavy-handedly trying to force Ms. Ganieva to keep silent about his years-long sexual, mental and emotional abuse in exchange for hush money.

259.    From that time until April 2021, Ms. Ganieva received regular payments from Black, via wire from an account called "E Trust."

260.    Prior to November 2015, whenever Black transferred money into her account, her bank statement recorded the funds as from "Leon D. Black," or "J. Black Trust Account."  Ms. Ganieva has no knowledge as to why payments began from the "E Trust," where the money from it originated, and why it was called "E Trust."

261.    Over the years, Ms. Ganieva asked Black numerous times to obtain a copy of what she signed that day.  He refused to respond.  By way of example only, in 2019 she wrote to him:

262.   Ms. Ganieva even retained legal counsel to demand that she receive a copy of the document. Her lawyer's February 18, 2020 and March 6, 2020 letters to Black remain unanswered.

263.   To this day, only Black has the NDA documents.

## X.   Black Says Publicly that He Has Never Committed Any Act of Misconduct

264.   On October 29, 2020, during an earnings call, in connection with his announcements about his future role at Apollo Management, Black publicly stated that:

> **"There has never been an allegation by anyone that I engaged in any wrongdoing, because I did not."**

265.   This false proclamation, and similar ones shortly thereafter, including in his above-mentioned January 25, 2021 "retirement" announcement, of Black's character and representation

52

of his clean hands deeply upset Ms. Ganieva.  Black knew what he had done to her, and that Ms. Ganieva considered many of his sexual acts to have been against her will and consent.

266.    Having enrolled in law school, Ms. Ganieva had a greater understanding of what Black had done to her physically and what he had coerced her into signing in connection with the non-produced confidentiality agreement.

267.    Knowing that Black was the one who had committed unlawful acts on her and likely other vulnerable women, and despite the threats he made to her to coerce her into signing, or knowing that whatever money she received from the mysterious E Trust may cease, Ms. Ganieva finally had the courage to say what her experience with Black had been.

268.  On March 17, 2021, Ms. Ganieva posted on Twitter the following:



269.  Thereafter, on April 8, 2021, Bloomberg published an article containing the

following statement by Black:

> "I foolishly had a consensual affair with Ms. Ganieva that ended
> more than seven years ago," Black said in the statement Thursday.
> "Any allegation of harassment or any other inappropriate behavior
> towards her is completely fabricated. The truth is that I have been
> extorted by Ms. Ganieva for many years and I made substantial
> monetary payments to her, based on her threats to go public
> concerning our relationship, in an attempt to spare my family from
> public embarrassment."
>
> Black had previously planned to step down by the end of July as
> CEO of the firm he co-founded. He said that, on advice from his

counsel, he asked criminal authorities several weeks ago to investigate Ganieva.[16]

270.     This statement was reprinted in countless publications.[17]

271.     For all of the reasons detailed above, everything Black said in the above statement about Ms. Ganieva is false.[18]

272.     Black's statement published on April 8, 2021 was made with malice.

---

[16]     Gillian Tan, *Black Says He Paid to Hide Affair, Denies It Led to Apollo Exit*, Bloomberg, (April 8, 2021, 10:04 PM), https://www.bloomberg.com/news/articles/2021-04-09/black-says-he-paid-to-hide-affair-denies-it-led-to-apollo-exit.

[17]     Josh Kosman, *Robert Kraft resigns from Apollo board amid Epstein controversy*, the New York Post, (April 12, 2021, 2:09 PM), https://nypost.com/2021/04/12/robert-kraft-resigns-from-apollo-board-amid-epstein-controversy/.

> In a statement to The Post, Black acknowledged that he knew Ganieva, but denied that he acted inappropriately toward her. "I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago," Black said in his statement. "Any allegation of harassment or any other inappropriate behavior towards her is completely fabricated." He also denied that her allegations influenced his decision to step away from the company faster than planned. In January, Black had signaled he would stay on as chairman after stepping down as CEO on July 31."This is entirely a personal matter; this matter has nothing to do with Apollo or my decision to step away from the firm." Black added that he believes he was being "extorted" by Ganieva because he had allegedly "made substantial monetary payments to her, based on her threats to go public concerning our relationship, in an attempt to spare my family from public embarrassment." The billionaire said he has referred the matter to "the criminal authorities" at the recommendation of his counsel and welcomes "a thorough investigation."

[18]     On April 12, 2021, the New York Post published yet another article, stating that, "[a]s exclusively reported by The Post last week, Black's unexpected exit on March 22 came just days after several directors on the private-equity giant's board learned of accusations of sexual harassment against him by a woman **he claimed was trying to shake him down over a 'consensual affair.'**" (emphasis added).

