# Exhibit B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| ~~LEON D. BLACK,~~Leon D. Black, |
| Plaintiff, |
| v. |
| ~~GUZEL GANIEVA, WIGDOR LLP, JOSH HARRIS, and STEVEN RUBENSTEIN~~Guzel Ganieva, Wigdor LLP, Joshua Harris, and Steven Rubenstein, |

~~Index~~ No. ~~21~~1:21-cv-~~8824 (~~08824-PAE~~)~~

Defendants.

**[PROPOSED] SECOND AMENDED COMPLAINT**

~~Jury Trial Demanded~~

Plaintiff Leon D. Black, by and through his undersigned ~~attorney, Susan Estrich, upon personal knowledge except where otherwise stated~~attorneys, for his Second Amended Complaint against Defendants Joshua Harris, Steven Rubenstein, Guzel Ganieva, and Wigdor LLP ("Wigdor"), alleges on information and belief as follows:

**INTRODUCTION**

~~This case arises out of two relationships that both led to an extortionate plot. The first is Mr. Black's relationship with Defendant Guzel Ganieva, a consensual sexual association between two adults. The second is Mr. Black's relationship with his former business partner Defendant Joshua Harris~~ who orchestrated a conspiracy and enterprise with Ms. Ganieva and ~~Defendant Steven Rubenstein (the "Enterprise") to take down Mr. Black, first as an attempted coup to become the CEO of the firm Mr. Black founded, Apollo Global Management Inc., and then, after Mr. Black denied him that role, to retaliate and destroy him by, among other things, weaponizing Ms. Ganieva to assassinate his character and extort even more from him.?The sexual relationship between Ms. Ganieva and Mr. Black began in 2008; was sporadic; and ended when she left the country in 2014, although she continued to profess her love for Mr. Black through numerous text messages and other communications. Ms. Ganieva returned to the United States in 2015 to extort him. In secretly taped conversations, she admitted her extortion by demanding $100 million of Mr. Black, expressly threatening to disclose and distort~~

~~their relationship to his wife and Apollo's board, as well as the press, if he did not pay her. Mr.~~ ~~Black allowed himself to be extorted, forgiving close to $1 million in loans to Ms. Ganieva;~~ ~~pledging £2 million to help secure immigration rights in the United Kingdom for her and her son;~~ ~~and agreeing to pay $100,000 every month for fifteen years, provided she maintained the privacy of~~ ~~their relationship. For six years thereafter, she did. And then she did something so economically~~ ~~irrational and inexplicable that it would make no sense other than when understood in the context~~ ~~of defendants' scheme: she walked away from the certainty of receiving $1.2 million a year for nine~~ ~~more years (having already received $9.2 million) and publicly attacked Mr. Black first on Twitter~~ ~~and then in lawsuits – lawsuits filed without even making a settlement demand first.~~At all times relevant to this Second Amended Complaint, Defendant Joshua Harris was an officer and director of Apollo Global Management, Inc. ("Apollo"), with an obligation to place the interests of Apollo and its shareholders ahead of his personal ambition. Harris's duties to Apollo included the duties of loyalty, honesty, and candor to his fellow officers and directors and, most fundamentally, a duty to subordinate his personal interests to the best interests of Apollo and its shareholders. Defendant Steven Rubenstein, Apollo's media consultant and agent, owed Apollo similar fiduciary duties. Harris and Rubenstein violated these duties by devising a fraudulent scheme to wrest managerial control of Apollo from Plaintiff Leon D. Black, Apollo's founder, CEO, and Chairman. Defendant Guzel Ganieva, in coordination with Harris and Rubenstein, made additional defamatory and false statements about Black, including through sham legal proceedings, that Defendants used to deceive and damage Apollo. Harris, Rubenstein, and

Ganieva's operation and management of this unlawful scheme – which continues to this day – violates the federal Racketeer Influenced and Corrupt Organizations Act ("RICO").

     1.    Defendants' fraudulent scheme to force Black's resignation from Apollo was centered on a secret strategy to manufacture and publicize false and defamatory stories about Black. Defendants carried out this scheme through an association-in-fact enterprise, assembled and funded by Harris, that included highly-skilled lawyers, media consultants, financial advisors, and others – some of whom were in fact being paid by and owed fiduciary duties to Apollo. The goal of the Defendants' scheme was to humiliate and defame Black – and therefore Apollo – to such an extent that Black would have no choice but to resign from the company he founded to spare Apollo from further financial and reputational injury. Ganieva, who was then extorting millions of dollars from Black in exchange for keeping secret a consensual relationship that ended many years earlier, publicized additional false and defamatory information about Black that was essential to the success of the scheme. Defendants concocted and publicized a series of defamatory statements and lies that placed significant additional pressure on Black and Apollo,

and positioned Ganieva to extort even more money from Black. Ganieva and Defendant Wigdor,

Ganieva's lawyers, then filed sham litigation falsely accusing Black of serious criminal conduct.

Mr. Harris and Mr. Black first became acquainted in the mid-to-late 1980s, when Mr. Black ran the mergers and acquisitions department and then the 500-member corporate finance group at Drexel Burnham Lambert, and Mr. Harris joined fresh out of college. After business school, Mr. Harris joined Apollo in 1991, a year after the firm's founding, as a junior employee. He was not until 2007, some 16 years later, designated as a "co-founder" of Apollo by Mr. Black even though he was not there when it started. Mr. Harris made no bones about wanting the top job for years. He asked for it and was rebuffed by Mr. Black in 2015. When news more recently came to light that Jeffrey Epstein had served as Mr. Black's financial adviser, Mr. Harris began a renewed effort to depose him and take over as CEO. In response to the Epstein news, Mr. Black did what most CEOs in his position would avoid: he requested that the independent directors of Apollo formally commission an independent outside law firm to scrutinize the situation. Senior former federal prosecutors from the Dechert law firm then investigated Mr. Black's relationship with Epstein for three months, ultimately concluding that neither Apollo nor Mr. Black had done anything wrong. That report was issued in January 2021; and its conclusions cleared the way for

the Board to promote Mr. Black's chosen successor Marc Rowan and move forward with a substantial business merger he and Mr. Black supported, while Mr. Black would remain Chairman. For Mr. Black, as Apollo's founder, CEO, and Chairman for 30 years—as well as its largest shareholder, who had never sold a single share—this was an easy decision, since Mr. Rowan was strategic and growth-oriented.

4Seeing his long-held dream of becoming CEO or Co-CEO crushed with Mr. Rowan's ascension, and enraged that Mr. Black would remain as Chairman, Mr. Harris kicked into high gear his campaign to destroy Mr. Black. Like Shakespeare's Iago, enraged by being passed over for promotion, he turned his wrath on his mentor and leader. He sought to undermine Dechert's conclusions with the Board, engaged in a whisper campaign about Mr. Black with investors, and undertook a press and legal strategy to try and salvage one last chance at the promotion he had always wanted but never received. Unbeknownst to Mr. Black, Apollo senior management, and the Board of Apollo, "co-founder" Mr. Harris convened a veritable war cabinet of advisers to take on the founder, the report, and Apollo itself—his very own company. This war cabinet, more aptly called a war council, was an ever-expanding group. It included *three* prominent political consulting/crisis management/public relations firms—Rubenstein (directed by its President, Defendant Steven Rubenstein), BerlinRosen (a firm that specifically promotes itself for its ability to "blunt the opposition's efforts" and "leverage the media" in litigation, with the "speed and intensity of a political campaign"), and Finsbury Glover Hering. It also included *three* prominent law firms engaged by Mr. Harris by January 2021 to try to undermine the decisions of his own Board and, if that did not work, to destroy Mr. Black in retaliation and retribution. Some of these firms, including one of the most prominent law firms in the world, were even representing

~~Apollo at the same time they secretly worked under Mr. Harris's direction to attack it and thus obviously were duty-bound not to act adversely to Apollo's interests.~~

~~5This war council met intensively over days and weeks, sometimes multiple times a day, including nights and weekends; they in turn set about to further their goals by contacting investors and the media, and by recruiting additional participants in their project. They kept their internal meetings and communications closely guarded secrets and deliberately avoided creating much of a record: as one email from Mr. Harris's Chief of Staff (and Apollo employee) Evan Zemsky, directed just days after Dechert's report was publicly announced, "ONLY USE SLACK WHEN COMMUNICATING WITH JOSH . . . Even if JH pings you on whatsapp -- it should go to slack." Slack is a communications platform that allows users to send what it describes as "self-destructing messages."~~

~~6Mr. Harris and his associates kept careful, indeed obsessive, track of media and metrics measuring the mentions, the popularity, the ratings and rankings of Josh Harris, Marc Rowan, and Leon Black. They received lengthy decks analyzing search results, social media mentions, and the like for each of the protagonists. They reviewed press and talking points and the like. They interviewed litigators with the intention of launching or fomenting litigation against Mr. Black, and employed an ever-expanding group of media advisors. They conscripted Apollo employees and advisors into Mr. Harris's effort to attack his own company and advance his career objectives. They even went so far as secretly recruiting a director for Apollo's board who would be sympathetic to Mr. Harris's views, and actively working to undermine the existing board, including by planting fake news stories directly attacking individual board members. But they still lacked the needed leverage over Mr. Black and were in search of a means -- or more precisely, a~~

person—who could launch a public assassination of Mr. Black without leaving their own fingerprints.

7On the eve of the presentation of the Dechert report to the Board, Mr. Harris—who had more openly been trying to undermine the integrity of the report with Apollo's own directors— was called on precisely this point by one of the three independent directors who had commissioned it. This was not his "first rodeo," the director told him, and unless Mr. Harris had evidence that Dechert did not (and Dechert examined some 60,000 documents, and conducted some two-dozen interviews), he should stop trying to undermine the report. Mr. Harris and his associates had no new evidence, but they were intent on undermining the report—and with it, Mr. Black and even Apollo—anyway. They reached out to third parties to determine, as one email documented, whether they could find anyone else who had "knowledge of additional allegations" about "LB"—Leon Black. Indeed, one of Mr. Harris's future director appointments, apparently cognizant of Mr. Harris's attempts to undermine Mr. Black, desire to oust Mr. Black as Chairman of Apollo, and willingness to weaponize women who might level accusations, warned Mr. Harris in January 2021—some two months before Ms. Ganieva sued Mr. Black in New York state court—to be ready to spring into action: "If things break, they break fast. Everything correlates. *Consider what happened to Harvey Weinstein's firm*." Mr. Black's relationship with Ms. Ganieva, of course, has absolutely nothing to do with, and is not remotely akin to, the circumstances of Mr. Weinstein's misconduct. But the implication and purpose here was clear: exploiting Mr. Black's relationship with Ms. Ganieva to fabricate a Weinstein-like situation where none actually existed.

8They thus made common cause with Ms. Ganieva, an unholy alliance in which litigation was the tinder in a larger campaign of destruction. Ms. Ganieva had managed to extort Mr. Black after their relationship ended; she had already been paid nearly ten million dollars in

~~exchange for not disclosing their affair. She wanted more. An ex-lover who wanted more money~~ ~~had the potential to do harm, given both the times and technology. She was the leverage.~~ ~~9Beginning as early as January 2021, Mr. Harris and his confederates made it their business to~~ ~~frame and spread Ms. Ganieva's lies, potentially extorting more money for her while destroying~~ ~~Mr. Black. Mr. Harris already had his personal lawyers engaged in the war council, and was~~ ~~searching for litigators on his own behalf. But inflamed by Mr. Black's refusal to name him as~~ ~~co-CEO of Apollo, he began searching for yet more lawyers to represent Ms. Ganieva to bring~~ ~~down Mr. Black. Within days of the Dechert report's completion, Mr. Harris's confederates, acting~~ ~~on his direction, began to contact law firms, not on their own behalves but apparently for an~~ ~~unidentified shadowy internal faction at Apollo that was involved in "cagey business" there.~~ ~~Among them, Alex Spiro at the Quinn Emanuel law firm. They were seeking a firm which could be~~ ~~"adverse to Leon Black." The name of the potential client was not disclosed, but a woman was~~ ~~mentioned. Eventually, the woman was identified as Guzel Ganieva.~~ Defendants' campaign to unseat Black and to extort money on behalf of Ganieva began at least as early as the fall of 2020 (and likely earlier), as Harris came to realize that Black would likely support Marc Rowan, Harris's rival at Apollo, to be Black's successor. Harris repeatedly asked Black to name him as the next Apollo CEO, but Black declined to do so. Black had long supported Rowan to be his successor and the issue had crystallized by the fall of 2020, at which point Apollo was evaluating a possible merger with Athene Holding Ltd. ("Athene"), an insurance company founded by Rowan that over time became one of Apollo's principal sources of investment capital. During the fall of 2020, Harris lobbied against Black's proposed merger and succession plans – plans that Apollo's Board later agreed were in the best interests of Apollo – because they undermined Harris's personal ambitions.

2.      On October 12, 2020, The New York Times published an article stating that, years earlier, Black had made payments totaling as much as $50 million to Jeffrey Epstein, and suggested that it was "not clear what kind of services Mr. Epstein provided to Mr. Black." Black publicly explained the nature of the financial and tax planning services Epstein had provided to Black and his family office. Black believed he had nothing to hide, and consequently asked Apollo to conduct a full investigation. In response, Apollo's independent directors retained Dechert, LLP ("Dechert"), a highly reputable law firm – independent of both Black and Apollo – to conduct a thorough investigation of Epstein's relationship with Black and Apollo.

3.      Harris, Rubenstein, and Ganieva, working through Harris's enterprise, sought to inflict unrelenting financial, professional, and personal harm on Apollo and Black, and thereby force his resignation from Apollo. Harris and Rubenstein promoted the publication of

unfavorable articles about Black, and planted flattering stories about Harris, profiling him as Black's likely successor.

4.      These initial efforts to force Black's resignation were unsuccessful. By mid-January 2021, Harris had learned that Dechert's report would exonerate Black. Harris also learned that Apollo's Board intended to go forward with the Athene merger, that Black would continue his leadership role as Apollo's CEO until his 70th birthday in July 2021, and that thereafter Black would serve indefinitely as Apollo's Board Chair. Harris also learned that the Apollo Board would appoint Rowan as CEO when Black stepped down in July 2021. Harris knew that, unless he could force Black out of Apollo before July 2021, he would never succeed Black as CEO.

5.      Defendants then escalated their campaign against Black and Apollo, engaging in even more fraudulent attacks. Among other things, Harris sought to undermine the integrity of the Dechert report, contacting Apollo's independent directors and falsely characterizing the report – the culmination of a three-month-long investigation led by one of the country's most established law firms – as a "whitewash." The day before the Dechert report was released, Harris and Rubenstein, working through an emissary, solicited a new lawyer for Ganieva who would commence and prosecute sham litigation against Black. Harris worked to undermine Black's support on Apollo's Board by nominating a new director who had provided Harris with assurances in advance that he would support Harris as Black's successor, without disclosing this arrangement to Apollo. Harris and Rubenstein also planted stories disparaging two other independent directors who Harris perceived to be loyal to Black, again without disclosure and in clear violation of their fiduciary duties to Apollo.

Some weeks later, in March 2021, Ms. Ganieva, seemingly out of the blue, took to Twitter to accuse Mr. Black of being a sexual predator. She posted just three carefully crafted tweets to a brand-new Twitter account, complete with the right hashtags, featuring three curated followers: all prominent members of the media who had covered the #metoo movement or Apollo. This was not

the work of a single woman unsophisticated in media campaigns; she was plainly well advised in a deliberate plan, in league with others. Tellingly, those three reporters, after learning more, all declined to write about her purported story. Those reporters were not the only followers of Ms. Ganieva's newly created Twitter account. In fact, Wigdor LLP ("Wigdor") partner Jeanne Christensen, who signed the complaint against Mr. Black soon to be filed on Ms. Ganieva's behalf in New York state court, was also an early follower.

~~Not coincidentally, later that month, two investigators came to Ms. Ganieva's home, showing badges, and were admitted by the doorman. The investigators supposedly told her that she should pursue claims against Mr. Black and gave her the name of a prominent litigator to contact — Spiro of Quinn Emanuel — the very same lawyer who had been contacted by an emissary of Mr. Harris at the behest of an Apollo faction previously to be adverse to Leon Black. Mr. Spiro has denied sending the investigators, and his firm declined the representation. However, Wigdor, which upon information and belief was working closely with one of the members of Mr. Harris's war council on another high profile case, ultimately agreed to take the case. Incidentally, Wigdor was not the first law firm that Ms. Ganieva retained to pursue her fictitious claims against Mr. Black. In 2019, another law firm sent Mr. Black a letter on Ms. Ganieva's behalf raising similarly trumped-up charges. Ms. Ganieva's law firm change only came about, surely not coincidentally, in the wake of the outreach by Mr. Harris's emissary.~~

~~In June 2021, represented by Defendant Wigdor, Ms. Ganieva sued Mr. Black in New York Supreme Court, bringing one outlandish complaint after another which Wigdor knew (or affirmatively chose not to know) were utterly fabricated. The twin pillars of the complaints are an alleged rape, and supposed defamation. Each of these pillars is nothing more than a tower of lies.~~

~~First, the alleged rape: Ms. Ganieva's first complaint (the "Original Complaint") centered on her allegation that Mr. Black burst into her apartment and raped her seven years earlier on July 6, 2014 (conveniently, just before the statute of limitations would expire). But she was seemingly unaware that Mr. Black retained text messages dating that far back, because her own words in the text messages showed her allegation was a complete lie. In her own words, she had *invited* Mr. Black to her apartment that evening, instructed him to bring wine and asked that he~~

~~tuck her in. In additional texts written and sent the next morning, she openly professed her love for~~ ~~him and, in the following weeks, repeatedly asked that he come see her. Ms. Ganieva knew that her~~ ~~story was false and would be shown to be false. Wigdor must have known it, could have known it,~~ ~~should have known it. Did they not even ask her if she had any texts — texts which professed love~~ ~~for the man the morning after he supposedly raped her?~~

~~The claim for supposed defamation is even more uncontrovertibly the product of Ms.~~ ~~Ganieva and Wigdor's fraud. Although he had allowed himself to be extorted in 2015, knowing~~ ~~the crime that was occurring, he engaged professional investigators to lawfully record his~~ ~~conversations with Ms. Ganieva. Not only was Ms. Ganieva caught red-handed on tape~~ ~~committing that extortion by demanding that $100 million, but in lengthy discussions that were~~ ~~recorded, she *did not even mention* any of the claims of rape that formed the basis of her newly-~~ ~~contrived suit.~~

~~Mr. Black and his lawyers repeatedly offered Defendant Wigdor the opportunity to~~ ~~review those text messages, tapes and transcripts, and for many months they declined to do so,~~ ~~agreeing only after the complaint in this action was filed. Such actions — like their failure *ever* to~~ ~~make a settlement demand before filing the complaint — would be inexplicable if these were~~ ~~legitimate complaints for legal relief rather than weapons being deployed to destroy Mr. Black.~~

~~The truth did not matter to Ms. Ganieva, Wigdor, or the Enterprise — spreading~~ ~~bald-faced lies and scurrilous allegations to destroy Mr. Black and extort even more money from~~ ~~him did. They used the courts as a vehicle, and social and mass media as an amplifier, to spread~~ ~~those lies and manipulate the public narrative. They responded to the incontrovertible proof that~~ ~~their allegations were lies with yet more lies. Pleadings showed up in the pages of *Vanity Fair*~~ ~~and the *New York Post* as they hit the docket. And most of those lies did not even have anything~~ ~~to do~~

with the claims in the case, and were thrown in solely for the public shock and humiliation value. The second complaint (the "Amended Complaint"), filed after Mr. Black had disclosed the exculpatory text messages and tapes, doubled down by taking the scheme many steps further. Not only did Ganieva and Wigdor repeat their lies from the first complaint, they added 170-plus gratuitous mentions of Jeffrey Epstein. Those included an alleged incident in which Mr. Black allegedly ***kidnapped*** Ms. Ganieva ***thirteen years earlier*** and took her to Jeffrey Epstein's Florida home for a threesome—an incident which was contradicted by both the tape recordings (she wasn't sure she had ever met Epstein) and by flight logs showing Mr. Black's plane never even touched down in the State of Florida at that time. These lies were included solely to taint Mr. Black and for the purposes of yet more destructive publicity—Mr. Epstein is utterly irrelevant to the causes of action. Notwithstanding the liberal seasoning of the successive complaints with lies about Epstein, the claims against Mr. Black (rape and defamation) remain exactly the same. The Epstein allegations are entirely gratuitous, designed only to inflict maximum harm and character assassination, with the intention of forcing Black to pay even more.

In fact, Ms. Ganieva has litigated her case in state court not like a plaintiff seeking to obtain justice as soon as possible, but like a defendant seeking to stall, obstruct and delay. Seeking to expose her illegitimate motives for bringing the lawsuit, Mr. Black has sought basic facts from Ganieva, such as her phone records in the weeks and months leading up to the filing of the case. Those records, upon information and belief, will reveal her claims to be false and will also reveal her connections to Mr. Harris and his advisors—motivated and coordinated with the Enterprise—which Ms. Ganieva to date has concealed from discovery. While Ms. Ganieva carefully crafts denials of coordination, she has obstructed basic discovery at every turn. The same is true as to other members of the Enterprise, such as public relations firm Rubenstein, which does

not deny speaking about her case to the press, but refuses to permit their denials to be tested by discovery—even just to search for phone records for calls with Ms. Ganieva. If they have nothing to hide in this respect, one must wonder, why the stonewalling?

The lawsuits provided the content for the campaign and the courts a public forum, and from there the campaign took off. In modern terms, we call it a cancellation campaign; in figurative terms, it is an orchestrated assassination attempt, using scurrilous garbage wrapped in pleading paper as the Enterprise's vehicle to spread deceit and lies, and with it the hope of an eventual huge payout. And never mind the truth: did Wigdor even ask how Ms. Ganieva could have forgotten about being kidnapped and taken to Jeffrey Epstein's house—only to remember after her first complaint was literally shredded to bits by her own love notes cited in Mr. Black's answer. Facing incontrovertible documentary evidence and the offers of more, did Wigdor stop and consider before they repeated the lies from the first version of the complaint in the second, and the second in the third? Willful blindness and conscious avoidance amount to intent in the criminal law, and surely no more is required in the civil law.

