UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LEON D. BLACK,

Plaintiff,

-v-

GUZEL GANIEVA, *et al.*,

Defendants.

21 Civ. 8824 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion for Rule 11 sanctions.

On October 28, 2021, plaintiff Leon Black filed a Complaint against multiple parties. The lead defendant was Guzel Ganieva, with whom Black had been in an extramarital relationship, and who in 2021 had sued Black in New York State Supreme Court for—among other alleged torts—sexual assault and defamation. Relevant here, Black also sued Wigdor LLP ("Wigdor"), Ganieva's counsel in the state court case. Black's Complaint brought substantive and conspiracy claims against Ganieva and Wigdor, along with several John Doe defendants, under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, plus state-law claims of defamation.

Wigdor now moves for sanctions against Black and his counsel under Federal Rule of Civil Procedure 11 for bringing what it terms frivolous RICO and defamation claims against it—and for not bringing a First Amended Complaint ("FAC") that dropped the RICO claim until after Rule 11's 21-day safe harbor for dropping the challenged claims had passed.

Wigdor's claim of a Rule 11 violation presents a substantial question insofar as Black's RICO claim against Wigdor had threadbare factual support and numerous apparent pleading deficiencies. Nonetheless, for the following reasons, the Court denies that motion.

## I.   Background[1]

Wigdor's motion arises from a series of complaints and other court filings, beginning with Ganieva's state-court lawsuit. The Court reviews those herein in sequence.

As background to this litigation history: Black is a financier and the founder of Apollo Global Management ("Apollo"), a publicly traded hedge fund. In 2008, he began an extramarital relationship with Ganieva, a Russian national, which continued, on and off, through 2014, although the nature and details of that relationship are contested. Black claims to have paid or agreed to pay Ganieva several million dollars during and after the relationship, for purposes that the parties dispute. Wigdor is a law firm that holds itself out as specializing in claims of sexual harassment and misconduct. Wigdor represented Ganieva in the lawsuit that she brought against Black in 2021 in New York State Supreme Court. Wigdor is solely a party to this federal action—it does not represent Ganieva in it.

### A.   Ganieva's State-Court Lawsuit Against Black

#### 1.   Ganieva's Complaint and Black's Answer

On June 1, 2021, Ganieva initiated her state-court suit by filing a complaint. Compl. ¶ 50; Dkt. 1-1 ("State Compl."); *Ganieva v. Black*, Index No. 155262/2021 ("State Dkt."), Dkt. 1. Its allegations recounted Black and Ganieva's relationship, its deterioration—punctuated by an alleged violent sexual assault—and Black's coercion of Ganieva to conceal their relationship.

---

[1] The facts here include those drawn from Black's initial complaint, Dkt. 1 ("Compl."), and attached exhibits, and Wigdor's moving papers, Dkt. 33, and attached exhibits, *see* Dkts. 33-1 ("Mot."), 33-3 ("State FAC"), 33-4 ("Engagement Ltr.").

The complaint's claims of defamation and intentional infliction of emotional distress ("IIED") were largely based on Black's statements about Ganieva. Its claims of gender-motivated violence were based on alleged rape of Ganieva by Black.

Relevant here, Ganieva's state complaint alleged that, in March 2008, Black and Ganieva met at an event for International Women's Day. State Compl. ¶ 20. Black began taking Ganieva, then working as a model, to dinner and courted her, including by arranging professional opportunities. *Id.* ¶¶ 21, 23. However, soon after their relationship began, and for several years thereafter, Black "forced sadistic sexual acts on [Ganieva]." *Id.* ¶ 26; *see id.* ¶¶ 27–28. Ganieva "would tell Black to never speak to her or contact her again," but Black inevitably would "induce her to meet him again," including by promising to be her mentor, support her child, fund a movie, purchase a townhouse and convert it into a museum that she could run, and help with her application to Harvard Business School. *Id.* ¶¶ 29–30. Throughout, Black "engaged in textbook harasser behavior." *Id.* ¶ 31.

In 2011, Ganieva's complaint alleged, she began coursework towards an undergraduate degree in math, as part of an effort to distance herself from Black—which also included cutting off most of her hair to make herself less attractive. *Id.* ¶¶ 32–33. On June 2, 2011, Ganieva and Black agreed he would loan her $480,000 over five years with a 5% interest rate. *See id.* ¶¶ 35–37. On May 24, 2013, they agreed to another, identical loan. *See id.* ¶ 39. These loans were Black's way of "excusing himself" from the harm he had inflicted on Ganieva. *Id.* ¶ 40. Black told Ganieva, "If you do not take the money, I will put you in prison" and, "If you do not take the money, I will destroy your life." *Id.* ¶ 3 (emphasis omitted).

In May 2014, Ganieva's complaint alleged, she graduated, and accepted Black's offer to help her find a job in finance. *Id.* ¶¶ 41, 43. The interviews arranged by Black were not "meant

3

to be legitimate," and it was "part of Black's sick plan to make her feel grateful to him . . . [and] allow him to belittle and humiliate her after each job rejection." *Id.* ¶ 42. After several rejections, Black told Ganieva that "he is the 'only one' who can help her escape her 'miserable life.'" *Id.* ¶ 46.

Ganieva's complaint alleged that, on July 6, 2014, Black sexually assaulted Ganieva while she was "in a weakened state, having been sick for almost a week." *Id.* ¶ 49; *see id.* ¶¶ 47–54. Ganieva then "took her son and left New York." *Id.* ¶ 55. Notwithstanding their physical distance, Ganieva felt threatened by Black, who would call her to tell her that he knew where she had recently been, with whom she had been, and what she had been wearing. *Id.* ¶ 56.

In 2015, Ganieva's complaint alleged, she asked to meet with Black in New York City. The loan from 2011 was coming due, and she "wanted to know what she could do to be able to live her life without his continued involvement." *Id.* ¶ 58. On October 18, 2015, Black and Ganieva met, and she signed an agreement that forgave her loans but which she later learned contained a non-disclosure agreement. She did not receive a copy of the document and is unsure as to its terms. *Id.* ¶¶ 64–66, 71. From then until April 2021, Ganieva received regular payments from Black. *Id.* ¶ 72. Periodically, Ganieva would ask Black for copies of what she signed on October 18, 2015. *Id.* ¶ 74.

On October 15 and 16, 2019, Ganieva's complaint alleged, she texted Black to ask again for a copy of the agreement, while accusing him of sexual harassment, sex trafficking, rape, and blacklisting. *See id.* On February 18 and March 6, 2020, Ganieva's counsel sent Black letters seeking a copy of the agreement. *Id.* ¶ 75.

On October 29, 2020, during an Apollo earnings call, Black stated that there have never been any allegations that he "engaged in any wrongdoing, because [he] did not." *Id.* ¶¶ 6, 77

(emphasis omitted).  That statement, Ganieva's complaint alleged, was a "tipping point" for her, as, having begun law school, she had a better understanding of her rights and wanted to hold Black accountable.  *Id.* ¶ 7.

On March 17, 2021, Ganieva publicly tweeted that Black was a "predator" who had "sexually harassed and abused" her for years.  *Id.* ¶¶ 9, 81.  The next day, Ganieva's complaint alleged, Black texted Ganieva and told her to call him immediately, but she refused.  *Id.* ¶ 9.

On April 8, 2021, an article quoted Black as describing his relationship with Ganieva as consensual, terming fabricated Ganieva's claim that he had harassed her, and alleging that Ganieva had extorted him and that he had paid her to deter her from going public about their relationship and to spare his family embarrassment.  *Id.* ¶¶ 1–2, 82.  Ganieva's complaint alleged that Black made that false statement with malice.  *Id.* ¶¶ 84–86.  It alleged that Black's defamatory statements had caused Ganieva emotional distress.  *Id.* ¶¶ 88–90.

Ganieva's complaint brought claims of defamation, defamation *per se*, IIED, and gender-motivated violence under the New York City Gender Motivated Violence Act ("GMVA"), N.Y.C. Admin Code § 8-901 *et seq.*  On July 19, 2021, Black filed an answer, citing texts between him and Ganieva indicative of a consensual relationship and which, he asserted, refute Ganieva's claims of assault and unlawful threats.  *See* Compl. ¶¶ 54–60; Dkt. 1-2; State Dkt. 4.

### 2.    Ganieva's First Amended Complaint and Black's Answer

On August 9, 2021, Ganieva filed a First Amended Complaint in state court.  It added a claim of retaliation under the GMVA.  *See* Compl. ¶¶ 61–62; Dkt. 1-3 ("State FAC") ¶¶ 285–290; State Dkt. 26.  It also added three sets of factual allegations.

First, it alleged "violent sexual acts" by Black against Ganieva that caused her to fear for her safety.  Although that section, as publicly filed, is heavily redacted, it claimed that Black

intentionally caused Ganieva pain, kept information about his "abnormal and atypical sexual needs" confidential, and that Ganieva feared that Black would harm her.  State FAC ¶¶ 33–49.

Second, it alleged facts about Black's relationship with the late Jeffrey Epstein, who, it notes, at the time of his death, faced federal charges of sex trafficking and conspiracy to engage in sex trafficking.  *Id.* ¶ 54.  Black viewed Epstein as "a friend worthy of trust" and his "best friend" and paid Epstein $158 million between 2012 and 2017, even after Epstein had pled guilty in 2008 to soliciting an underage prostitute.  *Id.* ¶¶ 53, 63, 65, 68, 73, 83.  Black spoke adoringly of Epstein's lifestyle, in which he spent time with young women and aspired to create a town over which he would have exclusive authority.  Black reported to Ganieva that Epstein had given him advice about managing Ganieva.  *Id.* ¶¶ 109–10, 115–16, 118.  In mid-to-late October 2008, Black flew Ganieva to Epstein's home in Florida, while Epstein was on "work release" from his 2008 conviction, told her not to tell anyone, and told her that he would plant drugs on her if she did talk about it.  *Id.* ¶¶ 75, 85–86.  During the visit, which was about two hours long, Black and Epstein associate Sarah Kellen sought to coerce Ganieva into having sex with Epstein, which Ganieva refused to do.  *Id.* ¶¶ 94, 97–98, 101–106.

Third, the amended complaint alleged, Black's defense that Ganieva was extorting him was false.  Black "made no attempt to keep secret the many women" with whom he was having extramarital affairs.  *Id.* ¶¶ 130–32.  Black was publicly involved with "young, Russian-speaking models"; Ganieva attended events attended by Black and his wife, at which "Black openly pursued Ms. Ganieva . . . in front of his wife," including at an event in the Hamptons in summer 2011.  *Id.* ¶¶ 133–34.  At that event, Black was affectionate with and hugged another young Russian woman, Jane Doe 3.  *Id.* ¶ 145.  Black also brought Ganieva to his houses in the Hamptons and in Bedford, New York, including while his wife was home.  On one occasion,

Black and Ganieva ran into Black's wife on the street leaving his studio apartment, which was directly across the street from his family's apartment. *Id.* ¶¶ 135–38. Ganieva also met several women with whom Black was involved, including Jane Doe 2—who had met Black through Epstein—and Jane Doe 4; Black did not try to hide his relationship with them. As with Ganieva, Black paid Doe 4's tuition money and bought her a piano. *Id.* ¶¶ 140–143, 148–153. He would "chastise and try to guilt Ms. Ganieva" into sexual conduct with him and Doe 4. *Id.* ¶ 154.

On September 8, 2021, Black filed an answer and counterclaims. Dkt. 1-4. Among other things, Black disputed Ganieva's allegations about her trip with him to Florida and that Ganieva ever met Epstein. Compl. ¶¶ 64–67.

### 3.    Ganieva's Second Amended Complaint

On September 20, 2021, Ganieva filed a proposed Second Amended Complaint. *See* Compl. ¶ 5; Dkt. 1-5 ("State SAC"). It included new claims based on recently unsealed documents about Black's relationship with Epstein, *see* State SAC ¶¶ 145–150, and, from an anonymous Jane Doe, about sexual violence by Black, Compl. ¶¶ 68–71; State SAC ¶¶ 50–85. As to the latter, it alleged that Doe, who was having financial troubles, met with Epstein in 2000 via a woman named "Maxwell." State SAC ¶¶ 52–55. Doe gave Epstein massages, and Epstein attempted to coerce her into performing sexual acts on him. *Id.* ¶¶ 57–59. Doe met Black in early 2002. *See id.* ¶¶ 60–65. Black assaulted Doe with a "violent and aggressive sexual act" that the State SAC termed rape, which caused Doe "terrible pain," such that she "was in such agony that she could barely breathe." *Id.* ¶¶ 69–71. After they walked out of the townhouse, Black introduced himself by saying "Black, my name is Leo [*sic*] Black." *Id.* ¶ 74.