55

273.    Black knew that he issued a false statement of facts to Bloomberg or made the statement intending it be published with reckless disregard for the truth.

274.    Black's decision to falsely state that Ms. Ganieva extorted him "for years" is right from the playbook of scores of wealthy and powerful men, a number of whom have ties to Black, who have faced similar accusations.  Just a fraction of such examples are below:

- Harvey Weinstein alleged that Ambra Gutierrez fabricated claims of sexual assault in an attempt to blackmail him into a movie role.[19]

- Bill O'Reilly and Fox News preemptively sued producer Andrea Mackris for extortion after she came forward with sexual harassment allegations.[20]

- Paul Haggis accused Christine Lepera of extortion following her allegations that he raped her.[21]

- Alan Dershowitz sued Virginia Giuffre for defamation following her claims of sexual assault, claiming that she made the claims in part to **"extort private settlements from other, wealthier individuals associated with [Jeffrey] Epstein."**[22]

[19]    Kyle Munzenrieder, *How Tabloids Dragged Ambra Gutierrez Through the Mud After She Accused Harvey Weinstein of Groping Her*, W Magazine, (October 10, 2017), https://www.wmagazine.com/story/harvey-weinstein-ambra-gutierrez-page-six-daily-mail-smear-campaign.

[20]    Anna North, *Men like Bill O'Reilly get to make a comeback. Women who speak up about harassment lose their jobs*, Vox, (May 16, 2018, 12:30 PM), https://www.vox.com/identities/2018/5/16/17360334/bill-oreilly-returning-sexual-harassment-fox-news-back-accusers-metoo-me-too-movement.

[21]    *Post-Weinstein, These Are the Powerful Men Facing Sexual Harassment Allegations*, Glamour, (May 18, 2019), https://www.glamour.com/gallery/post-weinstein-these-are-the-powerful-men-facing-sexual-harassment-allegations.

[22]    Tom Jackman and Deanna Paul, Alan Dershowitz countersues accuser in Jeffrey Epstein case, then is sued by David Boies, The Washington Post, (November 8, 2019, 3:39 PM),

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 339 of 349

- Russell Simmons claimed that a Jane Doe suing him over an alleged rape in 1988 made up the event to extort him.[23]

275. The false and defamatory statements exposed Ms. Ganieva to hostility, contempt, ridicule and professional disgrace.

276. In order to be admitted to the New York State bar, Ms. Ganieva must pass an ethics and moral character test. Such accusations against her will negatively impact this process and cause her severe damage.

277. The false and defamatory statements imputed sexual immorality and involved criminal activity in connection with Ms. Ganieva. Such statements will inevitably cause her harm and damage in her ability to secure employment going forward, and in all of her relationships, personal and professional.

## XI. Black Asserts Retaliatory Counterclaims

278. On June 1, 2021, Ms. Ganieva filed the instant lawsuit alleging defamation and gender-motivated violence.

279. On July 19, 2021, Black, in a blatant act of retaliation, filed baseless counterclaims against Ms. Ganieva for defamation, defamation *per se*, and breach of contract (the "Counterclaims") because she protested the years of abuse she suffered at Black's hands and his attempts to besmirch her name.

---

https://www.washingtonpost.com/crime-law/2019/11/08/alan-dershowitz-countersues-accuser-jeffrey-epstein-case-then-is-sued-by-david-boies/.

[23] Ashley Cullins, *Russell Simmons Says Jane Doe's Rape Lawsuit is a "Vile" Extortion Attempt*, The Hollywood Reporter, (April 18, 2018, 6:31 PM). https://www.hollywoodreporter.com/business/business-news/russell-simmons-says-jane-does-rape-lawsuit-is-a-vile-extortion-attempt-1103734/.

Case 1:21-cv-08824-PAE  Document 105-1  Filed 04/18/22  Page 340 of 349

280.    Black commenced the Counterclaims only after Ms. Ganieva brought this action against him.  At the time the tweets were made, on March 17, 2021, this case had not been filed and nowhere were the allegations about Black's conduct involving violations of the GMVA discussed or alleged by Ganieva publicly.

281.    Black's intentions are clear, he is attempting to make good on his promise, that if Ms. Ganieva did not comply with his whims, he would "destroy [her] life."

282.    Black has chosen to bully, threaten and intimidate by causing Ms. Ganieva to fear that she may owe him substantial life-altering money as a result of the Counterclaims.

283.    To make matters worse, Black audaciously seeks to hold Ms. Ganieva legally liable for breach of contract under an alleged contract that Ms. Ganieva is not even in possession of and has been requesting a copy of for years.  Incredulously, despite repeated requests by counsel for Ms. Ganieva, Black has continued to fail to produce the NDA to Ms. Ganieva to this very day.