The Defendants have used and abused the resources of the New York courts not to redress legitimate grievances, much less to advance the "Me Too" movement. Wigdor has represented many women who have been abused, but not here. The Enterprise, in invoking the movement as they have, is taking advantage of—and perverting—the efforts of reformers to protect women who, unlike Ms. Ganieva, are victims (and, hopefully, someday survivors), not criminals themselves. Were it not for the suffering of so many women whose pain has too often been ignored, Defendants would never have been able to get the attention—and inflict the harm—that they have. That they have bootstrapped their fraudulent, extortionate, and defamatory claims onto the legitimate movement to protect women against true harassment and abuse is especially

reprehensible. Destruction by accusation, using the justice system as a vehicle, does nothing to help the millions of women who continue to deal with real harassment, and will find nothing in common with Ms. Ganieva or her co-conspirators.

This is not just the work of one woman. Ms. Ganieva needed support. The participants needed each other, and benefited from each other's participation, when not working directly together. She needed her lawyers to file the phony complaints, packaging the lies as pleadings in an attempt to protect them from defamation claims, and abusing the attorney-client privilege to hide the work they did together to invent these stories and conceal her earlier extortion of Mr. Black. She needed the attention of the media. Mr. Harris worked hand in glove with experienced public relations agents he had both from Apollo and as owner of the 76ers, and he integrated them into his war council as he sought to destroy Mr. Black and win the top job at Apollo. In contrast, Ms. Ganieva was a PR naif, having tried and failed repeatedly to attract press attention. One after another, the leading reporters of the "MeToo" movement passed on her efforts to peddle lies about Leon Black—recognizing them for what they were after subjecting them to appropriate journalistic scrutiny. Selling her story turned out to be harder than she anticipated, and she needed help. She got it, thanks to Mr. Harris's PR team, who were working inside of Apollo at the same time they were working to undermine the report commissioned and accepted by the Board and the Chairman personally. Upon information and belief, all of them were paid (or promised to be paid) by Mr. Harris.

Mr. Black operated on the (sadly naïve) assumption that having been generous to Ms. Ganieva, having obeyed the law, having kept his family office, which made the payments to Epstein, entirely separate from Apollo, having literally invited the sort of independent investigation of himself that causes most CEOs to resign rather than face, he had nothing to fear.

~~He was wrong. Mr. Black will ultimately be vindicated in the courts. In the meantime, however, he is being publicly attacked with the imprimatur of a well-known law firm and the New York Supreme Court in a way that goes directly to his humanity. Of course he must fight back~~<u>On March 17, 2021, Ganieva – a first-time Twitter user with only three followers, each coincidentally a member of the press – posted a series of tweets in which she falsely accused Black of sexual harassment and abuse. Recognizing that the carefully-tagged tweets were clearly part of an ongoing, coordinated campaign, Black resigned for the good of Apollo, losing the considerable financial benefits he was receiving as Chairman and CEO. Black's resignation deprived Apollo of Black's decades of experience and judgment, as well as his widely recognized investing acumen. Ganieva and Wigdor then commenced sham litigation against Black, seeking to extort greater payments from Black. That litigation – which Black is vigorously defending against – is ongoing to this day. Wigdor has opposed the entry of the most routine confidentiality order, one of its excuses to not review evidence that would expose its own client's lies. Rather, Ganieva and Wigdor have sought at every opportunity to delay the litigation and frustrate the discovery process, thereby preventing the truth about Ganieva's litigation conduct and false allegations from being exposed.</u>

<u>6.      This action seeks to hold Harris, Rubenstein, Ganieva, and Wigdor accountable for their criminal, defamatory scheme against Black and Apollo</u>.

**PARTIES**

<u>7.</u>      ~~2~~Plaintiff Leon <u>D.</u> Black resides in New York County, in the State of New York. ~~2Mr.~~<u>Black founded Apollo Global Management, Inc. in 1990 and since that time has been Apollo's largest shareholder. As of April 1, 2022, Apollo had a market capitalization of approximately $37 billion, and approximately $500 billion in assets under management. For more than 30 years, until March 21, 2021, Black served as Apollo's CEO and as the Chairman of its Board of Directors.</u>

<u>8.      In addition to his work at Apollo,</u> Black has spent the last three decades ~~deeply involved not only in the business community but also in~~<u>working as a dedicated philanthropist and one of our nation's leading benefactors of</u> the arts, education, <u>and</u> cancer research~~and other philanthropy~~. He ~~spent ten~~<u>served for 20</u> years on the Board ~~of Trustees of Dartmouth College, 20 years on the board~~ of Mt. Sinai Hospital, ~~and~~ 15 years on the Board of the Metropolitan Museum of Art~~. A year ago, he was the Chairman of~~<u>, and 10 years on</u> the Board <u>of Trustees of Dartmouth</u>

College. Black served as a Trustee of the Museum of Modern Art ("MoMA") ~~and~~for approximately 25 years, and from 2016 to 2021 served as co-Chairman or Chairman of MoMA. He has also been one of ~~its~~MoMA's most generous supporters. At the outset of the pandemic, ~~Mr.~~ Black and his family funded $20 million for the Healthcare Heroes campaign, providing meals for front-line workers at the hundreds of hospitals ~~around~~in the five boroughs of New York City. Some ~~fourteen~~14 years ago, ~~Mr.~~ Black and his wife ~~also~~, Debra, co-founded the Melanoma Research Alliance, which became the largest private funder of melanoma research ~~worldwide~~in the world. Melanoma is the most deadly form of skin cancer, the fastest-growing cancer in the world, and a cancer that had been, for too many, a ~~hopeless diagnosis~~death sentence. The Melanoma Research Alliance has directly invested more than $~~131~~130 million to advance cutting edge research into immunotherapy for melanoma. Through that funding, the Melanoma Research Alliance has supported clinical trials and patent applications, leading to some ~~thirteen~~13 new FDA- approved therapies for melanoma, and has made important progress in using immunotherapy to treat more than 30 other cancers.~~It~~ As a result of ~~this~~his hard work and generosity, ~~Mr.~~ Black and his family have long enjoyed the respect of peers in the worlds of business ~~world and~~, the arts ~~community~~, ~~among~~and medical ~~researchers and~~research, as well as among Jewish leaders~~,~~ and ~~at~~people affiliated with his alma mater. ~~That changed in the last year as he faced a never-ending and never-consistent barrage of unsupported and unsupportable charges orchestrated~~

~~by the Defendants, and was hamstrung in his ability to defend himself. He had no wish to become engaged in a public battle, and no interest in attacking the reputation of a woman he tried to be kind to. That is why, notwithstanding all his reservations about caving to unlawful threats, he fell victim to extortion in the first instance. But he did not agree to have his reputation, his life's work, his philanthropy and his family tossed on the trash heap. Those things that matter more than money are what is now at stake.~~

9.      Defendant Joshua Harris currently resides in Miami-Dade County, in the State of Florida.

10.     Defendant Steven Rubenstein resides in New York County, in the State of New York.

11.     ~~Upon information and belief,~~ Defendant Guzel Ganieva is a Russian national~~.~~ ~~She~~ who currently resides in New York County, in the State of New York.

12.     ~~Upon information and belief,~~ Harris, Rubenstein, and Ganieva (together, the "RICO Defendants"), have each committed multiple criminal acts as part of a fraudulent, extortionate scheme designed to defraud Apollo and other third-parties, to inflict financial and reputational harm on Apollo and Black, and to force Black's resignation and separation from Apollo.

13.     Defendant Wigdor LLP maintains its principal place of business in New York County, in the State of New York.

~~Upon information and belief, Defendant Joshua Harris currently resides in Miami Dade County, in the State of Florida. Mr. Harris, the loser in the competition to succeed Mr. Black at Apollo, arranged for lawyers, consultants, crisis managers, and public relations professionals to be recruited to take down Mr. Black and covered some or all of the costs of doing so; has contacted investors, board members and others to raise questions about Mr. Black's judgment and leadership; and has encouraged and assisted the Enterprise in its efforts to extort Mr. Black, among other actions aimed at undermining the personal and professional reputation of Mr. Black.~~

~~X~~Upon information and belief, Defendant Steven Rubenstein lives in New York County, in the State of New York. Mr. Rubenstein is the President of Rubenstein, a public relations firm founded by his father, Howard Rubenstein. Mr. Rubenstein's firm was for many years, including during relevant events at issue in this Complaint, engaged by Apollo to provide public relations services. As Mr. Black has learned, he was also actively advancing the campaign to cancel Mr. Black, by promoting Ms. Ganieva's story to the press, and seeking to secure coverage

favorable to Mr. Harris and negative to Mr. Black—all in an effort to create a media narrative that would help force Mr. Black out as Chairman of Apollo.

20.Collectively, Ms. Ganieva, Mr. Harris, Mr. Rubenstein and his firm, certain other public relations professional identified below, along with such others as shall be disclosed or discovered, shall be referred to as the Enterprise. In its work, the Enterprise was aided by vendors whose participation may, upon further discovery, qualify them for inclusion as Defendants. Each participant was a necessary part of, and critical to the success of, the Enterprise's fraudulent scheme. They committed extortion and fraud. They aided and abetted Ms. Ganieva and Mr. Harris on multiple fronts: to get more money through extortion and/or a fraudulently-induced litigation award; to cost Mr. Black millions of dollars in a legal defense against Ms. Ganieva's fraudulent claims; to destroy the reputation of Mr. Black and his business; to undermine his career; to interfere with his business relationships; and to raise concerns about his having any role at the company he created and nurtured for thirty years in an attempt to open the door for Mr. Harris to succeed him.

## JURISDICTION AND VENUE

14.    3.Venue is proper in the~~this~~ District under 28 U.S.C. § 1391(b)(2), as a substantial number of the events giving rise to this action occurred in this District.

15.    1.This Court has subject matter jurisdiction over Mr. Black's racketeering claims under 28 U.S.C. § 1331 and under 18 U.S.C. § 1964. This suit is seekingPursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Black's defamation *per se*, unjust enrichment, and breach of contract claims. The relief sought in this suit seeks, among other things, monetary damages in excess of $75,000.

## FACTUAL ALLEGATIONS

### Ms. Ganieva Successfully Extorts Mr. Black: "I'm Dying to Talk to Press About It..."

### Apollo Global Management

16.    Black founded Apollo, a Delaware corporation, in 1990 to manage investment capital on behalf of institutional investors, focusing on leveraged buyouts, corporate restructurings, and credit positions, as well as taking minority positions in growth-oriented companies.

17.    Black had previously spent 13 years at Drexel Burnham Lambert ("Drexel"), where he served as the head of Drexel's Mergers & Acquisitions group and thereafter led its 500-member Corporate Finance group.

18.    Black is a visionary investor, who spearheaded Apollo's phenomenal growth from a shared office in 1990 into one of the nation's pre-eminent alternative asset managers. This success was the direct result of Black's strategy of creating a contrarian, value-oriented investment approach to private equity, credit-oriented capital markets, real estate, and distressed investments. Investors trusted Black's vision; in 2001, Apollo obtained $3.7 billion in investor commitments to Apollo Investment Fund V, followed by $10 billion in Fund VI, $15 billion in Fund VII, $18 billion in Fund VIII, and $25 billion in Fund IX in 2017. Apollo compiled a stunning track record of investment success, including a gross internal rate of return of 39% in its traditional private equity funds from inception through December 31, 2020. Apollo, under Black's leadership, was in the vanguard of the transformation of the pure leveraged buyout model of the 1980's into today's broad-based "alternative asset" approach. Apollo was a pioneer in finding the best risk-reward investment opportunities across the capital structures of good companies. For example, the Executive Life transaction in 1991 was a revolutionary development for the private equity industry. Apollo acquired a $6 billion portfolio of 400 positions in debt investments, including numerous investments in private equity and also in distressed corporate restructurings, on which it earned a substantial return. Apollo was one of the first private equity companies to go public,

and, as importantly, became the largest global alternative asset manager of credit platforms. In addition, Apollo was one of the first private equity firms to transition to permanent capital, building the Athene and Athora Holding Ltd. insurance platforms under the leadership of Rowan and James Belardi. All of these transformative changes in the last 30 years were first-mover initiatives by Apollo under Black's leadership, and they are now all broadly emulated by most of the other major players in the alternative investment world.

19. Black was a mentor to Harris, trained him, and gave him increasing levels of responsibility and significant amounts of equity in Apollo. Over time, Harris and Rowan became Apollo's two largest shareholders after Black. In 2007 – 17 years after he founded Apollo – Black designated Harris a "co-founder" of Apollo, despite the fact that Harris joined the firm as a junior analyst several years after Apollo's founding. Until March 21, 2021, Harris reported directly to Black.

20. Harris's principal responsibilities at Apollo included acting as a senior investor in Apollo's private equity business, and, since 2015, functioning essentially as the firm's chief operating officer. While Harris was hard working and competent in handling Apollo's internal operations, he was less effective as a creative or strategic thinker or investor, particularly as compared to Rowan. He also stifled growth by continuously delaying important decisions. Black was concerned that Harris would not foster the positive corporate culture or strategic vision necessary for increased growth, and that Harris had created an abusive, "Whiplash" culture at Apollo.

21. In or about 2002, Harris created HRS Management, a family investment office, to oversee the personal fortune he accumulated through his work under Black at Apollo. Harris devoted significant amounts of time and resources to HRS Management, and over time expanded his investment holdings. Harris purchased an NBA team, the Philadelphia 76ers, in 2011; then an

NHL team, the New Jersey Devils, in 2013; and an English Premier League soccer team, Crystal Palace F.C., in 2015.

22.     Over time, Harris formed and developed a cadre of professional advisors, including lawyers, financial advisors, accountants, and public relations specialists (collectively, an "enterprise" within the meaning of 18 U.S.C. § 1961(4)), that operated to protect, promote, and burnish Harris's public image; to advance his business and financial interests; and to provide a variety of services necessary to accomplish Harris's goals. Harris's business interests outside of Apollo, supported by his cadre of advisors, expanded to include businesses and investments valued at billions of dollars and that operated in, and affected, interstate and foreign commerce.

23.     For many years, Apollo retained RUBENSTEIN, a firm founded by Defendant Steven Rubenstein's late father, to provide it with public relations and media consulting advice, and to enhance Apollo's public profile. Apollo placed trust and confidence in RUBENSTEIN to act as its agent with respect to a wide range of important and sensitive issues. RUBENSTEIN had duties, as Apollo's fiduciary, to refrain from taking actions that might harm Apollo, and to inform Apollo of information it learned that would be important to Apollo. For years, and up until April 2021, Apollo paid RUBENSTEIN a monthly retainer of approximately $90,000 per month. Steven Rubenstein was employed by RUBENSTEIN and served Apollo. In that capacity, Rubenstein had access to highly sensitive corporate information, and was expected to exercise discretion and judgment to protect and promote Apollo's interests. As Apollo's agent, Rubenstein owed Apollo common law agency and fiduciary duties, including the duty of loyalty and an unremitting duty of candor.

~~The relationship between Ms. Ganieva and Mr. Black began~~**The Growth of Apollo**

24.     On March 29, 2011, Apollo conducted an initial public offering and registered its

common stock for trading on the New York Stock Exchange. Black was Apollo's Chairman of the Board and CEO. Rowan and Harris assumed seats on Apollo's Board of Directors, and served as Senior Managing Directors. As an officer and director of a publicly traded company, Harris owed agency and fiduciary duties to Apollo and its shareholders, including duties of loyalty, candor, and care. The duty of candor required Harris to disclose all material information relevant to any Apollo matter. Black, Rowan, and Harris also served on Apollo's executive committee, which was charged with making critical decisions regarding investments, long-term strategy, and personnel.

25.     Beginning in 2009, and with Black's full support, Rowan embarked on a business initiative that would, over time, fundamentally reshape Apollo's business model. Rowan helped co-found Athene, a retirement savings company that issues, reinsures, and acquires retirement savings products. Athene's retirement savings products were structured and designed to appeal to the increasing number of individuals and institutions seeking to fund their retirement needs, and included annuities that were offered to retail investors. In short, the investors paid premiums to Athene, which in return guaranteed a fixed income stream at a later date. Athene invested the premiums it received with Apollo, which generated investment returns that enabled Athene to pay its annuity obligations.

26.     Athene's business model created significant new capital-raising opportunities for Apollo. Whereas Apollo previously sought to raise capital primarily from large institutional investors – such as sovereigns, state pension funds, and other institutional investors, known as Limited Partners or LPs – Athene provided Apollo with a steadier, growing, and ultimately far larger capital base. Under Rowan's leadership, Athene grew and became a significant and stable source of investment capital for Apollo. As of December 31, 2011, approximately $8.5 billion of Apollo's $75.2 billion in total assets under management were sourced from Athene. Nearly a

decade later, by December 31, 2020, approximately 50% of Apollo's revenue was sourced from Athene, making a merger the logical next step.

27.     Harris understood that as Athene grew and became a more significant business relationship for Apollo, Rowan became a more critical contributor to Apollo's success. Rowan also became more important and influential to Black.

28.     In September 2019, Apollo purchased 33% of the common stock of Athene, in a transaction Harris initially argued against but that proved spectacularly successful for Apollo. A year later, Harris was reluctant to move forward with the merger of the two companies, and created multiple obstacles to Black's and Rowan's plan for the merger. At the same time, Harris also expressed reluctance towards, despite his later approval of, a series of corporate governance initiatives that Black believed were necessary to demonstrate Apollo's ongoing commitment to best-in-class governance. These initiatives included transitioning decision-making at Apollo to a one-share-one-vote structure. Harris also initially opposed Black's proposal to expand Apollo's Board so that it was comprised of a majority of independent directors. Harris resisted these and other changes that reduced his level of control over Apollo.

**Black's Prior Relationship with Ganieva**

29.     Black met Defendant Guzel Ganieva at a party both attended in 2008, continued sporadically,. From 2008 until 2014, Black and ended when Ms. Ganieva left the country in 2014. While Mr. Black paid for a luxurious apartment for Ms. Ganieva on the Upper East Side of Manhattan, he

~~never had the keys to that apartment, and came only when invited~~engaged in a sporadic, consensual affair.

30.     Ganieva's communications with Black between 2008 and 2014 were marked by consistent expressions of love and affection on her part. Black paid for Ganieva's apartment, paid for her acting lessons, financed expensive vacations, paid for a $40,000 portrait of her, and even

purchased a Steinway piano for her and her son. He also made a series of loans to her, and attempted to assist her in finding employment in the finance industry. In July 2014, ~~Ms.~~ Ganieva told ~~Mr.~~ Black ~~that~~ she ~~was leaving~~needed to leave the country for immigration-related reasons~~.~~ ~~¶From the time she left New York in~~, and departed for Russia on July 31, 2014 ~~until she returned in June 2015, Ms.~~. From the plane, Ganieva texted Black, "I love you and miss you already." For eleven months thereafter, Ganieva ~~continued to send text messages to Mr.~~sent texts to Black ~~telling him that~~from abroad stating how she missed him and ~~loved him~~longed to be together.

31.     On June 8, 2015, ~~however, the tone changed, and Ms.~~ Ganieva sent Black a ~~much more formal~~formally worded note insisting that she needed to meet with him in person about a matter that she characterized, without detail, as "both urgent and important." Based on statements she later made ~~by Ms. Ganieva~~ to ~~Mr.~~ Black, this sudden shift in tone appears to have coincided with her failure to gain legal status in the United Kingdom.

32.     ~~¶The two met in person on~~On June 24, 2015~~. Ms.~~, Ganieva ~~warned Mr.~~met Black in person in New York City. Ganieva threatened Black, telling him that if he did not pay her $100 million, she would ~~go~~disclose their personal and sexual relationship to Black's wife and children, and to the public.

33.     Black understood that Ganieva was extorting him. Black consulted attorneys, including criminal defense counsel. Black thereafter recorded his future conversations with ~~their~~

~~affair. As Ms.~~ Ganieva ~~put it during a later meeting, "*the more,*~~ .

34.　On August 12, 2015, Ganieva met Black at the Four Seasons restaurant in New York City. Ganieva again demanded money from Black, threatening that, "the longer I wait, the more sure I become that I actually, I prefer to go public," and that, "I'm dying to talk to press about it." ~~Ms.~~ Ganieva ~~made~~repeated her ~~demands clear: "*I will not agree to anything less than $100 million.*"~~

~~¶Understanding that he was being extorted, either by Ms. Ganieva acting alone or in concert with others, Mr. Black consulted attorneys, including criminal defense counsel, and thereafter recorded their conversations. Asked (secretly on tape) to explain her sudden demands, Ms. Ganieva claimed that the $100 million was justified based on~~ a news report she saw about a woman who had been fired after sleeping with her boss four times and had received $18 million, ~~and based on community property principles. Of course, Mr. Black was neither her boss nor her husband.~~

~~¶Ms. Ganieva also claimed~~demand for $100 million. She also exhibited signs of delusion, claiming that various prominent people~~—~~ – from international philanthropist Len Blavatnik to former New York Mayor Michael Bloomberg to ailing publisher

and developer Mort Zuckerman— – were following or harassing her at ~~Mr.~~ Black's direction, musings that she herself ~~called "~~ suggested were paranoid.~~" She claimed that Mr. Black was responsible for her son choking on a piece of meat at a restaurant. But *never once* in these conversations, laced as they were with extravagant fantasies of victimhood, did Ms. Ganieva so much as suggest that Mr. Black had physically or sexually assaulted her.~~

35.     On August 14, 2015, Ganieva met Black at Le Bernardin in New York City. Ganieva again extorted Black, informing him: "I will not agree to anything less than $100 million." Ganieva knew Black was married. Ganieva knew Black had children. Ganieva knew Black was a prominent business leader. And she knew that her threat to publicize their affair – and to do so in a way that mischaracterized the relationship – would instill fear in Black because of the potential damage to his family and his business.