The SAC alleged that Doe suffered extremely from the assault. *Id.* ¶ 75. Afterwards, Doe told a friend what happened; the friend responded that "if she told anyone what Black had done, no one would believe her." *Id.* ¶ 85. Several weeks after the assault, Black called Doe,

and insisted that they meet for lunch. *Id.* ¶¶ 76–77. At the restaurant, "Doe became upset when she saw Black and started reliving the rape and sexual assault," whereupon "Black was visibly concerned that Ms. Doe was making a scene and tried to get her to calm down." Doe left. *Id.* ¶ 77. A few weeks later, they met again, in a hotel lobby, when Black told Doe that he wanted to give her something. *Id.* ¶¶ 78–79. He gave her $5,000, which Black said was to help with her credit card debt; after that meeting, when Black asked to see her again, Doe asked "if he was trying to give her more money" and, when he exclaimed, "I just gave you $5,000!," refused to see him again. *Id.* ¶¶ 80–83.

On September 29, 2021, Black opposed Ganieva's motion for leave to file a second amended complaint. State Dkt. 58.[2]

### B.     Black's Federal Complaint, Bringing RICO and Defamation Claims Against Ganieva, Wigdor, and John Does

On October 28, 2021, Black filed the original Complaint in this action—the Complaint relevant to this motion. Dkt. 1. It brought claims against Ganieva, the Wigdor firm, and John Doe defendants of substantive and conspiracy violations of civil RICO and of defamation *per se*; it also brought claims of breach of contract and unjust enrichment against Ganieva.

Salient here, the Complaint's RICO claim contended that an enterprise—led by Ganieva; participated in by Wigdor and others; and aimed at injuring Black—had "committed extortion and fraud," including by filing the asserted baseless 2021 state-court suit against Black and by "carefully orchestrat[ing]" a public relations campaign to smear him. *See id.* ¶¶ 3–15. The following summarizes the Complaint's allegations, highlighting those germane to this motion.

---

[2] On May 6, 2022, Justice Cohen of the New York State Supreme Court granted leave to file the State SAC. Dkt. 116; State Dkts. 151, 155. On June 2, 2022, Black appealed this decision. *See Ganieva v. Black*, 2022-02357 (1st Dep't App. Div.).

### 1.    Ganieva's Initial Alleged Extortion (2015–2020)

Black's Complaint alleged that Ganieva and Black began their relationship in 2008 and "continued sporadically" until July 2014, when Ganieva left the country. *Id.* ¶ 36. At that point, Ganieva began a campaign of actual and attempted extortion of Black by "threatening to disclose and distort their relationship" to Black's wife, the board of Apollo, and the press. *Id.* ¶ 1. Although Ganieva had continued to send Black text messages, "telling him that she missed him and loved him, on June 8, 2015, she sent Black "a much more formal note," asking to meet with him. *Id.* ¶¶ 37–38. On June 24, 2015, they met, and Ganieva told Black that if he did not pay her $100 million she would go public about their relationship. *Id.* ¶ 39. On or about October 19, 2015,[3] Black agreed to pay Ganieva $100,000 monthly for 15 years[4]; forgive approximately $1 million in loans; and give her £2 million to help her get legal immigration status in the United Kingdom, all in exchange for Ganieva keeping their relationship confidential and releasing any claims relating to it. It alleged that Black and Ganieva signed an agreement to that effect. *Id.* ¶ 40.

On October 15 and 16, 2019, Black's Complaint alleged, Ganieva texted Black about their arrangement. She accused him of sexual harassment, sex trafficking, rape, blacklisting, and forcing her to sign the October 19, 2015 agreement. *Id.* ¶ 42. On March 6, 2020, Black received a letter from Ganieva's counsel—at the time, not Wigdor—which he ignored. *Id.* ¶ 43.

---

[3] Black and Ganieva disagree about whether they met, and the agreement was signed, on October 18 or 19 of 2015. *See* Compl. ¶ 40 ("At a lunch meeting at the Four Seasons restaurant in New York on October 19, 2015 . . . ."); State Compl. ¶ 64 ("At the Four Seasons hotel on October 18, 2015 . . . .").

[4] Black's monthly payments to Ganieva, the Complaint alleged, were made between October 2015 and March 2021. Compl. ¶ 91.

### 2. Alleged RICO Violations by Ganieva, Wigdor, and the John Does (2020–2021)

Black's Complaint alleged that, in 2020, after Ganieva's initial attempts to extort money, a broader assemblage, including Wigdor, joined her in "orchestrat[ing] an assassination of Mr. Black," which included attempts to extort money from him and ruin his reputation. *Id.* ¶ 6. The Complaint alleged that the extortion and defamation of Black was the work of a RICO association-in-fact, consisting of (a) Wigdor; (b) public relations experts, whom the Complaint termed the "Flacks" and identified as John Does 1 and 2; and (c) a participant the Complaint called the "Funder" and identified as John Doe 3, and whom it alleged was funding Ganieva's legal costs in connection with her state court lawsuit. *See id.* ¶¶ 10, 14 ("The Enterprise was comprised of Client, Firm, Flacks, and Funder.").

The enterprise's participants, the Complaint alleged, assisted in Ganieva's extortion of Black, by (a) filing complaints in court that made false allegations against Black, with the goal of inoculating these damaging allegations from defamation actions, thereby abusing the attorney-client privilege; (b) pitching Ganieva's allegations and the suit containing them to the media, with the goal of "inflict[ing] the maximum amount of damage and extort[ing] the maximum amount of money" from Black; and (c) covering Ganieva's legal expenses and potentially paying her for the money she forewent by suing Black. *Id.* ¶ 10; *see id.* ¶¶ 6 (the defendants "created an Enterprise to extort and cancel" Black), 8 (describing "the operation of an Enterprise that unites money, litigation, and media into a machine for financial, and personal, extortion and cancellation").

In October 2020, Black's Complaint alleged, the *New York Times*, contacted by the John Doe members of the enterprise, were alerted to Black's ties to Epstein. This triggered "hundreds of negative articles" about Black. *Id.* ¶ 45.

On March 17, 2021, Black's Complaint alleged, Ganieva tweeted about Black. *Id.* ¶ 46. It alleged Ganieva's three Twitter followers, "all reporters who covered the #MeToo movement and Apollo[,]. . . had been recruited by the Enterprise." *Id.* ¶ 47. When none of those reporters wrote a story, "an interview was arranged" with Ganieva and the *New York Post. Id.* ¶ 48. On April 8, 2021, an article in the *Post* covered Ganieva's tweets and quoted her. *Id.* "On information and belief," Ganieva's interview with the *Post*, her Twitter account, and her tweets "were arranged, written, and/or . . . approved by the Defendants, including Wigdor LLP and the Flacks," who then further publicized her tweets, including on Wigdor's website. *Id.* ¶ 17.

Ganieva's 2021 state court suit—and her amended complaints, which Black termed baseless—followed. *See id.* ¶¶ 50–71. Black's Complaint alleged that Ganieva "needed her lawyers [Wigdor] to file . . . phony complaints, packaging the lies as pleadings, . . . and abusing the attorney client privilege to hide the work they did together . . . and conceal her earlier extortion of Mr. Black." *Id.* ¶ 10; *see id.* ¶¶ 96–97. Contrary to its typical practice, Wigdor refused to settle the case before filing a complaint, because the firm "knew that Ms. Ganieva was extorting Mr. Black—or, at minimum, was willfully blind to that fact." *Id.* ¶ 18. Over the next several months, Wigdor and Ganieva slow-walked the litigation process. *Id.* ¶ 72. They did so in part because, on information and belief, Wigdor is "accepting payments and/or promises to pay from the Funder as consideration for Wigdor LLP's representation of Ms. Ganieva" in the state court litigation and for filing Ganieva's complaints in that action. *Id.* ¶ 92(j).

On October 25, 2021, Black's Complaint alleged, Black's representatives were contacted by a *Vanity Fair* reporter seeking comment on a story that the Manhattan District Attorney (the

"DA") was investigating Black for rape and sexual assault.[5] *Id.* ¶ 77. This showed that "Wigdor LLP and the Flacks knew they had a willing mouthpiece" in that journalist, "and took full advantage by feeding him distorted information." *Id.* ¶ 78. Even though Wigdor was "resisting legitimate discovery" as part of the state court litigation, the firm "pressed the prosecutor's office into their service and then conspired with a reporter" to report on a "spoon-fed" story. *Id.* ¶ 82.

Throughout the early phases of the state court litigation, Black's Complaint alleged, Wigdor "was a willing and critical participant" who "encouraged and enabled" the RICO enterprise centered around Ganieva. *Id.* ¶ 92. By working with Ganieva, the Flacks, and the Funder, Wigdor was seeking "to increase the pressure to pay, to brand the target, and to convict and punish him" before any hearing on the merits. *Id.* ¶ 12. Wigdor was thus involved in "operat[ing] . . . an Enterprise that unites money, litigation, and media into a machine for financial, and personal, extortion and cancellation[.]" *Id.* ¶ 8.

Black's Complaint also brought claims of defamation *per se* against Wigdor. Wigdor, it alleged, had known that the pleadings it had filed on Ganieva's behalf "had no basis in fact and included . . . defamatory and libelous statements." *Id.* ¶ 113. Wigdor filed the three complaints in the state court action solely to "publicize and disseminate lurid, scandalous and calumnious accusations against Mr. Black." *Id.* ¶ 114. In a further act of defamation, Wigdor partner Jeanne Christensen, Esq., stated that "[t]his case is the epitome of why #MeToo exists." *Id.* ¶ 122 (alteration in original). The Complaint alleged that Wigdor "caus[ed] the Flacks to disseminate" Ganieva's three baseless state-court complaints "to members of the media." *Id.* ¶¶ 92(h), 96(d), 97(d). And, on information and belief, "one or more of the Defendants actively marketed the

---

[5] Ganieva's state court complaints make a mirror-image allegation: that *Black* reported *Ganieva* to the DA. *See* State Compl. ¶ 13; State FAC ¶ 13.

story of Mr. Black's payments to Jeffrey Epstein," so that "[h]undreds of stories were written, many of them, upon information and belief, at the instigation of members of the Enterprise." *Id.* ¶ 15.

Black's Complaint also alleged that Wigdor had come to learn that Ganieva's allegations had been explicitly contradicted by the transcripts and recordings of Black and Ganieva's conversations that Black had disclosed. Nonetheless, Wigdor failed to retract its false claims in the state-court litigation, in service of its goal of "maximiz[ing] [that litigation's] extortionate impact while stalling the actual litigation of her claims." *Id.* ¶ 74; *see id.* ¶ 92(a) (the state-court complaints were "making good on Ms. Ganieva's extortionate threats," whose falsity Wigdor knew or willfully ignored; Wigdor refused to acknowledge that Black's evidence contradicted Ganieva's allegations). Similarly, Wigdor "refused to enter into a reasonable standard protective order," falsely stating that the firm, as a matter of practice, does not do so. *Id.* ¶¶ 74, 92(c).[6]

**C.     Pertinent History of This Litigation, Including Wigdor's Rule 11 Motion**

**1.     Wigdor's Rule 11 Motion**

On December 14, 2021, Wigdor served Black and his then-counsel in this case—Susan Estrich, Esq., of Estrich Goldin, LLP, and John B. Quinn, Esq., Michael B. Carlinsky, Esq., Jennifer J. Barrett, Esq., and Ryan A. Rakower, Esq., of Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP ("Quinn Emanuel")[7]—with its intended Rule 11 motion and a safe harbor letter.[8]

---

[6] On May 9, 2022, Justice Cohen granted Black's motion for a confidentiality order. *See* Dkt. 116-1; State Dkt. 152.

[7] Quinn Emanuel has since withdrawn from representing Black, but remains a party to the Rule 11 motion. *See* § I.C.2, *infra*; Dkt. 98 ("Tr.") at 88 (counsel for Wigdor, confirming it was still pursuing sanctions against Quinn Emanuel).

[8] Rule 11 permits a Court to sanction "any attorney, law firm, or party" that has violated the rule. Fed. R. Civ. P. 11(c)(1). Wigdor here brings a sanctions motion against Black and his counsel.

*See* Dkt. 37 at 1–2; Mot. at 6; Dkt. 56-1 ("Safe Harbor Ltr."). The letter notified Black and his counsel that, unless they dropped the claims against Wigdor within the Rule's 21-day safe harbor period, Wigdor would move for sanctions under Rule 11(b)(1), (2), and (3). Safe Harbor Ltr. at 2. On January 4, 2022, Black and his counsel responded to the safe harbor letter. Dkt. 56-2. They declined to drop Wigdor as a party and sought information about Wigdor's relationship with Ganieva and the terms of Wigdor's retention. *Id.* at 1, 3.