284.    The GMVA protects victims of violence that are specifically "motivated by gender," which occurs when the act is "committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender."

285.    While the GMVA does not expressly contain an anti-retaliation provision, the lack of express "anti-retaliation" language has not prevented courts from reading robust anti-retaliation protections into statutes to further their remedial purpose.[24]

---

[24]    For example, 20 USC § 1681 ("Title IX"), the federal law prohibiting sex discrimination in education, contains no anti-retaliation language. Nevertheless, in *Jackson v. Birmingham Board of Education*, the United States Supreme Court held that the law prohibited retaliation against a third-party teacher because, "if retaliation were not prohibited, Title IX's enforcement scheme would unravel." (544 US 167, 180 (2004)).

286.    Clearly, based on the purpose of the GMVA and how courts have interpreted similar statutes, the GMVA prohibits retaliation.

## FIRST CAUSE OF ACTION
### (Defamation)

287.    Ms. Ganieva hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

288.    As described above, Defendant Black has stated false information regarding, *inter alia*, the circumstances surrounding his relationship with Ms. Ganieva and payments made to Ms. Ganieva.

289.    These statements were untrue and defamatory in that they falsely reported, *inter alia*, that Ms. Ganieva and Defendant Black engaged in a wholly consensual relationship and that Ms. Ganieva extorted Defendant Black.

290.    Defendant Black knew or should have known that such defamatory statements were false.

291.    Defendant Black made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

292.    Defendant Black's statements constitute defamation because they impugn Ms. Ganieva's honesty, trustworthiness, dependability, and professional fitness and abilities by falsely claiming, *inter alia*, that Ms. Ganieva engaged in a wholly consensual affair with Defendant Black and that Ms. Ganieva committed a crime by extorting Defendant Black.

293.    Defendant Black's statements constitute defamation because they accuse Ms. Ganieva of committing a crime, namely, extortion.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 342 of 349

294.     Defendant Black's defamatory statements have harmed Ms. Ganieva's professional reputation and standing in her industry, have caused her economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost income, benefits, job security and opportunities for career advancement and have caused her embarrassment, humiliation and emotional injury.

295.     As a direct and proximate result of Defendant Black's defamation, Ms. Ganieva has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and emotional distress.

296.     As a direct and proximate result of Defendant Black's conduct, Ms. Ganieva has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

297.     Defendant Black's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Ms. Ganieva's rights.  As such, Ms. Ganieva is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Defamation *Per Se*)

298.     Ms. Ganieva hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

299.     As described above, Defendant Black has stated false information regarding, *inter alia*, the circumstances surrounding his relationship with Ms. Ganieva and payments made to Ms. Ganieva.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 343 of 349

300.     These statements were untrue and defamatory in that they falsely reported, *inter alia*, that Ms. Ganieva and Defendant Black engaged in a wholly consensual relationship and that Ms. Ganieva extorted Defendant Black.

301.     Defendant Black knew or should have known that such defamatory statements were false.

302.     Defendant Black made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

303.     Defendant Black's statements constitute defamation per se because they impugn Ms. Ganieva's honesty, trustworthiness, dependability, and professional fitness and abilities by falsely claiming, *inter alia*, that Ms. Ganieva engaged in a wholly consensual affair with Defendant Black and that Ms. Ganieva committed a crime by extorting Defendant Black.

304.     Defendant Black's statements constitute defamation because they accuse Ms. Ganieva of committing a crime, namely, extortion.

305.     Defendant Black's defamatory statements have harmed Ms. Ganieva's professional reputation and standing in her industry, have caused her economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost income, benefits, job security and opportunities for career advancement and have caused her embarrassment, humiliation and emotional injury.

306.     As a direct and proximate result of Defendant Black's defamation, Ms. Ganieva has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and emotional distress.

307. As a direct and proximate result of Defendant Black's conduct, Ms. Ganieva has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

308. Defendant Black's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Ms. Ganieva's rights. As such, Ms. Ganieva is entitled to an award of punitive damages.

309. Ms. Ganieva hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

310. Defendant Black made defamatory statements with malice and with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

311. Defendant Black's statements constitute defamation *per se* because they impugn Ms. Ganieva's honesty, trustworthiness, dependability and accuse her of a crime.

312. Defendant Black's defamatory statements have harmed Ms. Ganieva's professional reputation and standing in her industry, have harmed her personal reputation, have caused her economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost income, benefits, job security and/or opportunities for career advancement, and have caused her embarrassment, humiliation and physical and emotional injury.

313. As a direct and proximate result of Defendant Black's defamation, Ms. Ganieva has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and physical and emotional distress.