36.     ~~37.At a lunch meeting~~ During the August 14, 2015 meeting, Ganieva justified her demand for $100 million by referencing a news report she saw about a woman who received $18 million when she was fired after sleeping with her boss, a "Wall Streeter," only four times. Ganieva explained that, in her view, her demand for $100 million was justified because she believed her sporadic affair with Black was "like a marriage."

37.     On October 19, 2015, Ganieva again met Black at the Four Seasons restaurant in New York ~~on October 19, 2015, Mr~~ City. Black and ~~Ms.~~ Ganieva finalized the terms ~~they had discussed, including payments by Mr.~~ of a resolution to her extortion demands under which Ganieva agreed not to publicly disclose their affair. In exchange for Ganieva dropping her threat, Black agreed ~~to Ms.~~ pay Ganieva ~~of~~ $100,000 ~~monthly~~ per month for 15 years, ~~and forgiveness of approximately~~ forgive $1,000,000 in loans. ~~Mr. Black also agreed that he would,~~ and provide £2,000,000 for ~~Ms.~~ Ganieva to use toward obtaining legal status in the United Kingdom. ~~In exchange, Ms.~~

38.    Black made payments to Ganieva ~~agreed not to publicly disclose their affair. For the next~~ thereafter every month for five and a half years, ~~Mr. Black paid the ransom, and deposited $100,000 each month in Ms~~.

Ganieva ~~'s account. She~~ accepted every ~~single~~ payment ~~, while attending law school and afterward, effectively ratifying the agreement she would later claim was forced upon her. Never once did she take steps to void it. All told, she~~. Between October 2015 and March 2020, Ganieva received a total of $9.2 million ~~before deciding to go public not with the truth (which she had promised not to do) but with flat out lies.~~

~~**Ms. Ganieva Attempts To Extort More Money from Mr. Black**~~. On at least one occasion during that time, she reached out to Black to ask for a favor; on January 29, 2016, she emailed Black her Harvard Business School application asking for his support. He declined.

39.    ~~3)~~ In October 2019, ~~Ms. Ganieva complained to Mr.~~ after four years in which there was no other direct contact between Black and Ganieva other than her accepting the $100,000 payments each month, Ganieva sent Black a text message complaining about their arrangement, and claiming that he had forced her to sign the agreement under duress ~~(although she~~. Ganieva had never made that claim during the preceding four years ~~, during which she had accepted the payments). Five months later, attorneys (not Wigdor) purporting to represent her~~. Black did not respond. He continued to pay her $100,000 per month, and Ganieva continued to accept the payments.

40.    On November 15, 2019, Ganieva emailed Jodi Kantor of The New York Times, a prominent journalist. Ganieva falsely told Kantor that Black had sexually abused her. After speaking to Kantor by phone, Ganieva emailed her on November 19, 2019, writing, "I thought about it and I still think it is important to me to have a sense of control of the article. I think I can move forward only if I have a legal power to stop it at any time before it gets published. I would also need to see it just before it goes in print." Kantor did not report on Ganieva's claims.

41.     On November 20, 2019, after demanding "legal power" to control the reporting of her allegations, Ganieva emailed Ronan Farrow of The New Yorker, another prominent journalist. Ganieva repeated the same false claims of sexual abuse. Farrow did not respond to Ganieva's message. Farrow did not publish Ganieva's claims.

42.     On June 4, 2020, Ganieva emailed Julie Brown of the Miami Herald, claiming abuse by "one of the very high profile Epstein associates," and alleging that, "[a]t some point they and Weinstein conspired to retaliate and harass me into silence." Brown did not publish Ganieva's claims.

43.     On February 18, 2020, David Liston, an attorney, sent Black a letter to Mr. Black, stating they had been that Ganieva "has retained "our firm to investigate certain matters related to [Mr. Black's]your prior interactions with [Ms. Ganieva]" and requested copies of their agreement. On information and belief, both the

~~messages~~her and to advise and represent her in connection with same." Liston sent a follow-up letter on March 6, 2020. Black, uncertain whether this was a legitimate demand from ~~Ms.~~ Ganieva 's counsel,

and ~~this letter were sent in an effort to extort additional money from Mr. Black. He~~concerned about whether the request reflected a continuation of Ganieva's extortion, did not respond. ~~Nothing further happened. He~~Black continued to pay ~~her~~Ganieva $100,000 ~~each~~per month.~~ She~~, and Ganieva continued to accept the ~~money. She~~payments.

**Harris's Motive To Remove Black**

44.     During the summer and fall of 2020, Apollo was engaged in an extensive analysis of the possibilities of a merger with Athene. At that time, approximately $184 billion of Apollo's $455.5 billion in assets under management were sourced from Athene. Over the course of roughly a decade, assets under management by Apollo, and sourced from Athene, had increased 20 times over. The potential benefits of the merger to Apollo were significant, particularly given Apollo's significant equity stake in Athene. A merger of Apollo and Athene, an event directly attributable to Rowan's strategic vision for Athene, represented a serious threat to Harris's ambitions to succeed Black as Apollo's CEO.

45.     As a result, Harris steadfastly opposed the potential merger initiative, despite the manifest benefits to Apollo's business. Harris understood that a successful merger would effectively end his hopes of succeeding Black as CEO, and that his influence and control over Apollo were coming to an end.

46.     As the merger discussions progressed, and Black approached his 70th birthday, the issue of succession at Apollo came into sharper focus. As Harris well knew, Black thought Harris was capable of managing Apollo's day-to-day operations, but that he lacked the strategic vision and growth-oriented focus to be an effective successor. Indeed, many in Apollo's senior

management thought Harris was stifling growth. In 2015, Black had rebuffed Harris when Harris asked to be anointed as Black's successor, believing Harris would be the wrong choice for the job. Black asked Rowan to become Apollo's CEO in 2015 and again in 2019 when Apollo purchased one-third of Athene's common stock. Both times, Rowan declined. In the fall of 2020, Black

raised the possibility with Rowan a third time, in a private conversation that took ~~no steps to void~~place in the ~~contract. Those lawyers were not heard from again~~midst of Apollo's internal discussions of the potential merger of Athene and Apollo. Rowan for the first time agreed that, depending on how discussions concerning the merger unfolded, becoming Apollo's CEO might be the right decision. Harris was not privy to the conversation, and Black never asked Harris to consider the possibility that he might one day replace Black.

47.     ~~InOn~~On October ~~12,~~ 2020, ~~theThe~~The New York Times published a story detailing Black's relationship with Jeffrey Epstein. The article, authored by Matthew Goldstein, reported that ~~Mr.~~ Black had paid ~~Jeffrey Epstein someEpstein~~Epstein "at least $50 million ~~for tax advice. Upon information and belief, members of the~~" and that "[i]t was not clear what kind of services Mr. Epstein provided to Mr. Black."

**Ganieva's Engagement with Wigdor**

48.     As early as September 29, 2020, Ganieva initiated contact with Goldstein, the author of the October 12, 2020 article.

49.     On October 1, 2020, Ganieva sent Goldstein a text message on WhatsApp, asking whether sharing her "story" anonymously was an option. Goldstein informed her, "[i]t is possible for us not to use your name but we would still need to document everything. All the text messages you have from Leon and would need to talk to any friends you talked to about the situation. We need to do that to assure the reader your story stands up and can be backed up by

contemporaneous factors."

50.     The October 12, 2020 New York Times story regarding Black's connection to Epstein included no mention of or reference to Ganieva, anonymously or otherwise.

51.     On October 30, 2020, Ganieva sent a WhatsApp message to Goldstein, stating: "Did you speak to Wigdor? He is reaching out about a reporter wanting to speak to me." Ganieva's message referred to Douglas Wigdor, the co-founder of Defendant Wigdor LLP. Wigdor markets

itself as skilled in utilizing the litigation process to extract pre-complaint settlements. As Wigdor's website states: "Because we have a reputation for obtaining multi-million dollar verdicts, we are able to settle the majority of our cases without the need for even filing complaints."

52.     Goldstein responded to Ganieva's message about Wigdor, writing, "[w]e are supposed to talk. But not sure if there is another reporter on this too from another publication." Goldstein continued, "[t]ho I'm pretty certain it's me. Are you ok with him talking to me on background."

53.     On November 5, 2020, Ganieva confirmed she would permit Wigdor to speak to Goldstein on her behalf, stating, "P.S. I will let [W]igdor know that if you want to speak with him you can."

54.     On November 10, 2020, Goldstein confirmed his plans to speak to Wigdor, writing to Ganieva, "[h]ey there. Talking to Wigdor tomorrow afternoon. He wanted to review his notes. Let's talk on Wednesday if you are free or Thursday sorta wanted to wait until I spoke to Doug."

55.     On November 16, 2020, Goldstein informed Ganieva, again via WhatsApp message, that he "[h]ad good chat with Wigdor over the weekend."

56.     On January 10, 2022, Wigdor represented that it was "frivolous" to argue that it had conspired with public relations flacks as early as March 2021, "before Ms. Ganieva ever retained Wigdor." (ECF No. 33-1 at 11.) Wigdor represented that Ganieva formally retained the firm in April 2021. But those representations were misleading at best. Wigdor was at a minimum actively communicating with Ganieva as early as October 2020 and was speaking with reporters on Ganieva's behalf. Wigdor was coordinating Ganieva's press strategy and working to promote her lies long before Ganieva formally retained the firm in April 2021.

**Harris's Unsuccessful Attempt To Buy the New York Mets**

57.     In July 2020, Harris – then the owner of the New Jersey Devils and Philadelphia 76ers – was reported to be bidding on acquiring the New York Mets. Harris's principal competitor was Steve Cohen, the billionaire founder of SAC Capital. On August 12, 2020, as the bidding war between Harris and Cohen was escalating, Josh Kosman of the New York Post published an article entitled, "Discrimination claims haunting Steve Cohen's dream of owning the Mets." Kosman – who would later conduct and publish an "exclusive interview" with Ganieva, and who is known to be close to Defendant Rubenstein, who trumpets his purported influence with the New York Post – reported that multiple "complaints by ex-female employees" of Cohen's hedge fund had been filed in recent months.

58.     According to the article, Kosman learned of these complaints when "a man using technology to disguise his voice" called Kosman to provide information about these allegations. According to the article, the mystery caller suggested the complaints "could have a negative impact on Cohen's bid for the Mets." The Kosman article reported that a "source close to a rival bidder," stated that the story was "[expletive] huge" and that "'[a]ll the [other Major League Baseball] owners need is another excuse' to refuse Cohen the team."

59.     Kosman's article explicitly identified two complaints against Cohen's office filed

with the Connecticut Commission on Human Rights and Opportunities. One of those complainants was represented by Jeanne Christensen of Defendant Wigdor, the very same lawyer who is representing Ganieva in state court against Black.

**The** Enterprise ~~and Mr.~~**Positions** Harris **as Black**'s ~~team took steps to spread the news in the media — to the tune of hundreds~~**Successor**

60.   In the weeks that followed The New York Times's article on Black's links to Epstein, a wave of negative articles were written about Black, a man who, while well-known in the business community, is hardly a household name. ~~Then there were all the "concerned" investor calls to Apollo, also triggered by the Enterprise, and even a round of calls and stories carefully planted on the subject of who would replace Mr. Black, all of this even before Ms. Ganieva's artfully crafted tweets.~~

~~¶And these articles not coincidentally trumpeted Mr. Harris as Apollo's future leader~~Meanwhile, on October 28, 2020, the Financial Times published a story positioning Harris as Black's successor entitled, "Investors imagine private equity group Apollo after Leon Black." According to the article, an internal Apollo email responding to The New York Times article and signed by Harris "seemed to mark a passage of power at the formidable Wall Street firm." The article quoted a "former insider" as saying, " '[i]t's all Josh now. ' "

61.   On October 31, 2020, ~~just days after~~in the ~~New York Times~~ ~~published the story of Mr. Black and Epstein's professional relationship~~midst of this barrage of negative reporting about Black, the~~The~~ Wall Street Journal ~~featured a~~published a flattering profile of ~~Mr.~~Harris~~.~~ ~~The headline? Not subtle:~~ entitled, "A \$433 Billion Wall Street Giant Has a Reputation Problem. It's Josh Harris's Job to Fix It." ~~The article was promoted~~Harris and ~~placed by some~~members of the ~~very PR advisers who shaped the cancellation campaign of Mr. Black. The Enterprise had laid a canny trap — it had shaped and framed the problem, and positioned~~enterprise worked

secretly with The Wall Street Journal, and were the source of its reporting about Apollo's purported "cutthroat culture and rough-edged image," and about Harris "trying to move past the firm's reputation for using sharp elbows to pursue profits at all costs." Harris and members of the enterprise were also the source of the statement that Harris was "trying to modernize [Apollo's] corporate structure, creating a broader shared power arrangement that could one day form the basis of the succession plan." In fact, within Apollo, much of senior management was puzzled by the ~~fix.~~

~~Mr.~~article because Harris ~~Is Spurned, And Spurred into Action~~

~~62.The setup was in place. But the Enterprise did not achieve its goals so readily. Mr.Black turned to Apollo's Board of Directors and offered radical transparency. He invited them to investigate his relationship with Epstein and they hired distinguished independent counsel,~~was known to have opposed the corporate governance reforms mentioned in the article, and was viewed as contributing to an intense and abusive environment at Apollo.

62.     Many of Apollo's limited partners were large public pension funds that Harris expected would be concerned about Black's reported links to Epstein. An exodus of important institutional investors would have put tremendous pressure on Black to leave. But, despite Harris's efforts to stoke investor concerns, no flood of withdrawals followed. Among other things, Black's response to The New York Times story encouraged Apollo's investors to reserve their judgment

and keep faith with Black's long track record of investment success and leadership.

**Black Urges Apollo To Conduct an Independent Investigation of the Epstein Allegations**

63.     Black responded to the issues raised in The New York Times article and in the barrage of negative follow-up articles by confronting them directly. Knowing that he had nothing to hide, he invited the independent directors of Apollo to investigate his relationship with Epstein. In a statement to The New York Times, Black explained that the payments were for tax and estate planning services. Black's statement went on to say that Black "continue[d] to be

appalled by the conduct that led to the criminal charges against Mr. Epstein," and "deeply regret[ted] having any involvement with him."

64.     On or about October 20, 2020, Black attended a regularly scheduled meeting of Apollo's Board of Directors. At the meeting, Black stated that "it is in the best interests of Apollo, our employees, our shareholders and our LPs for there to be an independent review. Proceeding in this manner is the best way to assure all of our stakeholders that they have all of the relevant facts." Black requested that the Board's Conflicts Committee (comprised of the independent directors) retain outside counsel to conduct a thorough review of his relationship with Epstein and independently confirm that Epstein never did any business with Apollo.

65.     To evaluate whether Black's stewardship of Apollo continued to be in the best interest of its shareholders, Apollo delegated exclusive responsibility for investigating these issues to Apollo's independent directors on the Conflicts Committee. Apollo excluded management directors from overseeing the investigation to ensure the credibility and integrity of the investigation's results. The independent directors on Apollo's Conflicts Committee retained Andrew Levander, a widely-respected former Assistant U.S.United States Attorney for the Southern District of New York and a senior partner in the Dechert law firm, to do so. Mr. Black produced reams of texts, emails, and

~~other documents in his possession requested by Dechert to show the board – and the~~ ~~world – that he had nothing to hide when it came to Epstein. Mr. Black also directed the~~ ~~employees of his family office to meet with Dechert. There was no information asked for by~~ ~~Dechert that Mr. Black withheld, and they asked for a lot, all told some 60,000 documents.~~, of Dechert to conduct an investigation. The Conflicts Committee retained Dechert to investigate not only the relationship between Black and Epstein, but also "the financial or other relationship, if any, between Apollo . . . and Epstein."

66.     Black cooperated fully with the investigation conducted on behalf of Apollo's independent directors. Black provided thousands of documents and sat for an in-depth interview, and directed members of his family office to do the same. During an intensive investigation spanning several months, the independent investigators reviewed more than 60,000 documents dating back to 1998, and conducted more than 20 witness interviews, including an interview of Harris. Apollo's independent directors directed substantial corporate resources – including millions of dollars and a considerable investment of both their own time and that of Apollo management – to ensure the investigation's thoroughness and rigor.

67.     Following the October 12, 2020 New York Times article, the Apollo Board made a number of business judgments that it believed were in the best interests of Apollo and its shareholders. Among other things, Apollo elected to permit Black to continue to serve as CEO and Chairman of Apollo; ratified Black's ongoing efforts to pursue the possibility of merging with Athene; and agreed to Black's request that the independent directors conduct a thorough, independent investigation about the relationship between Black and Epstein. In a public filing on October 21, 2020, Apollo stated: "The Company fully supports this review and looks forward to the Committee completing its work and releasing its conclusions expeditiously."

68.     Apollo intended to rely on the results of the investigation to make significant

judgments on behalf of the company and its shareholders. Depending on the outcome of the investigation, Apollo might, among other possibilities, sever all association with Black, or allow him to maintain his leadership position at Apollo. These judgments were of the highest consequence. As Apollo disclosed to investors, the "success of our business depends on the efforts, judgment and personal reputations of our Managing Partners," including Black. Accordingly,

"[t]he loss of the services" of Black "would have a material adverse effect on us, including our ability to retain and attract investors." Indeed, investors in several of Apollo's funds had the right to terminate their commitment period in the event that certain "'key persons,' " including Black, were no longer able to "devote the requisite time to our businesses."

Even before the Dechert firm completed its work, Mr. Harris and team were on a war footing. As early as January 7, two weeks before Dechert released its report, the war council had been fully assembled and presented Mr. Harris with options for litigators to take on Mr. Black and perhaps even Apollo. In a presentation for Mr. Harris apparently prepared by one of the three public relations/crisis management/political consulting firms, the group proposed four of the most aggressive litigators that might bring claims against Leon Black and Apollo. These litigators were, not surprisingly, among the most prominent in the nation. They came expressly recommended by Mr. Harris's own top outside lawyers, who also included commentary of their own on how to deploy the litigators' talents to greatest effect. And Mr. Harris indeed engaged one of them, from a prominent litigation boutique, who became yet another member of the war council, and undertook to form litigation strategy about how Mr. Harris might exercise purported rights in the context of Apollo's impending governance changes, in an apparent and highly improper effort to evict Mr. Black from the firm that he had founded decades earlier.

Mr. Harris's war council added yet more crisis managers and public relations experts

too. In the week the Dechert report was released alone, Mr. Harris supplemented his longtime media advisor, Rubenstein—who happened also to represent Apollo—with two new advisors: Jonathan Rosen from BerlinRosen, and Paul Holmes from Finsbury Glover Hering (together, the "Flacks"). According to BerlinRosen's website, it was founded on a "simple idea—build a communications firm that operates with the speed and intensity of a political campaign."

BerlinRosen touts itself as a firm that can "help attorneys and their clients leverage the media to support their best case narratives, blunt the opposition's efforts and elevate firm's public profiles." Its website features numerous news articles in which it has managed to secure critical coverage of its client's adversaries.

45. Under Mr. Harris's and the Enterprise's direction, three of the most distinguished law firms in the City (including the newly retained litigation firm)—some of which were actually representing Apollo at the time—and thus had duties to Apollo, including a duty not to act adversely to Apollo's interests—joined forces with three of the best-known public relations firms—Rubenstein, BerlinRosen, and Finsbury Glover Hering. The war council even included Apollo staff, including Mr. Zemsky, many of whom doubled as Mr. Harris's family office employees. They met by Zoom (at a minimum) daily, including nights and weekends, to try to rally support for Mr. Harris and against the incumbent Chair of the company. They met literally round the clock—in a dozen or more Zoom calls—in the days surrounding the release of the Dechert report. At least twice on Sunday, January 24. Twice the next day, and again the following.

46. The war council obsessively tracked public discussion of Mr. Harris and, critically, Mr. Black. The day after the announcement of the Dechert report, they produced comprehensive reporting—in astonishing detail—of Mr. Harris, Mr. Rowan, and Mr. Black's media profiles. The public relations advisors tracked top keyword searches associated with them; the geographic source of searches; the number of hits on Wikipedia pages; even the time of day of news hits mentioning the three men.

47. The war council knew its activities were wrongful and conducted its internal activities in secret, making concerted efforts to avoid any detection of them by Apollo or others. For example, one email sent by Mr. Zemsky on January 27, just days after the release of the

Dechert report, warned that they should take their communications off the Apollo system: "GOING FORWARD, ONLY USE SLACK WHEN COMMUNICATING WITH JOSH. Chris -- set up necessary groups. Even if JH pings you on whatsapp -- it should go to slack." Slack is a messaging system that promotes itself as "let[ting] you send self-destructing messages" and "transmit sensitive information, while keeping it out of your Slack account logs."

And even when the war council members did create a record of their communications, they deliberately spoke in code. For example, a subsequent email from Mr. Zemsky read, in its entirety: "hi -- any new thinking on the matter earlier discussed?" Another simply noted: "No knowledge of additional allegations but as previously reported didn't think LB [Leon Black] should be at the co anymore." The clear inference of this email is that the war council was actively trying to dig up as much dirt -- and find people with dirt -- to throw at Mr. Black. Given the importance of these issues, Apollo devoted substantial resources to ensure the Dechert investigation and its findings were conducted and presented with the utmost thoroughness and integrity. Apollo paid substantial legal fees to Dechert for its work on behalf of the independent directors.

### Harris Undermines Confidence in the Independent Investigation

69.     Rather than respect Apollo's decision to delegate responsibility for conducting a full and fair investigation to Apollo's independent directors, Harris, working through the enterprise and in flagrant violation of his fiduciary duties, engaged in secret efforts to interfere, influence, and discredit the investigation. These efforts included using the assistance of outside lawyers and media consulting firms – including firms that were then working as agents and fiduciaries of Apollo – to undermine confidence in the competence and sufficiency of the Dechert investigation. By doing so, Harris deprived Apollo of the value of an important corporate asset, one created through the expenditure of significant time, money, and resources.