On January 10, 2022, after the safe harbor period had expired, Wigdor filed the instant motion, Dkt. 33, a memorandum of law in support, Dkt. 33-1 ("Mot."), the declaration of Max Gershenoff, Esq., Dkt. 33-2 ("Gershenoff Decl.") and attached exhibits, Dkts. 33-3 ("State FAC"), 33-4 ("Engagement Ltr."). Wigdor there argues that RICO claims in Black's Complaint violate Rule 11(b)(1), (2), and (3), and that the defamation claim violates Rule 11(b)(2).

As to Rule 11(b)(1), which prohibits filings for an improper purpose, Wigdor argues that Black and his counsel sued Wigdor "in an attempt to interfere with Wigdor's ability to represent Ms. Ganieva." Mot. at 29. It further argues that Black could have pursued his claims in the state court litigation as counterclaims, but sued in federal court in an improper attempt to forum-shop.

As to Rule 11(b)(2), which requires that claims have a legal basis—that is, that they be "warranted by existing law" or based on "a nonfrivolous argument" to extend, modify, reverse, or establish new law—Wigdor argues that the RICO and defamation claims against it fail this standard. Multiple RICO elements, it argues, are deficiently pled, including the existence of a cognizable enterprise; Wigdor's operation and management of that enterprise; the occurrence of

---

Rule 11(c)(1) provides that, "[a]bsent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." *Id.*

predicate acts; a pattern of racketeering activity; and an injury to Black. Wigdor also argues that the *Noerr-Pennington* doctrine blocks Black's claims.

Finally, as to Rule 11(b)(3), which requires the existence of evidentiary support for claims or the likelihood of same after a "reasonable opportunity for further investigation and discovery," Wigdor argues that Black and his counsel did not conduct a reasonable pre-filing inquiry, and make allegations about Wigdor that lack evidentiary support. Mot. at 8. Wigdor represents that no "Funder" or "Flacks" exist; that it is representing Ganieva pursuant to a contingency fee arrangement, and has no relationship with a "Funder"; that it has not worked with public relations professionals on Ganieva's behalf; that it did not represent her in March 2021 when she tweeted about Black; and that it has not willfully ignored evidence contradicting Ganieva's claims.

On January 13, 2022, Black sought an extension to respond to the sanctions motion, and asked the Court to deny the motion as moot, because Black intended to file a First Amended Complaint ("FAC") that would drop the RICO claims against Wigdor. Dkt. 36; *see also* Dkt. 46 (FAC, doing so).[9] On January 14, 2022, Wigdor opposed that motion. Dkt. 37. The same day, Black submitted a reply. Dkt. 38. On January 19, 2022, the Court denied Black's motions for an extension and to dismiss that motion as moot. As to the latter, the Court explained that Black had not withdrawn his Complaint within the 21-day safe harbor period; thus, filing an amended complaint excising the challenged portions would not entitle him to dismissal. Dkt. 40 (citing *Carousel Foods of Am., Inc. v. Abrams & Co.*, 423 F. Supp. 2d 119, 123–24 (S.D.N.Y. 2006);

---

[9] Black did not promise to drop the defamation claim against Wigdor, which Wigdor's sanctions motion also challenges. *See* Mot. at 27–28.

*Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, No. 15 Civ. 2457 (GHW), 2019 WL 1244493, at *10 (S.D.N.Y. Mar. 18, 2019)).

### 2.   First Amended Complaint, Sanctions Opposition, and Counsel Withdrawal

On January 24, 2022, Black filed the FAC. Dkt. 46. It added two named defendants— Josh Harris, a former Apollo executive, and Steven Rubenstein, a public relations executive—as parties. These replaced, respectively, the "Funder" and one of the "Flack" John Doe defendants named in the original Complaint. Salient here, the FAC dropped the RICO claims, but not the defamation claim, against Wigdor.

The FAC's reformulated RICO claims are brought against Ganieva, Harris, and Rubenstein. These are alleged to constitute an enterprise which, after Harris's bid to topple Black as the head of Apollo and install himself in his place had been thwarted, sought to retaliate against Black by publicly "weaponizing" Ganieva's allegations against him. *Id.* ¶ 1.

In brief, the FAC alleges that, around January 2021, after Black and Apollo's board had rebuffed Harris in his efforts to lead Apollo, Harris retained Rubenstein, and other public relations and law firms, to undermine the board and Black, and to retaliate against Black. *Id.* ¶¶ 3–4. As alleged, Harris and these cronies then joined forces with Ganieva, and assisted in her continuing efforts to smear Black. *Id.* ¶ 9. Among other things, Harris and his "confederates" attempted to secure representation for Ganieva, which entailed contacting law firms that could be adverse to Black. *Id.* Although these "confederates" did not initially identify the intended client, she was later revealed as Ganieva. *Id.* Wigdor's retention "came about . . . in the wake of th[at] outreach" to law firms. *Id.* ¶ 11.

Factually, although the FAC no longer names Wigdor as a RICO defendant, it accuses the firm of manipulating the state-court civil litigation it initiated on Ganieva's behalf as a part of a

"playbook" to harm Black, including by slow-walking the discovery process. *Id.* ¶¶ 70, 94, 96. Wigdor, it also claims, repeatedly declined to review texts, tapes, and transcripts that disproved or undermined Ganieva's state court allegations. *Id.* ¶¶ 14–15. The FAC's defamation claim against Wigdor is based on Wigdor's state-court litigation pleadings on behalf of Ganieva and on its alleged communications to the press about Black. These, it alleges, were made in consort with the alleged enterprise. *Id.* ¶¶ 136–49.

On January 24, 2022, Black and his counsel filed a memorandum in opposition to the sanctions motion, Dkt. 49 ("Opp."), and Ms. Estrich's supporting declaration, Dkt. 50 ("Estrich Decl."). As to Rule 11(b)(1), they argued that they had a proper purpose in filing the Complaint, and that Black was entitled to file in federal court and to challenge Wigdor's abusive litigation tactics. Opp. at 24. As to Rule 11(b)(2), they argued that Wigdor's motion is functionally a motion to dismiss for failure to state a claim, and that the Complaint's claims are non-frivolous. *Id.* at 7–9. Finally, they represented that they had made a reasonable pre-filing investigation, *id.* at 18, citing Ms. Estrich's declaration, which describes pre-suit steps Black's counsel took, including reviewing text messages, transcripts, recordings, and records of conversations and payments between Black and Ganieva; conducting interviews; and receiving information about the Funder and Flacks' work. Estrich Decl. ¶¶ 2–3. Ms. Estrich's declaration attached, as exhibits, four articles making allegations about Black, including his abuse and other misconduct towards Ganieva. *Id.*, Exs. 1–4.

On January 24, 2022, Quinn Emanuel filed a letter motion to withdraw, stating that it had determined it had a potential conflict of interest.[10]   Dkt. 51.   On January 25, 2022, the Court granted that motion.   Dkt. 54.

### 3.    Reply and Sur-Replies to the Rule 11 Motion

On January 31, 2022, Wigdor filed a reply in support of sanctions, Dkt. 55 ("Reply"), and the declaration of Max Gershenoff, Esq., in support, Dkt. 56, which attached the safe harbor letter, Dkt. 56-1, and Black's response to that letter, Dkt. 56-2.   The reply included an account of a January 23, 2022, conversation between Michael Carlinsky, Esq., a Quinn Emanuel lawyer who had been counsel for Black, and Mr. Gershenoff, in which Mr. Carlinsky allegedly offered to dismiss the RICO claim against Wigdor without prejudice if Wigdor would withdraw the sanctions motion, and *with* prejudice if Wigdor could provide information that showed defendant Josh Harris's (a/k/a the "Funder's") connection to Ganieva's suit.   Reply at 2–3.

On February 9, 2022, Black filed a sur-reply.   Dkt. 66.   It attached a letter from Black's former counsel, John B. Quinn, Esq., who stated that Ganieva's reply had mischaracterized the conversation between Messrs. Carlinsky and Gershenoff.   Dkt. 66-1.   Mr. Quinn argued that the discussions were protected under Federal Rule of Evidence 408 as a settlement discussion, and that Mr. Gershenoff's failure to attest to the statements in his declaration evinced their falsity. *Id.* at 1–2.

---

[10] That conflict of interest was based on the FAC's allegations that one lawyer whom Harris sought to recruit to represent Ganieva was Quinn Emanuel partner Alex Spiro, Esq.   FAC ¶¶ 9, 11 ("investigators" gave Ganieva Mr. Spiro's name), 61, 62; *see* Tr. at 81–82 (Ms. Estrich representing that Mr. Spiro was not involved in the Complaint's drafting and submission but that after the Complaint was filed, the firm alerted to the conflict), 83 (Ms. Estrich explaining that Quinn Emanuel is continuing to represent Black in state court because Mr. Spiro never made contact with Ms. Ganieva and only considered taking on the representation, and because the facts as to Mr. Spiro pertain to the RICO claims but not any of the state law claims).

The next day, Wigdor filed another sur-reply. Dkt. 67. It argued that Black had opened the door to the consideration of the conversation by stating—falsely—in opposing sanctions that "Wigdor has informed Plaintiff that it will maintain its request for sanctions even should Plaintiff withdraw his RICO claims against it," Opp. at 2. Dkt. 67 at 1. Wigdor also recapped its main arguments for sanctions. *Id.* at 2.

On March 9, 2022, Black filed his second sur-reply. Dkt. 92; *see* Dkt. 95 (with exhibits).[11] It challenged Wigdor's sanctions argument under Rule 11(b)(3) by pointing to evidence that Wigdor name partner Douglas Wigdor, Esq., was in communication with a *New York Times* reporter about Ganieva as early as October 2020. This, Black argued, shows that Wigdor's claims that it had not been retained by Ganieva at the time of the tweets are false, and contravenes Wigdor's claim that Black's claims against it lacked factual support.

On March 15, 2022, Wigdor filed its second sur-reply—the fourth in the case, with leave of the Court. It argued that Black's changing explanations for his litigation strategy were suspect and that the text messages revealed that Mr. Wigdor would not speak to the *Times* reporter until Ganieva agreed that he should, because she was a prospective client. Dkt. 100.

### 4.    Initial Pretrial Conference

On March 10, 2022, the Court held an initial pretrial conference. Dkt. 98 ("Tr."); *see* Dkt. 77, and took up various matters with counsel, including, briefly, the sanctions motion. In that colloquy, counsel for Black stated, *inter alia*, that the RICO claims against Wigdor had been withdrawn because counsel chose to take at face value Wigdor's representation that Ganieva did

---

[11] On March 9, 2022, Black filed the second sur-reply, without any exhibits. Dkt. 92. On March 10, 2022, the Court held an initial pretrial conference, at which it directed Ms. Estrich to refile, the next day, the letter "with any referenced attachments." Tr. at 89–90. On March 11, 2022, counsel did so. Dkt. 95. On March 14, 2022, the Court erroneously declined to accept this sur-reply. *See* Dkt. 97. The Court here corrects that error. It has considered the sur-reply, with its attached exhibits, as filed at docket 95.

not retain the firm until April 2021, Tr. at 79.  Asked why the claims had not been withdrawn

within the 21-day safe harbor, counsel for Black stated that it had taken more than the 21-day

period to decide to drop the RICO claims against Wigdor. *Id.* at 80.  The Court also authorized

counsel's sur-replies that had been filed, and an additional one from Wigdor. *Id.* at 90.

## II.    Applicable Law

Under Federal Rule of Civil Procedure 11(c), a court, on a party's motion or on its own,

may impose appropriate sanctions on "any attorney, law firm, or party that violated" Rule 11(b)

or is responsible for the violation.  Rule 11(b) provides that:

> [b]y presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonable based on belief or a lack of information.

Fed. R. Civ. P. 11(b).

### A.    Procedural Requirements

Rule 11(c)(2) sets forth the procedure to be followed where sanctions are pursued.  It

creates a "safe harbor," which gives the offending attorney a chance to modify or withdraw the

challenged submission so as to avoid sanctions.  *See In re Pennie & Edmonds LLP*, 323 F.3d 86,

89–90 (2d Cir. 2003).  A motion for sanctions is initially to be served only on the offending

attorney, and not filed with the Court. The motion is to be filed only if, 21 days after such service, the challenged submission has not been "withdrawn or appropriately corrected." Fed. R. Civ. P. 11(c)(2). Rule 11(c)(2) requires "the subject of a sanctions motion be informed of: (1) the source of authority for the sanctions being considered; and (2) the specific conduct or omission for which the sanctions are being considered so that the subject of the sanctions motion can prepare a defense." *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 334 (2d Cir. 1999); *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 175 (2d Cir. 2012). Sanctions may not be awarded under Rule 11(c)(2) where proper notice and opportunity to withdraw or correct the filing were not provided to the party to be sanctioned. *See Lawrence v. Richman Grp. of CT LLC*, 620 F.3d 153, 158 (2d Cir. 2010).