INDEX NO. 155262/2021
RECEIVED NYSCEF: 09/20/2021

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 345 of 349

314.   As a direct and proximate result of Defendant Black's conduct, Ms. Ganieva has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

315.   Defendant Black's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Ms. Ganieva's rights.  Therefore, Ms. Ganieva is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

316.   Ms. Ganieva hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

317.   Defendant Black engaged in conduct toward Ms. Ganieva that is extreme and outrageous so as to exceed the bounds of decency in a civilized society; namely by, *inter alia*, subjecting her to defamatory statements and publicly accusing her of the crime of extortion.

318.   These actions were taken with intent to cause, or disregard for, the substantial probability of causing severe emotional distress.

319.   As a direct and proximate result of Defendant Black's extreme and outrageous conduct, Ms. Ganieva has suffered severe emotional distress.

320.   Defendant Black's conduct was wanton, malicious, willful and/or cruel, entitling Ms. Ganieva to an award of punitive damages.

### FOURTH CAUSE OF ACTION
### (Gender-Motivated Violence Pursuant to GMVA)

321.    Ms. Ganieva hereby repeats, reiterates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

322.     The above-described conduct of Defendant Black, including, but not limited to, Defendant Black's sexual assaults and rapes of Ms. Ganieva constitutes a "crime of violence" and a "crime of violence motivated by gender" against Ms. Ganieva as defined by the New York City Gender Motivated Violence Act, N.Y.C. Admin. Code § 8-901 *et seq.* (2017).

323.     The above-described conduct of Defendant Black, including, but not limited to, Defendant Black's sexual assaults and rapes of Ms. Ganieva, constitutes a "crime of violence" against Ms. Ganieva motivated: (i) by her gender; (ii) on the basis of her gender; and/or (iii) due, at least in part, to an animus based on her gender.

324.     Defendant Black committed a "crime of violence" against Ms. Ganieva because she is a woman and, at least in part, because he has an unlawful animus towards women.  Defendant Black's gender-motivated animus towards women is demonstrated by, among other things, his sexually violent and abusive treatment of women.

325.     As a direct and proximate result of the aforementioned gender-motivated violence, Ms. Ganieva has sustained in the past and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory damages.

326.     Defendant Black's gender-motivated violence against Ms. Ganieva entitles her to punitive damages, as well as an award of attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**
**(Retaliation Pursuant to GMVA)**

327.     Ms. Ganieva hereby repeats, reiterates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

Case 1:21-cv-08824-PAE   Document 105-1   Filed 04/18/22   Page 347 of 349

328.    The above-described conduct of Defendant Black, including, but not limited to,

Defendant Black's filing of counterclaims against Ms. Ganieva, constitutes retaliation under the

GMVA.

329.    Defendant Black committed retaliation in violation of the GMVA by filing

counterclaims against Ms. Ganieva as a result of her protected action of filing GMVA claims

against Black .

330.    A cause of action for retaliation furthers the remedial purpose of the GMVA.

331.    As a direct and proximate result of the aforementioned retaliation in violation of the

GMVA, Ms. Ganieva has sustained in the past and will continue to sustain, monetary damages,

physical injury, pain and suffering, and serious psychological and emotional distress, entitling her

to an award of compensatory damages.

332.    Defendant Black's retaliation against Ms. Ganieva entitles her to punitive damages,

as well as an award of attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against

Defendant, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendant

complained of herein violate the laws of the State of New York and the City of New York;

B.    An injunction and order permanently restraining Defendant and his partners,

officers, owners, agents, successors, employees and/or representatives, and any and all persons

acting in concert with them, from engaging in any such further unlawful conduct, including the

policies and practices complained of herein;

C.    An award of damages against Defendant, or any jointly or severally liable entity or

person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

      D.      An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

      E.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, reputational harm and harm to professional reputation, in an amount to be determined at trial, plus prejudgment interest;

      F.      An award of punitive damages, and any applicable penalties and/or liquidated damages in an amount to be determined at trial;

      G.      Prejudgment interest on all amounts due;

      H.      Dismissal of the Defendant's retaliatory counterclaims, and costs and fees incurred in defense thereof;

      I.      An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

      J.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.


Dated: _____, 2021
        New York, New York                    Respectfully submitted,

                                              **WIGDOR LLP**


                                              By: _____
                                                  Jeanne M. Christensen
                                                  Lindsay M. Goldbrum

                                              85 Fifth Avenue
                                              New York, NY  10003
                                              Telephone:  (212) 257-6800
                                              Facsimile:   (212) 257-6845
                                              jchristensen@wigdorlaw.com
                                              lgoldbrum@wigdorlaw.com

                                              *Counsel for Plaintiff*