70.     These efforts included retaining two other prominent crisis management and public relations firms in addition to RUBENSTEIN – BerlinRosen (a firm that specifically

promotes itself for its ability to "blunt the opposition's efforts" and "leverage the media" in litigation, with the "speed and intensity of a political campaign"), and Finsbury Glover Hering (a global crisis management firm), to assist the enterprise. The enterprise also retained the services of three prominent law firms, at least two of which were also representing Apollo at the time. These professionals worked in a coordinated effort through the enterprise to discredit Black, to undermine the work of Apollo's independent directors, and to challenge Apollo's decisions on critical strategic issues. These efforts were conducted in secret and were contrary to the interests of Apollo and its shareholders.

71.    As the Dechert investigation proceeded, Harris secretly approached Rowan. Harris told Rowan that Black's links to Epstein and the Dechert report might become damaging to Apollo. Harris proposed to Rowan that the two become co-CEOs immediately. Rowan responded to Harris that the better course of action would be to wait for the conclusions of the Dechert report and, in the interim, to empower Scott Kleinman and Jim Zelter with more operational authority. Harris did not agree.

72.    On January 7, 2021, Evan Zemsky, who was employed by Apollo as Harris's Chief of Staff, but who was secretly working on behalf of the enterprise, sent himself an email attaching a presentation prepared for Harris. The presentation identified four prominent litigators, including Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), to consider to initiate litigation against Black or Apollo. The litigators came expressly recommended by the law firms working with the enterprise, including firms that owed Apollo duties at the time, and the presentation included commentary as to the strengths and weaknesses of each as adversaries to Black and Apollo.

73.    On or about January 19, 2021, as the investigation commissioned by Apollo's independent directors approached its conclusion, members of the enterprise began to meet daily,

and sometimes multiple times per day.

74.     On or about January 23, 2021, Harris learned that the Dechert report would be highly favorable to Black, and that facts favorable to Black would be presented in a public report. Rather than respecting the judgment of Apollo and its independent directors, and in circumvention

of the corporate governance processes that Apollo had put in place with respect to these issues, Harris improperly reached out to at least two of Apollo's independent directors, falsely stating that Dechert's forthcoming report was a whitewash and not thorough enough, and urging them to reject it before even reviewing it. Harris, who did not have access to the evidence available to the committee, had no legitimate basis to disparage the investigation or its conclusions.

75.     On or about January 23, 2021, Harris spoke to A.B. Krongard, a former Executive Director of the CIA, and one of the three independent directors who had hired Dechert to conduct the investigation. Harris made disparaging remarks about the integrity of the investigation and criticized its conclusions. Krongard responded by telling Harris that this was "not his first rodeo," and warned Harris that if he did not have evidence that was unavailable to Dechert, it was improper for him to criticize the investigation by the independent directors, or interfere with Dechert's presentation of its report to the Apollo Board.

76.     Harris had no information that the independent investigators did not have access to, because Dechert had interviewed Harris in the course of its investigation. Further, Harris had agency, fiduciary, and other duties to disclose all relevant information to the independent directors.

77.     During his discussions with Krongard and other independent directors, Harris was subject to the duties of undivided loyalty, candor, and care. At no time did Harris inform any of the independent directors that at the same time he was criticizing the Dechert report and the work

of Apollo's independent directors, he was secretly engaged in extensive efforts, through the enterprise, to inflict financial and reputational harm on Black and Apollo, and thereby force Black's resignation from Apollo.

78.     On the same day that Harris spoke to Krongard, an emissary of Harris's approached Alex Spiro of Quinn Emanuel, one of the four firms identified by the enterprise in its search for

aggressive litigators. According to the emissary to Spiro, he was being sought out on behalf of a faction at Apollo engaged in "cagey business" and looking for a litigator who could be "adverse to Leon Black" on behalf of a woman later identified as Ganieva.

79.     In addition to failing to disclose his efforts to secure representation for Ganieva, at no time did Harris inform the independent directors that some of the professionals he had secretly retained to work through the enterprise – including Rubenstein – were also Apollo's agents and were being paid by Apollo. Nor did he inform the independent directors that he was secretly engaged in efforts to investigate Black's relationship with Epstein and was engaged in other efforts that were circumventing and undermining Apollo's well considered governance processes. But he was, as reflected in a March 21, 2021 email from Zemsky discussing an ongoing search for "knowledge of additional allegations" against Black, and the January 23, 2021 approach to Spiro to represent Ganieva, "adverse to Leon Black." During his discussions with Krongard and other directors, Harris was subject to the duties of undivided loyalty, candor, and care.

**The Independent Investigation Exonerates Black and Apollo of Wrongdoing**

80.     0The Dechert report, presented the findings of its independent investigation to Apollo's Board of Directors on January 24, 2021, concluded.

81.     Dechert informed the Apollo Board that Mr.it found "no evidence that Black had

~~engaged in no misconduct with Epstein. The central findings of the report were: first, all fees paid to Epstein were for legitimate business purposes; second, Epstein's fees were consistently vetted by major law firms; third, all fees~~ or any employee of [Black's] Family Office or Apollo was involved in any way with Epstein's criminal activities at any time." Dechert found "no evidence that Epstein ever introduced Black, or offered to introduce Black, to any underage woman." Dechert also found "no evidence suggesting knowledge of any other of Epstein's criminal activity or the scope and details of such activity, at any time prior to such activities being publicly reported."

82.    Dechert explained that the fees Black paid Epstein were for ~~value received from~~ "Epstein's legitimate advice on trust and estate planning, tax issues, issues relating to artwork, Black's airplane, Black's

yacht, and other similar matters, philanthropic issues, and the operation of the Family Office~~, and more; fourth~~." The report found that "such advice was vetted consistently by Black's other advisors" – including several major law firms – and that the fees paid "were intended to be proportional to the value provided," value that "witnesses generally agreed . . . conferred more than $1 billion and as much as $2 billion or more in value to Black."

83.    The investigators, consistent with the mandate of the independent directors, also thoroughly reviewed any ties between Apollo and Epstein. Their report found that other than an Epstein-linked entity purchasing a de minimis amount of Apollo stock, there was "no evidence of ~~any wrongdoing; and, fifth, there was no connection between Epstein and Apollo.~~

~~80.Upon information and belief, Mr. Harris sought to undermine the conclusions of the Dechert report both before and after it was provided to the Board. On January 23, 2021, aware of the report's conclusions, Mr. Harris sought out and conferred with at least two independent directors of Apollo to tell them that the report that they were about to receive was a whitewash,~~

not thorough enough, inadequate to support its conclusions. Mr. Harris did so not because he

~~possessed evidence that Mr. Levander had failed to consider, or because he possessed evidence that~~
~~Mr. Levander had in any way been derelict in his duties, but because of his bitterness that he was~~
~~about to be passed over as CEO by Mr. Black and his fellow Board members.~~

~~⁵Indeed, independent director A.B. Krongard called Mr. Harris on precisely this point the~~

~~day before the report was formally presented to the Board.~~ A ~~former Executive Director of the~~

~~CIA, and one of the three independent directors who had hired~~ Mr. ~~Levander, Mr. Krongard told~~

~~Mr. Harris that this was "not his first rodeo." Mr. Krongard warned Mr. Harris that if he did not~~

~~have additional information~~ that was ~~unavailable to the Dechert firm, he should not be attacking~~

~~the conclusions that the Board was poised to accept. Clearly, that would not have been in~~

~~Apollo's interest — not that Mr. Harris cared. The source of Mr. Harris's displeasure was not~~

~~Jeffrey Epstein at all, but the Board's decision to appoint Mr. Rowan as Black's sole successor~~

~~as CEO and retain Mr. Black as Chairman.~~Epstein or any Epstein entity having any relationship

with Apollo or any Apollo-managed fund."

84.     In addition to reviewing the Dechert report, the Board also made several critical

personnel and governance decisions at the January 24, 2021 meeting. First, the Board supported

the executive committee's decision to appoint Rowan to succeed Black as CEO on or before

Black's 70th birthday. According to Apollo, Rowan's appointment reflected "the complexion

and continued evolution of our business, and [Rowan's] unique contributions to the growth of

Apollo as credit and our permanent capital vehicles," – a reference to Athene, among other

initiatives – "now make up over 70% of our more than $455b AUM." Second, the Board decided

to add a total of six new directors, two management directors – Apollo co-Presidents Kleinman

and Zelter – and four independent directors. Two of the four new independent directors, Pamela

Joyner and Siddhartha Mukherjee, were proposed by Black and appointed at the meeting. Third,

during the meeting, Black requested that the Board consider additional measures to enhance

corporate governance, including changing the voting structure of Apollo shares "to ensure that

the voting rights of our shareholders align with their economic interests," and taking steps to better "empower the full Board to oversee all aspects of the company." Taken together, these decisions dramatically

reduced Harris's influence and control over Apollo's affairs.

85.     On January 25, 2021, Apollo publicly disclosed the results of the Dechert report, emphasizing the thoroughness of the investigation. Apollo also announced that Black would remain Chairman of the Board, and would retire as CEO on or before his 70th birthday in July of 2022. Finally, Apollo announced that the executive committee appointed Rowan to be Apollo's next CEO.

**The Enterprise Escalates Efforts To Remove Black**

86.     On January 26, 2021, at 3:45am, Harris forwarded the Apollo announcement to participants in the enterprise, including Rubenstein. One of the lawyers responded, "You ok?"

87.     Given the events of January 25, 2021, Black remained the major impediment to Harris's ambition to succeed Black as Apollo's CEO. It was therefore essential to Harris that Black be removed as CEO as soon as possible; that Black not be permitted to retain the role of Chairman of the Board; that directors loyal and sympathetic to Black be removed; and that Black's premature departure be used as the occasion to appoint Harris as co-CEO.

~~52In furtherance of the same scheme to stack the Apollo Board in his favor, Mr. Harris connived with one of his future designees to the Board. More specifically, on January 27, 2021, this future Board member sent Mr. Harris an email in which the future Board member wrote that he "was thinking of two directors for" Mr. Harris, and proceeded to identify two candidates while noting that he had "other names in mind as well." Forecasting that Mr. Harris might have to act fast in an effort to take down Mr. Black in the event there was more additional negative press on Mr. Black, the future Board member ominously advised Mr. Harris in the same email:~~

"If things break, they break fast. Everything correlates. Consider what happened to Harvey Weinstein's firm. There will be lots more digging into these stories."

§At the same time, the PR professionals who had joined the Enterprise went into high gear. They reached out toAs detailed below, Harris, Rubenstein, and other members of the enterprise escalated their efforts to execute on the fraudulent scheme to inflict economic and reputational harm on Black and Apollo, weaken Black's support at Apollo, and force his separation from the company. Among the methods by which members of the enterprise sought to accomplish these goals was to attack the conclusions of the independent investigation. Members of the enterprise began to undermine Black's support on Apollo's Board and worked to appoint directors supportive of Harris. Finally, the enterprise manufactured and disseminated flat out lies to discredit Black.

88.    Members of the enterprise worked in secret, in order to disguise their disloyalty to Apollo and its shareholders. On January 27, 2021, Harris's Chief of Staff (and Apollo employee) Zemsky wrote, in an email from his Apollo email address, "ONLY USE SLACK WHEN COMMUNICATING WITH JOSH . . . Even if JH pings you on whatsapp – it should go to slack." Slack is a communications platform that allows users to send what it describes as "self destructing messages." Zemsky's email strongly suggests the enterprise's communications were too sensitive, and too clearly against Apollo's interests, to be carried out on Apollo's servers, or to be recorded in any form.

89.    The enterprise, through Rubenstein and the other media consultants, contacted numerous media outlets, including Bloomberg, theThe Wall Street

Journal, ~~the New York Post, and likely others, to attempt to undermine the Dechert report, and to undermine Mr. Black.~~

~~89.~~ ~~Having been cleared of wrongdoing by the Dechert report, Mr. Black announced that he was following through on his plan to retire as CEO when he turned 70 in several months and remain as chairman of Apollo. Twice before, Mr. Black had offered the position of CEO to Marc Rowan, the other co-founder who, unlike Mr. Harris, was actually part of Apollo when it was founded. And twice before, Mr. Rowan had turned it down, because he was too busy building Athene. Presumably, Mr. Harris thought he would do so again, as Mr. Rowan had taken a 6-month "semi-sabbatical" in the spring and summer of 2020. But this time, though, with Apollo planning to merge with the insurance firm, Athene, that was Mr. Rowan's brilliant brain child, Mr. Rowan accepted the offer. Mr. Harris was totally spurned. Upon learning that he would be neither CEO nor co-CEO, Mr. Harris spurred his now fully constituted war council on to undermine the Apollo Board, which had refused to succumb to the Enterprise's pressure, and destroy Mr. Black.~~

~~**"[Y]ou are the right person to be CEO" . . . and "I wish there was something I could do to help you."**~~

~~89.~~ ~~The attitude of Mr.~~and the New York Post. Among the purposes of these contacts was to undermine the Dechert report and to call into question the report's conclusion that Black had no involvement in or even knowledge of any of Epstein's criminal activities.

90.     On January 25, 2021, Harris ~~and his war council~~was in communication with one of his potential nominees to ~~the~~ Apollo~~'s~~ Board ~~of Directors was simple: if the Board would not support Mr. Harris, then Mr. Harris would change, or at least punish, the Board. Mr. Harris's efforts to subvert the Board and Apollo's corporate governance began even before~~ During the course of their discussions about the Dechert report ~~was released,~~ and ~~only intensified after~~the Board's decision to permit Black to remain at Apollo, the future Board ~~accepted it.~~

~~¶Mr. Harris and the Enterprise had no time~~ member stated in an email exchange with Harris: "You are absolutely right. There's only one reasonable explanation for why Black made all those payments to ~~waste~~ Epstein." The ~~very same day that Apollo released the Dechert report, Mr. Harris began to correspond in secret with the future Board Member, who told Mr. Harris exactly what he wanted to hear. He claimed to be "outraged that the board kept Leon Black," reassured Mr. Harris that~~ potential Board member continued, "you are the right person to be CEO~~," and~~

." He wrote, "I wish there was something I could do to help you." ~~And he had a specific idea for helping: he suggested~~He then observed that, in "looking at the bios of your board members," they were not the right people to advance ~~Mr.~~Harris, and suggested that ~~Mr.~~Harris needed "independent . . . minded directors." ~~(Not "independent minded" from Mr. Harris, of course.) The two spoke in secret just two days later~~Like himself.

91.    Later the same day, Harris forwarded the future Board member's email to a lawyer advising the enterprise – a lawyer whose firm Apollo was paying significant fees – who responded to the suggestion that Harris should have been appointed CEO, and that the pro-Black composition of the Apollo Board was Harris's main impediment to becoming CEO, by writing, "[e]xactly."

92.    On January 27, 2021, Harris and the future Board member spoke via Zoom. After the call, the future Board ~~Member~~member told ~~Mr.~~Harris that he needed to ensure that ~~any new~~the newly-appointed Apollo directors would have "safety in numbers," and "strong peers~~,~~." ~~and~~He then suggested how Apollo's Board could be restructured in a way that would ~~allow Mr.~~enable Harris to cause Black to be removed. Referencing Harris~~'s attempts~~ to ~~exert maximum leverage. He, not so subtly, asked "if there are any interesting boards you want someone like me on~~discredit the Dechert report and Harris's desire to remove Black, the future Board member wrote, "[i]f things break, they break fast. Everything correlates. Consider what happened to Harvey Weinstein's firm. There will be lots more digging into these stories." Soon thereafter, ~~Mr.~~Harris appointed him to the Apollo Board~~.~~

~~57.Meanwhile, the Enterprise also set to work trying to destroy others on the Apollo Board. As part of a series of corporate governance enhancements announced around the time of the Dechert report's release, Mr. Black appointed two independent directors to the Board. The first was a world renowned physician and scientist (and Pulitzer Prize winner), Siddhartha~~

Mukherjee. Fearful that Mr. Mukherjee might not support Mr. Harris, given his appointment by Mr. Black, the Enterprise worked to take him down. Upon information and belief, Mr. Rubenstein and his team planted a hit job story with the *New York Post* attacking Mr. Mukherjee and questioning his independence, where he serves to this day.

93. On April 25, 2021, Kosman, who was a longstanding close professional contact of Rubenstein, published an article in the New York Post impugning the independence of Joyner and Mukherjee, Black's nominees to serve as independent directors. ThatThe story, published in late April and authored by *Post* journalist Josh Kosman, cited "sources close to the situation" for its (inaccurate) discussion of confidential Apollo boardBoard processes.

94. Apollo fought back with the facts, emphasizingissued a statement included in the story, stating that all its directors had "impeccable credentials and offer significant value to the Apollo Board"; that "[n]o member of the board has raised any concerns regarding the qualifications or commitment of the independent directors"; that new directors were "unanimously approved after extensive due diligence"; and that "[i]t is disappointing that the integrity and independence of such highly accomplished individuals

is being questioned by anonymous, unsubstantiated accusations." ~~But the damage was done. Two months later, Mr.~~ Mukherjee announced shortly thereafter that he would step down.

~~%The *Post*'s Mr. Kosman penned a scurrilous and defamatory article about the other of Mr. Black's director nominees, Pamela Joyner, in the wake of Ms. Joyner's appointment to the Apollo Board in January 2021, baselessly impugning her independence and the propriety of her serving as a Board member. Ms. Joyner, in fact, has unimpeachable integrity and extensive professional experience. In addition to founding Avid Partners, LLC, Ms. Joyner has held positions at Bowman Capital Management, Capital Guardian Trust Company, Fidelity Management Trust Company, Kidder Peabody and Merrill Lynch. Ms. Joyner is a former director of The Sharper Image, is a Trustee of Dartmouth College, and serves on the board of the Hopkins Center and the Hood Museum. She also serves as Co-Chair of the San Francisco Ballet, a trustee of the California HealthCare Foundation, and a board member of the Harvard Business School Association of Northern California. Mr. Kosman's—and the *Post*'s—assault on her credentials—at the behest of the Enterprise—was utterly misguided and of a piece with its attack on Mr. Mukherjee. It is no coincidence that these two hit jobs appeared against the two independent directors nominated by Mr. Black.~~

~~**The Search for a Lawyer for Guzel**~~**Ganieva's Defamatory Public Statements About Black**

95. On or about March 11, 2021, the Twitter account @GuzelGanieva3 was created.

96. Between March 11, 2021 and March 17, 2021, Ganieva

~~9)Meanwhile, at the same time they worked to take down anyone associated with Mr. Black, the Enterprise continued their efforts to destroy Mr. Black himself. Although Mr. Harris consulted with top litigators in the country to identify the most aggressive one to bring as of yet unidentified claims he could assert against Mr. Black, he lacked weapons which would detract~~

from the conclusions of the Dechert report. He had no claims to assert. But Guzel Ganieva did, even if they were total fabrications.

~~Upon information and belief, Mr. Harris deployed his associates to contact one or more of these firms in a search that ultimately ended when Ms. Ganieva retained the Wigdor firm. But before Wigdor was retained, the outlines of the Enterprise were revealed in a series of conversations with lawyers who ultimately turned down the representation.~~

~~Dechert's report was presented to the Board over the weekend of January 23-24. As it was happening, Mr. Harris's confederates were making the first of multiple calls to secure the most aggressive attorney they could find in New York City who was willing to be adverse to Mr. Black. They called Mr. Spiro of Quinn Emanuel, one of the four firms on their list, to find out if they would be free to take a case "adverse to Leon Black." They were reaching out~~ on behalf of a faction at Apollo engaged in "cagey business." ~~But Mr. Harris' confederates were not seeking counsel to represent themselves, or Mr. Harris. The potential client, as it turned out, was someone else entirely: a woman who would be "adverse" to Mr. Black, a woman later identified as Ms. Ganieva.~~

~~According to Ms. Ganieva's counsel, the incident with the investigators happened two months later, around the time Ms. Ganieva had taken to Twitter. Two individuals showed some form of law enforcement identification to the doorman at her building and were allowed up to her apartment door. The individuals supposedly identified themselves as investigators, but not for whom. Upon information and belief, the investigators advised her that if she wanted to sue Leon Black, she should hire Spiro—the same litigator the "cagey" faction had already contacted.~~

**~~Ms. Ganieva Takes to Twitter~~**

~~The timing of the investigators' approach to Ms. Ganieva was hardly a coincidence. A week earlier, on March 17, 2021, pointedly referring to Mr. Black as "~~, with help from others, composed a series of tweets in which she would publicly and falsely accuse Black of criminal acts,

including sexual abuse, threats, harassment, and other unlawful behavior. Before Ganieva posted any tweets, only three other Twitter users followed her account: Ronan Farrow of The New Yorker, Matthew Goldstein of The New York Times, and Richard McHugh, then of NBC. It is

unlikely that these three well-credentialed reporters – each of whom had published articles regarding sexual harassment allegations – happened upon Ganieva's newly created account by accident. Rather, the initial followers were presumably, and indeed most probably, invited or recruited by the enterprise in advance of Ganieva's planned attack on Black, in order to generate additional unfavorable reporting on Black.

97.    On March 17, 2021, Ganieva posted three tweets. She wrote: "Although I am a private person, in light of the recent media coverage, I think I have an obligation to make a statement regarding Apollo Global Management's CEO and Chairman, Leon Black," and including the hashtags #MeToo and

#LeonBlack, Ms. Ganieva had tweeted (i) that she had been ". I was sexually harassed and abused" by Mr. Black "him for years"; (ii) that Mr. Black "could not understand me when I refused his sexual advances"; (iii) that she had been "bullied, manipulated, threatened, and coerced" by Mr. Black;

(iv) that, "under duress, I was forced to sign an NDA in 2015"; and (v) that she did "not want this type of predatory behavior to continue happening to other women."