"Due process requires that courts provide notice and opportunity to be heard before imposing *any* kind of sanctions." *Schlaifer Nance*, 194 F.3d at 334 (emphasis in original) (cleaned up). The moving party's Rule 11 motion papers can satisfy the notice requirement— and an opportunity to submit written briefs in opposition to a Rule 11 motion can constitute a sufficient opportunity to be heard. *See id.* at 335–36; *Margo v. Weiss*, 213 F.3d 55, 63–64 (2d Cir. 2000). Although argument on Rule 11 sanctions motions is favored, the district court is not obliged to hold a hearing where, as here, none has been requested. *Margo*, 213 F.3d at 64; *Schlaifer Nance*, 194 F.3d at 335–36.

Finally, sanctions may be assessed against represented parties and their attorneys where a court finds that a "party has acted in bad faith, or proceeded with an improper purpose." *S. Pac. Shipping Co. v. Redi-Fresh Produce Inc.*, No. 14 Civ. 4157 (LAK) (AJP), 2014 WL 6968039, at *11 (S.D.N.Y. Dec. 9, 2014) ("*South Pacific*"); *see also Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 176 (2d Cir. 1999). However, a "court must not impose a

monetary sanction (A) against a represented party for violating Rule 11(b)(2); or (B) on its own, unless it issued the show-cause order under Rule 11(c)(3)[.]" Fed. R. Civ. P. 11(c)(5).

**B.      Substantive Standards**

The Court may impose sanctions if the attorney responsible for the submission is found to have acted with "objective unreasonableness." *Pennie & Edmonds LLP*, 323 F.3d at 90; *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 150 (2d Cir. 2009). "In other words, Rule 11 is violated if a pleading is submitted for 'any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the reasonable belief that pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.'" *Watkins v. Smith*, No. 12 Civ. 4635 (DLC), 2013 WL 655085, at *5 (S.D.N.Y. Feb. 22, 2013) (emphasis omitted) (quoting *Kropelnicki v. Siegel*, 290 F.3d 118, 131 (2d Cir. 2002)).

To determine whether sanctions are warranted, a court "may consider a variety of factors, including whether the attorney relied on the client for factual information [or] whether the pleading was supported by a plausible view of the law[.]" *O'Malley v. N.Y.C. Transit Auth.*, 896 F.2d 704, 706 (2d Cir. 1990). Doubts about a pleading's factual or legal viability "are to be resolved in favor of the signer." *Id.* A court fashioning a deterrent sanction has "broad discretion" to "tailor[] appropriate and reasonable sanctions under [R]ule 11." *Id.* at 709. "Where a district court concludes that a monetary award is appropriate, its broad discretion extends to determining the amount of the award" and "including an award of attorney's fees where warranted." *Lawrence v. Wilder Richman Secs. Corp.*, 417 F. App'x 11, 15 (2d Cir. 2010) (summary order) (citing *Caisse Nationale de Credit Agricole-CNCA*, 28 F.3d 259, 266 (2d Cir. 1994); *Eastway Constr. Corp. v. City of New York*, 821 F.2d 121, 123 (2d Cir. 1987)).

### III.  Discussion

Wigdor pursues sanctions for asserted failures to comply with each of Rules 11(b)(1), (2), and (3).  The Court considers Wigdor's arguments under each provision in turn.

### A.  Rule 11(b)(1)

Under Rule 11(b)(1), a claim may not be "presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation."  Analysis under Rule 11(b)(1) inquiry is often intertwined with analysis of the substantive viability of a party's claims.  Courts, for example, may infer an improper purpose where "applicable preclusion doctrines clearly foreclose further litigation."  *See Lipin v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 202 F. Supp. 2d 126, 140 (S.D.N.Y. 2002) (cleaned up); *see also, e.g., Ginther v. Provident Life & Cas. Ins. Co.*, 350 F. App'x 494, 496 (2d Cir. 2009) (summary order); *Lipin v. Hunt*, 573 F. Supp. 2d 836, 844 (S.D.N.Y. 2008).  But, where a complaint "is not held to lack foundation in law or fact," the "filing of the complaint with a view to exerting pressure on defendants through the generation of adverse and economically disadvantageous publicity" is insufficient to show improper purpose.  *See Sussman v. Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1995); *see also Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 393 (2d Cir. 2003) ("Without objectively unreasonable statements, economic disparity and a greater litigiousness do not alone amount to improper purpose.").

Wigdor advances two theories of an improper purpose.

First, it argues that Black sued it intending to interfere with its representation of Ganieva in her state court suit.  Intentional interference with an attorney-client representation can be sanctionable.  *See Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 831 (2d Cir. 1992) (had district court found that the defendant had offered evidence with goal to "disqualify plaintiff's attorney

and her law firm" by forcing the attorney to testify at trial, then "Rule 11 sanctions would have been appropriate").

Here, however, Black's allegations of RICO violations and defamation by Wigdor—the latter of which survive in the FAC—have not prevented Wigdor from continuing to represent Ganieva in state court. Nor would the pendency of such claims ineluctably have done so. To be sure, the course of events had the potential to lead there. For example, had Black's lawsuit uncovered proof of criminal complicity between Wigdor and Ganieva, the disciplinary and/or criminal ramifications could have prompted or forced Wigdor to step aside in the state case. And, as in any case in which claims against a law firm relating to a client are made, attentive judicial supervision would have been had needed—and would still be needed if Black continues to pursue a defamation claim against Wigdor and if such survives into discovery—to guard against incursions on attorney-client privilege and protected attorney work product.

But Wigdor does not concretely explain how Black's mere pleading of such claims would inexorably force Wigdor's state-court withdrawal or rupture its representation of Ganieva. And Wigdor does not show—and nor does the Complaint evince—that Black's claims against Wigdor were brought to harass Wigdor. Nor are these claims asserted to be part of a broader series of vexatious filings. *See Hassan Abbas v. Orrick, Herrington & Sutcliffe, LLP, et al.*, No. 15 Civ. 1545 (RJS), 2016 WL 1071033, at *6 (S.D.N.Y. Mar. 16, 2016), *aff'd sub nom. Abbas v. Martin*, 689 F. App'x 43 (2d Cir. 2017) (summary order). That the Complaint alleges that Wigdor took unlawful action against Black outside its representational capacity, to wit, that it catalyzed a defamation campaign against him, suggests a proper purpose for Black's claims: to hold Wigdor accountable for tortious injury to Black, rather than to disqualify Wigdor from representing her.

The Court thus is unpersuaded by Wigdor's accusation that Black and his counsel sued Wigdor with the improper purpose of interfering with Wigdor's representation of Ganieva.

Wigdor's second argument is that Black and his counsel engaged in improper forum shopping in bringing their claims against Ganieva in federal court, rather than as counterclaims to Ganieva's state-court action.

A party's pursuit of a preferred forum, however, is rarely held sanctionable. For purposes of federal subject matter jurisdiction, the plaintiff is "the master of the claim." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). The Second Circuit has voiced "skeptic[ism]" of the notion "that the commencement of a suit in an inconvenient forum may be the basis of Rule 11 sanctions where venue was not improper." *Sussman*, 56 F.3d at 457.

Here, although Black's federal claims, under RICO, are dubiously pled, as reviewed below, the Court does not find them frivolous. And insofar as the Complaint articulated federal causes of action, it supplied, on its face, federal question jurisdiction. Critically, too, Wigdor does not argue that there was anything inconvenient for it about litigating in this federal forum. There demonstrably was not: this Court is situated 100 yards from the forum Wigdor chose for Ganieva's state-court lawsuit. And although uniting Black's and Ganieva's claims in a single action would have promoted greatest efficiency, case-management and discovery tools are available that would have enabled this Court and its state supreme court counterpart to minimize duplicative work. Indeed, even where a forum has persuasively been claimed to be inconvenient, such, standing alone, has not been held to justify sanctions. *See, e.g., Newton v. Thomason*, 22 F.3d 1455, 1463–64 (9th Cir. 1994) (because "[a]ttorneys are not under an affirmative obligation to file an action in the most convenient forum; their only obligation is to file in a proper forum . . . filing in an inconvenient but proper forum is not a legitimate ground for Rule 11 sanctions");

*HR U.S. LLC v. Mizco Int'l, Inc.*, No. 07 Civ. 2394, 2010 WL 3924548, at *5 (E.D.N.Y. Sept. 29, 2010) ("[p]laintiff did not engage in litigation misconduct by filing in a proper, but ultimately inconvenient venue" especially where "defendants have not shown that plaintiff's filing in [the Eastern District of Virginia] was intended to harass them" and "plaintiff had a legitimate purpose for filing there"); *cf. Baddie v. Berkeley Farms, Inc.*, 64 F.3d 487, 491 (9th Cir. 1995).

This case is thus at some remove from the rare ones to find sanctions warranted based on improper forum-shopping.  In such cases, commonly, not only was the offending party's federal claim substantively deficient, but that party had also engaged in associated vexatious conduct.  In *South Pacific*, for example, "South Pacific's behavior exemplifie[d] impermissible forum shopping" where it filed an action in the Eastern District of New York, but after the defendant filed a notice of relatedness to an ongoing action in this District, South Pacific immediately withdrew its complaint and refiled suit in state court.  South Pacific's weak claims and abrupt change of course, Judge Kaplan noted, "[gave] rise to an inference of improper purpose."  2014 WL 6968039, at *10; *see also, e.g., Pack v. Hoge Fenton Jones & Appel, Inc.*, No. 12 Civ. 4512, 2013 WL 140027, at *3 (N.D. Cal. Jan. 10, 2013) (imposing sanctions where claims were frivolous and action's timing "demonstrates that it was filed for an improper purpose: avoiding the state court's adverse rulings through forum shopping," while defendant "offers no alternative explanation"); *China Healthways Inst., Inc. v. Hsin Ten Enter. USA, Inc.*, No. 02 Civ. 5493, 2003 WL 21982477, at *7, *8 (C.D. Cal. Mar. 12, 2003) (explaining "[f]iling in an inconvenient but proper forum is not a legitimate ground for Rule 11 sanctions.  However, when a complaint is filed in an inconvenient but proper forum for an improper purpose, such as harassment, then such action is subject to Rule 11 sanctions" and imposing sanctions where "Defendant's purpose in

filings its suit was to avoid the forum that it knew from Plaintiff's correspondence that Plaintiff would select") (citation omitted).

Here, to be sure, there is much force to Wigdor's claim that Black's RICO claims against it were legally tenuous. The Court considers that in connection with Wigdor's most substantial argument for sanctions—that these claims were so defective as to be frivolous and sanctionable under Rule 11(b)(2). But Wigdor has not identified other harassing behavior by Black, such as that noted by Judge Kaplan in *South Pacific*, supporting sanctions. The Court accordingly does not find sanctions warranted under Rule 11(b)(1).

## B.    Rule 11(b)(2)

Rule 11(b)(2) requires that claims "and other legal contentions [be] warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." It "establishes an objective standard, intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments." *Simon DeBartolo Grp.*, 186 F.3d at 166 (quoting Rule 11 advisory committee note to 1993 amendments).

When a party's legal contentions are challenged as violating Rule 11, "[t]he operative question is whether the argument is frivolous, *i.e.*, the legal position has no chance of success, and there is no reasonable argument to extend, modify, or reverse the law as it stands." *Fishoff v. Coty Inc.*, 634 F.3d 647, 654 (2d Cir. 2011) (internal quotation marks and citation omitted); *see also Star Mark Mgmt.*, 682 F.3d at 177; *Healey v. Chelsea Res., Ltd.*, 947 F.2d 611, 626 (2d Cir. 1991) ("Rule 11 targets situations where it is patently clear that a claim has absolutely no chance of success.") (internal quotation marks omitted). However, the Second Circuit has counseled that "[a] distinction must be drawn between a position which is merely losing and one which is both losing and sanctionable." *Sec. Indus. Ass'n v. Clarke*, 898 F.2d 318, 321 (2d Cir. 1990) (internal quotation marks omitted). As the Circuit has explained, "not all unsuccessful legal

27

arguments are frivolous or warrant sanction." *Mareno v. Rowe*, 910 F.2d 1043, 1047 (2d Cir. 1990). But "the point at which an argument turns from merely 'losing' to losing *and* sanctionable is often difficult to discern." *Motown Prods., Inc. v. Cacomm, Inc.*, 849 F.2d 781, 785 (2d Cir. 1988) (emphasis in original).