64.Ms. Ganieva's new account had attracted only three followers, but they were no random trio: Ronan Farrow of the New Yorker, Matt Goldstein of the New York Times, and Richard McHugh, then of NBC. The three were all journalists who covered the #MeToo movement and Apollo. Upon information and belief, they didn't just happen upon Ms. Ganieva's never-used Twitter account by accident – which would be a remarkable coincidence; they were recruited for that very reason, in advance of her explosive tweets.

65.The Enterprise might have expected that at least one of the three followers would follow up with a story repeating the false charges – even if they were totally unsupported and inconsistent with Ms. Ganieva's own conduct. But all three reporters passed on the story, as did other prominent journalists including Julie Brown, who broke the Epstein story, and Jodi Kantor, who broke the Weinstein story. All of these reporters presumably saw this for what this was: *not* a true story, but an effort to use them as a tool to extort more money.. It started in 2008 when I met with him to discuss work. While he understood my career aspirations, he could not understand me when I refused his sexual advances. I was bullied, manipulated, threatened, and coerced. Similarly, under duress, I was forced to sign an NDA in 2015. I am breaking my silence now because I do not want this type of predatory behavior to continue happening to other women. #MeToo #LeonBlack." The conspicuous reference to "Apollo Global Management" constitutes strong circumstantial evidence that Ganieva's tweets were designed to apply pressure

on Apollo to remove Black.

98.     However, none of Ganieva's three hand-picked followers on Twitter published anything in response to Ganieva's false allegations. They were not the only ones to say no: not only Farrow, Goldstein, and McHugh, but also Julie Brown of the Miami Herald, who was responsible for breaking the Epstein story, and to whom Ganieva emailed her false accusations on multiple occasions, including in the weeks before the tweets, and Jodi Kantor of The New York

Times, whom Ganieva contacted in 2019.

99.     On March 25, 2021, Ganieva sent Goldstein of The New York Times a WhatsApp message stating: "Two PIs showed up in my place yesterday. They passed through the doorman by showing a badge. They told me that they work for a lawyer Alex Spiro and he wants to represent me." As described above, in January 2021 an emissary of Harris seeking representation for Ganieva on behalf of a faction at Apollo engaged in "cagey business" had reached out to Spiro. Following Ganieva's tweets, Spiro attempted to secure Ganieva as a client.

~~(The Enterprise had seemingly hit a wall. Lacking other options—having failed to garner coverage from the leading reporters covering the #metoo movement or Apollo, notwithstanding the potentially explosive story, that any legitimate journalist would want to break—they went to an old friend. An interview was arranged with Josh Kosman, the one reporter who they all knew, based on his past reporting, highly critical of Mr. Black, would not pass, and who was particularly close to Rubenstein. He delivered. The interview with Ms. Ganieva was~~

~~published in the~~**Black's Resignation from Apollo**

100.    Black learned about Ganieva's tweets shortly after March 17, 2021. Black learned that Harris, too, knew about the tweets at that time, despite the fact that they had not been widely liked, retweeted, or commented on.

101.    Black discussed the tweets with Rowan, his chosen successor. In light of the serious nature of the allegations, and their potential adverse impact on Apollo's business, Black and Rowan agreed Black needed to resign as Chairman and CEO to protect Apollo. Black thought it was in the best interests of Apollo to defend himself without involving Apollo in the fight. Black planned to continue to play an informal advisory role at Apollo, lending his several decades of investment experience and acumen to the firm.

102.    On March 21, 2021, Black resigned as CEO, Director, and Chairman. As a result, Black lost his office, health insurance, and other valuable benefits including administrative support and a car and driver. Black was formally cut off from an institution he spent his life building, and in which he remains the single largest shareholder.

103.    Stripped of his role as Chairman and forced to transition from the CEO role months ahead of schedule, Black nevertheless remained committed to the company to which he had devoted his life. The week of March 29, 2021, Black attended, in his capacity as Apollo's largest

shareholder, a meeting with certain Apollo executives. As described below, shortly thereafter, Black's attendance at the informal meeting – which was not press-worthy – somehow made its way into the press.

104.    Black's suspicions that Ganieva's tweets were part of an orchestrated attack to remove him from Apollo were soon confirmed. On April 8, 2021, Kosman published an

"exclusive interview" with Ganieva. The New York Post ~~on April 8, 2021, including her~~article included Ganieva's false claim that "Black's abuse 'was over a long period of time and it was tragic.'" ~~Josh Kosman, *Leon Black's surprise Apollo Global exit came amid sexual harassment allegation*, N.Y. POST (Apr. 8, 2021), https://nypost.com/2021/04/08/leon-black-accused-of-sexual-harassment/.~~

~~¶In response, Mr. Black, concerned that the story would not only damage him and his family, but also the company he spent thirty years building, stepped down as Chairman of Apollo. Mr. Black responded to a reporter for the business publication, Bloomberg'~~"

105.   On or about April 8, 2021, Black issued a statement regarding his relationship with Ganieva: "I foolishly had a consensual affair with ~~Ms.~~Ganieva that ended more than seven years ago~~" adding that~~. Any allegation of harassment or any other inappropriate behavior towards her ~~allegations were "~~is completely fabricated.~~"; and "I have been~~ Black also stated that Ganieva had extorted ~~by Ms. Ganieva~~him for ~~many~~ years and ~~I~~that he had "made substantial monetary payments to her~~. . . ." Gillian Tan, *Leon Black says he paid to hide affair, denies it led to Apollo exit*, BLOOMBERG NEWS NETWORK (Apr. 8, 2021), https://www.bnnbloomberg.ca/leon-black-says-he-paid-to-hide-affair-denies-it-led-to-apollo-exit-1.1588031. All of which was, and is, indisputably true.~~, based on her threats to go public concerning our relationship, in an attempt to spare my family from public embarrassment."

~~¶In the wake of Ms. Ganieva's tweet, Mr. Harris and his minions kicked their monitoring of press regarding Mr. Black into high gear. On March 23, 2021, just days after the publication of the tweet, a technology and digital consulting firm evidently working on Mr. Harris's behalf sent an email to his Apollo employees doing his bidding, writing, "Attached is today's sentiment tracking report . . . Would you like a similar report tomorrow?" Accompanying the email was an attachment titled, "APO-Leon Black Sentiment Tracking," a 21-page PowerPoint presentation~~

detailing, among other things, press reports about Mr. Black and his association with none other than Jeffrey Epstein.

**The Original Complaint: An Alleged Sexual Assault.**

60. The next step was litigation in New York State Court, with the accompanying presumptions of privilege from disclosure and defamation, privileges that should not withstand the rules governing crime-fraud and sham litigation.

71. Notably, Ms. Ganieva's counsel in that litigation, Wigdor, deployed an entirely new playbook to handle this case, one that is flatly at odds with its handling of its other cases. Seemingly without fail, Wigdor takes cases on contingency, makes demands, signs protective orders where appropriate to obtain information from its accused targets, and resolves most of its cases without so much as filing an initial complaint. As its website proudly proclaims, "Because we have a reputation for obtaining multi-million verdicts, we are able to settle the majority of our cases without the need for even filing complaints." That is because Wigdor's clients have their greatest leverage—and Wigdor its biggest profit margins—when the firm can quietly trade away claims whose embarrassment potential is usually far greater than the potential liability or damages.

7. This time, Wigdor took on a client who had already extorted her target and was walking away from far more money than she could ordinarily hope to collect once she went public. Wigdor chose to file its complaints without making a single demand for settlement—sacrificing all its leverage by going public with lies that went far beyond the "tweets" in scope and detail. Days after Ganieva's defamatory statement to the New York Post was published, Black was subject to yet another press attack. On April 13, 2021, the Financial Times published an article entitled "Leon Black attended Apollo Global meeting days after resignation." The article suggested that Black's attendance was improper, and that his continued presence "could undermine [Apollo's] efforts . . . to emerge from the shadow of its billionaire co-founder." The article did not mention that it was in the best interests of the company for Black to continue

providing his unique knowledge and insight to members of Apollo's executive committee.

106.    In response to the story, Apollo and Black severed even informal ties. Apollo was deprived of the benefit of the financial genius, strategic vision, and operational competence that had generated tens of billions of dollars in shareholder value over the prior 30 years.

**Ganieva and Wigdor's Sham Litigation**

107.    On or around April 9, 2021, Ganieva formally retained Wigdor. However, Wigdor had been advising Ganieva at least as early as October 2020 in connection with her efforts to generate negative press stories about Black. It is not clear why Wigdor and Ganieva waited until April 2021 to execute a formal engagement letter, or whether anyone other than Ganieva was involved in that decision. Wigdor did not reach out to Black before filing Ganieva's complaint, nor did it make a settlement demand. Wigdor would go on to file not one but three different complaints on behalf of Ganieva, each of which was laden with lies disproven by Ganieva's own statements, which Black had recorded and preserved.

108.    7On June 1, 2021, Ms. Ganieva and Wigdor filed the first of three increasingly salacious (and wildly different)these complaints in New York Supreme Court, New York County. (Ex. 1,See generally Complaint, *Ganieva v. Black*, No. 155262/2021 (N.Y. Sup. Ct. June 1, 2021 Complaint) ("Original Compl."), attached hereto as Ex. 1.) The Original Complaint asserted four claims: two for defamation based on Mr. Black's public statement rebutting her defamatory tweets; a claim for intentional infliction of emotional distress based on abuse Mr. Black supposedly heaped on her during the duration of their affair; and a claim under the New York City Gender Motivated Violence Act based on a purported sexual assault, the centerpiece of the Original Complaint. (*Id*. ¶¶ 91-130.)

109.   ~~7.~~The assault supposedly took place seven years earlier, on July 6, 2014, when the Original Complaint alleges that ~~Mr.~~ Black "barged" into ~~Ms.~~ Ganieva's apartment "suddenly" and without warning. (*Id.* ¶ 47.) Ganieva then allegedly became unwell and was "limp and unable to move." (*Id.* ¶¶ 47, 51.) ~~In her Original Complaint, Ms.~~ Ganieva ~~claimed that after sending Mr.~~made these allegations even though contemporaneous text messages show that she had invited Black to her apartment. Ganieva had texted Black ~~a text inviting him (,~~ "Baby . . . I'm all alone. Let's get together soon. I miss you. Xoxo.~~")~~ (Ex. 2, Answer ¶ 49), she then ~~became unwell and was "limp and unable to move" when Black came "barg[ing] in." (*Id.* ¶¶ 47, 51.) Not too unwell, as it turned out, to invite Mr. Black to "tuck her in," to ask that he~~" and on the evening of July 6, had asked Black to bring her a bottle of wine~~, and to profess her love the next day.~~

~~7.A false accusation of criminal wrongdoing generally amounts to defamation, and may also give rise to claims for mental and emotional distress. False accusations *may* be subject to the litigation privilege if made in the course of litigation brought and prosecuted in good faith, or in statements made about judicial proceedings. *But there is nothing magical about packaging lies in a court filing.* A "sham pleading"—a sham complaint, or answer, or other statement about litigation—does not protect the lies it contains from being actionable. Under the sham pleading doctrine, a defamation claim may lie based on claims made in litigation "where the underlying lawsuit was a sham action brought solely to defame the defendant." *Flomenhaft v. Finkelstein*, 127 A.D.3d 634, 638 (1st Dep't 2015); *see Williams v. Williams*, 23 N.Y.2d 592, 596 (1969). A defamation claim based on the sham pleading doctrine is actionable against both the plaintiff in the underlying lawsuit and their attorneys. *See, e.g.*, *Flomenhaft*, 127 A.D.3d at 634, 639; *Halperin v. Salvan*, 117 A.D.2d 546 (1st Dep't 1986).~~

~~The Answer: "This is Love."~~ (Answer, *Ganieva v. Black*, No. 155262/2021, ¶ 49 (N.Y. Sup. Ct. July 19,

2021) ("Answer"), attached hereto as Ex. 2.)

110.    Within hours of Wigdor filing Ganieva's Original Complaint, the New York Post's Josh Kosman, who had earlier coordinated with Rubenstein to publish Ganieva's April 2021 "exclusive interview," published an article quoting Ganieva's false allegations at length. The next day, Kosman authored yet another article about Ganieva's sham complaint. Rehashing Ganieva's false allegations, Kosman, paraphrasing "legal experts," commented that the "silver lining" of Ganieva's suit was that it did not "mention Epstein, and therefore doesn't provide grounds for digging into matter pertaining to the dead pedophile."

111.    ~~75Mr.~~ Black responded to the Original Complaint with an Answer filed on July 19, 2021.

The Answer contradicted the Original Complaint's claims with ~~Ms.~~ Ganieva's own words. A week before the supposed assault, on June 28, ~~Ms.~~ Ganieva sent the text suggesting she and ~~Mr.~~ Black should get together "soon." Then, on July 6, the ~~*very*~~ day of the supposed assault, it was

~~Ms.~~ Ganieva who wrote to ~~Mr.~~ Black, unsolicited: "This is love. I need you." (Ex. 2, Answer ¶ 49 ~~(emphasis added)~~.)

112.    ~~7.~~In response, ~~Mr.~~ Black said that he would be driving back to New York City the evening of July 6, and inquired if he could "come over and tuck you in at 10:30?" (*Id*.) ~~She not only agreed. She asked for wine. "Aaah~~<u>Ganieva responded, "[a]aah</u>. Can you please bring a bottle of wine if you can?" (*Id*.) He agreed~~, as she knew he would. And he arrived earlier, at her invitation.~~

~~7.~~~~Ms.~~

113.    Ganieva reached out to ~~Mr.~~ Black first thing the following morning with a message of thanks and love: "Good morning. It was very nice to see you last night. I already feel better . . .~~.~~ .

I love you and thank you!!! Xoxoxoxoxo and more love." (*Id*.<u> ¶ 52.</u>) ~~This, to her supposed brutal rapist.~~ And on July 9, she thanked ~~Mr.~~ Black again, asked if he wanted to get together, and sent "lots of love." (*Id*. ¶ 53.) When ~~Mr.~~ Black did not respond, ~~Ms.~~ Ganieva reached out yet again the next day to try ~~again~~ to get together. (*Id*.) ~~When Ms. Ganieva peddled her lies in her June 2021 lawsuit, she obviously did not expect that Mr. Black still kept the text messages she had sent him some seven years earlier.~~

114.    ~~8.~~Contrary to the claim in the Original Complaint that "[a]fter this rape, ~~Ms.~~ Ganieva took her son and left New York to physically distance herself from Black," (Ex. 1, <u>Original </u>Compl.

¶ 55), ~~Ms.~~ Ganieva and ~~Mr.~~ Black saw each other several times, at her request, between July 6, when ~~Mr.~~ Black supposedly raped her, and July 30, when she texted him from the plane as she was departing: "I love you and miss you already." (Ex. 2, Answer ¶ 58.) ~~Mr.~~ Black's Answer~~—~~ <u>–</u> entirely corroborated by contemporaneous text messages ~~—showed~~ <u> – exposed</u> the ~~fraudulent~~

allegation of sexual assault ~~to be~~as a fraudulent sham.

115.    ~~7)Ms.~~ Ganieva's ~~defamation~~ claims that Black defamed her in a public statement in which he accurately described her extortion are no less of a sham. Truth is an absolute defense to defamation. ~~The~~Ganieva's extortion was captured on tape. ~~Ms.~~In the summer of 2015, Ganieva repeatedly warned that

if ~~Mr.~~ Black did not pay her ~~the money she demanded~~$100 million, she would report their affair to ~~Mr.~~ Black's wife, the ~~board of his company~~Apollo Board, and the press. ~~This is, of course, the very definition of extortion.~~

116.     ~~¶~~Ms. Ganieva ~~has~~also alleged that she was threatened by ~~Mr.~~ Black, and that he forced her to ~~agree to~~accept the ~~extortion against him~~agreement to pay her $100,000 per month in exchange for Ganieva not publicizing their relationship. Her Original Complaint offers supposed direct quotations from ~~Mr.~~ Black in this regard: "If you do not take the money, I will put you in prison~~,~~," and "~~If~~[i]f you do not take the money, I will destroy your life." (Ex. 1, Original Compl. ¶ 3 ~~(emphasis in original)~~; *see also id.* ¶ 63.) ~~Mr.~~ Black ~~never said anything of the sort. Here and elsewhere, Defendants' pleadings in the state case liberally and seemingly randomly place quotation marks around certain words, turns of phrase, and full sentences, as though they were verbatim quotes but without any citation or even reference to where they come from. There are recordings. They were never said. Once again, Ms.~~'s recordings of his conversations with Ganieva demonstrate the falsity of these claims. The recordings make clear that Ganieva ~~miscalculated—this time she was unaware of the secret recordings Mr. Black had made six years earlier when he captured her extortionate threats.~~

~~¶~~Ms. ~~Ganieva was openly~~was pleased with the ~~agreement. It was not simply in later years, while attending law school and afterwards, that she ratified the basic agreement by accepting her monthly checks~~arrangement. After agreeing to accept millions of dollars in exchange for not speaking publicly about their affair, she ~~spent approximately 45 minutes sharing a Grand Marnier soufflé with Mr. Black, discussing~~discussed her investment and travel plans, and ~~laughing~~laughed about the fact that she was "a woman of means now." (Ex. 2, Answer ¶ 40.) Shortly after their meeting, she texted him: "[t]hank you for everything. Talk soon xoxo." (*Id.*

¶ 41.) ~~Not a word about rape.~~

**~~The~~The Ganieva's   Amended   Complaint~~:   "Finding   Jeffrey Epstein."~~**

<u>117.</u>   ~~¶The Original Complaint clocked in at 90 paragraphs. But after it was thoroughly debunked by the texts and tape recordings, Defendants intensified their efforts to destroy Mr. Black and extort him for even more~~<u>Black's Answer set forth detailed evidence demonstrating that Ganieva's allegations were false</u>. On August 9, 2021, <u>in what was solely a malicious attempt to injure Black further,</u> Ganieva and Wigdor filed an Amended Complaint. ~~This one ballooned to some 244 paragraphs—with a new slate of scandalous, headline-~~

~~grabbing and wholly fabricated material~~ almost twice as long as the original.

(*See* Am. Compl., *Ganieva v. Black*, No. 155262/2021 (N.Y. Sup. Ct. Aug. 9, 2021) ("Am. Compl."), attached hereto as Ex. 3.) The new allegations focused ~~largely~~almost entirely on Jeffrey Epstein. ~~None of these new allegations arose from anything that happened after the filing of the Original Complaint that might explain their noticeable absence from the Original Complaint. Quite the contrary, they dealt with events even longer before: in this case, *thirteen years earlier*. Had there been even the slightest kernel of truth to any of them—which there is not—they logically would have appeared in the Original Complaint. And there is no reason, legally speaking, for their inclusion at any point,~~ who was barely mentioned in the Original Complaint. The new allegations were scandalous, intentionally headline-grabbing, and, most importantly, entirely fabricated. The newfound allegations regarding Epstein appear nowhere in any of the actual Causes of Action asserted in any iteration of ~~the complaint. They are part of the extortion campaign~~Ganieva's complaints, and are not relevant to any claim. The allegations serve only to defame Black, ~~and~~ not to advance any legitimate litigation ~~effort. *See Oakley v. Madison Square Garden Networks*, 1:17-cv-06903-RJS (S.D.N.Y. 2021) Dkt. 68 ("From its inception, this case has had the feel of a public relations campaign"); Dkt. 124 (seeking sanctions against lead counsel Wigdor for pursuing "baseless allegations [in successive complaints] that they knew from the outset were false, but which furthered their smear campaign.").~~objective.

118.     ~~¶For the~~In her Amended Complaint, ~~Ms.~~ Ganieva ~~suddenly remembered~~alleged being kidnapped by ~~Mr.~~ Black in October 2008, flown against her will to Palm Beach, Florida on ~~Mr.~~ Black's private plane, taken to Epstein's home there, and coerced into a meeting with Epstein, ~~Mr.~~ Black, and one of Epstein's associates, Sarah Kellen, for the purpose of gratifying ~~Mr.~~ Epstein's sexual desire. (Ex. 3, Am. Compl. ¶¶ 75-108.) During that meeting, ~~Ms.~~ Kellen supposedly told ~~Ms.~~ Ganieva that Epstein and ~~Mr.~~ Black were "sex addicts." (*Id*. ¶ 97.) ~~All~~

~~wholly fabricated~~<u>These allegations are demonstrably false</u>.

119.   ~~¶~~Although the Amended Complaint contains boldfaced, block-text quotations supposedly from ~~Ms.~~ Kellen, it identifies no documentation, recordings, or other memorialization of the alleged conversation between ~~Ms.~~ Ganieva and ~~Ms.~~ Kellen some 13 years ago. (*Id*.) And

like so much of the various complaints ~~Ms.~~ Ganieva filed, ~~they~~the alleged quotations from Kellen are fabrications. ~~Ms.~~ Kellen ~~will testify at the appropriate time that she took part in no such meeting, and~~ had no such conversation with Ganieva; indeed, Kellen never met Ganieva.

**~~The Answer: "Jeffrey Who?"~~**

*120.*   ~~In his~~Black's Answer to the Amended Complaint (~~Ex. 4), Mr~~Answer to Am. Compl., *Ganieva v.*

*Black*, No. 155262/2021 (N.Y. Sup. Ct. Sept. 8, 2021), attached hereto as Ex. 4), again conclusively debunked Ganieva's lies. Black used flight manifests to establish that ~~Mr. Black~~he and ~~Ms.~~ Ganieva never took the same-day round trip flight to Florida in October 2008 that is described in the Amended Complaint. In fact, they never flew to Florida together at any point that entire year.

Another lie.¶ Moreover, the contemporaneous recordings of ~~Mr.~~Black and ~~Ms.~~ Ganieva from the summer of 2015, shortly after she began extorting him, call into question the Amended Complaint's allegation that Ganieva ever even met Epstein, let alone that their meeting was the result of a kidnapping by ~~Mr. Black—which explains his late appearance as the centerpiece of this case.~~Black.