Here, Wigdor argues that the RICO and defamation *per se* claims that Black brings against it so flagrantly fail to state a claim as to be frivolous.

### 1.    Black's Civil RICO Claims

The RICO statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "To establish a claim for a civil violation of section 1962(c), 'a plaintiff must show that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (quoting *Azrielli v. Cohen Law Offs.*, 21 F.3d 512, 520 (2d Cir. 1994)).

Wigdor argues that the Black's RICO claims failed to adequately allege six ingredients of a viable RICO claim or to take account a dispositive immunity defense, and that these lapses were so manifest as to make these claims frivolous.

####       *a.    Enterprise*

First, Wigdor argues that the Complaint does not adequately allege a RICO enterprise.

A RICO enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[T]o establish liability under § 1962(c), [the plaintiff] must allege and prove the existence of two distinct entities; (1) a 'person'[,] and (2) an 'enterprise' that is not

simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). A RICO enterprise may be a lawful entity or an association-in-fact. *Boritzer v. Calloway*, No. 10 Civ. 6264 (JPO), 2013 WL 311013, at *5 (S.D.N.Y. Jan. 24, 2013). The latter is "a group of persons associated together for the common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Such an enterprise must have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

In pursuing sanctions, Wigdor argues that the Complaint does not distinguish between the defendants and the enterprise, contains scant allegations about the Flacks and the Funder, and does not allege a purpose beyond the legitimate one of representing its client Ganieva. Mot. at 15. Accordingly, it terms the enterprise allegations "totally insufficient." *Id.* Black defends the Complaint's enterprise allegations as plausible and, even if not, non-frivolous. Opp. at 9–10.

The Complaint's allegations of a racketeering enterprise are indeed strikingly sparse. It is highly unlikely that these would have survived a motion to dismiss. And indeed, the Court today dismisses the similar RICO claims in Black's FAC—now brought against all defendants other than Wigdor—for multiple pleading deficiencies, including as to the enterprise element. But, the Complaint's claim of an association-in-fact among Wigdor, Ganieva, the Funder, and the Flacks is not so "patently frivolous" so as to be sanctionable.

Insofar as Wigdor's sanctions motion focuses on the requirement of distinctiveness, "to establish liability under § 1962(c) a plaintiff must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner*, 533 U.S. at 161. Accordingly, a corporation cannot be a

distinct RICO person when the RICO enterprise is the corporation and its employees "acting in the normal course of business." *See Crabhouse of Douglaston Inc. v. Newsday Inc.*, 801 F. Supp. 2d 64, 82 (E.D.N.Y. 2011) (citing *Cedric Kushner*, 533 U.S. at 163). Wigdor urges that the distinctiveness requirement was literally incapable of being met here because the members of the association-in-fact enterprise are also named as RICO defendants. But that argument reflects "a fundamental misunderstanding of the distinctness requirement." *Bd. of Managers of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo*, 346 F. Supp. 3d 432, 454 (S.D.N.Y. 2018). In fact, it is permissible for the defendants both to "collectively constitute the enterprise" and to also be separately liable under RICO for their roles in operating it. *Id.*

Insofar as Wigdor next argues that the Complaint insufficiently alleges the existence of the Funder and the Flacks and a common purpose uniting the enterprise members, that argument resounds strongly under Rule 12(b)(6), but it does not stamp the Complaint as frivolous. At the threshold, there is no caselaw foreclosing pleading "John Does" as either RICO defendants or enterprise members. *See, e.g., Gagasoules v. MBF Leasing LLC*, 286 F.R.D. 205, 211–12 (E.D.N.Y. 2012) (declining to sanction proposed amended complaint that would have brought claims against an additional individual defendant and John Does 1–100 where claims were at least partially internally inconsistent). And the existence of persons in the roles of Flack and Funder—even if not identified by name until the ensuing FAC—is non-frivolously inferred given the Complaint's allegations of Ganieva's litigation's unexplained funding and of the dissemination to the media, by person(s) unknown, of derogatory information about Black on her behalf.

Further, although the Complaint's allegations about the enterprise's objectives are only thinly supported by concretely pled facts, it does recite a purpose of sorts uniting the enterprise

participants that goes beyond the proper one of pursuing colorable litigation: to retaliatorily damage Black's reputation and publicly "brand" him a sexual predator, in the hope that this would induce Black to cede money to Ganieva. *See* Compl. ¶ 13. In support, the Complaint notes that Wigdor, to maximize the enterprise's capacity to publicly besmirch Black, deviated from its allegedly customary approaches of either settling cases before filing a complaint or entering into a protective order in cases that were filed. *Id.* ¶¶ 18, 72, 74. And, it alleges, Wigdor and its client Ganieva abused the litigation process, concocting false claims against Black which it made the basis of its complaint falsely accusing him of rape, which it filed with the goal of "humiliat[ing]" and "extort[ing] him." *Id.* ¶¶ 52, 86. Such allegations would almost certainly fail on a motion to dismiss under Rule 12(b)(6), for reasons tracking those in today's decision dismissing the similar FAC. But the deficiency of these claims does not make them sanctionable. *See Mareno*, 910 F.2d at 1047.

Finally, precedent does not foreclose a RICO enterprise whose participants centrally include an attorney and client. Although such is far afield from the RICO paradigm, the Second Circuit has left open such a possibility. *Cf., e.g., Azrielli*, 21 F.3d at 521 (where attorney argued that "he could not be held liable under RICO because he had merely acted as an attorney for the other individual defendants," Circuit "agree[d]," but only "[o]n the record in this case").

The Court, therefore does not find the Complaint's allegations as to a RICO enterprise patently frivolous. And the few cases to impose Rule 11(b)(2) sanctions on this ground entailed more blatantly frivolous conduct. *See, e.g., LCS Grp., LLC v. Shire LLC*, No. 18 Civ. 2688 (AT), 2019 WL 1234848, at *11, *15–16 (S.D.N.Y. Mar. 8, 2019) (dismissing claim and awarding 11(b)(2) sanction where, *inter alia*, complaint mentioned an enterprise "only once in its complaint, in a conclusory sentence, without identifying the specific enterprise"), *judgment aff'd,*

*appeal dismissed in part sub nom.* No. 20-2319, 2022 WL 1217961 (2d Cir. Apr. 26, 2022); *cf.*

*United States Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 455 (S.D.N.Y.

2004) (denying 11(b)(2) sanctions after dismissing civil RICO claims where civil RICO

pleadings "are not in and of themselves sanctionable," or "destined to fail based on existing

precedent") (internal quotation marks and citation omitted).

>    b.    *Operation and management*

Wigdor next argues for sanctions under Rule 11(b)(2) because the Complaint does not

adequately allege that it was involved in the operation or management of the enterprise.

To "conduct or participate" in a RICO enterprise, "one must participate in the operation

or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)

(holding accountants not liable under RICO because, in providing professional services, they did

not direct the enterprise); *see DeFalco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001). "In this

Circuit, the 'operation or management' test typically has proven to be a relatively low hurdle for

plaintiffs to clear, especially at the pleading stage." *First Cap. Asset Mgmt., Inc. v. Satinwood,

Inc.*, 385 F.3d 159, 176 (2d Cir. 2004) (internal citations omitted).  But courts in several cases

have disdained finding lawyers liable under RICO based on their legal services, reasoning that

"providing important services to a racketeering enterprise is not the same as directing the affairs

of the enterprise." *Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449,

465–66 (S.D.N.Y. 1996).[12]

_____

[12] *See, e.g., Azrielli*, 21 F.3d at 521–22 (where attorney represented clients in transactions at
issue but "acted as no more than their attorney" and plaintiffs "adduced no evidence to show that
[the attorney] in any way participated in the management or direction of a RICO enterprise,"
affirming grant of summary judgment); *Nolte v. Pearson*, 994 F.2d 1311, 1317 (8th Cir. 1993);
*Friedman v. Hartmann*, No. 91 Civ. 1523 (BSJ), 1996 WL 457300, at *5 (S.D.N.Y. Aug. 13,
1996) ("[I]t has been established that an attorney can be substantially involved in a RICO
enterprise or fraud, and still not be liable under RICO because such substantial involvement does

Here, Wigdor depicts the Complaint as alleging only that "Wigdor acted improperly while representing Ms. Ganieva in her lawsuit against Black"—conduct which, it argues, does not constitute operation or management. Mot. at 16. Black and his counsel counter that, as pled, Wigdor did more than represent Ganieva—it brought bogus claims against him and also, outside the litigation process, manipulated the press to advance the goal of smearing Black. Opp. at 11.

The Court does not find the Complaint's pleadings on this point frivolous. A law firm is capable of involvement in the operation or management of a RICO enterprise. *See Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 995 (E.D.N.Y. 1995) (although "attorneys do not incur RICO liability for the traditional functions of providing legal advice and services," caselaw does "not foreclose the possibility of an attorney or law firm maintaining an operational or managerial position in a RICO enterprise"). Here, the Complaint alleges—in addition to the provision of legal services—that Wigdor engaged in illegal conduct outside its representational capacity, specifically, engineering defamatory press coverage of Black to advance the interests of its client, Ganieva. Compl. ¶¶ 17, 78, 92.

Although the factual allegations on this point are, again, sparse—and it is likely that the Complaint would not have survived a Rule 12(b)(6) motion aimed at this requirement—that its claims are deficient is not so patently obvious as to be frivolous. A law firm is not precedentially foreclosed from participating in the operation and management of a RICO enterprise, such that

not constitute 'operation and management.'") (collecting cases); *Biofeedtrac, Inc. v. Kolinor Optical Enters. & Consultants, S.R.L.*, 832 F. Supp. 585, 591–92 (E.D.N.Y. 1993) (where "plaintiff has adduced no facts to suggest that [an attorney's] actual or projected role was to lead, run, manage, or direct any part of the enterprise," he "did not violate § 1962(c), even though he may have intentionally assisted a scheme to defraud") (internal quotation marks omitted); *Arons v. Lalime*, 3 F. Supp. 2d 314, 321 (W.D.N.Y. 1998) ("[P]roviding legal advice and legal services generally does not constitute participation in the operation or management of an enterprise sufficient to ground an allegation of a violation of § 1962(c).") (collecting cases).

the pleadings stand no chance of success. The Court therefore does not find the Complaint frivolous on this ground.

c.     *Predicate acts*

Wigdor next argues that the Complaint does not allege that Wigdor engaged in any predicate acts of racketeering activity. Mot. at 17.

"To be liable under the RICO statute, a defendant must commit 'at least two acts of racketeering activity.'" *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 405 (S.D.N.Y. 2013) (quoting 18 U.S.C. § 1961(5)) (citing *DeFalco*, 244 F.3d at 306). "Racketeering activity" is "broadly defined to encompass a variety of state and federal offenses including, inter alia, murder, kidnapping, gambling, arson, robbery, bribery and extortion." *DeFalco*, 244 F.3d at 306 (citing 18 U.S.C. § 1961(1)).

Here, Wigdor argues that the Complaint does not allege that Wigdor ever demanded any money from Black; that the firm's litigation activity cannot constitute extortion; and that, with litigation conduct stripped away, the Complaint's allegations "are insufficient to demonstrate that Wigdor engaged in any mail or wire fraud." Mot. at 17–20. Black and his counsel counter that "[t]he preparation and filing of fraudulent litigation, which counsel knew or should have known was fraudulent, can constitute mail or wire fraud," and, in any event, the Complaint alleges non-representational acts constituting wire fraud. Opp. at 11–12.

A threshold question—on which the parties disagree—is whether the Second Circuit's recent decision in *Kim v. Kimm* so clearly disposes of Black's RICO claims against Wigdor as to make these frivolous. In *Kim*, the Circuit affirmed the dismissal of RICO claim against an attorney defendant. 884 F.3d 98, 101 (2d Cir. 2018). It "decline[d] to reach the issue of whether all RICO actions based on litigation activity are categorically meritless," and "conclude[d] only

that where, as here, a plaintiff alleges that a defendant engaged in a single frivolous, fraudulent, or baseless lawsuit, such litigation activity alone cannot constitute a viable RICO predicate act." *Id.* at 105.