~~¶At one point during a recorded conversation, Ms. Ganieva brought up Epstein's name in the context of one of the convoluted conspiracy theories she accused Mr. Black of orchestrating against her. Mr. Black questioned whether Ms. Ganieva had ever even met Epstein. In response to that question, Ms. Ganieva initially told Mr. Black that she had *never met* Epstein and mentioned *nothing* about Mr. Black's supposed kidnapping of Ms. Ganieva to take her to Epstein's house for a threesome, as she later alleged in her Amended Complaint. (Ex. 4, Answer to Amended Complaint, at 2).~~

~~¶The Amended Complaint also made accusations that Mr. Black subjected Ms. Ganieva to yet additional sexual assaults and abuse, that he threatened to plant heroin on her, and~~

that he threatened to manufacture evidence against her and even kill her if she did not do his bidding. *None of* these terrible accusations -- all of them total lies -- were even alluded to in the Original Complaint, much less stated outright. And none of the alleged "facts" underlying these

~~purported grievances were unknown or unknowable to Defendants when the Original Complaint was filed. The obvious explanation for their debut in the Amended Complaint is that Defendants, after realizing that the central rape and coercion allegations in the Original Complaint had been completely debunked by unrebuttable evidence, felt they had no choice but to double down and come up with yet a new slate of lies in order to keep their extortion scheme alive.~~

**~~The Proposed Second~~**

121.   Faced with documentary evidence that the core allegations in the Amended

Complaint~~: **Twenty Years After**~~

~~9).After being confronted yet again with Ms.~~ were also false, Ganieva~~'s own words, this time in Mr.~~

~~Black's second Answer, Defendants moved to amend the complaint once again~~ on

September 20, 2021~~.¹ Defendants'~~ filed a proposed Second Amended Complaint~~(~~. (*See* Second

Amended Compl., *Ganieva v. Black*, No. 155262/2021 (N.Y. Sup. Ct. Sept. 20, 2021) ("Second

Am. Compl."), attached hereto as ~~Ex. 5.~~)

122.   Ganieva and Wigdor's proposed Second Amended Complaint offers a new round

of unfounded and defamatory allegations, including ~~an impossible-to-defend against~~several that

have nothing to do with Ganieva's claims. These gratuitous allegations include a tale of an

anonymous massage at ~~Jeffrey~~ Epstein's ~~house~~Manhattan home some two decades ago for which

the ~~woman~~Jane Doe referenced was supposedly paid ~~$5,000. In 2001. Again, all lies.~~

~~9).The definition of a sham complaint is one that is brought solely to defame. These Jane~~

~~Doe allegations have nothing whatsoever to do with Ganieva's claims, even such as they are: an~~

~~alleged single encounter between strangers versus a multi-year affair; a supposed payoff of~~

~~$5,000 twenty years ago versus monthly payments totaling millions of dollars; an unknown Jane~~

~~Doe versus a woman sending her love. No pattern can be found even in the fabrications.~~

~~9).Defendants also added a completely gratuitous new section to their~~ proposed Second

_____

~~¹        Mr. Black has reserved all rights with respect to the proposed Second Amended Complaint.~~

~~Amended Complaint~~ _called_

_$5,000, and an entire section labeled,_ "Other Evidence of Black's Close Ties to Epstein's Private Conduct." ~~These~~(_Id._ ¶¶ 145-150.) Ganieva and Wigdor added these extraneous allegations ~~have~~ ~~_nothing whatsoever_ to do with anything else in the complaint, except in terms of its extra-judicial impacts, that is, attempting to use them as weapons of mass destruction.~~

~~¶Defendants included an image of a document that purports to show that someone requested someone named "Leon's" telephone number from Epstein. Not Leon who? Not Leon why? Inclusion in the Epstein rolodex hardly appears, in retrospect, a mark of exclusivity. Mr. Black invited Apollo's independent directors to investigate his relationship with Epstein because he knew they would find no wrongdoing. It should have mattered. It was the work of the Enterprise to assure that it did not.~~

**~~The Defendants Deliberately Stall~~**

~~¶Nothing material has happened in the state case~~<u>to apply additional settlement pressure on Black.</u>

<u>123.</u>   <u>Wigdor's representation of Ganieva has been marked by a variety of dilatory tactics inconsistent with pursuing a bona fide claim.</u> On September 27, 2021, an in- person conference was called because ~~Mr.~~ Black's lawyers<u>' letters and phone calls</u> were simply being ignored. ~~They wrote letters. No one answered. They asked for phone calls. No luck.~~ Discovery deadlines ~~came and went. Nothing. Fights about nothing – the signing of a boilerplate protective order – have become excuses used by~~<u>passed with no action.</u> Wigdor <u>also falsely claimed that it does not, as a matter of firm practice, sign</u> <span style="color:green">protective orders to govern the disclosure of sensitive materials. Wigdor relied on this false claim both</span> to block <u>progress on</u> discovery ~~Meanwhile, more~~ and ~~more stories, full of unverified, untrue, and scurrilous character assassination, are being spread in the mainstream and social media by the Enterprise.~~

~~¶Once this case was filed, Defendants found a new excuse to block legitimate discovery in the case they themselves brought. They claimed that Mr. Black was simply using discovery in the state case to uncover facts that support this claim. Were that its purpose, and it is not, it would count as a dismal failure. Ms~~<u>as a pretext to ignore the tape recordings, texts, and other information that demonstrate Ganieva engaged in illegal extortion.</u>

<u>124.</u>   Ganieva and her confederates have ~~blocked~~<u>refused to provide</u> the most basic items that a party seeks in discovery – items ~~such as~~<u>including</u> phone records ~~of~~<u>showing</u> the existence (not the substance) of ~~conversations~~<u>her communications with Rubenstein,</u> among ~~parties. Ms~~<u>others.</u>

Ganieva's attorneys at Wigdor have even blocked discovery of her own telephone and related records in the weeks and months leading up to the complaint, which, upon information and belief, will reveal coordination with the Enterprise. Indeed, at the last Original Complaint. At a court appearance in the state court action, on January 7, 2022, her Ganieva's lawyers at Wigdor made no mention of seeking to contest Mr. Black's subpoena for her phone records, and then made a motion

late that very evening that blocked the planned release of Ms. Ganieva's phone records, due four days later.

125.    ~~¶Ms. Ganieva's determination to avoid confronting the weaknesses in her own case is understandable; they are no surprise to her. But it is hardly typical conduct for a plaintiffs' firm (especially one acting on contingency), confronted with its own clients' texts and recordings directly and explicitly contradicting the claims included by counsel in a complaint, to decline the opportunity to review the transcripts, to listen to the tapes, to find out if their client's claims are bogus until after they had filed three complaints.~~<u>The limited phone records requested will reveal in greater detail Ganieva's coordination with the other members of the enterprise. Indeed, the limited discovery provided since the filing of Black's Amended Complaint in this action (ECF No. 46) has revealed that, contrary to Wigdor's suggestion, Ganieva and Wigdor worked together to spread her false claims to the press as early as October 2020.</u>

126.    ~~¶There are myriad examples of Wigdor litigating Ms. Ganieva's state court case in a manner designed to maximize its extortionate impact while stalling the actual litigation of her claims. One stark illustration is how they refused to enter into a standard protective order, using this as a pretext for not reviewing the evidence proving to the firm what it must have known, and what Mr. Black's answers in the state court case clearly demonstrated -- that Ms. Ganieva's allegations in the complaints were squarely contradicted by tape recordings, texts, and other evidence that she engaged in unlawful extortion. Wigdor attempted to justify its willful blindness by claiming that the firm *never* signs~~ protective orders to govern the disclosure of sensitive materials, ~~stating that this is something "*which Wigdor LLP does not do*." Except that it does. *See, e.g.*, Stipulation and Order, *Kafenbaum v. Soulcycle Inc.*, 20-cv-06315 (AT) (OTW) (S.D.N.Y. Apr. 21, 2021); Stipulation and Order, *Chase v. Reed Smith LLP*, 20-CV-06121 (JPO) (S.D.N.Y. Jan. 28, 2021); Stipulation and Order for the Production and Exchange of Confidential~~

Information, *Mann v. MLB Advanced Media, L.P.*, 651503/2018 (Sup. Ct. N.Y. County Aug. 23, 2018); Stipulation and Order for the Production and Exchange of Confidential Information, *Town Total Holdings v. Conte*, 656194/2016 (Sup. Ct. N.Y. County Apr. 10, 2017). Ganieva and Wigdor recently proposed extending discovery until at least January 2023; delaying the filing of dispositive motions until July 2023; and thereby effectively delaying any judicial resolution of the litigation for nearly two years. As the state court action hangs in limbo as a result of Ganieva's and Wigdor's obstructionism, the enterprise continues to spread defamatory stories in both the mainstream press and on social media.

**~~"Billionaire Investigated for Rape"~~**

~~97.~~**Ms.** **Ganieva** ~~has committed a crime. She extorted Mr. Black. Mr. Black reported this crime~~**Makes a False Report** to the ~~New York County~~**Manhattan** District Attorney~~'s Office without fanfare.~~

~~98.The Enterprise has taken a different approach. Seven years after texting her love to the man who she would later claim had raped her, the Enterprise arranged not only for the filing of a false police report by Ms. Ganieva, but for a new and enhanced round of publicity claiming that Mr. Black was being criminally "investigated" for rape.~~

~~99.The Enterprise did this solely for its media impact. They understood that~~<u>In or around the early fall of 2021, Ganieva filed a false report with</u> the Manhattan District Attorney~~as~~<u>, claiming Black raped and sexual assaulted her. As</u> a matter of policy<u>, the Manhattan District Attorney</u> is obligated to examine every complaint of sex abuse.~~ That hardly means there is an active investigation.~~

~~100.In short, while still resisting legitimate discovery in the underlying action, while refusing to confront the evidence that establishes that their client's claims are lies, Defendants are pressing forward with their false claims, not because they have any realistic expectation of prosecution but because of the certainty of yet another public repetition of the false accusations that, in the wrong hands, have become a weapon of mass media destruction.~~

~~*      *      *~~

~~101.It is not a sham to bring a lawsuit in good faith, even if it ultimately is not possible to prove liability by a preponderance of the evidence. That has been true in the context of sexual assault, and women have been blamed, and victimized, by a system that visited upon the women victims of sexual assault a level of distrust and skepticism that made it all but impossible to find appropriate men—powerful men, husbands, bosses—responsible for wrongdoing.~~

~~102.#MeToo was, in the view of many long overdue, and jury verdicts are beginning to~~

reflect that. A correction was needed, and the statistics suggest it still is. But recognizing that women should be believed does not mean that every woman is telling the truth. Understanding

that we have too long overlooked sexual assault and harassment can also lead to a tendency to be quick to credit accounts that are not well founded. What makes Defendants' conduct so offensive is that they have attempted to capitalize and profit from the sympathies we rightly feel to extort Mr. Black and convict him in the court of public opinion long before a court of law will exonerate him. They have subverted the movement they purport to represent.

This is not a case at the edge, a borderline fact pattern, a "he said she said," a maybe yes or maybe no. The consensual sexual relationship ended years ago. This has been a financial arrangement, a criminal one celebrated over Grand Marnier soufflé at the Four Seasons by a woman who toasted her newly and unlawfully acquired wealth, and then publicly renounced it on Twitter, then in the *New York Post*, and then in a series of fraudulent court filings and related public statements designed to show Mr. Black that $100,000 per month was no longer enough to prevent her from making good on her extortionate threats., regardless of merit. On October 25, 2021, Vanity Fair's Gabe Sherman published an article titled, "Billionaire Leon Black is Being Investigated by the Manhattan D.A., Sources Say."

127.    Members of the enterprise, through Ganieva's state court action and related press Had there been physical abuse, harassment, or neglect, that would be the law's business. Instead, here, what is the law's business was blackmail, extortion, and fraud. Ms. Ganieva was caught red handed. And there is no way her co-Defendants did not know this before adopting and continuing her extortionate and fraudulent scheme. Ms. Ganieva has already profited from her extortion, and she hopes to increase these ill-gotten gains by pursuing Mr. Black through her escalating campaign of fraudulent litigation and publicity. As for Mr. Harris and his cohort, their goal has been clear from the outset, but it was their decision to join forces with Guzel Ganieva, to make common cause with an extortionist, to use social media and modern technology to further their attempt to retaliate against Mr. Black.

Congress passed the Racketeer Influenced and Corrupt Organizations Act ("RICO") in 1970 because, as Attorney General Robert Kennedy had warned before his death, of

the special danger posed when formal and informal groups agree to work together to do wrong. Groups are more likely to succeed, and to escalate, and to do more harm than an individual can acting alone. A group such as this one, which uses the courts as the unwitting vehicle for fraud, extortion, and personal assassination, lawyers as its architects, and the media as the mouthpieces, obstructs the working of the very system we depend upon to do justice. It does so without the need for any formal ties or organizational structure, as RICO recognizes. It is an enterprise-in-fact, not by law or contract, bound together by its wrongful purpose, operating in a technological time that the law's drafters could not have imagined, but which makes possible a form of almost-instant annihilation of everything and everyone in its path. One of the earliest decisions interpreting RICO rejected the argument that it should apply only to what is traditionally thought of as "organized crime." RICO is not limited by formal structure, and not restricted to groups that are themselves unlawful (else it be a defense to a RICO charge that "all" the group did together was crime). While adopting a broad definition of RICO in this respect, courts have been equally careful to restrict the civil RICO prohibitions so as not to turn every wrong into a federal case. But the courts in this Circuit have specifically rejected the argument, which the Defendants are sure to make here as well, that the Court "adopt a bright-line rule that mail and wire fraud committed in the course of litigation . . . cannot, as a matter of law, constitute predicate acts for RICO purposes. [T]he Second Circuit and courts in this district have allowed RICO claims to proceed where the alleged predicate acts involved litigation activities." *Mayfield v. Asta Funding Inc.*, 95 F. Supp. 3d 685, 698 (S.D.N.Y. 2015) (Preska, J.); *see also U.S. v. Eisen*, 974 F.2d 246, 253–54 (2d Cir. 1992); *Sykes v. Mel S. Harris & Assocs. LLC*, 757 F. Supp. 2d 413, 425 (S.D.N.Y. 2010).

106 In *Kim v. Kimm*, 884 F. 3d 98, 105 (2d Cir. 2018), the Second Circuit specifically "declined[d] to reach the issue" of whether litigation activity without more could ever be the basis

of a RICO claim, concluding only that where "a plaintiff alleges that a defendant engaged in a single frivolous, fraudulent or baseless lawsuit, such litigation activity alone cannot constitute a viable RICO predicate act." Here, far more has been alleged.

Had Ms. Ganieva done no more than file a single complaint, had she not joined forces with business rivals like Mr. Harris, who had no legitimate business here, had the goal been to redress grievances in the court of law rather than to cancel an individual and everything associated with him, she would have failed. The lawsuit qua lawsuit was a sham, beside the point. The legal claims would fall flat in court. No jury is going to ignore that many love notes. Or the tapes. Or the flight logs. She had no legal claim to financial support. Defendants did not have a leg to stand on, which is why they were forced to resort to bald-faced lies contradicted by Ms. Ganieva's own texts and talk. But this Enterprise operated not to increase the chance of success *in* court, but to increase the pressure to pay the blackmailer *out* of court, to brand the target, to extort him for money by convicting him in the court of public opinion long before any proceedings at all on the merits.

"RICO is to be read broadly" and should "be liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985) (quotation marks and citation omitted). While the extortion and fraudulent pursuit of Mr. Black may not look like a traditional RICO case, machines like this Enterprise, which operate in secret, across state lines, invisibly wreaking havoc unique to our cultural and technological times, represent a threat with even greater potential to disrupt our economy and our social mores than the racketeers of old. coverage, continue to target Black, and will continue to do so until their extortion succeeds or the law intervenes.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION** Civil ~~Racketeer Influenced and Corrupt Organizations Act (RICO,~~ 18 U.S.C. § 1962(c)

**(Against ~~Ms. Ganieva~~Harris, ~~Mr.~~ Rubenstein, and ~~Mr. Harris~~Ganieva)**

128.    ~~[0]Mr.~~Black incorporates ~~all~~each of the ~~above~~ allegations set forth above as if they were repeated and fully stated ~~here~~herein.

129.    ~~[1]Ms. Ganieva, Mr. Rubenstein, and Mr. Harris violated RICO, 18 U.S.C. § 1962 ("Section 1962").~~Black is a person within the meaning of 18 U.S.C. § 1961(3).

~~[1]Ms. Ganieva, Mr. Rubenstein and his firm, the Flacks, and Mr. Harris, together, comprise an associated-in-fact Enterprise.~~

~~[2]Ms. Ganieva, Mr.~~Harris, Rubenstein, and ~~his firm,~~ Ganieva (the ~~Flacks, and Mr. Harris are also~~RICO Defendants), each violated RICO, 18 U.S.C. § 1962(c).

130.    Each RICO Defendant is a person within the meaning of 18 U.S.C. ~~§§§~~ 1961(3) and ~~separate from the Enterprise.~~

~~[3]Ms. Ganieva was a willing and critical participant in the racketeering scheme. Ms. Ganieva encouraged and enabled the Enterprise by, among other things:~~1962(c).

131.    On or before 2002 and continuing until the filing of this Second Amended Complaint, Harris was the funder, leader, and head of an association-in-fact enterprise formed to pursue the common purpose of advancing Harris's personal, financial, and reputational interests. At all relevant times, the enterprise was engaged in, and the activities of the enterprise affected, interstate and foreign commerce. The enterprise was comprised of, among others:

a.    HRS Management;

b.    Certain individuals employed by HRS Management and/or Apollo;

    c.   Various lawyers and law firms, including Wigdor;

    d.   Various public relations professionals and public relations firms including Steven Rubenstein, RUBENSTEIN, BerlinRosen, and Finsbury Glover Hering;

    e.   Other professional advisors; and

    f.   Other individuals, including Ganieva.

132.   The RICO Defendants each conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs.

133.   Harris conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs, in that Harris:

    a.   Identified the goals of the enterprise, which included advancing his personal, financial, professional, and reputational interests;

    b.   Organized, funded, directed, and deployed the resources of the enterprise;

    c.   Utilized and directed employees of the Harris family office, Apollo employees, and legal, accounting, financial, and public relations advisors, including individuals and entities with agency, fiduciary, and other duties to Apollo, to conduct and participate in the enterprise's affairs;

    d.   Devised the schemes and artifices to defraud, set forth above;

    e.   Attempted to discredit the conclusions of the Dechert investigation conducted on behalf of Apollo's independent directors;

    f.   Delegated responsibility and managerial control over portions of the enterprise's affairs to Rubenstein, who Harris tasked with working in coordination with other enterprise members to generate media coverage favorable to Harris and harmful to Black and Apollo;

g.  Directed Rubenstein to take actions on behalf of the enterprise in violation of Rubenstein's agency, fiduciary, and other duties to Apollo, in order to further the fraudulent schemes and artifices to defraud devised by Harris;

h.  Entered, indirectly and through intermediaries, into a secret relationship with Ganieva and her advisors to participate, directly and indirectly, in the enterprise's affairs and to further the schemes and artifices to defraud, described above;

i.  ~~a.~~Assisted, indirectly and through intermediaries, Ganieva in her ongoing efforts to harass, embarrass, intimidate, and instill fear in Black by threatening to reveal ~~her affair with Mr.~~to Black ~~to his~~'s family and the public ~~if Mr.~~ ~~Black did not pay her money;~~

~~b.~~threatening to make false allegations to the public that Mr.~~, information about her personal and sexual relationship with Black ~~abused~~ and ~~harassed her if Mr.~~about Black ~~did not pay her money;~~

~~c.~~accepting from Mr. Black (i) a £2 million pound payment, (ii) forgiveness of two loans of $480,000 that had been accruing interest at 5% per annum for two and four years, respectively, and (iii) monthly payments of $100,000 from October 2015 through March 2021, in exchange for not revealing her affair with Mr. Black to his family and the public and not making false allegations of abuse or harassment to the public;~~'s private payments to her;

j.  Facilitated, indirectly and through intermediaries, Ganieva in making defamatory and other misleading, false, embarrassing, and damaging statements about Black to the media;

~~d.attempting to extort and fraudulently induce Mr. Black into providing additional consideration by sending Mr. Black a threatening text message on October 16, 2019, in which she falsely accused him of "sexually harrass[ing]" her, "sex traffick[ing]" her, "rap[ing]" her, "blacklist[ing]" her, and "forc[ing] [her] to sign" the Release and Confidentiality Agreement "under duress" without permitting her to read it;~~

~~e.causing lawyers other than Wigdor LLP to send letters to Mr. Black on February 18, 2020, and March 6, 2020 regarding the Release and Confidentiality Agreement, on information and belief, in order to demand additional consideration from Mr. Black in exchange for not publicizing her affair with Mr. Black and making false allegations against Mr. Black;~~

~~f.making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by falsely posting on Twitter on~~<u>Facilitated, indirectly and through intermediaries, Ganieva in retaining lawyers to commence sham litigation against Black; and</u>

<u>k.</u>   <u>Misappropriated information and other valuable assets and property of Apollo, and diverted those Apollo resources to further his personal financial and professional interests, and to further the fraudulent schemes and artifices to defraud, described above.</u>

<u>134.</u>   <u>Rubenstein conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs, in that Rubenstein:</u>

<u>a.</u>   <u>Managed interactions between the enterprise and the media, including, but not limited to, representatives of the New York Post, The Wall Street Journal, Bloomberg, Vanity Fair, and the Financial Times, to generate favorable reporting about Harris, and unfavorable reporting about Black and Apollo that was contrary to the interests of Apollo and its shareholders, to further the schemes and artifices to defraud, described above;</u>

<u>b.</u>   <u>While retained by Apollo, secretly participated in the operation and management of the enterprise's affairs by communicating with members of</u>

the media to generate negative and embarrassing reports about Black and Apollo that were contrary to the interests of Apollo and its shareholders;

c. While retained by Apollo, engaged, directly and indirectly, in secret communications with the media to cause those outlets to publish information harmful to individuals Black recommended appointing to Apollo's Board of Directors, in order to limit the ability of Black and his supporters at Apollo from impeding Harris's efforts to become the CEO or co-CEO of Apollo; and

d. In violation of his agency and fiduciary duties to Apollo, worked to publicize information about Ganieva's sham litigation.