Critically, following *Kim*, complaints that allege, as RICO predicate act(s), abusive litigation activity have the capacity to state a claim, provided that they allege more than bringing a single lawsuit.[13] *See Carroll v. U.S. Equities Corp.*, 18 Civ. 667, 2020 WL 11563716, at *8–9 (N.D.N.Y. Nov. 30, 2020) ("While *Kim* makes clear that abusive litigation tactics from a single lawsuit cannot form proper predicate acts under RICO, *Kim* leaves open the door for RICO claims premised on abusive litigation activities involving conduct beyond a single lawsuit."), *reconsideration denied*, 18 Civ. 667, 2021 WL 4472513 (N.D.N.Y. Sept. 30, 2021). *Kim* itself distinguished a case in which defendants, including a law firm, had "used litigation to carry out their scheme" and also "engaged in a variety of out-of-court actions to further their activity." 884 F.3d at 105 (citing *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 418–20 (S.D.N.Y. 2010)).

Here, as Black notes, the Complaint also alleges extra-litigation conduct on Wigdor's part—the orchestration of a campaign of defamation—which it casts as wire fraud. Accordingly, he argues, the Complaint meets *Kim*'s standard of pleading more than "a single frivolous, fraudulent, or baseless lawsuit." *See* 884 F.3d at 105. The firm, as alleged, helped Ganieva make a false report to the DA. And it disseminated Ganieva's false accusations to the press. Although these allegations likely would not survive a motion to dismiss, for several reasons—as reflected in the Court's decision today dismissing Black's FAC, which makes similar

---

[13] Black and his counsel cite cases where a single lawsuit was a RICO predicate act, but those cases all predate *Kim*. *See* Opp. at 11–12.

allegations—these do not qualify as frivolous. Filing of false complaints with law enforcement can be cognizable as the factual basis for a RICO predicate act. *Cf. Flier v. Cayuga Cnty.*, No. 03 Civ. 578, 2006 WL 2655698, at *7 (N.D.N.Y. Sept. 15, 2006) (where Complaint alleged predicate acts of, *inter alia*, perjury and filing false police reports, allegations failed to satisfy Rule 9(b)); *see also Gilfus v. Vargason*, 04 Civ. 1379, 2006 WL 2827658, at *7 (N.D.N.Y. Sept. 30, 2006) (related case). Accordingly, the Complaint did not make allegations that *necessarily* stood no chance of success.

To be sure, as pled, the Complaint's factual allegations to this effect against Wigdor are thin gruel, such that a motion to dismiss aimed at these predicates would almost certainly have succeeded. As reflected in the Court's decision today invalidating the RICO claims in Black's FAC, courts are loath to treat claims casting defamatory statements as mail or wire fraud predicates. *See Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d 45, 73–74 (E.D.N.Y. 2020) ("Just as courts are loath to permit litigation activities to be shoehorned into civil RICO predicates, courts express similar reticence towards attempts to recast defamatory statements as mail and wire fraud.") (collecting cases). And *Chevron Corp. v. Donziger*—on which Black and his counsel rely as support for casting Wigdor's conduct as extortion—is far afield. There, defendant Donziger's conduct pled as extortion consisted of "a multi-faceted, extortionate scheme" including bringing litigation, "intimidating of Ecuadorian judges, fabricating evidence, making false statements to U.S. courts, Congress, the SEC, and the media, and bringing false criminal charges, all for the purpose of coercing Chevron into paying to stop the campaign against it." 871 F. Supp. 2d 229, 249 (S.D.N.Y. 2012) (internal quotation marks omitted). Judge Kaplan distinguished this suite of extortionate conduct from garden-variety frivolous litigation and defamatory statements—conduct inadequate to qualify as extortion. *Id.* ("Chevron's

amended complaint goes far beyond that."). Here, the extortion pled by Black goes little beyond litigation conduct and the making of relatively garden-variety defamatory statements. Had the RICO claims against Wigdor not been withdrawn, these claims thus were in grave jeopardy of dismissal, for failure to plead conduct plausibly making out the *actus reus* and *mens rea* elements of mail and wire fraud. *See S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996) (citing *United States v. Gelb*, 700 F.2d 875, 879 (2d Cir.), *cert. denied,* 464 U.S. 853 (1983)). A separate potential impediment would have been Rule 9(b), in that it is far from clear that Black's allegations adequately "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (citation omitted).

But for sanctions to be warranted, more must be shown than a failure to state a claim, particularly where the plaintiff's pleading faces the heightened pleading standards of Rule 9(b). *See, e.g., United States Fire Ins.*, 303 F. Supp. 2d at 455 (declining to sanction for failure to meet 9(b) requirements); *G-I Holdings, Inc. v. Baron & Budd*, No. 01 Civ. 0216 (RWS), 2002 WL 1934004, at *15 (S.D.N.Y. Aug. 21, 2002) ("[T]here is no blackletter rule that sanctions are warranted whenever a motion to dismiss succeeds on Rule 9(b) grounds."); *Patrick Carter Assocs., Inc. v. Rent Stabilization Ass'n of N.Y.C., Inc.*, No. 89 Civ. 7716 (WCC), 1990 WL 195993, at *6 (S.D.N.Y. Nov. 28, 1990) ("The failure to plead RICO allegations in conformity with Rule 9(b) cannot form the basis for sanctions.") (citing *Off. Pubs., Inc. v. Kable News Co.*, 884 F.2d 664, 670 (2d Cir. 1989)). Wigdor has shown the Complaint's predicate-act claims to be

feeble, but it has not, quite, shown them to be frivolous or foreclosed by precedent. The Court accordingly does not find this dimension of the RICO claims to merit sanctions.[14]

> d.      *Pattern of racketeering activity*

Wigdor next pursues sanctions on the ground that the Complaint fails to allege a pattern of racketeering activity to such a degree as to be sanctionable.

A viable RICO claim must allege a pattern of racketeering activity. "For such a pattern to exist, the acts of racketeering activity 'must be related and continuous.'" *Kalimantano*, 939 F. Supp. 2d at 406 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. A complaint that properly alleges either a closed- or open-ended pattern satisfies the continuity requirement of the pattern element. *See Kalimantano*, 939 F. Supp. 2d at 406; *Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC*, No. 11 Civ. 7801 (PAE), 2012 WL 1231775, at *7 (S.D.N.Y. Apr. 12, 2012) (citing *Satinwood*, 385 F.3d at 181).

Here, Wigdor argues that there is no closed-ended continuity because the predicate acts took place within one year and because the Complaint does not allege any possibility of open-ended continuity. Mot. at 21–22. And, it argues, the Complaint does not viably allege a pattern as it alleges "at most . . . a single, narrow scheme with one victim and limited participants." *Id.* at 23. Black and his counsel counter that the scheme as pled began in 2015 and continued into 2021, and that the Complaint alleges open-ended continuity by "giv[ing] rise to the inference that

---

[14] Wigdor also pursues sanctions on the grounds that Complaint does not allege any RICO claims but only a breach of contract claim. Mot. at 24 (citing *Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, No. 12 Civ. 8205 (RWS), 2013 WL 3943267, at *9 (S.D.N.Y. July 31, 2013)). Black, however, correctly rejoins that—whether or not well-pled—his RICO claim is distinct from his breach of contract claim, which is brought against Ganieva, and not Wigdor, for her alleged breach of the October 2019 agreement she signed with Black. Opp. at 15.

Wigdor will continue to make and disseminate filings" and "continue to encourage the media to public articles regarding this litigation and false accusations." Opp. at 13. They also note decisions sustaining RICO allegations based on single-victim schemes. *Id.* at 14.

This dimension of the Complaint, although problematically pled as reflected in the Court's decision today dismissing the FAC's RICO claims, is also short of sanctionable. "Where the enterprise is engaged primarily in racketeering activity, and the predicate acts are inherently unlawful, there is a threat of continued criminal activity, and thus open-ended continuity." *Cofacredit*, 187 F.3d at 242–43 (citing *H.J. Inc.*, 492 U.S. at 242–43). By contrast, "where the enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Id.* at 243 (citing *H.J. Inc.*, 492 U.S. at 243). Here, the Complaint attempts to alleges that the association-in-fact enterprise engaged in inherently unlawful predicate acts, creating the possibility of open-ended continuity. The purpose of the collective formed by Wigdor, Ganieva, the Funder, and the Flack was ostensibly to defame and extort Black through improper means. Although the facts pled in support of this thesis are wanting, the Complaint does not plead facts indicating that the participants lost an interest in these objectives, such that such conduct was durably at an end. Accordingly, its allegations of open-ended continuity, even if insufficient to state a claim, are not frivolous. *See Patrizzi v. Bourne in Time, Inc.*, No. 11 Civ. 2386 (PAE), 2013 WL 316148, at *4 (S.D.N.Y. Jan. 28, 2013) (denying sanctions motion where, "although for other reasons the RICO claim failed to satisfy the requirement of continuity, plaintiff did allege a scheme lasting more than two years, which is one necessary ingredient for a closed-ended RICO claim to survive"); *Int'l Bhd. of Teamsters v. Carey*, 163 F. Supp. 2d 271, 286 (S.D.N.Y. 2001) (rejecting

application for sanctions where complaint failed to satisfy continuity because complaint "can be made out to allege both closed-ended and open-ended continuity," even if it did not state a claim for purposes of a Rule 12(b)(6) motion).

e.    *Injury*

Wigdor next argues that the Complaint does not allege a cognizable RICO injury. "To satisfy RICO's standing requirements, a plaintiff must demonstrate, "(1) a violation of [18 U.S.C. §] 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003) (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990)); *see also First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994) ("A RICO plaintiff 'only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation.'") (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)) (further citations omitted). "[A]s a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *First Nationwide Bank*, 27 F.3d at 768 (citing *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1106 (2d Cir. 1988), *cert. denied*, 490 U.S. 1007 (1989)).

Wigdor faults Black for not exhausting his remedies before bringing the RICO claim, and argues that the injuries the Complaint alleges are not attributable to racketeering activity on its part. Mot. at 23–24. Black and his counsel counter that there is no exhaustion requirement and that the Complaint alleges financial injuries, including those caused by having to defend against abusive state court litigation. Opp. at 15.

Wigdor's first argument is easily put aside. There is no broad-ranging requirement of exhaustion of remedies before bringing a RICO action. Such applies only in a narrow set of cases involving failure to pursue contractual remedies. Thus, in the case cited by Wigdor, the

40

Second Circuit noted that "a plaintiff who claims that a debt is uncollectible because of the defendant's conduct can only pursue the RICO treble damages remedy after his contractual rights to payment have been frustrated." *First Nationwide Bank*, 27 F.3d at 768; *see also Panabroker Protecting & Indem. Assoc. v. Vneshprombank*, No. 16 Civ. 2120 (ALC), 2017 WL 7411188, at *3 (S.D.N.Y. Sept. 26, 2017) ("Plaintiff's RICO claim against LLC Defendants is unripe because Plaintiff has not exhausted his contractual remedies with VPB in bankruptcy proceedings."). Wigdor does not show an analogous situation here—a failure by Black to avail himself of a contractual remedy—much less that his failure to do so makes his RICO claim frivolous.

Wigdor's argument that damages are not attributable to its conduct is also not a basis for sanctions. If Wigdor indeed knowingly filed fabricated claims against Black, and if Black's Complaint plausibly pled such as a RICO predicate act (*e.g.*, mail or wire fraud) that caused him financial injuries, then Black plausibly could have pursued damages, including his costs of defending against these vexatious claims. *See Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1167 (2d Cir. 1993) ("[W]e explicitly ruled in *Bankers Trust* that legal fees may constitute RICO damages when they are proximately caused by a RICO violation.") (citing 859 F.2d at 1105); *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 153 (S.D.N.Y. 2014) ("Plaintiffs do allege a sufficient injury to business or property to the extent that they allege monetary losses in the form of legal fees they had to pay in response to Defendants' allegedly fraudulent lawsuits."); *Aramony v. United Way of Am.*, 969 F. Supp. 226, 232 (S.D.N.Y. 1997) ("A plaintiff's prior expenditure on legal fees is only a sustainable RICO injury where defendant's underlying wrongful acts contemplate the victim responding in court.") (collecting cases). Such allegations would face challenges, including proving that the enterprise's predicate acts caused such an

injury—which the Court assumes *arguendo*—and of sufficient definiteness given that the state court suit is ongoing and in its early stages.[15] But the Court cannot find such claims to have been frivolously pled. *See Shirokov v. Dunlap, Grubb & Weaver, PLLC*, No. 10 Civ. 12043, 2012 WL 1065578, at *29 (D. Mass. Mar. 27, 2012) (complaint failed to state a RICO claim based on alleged injury of expenditure of legal fees, but court declined to award sanctions).