135. Ganieva conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs, in that Ganieva:

a. Coordinated through intermediaries with Harris and Rubenstein in their efforts to intimidate, harass, embarrass, instill fear in, and extort Black;

b. Publicized personal and embarrassing information about Black, including information about her personal and sexual relationship with Black, and made defamatory, misleading, false, and damaging statements about Black;

c. On March 17, 2021, posted false and defamatory statements on Twitter, including statements that that she was "sexually harassed and abused by [~~Mr.~~ Black] for years," that "[i]t started in 2008 when [she] met with [~~Mr.~~ Black] to discuss work," that she "refused [~~Mr.~~ Black's] sexual advances," that ~~Mr.~~ Black "bullied,

manipulated, threatened, and coerced" her, that ~~Mr.~~ Black "forced [her] to sign an NDA in 2015," and that ~~Mr.~~ Black engaged in "predatory behavior";

d. ~~g.making good on her extortionate threats and attempting to extort and~~

~~fraudulently induce Mr. Black into providing additional consideration by~~ ~~falsely stating in~~<u>Coordinated with Rubenstein to set up</u> an interview with the New York Post <u>in which she made false and defamatory statements, including a statement </u>that ~~Mr.~~ Black had "abuse[d]" her "<u>"</u>over a long period of time and it was tragic,~~" which~~<u>'"</u> statements

were later published in an April 8, 2021 newsNew York Post article, Josh Kosman, Leon Black's Surprise Apollo Global Exit Came Amid Sexual Harassment Allegation, N.Y. Post (Apr. 8, 2021), https://nypost.com/2021/04/08/leon-black-accused-of- sexual-harassment/;

e. h.making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by working withAuthorized and continues to pursue a sham litigation campaign targeted at and designed to extort additional money and property from Black, in which Ganieva:

- Directed Wigdor LLP to file a Complaint seeking damages on her behalf on June 1, 2021 in which she publicizedsham complaint in New York Supreme Court on or about June 1, 2021, seeking damages on her behalf, and publicizing her affair with Mr. Black, including detailed personal and sexual allegations, and falsely accused Mr.accusing Black of abuse, harassment, and sexual assault, among other outrageous and false accusations;

- i.making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by causingDirected Wigdor LLP to file an Amended Complaint seeking damages on her behalf on or about August 9, 2021 in which she publicized her affair with Mr. Black and falsely accused Mr. Black, seeking damages on her behalf, and repeating and embellishing her earlier false claims of abuse, harassment, and sexual assault, among other outrageous with gratuitous and false accusations;

j.~~making good on her extortionate threats and attempting~~references to ~~extort~~Epstein; and ~~fraudulently induce Mr. Black into providing additional consideration by causing~~

- Directed Wigdor ~~LLP~~ to file a ~~Proposed~~proposed Second Amended Complaint ~~seeking damages on her behalf~~ on or about September 20, 2021 ~~in which she publicized her affair with Mr. Black and falsely accused Mr. Black of abuse, harassment, and sexual assault, among other outrageous and false accusations; and~~

k.~~making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by, on information and belief, making~~, seeking damages on her behalf, and again repeating and further embellishing her false claims with additional gratuitous and false references to Epstein;

f.   Made a false report to the Manhattan District Attorney's Office claiming that ~~Mr.~~ Black raped and sexually assaulted her~~.~~

~~111.Mr. Rubenstein and the Flacks were willing and critical participants in the racketeering scheme. They encouraged and enabled the Enterprise by, among other things:~~

~~a.on information and belief, assisting Ms. Ganieva in making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by disseminating the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media in an effort to publicize those allegations;~~

~~b.on information and belief, assisting Ms. Ganieva in making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by telling the press that the Manhattan District Attorney's Office had opened a criminal investigation into Mr. Black; and~~

~~c.on information and belief, accepting payments and/or promises to pay from Mr.~~

~~Harris as consideration for Mr. Rubenstein and the Flacks' dissemination of the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media and~~

encouragement of press coverage regarding Ms. Ganieva's false allegations.

115.Mr. Harris was a willing and critical participant in the racketeering scheme. Mr.

Harris encouraged and enabled the Enterprise by, among other things:

a. ~~on information and belief, causing an emissary to inquire with one or more law firms to see if they could represent Ms. Ganieva in her fraudulent lawsuit against Mr. Black, with the search resulting in the eventual retention of Wigdor;~~, and coordinated with Wigdor to

b. ~~on information and belief, providing payments and/or promises to pay to Mr. Rubenstein and the Flacks as consideration for their dissemination of the Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media and encouragement of press coverage regarding Ms. Ganieva's false allegations; and~~

c. ~~on information and belief, providing payments and/or promises to pay to Mr. Rubenstein and the Flacks as consideration for their assisting Ms. Ganieva in making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by telling the press that the Manhattan District Attorney's Office had opened a criminal investigation into Mr. Black.~~

promote media coverage of the mandatory investigation triggered by the report; and

g. Accepted extortionate payments of $100,000 each in January 2021, February 2021, and March 2021 pursuant to her extortion agreement with Black.

136. ~~116.~~Defendants' scienter is established by the pattern of racketeering predicate acts set forth below, and by their intentional and knowing material misrepresentations, described ~~above~~herein.

137. ~~117.~~The RICO Defendants ~~committed extortion,~~conducted or participated, directly or indirectly, in the conduct, management, or operation of the enterprise's affairs through a

"pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c).

### Defendant Harris

138.    Harris conducted and participated, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, in violation of both federal and state law, including, ~~without limitation, violations of the Hobbs Act,~~ but not limited to, the following predicate offenses:

*Wire Fraud in Violation of 18 U.S.C. §* ~~1951~~.

~~a. **Ms. Ganieva**. Ms. Ganieva threatened to publicize her affair with Mr. Black and make false allegations to the public that he harassed or abused her. Ms. Ganieva engaged in this unlawful conduct with the intent to extort money from Mr. Black; if Mr. Black did not pay money to Ms. Ganieva, she would carry out~~

her threat to cause substantial financial, reputational, and emotional damage to Mr. Black. Ms. Ganieva exploited Mr. Black's fear of economic, reputational, and emotional harm, by causing Mr. Black to make payments to Ms. Ganieva or risk exposing himself to such harm.

b. As a result of her extortionate threats, Ms. Ganieva accepted from Mr. Black (i) a £2 million payment; (ii) forgiveness of two loans of $480,000 that had been accruing interest at 5% per annum for two and four years, respectively; and (iii) monthly payments of $100,000 from October 2015 through March 2021. Some of the monthly payments were made and accepted through interstate and international wires. Each acceptance of such payments by Ms. Ganieva constituted a predicate act within the meaning of RICO.

c. Ms. Ganieva then made good on her extortionate threats and attempted to extort Mr. Black into providing additional consideration by: (i) making the false posts on Twitter, described above; (ii) making false statements to the New York Post, described above; (iii) causing the filing and dissemination of the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint seeking damages, and the false allegations contained therein; and

(iv) on information and belief, making a false report to the Manhattan District Attorney's Office that Mr. Black sexually assaulted her.

d. **Mr. Rubenstein and the Flacks.** Mr. Rubenstein and the Flacks assisted Ms. Ganieva in making good on her extortionate threats and attempting to extort Mr. Black into providing additional consideration by: (i) on information and belief, disseminating the Original Complaint, the Amended Complaint, and the

~~Proposed Second Amended Complaint and the false allegations therein to members of the media in an effort to publicize those allegations; and (ii) on information and belief, telling the press that the Manhattan District Attorney's Office had opened a criminal investigation into Mr. Black.~~

~~e.**Mr. Harris**. Mr. Harris assisted Ms. Ganieva in making good on her extortionate threats and attempting to extort Mr. Black into providing additional consideration by: (i) on information and belief, causing an emissary to inquire with one or more law firms to see if they could represent Ms. Ganieva in her extortionate lawsuit against Mr. Black, with the search resulting in the eventual retention of Wigdor; and (ii) on information and belief, providing payments and/or promises to pay to Mr. Rubenstein and the Flacks as consideration for their dissemination of the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media, and telling the press that the Manhattan District Attorney's Office had opened a criminal investigation into Mr. Black, and encouraging press coverage regarding Ms. Ganieva's false allegations.~~*1343*

139.  Harris, in breach of his agency, fiduciary, and other duties to Apollo, did willfully and knowingly devise, and with Rubenstein and Ganieva did execute and attempt to execute, various schemes and artifices to defraud and to obtain money and property from Apollo and Black by means of false and fraudulent pretenses, representations, and promises, to wit, Harris:

a.  Deceptively made untruthful, defamatory, and negative statements about Black to officers and directors of Apollo;

b.  Deceptively made untruthful and negative statements about the Dechert report to officers and directors of Apollo, depriving Apollo of the full value of a report it spent considerable corporate resources preparing;

c.  Made and caused to be made untruthful, defamatory, and negative statements to third-parties about Black and Apollo that were contrary to the best interests of Apollo;

d.  Unlawfully misappropriated confidential, valuable, and material information of Apollo concerning Black's ongoing relationship with Apollo, and secretly caused that information to be shared with the media;

e.  Concealed from Apollo his direct and indirect involvement in encouraging the publication of negative, unflattering, untruthful, and defamatory information

about Black and his personal life;

    f.   Concealed from Apollo his direct and indirect involvement in identifying litigation counsel to represent Ganieva in potential litigation against Black, and encouraging Ganieva to file and prosecute the sham litigation against Black that included information designed to inflict financial and reputational harm on Black and Apollo;

    g.   Concealed from Apollo his direct and indirect involvement in encouraging the publication of untruthful, defamatory, and negative information about the Apollo independent directors who Harris considered loyal to Black, in order to pressure those individuals to resign as directors of Apollo;

    h.   Concealed from Apollo that his nominee to serve as an independent director of Apollo had previously provided assurances that he would support Harris to succeed Black as CEO; and

    i.   Concealed from Apollo his efforts to undermine the right of Apollo to control, through its internal corporate governance processes, its public disclosures and exercise of business judgment with respect to Black's ongoing role at Apollo, thereby depriving Apollo of money and property.

140.   Harris, with intent to defraud, knowingly and intentionally made these false statements and material omissions with the intent that Apollo's officers and directors, and other third-parties, would rely on them, in order to further his scheme and artifice to deprive Black and Apollo of money and property; including by forcing Black's resignation as CEO and Chairman of Apollo.

141.   Harris, for the purpose of executing his scheme and artifice to defraud and to deprive Black and Apollo of money and property, did transmit and caused to be transmitted by

means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit:

    a.   Communications with members of the enterprise by email, telephone, videoconference, and other methods of communication by wire, radio, and television transmission in interstate and foreign commerce, including, but not limited to:

       • Zoom conference calls among members of the enterprise on dates including, but not limited to:

          • January 21, 2021;

          • January 22, 2021;

          • January 24, 2021;

          • January 25, 2021; and

          • January 26, 2021;

       • A January 26, 2021 email sent by Harris at 3:45am to members of the enterprise with subject "Fwd: Apollo Firmwide Updates and Continued Evolution";

    b.   Communications with directors, officers, and employees of Apollo by email, telephone, videoconference, and other methods of communication by wire, radio, and television transmission in interstate and foreign commerce; and

    c.   Communications with a future Apollo Board member by email, telephone, videoconference, and other methods of communication by wire, radio, and television transmission in interstate and foreign commerce including, but not limited to:

       • A January 25, 2021 email between Harris and a future Apollo Board

member with subject, "Outrageous";

• A January 27, 2021 email exchange between Harris and a future Apollo

Board member with subject, "board"; and

• A March 15, 2021 Zoom call between Harris and a future Apollo Board

member.

142.    Each of the foregoing communications using the means and instrumentalities of

wire, radio, and television in interstate and foreign commerce were in furtherance of the various

schemes and artifices to defraud. Each constitutes a separate and additional violation of 18

U.S.C.

§ 1343, and each constitutes a separate predicate act in a pattern of racketeering acts.

*Extortion in Violation of the Hobbs Act, 18 U.S.C. § 1951*

143.    Harris willfully and knowingly engaged, directly and indirectly, in actions

intended to deprive Black of money and property, with his consent, which was induced and

brought about

by the actions of Harris, Rubenstein, and Ganieva that were intended to cause, and did cause,

Black embarrassment, intimidation, and fear, unless he made financial payments to Ganieva in

response to her threats and demands.

Defendant Rubenstein

144.    Rubenstein conducted and participated, directly and indirectly, in the conduct of

the enterprise's affairs through a pattern of racketeering activity, in violation of both federal and

state law, including, but not limited to, the following predicate offenses:

*Wire Fraud in Violation of 18 U.S.C. § 1343*

145.    Rubenstein, in breach of his agency, fiduciary, and other duties to Apollo, did

willfully and knowingly devise, and with Harris and Ganieva did execute and attempt to execute,

various schemes and artifices to defraud, and to obtain money and property from Black and Apollo by means of false and fraudulent pretenses, representations, and promises, to wit, Rubenstein:

a. Unlawfully misappropriated confidential, valuable, and material information of Apollo concerning Black and his relationship with Apollo, as well as other valuable information from Apollo; and secretly caused that information to be shared with the media in order to encourage its publication;

b. Disseminated negative, false, and defamatory information to the media regarding the private and personal life of Black, for the purpose of causing false and defamatory information to be published;

c. Concealed from Apollo his direct and indirect involvement in encouraging the publication of negative, unflattering, untruthful, and defamatory information about Black's personal life and relationship to Apollo, and about Apollo;

d. Concealed from Apollo his direct and indirect involvement in identifying litigation counsel to represent Ganieva in potential litigation against Black, and encouraging Ganieva to file and prosecute the sham litigation against Black that included information designed to cause harm to Black and Apollo;

e. Disseminated Ganieva's Original Complaint, Amended Complaint, and proposed Second Amended Complaint;

f. In violation of his fiduciary and agency duties to Apollo, encouraged the publication of untruthful, defamatory, and negative information about the Apollo independent directors who Harris considered loyal to Black, in order to pressure those individuals to resign as directors of Apollo; and

g. Concealed from Apollo his efforts to compromise the right of Apollo to control, through its internal corporate governance processes, its public disclosures and exercise of business judgment with respect to Black's ongoing

role at Apollo.

146.   Rubenstein, with intent to defraud, knowingly and intentionally made these false statements and material omissions with the intent that Apollo's officers and directors, and other third-parties, would rely on them, in order to further his scheme and artifice to deprive Black and Apollo of money and property; including by forcing Black's resignation as CEO and Chairman of Apollo.

147.   ~~Defendants committed mail and wire fraud in violation~~Rubenstein, for the purpose of executing his scheme and artifice to defraud and to deprive Black and Apollo of money and property, did transmit and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit:

    a.   Communications with members of the enterprise by email, telephone, and videoconference, and other methods of communication by wire, radio, and television transmission in interstate and foreign commerce including, but not limited to:

        • Zoom conference calls among members of the enterprise on dates including, but not limited to:

            • January 21, 2021;

            • January 22, 2021;

            • January 24, 2021;

            • January 25, 2021; and

            • January 26, 2021;

        • A January 31, 2021 email exchange involving Rubenstein and Zemsky, and other members of the enterprise, with subject, "Talking points for

JH/MR convo"; and

    b.   Communications with members of the media by email, telephone, and videoconference, and other methods of communication by wire, radio, and television transmission in interstate and foreign commerce.

148.   Each of the foregoing communications using the means and instrumentalities of wire, radio, and television in interstate and foreign commerce were in furtherance of the various schemes and artifices to defraud. Each constitutes a separate and additional violation of 18 U.S.C.

§ 1343, and each constitutes a separate predicate act in a pattern of racketeering acts.

*Extortion in Violation of the Hobbs Act, 18 U.S.C. § 1951*

149.   Rubenstein willfully and knowingly engaged, directly and indirectly, in actions intended to deprive Black of money and property, with his consent, which was induced and brought about by the actions of Rubenstein, Harris, and Ganieva that were intended to cause, and did cause,

Black embarrassment, intimidation, and fear, unless he made financial payments to Ganieva in response to her threats and demands.

Defendant Ganieva

150.   Ganieva conducted and participated, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, in violation of both federal and state law, including, but not limited to, the following predicate offenses:

*Mail and Wire Fraud in Violation* of 18 U.S.C. §§ 1341, 1343.

151.   Ganieva did willfully and knowingly devise, and with Harris and Rubenstein did execute and attempt to execute, various schemes and artifices to defraud, and to obtain money and property from Apollo and Black by means of false and fraudulent pretenses, representations,

and promises, and carried out these schemes through the following fraudulent misrepresentations and material omissions, including:

      a.  Posted affirmative misrepresentations and defamatory statements regarding her personal relationship with Black on Twitter;

      b.  Made affirmative misrepresentations and defamatory statements to members of the media, with the intent that those affirmative misrepresentations and defamatory statements be published; and

      c.  a.**Ms. Ganieva.** Ms. Ganieva used interstate and international mails and wires to obtain money from Mr. Black under fraudulent pretenses. Ms. Ganieva threatenedDirected Wigdor to file a sham Original Complaint, Amended Complaint, and proposed Second Amended Complaint.

152.   With intent to defraud, knowingly and intentionally made these false statements with the intent that Apollo and third-parties would rely on them, in order to further her scheme and artifice to deprive Black and Apollo of money and property, including by forcing Black's resignation as CEO and Chairman of Apollo.

153.   Ganieva, for the purpose of executing her schemes and artifices to defraud and to obtain money and property from Black and Apollo, did transmit and caused to be transmitted by means of the mails or wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit:

      a.  Communications with members of the media by email, telephone, and videoconference, and other methods of communication by wire, radio, and television transmission in interstate and foreign commerce including, but not limited to:

- Emails to Miami Herald reporter Julie Brown on March 4, 2021, March 5, 2021, and April 5, 2021 with subject, "Dear Julie"; and

- WhatsApp message to Bloomberg reporter Gillian Tan on April 9, 2021 stating, "[i]n response to Mr. Black's statements I stand by what I said in my tweets on March 17, 2021";

b. Postings to social media;

- Three tweets on March 17, 2021 including false, negative, and defamatory statements about her private and consensual relationship with Black; and

c. Electronic and other filings related to the state court action including, but not limited to:

- Original Complaint filed on June 1, 2021;

- Amended Complaint filed on August 9, 2021; and

- Proposed Second Amended Complaint filed on September 20, 2021.

154.   Each of the foregoing communications using the mail or means and instrumentalities of wire, radio, and television in interstate and foreign commerce were in furtherance of the various schemes and artifices to defraud, and each constitutes a separate predicate act in a pattern of racketeering acts.

*Extortion in Violation of the Hobbs Act, 18 U.S.C. § 1951*

155.   Ganieva did willfully and knowingly engage in a scheme and artifice to deprive Black of money and property, with his consent, which was induced and brought about actions by Ganieva that were intended to cause, and did cause, Black to experience fear over expected economic harm and personal injury unless he made financial payments to Ganieva in response to her threats and demands, to wit:

a. Starting in or around June of 2015, and continuing after she joined the enterprise,

Ganieva made repeated threats to publicize her affair with ~~Mr.~~ Black and make false allegations to the public that he harassed or abused her. ~~Ms.~~ Ganieva engaged in this unlawful conduct with the intent to ~~obtain~~extort money from ~~Mr.~~Black by instilling fear in Black ~~under fraudulent pretenses; if Mr. Black did not pay money to Ms. Ganieva, she would carry out~~

~~her threat to unlawfully cause~~that any refusal to continue these payments would result in substantial financial, reputational, and emotional damage to ~~Mr.~~ Black

~~b.As a result of her threats, Ms. Ganieva accepted from Mr. Black under fraudulent pretenses (i) a £2 million payment; (ii) forgiveness of two loans of $480,000 that had been accruing interest at 5% per annum for two and four years, respectively; and (iii) monthly payments of $100,000 from October 2015 through March 2021. Some of the monthly payments were made and accepted through interstate and international wires. Each acceptance of such payments by Ms. Ganieva constituted a predicate act within the meaning of RICO.~~

~~c.Ms. Ganieva then made good on her threats and~~ and his family;

b.   No later than January 2021, Ganieva became a member of the association-in-fact enterprise led and directed by Harris. In January, February, and March 2021 Ganieva continued to receive extortionate payments of $100,000 per month based on her earlier threat that if Black did not make the payments, she would publicize her affair with Black and make false allegations that he harassed or abused her; and

c.   Ganieva attempted to ~~induce Mr.~~extort Black into ~~providing additional payments under fraudulent pretenses through interstate mails and/or wires by: (i)~~increasing the amount of the extortion payments to her by, among other things:

•   On March 17, 2021, making the false posts on Twitter, described above; ~~(ii)~~

•   On or around April 8, 2021, making false statements to the New York Post, described above; ~~(iii) causing~~

•   Causing the filing and dissemination of the Original Complaint, ~~the~~ Amended

Complaint, and ~~the Proposed~~proposed Second Amended Complaint ~~seeking damages, and the false allegations contained therein; and (iv) on information and belief, making~~; and

- Making a false report to the Manhattan District Attorney's Office that ~~Mr.~~ Black raped and sexually assaulted her.