### f.    Conspiracy

Wigdor next argues that the Complaint fails to allege that Wigdor participated in a racketeering conspiracy. To establish a RICO conspiracy under § 1962(d), a plaintiff must demonstrate that each defendant "knew about and agreed to facilitate" a pattern of racketeering activity. *Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003). To satisfy this standard for each co-conspirator, a plaintiff must establish "(1) an agreement to join the conspiracy; (2) the acts of each co-conspirator in furtherance of the conspiracy; (3) that the co-conspirator knowingly participated in the same." *Valenti v. Penn Mutual Life Ins.*, No. 10 Civ. 3325 (JGK), 2012 WL 1034535, at * 4 (S.D.N.Y. Mar. 28, 2012) (quoting *Nasik Breeding & Rsch. Farm Ltd. v. Merck & Co., Inc.*, 165 F. Supp. 2d 514, 541 (S.D.N.Y. 2001)).

Here, Wigdor's challenge to the RICO conspiracy claim is largely derivative of its challenges to the substantive RICO claims, which the Court has found nonfrivolous, even if thinly, and almost surely inadequately, pled. Mot. at 25–26. Beyond that, Wigdor argues that this claim fails for want of pleadings of conspiratorial conduct. But that dimension of Black's pleading is not sanctionable. Although Black's Complaint is fairly assailed for the conclusory

---

[15] As the Court notes in its opinion dismissing Black's FAC, such allegations suffer from a lack of ripeness, because the Complaint's allegations as to the fees it has incurred defending against Ganieva's action are not yet clear and definite. *See, e.g., Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 233 (E.D.N.Y. 2014).

quality of its allegations, these do plead coordination among Ganieva, Wigdor, the Flacks and

the Funder, with the goal of damaging Black, including the Funder's bankrolling of the lawsuit

and the Flacks' dissemination of its allegations. *See, e.g.*, Compl. ¶¶ 13, 17, 92, 94, 104. Had

the Complaint's RICO conspiracy allegations been subject to a motion to dismiss, they might

well have been found to lack a "substantial factual basis from which to infer an agreement

among these defendants." *See U.S. Fire Ins. Co.*, 303 F. Supp. 2d at 454 (quoting *Madanes v.*

*Madanes*, 981 F. Supp. 241, 258 (S.D.N.Y. 1997)).  But the allegations are not so threadbare as

to qualify as sanctionable. *See, e.g.*, *LoPorto v. Cnty. of Rensselaer*, No. 15 Civ. 866, 2018 WL

4565768, at *22 (N.D.N.Y. Sept. 24, 2018) (where plaintiff failed to state a claim as to, *inter*

*alia*, RICO and RICO conspiracy, sanctions were not warranted, "[i]n light of the Court's duty to

resolve 'any and all doubts' in the favor of the party opposing Rule 11 sanctions" (quoting

*Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993) and where "there was 'some

arguable basis for'" the action (quoting *Perez v. Posse Comitatus*, 373 F.3d 321, 326 (2d Cir.

2004)); *O & G Carriers, Inc. v. Smith*, 799 F. Supp. 1528, 1543 (S.D.N.Y. 1992) (denying

motion for sanctions where complaint failed to allege, *inter alia*, RICO conspiracy and Court

found it "difficult to imagine a vaguer or more conclusory conspiracy allegation" and stated

"[t]here is nothing in the amended complaint that even approaches the threshold pleading

requirements for a § 1962(d) claim").  The Court will not award sanctions on this ground.

      *g.*    Noerr-Pennington *immunity*

    Wigdor's final argument for Rule 11(b)(2) sanctions based on the RICO allegations is

they are barred by the *Noerr-Pennington* doctrine and that doctrine's "sham litigation" exception

does not apply.  That doctrine has its roots in antitrust cases.[16]  As first formulated, it provided

---

[16] It derives from *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961),
and *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).

that "the First Amendment right to petition provides immunity from antitrust suits based on activity petitioning the government for redress of grievances." *See In Re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, No. 14 Civ. 6228 (VSB), 2021 WL 3371938, at *22 (S.D.N.Y. Aug. 3, 2021). It thus immunized from antitrust liability private actors "for conduct that constitutes petitioning activity," or lobbying, "aimed at persuading the government of a position or expressing views and wishes concerning government decisions." *In re Actos End-Payor Antitrust Litig.*, 417 F. Supp. 3d 352, 374 (S.D.N.Y. 2019) (internal quotation marks omitted), *aff'd sub nom. United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Takeda Pharm. Co. Ltd.*, 11 F.4th 118 (2d Cir. 2021). The doctrine has since been applied outside the antitrust context to the petitioning of courts and administrative bodies. *Id.* (citing *Primetime 24 Joint Venture v. Nat'l Broad., Co.*, 219 F.3d 92, 99 (2d Cir. 2000)).

Black and his counsel argue that the doctrine's "sham litigation" exception is non-frivolously claimed to apply here. Under that exception, petitioning activity is unprotected where it is "(1) objectively baseless and (2) intended to cause harm to the defendant through the use of governmental process—as opposed to the outcome of that process." *T.F.T.F. Cap. Corp. v. Marcus Dairy, Inc.*, 312 F.3d 90, 93 (2d Cir. 2002) (cleaned up); *see Mosdos Chofetz Chaim, Inc. v. Vill. Of Wesley Hills*, 701 F. Supp. 2d 568, 602 (S.D.N.Y. 2010).

The Court agrees that, for two reasons, sanctions are not warranted based on *Noerr-Pennington* immunity.

First, there is a non-frivolous argument that the *Noerr-Pennington* doctrine would not apply in this context. The Second Circuit has not firmly resolved the parameters of *Noerr-Pennington* immunity outside the antitrust context. *See Mosdos Chofetz Chaim, Inc.*, 701 F. Supp. 2d at 594; *see Hirschfeld v. Spanakos*, 104 F.3d 16, 19 (2d Cir. 1997) (reserving on issue

whether *Noerr-Pennington* extends to non-commercial litigation); *T.F.T.F. Cap. Corp.*, 312 F.3d

at 94.  It has, in two unpublished opinions, found that it applies to RICO claims.  *See Singh v.*

*NYCTL 2009-A Tr.*, 683 F. App'x 76, 77–78 (2d Cir. 2017) (summary order) (finding RICO

claims barred by *Noerr-Pennington*); *Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*,

229 F.3d 1135 (2d Cir. 2000) (tbl.) ("Noerr Pennington immunity is applicable to RICO

actions[.]").[17]  And because the Circuit has "acknowledged that the doctrine is 'an application of

the [F]irst [A]mendment,'" courts in the Circuit have applied it to cases more broadly.  *See*

*Mosdos Chofetz Chaim*, 701 F. Supp. 2d at 594 (quoting *Suburban Restoration Co. v. ACMAT*

*Corp.*, 700 F.2d 98, 101 (2d Cir. 1983) and collecting cases) (alteration in *Mosdos Chofetz*

*Chaim*).  But in the absence of controlling Circuit case law, it is not certain that the doctrine

would apply to RICO claims substantially sounding in defamation.  *See Giles v. Phelan,*

*Hallinan & Schmieg, L.L.P.*, No. 11 Civ. 6239, 2013 WL 4431274, at *4 (D.N.J. Aug. 14, 2013)

(denying sanctions motion where "[t]he Court held that the Noerr-Pennington doctrine barred

Plaintiffs' RICO claims, but that holding was an extension of the Noerr-Pennington doctrine," so

that "Plaintiffs' bringing of this lawsuit could [not] be considered objectively baseless").

Second, the Complaint alleges facts that make non-frivolous Black's argument that the

sham litigation exception applies.  The exception has objective and subjective elements.  It

requires that the petitioning activity be "(1) objectively baseless and (2) intended to cause harm

to the defendant through the use of governmental process—as opposed to the outcome of that

process." *T.F.T.F. Cap. Corp.*, 312 F.3d at 93 (cleaned up).  As to objective unreasonableness,

---

[17] The Seventh and the Ninth Circuits have so held.  *See, e.g., Sosa v. DIRECTV, Inc.*, 437 F.3d
923, 942 (9th Cir. 2006); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip
Morris Inc.*, 196 F.3d 818, 826 (7th Cir. 1999) ("Although the *Noerr-Pennington* doctrine
originated in antitrust law, its rationale is equally applicable to RICO suits.").

the Complaint alleges that Ganieva's state court complaints alleging sexual abuse by Black were "shams" and refuted by text messages indicative of a consensual affair; that these claims were "fraudulent"; and that they were replete with "outrageous and false accusations." Compl. ¶¶ 3, 6, 92. As to subjective intent, the Complaint alleges that Wigdor and the Enterprise pursued litigation not seeking "success *in* court," but to increase the pressure on Black to pay Ganieva and to punish and brand him an abuser, "before any proceedings at all on the merits." *Id.* ¶ 13 (emphasis in original). The Complaint also alleges that Wigdor made herself willfully ignorant of "evidence disproving [Ganieva's] claims" by uncharacteristically refusing to sign a protective order. *Id.* ¶ 74. These allegations easily clear the frivolousness bar. *See, e.g.*, *In re Outlaw Lab'y, LP Litig.*, No. 18 Civ. 1820, 2019 WL 1205004, at *5 (S.D. Cal. Mar. 14, 2019) (noting that a pleading of *Noerr-Pennington* immunity's sham litigation exception must be accepted as true on a motion to dismiss); *Vasudevan Software, Inc. v. Microstrategy, Inc.*, No. 11 Civ. 6637, 2013 WL 12174179, at *3 (N.D. Cal. Mar. 11, 2013) (noting "the First Amendment implications of sanctioning a party engaged in petitioning activity," despite conduct "that falls far short of model professional conduct").

### 2. Defamation *Per Se*

Wigdor also seeks sanctions under Rule 11(b)(2) on the ground that the Complaint's defamation *per se* claim is foreclosed by the New York litigation privilege. Mot. at 27–28. That privilege protects "[s]tatements made by parties, attorneys, and witnesses in the course of a judicial or quasi-judicial proceeding . . . notwithstanding the motive with which they are made, so long as they are material and pertinent to the issue to be resolved in the proceeding." *Officemax Inc. v. Cinotti*, 966 F. Supp. 2d 74, 79 (E.D.N.Y. 2013) (quoting *Bisogno v. Borsa*, 954 N.Y.S.2d 896, 896 (2d Dep't 2012)). That privilege does not, however, protect an individual from defamation liability where he "'maliciously institute[s] a judicial proceeding alleging false

46

and defamatory charges' and disseminates those allegations to the press." *Capsolas v. Pasta Res., Inc.*, No. 12 Civ. 5533 (PKC), 2013 WL 703670, at *2 (S.D.N.Y. Feb. 26, 2013) (quoting *Williams v. Williams*, 23 N.E.2d 333, 337 (N.Y. 1969)); *see id.* ("Under *Williams*, a defamation claim may arise when a sham pleading exists solely as a vehicle for publicizing false allegations, amounting to a 'perversion of judicial proceedings.'") (quoting 23 N.E.2d at 337 and citing *Halcyon Jets, Inc. v. Jet One Grp., Inc.*, 894 N.Y.S.2d 392 (1st Dep't 2010)). Accordingly, some courts have held that giving a copy or the substance of a complaint to the press is not protected by the litigation privilege. *Block v. First Blood Assocs.*, 691 F. Supp. 685, 699 (S.D.N.Y. 1988); *Bridge C.A.T. Scan Assocs. v. Ohio-Nuclear Inc.*, 608 F. Supp. 1187, 1195 (S.D.N.Y. 1985).

Here, Black and his counsel oppose sanctions on the ground that it is not frivolous to contend that the sham pleading exception applies. Opp. at 17. The Court agrees. Black's central thesis, in fact, is that Ganieva's state-court claims were works of fiction, at odds with the facts, including the pair's text messages, and brought vengefully to punish and extort Black. *See* Compl. ¶¶ 4, 6, 18, 57, 92. The Complaint further alleges that Wigdor used the Flacks to shop these false claims to the media. *Id.* ¶¶ 10, 17; *see id.* ¶ 3 (Wigdor's "fomentation" caused "escalatingly salacious and fraudulent complaints" to become "instant press releases").

Wigdor argues that N.Y. Civ. Rights L. § 74 precludes sanctions for "fair and true report(s) of any judicial proceeding." Reply at 9–10. But the New York Court of Appeals has held that the statutory privilege does not apply to sham litigation. As that Court put the point in *Williams*: "[I]t was never the intention of the Legislature in enacting section 74 to allow 'any person' to maliciously institute a judicial proceeding alleging false and defamatory charges, and to then circulate a press release or other communication based thereon and escape liability by invoking the statute." 246 N.E.2d at 337; *see Reszka v. Collins*, 25 N.Y.S.3d 457, 459 (N.Y.