~~d.**Mr. Rubenstein and the Flacks.** Mr. Rubenstein and the Flacks assisted Ms.~~

~~Ganieva in making good on her threats and attempting to induce Mr. Black into providing additional payments under fraudulent pretenses through interstate mails and/or wires by: (i) on information and belief, disseminating the Original Complaint, the Amended Complaint, and the Proposed Second Amended~~

~~Complaint and the false allegations therein to members of the media in an effort to publicize those allegations; and (ii) on information and belief, telling the press that the Manhattan District Attorney's Office had opened a criminal investigation into Mr. Black.~~

~~e.**Mr. Harris**. Mr. Harris assisted Ms. Ganieva in making good on her threats and attempting to induce Mr. Black into providing additional payments under fraudulent pretenses through interstate mails and/or wires by: (i) on information and belief, causing an emissary to inquire with one or more law firms to see if they could represent Ms. Ganieva in her extortionate lawsuit against Mr. Black, with the search resulting in the eventual retention of Wigdor; and (ii) on information and belief, providing payments and/or promises to pay to Mr. Rubenstein and the Flacks as consideration for their dissemination of the Original Complaint, the Amended Complaint, and the~~ Proposed Second Amended Complaint ~~and the false allegations therein to members of the media, and telling the press that the Manhattan District Attorney's Office had opened a criminal investigation into Mr. Black, and encouraging press coverage regarding Ms. Ganieva's false allegations.~~

~~155.Accordingly, Ms. Ganieva, Mr. Rubenstein, and Mr. Harris have each committed at least two predicate acts, as required by Section 1962.~~

156.   Each of the RICO Defendants engaged in multiple predicate acts, as described above. The conduct of each of the RICO Defendants constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

157.   ~~120.~~The racketeering predicate acts identified above were related to one another and formed a pattern of racketeering activity in that they (a) were in furtherance of common goals, including to ~~extort and fraudulently induce Mr. Black into providing payments to prevent or stop the spread of false and outrageous allegations against him~~injure Black and Apollo and benefit

Harris; (b) used similar methods to perpetrate the frauds.

including making and making good on threats to spread false and outrageous allegations against Mr. Black fraud and extortion; (c) had similar participants; and (d) had the same victim.

(2) Defendants' racketeering acts were a regular way of conducting their ongoing business regarding Mr. Black and of conducting or participating in the ongoing RICO Enterprise. The racketeering acts or victims; and

(e) were sufficiently continuous to form a pattern of racketeering activity.

158.    (2) The RICO Defendants' racketeering acts pose a threat of continuing criminal activity. On information and belief, Ms. Ganieva, in *Ganieva v. Black*, No. 155262/2021 (N.Y. Sup. Ct., N.Y. Cty. 2021), will likely continue to make and disseminate filings containing litigation filings and public statements that include false and outrageous defamatory accusations regarding Mr. Black. The media likewise continues to publish articles, and the enterprise will continue to disseminate information regarding Ms those filings to the media to harm Black. Ganieva's litigation and the false accusations she has made against Mr. Black. *See, e.g.,* Gabriel Sherman, *Billionaire Leon Black is Being Investigated by the Manhattan D.A.*, Sources Say, Vanity Fair, Oct. 25, 2021, https://www.vanityfair.com/news/2021/10/billionaire-leon-black-is-being-investigated-by-the-manhattan-da.

(3) Mr, with the assistance of other members of the enterprise, will likely continue to use the state court litigation and related media coverage as a vehicle to attempt to extort additional money from Black. Members of the enterprise will likely continue to make efforts to conceal their activities on behalf of the enterprise, by engaging in unlawful conduct to prevent facts about their activities from becoming known and to avoid accountability in litigation for their actions.

159.    Black has been injured in his business or property as a result by reasons of the RICO Defendants' racketeering scheme. For example violations of 18 U.S.C. § 1962(c). Among other

things, the RICO Defendants' fraudulent and extortionate conduct caused Mr.had the intended effect of causing Black to lose his position as CEO and Chairman of Apollo and to be deprived of the significant financial and other benefits he received from those positions. Black to sufferhas also suffered damages insofar as he provided Ms. Ganieva (i) a £2 million payment; (ii) forgiveness of two loans of $480,000 that had been accruing interest at 5% per annum for two and four years, respectively; and (iii) monthly payments of $100,000 from October 2015 through March 2021. Mr. Black likewise has incurred substantial costs defending against the RICO Defendants' sham lawsuits and media campaign. Mr. Black has also suffered loss of business opportunities as a result of the RICO Defendants' wrongdoing.

121Mr These injuries to Black were a direct, proximate, and reasonably foreseeable result of the RICO Defendants' violation of 18 U.S.C. § 1962(c).

160.    Black is not the only victim of the EnterpriseRICO Defendants' pattern of racketeering.

Apollo— – which manages $480approximately $500 billion in assets, on behalf of major institutional investors, and employs thousands of people

around the world ~~— was victimized~~ – has been deprived of money and property as well. ~~Mr.~~ Harris was an officer of ~~the Company~~Apollo, promoted for years as a "co-founder" of the firm, and remains a member of its Board. The ~~Enterprise~~enterprise's conduct ~~caused~~resulted in Apollo being deprived of money and property, and suffering significant reputational harm. ~~Investors in Apollo-managed funds were deeply troubled by the allegations raised by Ms. Ganieva and the wave of negative publicity directly fomented by the Enterprise. Apollo suffered vis à vis its peers who were not the targets of such misconduct. And it was wrongfully~~, including being deprived of the services of its founder and Chairman.

161.   ~~125.~~As a result of Defendants' violations of 18 U.S.C. § 1962(c), ~~Mr.~~ Black is entitled to treble damages, plus interest, costs, and attorneys' fees in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**Civil RICO Conspiracy, 18 U.S.C. § 1962(d)**
**(Against ~~Ms. Ganieva~~Harris, ~~Mr.~~**
**Rubenstein, and ~~Mr. Harris~~Ganieva)**

162.   ~~126.Mr.~~Black incorporates ~~all~~each of the ~~above~~ allegations set forth above as if they were repeated and fully stated here.

163.   ~~127.~~In violation of 18 U.S.C. § 1962(d), ~~Ms. Ganieva, Mr. Rubenstein, and Mr. Harris~~the RICO Defendants conspired to violate 18

U.S.C. § 1962(c) in that~~, on information and belief,~~ they knowingly agreed and conspired together and with others to conduct or participate, directly or indirectly, in the affairs of an enterprise through the pattern of racketeering activity~~,~~ described above.

164.   ~~128.~~In violation of 18 U.S.C. § 1962(d), the frauds that were perpetrated, the extortion conduct, and the continuance of this scheme, could not have occurred without the consent and knowing ~~connivance~~agreement of ~~Ms. Ganieva, Mr. Rubenstein, and Mr. Harris~~the RICO Defendants working together.

165.   ~~129.~~In violation of 18 U.S.C. § 1962(d), as part of and in furtherance of their

conspiracy, ~~Ms. Ganieva, Mr. Rubenstein, and Mr. Harris~~the RICO Defendants conspired in the commission of the many predicate acts described above, with the knowledge that they furthered ~~that~~a pattern of racketeering activity. As part of and in furtherance of their conspiracy, in violation of 18 U.S.C. § 1962(d), ~~Ms. Ganieva,~~

Mr. Rubenstein, and Mr. Harris the RICO Defendants agreed to and did commit at least two predicate acts of racketeering. Further in violation of 18 U.S.C. § 1962(d), each of Ms. Ganieva Harris, Mr. Rubenstein, and Mr. Harris' Ganieva's actions are attributable to the other.

166.    130 No RICO Defendant has withdrawn, or otherwise disassociated itself, from the conspiracy at issue or from the other conspirators.

167.    131 Mr. Black has been injured in business or property as a result by reasons of the RICO Defendants' violations of 18 U.S.C. § 1962(d). For example, Among other things, the RICO Defendants' fraudulent and extortionate conduct caused Mr had the intended effect of causing Black to lose his position as CEO and Chairman of Apollo and to be deprived of the significant financial and other benefits he received from those positions. Black to suffer has also suffered damages insofar as he provided Ms. Ganieva (i) a £2 million payment; (ii) forgiveness of two loans of $480,000 that had been accruing interest at 5% per annum for two and four years, respectively; and (iii) monthly payments of $100,000 from October 2015 through March 2021. Mr. Black likewise has incurred substantial costs defending against the RICO Defendants' sham lawsuits and media campaign. Mr. Black has also suffered loss of business opportunities as a result of the RICO Defendants' wrongdoing. These injuries to Black were a direct, proximate, and reasonably foreseeable result of the RICO Defendants' violation of 18 U.S.C. § 1962(d).

168.    132 As a result of the RICO Defendants' violations of 18 U.S.C. § 1962(d), Mr. Black is entitled to treble damages, plus interest, costs, and attorneys' fees.

### THIRD CAUSE OF ACTION
### Defamation *Per Se*
### (Against All Defendants)

169.    133 Mr. Black incorporates all each of the above allegations set forth above as if they

were ~~repeated and~~ fully stated here.

170.   ~~131~~Ms. Ganieva publicly accused ~~Mr.~~ Black on Twitter of ~~sexual~~sexually harassing and abusing her for years ~~on Twitter~~, knowing that those accusations were false, with the intent to cause ~~Mr.~~ Black severe reputational, professional, and economic harm.

171.    Beginning on or about November 15, 2019, Ganieva secretly made statements to reporters and other members of the media and falsely claimed that Black had harassed, abused, drugged, and raped her. She made these statements knowing them to be false and with the intent, and purpose, of causing Black severe reputational, professional, and economic harm, including compelling Black to resign from Apollo and damaging him financially.

172.    ~~15~~Aware of ~~Ms.~~ Ganieva's ~~lies~~false and defamatory statements about Black, ~~Mr.~~ Rubenstein and ~~the Flacks pushed stories and articles to promote her lies, including setting up an interview with~~Harris, directly and indirectly, repeated those statements while knowing them to be false, and encouraged the reporting and publication of stories and articles that repeated Ganieva's statements. Rubenstein and Harris caused an article to be placed in the New York Post~~. In that interview, Ms.~~ detailing Ganieva ~~claimed that Mr. Black's abuse of her "was over a long period of time and it was tragic." These continued lies that Mr. Black sexually abused Ms. Ganieva were made to cause Mr.~~'s claims. Rubenstein and Harris made these statements, directly and indirectly, for the purpose of causing Black reputational, professional, and economic harm.

173.    ~~16~~Wigdor ~~LLP~~'s pleadings (actual and proposed) filed on behalf of ~~Ms.~~ Ganieva ~~were shams~~constitute sham litigation made for the purpose of evading defamation liability. Wigdor ~~LLP~~ and ~~Ms.~~ Ganieva knew that the pleadings contained false and defamatory statements that had no basis in fact~~and included in them~~, but they filed the pleadings nonetheless for the purpose of publicizing the false and defamatory statements about Black while seeking to avoid defamation liability. Wigdor and Ganieva made these defamatory and libelous statements about ~~Mr.~~ Black ~~that were made~~ (i) without any good faith basis, (ii) without conducting ~~anything akin to a remotely~~an adequate investigation (if any investigation was done at all), (iii) while ignoring and refusing to consider, and in direct defiance

and conscious disregard of contemporaneous, documentary evidence that contradicted those statements, (iv) in bad faith and with actual malice, and (v) with the sole purpose of causing Mr. Black severe reputational, professional, and economic harm.

174.   137.Wigdor LLP filed those state court complaints on behalf of Ms. Ganieva and in coordination with Mr. Harris, Mr. Rubinstein, and the FlacksRubenstein not because they had a good faith basis to reasonably believe that their client had any passably legitimate claim for redress, but because they wanted to publicize and disseminate lurid, scandalous, and calumnious accusations about Mr. Black and to extract a favorable settlement from him.

175.   138.With each pleading, Wigdor LLP, Ganieva, Mr. Rubenstein, and the FlacksHarris, directly and indirectly, communicated the filing and substance of thateach filing to the press. On information and belief, Mr. Harris funded and actively encouraged these actions

176.   The allegations in the complaints were not in any way made in furtherance of any *bona fide* litigation objective.

177.   139.Defendants are in no way entitled to any protections, immunities, or privileges with respect to the allegations in their complaints because those filings were made exclusively for the

purpose of ~~attempting to cloak~~cloaking the allegations in them with ~~the appearance of~~ such protections, immunities, or privileges.

~~[¶]In addition, the allegations in the complaints were not in any way made in furtherance of any bona fide litigation objective.~~

178.  ~~[¶]~~The allegations in all three iterations of the complaint are written defamatory and libelous statements of purported fact concerning ~~Mr.~~ Black, ~~and were~~ and are utterly false, as conclusively shown by contemporaneous documentary evidence that has been offered to Wigdor ~~LLP~~for review, and that Wigdor has deliberately refused to view and has never rebutted.

179.  ~~[¶]~~The allegations in the complaints amount to defamation and libel *per se* under the law as they allege that ~~Mr.~~ Black committed serious crimes, including sexual assault and kidnapping, and thus damages are presumed.

180.  ~~[¶]~~The defamatory statements in Defendants' pleadings include, but are not limited to: that ~~Mr.~~ Black raped ~~Ms.~~ Ganieva; that ~~Mr.~~ Black "sexually harassed and abused" ~~Ms.~~ Ganieva "for years"; that ~~Mr.~~ Black "bullied, manipulated, threatened, and coerced" ~~Ms.~~ Ganieva; that ~~Mr.~~ Black kidnapped ~~her~~Ganieva and flew her to Epstein's home for purported sex trafficking; that ~~Mr.~~ Black previously raped an unidentified woman that he met through Epstein; that ~~Mr.~~ Black is a "sadist" ~~and a "sex addict"~~; and that ~~Mr.~~ Black threatened ~~Ms.~~ Ganieva to sign the NDA, saying "~~If~~[i]f you do not take the money, I will put you in prison" and "~~If~~[i]f you do not take the money, I will destroy your life."

181.  ~~[¶]~~~~Defendants~~Ganieva's statements to the public and the press also amount to defamation and libel *per se* under the law as they allege that ~~Mr.~~ Black committed serious crimes, including sexual assault, and thus damages are presumed. These allegations include, but are not limited to, ~~Ms.~~ Ganieva's tweets accusing ~~Mr.~~ Black of "sexually harass[ing] and abus[ing]" her; ~~Ms.~~ Ganieva's

statements to the New York Post that ~~Mr.~~ Black abused her "over a long period of time and it was tragic"; ~~Ms.~~ Christensen's statement branding ~~Mr.~~ Black as a "sexual predator[]" and inviting prosecutors to "go after" him~~, invoking the "#MeToo" movement~~; ~~Ms.~~ Christensen's participation in telephone interviews with news organizations, including a statement to Forbes accusing ~~Mr.~~ Black of "heinous conduct" towards Ganieva and of "intimidating" her; and allegations that ~~Mr.~~ Black raped a Jane Doe ~~twenty~~20 years ago.

182.   ~~15~~The allegations in the pleadings were published without privilege or authorization to a third -party.

183.   ~~16~~In publishing those defamatory and libelous allegations, and repeating those lies to the press and the public, ~~the Defendants~~Harris, Rubenstein, Wigdor, and Ganieva wrongfully and willfully intended by such publication to injure ~~Mr.~~ Black's personal and business reputation.

184.   ~~17~~At the time ~~Defendants~~Harris, Rubenstein, Wigdor, and Ganieva directly and indirectly uttered and caused to be published the defamatory and libelous matter set out above, Defendants acted with actual malice because they knew the allegations in the pleadings were false or, in the alternative, they failed to take any reasonable steps to ascertain the accuracy of the allegations and instead published them with reckless or grossly negligent disregard for whether they were true or not.

185.   ~~18~~As a direct result of the foregoing defamatory and libelous statements, in Defendants' sham pleadings and to the press, ~~Mr.~~ Black has suffered injury to his personal and business reputation.

186.   ~~19In addition, because~~Because of the wanton, willful, and malicious nature of the foregoing wrongful conduct, ~~Mr.~~ Black is ~~also~~ entitled to recover punitive damages.

**FOURTH CAUSE OF ACTION**

**Breach of Contract**
**(Against ~~Ms.~~**
**Ganieva)**

187.  ~~150~~~~Mr.~~ Black incorporates ~~all~~each of the ~~above~~ allegations set forth above as if they were repeated and fully stated here.

188.  ~~151~~~~Mr.~~ Black and ~~Ms.~~ Ganieva entered into a ~~contract~~non-disclosure agreement on October 19, 2015.

189.  ~~152~~The contract consists of a one -page document entitled, "Release and Confidentiality Agreement." ~~that was~~Ganieva signed ~~by Ms. Ganieva~~the document.

190.  ~~153~~Under the agreement, ~~Mr.~~ Black agreed to forgive two loans of $480,000 each that he had made to ~~Ms.~~ Ganieva that had been accruing interest at 5% per annum for two and four years, respectively; make a simultaneous payment to ~~Ms.~~ Ganieva of $100,000; and to provide ~~Ms.~~ Ganieva with "other consideration," which ~~Mr.~~ Black and ~~Ms.~~ Ganieva agreed that day would consist of £2 million to secure ~~Ms.~~ Ganieva a United Kingdom visa, as well as payments of $100,000 a month for ~~fifteen~~15 years.

191.  ~~154~~In exchange, ~~Ms.~~ Ganieva agreed to release ~~Mr.~~ Black from "all matters, causes of action, claims, suits and any and all further liability or accountability, in law or equity, by reason of any matter, cause or thing whatsoever arising prior to the signing of this Agreement, contemporaneous with the signing of this Agreement or any time in the future after the signing of this Agreement."

192.  ~~155~~~~Ms.~~ Ganieva further agreed "never to disclose, directly or indirectly, to any individual, entity or other potential recipient, any information relating to (i) the allegations and claims that she has asserted against [~~Mr.~~Black], (ii) the signing, content or other attributes of this Agreement, including any consideration furnished by [~~Mr.~~Black] in connection with the

signing

of this Agreement and (iii) any other matters that could damage [~~Mr.~~ Black's] career, reputation and relationship with others."

193. ~~156.~~Before signing the contract, ~~Ms.~~ Ganieva read the document for as long as she wanted.

She asked questions about its terms, which ~~Mr.~~ Black answered. And she negotiated the amount of money she would receive from ~~Mr.~~ Black.

194. ~~157.~~ ~~Mr.~~ Ganieva acquiesced to the terms of the contract by intentionally accepting $100,000 each month from October 2015 through March 2021. At no time from October 2015 through March 2021 did Ganieva repudiate the contract or refuse the benefits of the contract.

195. Black faithfully performed under the agreement for more than five years, from October 2015 through March 2021, providing all consideration set forth in the agreement, including monthly payments of $100,000.

196. Beginning on or about November 15, 2019, Ganieva breached the contract by making statements to reporters and other members of the media regarding the matter covered by the contract.

197. ~~158.~~On March 17, 2021, ~~Ms.~~ Ganieva ~~failed to perform under~~publicly violated the terms of the contract by ~~publicly~~ tweeting that ~~Mr.~~ Black had "sexually harassed and abused" her for years and that she "was forced to sign an NDA in 2015."

198. ~~159.~~~~Ms.~~ Ganieva has thereafter ~~breached~~continued to violate the agreement on numerous occasions, including by making or authorizing the statements and legal claims in the court filings and press statements pleaded herein.

199. ~~160.~~By breaching their agreement, ~~Ms.~~ Ganieva has caused ~~Mr.~~ Black damages.

**FIFTH CAUSE OF ACTION**
**Unjust Enrichment**
**(Against ~~Ms.~~**
**Ganieva)**

125

200. ~~161~~~~Mr.~~ Black incorporates ~~all~~each of the ~~above~~ allegations set forth above as if they were repeated and fully stated here.

201. ~~162~~Pursuant to the agreement, ~~Mr.~~ Black paid ~~Ms.~~ Ganieva $9,251,084.00 from October 2015 through March 2021.

202. ~~163~~~~Ms.~~ Ganieva was enriched by these payments, at ~~Mr.~~ Black's expense.

203.    ~~[4]Ms.~~ Ganieva willfully broke the terms of the agreement, depriving ~~Mr.~~ Black of what he had bargained for ~~—~~ – that is, ~~Ms.~~ Ganieva's silence as to their affair and the resolution of their agreement.

204.    Ganieva continued to accept payments from Black even though she knew that she breached the agreement as early as November 2019.

205.    ~~[5]It~~ It is against equity and good conscience for ~~Ms.~~ Ganieva to be allowed to keep the money she extorted from ~~Mr.~~ Black after breaking the terms of their agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Leon D. Black hereby requests judgment against Defendants ~~Guzel Ganieva, Wigdor, LLP~~Joshua Harris, Steven Rubenstein, Guzel Ganieva, and ~~Josh Harris~~Wigdor LLP as follows:

a)  Enter judgment on the claims in ~~Mr.~~ Black's favor;

b)  Award ~~Mr.~~ Black damages, in an amount to be determined at trial, plus prejudgment interest, to compensate ~~Mr.~~ Black for all monetary and/or economic damages;

c)  Award ~~Mr.~~ Black damages for any and all other monetary and/or non-monetary losses suffered by him, including, but not limited to, loss of income, reputational harm, lost business and financial opportunities, and harm to professional reputation, in an amount to be determined at trial, plus prejudgment interest;

d)  Award punitive damages for the Defendants' gross wanton, malicious, and outrageous misconduct in an amount to be determined at trial;

e)  Award ~~Mr.~~ Black treble damages;

f)  Award attorneys' fees, costs, and disbursements incurred as a result of this action; and

g)  Award such other, further, and different relief as the Court may deem just and proper.

h)

## DEMAND FOR JURY TRIAL

~~Mr.~~ Black demands a jury trial for all claims and issues in this action that are triable as a matter of right to a jury.

~~By:~~
Dated: April 18, 2022

Respectfully submitted,

Reid M. Figel
Michael K. Kellogg
Kellogg, Hansen, Todd, Figel
  & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036 (202) 326-7900
rfigel@kellogghansen.com
mkellogg@kellogghansen.com

/s/ *Susan R. Estrich*

Susan R. Estrich

~~ESTRICH GOLDIN~~
Estrich Goldin LLP
947 Berkeley ~~Street~~ St.
Santa Monica, CA 90403
(~~212~~213) 399-2132
susan@estrichgoldin.com ~~(pro hac vice)~~

*eys for Plaintiff Leon D. Black*