App. Div. 4th Dep't 2016) ("A party cannot . . . maliciously commence a judicial proceeding alleging false and defamatory charges and then circulate a press release based on the same charges and escape liability by invoking Civil Rights Law § 74.") (citing *Williams*, 246 N.E.2d 333). Accordingly, "[l]iability for disseminating defamatory statements contained in a pleading to the press under New York law is barred neither by the absolute privilege afforded statements made in pleadings, nor by the statutory privilege afforded fair and true reports of such statements." *Block*, 691 F. Supp. at 699 (cleaned up).

Wigdor argues that the sham litigation exception does not apply insofar as the Complaint alleges that the state court complaints were brought to obtain money from Black, rather than defame him. There is a split of authority as to whether the exception applies only where a Complaint was filed for the sole purpose of defaming its subject. Some courts have so held. *See, e.g.*, *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 412 (S.D.N.Y. 2009) (exception "does not apply in the absence of any allegation that the action was brought maliciously and *solely for the purpose of* later defaming the plaintiff") (cleaned up) (emphasis added); *Riel v. Morgan Stanley*, No. 06 Civ. 524 (TPG), 2007 WL 541955, at *12 (S.D.N.Y. Feb. 16, 2007), *aff'd sub nom. Riel v. Stanley*, 299 F. App'x 91 (2d Cir. 2008) (summary order). Others have read *Williams* also to exempt from the litigation privilege other bad-faith conduct undertaken to manipulate the litigation process. *See Halcyon Jets, Inc.*, 894 N.Y.S.2d at 393–94 ("*Williams* created a judicial exception to the statutory protections if it appears that the public policy goals of the statute are being thwarted by the commencement of litigation intended as a device to protect a report thereof and thereby disseminate defamatory information.").[18] Given

---

[18] *See also, e.g.*, *GeigTech E. Bay LLC v. Lutron Elecs. Co.*, No. 18 Civ. 5290 (CM), 2019 WL 1768965, at *6 (S.D.N.Y. Apr. 4, 2019) (where "Geigtech knowingly filed a baseless lawsuit and

this conflicting authority, Black's defamation claim here does not fall outside the bounds of available legal authority.

### C.    Rule 11(b)(3)

Rule 11(b)(3) requires an attorney's certification that, for any filing, "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Under this rule, "sanctions may not be imposed unless a particular allegation is utterly lacking in support." *O'Brien v. Alexander*, 101 F.3d 1479, 1489 (2d Cir. 1996). But "[a]n attorney who files a paper that no competent attorney could believe, after reasonable inquiry, is well-grounded in fact violates Rule 11." *Goldman v. Barrett*, 825 F. App'x 35, 37 (2d Cir. 2020) (summary order) (citing *Kropelnicki*, 290 F.3d at 131). Wigdor argues that there literally cannot be a factual basis for several parts of the Complaint. On the present record, the Court cannot so find.

---

publicized its contents for the sole purpose of harming its competitor," and claim was "supported by sufficient factual matter from which the Court can infer bad faith," exception applied: "The deliberate institution of baseless litigation for the purpose of fabricating a reporting privilege falls squarely within the malicious filing exception[.]"); *Moritz v. Town of Warwick*, No. 15 Civ. 5424 (NSR), 2017 WL 4785462, at *10 (S.D.N.Y. Oct. 19, 2017) ("A favorable ruling on this basis requires a showing that the action was in fact brought maliciously to defame the allegedly wronged party.") (citing *Frydman v. Verschleiser*, 172 F. Supp. 3d 653, 672 (S.D.N.Y. 2016); *El Greco Leather Prod. Co. v. Shoe World, Inc.*, 623 F. Supp. 1038, 1042–43 (E.D.N.Y. 1985), *aff'd*, 806 F.2d 392 (2d Cir. 1986)); *Capsolas*, 2013 WL 703670, at *3 (complaint "alleges no facts asserting that the Complaint is a mere vehicle for insulating defamatory statements *or amounts to a 'perversion of judicial proceedings'*") (quoting *Williams*, 246 N.E.2d at 337) (emphasis added); *El Greco*, 623 F. Supp. at 1042 (accusation that lawsuit was strategically filed "to coincide with the National Shoe Show and Volume Retailers Shoe Show held in New York City in December 1983 in order to ensure rapid and widespread dissemination of El Greco's defamatory statements to the footwear trade [could] . . . if proven, could lead a jury to conclude that this entire lawsuit was a 'perversion of judicial proceedings,' not within the contemplation of the New York Legislature in enacting Section 74") (cleaned up) (quoting *Williams*, 246 N.E.2d at 337); *Gottwald v. Sebert*, 148 N.Y.S.3d 37, 46 (2021) ("Issues of fact exist as to the applicability of the litigation privilege to statements made in Kesha's California action, since a jury could find that Kesha commenced that action, in which she alleged that Gottwald drugged and raped her, to pressure Gottwald into renegotiating her contracts or to release her from her contracts with plaintiffs.") (citation omitted).

### 1.   Existence of Funder and Flacks

First, Wigdor asserts that the "John Doe" Funder and Flacks do not exist. Mot. at 8–9. Black and his counsel counter by noting, correctly, that Rule 11 permits a party to name "John Doe" defendants. *See* Opp. at 20.

On the present state of the record, there is no basis on which the Court could determine, as Wigdor claims, that persons do not exist who played the roles alleged the Funder and the Flack. Indeed, since the motion for sanctions was filed, Black has filed an FAC that names the Funder (Josh Harris) and the Flack (Steven Rubenstein). *See* Dkt. 46. It remains to be seen whether Black and his counsel had evidentiary support—or a good-faith basis to believe that such would be discovered upon further investigation—for these allegations.

### 2.   Wigdor's Relationship to The Funder

Second, Wigdor asserts that there is no evidentiary support for the Complaint's allegation that the Funder is collaborating with Wigdor. It represents that it is representing Ganieva pursuant to a contingency fee arrangement, Mot. at 10 (citing Engagement Ltr.), and implies that the Funder is not helping finance the litigation. Black and his counsel counter by citing factual allegations supporting the inference that the Funder is helping finance the state-court litigation and/or the enterprise's extra-litigation activities directed at Black. These include that Ganieva and Wigdor have "specifically declined to answer questions about payments they have received from third parties" in the state court action, that Ganieva's response to an interrogatory of Black's about payment of attorneys' fees or costs was slippery, addressing only the legal fees she may incur as opposed to associated costs; and that Wigdor's redacted engagement letter—not disclosed until after the complaint was filed—does not preclude that the firm is being paid by another entity. Opp. at 21, 22.

At this stage, Wigdor has not eliminated the possibility that it is being paid by another actor. The excerpts of the engagement letter that Wigdor has made publicly available do not conclusively so establish. The engagement letter describes the Firm's 38% contingency fee arrangement with Wigdor and further states, "There is a possibility that you will recover nothing, in which case we will receive no attorneys' fee *from you*." Engagement Ltr. at 1 (emphasis added). As Black and his counsel note, this turn of phrase does not "disprove the possibility that Wigdor received funding or promises to pay from an outside funder." Opp. at 22.[19] Although Black and his counsel have not pointed to solid evidence of such an arrangement, and although their supposition to this effect is based on relatively tenuous circumstantial inferences, the Court cannot—at this stage—find this factual allegation to be devoid of any basis. The Court denies Wigdor's motion for Rule 11(b)(3) sanctions on this ground, as well.[20]

### 3. Wigdor's Relationship to the Flacks

Third, Wigdor asserts that Black and his counsel did not have a factual basis to claim that Wigdor had a relationship to the Flacks, or to claim that Wigdor represented Ganieva at the time of her derogatory tweets about Black. Mot. at 11.

---

[19] Wigdor states in its memorandum in support of its motion for sanctions that "[n]o one has paid or reimbursed Wigdor for *anything* in connection with its representation of Ms. Ganieva." Mot. at 10 (emphasis in original). Limited as it is to historical payments, that studied construction does not eliminate the possibility of any understanding as to future payments.

[20] Wigdor separately urges that sanctions may be warranted based on the conversation in which—according to Mr. Gershenoff—Mr. Carlinsky of Quinn Emanuel allegedly offered to drop the RICO claims against Wigdor with prejudice if Wigdor provided information connecting Ganieva to the Funder. Reply at 2–3. If credited, this account might support that Quinn Emanuel lacked factual conviction in its RICO claims against Wigdor—or, less troubling, that Quinn Emanuel regarded information about Ganieva and the Funder as so valuable as to be worth trading away these claims. In all events, Quinn Emanuel contests Mr. Gershenoff's account, Dkt. 66-1, and the Court cannot reliably resolve this swearing contest.

Black and his counsel counter that press articles quoting Wigdor attorneys about Ganieva provided a basis to believe that Wigdor was communicating with the press on Ganieva's behalf. Opp. at 22. They also note that Ganieva's Twitter account was followed by three people—all "prominent reporters in the #MeToo movement"—which led them to believe that Ganieva was being assisted by a professional public relations firm. *Id.* at 23. They argue that Ganieva's refusal to produce information or respond to interrogatories in the state court action about media and public relations firms gives rise to an inference that she or her lawyers were working with such persons. Finally, they note that although Ganieva denied having personally contacted public relations professionals, she has not denied that Wigdor did so on her behalf. *Id.* at 23–24. Black also cites later-acquired chat messages between Ganieva and a *New York Times* reporter that overtly reference Wigdor. In one, on October 30, 2020, Ganieva asks, referring to the namesake of the Wigdor firm, "Did you speak to [Douglas] Wigdor? He is reaching out about a reporter wanting to speak to me." Dkt. 95-1 at 2. The reporter states to Ganieva: "not sure if there is another reporter on this too from another publication." *Id.* Over the next several days, Ganieva and the reporter discussed further conversations the reporter could have with Mr. Wigdor. *See, e.g.*, Dkt. 95-2 at 2 (on November 5, 2020, Ganieva wrote: "I will let [W]igdor know that if you want to speak with him you can."); Dkt. 95-3 at 2 (coordinating discussion with each other following the reporter's conversation with Mr. Wigdor); Dkt. 95-4 at 2 (same); Dkt. 95-5 at 2 (same); Dkt. 95-6 (on November 16, 2020, reporter writes: "Had good chat with Wigdor over the weekend. Will update you . . . .").

Far from there being a lack of evidence that the Wigdor firm orchestrated adverse press coverage about Black, this evidence and the reasonable inferences drawn therefrom comfortably support Black's allegation that the Wigdor firm, Ganieva, and public relations professional(s)

collaborated to pitch her derogatory account about Black to the media. The niceties of the timing of Wigdor's formal retention are beside the point. Whatever that date, the assembled evidence above supplies a fair basis for Black's inference that the Wigdor firm lent aid and comfort to Ganieva outside the litigation context, including by fomenting supportive media stories. Although other allegations in Black's Complaint have threadbare factual support, these allegations have clear objective support. *See* Dkt. 95-1 (Ganieva: "[Mr. Wigdor] is reaching out about a reporter wanting to speak to me." Reporter: "We are supported to talk. But not sure if there is another reporter on this too from another publication[.]"). The Court therefore denies sanctions on this ground.

### 4.    Wigdor's Alleged Misconduct

Finally, Wigdor seeks sanctions on the ground that the Complaint's allegations are false that the law firm refused to review Black's transcripts or listen to Black's tapes of his conversations with Ganieva. Mot. at 11. In fact, Wigdor protests, it "repeatedly requested these documents and audio recordings," but Black's counsel allegedly "refused to produce any of these documents for over five months." *Id.* at 11–12.

Although Black and his counsel do not directly respond to this point in opposing the sanctions motion, the Complaint contains pertinent allegations. It alleges that Wigdor LLP refused to sign a routine protective order under which Black's counsel would have produced such evidence, and which in turn which have tended to disprove Ganieva's allegations about Black. Compl. ¶ 18; *see id.* ¶¶ 72 ("Fights about . . . the signing of a boilerplate protective order . . . have become excuses by Wigdor LLP to block discovery."), 74 (Wigdor has "refused to enter into a reasonable standard protective order as a pretext for receiving the evidence disproving [Ganieva's] claims."), 92. In light of these allegations, there is a factual basis for the Complaint's allegation that Wigdor turned a blind eye to evidence that would have contradicted

its client's false narrative about the nature of the Black-Ganieva relationship.  In essence, Wigdor

"decline[d] the opportunity to review the transcripts [and] to listen to the tapes."  Compl. ¶ 73.

The Complaint's allegations on this point are not sanctionable.

## CONCLUSION

For the aforementioned reasons, the Court denies Wigdor's motion for sanctions.  The

Clerk of the Court is respectfully directed to close the motion pending at docket 33, and to close

this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: June 30, 2022
       New York, New York

54